# EXHIBIT 1

CORRECTION



# Congressional Record

**United States
of America**

**PROCEEDINGS AND DEBATES OF THE** 116th **CONGRESS, SECOND SESSION**

---

*Vol. 166*      **WASHINGTON, WEDNESDAY, JANUARY 29, 2020**      *No. 19*

---

# *Senate*

The Senate met at 1:13 p.m. and was called to order by the Chief Justice of the United States.

## TRIAL OF DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES

The CHIEF JUSTICE. The Senate will convene as a Court of Impeachment.

The Chaplain will lead us in prayer.

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Divine Shepherd, honor, glory, and power belong to You. Refresh our Senators as they enter a new phase of this impeachment trial. May they realize that You have appointed them for this great service, and they are accountable to You.

Lord, empower them to labor today with the dominant purpose of pleasing You, knowing that it is never wrong to do right. Give them resiliency in their toil, as they remember Your promise that they will reap a bountiful harvest if they don't give up. Help them to follow the road of humility that leads to honor, as they find their safety in trusting You.

We pray in Your majestic Name. Amen.

### PLEDGE OF ALLEGIANCE

The Chief Justice led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

### THE JOURNAL

The CHIEF JUSTICE. If there is no objection, the Journal of proceedings of the trial is approved to date.

Without objection, it is so ordered.

The Sergeant at Arms will make the proclamation.

The Sergeant at Arms, Michael C. Stenger, made proclamation as follows:

Hear ye! Hear ye! Hear ye! All persons are commanded to keep silent, on pain of imprisonment, while the Senate of the United States is sitting for the trial of the articles of impeachment exhibited by the House of Representatives against Donald John Trump, President of the United States.

The CHIEF JUSTICE. The majority leader is recognized.

### ORDER OF PROCEDURE

Mr. McCONNELL. Mr. Chief Justice, today the Senate will conduct up to 8 hours of questions to the parties delivered in writing to the Chief Justice. As a reminder, the two sides will alternate and answers should be kept to 5 minutes or less.

The majority side will lead off with a question from the Senator from Maine.

Ms. COLLINS. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator is recognized.

Ms. COLLINS. I send a question to the desk on behalf of myself, Senator MURKOWSKI, and Senator ROMNEY.

The CHIEF JUSTICE. This is a question for the counsel for the President:

If President Trump had more than one motive for his alleged conduct, such as the pursuit of personal political advantage, rooting out corruption, and the promotion of national interests, how should the Senate consider more than one motive in its assessment of article I?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, in response to that question, there are really two layers to my answer because I would like to point out first that, even if there was only one motive, the theory of abuse of power that the House managers have presented, that the subjective motive alone can become the basis for an impeachable offense, we believe is constitutionally defective. It is not a permissible way to frame a claim of an impeachable offense under the Constitution.

I will put that aside and address the question of mixed motive. If there were a motive that was of public interest and also of some personal interest, we think it follows even more clearly that that cannot possibly be the basis for an impeachable offense. Even the House managers, as they have framed their case, they have explained—and this is pointed out in our trial memorandum— that in the House Judiciary Committee report, they specify that the standard they have to meet is to show that this is a sham investigation; it is a bogus investigation. These investigations have—there is not any legitimate public purpose. That is the language: any "legitimate public purpose." That is the standard they have set for themselves in being able to make this claim under their theory of what an abuse of power offense can be.

It is a very demanding standard that they have set for themselves to meet, and they have even said—they came up, and they talked a lot about the Bidens. They talked a lot about these issues and 2016 election interference because they were saying there is not even a scintilla—a scintilla of any evidence of anything worth looking into there. And that is the standard that they would have to meet, showing that there is no possible public interest and the President couldn't have had any smidgeon, even, of a public interest motive because they recognize that once you get into a mixed-motive situation—if there is both some personal motive but also a legitimate public interest motive—it can't possibly be an offense because it would be absurd to have the Senate trying to consider: Well, was it 48 percent legitimate interest and 52 percent personal interest or was it the other way, was it 53 percent and 47 percent? You can't divide it that way.

That is why they recognize that to have even a remotely coherent theory, the standard they have to set for themselves is establishing there is no possible public interest at all for there is no investigations. And if there is any possibility, if there is something that shows a possible public interest and the President could have that possible public interest motive, that destroys their case. So once you are into mixed-motive

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

land, it is clear that their case fails. There can't possibly be an impeachable offense at all.

Think about it. All elected officials, to some extent, have in mind how their conduct, how their decisions, their policy decisions will affect the next election. There is always some personal interest in the electoral outcome of policy decisions, and there is nothing wrong with that. That is part of representative democracy. And to start saying now that, well, if you have a part motive that is for your personal electoral gain that somehow is going to become an offense, it doesn't make any sense and it is totally unworkable and it can't be a basis for removing a President from office.

The bottom line is, once you are into any mixed-motive situation, once it is established that there is a legitimate public interest that could justify looking into something, just asking a question about something, the managers' case fails, and it fails under their own terms. They recognize that they have to show no possible public interest. There isn't any legitimate public interest, and they have totally failed to make that case.

I think we have shown very clearly that both of the things that were mentioned, 2016 election interference and the Biden-Burisma situation, are things that raise at least some public interest; there is something worth looking at there. It has never been investigated in the Biden situation. Lots of their own witnesses from the State Department said that on its face it appears to be a conflict of interest. It is at least worth raising a question about or asking a question about it. And there is that public interest, and that means their case absolutely fails.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Democratic leader is recognized.

Mr. SCHUMER. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. The Democratic leader asks of the House managers:

John R. Bolton's forthcoming book states that the President wanted to continue withholding $391 million in military aid to Ukraine until Ukraine announced investigations into his top political rival and the debunked conspiracy theory about the 2016 election. Is there any way for the Senate to render a fully informed verdict in this case without hearing the testimony of Bolton, Mulvaney, and the other key eyewitnesses or without seeing the relevant documentary evidence?

Mr. Manager SCHIFF. Thank you, Mr. Chief Justice.

The short answer to that question is no. There is no way to have a fair trial without witnesses. And when you have a witness who is as plainly relevant as John Bolton, who goes to the heart of the most serious and egregious of the President's misconduct, who has volunteered to come and testify, to turn him away, to look the other way, I think, is deeply at odds with being an impartial juror.

I would also add, in response to the last question, that if any part of the President's motivation was a corrupt motive, if it was a causal factor in the action to freeze the aid or withhold the meeting, that is enough to convict. It would be enough to convict under criminal law.

But here there is no question about the President's motivation. And if you have any question about the President's motivation, it makes it all the more essential to call the man who spoke directly with the President, whom the President confided in and said he was holding up this aid because he wanted Ukraine to conduct these political investigations that would help him in the next election—if you have any question about whether it was a factor, the factor, a quarter of the factor, all of the factor, there is a witness a subpoena away who could answer that question.

But the overwhelming body of the evidence makes it very clear, on July 26, the day after that phone call, Donald Trump speaks to Gordon Sondland. That is that conversation at a Ukraine restaurant. What does Gordon Sondland—what is the President's question of Gordon Sondland the day after that call? Is he going to do the investigations?

Counsel for the President would have you believe the President was concerned about the burden-sharing. Well, he may have had a generic concern about the burden-sharing in other contexts, but here the motivation was abundantly clear. On that phone with Gordon Sondland, the only question he wanted an answer to was, Is he going to do the investigation?

Now, bear in mind he is talking to the Ambassador to the European Union. What better person to talk to if his real concern was about burden-sharing than the guy responsible for Europe's burden-sharing? But did the President raise this at all? Of course not. Of course not. And if you have any question about it at all, you need to hear from his former National Security Advisor. Don't wait for the book. Don't wait until March 17, when it is in black and white, to find out the answer to your question: Was it all the motive, some of the motive, or none of the motive?

We think, as I mentioned, the case is overwhelmingly clear without John Bolton, but if you have any question about it, you can erase all doubt.

Let me show a video to underscore—No. 2, slide 2—how important this is.

(Text of Videotape presentation:)

Mr. Counsel CIPOLLONE. As House managers, really their goal should be to give you all of the facts because they are asking you to do something very, very consequential . . . and ask yourself, ask yourself, given the facts you heard today that they didn't tell you, who doesn't want to talk about the facts? Who doesn't want to talk about the facts?

Impeachment shouldn't be a shell game. They should give you the facts.

Mr. Manager SCHIFF. One last video, which is even more important and on point for Mr. Bolton—No. 3.

(Text of Videotape presentation:)

Mr. Counsel PURPURA. And once again, not a single witness in the House record that they compiled and developed under their procedures that we discussed and will continue to discuss provided any firsthand evidence that the President ever linked the Presidential meeting to any of the investigations.

Anyone who spoke with the President said that the President made it clear that there was no linkage between security assistance and investigations.

Mr. Manager SCHIFF. We know that is not correct, right? Because, of course, Mick Mulvaney said the money was linked to these investigations. He said, in acknowledging a quid pro quo, that they do it all the time, and we should just get over it. Gordon Sondland also said the President said, on the one hand, no quid pro quo but also made it clear that Zelensky had to go to the mic and announce these investigations.

The CHIEF JUSTICE. The gentleman's time has expired.

Mr. Manager SCHIFF. Thank you, Mr. Chief Justice.

The Senator is recognized.

Mr. THUNE. I have a question for the President's counsel.

The CHIEF JUSTICE. To the President's counsel:

Would you please respond to the arguments or assertions the House managers just made in response to the previous question?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, a couple of points that I would like to make.

Manager SCHIFF suggested that there was no evidence the President was actually interested in burden-sharing because he didn't, apparently, according to David Hale, raise it in the telephone conversation he had with Gordon Sondland that Hale seems to have overheard in a restaurant in Kiev.

Let's look at the real evidence.

As we explained, on June 24, there is an email in the record. It is an email from one person at the Department of Defense to another, with the subject line: "POTUS' follow-up"—President of the United States' follow-up—asking specifically about burden-sharing.

It reads: "What do other NATO members spend to support Ukraine?"

That was what they were following up for the President.

In the transcript of the July 25 call itself, the President said:

We spend a lot of effort and a lot of time on Ukraine, much more than the European countries are doing, and they should be helping you more than we are. Germany does almost nothing for you. All they do is talk, and I think it is something you should really ask them about.

He goes on to say that he talks to Angela Merkel about it and that they are not really doing as much as the United States is doing. He is raising burden-sharing, and President Zelensky agreed with him.

Manager SCHIFF also suggested that there is evidence of some connection

Case 0:20-cv-61872-AHS   Document 17-1   Entered on FLSD Docket 11/06/2020   Page 4 of 48

between the military assistance and investigations into 2016 election interference because of a statement that Acting Chief of Staff Mulvaney made at a press conference, but that has been made clear in the record, since that press conference, that what he was saying was garbled and/or misunderstood. He immediately clarified and said on that date: "The President never told me to withhold any money until the Ukrainians did anything related to the server."

Similarly, he issued a statement just the other day, making clear again—this is from his counsel; so it is phrased in the third person: ". . . nor did Mr. Mulvaney ever have a conversation with the President or anyone else indicating that Ukrainian military aid was withheld in exchange for the Ukrainian investigation of Burisma, the Bidens, or the 2016 election."

That was Mr. Mulvaney's statement.

Lastly, as to the point of whether this Chamber should hear from Ambassador Bolton—and I think it is important to consider what that means, because it is not just a question of, well, should we just hear one witness? That is not what the real question is going to be.

For this institution, the real question is, What is the precedent that is going to be set for what is an acceptable way for the House of Representatives to bring an impeachment of a President of the United States to this Chamber, and can it be done in a hurried, half-baked, partisan fashion?

They didn't even subpoena John Bolton. They didn't even try to get his testimony. To insist now that this body will become the investigative body—that this body will have to do all of the discovery—then, this institution will be effectively paralyzed for months on end because it will have to sit as a Court of Impeachment while now discovery will be done. It would be Ambassador Bolton, and if there are going to be witnesses, in order for there to be, as they said, a fair trial, fair adjudication, then, the President would have to have his opportunity to call his witnesses, and there would be depositions. This would drag on for months. Then that will be the new precedent. Then that is the way all impeachments will operate in the future, where the House doesn't have to do the work—it does it quickly and throws it over the transom—and this institution gets derailed and has to deal with it. That should not be the precedent that is set here for the way this body will have to handle all impeachments in the future, because, if it becomes that easy for the House to do it, it will be doing it a lot.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Massachusetts.

Mr. MARKEY. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. The question from Senator MARKEY to the House managers:

On Monday, President Trump tweeted, "The Democrat controlled House never even asked John Bolton to testify." So that the record is accurate, did House impeachment investigators ask Mr. Bolton to testify?

Mr. Manager SCHIFF. Senators, the answer is yes. Of course, we asked John Bolton to testify in the House, and he refused. We asked his deputy, Dr. Kupperman, to testify, and he refused. Fortunately, we asked their deputy, Dr. Fiona Hill, to testify, and she did. We asked her deputy, Colonel Vindman, to testify, and he did. We did seek the testimony of John Bolton as well as Dr. Kupperman, and they refused.

When we subpoenaed Dr. Kupperman, he sued us. He took us to court. When we raised a subpoena with John Bolton's counsel, the same counsel for Dr. Kupperman, the answer was, "Senator, you serve us with a subpoena, and we will sue you, too." We knew, based on the McGahn litigation, it would take months, if not years, to force John Bolton to come and testify.

Because, I think, this is an essential point to underscore, as the President's lawyers say, "They didn't try hard enough to get John Bolton," or "they should have subpoenaed John Bolton"—that this is what they are telling you—let me show you what they are telling the court in the McGahn litigation, if we could pull up slide 39.

This is from the President's lawyers who are in the court of appeals right now in the McGahn litigation: "The committee [meaning our committee] lacks article III standing to sue to enforce a congressional subpoena demanding testimony from an individual on matters related to his duties as an Executive Branch official."

I mean, it takes your breath away, the duplicity of that argument. They are before you, saying: They should have tried harder to get these witnesses. They should have subpoenaed. They should have litigated for years; and down the street in the Federal courthouse, they are arguing: Judge, you need to throw them out. They have no standing to sue to force a witness to testify.

Are we really prepared to accept that?

Counsel says to think about the precedent we would be setting if you allow the House to impeach a President and you permit them to call witnesses. I would submit: Think about the precedent you would be setting if you don't allow witnesses in a trial. That, to me, is the much more dangerous precedent here.

I will tell you something even more dangerous, and this was something that we anticipated from the very beginning, which is that we understood, when we got to this point, they could no longer contest the facts that the President withheld military aid from an ally at war to coerce that ally into doing the President's political dirty work. So now they have fallen back on,

You shouldn't hear any further evidence or any further witnesses on this subject.

What is more, we are going to use the end-all argument: So what? The President is free to abuse his power. We are going to rely on a constitutional theory—a fringe theory—that even the advocate of which says is outside the consensus of constitutional law to say that a President can abuse his power with impunity. Imagine where that leads. The President can abuse his power with impunity.

That argument made by Professor Dershowitz is at odds with the Attorney General's own expressed opinion on the subject, with Ken Starr's expressed opinion on the subject, and with other counsel for the President. Jonathan Turley, who testified in the House, said that theory is constitutionally, effectively, nonsense. Even 60-year-old Alan Dershowitz doesn't agree with 81-year-old Alan Dershowitz and for a reason—because where that conclusion leads us is that a President can abuse his power in any kind of way, and there is nothing you can do about it.

Are we really ready to accept the position that this President or the next can withhold hundreds of millions of dollars of military aid to an ally at war unless he gets help in his reelection?

Would you say that you could, as President, withhold disaster relief from a Governor unless that Governor got his Attorney General to investigate the President's political rival?

That, to me, is the most dangerous argument of all. It is a danger to have a President engage in this conduct, and it is dangerous to have a trial with no witnesses and set that precedent. The biggest danger of all would be to accept the idea that a President could abuse his office in this way and that the Congress is powerless to do anything about it. That is certainly not what the Founders intended.

The CHIEF JUSTICE. The Senator from Tennessee.

Mrs. BLACKBURN. Mr. Chief Justice, I send a question to the desk on my behalf. I am also joined by Senators LOEFFLER, CRAMER, LEE, and McSALLY.

The CHIEF JUSTICE. Senators BLACKBURN, LOEFFLER, CRAMER, LEE, and McSALLY ask of counsel for the President:

Is the standard for impeachment in the House a lower threshold to meet than the standard for conviction in the Senate, and have the House managers met their evidentiary burden to support a vote of removal?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, as for the standard in the House, of course, the House is not making a final determination. In the structure of the Constitution, an impeachment is simply an accusation, and as in most systems where there is simply an accusation being made, the House does not have to adhere to the same standard that is used in the Senate.

In most instances, House Members have suggested in debates on articles—

of whether or not to approve Articles of Impeachment—that they should have clear and convincing evidence in the view of the Members voting on it that there was some impeachable offense, and that is all—some, not even that standard. So there is simply enough evidence that an accusation can be made. It is definitely a lower standard than the standard that has to be met here in a trial for an ultimate verdict.

The Constitution speaks in terms of a conviction in the Senate. As both Professor Dershowitz and Judge Starr pointed out in their comments, everywhere in the Constitution in which there is any mention of impeachment, it is spoken of in terms of the criminal law. The offenses that define the jurisdiction for the Senate in its sitting as a Court of Impeachment are treason, bribery, and high crimes and misdemeanors. The Constitution speaks of a conviction, upon being convicted in the Senate. It speaks of all crimes being tried by a jury except in cases of impeachment—again, suggesting notions of the criminal law.

As we pointed out in our trial memorandum, all of these textual references make it clear that the standards of the criminal law should apply in the trial, certainly to the extent of the burden and standard of proof to be carried by the House managers, which means proof beyond a reasonable doubt. It is very clear that there is not any requirement for proof beyond a reasonable doubt simply for the House to vote upon Articles of Impeachment.

There is a very much higher standard at stake here. As we pointed out in our trial memorandum, the mere accusation made by the House comes here with no presumption of regularity at all in its favor. The Senate sits as a trier of both fact and law, reviewing both factual and legal issues de novo, and the House managers are held to a standard of proving proof beyond a reasonable doubt of every element of what would be a recognizable impeachable offense.

Here they have failed in their burden of proof. They have also failed in the law. They have not stated in the Articles of Impeachment anything that on its face amounts to an impeachable offense. On that fact, I think we have demonstrated very clearly that they have not presented facts that would amount to an impeachable offense even under their own theories. They have presented only part of the facts and left out the key facts. Mr. Purpura, I think, went through, very effectively, showing that there are some facts that don't change.

The transcript of the July 25 call shows the President doing nothing wrong. President Zelensky said he never felt any pressure. His other advisers have said the Ukrainians never felt any pressure. They didn't think there was any quid pro quo. They didn't even know that the military assistance had been held up until the POLITICO article at the end of August.

The only two people with statements on record who spoke to the President, Gordon Sondland and Senator RON JOHNSON, report that the President said to them there was no quid pro quo, and the aid flowed without anything ever being done related to investigations.

That is what is in the record. That is what the House managers have to rely on to make their case, and they have failed to prove their case beyond a reasonable doubt, failed even to prove it by clear and convincing evidence—failed to prove it at all, in my opinion.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from California is recognized.

Mrs. FEINSTEIN. Mr. Chief Justice, I send a question to the House managers.

The CHIEF JUSTICE. Senator FEINSTEIN asks the House managers:

The President's counsel stated that "there is simply no evidence anywhere that President Trump ever linked security assistance to any investigations"—is that true?

Mr. Manager CROW. Thank you, Mr. Chief Justice, and thank you, Senator, for that question.

President's counsel is not correct. There is, in fact, overwhelming evidence that the President withheld the military aid directly to get a personal political benefit to help his individual political campaign.

There are a few points that I would like to submit for your consideration.

First, look no further than the words of the President's Acting Chief of Staff, Mick Mulvaney, who, on October 17, 2019, during a national press conference mentioned—or he was asked about the direct connection between the aid, and he said "Did he"—meaning President Trump, referring to "he"—"also mention to me in passing the corruption related to the DNC server? Absolutely—no question about that. That's it, and that's why we held up the money."

He was repeating the President's own explanation relayed directly to him.

Second, Gordon Sondland testified he spoke by phone with President Trump on September 7. The President denied there was a "quid pro quo," but then outlined the very quid pro quo that he wanted from Ukraine.

Then he told Ambassador Sondland that President Zelensky should "go to a microphone and announce the investigations . . . he should want to do [it]."

Third, the President's own advisers, including the Vice President and Secretary Pompeo, were also aware of the direct connection. In Warsaw, on September 1, Ambassador Sondland told Vice President PENCE that he was concerned the delay in security assistance had become "tied to the issue of investigations." The Vice President simply nodded, tacitly acknowledging the conditionality of the aid.

Fourth, we heard from Ambassador Taylor, who, in direct emails and texts, said it was crazy to tie the security assistance to the investigations.

Five, we also know there is no other reason. The entire apparatus and structure of the Defense Department, the State Department that should have been dealing with the other legitimate reasons—you know, the policy debate that the President's counsel wants you to believe that this was about—they were all kept in the dark.

And the supposed interagency process that they made up several months after the fact had ended months before, during the last interagency meetings.

Now I will make one final point. Again, if you have any lingering questions about direct evidence, any thoughts about anything we just talked about, anything I have just relayed or that we have talked about the last week, there is a way to shed additional light on it: You can subpoena Ambassador Bolton and ask him that question directly.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Utah.

Mr. LEE. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Senators LEE and CRUZ ask of counsel for the President:

The House managers have argued aggressively that the President's actions contravened U.S. foreign policy. Isn't it the President's place—certainly more than the place for career civil servants—to conduct foreign policy?

Mr. Manager PHILBIN. Thank you, Mr. Chief Justice, Senators, and thank you for that question.

It is definitely the President's place to set U.S. foreign policy, and the Constitution makes this clear. Article II, section 1 vests the entirety of the executive authority in a President of the United States, and it is critically important in our constitutional structure that that authority is vested solely in the President because the President is elected by the people every 4 years. That is what gives the President democratic legitimacy to have the powers that he is given under the Constitution.

Our system is somewhat unique in the very broad powers that are assigned to the Executive, but it works, and it makes sense in a democratic system precisely because he is directly accountable to the people for the policies that he sets.

Those who are staffers in the executive branch bureaucracy are not elected by the people. They have no accountability, and they have no legitimacy or authority that comes from an election by the people, and so it is critically important to recognize the President sets foreign policy.

Of course, within some constraints, there are some roles for Congress in foreign affairs. To some extent, statutes can be passed, funding provisions can be passed that relate to it, but the Supreme Court has recognized time and again that the President is, as the Court said in Curtiss-Wright, the "sole organ of the nation" in foreign affairs.

So he sets foreign policy, and if staffers disagree with him, that does not mean that the President is doing something wrong, and this is a critical point because this is one of the centerpieces of the abuse of power theory that the House managers would like this body to adopt, and that is that they are going to impeach the President based solely on his subjective motive.

The premise of their case is the objective actions that were taken were perfectly permissible and within the President's constitutional authority, but if his real reason—if we get inside his head and figure it out—then we can impeach him. And the way that they have tried to explain that they can prove that the President had a bad motive is they say: Well, we compare what did the President want to do with what the interagency consensus was.

And I mentioned this the other day. They say that the President defied and confounded every agency in the executive branch. That is a constitutionally incoherent statement. The President cannot defy the agencies within the executive branch that are subordinate to him. It is only they who can defy the President's determinations of policy.

And so what this all boils down to is it shows that this case is built upon a policy difference and a policy difference where the President is the one who gets to determine policy because he has been elected by the people to do that.

And we are right now only a few months away from another election where the people can decide for themselves whether they like what the President has done with that authority or not, and that is the way disputes about policy like that should be resolved.

It is not legitimate to say that there is some interagency consensus that disagrees with the President, and therefore we can show he did something wrong, and therefore he can be impeached. That is an extraordinarily dangerous proposition because it lacks any democratic legitimacy whatsoever. It is contrary to the Constitution, and it should be rejected by this body.

The President is the one who gets to set foreign policy because that is the role assigned to him in the Constitution.

And it was even Lieutenant Colonel Vindman, who had complained about the July 25 call, himself ultimately agreed that it was only a policy difference; it was a policy concern that he raised about the call. That is not enough to impeach a President of the United States.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from New Hampshire.

Mrs. SHAHEEN. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Senator SHAHEEN asks the House managers:

The President's counsel has argued that the alleged conduct set out in the articles does not violate a criminal statute and thus may not constitute grounds for impeachment as "high Crimes and Misdemeanors." Does this reasoning imply that if the President does not violate a criminal statute he could not be impeached for abuses of power such as ordering tax audits of political opponents, suspending habeas corpus rights, indiscriminately investigating political opponents or asking foreign powers to investigate Members of Congress?

Ms. Manager GARCIA of Texas. Mr. Chief Justice, Senators, I appreciate the question.

The simple answer is that a President can be impeached without a statutory crime being committed. That was the position and the question that was rejected in President Nixon's case and rejected again in President Clinton's case. It should be rejected here in President Trump's case.

The great preponderance of legal authority confirms that impeachable offenses—of legal authority confirms that it is not defined in criminal conduct. This authority includes nearly every legal scholar who has studied the issue, multiple Supreme Court Justices who addressed it in public remarks, and prior impeachments in the House.

This conclusion follows that constitutional history, text, and structure and reflects the absurdities and practical difficulties that would result were the impeachment power confined to indictable crimes.

As title 35 shows, first, the plain text of the Constitution does not require that an offense be a crime in order for it to be impeachable.

Alexander Hamilton explained that impeachable offenses, high crimes, and misdemeanors are defined fundamentally by the abuse or violation of some public trust—some public trust. They are political as they relate chiefly to injuries done immediately to society itself.

Offenses against the Constitution are different than offenses against the Criminal Code. Some crimes, like jaywalking, are not impeachable, and some forms of misconduct often both offend the Constitution and the criminal law.

Impeachment and criminality must, therefore, be assessed separately, even though the President's commission of indictable crimes may further support a case of impeachment and removal.

The American experience with impeachment confirms this. A strong majority of impeachments voted by the House since 1789 have included one or more allegations that did not charge a violation of criminal law.

Although President Nixon resigned before the House could consider the Articles of Impeachment against him, the Judiciary Committee's allegations encompassed many, many noncriminal acts.

And in President Clinton's case, the Judiciary Committee report accompanying the Articles of Impeachment to the House floor stated that "the actions of President Clinton do not have to rise to the level of violating the Federal statute regarding obstruction of justice in order to justify impeachment. . . . The Framers intended impeachment to reach the full spectrum of Presidential misconduct that threatened the Constitution. They also intended that our Constitution endure throughout the ages."

In other words, if it named one, two, and three, but new ones came up and you had to keep up with the times, it was better to have the full spectrum of Presidential misconduct. Because it could not anticipate and specifically prohibit every single threat a President might someday pose, the Framers adopted a standard sufficiently general and flexible to meet unknown future circumstances. This standard was meant, as Mason put it, to capture "all manner of great and dangerous offences," and compatible with the Constitution.

When the President uses the powers of his high office to benefit himself while injuring or ignoring the very people he is duty-bound to serve, he has committed an impeachable offense.

The records of the Constitutional Convention offer further clarity. At the Constitutional Convention itself, no delegate—no delegate—linked impeachment to the technicalities of criminal law. Instead, the Framers principally intended impeachment for three forms of Presidential wrongdoing, the ABCs of impeachment: A, abuse of power; B, betrayal of the national interests through foreign entanglements; and C, corruption of office and elections.

When the President uses his power to obtain illicit help in his election from a foreign power, it undermines our national security and election integrity. It is a trifecta.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Louisiana.

Mr. KENNEDY. Mr. Chief Justice, along with Senator BLACKBURN and Senator CORNYN, I send a question to the desk for the House managers and for counsel to the President.

The CHIEF JUSTICE. In the case of such a question, addressed to both sides, they will split the 5 minutes equally.

The Senators ask:

Why did the House of Representatives not challenge President Trump's claims of executive privilege and/or immunity during the House impeachment proceedings?

We will begin with the House managers.

Mr. Manager JEFFRIES. Mr. Chief Justice, distinguished Senators, thank you for your question. The answer is simple. We did not challenge any claims related to executive privilege because, as the President's own counsel admitted during this trial, the President never raised the question of executive privilege.

What the President did raise was this notion of blanket defiance, this notion that the executive branch, directed by the President, could completely defy any and all subpoenas issued by the

House of Representatives, not turn over documents, not turn over witnesses, not produce a single shred of information in order to allow us to present the truth to the American people.

In the October 8 letter that was sent to the House of Representatives, there was no jurisprudence that was cited to justify the notion of blanket defiance. There has been no case law cited to justify the doctrine of absolute immunity. In fact, every single court that has considered any Presidential claims of absolute immunity such as the one asserted by the White House has rejected it out of hand.

The CHIEF JUSTICE. Counsel for the President.

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for that question.

Let me frame this partly in response to what Manager JEFFRIES said, and I went through this before. The idea that there was blanket defiance and no explanation and no case law from the White House is simply incorrect. I put up slides showing the letter—the letter from October 18 that explains specifically that the subpoenas that had been issued by the House, because they were not authorized by a vote from the House, were invalid. And there was a letter from the White House counsel saying that. There was a letter from OMB saying that. There was a letter from the State Department saying that. There was specific rationale given, citing cases—Watkins, Rumely, and others—explaining that defect. The House managers—the House, Manager SCHIFF—chose not to take any steps to correct that.

We also pointed out other defects.

We asserted the doctrine of absolute immunity for senior advisers to the President, which has been asserted by every President since the 1970s. They chose not to challenge that in court.

We also explained the problem that they didn't allow agency counsel to be present at depositions. They chose not to challenge that in court.

These are specific legal reasons, not blanket defiance. That is a misrepresentation of the record. And there was no attempt to have that adjudicated in court. The reason there was no attempt is that the House Democrats were just in a hurry. They had a timetable. One of the House managers said on the floor here—they had no time for courts. They had to impeach the President before the election, so they had to have that done by Christmas. That is why the proper process wasn't followed here, because it was a partisan and political impeachment that they wanted to get done all around timing for the election.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Vermont.

Mr. LEAHY. Mr. Chief Justice, I have a question for the House managers, and I send it to the desk.

The CHIEF JUSTICE. Senator LEAHY asks the House managers:

The President's counsel argues that there was no harm done, that the aid was ultimately released to Ukraine, the President met with Zelensky at the U.N. in September, and that this President has treated Ukraine more favorably than his predecessors. What is your response?

Mrs. Manager DEMINGS. Mr. Chief Justice, Senators, thank you so much for your question.

Contrary to what the White House counsel has said or has claimed—that there was no harm, no foul; that the aid eventually got there—we promised Ukraine in 2014 that if they gave up their nuclear arsenal, that we would be there for them, that we would defend them, that we would fight along beside them.

Fifteen thousand Ukrainians have died. It was interesting the other day when the White House counsel said that no American life was lost, and we are always grateful and thankful for that. But what about our friends? What about our allies in Ukraine? According to Diplomat Holmes and Ambassador Taylor, our Ukrainian friends continue to die on the frontlines, those who are fighting for us, fighting Russian aggression. When the Ukrainians have the ability to defend themselves, they have the ability to defend us.

The aid, although it did arrive, took the work of some Senators in this room who had to pass additional laws to make sure that the Ukrainians did not lose out on 35 million additional dollars.

Contrary to the President's tweet that all of the aid arrived and that it arrived ahead of schedule—that is not true. All of the aid had not arrived.

Let's talk about what kind of signal is sent, withholding the aid for no legitimate reason. The President talked about burden-sharing, but nothing had changed on the ground. Holding the aid for no legitimate reason sent a strong message that we would not want to send to Russia—that the relationship between the United States and Ukraine was on shaky ground. It actually undercut Ukraine's ability to negotiate with Russia, with which, as everybody in this room knows, it is in an active war, in a hot war.

So when we talk about "The aid eventually got there; no harm, no foul," that is not true, Senators, and I know that you know that. There was harm and there was foul. And let us not forget that Ukraine is not an enemy. They are not an adversary. They are a friend.

The CHIEF JUSTICE. Thank you.

Senator CRUZ?

Mr. CRUZ. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. The question is addressed to counsel for the President:

As a matter of law, does it matter if there was a quid pro quo? Is it true that quid pro quos are often used in foreign policy?

Mr. Counsel DERSHOWITZ. Mr. Chief Justice, thank you very much for your question.

Yesterday, I had the privilege of attending the rolling-out of a peace plan by the President of the United States regarding the Israel-Palestine conflict, and I offered you a hypothetical the other day: What if a Democratic President were to be elected and Congress were to authorize much money to either Israel or the Palestinians and the Democratic President were to say to Israel "No; I am going to withhold this money unless you stop all settlement growth" or to the Palestinians "I will withhold the money Congress authorized to you unless you stop paying terrorists, and the President said "Quid pro quo. If you don't do it, you don't get the money. If you do it, you get the money"? There is no one in this Chamber who would regard that as in any way unlawful. The only thing that would make a quid pro quo unlawful is if the quo were in some way illegal.

Now, we talked about motive. There are three possible motives that a political figure can have: One, a motive in the public interest, and the Israel argument would be in the public interest; the second is in his own political interest; and the third, which hasn't been mentioned, would be in his own financial interest, his own pure financial interest, just putting money in the bank. I want to focus on the second one for just one moment.

Every public official whom I know believes that his election is in the public interest. Mostly, you are right. Your election is in the public interest. If a President does something which he believes will help him get elected—in the public interest—that cannot be the kind of quid pro quo that results in impeachment.

I quoted President Lincoln, when President Lincoln told General Sherman to let the troops go to Indiana so that they could vote for the Republican Party. Let's assume the President was running at that point and it was in his electoral interests to have these soldiers put at risk the lives of many, many other soldiers who would be left without their company. Would that be an unlawful quid pro quo? No, because the President, A, believed it was in the national interest, but B, he believed that his own election was essential to victory in the Civil War. Every President believes that. That is why it is so dangerous to try to psychoanalyze the President, to try to get into the intricacies of the human mind.

Everybody has mixed motives, and for there to be a constitutional impeachment based on mixed motives would permit almost any President to be impeached.

How many Presidents have made foreign policy decisions after checking with their political advisers and their pollsters? If you are just acting in the national interest, why do you need pollsters? Why do you need political advisers? Just do what is best for the country. But if you want to balance what is in the public interest with what is in your party's electoral interest and your own electoral interest, it

is impossible to discern how much weight is given to one or the other.

Now, we may argue that it is not in the national interest for a particular President to get reelected or for a particular Senator or Member of Congress—and maybe we are right; it is not in the national interest for everybody who is running to be elected—but for it to be impeachable, you would have to discern that he or she made a decision solely on the basis of, as the House managers put it, corrupt motives, and it cannot be a corrupt motive if you have a mixed motive that partially involves the national interest, partially involves electoral, and does not involve personal pecuniary interest.

The House managers do not allege that this decision, this quid pro quo, as they call it—and the question is based on the hypothesis there was a quid pro quo. I am not attacking the facts. They never allege that it was based on pure financial reasons. It would be a much harder case.

If a hypothetical President of the United States said to a hypothetical leader of a foreign country: Unless you build a hotel with my name on it and unless you give me a million-dollar kickback, I will withhold the funds. That is an easy case. That is purely corrupt and in the purely private interest.

But a complex middle case is: I want to be elected. I think I am a great President. I think I am the greatest President there ever was, and if I am not elected, the national interest will suffer greatly. That cannot be.

The CHIEF JUSTICE. Thank you, counsel.

Mr. DERSHOWITZ. Thank you, Mr. Chief Justice.

The CHIEF JUSTICE. I recognize the democratic leader.

Mr. SCHUMER. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Senator SCHUMER's question is for the House managers:

Would you please respond to the answer that was just given by the President's counsel?

Mr. Manager SCHIFF. I would be delighted. There are two arguments that Professor Dershowitz makes: one that is, I have to say, a very odd argument for a criminal defense lawyer to make, and that is, it is highly unusual to have a discussion in trial about the defendant's state of mind, intent, or mens rea.

In every courtroom in America, in every criminal case—or almost every criminal case, except for a very small sliver where there is strict liability—the question of the defendant's intent and state of mind is always an issue. This is nothing novel here. You don't require a mind reader. In every criminal case—and I would assume in every impeachment case—yes, you have to show that the President was operating from a corrupt motive, and we have.

But he also makes an argument that all quid pro quos are the same and all

are perfectly copacetic. Now, some of you said earlier: Well, if they could prove a quid pro quo over the military, now that would be something. Well, we have. So now the argument shifts to all quid pro quos are just fine, and they are all the same.

Well, I am going to apply Professor Dershowitz's own test. He talked about the step test, John Rawls, the philosopher—let's put the shoe on the other foot and see how that changes our perception of the case. I want to merge that argument with one of the other Presidential counsel's argument when they resorted to the whataboutism about Barack Obama's open mic.

Now, that was a very poor analogy, I think you will agree, but let's use that analogy and let's make it more comparable to today and see how you feel about this scenario.

President Obama, on an open mic, said to Medvedev: Hey, Medvedev, I know you don't want me to send this military money to Ukraine because they are fighting and killing your people. I want you to do me a favor, though. I want you to do an investigation of MITT ROMNEY, and I want you to announce you found dirt on MITT ROMNEY, and if you are willing to do that, quid pro quo, I will not give Ukraine the money they need to fight you on the frontline.

Do any of us have any question that Barack Obama would be impeached for that kind of misconduct? Are we really ready to say that would be OK, that Barack Obama asked Medvedev to investigate his opponent and would withhold money from an ally that needed to defend itself to get an investigation of MITT ROMNEY?

That is the parallel here. And to say, well, yes, we condition aid all the time—for legitimate reasons, yes. For legitimate reasons, you might say to a Governor of a State: Hey, Governor of the State, you should chip in more toward your own disaster relief. But if the President's real motive in depriving the State of disaster relief is because that Governor will not get his attorney general to investigate the President's political rival, are we ready to say that the President can sacrifice the interest of the people of that State or, in the case of Medvedev, the people of our country because all quid pro quos are fine? It is carte blanche? Is that really what we are prepared to say with respect to this President's misconduct or the next?

Because if we are, then the next President of the United States can ask for an investigation of you. They can ask for help in their next election from any foreign power, and the argument will be made: No, Donald Trump was acquitted for doing exactly the same thing; therefore, it must not be impeachable.

Now, bear in mind that efforts to cheat an election are going to be in proximity to an election. And if you say you can't hold a President accountable in an election year, where

they are trying to cheat in that election, then you are giving them carte blanche.

So all quid pros are not the same. Some are legitimate and some are corrupt, and you don't need to be a mind reader to figure out which is which. For one thing, you can ask John Bolton.

The CHIEF JUSTICE. Thank you, Mr. Manager.

Mr. GRASSLEY. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Iowa.

Mr. GRASSLEY. I send a question to the desk.

The CHIEF JUSTICE. Senator GRASSLEY asks counsel for the President:

Does the House's failure to enforce its subpoenas render its "obstruction of Congress" theory unprecedented?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, the answer is yes. As far as I am aware, there has never been a prior instance in which there has been an attempt, even in the House, as in the Nixon proceeding—never mind in the Clinton proceeding, which actually left the House and came to the Senate—to suggest that there can be obstruction of Congress when there hasn't been anything beyond simply issuing a subpoena, getting resistance, and then throwing up your hands and giving up and saying: Oh, well, that is obstruction.

In the Clinton situation, most of the litigation was with independent counsel, and there were privileges asserted in litigation and litigation again and again, but the point is that the issues about the privileges were all litigated, and they were resolved before things came to this body.

Similarly, in the Nixon impeachment proceeding within the House, a lot of investigation had been done by the special counsel, and there was litigation over assertions of privileges there in order to get the tapes, and some tapes and transcripts had already been turned over, but, again, there was litigation about the assertion of the privilege in response to the grand jury subpoena that then fed into the House's proceedings.

So it would be completely unprecedented for the House to attempt to actually bring a charge of obstruction into the Senate where all they can present is: Well, we issued a subpoena, and there were legal grounds asserted for the invalidity of the subpoena, and there were different grounds, as I have gone through. I will not repeat them all in detail here.

Some of those subpoenas were just invalid when issued because there was no vote. Some of the subpoenas for witnesses were invalid because senior advisers to the President had absolute immunity from compulsion. Some were that they were forcing executive branch officials to testify without the benefit of agency counsel and executive branch counsel with them. So there were various reasons asserted for the

invalidity and the defects in various subpoenas and then no attempt to enforce them, no attempt to litigate out what the validity or invalidity might be but to just bring it here as an obstruction charge is unprecedented.

I will note that House managers have said—and I am sure that they will say again today—that, well, but if we had gone to court, the Trump administration would have said that the courts don't have jurisdiction over those claims. Now, that is true. In some cases—there is one being litigated right now related to the former Counsel for the President, Don McGahn. The Trump administration's position, just like the position of the Obama administration, is that an effort by the House to enforce a subpoena in an article III court is a nonjusticiable controversy. That is our position, and we would argue that in court.

But that is part of what would have to be litigated. That doesn't change the fact that the House managers can't have it both ways. I want to make this clear. The House managers want to say that they have an avenue for going to court; they are using that avenue for going to court; and they actually told the court in McGahn that once they reached an impasse with the executive branch, the courts were the only way to resolve the impasse.

As I explained the other day, there are mechanisms for dealing with these disputes between the executive and Congress. First is an accommodations process. They didn't do that. We offered to do that in the White House Counsel's October 8 letter. They didn't do accommodations. If they think they can sue, they have to take that step because the Constitution, the courts have made clear, requires incrementalism in disputes between the executive and the legislative branch.

So if they think that the courts can resolve that dispute, that is the next step. They should do that and have that litigated, and then things can proceed on to a higher level of confrontation. But to jump straight to impeachment, to the ultimate constitutional confrontation, doesn't make sense. It is not the system that the Constitution requires, and it is unprecedented in this case. Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Michigan.

Ms. STABENOW. Thank you, Mr. Chief Justice. I send a question to the desk.

The CHIEF JUSTICE. Senator STABENOW asks the House managers:

Would the House Managers care to correct the record on any falsehoods or mischaracterizations in the White House's opening arguments?

Ms. Manager LOFGREN. Mr. Chief Justice and Senators, thank you for that question. We believe that the President's team has claimed basically there were six facts that have not been met and will not change and all six of those so-called facts are incorrect.

Let's be clear. On July 25—that is not the whole evidence before us, even though it includes devastating evidence, the President's scheme. President Trump's intent was made clear on the July 25 call, but we had evidence of information before the meeting with Mr. Bolton, the text message to Mr. Zelensky's people telling him he had to do the investigations to get what he wanted. All of this evidence makes us understand that phone call even more clearly.

Now, the President's team claimed that Mr. Zelensky and other Ukrainians said they never felt pressured over investigations. Now, of course, they didn't say that publicly. They were afraid of the Russians finding out. But Zelensky said privately that he didn't want to be involved in U.S. domestic politics. He resisted announcing the investigations. He only relented and scheduled the CNN meeting after it became clear that he was not going to receive the support that he needed and that Congress had provided in our appropriations. That is the definition of ''pressure.''

Now, Ukraine—the President's lawyers say—didn't know that Trump was withholding the security assistance until it was public. Many witnesses have contested that, including the open statement by Olena Zerkal, who was then the Deputy Foreign Minister of Ukraine, that they knew about the President's hold on security matters, and in the end, everyone knew, it was public, and afterward, Ukraine did relent and scheduled that testimony.

Fourth, they said no witnesses, said security was conditioned on the investigations. Not so. There was Mulvaney, and we had other witnesses talking about the shakedown for the security assistance. But the important thing is, you can get a witness who talked to the President firsthand about what the President thought he was doing.

Ultimately, of course, the funds—or at least some of them—were released, but the White House meeting that the President promised three different times still has not occurred, and we still don't have the investigation of the Bidens.

Getting caught doesn't mitigate the wrongdoing. The President is unrepentant, and we fear he will do it again.

The independent Government Accountability Office concluded that the President violated Federal law when he withheld that aid. That misconduct is still going on. All the aid has not yet been released.

Finally, I would just like to say that there has been some confusion, I think. I am sure it is not intentional. But the President surely does not need the permission of his staff about foreign policy. That information is offered to you as evidence of what he thought he was doing. He did not appear to be pursuing a policy agenda. From all of the evidence, he appeared to be pursuing a corruption—a corruption of our election that is upcoming; a high crime

and misdemeanor that requires conviction and removal.

I yield back.

The CHIEF JUSTICE. Thank you, counsel.

Mr. COTTON. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Arkansas.

Mr. COTTON. I send a question to the desk for the President's counsel on behalf of myself and Senators BOOZMAN, MCSALLY, BLACKBURN, KENNEDY, and TOOMEY.

The CHIEF JUSTICE. The Senators ask the President's counsel:

Did the House bother to seek testimony or litigate executive privilege issues during the month during which it held up the impeachment articles before sending them to the Senate?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, no, the House did not seek to litigate any of the privilege issues during that time. In fact, they filed no lawsuits arising from this impeachment inquiry to seek to contest the bases that the Trump administration gave for resisting the subpoenas, the bases for why those subpoenas were invalid.

When litigation was filed by one of the subpoena recipients—that was Dr. Charles Kupperman, the Deputy National Security Advisor—he went to the court and sought a declaratory judgment, saying: The President has told me I shouldn't go. I have a subpoena from the House saying I should go. Please, courts, tell me what my obligations are.

I believe that was filed around October 25. It was toward the end of October.

Very shortly, within a few days, the court had set an expedited briefing schedule and scheduled the hearing for December 10. They were supposed to hear both preliminary motions to dismiss and also the merits issue.

So they were going to get a decision after a hearing on December 10 that would go to the merits of the issue, but the House managers withdrew the subpoena. The House of Representatives decided they wanted to moot out the case so they wouldn't get a decision.

So, no, the House has not pursued litigation to get any of these issues resolved. It has affirmatively avoided getting into any litigation. That seems to be at least in part based on—if you look at the House Judiciary Committee report—their assertion that under the sole power of impeachment assigned to the House, the House believes that the Constitution assigns—I believe the exact words are that it gives the House the last word, something to that effect.

I mentioned this the other day. This is the new constitutional theory that because they have the sole power of impeachment, in their view, it is actually the paramount power of impeachment and that all other constitutionally based privileges or rights or immunities or roles, even, of the other branches—both the judiciary and the executive—fall away, and there is nothing that can stand in the way of the

House's power of impeachment. If they issue a subpoena, the executive has to respond, and it can't raise any constitutionally based separation of powers concerns. If you do, that is obstruction of the courts. The courts have no role. The House has the sole power of impeachment.

That is a very dangerous construct for our Constitution. It suggests that once they flip the switch on to impeachment, there is no check on their power and what they want to do. That is not the way the Constitution is structured. When there are interbranch conflicts, the Constitution requires that there be an accommodation process, that there be attempts to address the interests of both branches.

The House has taken the position—and in other litigation—the McGahn litigation—they are telling the courts that the courts are the only way to resolve these issues. They brought that case in August. They already have a decision from the district court. They have an appeal in the DC Circuit. It was argued on January 3. A decision could come any day. That is pretty fast for litigation. But in this impeachment, they have decided that they don't want to do litigation. Again, it is because they had a timetable. One of the House managers admitted it on this floor. They had to get the President impeached before the election. They had no time for the courts, for anyone telling them what the rules were. They had to get it done by Christmas, and that is what they did. Then they waited around a month before bringing it here.

I think that shows you what is really behind the claims of, oh, it is urgent, then it is not urgent. It was urgent when it was our timetable to get it done by Christmas. It is not so urgent when we can wait for a month because we want to tell the Senate how to run things. It is all a political charade.

That is part of the reason—a major reason—that the Senate should reject these Articles of Impeachment.

The CHIEF JUSTICE. Thank you, counsel.

Mr. UDALL. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from New Mexico.

Mr. UDALL. Thank you for the recognition, Mr. Chief Justice. I send a question to the desk.

The CHIEF JUSTICE. Senator UDALL's question is for the House managers:

Please address the President's counsel's argument that House managers seek to overturn the results of the 2016 election and that the decision to remove the President should be left to the voters in November.

Mr. Manager SCHIFF. Thank you for the question.

First, I just want to respond to something counsel just said—that 9 months is pretty fast for litigation in the courts. Sadly, I agree with that. Nine months is pretty fast in the McGahn case, and we still don't have a decision yet. What is more, that is the very case

in which they are arguing, as I quoted earlier, that Congress has no right to come to the courts to force a witness to testify. So here we are 9 months later in that litigation that they said we are compelled under the Constitution to bring, and they are saying in court: You can't bring this. And it is 9 months, and we still don't have a decision. I think that tells you just where they are coming from. It all goes back to the President's directive to fight all subpoenas, and they are.

Nixon was going to be impeached for far less obstruction than anything that Donald Trump did.

The argument: Well, if you impeach a President, you are overturning the results of the last election and you are tearing up the ballots in the next election. If that were the case, there would be no impeachment clause in the Constitution because, by definition, if you are impeaching a President, that President is in office and has won an election.

Clearly, that is not what the Founders had in mind. What they had in mind is, if the President commits high crimes and misdemeanors, you must remove him from office. It is not voiding the last election; it is protecting the next election. Indeed, the impeachment power was put in the Constitution not as a punishment—that is what the criminal laws are for—but to protect the country.

Now, if you say you can't impeach a President before the next election, what you are really saying is you can only impeach a President in their second term. If that were going to be the constitutional requirement, the Founders would have put in the Constitution: A President may commit whatever high crimes and misdemeanors he wants as long as it is in the first term. That is clearly not what any rational Framer would have written, and, indeed, they didn't, and they didn't for a reason. The Founders were concerned that, in fact, the object of a President's corrupt scheme might be to cheat in the very form of accountability that they have prescribed: the election.

So counsel has continued to mischaracterize what the managers have said. We are not saying we had to hurry to impeach the President before the election. We had to hurry because the President was trying to cheat in that election.

The position of the President's counsel is, well, yes, it is true that if a President is going to try to cheat an election, by definition, that is prior to their reelection; by definition, that is going to be proximate to an election; but, you know, let the voters decide, even though the object is to corrupt that vote of the people. That cannot be what the Founders had in mind.

One of the things I said at the very opening of this proceeding is, yes, we are to look to history; yes, we are to try to define the intent of the Framers; but we are not to leave our common sense at the door.

The issue isn't whether it is his first term or his second. It isn't whether the election is a year away or 3 years away. The issue is, did he commit a high crime and misdemeanor? Is it a high crime and misdemeanor for a President of the United States to withhold hundreds of millions of dollars in aid to an ally at war to get help, to elicit foreign interference in our election? If you believe that it is, it doesn't matter what term it is, it doesn't matter how far away the election is because that President represents a threat to the integrity of our elections and, more than that, a threat to our national security.

As we have shown, by withholding that aid—and I know the argument is, no harm, no foul—we withheld aid from an ally at war. We sent a message to the Russians, when they learned of this hold, that we did not have Ukraine's back. We sent a message to the Russians, as Zelensky was going into negotiations with Putin to try to end that war, that Zelensky was operating from a position of weakness because there was a division between the President of the United States and Ukraine. That is immediate damage. That is damage done every day. That damage continues to this day.

The damage the President does in pushing out the Russian conspiracy theories were identified during the House proceedings—and you have heard it in the Senate—as Russian intelligence propaganda. The danger the President poses by taking Vladimir Putin's side over his own intelligence agencies—that is a danger today. That is a danger that continues every day he pushes out this Russian propaganda.

If the Framers meant impeachment only to apply in the second term, they would have said so. But that would have made the Constitution a suicide pact. That is not what it says, and that is not how you should interpret it.

The CHIEF JUSTICE. Thank you, counsel.

Mr. PORTMAN. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Ohio.

Mr. PORTMAN. I send a question to the desk.

The CHIEF JUSTICE. Senator PORTMAN's question is directed to counsel for the President:

Given that impeachment proceedings are privileged in the Senate and largely prevent other work from taking place while they are ongoing, please address the implications of allowing the House to present an incomplete case to the Senate and request the Senate to seek testimony from additional witnesses.

Mr. Counsel PHILBIN. Thank you, Mr. Chief Justice, Senators. I think this is one of the most important issues that this body faces, given these calls to have witnesses, because the House managers tried to present it as if, oh, it is just a simple question; how can you have a trial without witnesses? But in real litigation, no one goes to trial without doing discovery. No one goes to trial without having heard

from the witnesses first. You don't show up at trial and then start trying to call witnesses for the first time.

The implications here in our constitutional structure, trying to run things in such an upside-down way would be very grave for this body as an institution because, as the Senator's question points out, it largely prevents this Chamber from getting other business done as long as there is a trial pending.

The idea that the House can do an incomplete job in trying to find out what witnesses there are, having them come testify, trying to find out the facts—just rush something through and bring it here as an impeachment and then start trying to call all the witnesses—means that this body will end up taking over that investigatory task, and all the regular business of this body will be slowed down, hindered, prevented while that goes on.

And it is not a question of just one witness. A lot of people talk right now about John Bolton, but the President would have the opportunity to call his witnesses, just as a matter of fundamental fairness. There would be a long list of witnesses if the body were to go in that direction. It would mean this would drag on for months and prevent this Chamber from getting its business done.

There is a proper way to do things and an upside-down way of doing things. To have had the House not go through a process that is thorough and complete and to just rush things through in a partisan and political manner and then dump it onto this Chamber to clean everything up is a very dangerous precedent to be set. As I said the other day, whatever is accepted in this case becomes the new normal. If this Chamber puts its imprimatur on this process, then that is the seal of approval for all time in the future.

If it becomes that easy for the House of Representatives to impeach a President of the United States—don't attempt to subpoena the witnesses, never mind litigation because it takes too long, but then leave it all to this Chamber—and, as I said the other day: Remember, what do we think will happen if some of these witnesses are subpoenaed now that they never bothered to litigate about? Then there will be the litigation now, most likely, and then that will take time while this Chamber is still stuck sitting as a Court of Impeachment.

That is not the way to do things, and it would forever change the relationship between the House of Representatives and the Senate in terms of the way impeachments operate.

So I think it is vitally important for this Chamber to consider what it really means to start having this Chamber do all that investigatory work, how this Chamber would be paralyzed by that. And is that really the precedent? Is that the way this Chamber wants everything to operate in the future? Once you make it that much easier—and we have said this on a couple of different points, both in terms of the standards for impeachable offenses but also in terms of the process that is used in the House. If you make it really way too easy to impeach a President, then this Chamber is going to be dealing with that all the time.

As Minority Leader SCHUMER had pointed out at the time of the Clinton impeachment—he was prophetic, as White House counsel pointed out the other day—once you start down the path of partisan impeachments, they will be coming again and again and again. And if you make it easier, they will come even more frequently, and this Chamber is going to be spending a lot of time dealing with impeachment trials and cleaning up any incomplete, half-baked procedures, rushed partisan impeachments from the House if that is the sort of system that is given the imprimatur here.

That is a very important reason for not accepting that procedure and not trying to open things up now when things haven't been done properly in the House of Representatives.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Delaware.

Mr. CARPER. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Senator CARPER's question is for the House managers:

Some have claimed that subpoenaing witnesses or documents would unnecessarily prolong this trial. Isn't it true that depositions of the three witnesses in the Clinton trial were completed in only one day each? And, isn't it true that the Chief Justice, as presiding officer in this trial, has the authority to resolve any claims of privilege or other witness issues, without any delay?

Mr. Manager JEFFRIES. Mr. Chief Justice, the answer is yes. What is clear, based on the record that was compiled by the House of Representatives, where up to five depositions per week were completed, is that this can be done in an expeditious fashion.

It is important to note that the record that exists before you right now contains strong and uncontroverted evidence that President Trump pressured a foreign government to target an American citizen for political and personal gain, as part of a scheme to cheat in the 2020 election and solicit foreign interference. That is evidence from witnesses who came forward from the Trump administration, including individuals like Ambassador Bill Taylor, a West Point graduate and a Vietnam War hero; including individuals like Ambassador Sondland, who gave $1 million to President Trump's inauguration; including respected national security professionals like LTC Alexander Vindman, as well as Dr. Fiona Hill—17 different witnesses, Trump administration employees, troubled by the corrupt conduct that took place, as alleged and proven by the House of Representatives.

But to the extent that there are ambiguities in your mind, this is a trial. A trial involves witnesses. A trial involves documents. A trial involves evidence. That is not a new phenomenon for this distinguished body. The Senate, in its history, has had 15 different impeachment trials. In every single trial there were witnesses—every single trial. Why should this President be treated differently, held to a lower standard, at this moment of Presidential accountability?

In fact, in many of those trials, there were witnesses who testified in the Senate who had not testified in the House. That was the case most recently in the Bill Clinton trial. It certainly was the case in the trial of President Johnson. Thirty-seven out of the 40 witnesses who testified in the Senate were new—37 out of 40.

Why can't we do it in this instance, when you have such highly relevant witnesses like John Bolton, who had a direct conversation with President Trump, indicating that President Trump was withholding the aid because he wanted the phony investigations?

Counsel has said the greatest invention in the history of jurisprudence for ascertaining the truth has been the vehicle of cross-examination. Let's call John Bolton. Let's call Mick Mulvaney. Let's call other witnesses, subject them to cross-examination, and present the truth to the American people.

The CHIEF JUSTICE. Thank you.

The Senator from Texas.

Mr. CORNYN. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Senators CORNYN and GARDNER ask counsel for the President:

What are the consequences to the Presidency, the President's constitutional role as the head of the executive branch, and the advice the President can expect from his senior advisers, if the Senate seeks to resolve claims of executive privilege for subpoenas in this impeachment trial without any determination by an article III court?

Mr. Counsel PHILBIN. Mr. Chief Justice, I thank the Senators for the question.

The Supreme Court has recognized that the confidentiality of communications with the President is essential—keeping those communications confidential is essential for the proper functioning of the government.

In Nixon v. United States, the court explained that this privilege is grounded in the separation of powers and essential for the functioning of the executive for this reason: In order to receive candid advice, the President has to be able to be sure that those who are speaking with him have the confidence that what they say is not going to be revealed, that their advice can remain confidential. If it is not confidential, they would temper what they are saying; they wouldn't be candid with the President; and the President, then, would not be able to get the best advice.

Case 0:20-cv-61872-AHS Document 17-1 Entered on FLSD Docket 11/06/2020 Page 12 of 48

It is the same concern that underpins the deliberative process aspect of executive privilege. Even if it is not a communication directly with the President, if it is the deliberative process within the executive branch, people have to be able, before coming up with a decision, to discuss alternatives, to probe what other ways might work to address the problem, and to discuss them candidly and openly, not with the feeling that the first thing they say is going to be on the front page of the Washington Post the next day, because if you don't have the confidence that what you are saying is going to be kept confidential, you will not be candid, you will not give your best advice, and that damages decision-making. It is bad for the government, and it is bad for the people of the United States because it means the government and the executive branch can't function efficiently.

So there is a critical need for the executive to be able to have these privileges and to protect them, and that is why the Supreme Court recognized that in Nixon v. United States and pointed out that there has to be some very high showing of need from another branch of government if there is going to be any breach of that privilege.

That is why there is an accommodation process. The courts have said that, when the Congress and the legislature seek information from the executive and the executive has confidentiality interests, both branches are under an obligation to try to come to some accommodation to address the interests of both branches. But it is not a situation of simply that the Congress is supreme and can demand information from the executive and the executive must present everything. The courts have made that clear, because that would be damaging to the functioning of government.

So here, in this case, there are vital interests at stake. And one of the potential witnesses that the House managers have raised again and again is John Bolton. John Bolton was a National Security Advisor to the President. He has all of the Nation's secrets from the time that he was the National Security Advisor, and that is precisely the area, the field, in which the Supreme Court suggested, in Nixon v. United States, there might be something approaching an absolute privilege of confidentiality in communications with the President: the fields of national security and foreign affairs. That is the crown jewel of executive privilege.

So to suggest that the National Security Advisor—well, we will just subpoena him, and he will come in; that will be easy; there will not be any problem—that is not the way it would work because there is a vital constitutional privilege at stake there, and it is important for the institution of the Office of the Presidency, for every President, to protect that privilege, because once

precedents start to be set—if one President says: Well, I will not insist on the privilege then; I will let people interview this person; I will not insist on the immunity—that sets precedent. Then the next time, when it is important to preserve the privilege, the precedent is raised, and the privilege has been weakened—and is forever weakened—and that damages the functioning of government.

So this is a very serious issue to consider. It is important. The Supreme Court has made it clear for the proper functioning of the executive branch, for the proper functioning of our government. And there would be grave issues raised attempting to have a National Security Advisor to the President come under subpoena to testify. That would all have to be dealt with, and that would take some time before things would continue.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Hawaii.

Mr. SCHATZ. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. The question from Senator SCHATZ is directed to the House managers, and the question also is from Senator FEINSTEIN:

If the President were acting in the interest of national security, as he alleges, would there be documentary evidence or testimony to substantiate his claim? If yes, has any evidence like that been presented by the President's counsel?

Mr. Manager CROW. Thank you, Mr. Chief Justice. Thank you, Senators, for the question.

The answer is yes. There are well-established processes, mechanisms, and agencies in place to pursue valid and legitimate national security interests of the United States—like the National Security Council; like the National Security Advisor, as in Ambassador John Bolton; and many other folks within the State Department and the Department of Defense. And as we have well established over the last week, none of those folks, none of those agencies, would have been involved in having that deliberation, reviewing that evidence, having that discussion, or incorporated into any type of interagency review process during the vast majority of the time that we are talking about here.

From the time of the President's call on July 25 to the time the hold was lifted, those individuals, those agencies were in the dark. They didn't know what was happening, and, more so, not only were they in the dark, but the President violated the law by violating the Impoundment Control Act to execute his scheme. None of that suggests a valid, legitimate policy objective.

More so, the President himself and his counsel are bringing at issue the question of documents and witnesses. If over and over again, as we have heard in the last few days, the President was simply pursuing a valid, legitimate policy objective, if this was a specific

debate about policy, a debate about corruption, a debate about burden-sharing, then, let's have the documents that would show that. Let's hear from the witnesses that would show that. The documents and the witnesses that we have forwarded and we have talked about show the exact opposite.

The American people in this Chamber deserve to have a fair trial. The President deserves to have a fair trial. In fact, if he is arguing that there is evidence, that there was a policy debate, then, I think everybody would love to see those documents, would love to see the witnesses and hear from them directly about what exactly was being debated.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from South Carolina.

Mr. GRAHAM. I send a question to the desk from myself and Senator CRUZ.

The CHIEF JUSTICE. Senator GRAHAM and Senator CRUZ pose this question for the House managers:

In Mr. SCHIFF's hypothetical, if President Obama had evidence that MITT ROMNEY's son was being paid $1 million per year by a corrupt Russian company—and MITT ROMNEY had acted to benefit that company—would Obama have authority to ask that that potential corruption be investigated?

Mr. Manager SCHIFF. First of all, the hypothetical is a bit off because it presumes in that hypothetical that President Obama was acting corruptly or there was evidence he was acting corruptly with respect to his son. But, nonetheless, let's take your hypothetical on its terms.

Would it have been impeachable if Barack Obama had tried to get Medvedev to do an investigation of MITT ROMNEY, whether it was justified or unjustified? The reality is, for a President to withhold military aid from an ally—or, in the hypothetical, to withhold it to benefit an adversary—to target their political opponent is wrong and corrupt—period, end of story.

If you allow a President to rationalize that conduct, rationalize jeopardizing the Nation's security to benefit himself because he believes that his opponent should be investigated by a foreign power, that is impeachable.

If you have a legitimate reason to think that any U.S. person has committed an offense, there are legitimate ways to have an investigation conducted. There are legitimate ways to have the Justice Department conduct an investigation.

I would suggest to you that for a President to turn to his Justice Department and say, "I want you to investigate my political rival," taints whatever investigation they do. Presidents should not be in the business of asking even their own Justice Department to investigate their rivals.

The Justice Department ought to have some independence from the political desires of the President, and one of the deeply troubling circumstances

of the current Presidency is you do have a President of the United States speaking quite openly, urging his Justice Department to investigate his perceived enemies.

That should not take place either, but under no circumstances do you go outside of your own legitimate law enforcement process to ask a foreign power to investigate your rival, whether you think there is cause or you don't think there is cause, and you certainly don't invite that foreign power to try to influence an election to your benefit.

It is remarkable to me that we even have to have this conversation. Our own FBI Director has made it abundantly clear—and it shouldn't require an FBI Director to say this—that if we were approached with an offer of foreign help, we should turn it down. We should, of course, certainly not solicit a foreign country to intervene in our election. And whether we think there is grounds or we don't, the idea that we would hold our own country's security hostage by withholding aid to a nation at war to either damage our ally or help our adversary because they will conduct an investigation into our opponent, I can't imagine any circumstance where that is justified, and I can't imagine any circumstance where we would want to say the President of the United States can target his rival, can solicit, elicit foreign help in an election, can help him cheat and that is OK, because that will dramatically lower the bar for what we have a right to expect in the President of the United States; and that is, they are acting in our interests.

I would say it is wrong for the President of the United States to be asking for political prosecutions by his own Justice Department. I would say it is wrong for the President of the United States to ask a foreign power to engage in an investigation of his political rival, but, particularly, where, as we have shown here, there is no merit to that investigation is even more egregious. You know there is no merit to it because he didn't even want the investigation.

The more accurate parallel, Senator, would be if Barack Obama said: I don't even need you, Russia, to do the investigation; I just want you to announce it—because that portrays the fact there was no legitimate basis, because the President didn't even need the investigation done. He just wanted it announced. There is no legitimate explanation for that except he wanted their help in cheating the next election.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Michigan.

Mr. PETERS. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. The question is from Senator PETERS and is for the House managers.

Does the phrase "or other high Crimes and Misdemeanors" in Article II, Section 4 of the Constitution require a violation of the U.S. criminal code or is a breach of public trust sufficient? Please explain.

Ms. Manager LOFGREN. The Framers were very clear that abuse of power is an impeachable offense. In explaining why the Constitution must allow impeachment, Edmund Randolph warned that "the Executive will have great opportunities of abusing his power."

Alexander Hamilton described "high crimes and misdemeanors" as "offenses which proceed from the . . . abuse or violation of some public trust."

The Framers also described what it meant. It was impeachable for a President to abuse his pardon power to shelter people he was connected with in a suspicious manner. Future Supreme Court Justice James Iredell said the President would be liable to impeachment if he acted from some corrupt motive or other or if he was willfully abusing his trust.

As was later stated in a treatise summarizing centuries of common law, abuse of power occurs if a public officer, entrusted with definite powers to be exercised for the benefit of the community, wickedly abuses or fraudulently exceeds them.

So when the Framers said this—that abuse of power was impeachable—it was not just an empty, meaningless statement. Remember, the Founders had been participating with overthrowing the British Government, a King who was not accountable.

They incorporated the impeachment power into the Constitution late, actually, in the drafting of the Constitution. They knew they were giving the President many powers, and they specified, if he abused them, that those powers could be taken away.

Now, the prior articles that the Congress has had on impeachment did not include specific crimes. President Nixon was charged with abusing his power, targeting political opponents, engaging in a coverup.

There was conduct specified. Some of it was clearly criminal. Some of it was not. But it was all impeachable because it was corrupt, and it was abusing his power.

In the House Judiciary Committee, we had witnesses called by both Republicans and Democrats. The Republican-invited constitutional law expert Jonathan Turley testified unequivocally that it is possible to establish a case for impeachment based on a non-criminal allegation of abuse of power.

Every Presidential impeachment, including this one, has included conduct that violated the law, but each Presidential impeachment has included the charges directly under the Constitution.

It is important to note that a specific criminal law violation was not in the minds of the Founders, and it wouldn't make any sense today. You could have a criminal law violation, you could deface a post office box. That would be a violation of Federal law. We would laugh at the idea that that would be a basis for impeachment. That is not abuse of Presidential powers. It might be a crime. And yet, you could have activities that are so dangerous to our Constitution, that are not a crime, that would be charged as an impeachable offense because they are an abuse of power. That is what the Framers worried about. That is why they put the impeachment clause in the Constitution, and, frankly, they opined that, because of the impeachment clause, no Executive would dare exceed their powers. Regrettably, that prediction did not prove true, which is why we are here today with President Trump having abused his broad powers to the detriment of our national interest for a corrupt purpose, his own personal interests.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

Senator.

Mr. ROUNDS. Mr. Chief Justice, I send a question to the desk on behalf of myself and Senator MURKOWSKI.

The CHIEF JUSTICE. Thank you, Senator.

The CHIEF JUSTICE. Senators ROUNDS and MURKOWSKI ask counsel for the President:

Describe in further detail your contention that all subpoenas issued prior to the passage of H. Res. 660 are cases of invalid subpoena authority by the House committees.

Mr. Counsel PHILBIN. Mr. Chief Justice.

Thank you, Senators, for that question.

As I explained the other day, this contention is based on a principle that has been laid out in several Supreme Court cases explaining that the Constitution assigns powers to each House of the legislative branch: to the House of Representatives or to the Senate. And in particular, the language of the Constitution is clear in article I that the sole power of impeachment is assigned to the House—as to the House of Representatives as a body. It is not assigned to any committee, to a subcommittee, or to any particular Member of the House.

And in cases such as Rumely v. The United States and the United States v. Watkins, the Court has been called—there are disputes about subpoenas. They are not specifically in the impeachment context, but they establish the general rule, a principle, that whenever a committee of either body of Congress issues a subpoena to someone and that person resists the subpoena, the courts will examine what was the authority of that committee or subcommittee to issue that subpoena.

It has to be traced back to some authorizing rule or resolution from the House of Representatives itself, for example, in a House subcommittee. And the courts will examine—the Supreme Court has made clear that that is the charter of the committee's authority. It gets its authority solely from an action by the House itself. That requires

CONGRESSIONAL RECORD — SENATE

a vote of the House, either to establish the committee by resolution or to establish by rule the standing authority of that committee. And if the committee cannot trace its authority to a rule or a resolution from the House, then its subpoena is invalid.

The Supreme Court made clear in those cases those subpoenas are null and void because they are ultra vires; they are beyond the power of the committee to issue. They can't be enforced. Our point here is very simple. There is no standing rule in the House that provides the committees that were issuing subpoenas here, under the leadership of Manager SCHIFF, the authority to use the impeachment power to issue subpoenas. Rule 10 of the House defines the legislative jurisdiction of committees. It doesn't mention the word ''impeachment'' even once. So no committee under rule 10 was given the authority to issue subpoenas for impeachment purposes.

This has always been the case in every Presidential impeachment in the history of the Nation. There has always been a resolution from the House, first, to authorize a committee to use the power of impeachment before it intended to issue compulsory process. So in this case, there was no resolution from the House. The authority, the sole power of impeachment, remained with the House of Representatives itself. And Speaker PELOSI, by herself, did not have authority merely by talking to a group of reporters on September 24, to give the powers of the House to any particular committee to start issuing subpoenas. So the subpoenas that were issued were invalid when they were issued.

And then 5 weeks later, on October 31, when the House finally adopted H. Res. 660, that authorized from that point—purported to authorize from that point the issuance of subpoenas. Nothing in that resolution addressed the subpoenas that had already been issued. It didn't even attempt or purport to say the ones that have already been issued, we are going to try to retroactively give authority to that. It is a separate question about whether that could have been done legally. They didn't even attempt to do it.

This is all explained in the opinion from the Office of Legal Counsel, which is in our trial memorandum attached as appendix C. It is a very detailed and thorough opinion; it is 37 pages of legal reasoning, but it explains all of this, the basic principle that applies, generally, and the history that it has always been done this way. There has always been, in every Presidential impeachment, been an authorizing resolution from the House. And the fact that there was none here—so there was no authority for those subpoenas—that means that 23 subpoenas that were issued were invalid.

And this was explained, as I pointed out the other day, in letters from the administration to the committees—a letter from the White House, from

OMB, I think the State Department—and in very specific terms, they set out this rationale. That is the basis on which those subpoenas were invalid, and they were properly resisted by the administration.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Pennsylvania.

Mr. CASEY. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Thank you.

Senator CASEY's question is directed to the House managers:

In Federalist 65, Alexander Hamilton writes that the subjects of impeachment are ''those offenses which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust.'' Could you speak broadly to the duties of being a public servant and how you believe the President's actions have violated this trust?

Mr. Manager NADLER. Mr. Chief Justice, Members of the Senate.

President Trump used the powers of his office to solicit a foreign nation to interfere in our elections for his own benefit, and then he actively obstructed Congress in his attempts to investigate his abuses of power. These actions are clearly impeachable. The key purpose of the impeachment clause is to control abuses of power by public officials; that is to say, conduct that violates the public trust.

Since the founding of the Republic, all impeachments have been based on accusations of conduct that violates the public trust. When the Framers wrote the phrase ''high Crimes and Misdemeanors,'' they intended to capture the conduct of public officials, like President Trump, who showed no respect for their oath of office. President Trump ignored the law and the Constitution in order to gain a political favor. The Constitution and his oath of office prohibited him from using his official favor to corruptly benefit himself rather than the American people. That is exactly what the President did, illegally withholding military aid and a White House meeting until the President of Ukraine committed to announcing an investigation of President Trump's opponent.

In the words of one constitutional scholar: ''If what we're talking about is not impeachable, then nothing is impeachable.''

This is precisely the misconduct that the Framers created the Constitution, including impeachment, to protect against.

I want to add something in reference to some of the comments that were made by some of the President's counsel a few minutes ago. They talk about the subpoena power, about the failure of the House to act properly in the subpoena power because they said the House did not delegate by rule—have a resolution authorizing the committees to offer subpoena power. They apparently haven't read the fact that the House has generally delegated all subpoena power to the committees. It

wasn't true at the time of the Watkins case; it wasn't true 15 years ago; but it is true now.

Second, the House power is the sole power of impeachment and the manner of its exercise may not be challenged from outside. Whether the President should be convicted upon our accusation is a question for the Senate, but how we reached our accusation is a matter solely for the House.

Thirdly, they talked about executive privilege, and they pointed to the Nixon case that established executive privilege; that the President has a right to private, candid advice and, therefore, executive privilege is established. The same case says that executive privilege cannot be used to hide wrongdoing and, in fact, President Nixon was ordered in that case to turn over all his material.

Thirdly, there is a doctrine of waiver. You cannot use executive privilege or any other privilege if you waive it. The moment President Trump said that John Bolton was not telling the truth when he said that the President told him of the improper quid pro quo, he waived any executive privilege that might have existed. He cannot characterize a conversation and put it into the public domain and then claim executive privilege against it. The President, by the way, never claimed executive privilege ever. He has claimed, instead, absolute immunity—a ridiculous doctrine that the President has absolute immunity from any questioning by the Congress or by anybody else. It is a claim rejected by every court that has ever considered it.

Finally, the difference from this President and any other President claiming privilege of any sort is that this President told us in advance: I will defy all subpoenas, whatever their nature. I will make sure that the Congress gets no information. In other words: I am absolute. The Congress cannot question what I do because I will defy all subpoenas. I will make sure they get no information, no matter what their rights, no matter what their situation.

That is the subject of our article II of the impeachment because that is a claim of absolute monarchical power.

The CHIEF JUSTICE. Thank you, Mr. Manager.

Mr. McCONNELL. Mr. Chief Justice.

The CHIEF JUSTICE. The majority leader is recognized.

Mr. McCONNELL. I want to suggest that after two more questions on each side—I have been corrected, as I frequently am—one more question on each side, we take a 15-minute break.

The CHIEF JUSTICE. Thank you.

The Senator from Kansas.

Mr. ROBERTS. I send a question to the House counsel for a question.

The CHIEF JUSTICE. Thank you.

Senator ROBERTS asks:

Would you please respond to the arguments or assertions the House managers made in response to the previous questions?

This is directed to the counsel for the President.

CORRECTION

Mr. Counsel SEKULOW. Mr. Chief Justice, Members of the Senate. I want to respond to a couple.

First, with regard to the question or the issues that have been raised as it relates to witnesses, it is important to note that in the Clinton impeachment proceeding, the witnesses who actually gave deposition testimony were witnesses who had either been interviewed by deposition in the House proceedings, grand jury proceedings, and then, more specifically, was Sid Blumenthal, Vernon Jordan, and Monica Lewinsky. New witnesses were not being called. That is because the House, in their process, moved forward with a full investigation. That did not happen here.

There was another statement that was raised by Mr. Chairman SCHIFF, Manager SCHIFF, regarding the Chief Justice could make the determination on executive privilege. And again, with no disrespect to the Chief Justice, the idea that the Presiding Officer of this proceeding could determine a waiver or an applicability of executive privilege would be quite a step. There is no historical precedent. There is no historic precedent that would justify it.

But there is something else. If we get to the point of witnesses, then, for instance, if one of the witnesses to be called by the President's lawyers was ADAM SCHIFF in the role, basically, of Ken Starr—Ken Starr presented the report and made the presentation before the House of Representatives. He had about 12 hours of questioning, I believe, is what Judge Starr had. If Representative SCHIFF was called as a witness, would, in fact, then issues of speech and debate clause privilege be litigated and decided by the Presiding Officer or would it go to court or maybe they would waive it, but those would be the kind of issues that would be very, very significant.

Senator GRAHAM presented a hypothetical, which Manager SCHIFF said, well, that is not really the hypothetical, but hypotheticals are actually that; they are hypotheticals. To use Manager SCHIFF's words, he talked about how it would be wrong if FBI or the Department of Justice was starting a political investigation of someone's political opponent.

I am thinking to myself, but isn't that exactly what happened? The Department of Justice and the FBI engaged in an investigation of the candidate for President of the United States when they started their operation called Crossfire Hurricane.

He said it would be targeting a rival. That is what that did. He said it would be calling for foreign assistance in that. In the particular facts of Crossfire Hurricane, it has been well established now that, in fact, Fusion GPS utilized the services of a former foreign intelligence officer, Christopher Steele, to put together a dossier and that Christopher Steele relied on his network of resources around the globe, including Russia and other places, to put together this dossier, which then

James Comey said was unverified and salacious. Yet it was the basis upon which the Department of Justice and the FBI obtained FISA warrants. This was in 2016, against a rival campaign. So we don't have to do hypotheticals. It is precisely the situation.

To take it an additional step, this idea that a witness will be called—if this body decides to go to witnesses—would be a violation of fundamental fairness. Of course, if witnesses are called by the House managers through that motion, the President's counsel would have the opportunity to call witnesses as well, which we would.

Thank you, Mr. Chief Justice.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from California.

Ms. HARRIS. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. The question from Senator HARRIS is for the House managers:

President Nixon said, "When the president does it that means that it is not illegal." Before he was elected, President Trump said, "When you're a star, they let you do it. You can do anything." After he was elected, President Trump said that Article II of the Constitution gives him "the right to do whatever [he] want[s] as president." These statements suggest that each of them believed that the president is above the law—a belief reflected in the improper actions that both presidents took to affect their reelection campaigns. If the Senate fails to hold the President accountable for misconduct, how would that undermine the integrity of our system of justice?

Mr. Manager SCHIFF. Mr. Chief Justice, Senators, I think this is exactly the fear. I think, if you look at the pattern in this President's conduct and his words, what you see is a President who identifies the state as being himself. When the President talks about the people who report his wrongdoing—for example, when he describes a whistleblower as a traitor or a spy—the only way you can conceive of someone who reports wrongdoing as committing a crime against the country is if you believe that you are synonymous with the country, that any report of wrongdoing against the President—the person the President—is a treasonous act. It is the kind of mentality that says that under article II, I can do whatever I want, that I am allowed to fight all subpoenas.

Counsel has given a variety of explanations for the fighting of all subpoenas. They might have had a plausible argument if the administration had given hundreds of documents but reserved some and made a claim of privilege or if the administration has said: We will allow these witnesses to testify, but with these witnesses, with these particular questions, we want to assert the privilege.

Of course, that is not what was done here. What we have, instead, is a shifting series of rationales, of explanations, and duplicitous arguments—some made in court and some made here—the argument that the subpoenas

aren't valid before the House resolution, and then with respect to subpoenas issued after the House resolution, like to Mulvaney, they are no good either. You have the argument made that, we have absolute immunity, and the court that addresses this says: No, you don't; you are not a King. That argument may have been thought of with favor by various Presidents over history, but it has never been supported by any court in the land, and there is no constitutional support for that either.

There are documents that are being released right now, as we sit here, and it is a mystery to the country, and it is a mystery to some of us. How are private litigants able to get documents through the Freedom of Information Act that the administration has withheld from Congress? If they were operating in any good faith, would that be the case? Of course, the answer is no. What we have instead is, we are going to claim absolute immunity, although the court says that doesn't exist.

They said: You know, the House withdrew the subpoena on Dr. Kupperman. Why would they withdraw the subpoena on Dr. Kupperman when he was only threatening to tie you up endlessly in court?

Now, we suggested to counsel for Dr. Kupperman that, if they had a good-faith concern about testifying—if this were really good faith and it were not just a strategy to delay; if it were not just part of the President's wholesale "fight all subpoenas"—they didn't need to file separate litigation because there was actually a case already in court involving Don McGahn on that very subject that was ripe for a decision. Indeed, the decision would come out very shortly thereafter. We said: Let's just agree to be bound by what the McGahn court decides.

They didn't want to do that, and it became obvious once the McGahn court decision came out because the McGahn court said: There is no absolute immunity. You must testify.

By the way, if you think people involved in national security—i.e. Dr. Kupperman and John Bolton, if you are listening—are somehow absolutely immune, they are not.

So did Dr. Kupperman say: "Now I have the comfort I need because the court has weighed in"? The answer is, of course not.

Counsel says: Well, we might have gotten a quick judgment in Kupperman.

Yes—in the lower court.

Do any of you believe for a single minute that they wouldn't appeal to the court of appeals and to the Supreme Court and that if the Supreme Court struck down the absolute immunity argument, they wouldn't be back in the district court, saying: "OK. He is not asking for absolute immunity anymore, but we are going to claim executive privilege over specific conversations that go to the President's wrongdoing"?

That is the sign of a President who believes that he is above the law, that article II empowers him to do anything he wants.

I will say this: If you accept that argument—if you accept the argument that the President of the United States can tell you to pound sound when you try to investigate his wrongdoing—there will be no force behind any Senate subpoena in the future.

The "fighting all subpoenas" started before the impeachment. If you allow a President to obstruct Congress so completely in a way that Nixon could never have contemplated, nor would the Congress of that day have allowed, you will eviscerate your own oversight capability.

Thank you.

The CHIEF JUSTICE. The majority leader is recognized.

RECESS

Mr. McCONNELL. Mr. Chief Justice, I ask unanimous consent that the Senate stand in recess until 4 p.m.

There being no objection, the Senate, at 3:38 p.m., recessed until 4:06 p.m. and reassembled when called to order by the CHIEF JUSTICE.

The CHIEF JUSTICE. The Senator from Oklahoma.

Mr. INHOFE. Mr. Chief Justice, I have a question for the President's counsel, and it is cosponsored by Senators ROUNDS, WICKER, ERNST, BLACKBURN, TILLIS, CRAMER, COTTON, SULLIVAN, McSALLY, all members of the Senate Armed Services Committee.

The CHIEF JUSTICE. The Senators ask the following question of the counsel for the President:

Mr. Cipollone, as Members of the Senate Armed Committee, we listened intently when Manager CROW was defending one of Senator SCHUMER's amendments to the organizing resolution last week as he explained how he had firsthand experience being denied military aid when he needed it during his service. As you know, David Hale, Under Secretary of State for Political Affairs, confirmed that the lethal aid provided to Ukraine last year was future aid. Which would you say had the greater military impact: President Trump's temporary pause of 48 days on future aid that will now be delivered to Ukraine, or President Obama's steadfast refusal to provide lethal aid to Ukraine for 3 years—more than 1,000 days—while Ukraine attempted to hold back Russia's invasion and preserve its sovereignty?

Mr. Counsel PHILBIN. Mr. Chief Justice. Thank you, Senators for that question.

I think it was far more serious and far more jeopardy for the Ukrainians the decision of the Obama administration to not use the authority that was given by Congress—that many of you all, many Members of the House of Representatives voted for—giving the U.S. Government the authority to provide lethal aid to the Ukrainians, and the Obama administration decided not to provide that aid.

And multiple witnesses who were called in the House by the House Democrats testified that United States policy toward Ukraine got stronger under the Trump administration, in part, largely, because of that lethal aid.

Ambassador Yovanovitch, Ambassador Volker, others also testified that U.S. policy providing that aid was greater support for Ukraine than was provided in the Obama administration, particularly the provision of Javelin anti-tank missiles, which they explained were lethal and would kill Russian tanks and change the calculus for aggression from the Russians in the Donbas region in the eastern portion of Ukraine where that conflict was still ongoing.

In terms of the pause, the temporary pause on aid here, the testimony in the record—put aside what the House managers have said about their speculation and they know what it is like to be denied aid—the testimony in the record is that this temporary pause was not significant.

And as for Volker, Ambassador Volker testified that the brief pause on releasing the aid was "not significant."

And Under Secretary of State for Political Affairs David Hale explained that this is "future assistance, not to keep the Army going now."

So, in other words, this isn't money that had to flow every month in order to fund current purchases or something like that. It was money—it is 5-year money. Once it is obligated, it is there for 5 years, and it usually takes quite a bit of time to spend all of it.

So the idea, somehow, that during the couple of months in July, August, and up until September 11—55 or 48 days, depending upon how you count it—that this was somehow denying critical assistance to the Ukrainians on the frontlines right then is simply not true.

And now the House managers have tried to pivot away from that because they know it is not true. They say: No, it was a signal to the Russians. It was a signal of lack of support that the Russians would pick up on. But here again, it is critical, even the Ukrainians didn't know that the aid had been paused, and part of the reason was they never brought it up in any conversations with representatives of the U.S. Government. And as Ambassador Volker testified, representatives of the U.S. Government didn't bring it up to them because they didn't want anyone to know; they didn't want to put out any signal that might be perceived by the Russians or by the Ukrainians as any sign of lack of support. It was kept internal to the U.S. Government.

They pointed to some emails that someone at the Department of Defense or Department of State, Laura Cooper, received from unnamed Embassy staffers suggesting that there was a question about the aid, but her testimony was that she couldn't even remember what the question really was, and she didn't want to speculate.

There is not evidence that any decision makers in the Ukraine Government knew about the pause.

And just the other day, another article came out—I believe it was from, at the time, the Foreign Minister Danylyuk—explaining that when the POLITICO article was published on August 28, there was panic in Kyiv because it was the first time they realized there was any pause on the aid. So that was not something that was providing any signal either to the Ukrainians or the Russians because it wasn't known. It was 2 weeks later, after it became public, that the aid was released.

The testimony in the record is that the pause was not significant; it was future money, not for current purchases; and it was released before the end of the fiscal year.

They point out that some of it wasn't out the door by the end of the fiscal year. That happens every year. There is some percentage that doesn't make it out the door by the end of the year.

Again, it is 5-year money. It is not like it is all going to be spent in the next 30, 60, 90 days anyway. So the fact that there was a little fix—Congress passed a fix to allow that $35 million to be spent; something similar happens for some amount almost every year; and it was not affecting current purchases—it wasn't jeopardizing anything at the frontlines. There is no evidence about that in the record. The evidence is to the contrary.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Maine is recognized.

Mr. KING. Mr. Chief Justice, I have a question for both sets of counsel, which I send to the desk.

The CHIEF JUSTICE. The question from Senator KING is for both counsel for the President and House managers:

President Trump's former chief of staff, General John Kelly has reportedly said, "I believe John Bolton" and suggests Bolton should testify, saying, "If there are people that could contribute to this, either innocence or guilt, I think they should be heard." Do you agree with General Kelly that they should be heard?

I think, counsel for the President, it is your turn to go first.

Mr. Counsel SEKULOW. Thank you, Mr. Chief Justice, Members of the Senate, this was a bit of a topic that I discussed yesterday, and that was the information that came out of the New York Times piece about what is purportedly in a book by Ambassador Bolton.

Now, as I said, the idea that a manuscript is not in the book—there is not a quote from the manuscript in the book; this is a perception of what the statement might be. There have been very forceful statements, not just from the President but from the Attorney General. The Department of Justice stated that while the Department of Justice has not reviewed Mr. Bolton's manuscript, the New York Times account of this conversation grossly mischaracterizes what Attorney General Barr and Mr. Bolton discussed. -

There was no discussion of his getting any personal favors or undue influence for the investigation, nor did Attorney General Barr state that the President's conversations with foreign leaders were improper. So again, that goes to some of the allegations that were in the article.

The Vice President said the same thing. He said: In every conversation with the President and Vice President, in preparation for our trip to Poland, the President consistently expressed his frustration that the United States was bearing the lion's share of responsibility.

There is also an interview that Ambassador Bolton had given, I think in August, about the conversation, where he said it was a perfectly appropriate conversation. I think that information is publicly available now.

So again, to move that into a change in proceeding, so to speak, I think is not correct. The evidence that has already been presented, an accusation that if you get into witnesses, and I will do this very briefly—if we get down the road on the witness issues, let's be clear, it should not be—I certainly can't dictate to this body—it should certainly not be, though, that the House managers get John Bolton, and the President's lawyers get no witnesses. We would expect that if they are going to get witnesses, we will get witnesses, and those witnesses would then—but all of that, just to be clear, changes the nature and scope of the proceedings. They didn't ask for it before.

The CHIEF JUSTICE. Thank you, counsel.

Mr. Manager SCHIFF. Senators, Mr. Chief Justice: What is the significance of the President's former Chief of Staff saying that he believes John Bolton and implicitly does not believe the President, that Bolton should testify? It is really, at the end of the day, not whether I believe John Bolton or whether General Kelly believes John Bolton but whether you believe John Bolton or whether you will have an opportunity to hear directly from John Bolton or whether you will have the opportunity to evaluate his credibility for yourself.

There are a few arguments made against this. Some are rather extraordinary. It would be unprecedented, the suggestion, I think is, to have witnesses in the trial. What an extraordinary idea. But as my colleagues have said, it would be extraordinary not to. This would be the first impeachment trial in history that involves no witnesses, if you decide you don't want to hear from any, that you simply want to rely on what was investigated in the House. That would be unprecedented.

Yes, we should be able to call witnesses, and, yes, so should the President—relevant witnesses.

Now, the President says that you can't believe John Bolton, and Mick Mulvaney says you can't believe John Bolton. Well, let the President call

Mick Mulvaney, another relevant witness with firsthand information. If he is willing to say publicly, not under oath, that Bolton is wrong, let him come and say that under oath. Yes, we are not saying that just one side gets to call witnesses; both sides get to call relevant witnesses.

Now, they also make the argument, implicitly, that this is going to take long. Senators, warn you, if you want to have a real trial, it is going to require witnesses, and that is going to take time. I think the underlying threat—and I don't mean this in a harsh way—is: We are going to make this really time-consuming.

The depositions took place very quickly in the House. We have a perfectly good Chief Justice behind me that can rule on evidentiary issues. What is more, the President has waived and waived and waived any claim about national security here by talking about himself, by declassifying the call record.

We are not interested in asking Bolton about Venezuela or other places or other countries, just Ukraine. If there is any question about it, the Chief Justice can resolve. These are relevant questions to the matter at hand. What you cannot do is use privilege to hide any wrongdoing of an impeachable kind and character.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Utah.

Mr. LEE. Mr. Chief Justice, I send a question to the desk on behalf of myself and Senators CRUZ and HAWLEY.

The CHIEF JUSTICE. The question is directed to counsel for the President:

Is it true that Sean Misko, Abigail Grace, and the alleged whistleblower were employed by or detailed to the National Security Council during the same time period between January 20, 2017, and the present? Do you have reason to believe that they knew each other? Do you have any reason to believe that the alleged whistleblower and Misko coordinated to fulfill their reported commitment to "do everything we can to take out the President"?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, the only knowledge that we have—that I have of this comes from public reports. I gather that there is a news report in some publication that suggests a name for the whistleblower, suggests where he worked, that he worked at that time while detailed to the NSC staff for then-Vice President Biden and that there were others who worked there. We have no knowledge of that, other than what is in those public reports, and I don't want to get into speculating about that. It is something that, to an unknown extent, may have been addressed in the testimony of the inspector general of the intelligence community before Chairman SCHIFF's committees, but that testimony, contacts between members of Manager SCHIFF's staff and the whistleblower are shrouded in secrecy to this day. We don't know what the testimony of the ICIG was. That remains secret. It has not been forwarded.

We don't know what Manager SCHIFF's staff's contact with the whistleblower have been and what connections there are there. It is something that would seem to be relevant, since the whistleblower started this entire inquiry, but I can't make any representations that we have particular knowledge of the facts suggested in the question. We know that there was a public report suggesting connections and prior working relationships between certain people—not something that I can comment on other than to say that there is a report there.

We don't know what the ICIG discussed. We don't know what the ICIG was told by the whistleblower. Other public reports about inaccuracies in the whistleblower's report to the ICIG, we don't know the testimony on that. We don't know the situation of the contacts, coordination, advice provided by Manager SCHIFF's staff to the whistleblower. That all remains unknown, but something that obviously—to get to the bottom of motivations, bias, how this inquiry was all created could potentially be relevant.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from New Mexico.

Mr. HEINRICH. Mr. Chief Justice, I send a question to the desk for the President's counsel.

The CHIEF JUSTICE.

When did the President's counsel first learn that the Bolton manuscript had been submitted to the White House for review, and has the President's counsel or anyone else in the White House attempted in any way to prohibit, block, disapprove, or discourage John Bolton, or his publisher, from publishing his book?

Mr. Counsel PHILBIN. Thank you, Mr. Chief Justice, and thank you, Senator, for the question.

At some point—I don't know off the top of my head the exact date—the manuscript had been submitted to the NSC for review. It is with career NSC staff for review. The White House Counsel's Office was notified that it was there. The NSC has released a statement explaining that it has not been reviewed by anyone outside NSC staff.

In terms of the second part of the question, has there been any attempt to prevent its publication or to block its publication, I think that there was some misinformation put out into the public realm earlier today, and I can read for you a relatively short letter that was sent from NSC staff to Charles Cooper, who is the attorney for Mr. Bolton, on January 23, which was last week.

It says:

Dear Mr. Cooper: Thank you for speaking yesterday by telephone. As we discussed, the National Security Council . . . Access Management directorate has been provided the manuscript submitted by your client, former Assistant to the President for National Security Affairs John Bolton, for prepublication review. Based on our preliminary review, the

manuscript appears to contain significant amounts of classified information. It also appears that some of this classified information is at the TOP SECRET level, which is defined by Executive Order 13526 as information that "reasonably could be expected to cause exceptionally grave harm to the national security" of the United States if disclosed without authorization. Under federal law and the nondisclosure agreements your client signed as a condition for gaining access to classified information, the manuscript may not be published or otherwise disclosed without the deletion of this classified information.

The manuscript remains under review in order for us to do our best to assist your client by identifying the classified information within the manuscript, while at the same time ensuring that publication does not harm the national security of the United States. We will do our best to work with you to ensure your client's ability to tell his story in a manner that protects U.S. national security. We will be in touch with you shortly with additional, more detailed guidance regarding next steps that should enable you to revise the manuscript and move forward as expeditiously as possible. Sincerely,

And the signature of the career official. So it is with the NSC doing their prepublication review.

Through his lawyer, Ambassador Bolton was notified that the manuscript he submitted contains a significant amount of classified information, including at the top secret level, so that in its current form it can't be published but that they will be working with him as expeditiously as possible to provide guidance so it can be revised and so that he can tell his story.

That is the letter from the NSC that went out. Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Iowa.

Ms. ERNST. Mr. Chief Justice, I send a question to the desk on behalf of myself and Senators BURR, McSALLY, DAINES, MORAN, YOUNG, and SASSE.

The CHIEF JUSTICE. The Senators' question is directed to counsel for the President.

Is it true the Trump administration approved supplying Javelin anti-tank missiles to Ukraine? Is it also true this decision came on the heels of a nearly three-year debate in Washington over whether the United States should provide lethal defense weapons to counter further Russian aggression in Europe? By comparison, did President Obama refuse to send weapons or other lethal military gear to Ukraine? Was this decision against the advice of his Defense Secretary and other key military leaders in his administration?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators. Thank you, Senators, for the question.

Yes, the Trump administration made the decision to provide Javelin anti-tank missiles, and there was a significant debate about that for some time. Authorization had been granted by Congress, and many of you voted for that statutory authorization during the Obama administration to provide lethal assistance to Ukraine, but the Obama administration decided not to provide that.

It was only the Trump administration that made that lethal assistance available, and there was a significant amount of testimony in the House proceedings that President Trump's policy toward Ukraine was actually stronger.

Ambassador Volker explained that America's policy toward Ukraine has been strengthened under President Trump and that each step, along the way in decisions that got to the Javelin missiles being provided, was made by President Trump. It is something that has substantially strengthened our relationship with Ukraine and strengthened their ability to resist Russian aggression.

Ambassador Yovanovitch said that President Trump's decision to provide lethal weapons meant that our policy actually got stronger over the last 3 years, and she called it "very significant."

Another point to make in relation to this is, again, that the pause—the temporary pause that took place over the summer—is something that the Ukrainian Deputy Defense Minister described it as being so short that they didn't even notice it. So President Trump's policies, across the board, have been stronger than the prior administration's in providing defensive capability—lethal defensive capability—to Ukrainians, and I think that that is significant.

As to the specific part of the question, Senators, whether it was contrary to the advice of the President's Defense Secretary and others, I believe that that is accurate. It was against the advice of the Secretary of Defense. It was President Trump's decision to provide the lethal assistance, and that has been made public in the past. Thank you.

The CHIEF JUSTICE. Thank you, counsel.

Mrs. FEINSTEIN. Mr. Chief Justice.

The CHIEF JUSTICE. Senator FEINSTEIN.

Mrs. FEINSTEIN. Thank you, Mr. Chief Justice. I send a question to the desk on behalf of Senators CARPER, COONS, HIRONO, LEAHY, TESTER, UDALL, and myself to the House managers. Thank you.

The CHIEF JUSTICE. The question from Senator FEINSTEIN and the other Senators is to the House managers:

The President has taken the position that there should be no witnesses and no documents provided by the executive branch in response to these impeachment proceedings. Is there any precedent for this blanket refusal to cooperate, and what are the consequences if the Senate accepts this position here?

Ms. Manager LOFGREN. Mr. Chief Justice and Senators, President Trump has taken really an extreme measure to hide this evidence from Congress. No President has ever issued an order to direct a witness to refuse to cooperate in an impeachment inquiry before this.

Despite his famous attempts to conceal the most damaging evidence against him, even President Nixon allowed senior officials to testify under oath. Not only did he allow them; he told them to go to Congress voluntarily and answer all relevant questions truthfully.

But President Trump issued a blanket order directing the entire executive branch to withhold all documents and testimony from the House of Representatives. His order was categorical. It was indiscriminate and unprecedented. Its purpose was clear: to prevent Congress from doing its duty under the Constitution to hold the President accountable for high crimes and misdemeanors.

Telling every person who works in the White House and every person who works in every department, agency, and office of the executive branch is just unprecedented. It wasn't about specific, narrowly defined privileges. He never asserted privileges, and the President's counsel has mentioned over and over that he had some reason because of the subpoenas.

Well, I tell you, we adopt rules about subpoenas in the House. The Senate is a continuing body, but the House isn't. In January, we adopted our rules, and it allows the committee chairman to issue subpoenas, and that is what they did.

He refused to comply with those subpoenas, not because he exerted executive privilege but because he didn't like what we were doing. He tried to say it was invalid, but it was valid.

Actually, he doesn't have the authority to be the arbiter of the rules of the House. The House is the sole arbiter of its rules when it comes to impeachment.

Now, this refusal to give testimony, documents, and the like is still going on. We still have former or current administration officials who are refusing to testify. You know, we would not allow this in any other context. You know, if a mayor said that I am not going to answer your subpoenas, they would be dealt with harshly if it was to cover up misdeeds and crimes, as we have here. The mayor would actually go to jail for doing that.

If we allow the President to avoid accountability by simply refusing to provide any documents, any witnesses—unlike every single President who preceded him—we are opening the door not just to eliminating the impeachment clause in the Constitution. Try doing oversight. Try doing oversight, Senators, working without that in the House. If the President can just say, we are not sending any witnesses; we are not sending any documents; we don't have to; we don't like your processes; we have a wholesale rejection of what you are doing—that is not the way our Constitution was created. Each body has a responsibility. There is sharing of power. I, and I know you, cherish the responsibility that we have that would be eviscerated if the President's complete stalling is allowed to persist and be accepted by this body. You have to act now in this moment in history.

I yield back.

The CHIEF JUSTICE. Thank you.

Mrs. CAPITO. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from West Virginia.

Mrs. CAPITO. Thank you. I send a question to the desk for the President's counsel.

The CHIEF JUSTICE. Senator CAPITO's question is for counsel for the President:

You said that Ukrainian officials didn't know about the pause on aid until August 28, 2019, when it was reported in POLITICO. But didn't Laura Cooper, the deputy assistant secretary of defense for Russia, say that members of her staff received queries about the aid from the Ukrainian Embassy on July 25? Does that mean that Ukrainian officials knew about the hold on aid earlier than the POLITICO article?

Mr. Counsel PURPURA. Mr. Chief Justice, Members of the Senate, Senator, thank you for your question.

It does not mean that. As we explained on Saturday, the overwhelming body of evidence indicates that the Ukrainians, at the very highest levels—President Zelensky and his top advisers—only became aware of the pause in the security assistance through the August 28 POLITICO article.

I addressed this on Saturday—and so those comments will stand—the emails that Deputy Assistant Secretary of Defense Laura Cooper testified about previously. What she had said was that she—her staff—had gotten emails from someone at the State Department who had had some sort of conversation with Ukrainian officials here that somehow related to the aid at a time prior to August 28. She did not know the substance of the emails or whether they mention ''hold,'' ''pause,'' ''review,'' or anything of that nature. And she even said herself that she didn't want to speculate as to what the emails meant and cannot say for certain what they were about.

I presented on Saturday the evidence, which, again, is referencing the common sense that would be in play here. This was something that on August 28 caused a flurry of activity among the highest ranking Ukrainian officials. Never before did they raise any questions at any of the meetings they had with the high-ranking U.S. officials through July and August. There were meetings on July 9, July 10, July 25 call, July 26, and August 27. At none of those meetings was the pause on aid revealed or inquired about. However, as soon as the POLITICO article came out on August 28, within hours of that POLITICO article coming out, Mr. Yermak texted the article to Ambassador Volker and asked to speak with him. That is consistent with someone finding out about it for the first time. The Ukrainians have also made statements that they learned about it for the first time.

And then Mr. Philbin just referenced an article that came out yesterday in the Daily Beast, which is an interview with Mr. Danyliuk, who was, at the time, a high-ranking defense official with the Ukrainians. This is interesting, and I am going to read this article because I think it is important, and

I suggest it to the Senate if they wish to have something to consider further on this.

Danyliuk said he first found out that the U.S. was withholding aid to Ukraine by reading POLITICO's article published Aug. 28. U.S. officials and Ukrainian diplomats, including the country's former Foreign Minister Olena Zerkal, have said publicly that Kyiv was aware that there were problems with the U.S. aid as early as July.

That is the article that they have mentioned in the statement that the House managers have mentioned.

Here is Mr. Danyliuk:

''I was really surprised and shocked. Because just a couple of days prior to that . . . I actually had a meeting with John Bolton. Actually, I had several meetings with him. And we had extensive discussions. The last thing I expected to read was an article about military aid being frozen,'' Danyliuk said. ''After that . . . I was trying to get the truth. Was it true or not true?''

Danyliuk said that ''it was a panic'' inside the Zelensky administration after the initial news broke, saying Zelensky was convinced there had been some sort of mistake.

That is President Zelensky.

Danyliuk put in calls to the National Security Council and asked other officials in Washington what to make of the news.

Again, this is on August 28, or right after August 28.

''The next time we met in September . . . it was in Poland for the commemoration of the beginning of the Second World War''—

The Warsaw meeting we discussed previously—

Danyliuk said, adding that he met with Bolton on the sidelines of the commemoration. ''I had my suspicions. There was a special situation with one of our defense companies that were acquired by the Chinese. And the U.S. was concerned about this. Bolton actually made the public comments about this as well. So somehow I linked this to things and tried to understand. OK, maybe this could be related to this.''

So not only did they not know until August 28—when they did find out—but they didn't link it to any investigation. Where is the quid pro quo? If it is such at the forefront of their minds, such pressure on them that the Ukrainians have to do these investigations to get the aid, when the aid was held up, they didn't think it was connected to the investigations.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Maryland.

Mr. CARDIN. Mr. Chief Justice, I have a question on behalf of Senator BALDWIN and myself, and I send it to the desk.

The CHIEF JUSTICE. The question is addressed to the House managers:

Is the White House correct in its trial memorandum and in presentations of its case that ''President Zelensky and other senior Ukrainian officials did not even know that the security assistance had been paused'' before seeing press reports on August 28, 2019, which was more than a month after the July 25 phone call between Presidents Zelensky and Trump?

Mr. Manager CROW. Thank you, Chief Justice and Senators, for the question.

The answer is no. The evidence does not show that. We know that Defense Department official Laura Cooper testified that her staff received 2 emails from the State Department on July 25 revealing that the Ukrainian Embassy was ''asking about security assistance,'' and, in fact, counsel for the President brought up these emails just now. I would propose that the Senate subpoena those emails and we can all see for ourselves what exactly was happening.

We also know that career diplomat Catherine Croft stated that she was ''very surprised at the effectiveness of my Ukrainian counterparts' diplomatic tradecraft, as in to say they found out very early on, or much earlier than I expected them to,'' and that LTC Alex Vindman testified that by mid-August he was getting questions from Ukrainians about the status of security assistance.

So the evidence shows over and over again from the House inquiry that there was a lot of discussion, and there should be because we also know that delays matter. They matter a lot. You don't have to take my word for it. This is not just about a 48-day delay. Ukrainians were consistently asking about it because it was urgent. They needed it. They needed it.

You know who else was asking for it—American businesses. The contractors who were going to be providing this were also making inquiries about it because there is a pipeline.

As my esteemed Senate Armed Services colleagues know very well, providing aid is not like turning on and off a light switch. You have to hire employees. You have to get equipment. You have to ship it. It takes a long time for that pipeline to go. In fact, we had to come together as a Congress to pass a law to extend that timeline because we were at risk of losing it. And to this day, $18 million of that aid has still not been spent.

Let's just assume for a minute, also broadly speaking, that the President's counsels' argument that support for Ukraine has never been better than it is today, that under the Trump administration, they are the strongest ally Ukraine has seen in years. Just assuming for a minute that argument to be true, it kind of makes our own argument. It kind of makes our argument: Then why hold the aid? Why hold the aid? Because nothing had changed in 2016; nothing had changed in 2017; and nothing had changed in 2018. One thing had changed in 2019, and that was Vice President Biden was running for President.

Lastly, the previous question by my Senate Armed Services colleagues framed this in terms of the military impact. They asked: What was greater in terms of military impact, not providing lethal aid or a 48-day delay?

Let's not forget the reason for the delay, because there is a lot of discussion today about the technicalities of the delay and that the President's

mentality, his mindset, doesn't matter. It doesn't matter what he intended to do. I would posit that is exactly why we are here—that it does matter what the President intended to do because in matters of national security, the American people deserve to go to bed every night knowing that the President, the Commander in Chief, the person who is ultimately responsible for the safety and security of our Nation every night, has the best interests of them and their families and this country in mind, not the best interests of his political campaign. That is why we are here.

The CHIEF JUSTICE. Thank you, Mr. Manager.

Ms. COLLINS. Mr. Chief Justice.

The CHIEF JUSTICE. Senator.

Ms. COLLINS. I send a question to the desk on behalf of myself and Senator MURKOWSKI.

The CHIEF JUSTICE. Thank you.

The question is to counsel for the President:

Witnesses testified before the House that President Trump consistently expressed the view that Ukraine was a corrupt country. Before Vice President Biden formally entered the 2020 presidential race in April 2019, did President Trump ever mention Joe or Hunter Biden in connection with corruption in Ukraine to former Ukrainian President Poroshenko or other Ukrainian officials, President Trump's cabinet members or top aides, or others? If so, what did the President say to whom and when?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for that question.

Of course, I think it is important at the outset to frame the answer by bearing in mind I am limited to what is in the record, and what is in the record is determined by what the House of Representatives sought. It was their proceeding. They were the ones who ran it. They were the ones who called the witnesses. Part of the question refers to conversations between President Trump and other Cabinet members and others like that. There is not something in the record on that. It wasn't thoroughly pursued in the record, so I can't point to something in the record that shows President Trump, at an earlier time, mentioning specifically something related to Joe or Hunter Biden.

It is in the record that he spoke to President Poroshenko twice about corruption in Ukraine, both in June of 2017 and again in September of 2017. But there is other information publicly available and in the record that I think is important for understanding the timeline and understanding why it was that the information related to the Bidens and the Burisma affair came up when it did.

One important piece of information to bear in mind is that from the tapes we have seen, President Poroshenko was the person who Joe Biden himself went to to have the prosecutor fired. So as long as President Poroshenko was still in charge in Ukraine, he was the person who Joe Biden had spoken

to to get the prosecutor, Shokin, fired when, according to public reports, Shokin was looking into Burisma. As long as he was still the President in Ukraine, it questioned the utility of raising an incident in which he was the one who was taking the direction from Vice President Biden to fire the prosecutor.

When you have an election in April of 2019 and you have a new President—President Zelensky—who has run on an anti-corruption platform, and there is a question "Is he really going to change things; is there going to be something new in Ukraine?" it opens up an opportunity to really start looking at anti-corruption issues and raising questions.

The other thing to understand in the timeline is that we have heard a lot about Rudy Giuliani, the President's private lawyer, and what was he interested in in Ukraine and what was his role? Well, as we know—it has been made public—Mr. Giuliani, the President's private lawyer, had been asking a lot of questions in Ukraine dating back to the fall of 2018, and in November 2018, he said publicly he was given some tips about things to look into.

He gave a dossier to the State Department in March of this year. Remember, Vice President Biden announced his candidacy in April—April 25. In March, Rudy Giuliani gave documents to the State Department, including interview notes from interviews he conducted both with Shokin and with Yuriy Lutsenko, who was also a prosecutor in Ukraine. Those interview notes are from January 23 and January 25, 2019—so months before Vice President Biden announced any candidacy—and it goes through in these interview notes, Shokin explaining that he was removed at the request of Mr. Joseph Biden, the Vice President. It explains that he had been investigating Burisma and that Hunter was on the board, and it raises all of the questions about that.

So it was Mr. Giuliani who had been, as Jane Raskin as counsel for the President explained the other day—Mr. Giuliani is looking into what went on in Ukraine: Is there anything related to 2016? Are there other things related there?

And he is given this information—tips about this—and starts pursuing that as well. He is digging into that in January of 2019.

We know that Mr. Giuliani is the President's private counsel. I can't represent specific conversations they had. They would be privileged. But we do know from testimony that the President said in a May 23 Oval Office meeting with respect to Ukraine: Talk to Rudy. Rudy knows about Ukraine. It seems from that that the President gets information from Mr. Giuliani.

Months before Vice President Biden announced his candidacy, Mr. Giuliani is looking into this issue, interviewing people, and getting information about it.

In addition, in March of 2019, articles began to be published. Then three articles were published by ABC, by the New Yorker, and by the Washington Post before the July 25 call.

On July 22, 3 days before the call, the Washington Post has an article specifically about the Bidens and Burisma. That is what makes it suddenly current, relevant, probably to be in someone's mind.

That is the timeline.

The CHIEF JUSTICE. Thank you, counsel.

Mr. Counsel PHILBIN. Thank you, Senator.

Ms. HARRIS. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from California.

Ms. HARRIS. Thank you. I send a question to the desk on behalf of Senator PATTY MURRAY and myself.

The CHIEF JUSTICE. Senators HARRIS and MURRAY ask the House managers:

The House of Representatives is now in possession of a tape of President Trump saying of Ambassador Maria Yovanovitch, "Get rid of her! Get her out tomorrow. I don't care. Get her out tomorrow. Take her out. Okay? Do it." President Trump gave this order to Lev Parnas and Igor Fruman, two men who carried out Trump's pressure campaign in Ukraine at the direction of Rudy Giuliani. Does the discovery of this tape suggest that if the Senate does not pursue all relevant evidence—including witnesses and documents—that new evidence will continue to come to light after the Senate renders a verdict?

Mr. Manager SCHIFF. The answer is yes.

What we have seen, really, over the last several weeks, since the passage of the articles in the House of Representatives, is that every week—indeed, sometimes every day—there is new information coming to light.

We know there is going to be new information coming to light on March 17, when the Bolton book comes out; that is, if the NSC isn't successful in redacting it or preventing much of its publication.

On that issue, I do want to mention one other thing in response to the question about the Bolton manuscript and what the White House lawyers knew. I listened very carefully to the answer to that question, and maybe you listened more carefully than I did. What I thought I heard them say in answer to the question "What did they know about the manuscript and when did they know it?"—their statement was very precisely worded: The NSC unit reviewing the book did not share the manuscript.

Well, that is a different question than whether the White House lawyers found out what is in it, because you don't have to circulate the manuscript to have someone walk over to the White House and say: You do not want John Bolton to testify. Let me tell you, you do not want John Bolton to testify. You don't need to read his manuscript because I can tell you what is in it.

The denial was a very carefully worded one. I don't know what White House lawyers knew and when they knew it, but they did represent to you repeatedly that the President never told a witness that he was freezing the aid to get Ukraine to do these investigations.

We know that is not true. We know that from the witnesses we have already heard from, but we also know—at least if the reporting is correct, and you should find out if it is—that John Bolton tells a very different story.

There are going to continue to be revelations, and Members of this body on both sides of the aisle are going to have to answer a question each time it does: Why didn't you want to know that when it would have helped inform your decision?

In every other trial in the land, you call witnesses to find out what you can. Again, we are not a court of appeals here. We are the trial court. We are not confined to the record below. There is no "below." In answer to the Senator's question about whether Donald Trump ever brought up the Hunter Biden problem with President Poroshenko in the past, counsel says: Well, we are confined to the record before us.

You are not confined to the record in the House, nor is the President. The President could call witnesses if they existed. There is nothing to prevent them from saying: As a matter of fact, tomorrow we are going to call such and such, and they are going to testify that, indeed, Donald Trump brought up Hunter Biden to President Poroshenko. There is nothing prohibiting them from doing that.

At the end of the day, we are going to continue to see new evidence come out all the time. Among the most significant evidence, we know what that is going to be. And the effort to suggest, well, because this President was stronger in Javelins than his predecessor—when we know from the July 25 call, the moment that Zelensky brings up the Javelins, what is the very next thing the President says? He wants a favor.

The question is, Why did he stop the aid? Why did he stop the aid this year and no prior year? Was it merely a coincidence? Are we to believe it was merely a coincidence that it was the year that Joe Biden was running for President? Are we to believe that, of all the companies in all the land—of all the gin joints in all the land—of Ukraine, that it was just Hunter Biden walking into this one; that was the reason why; that he was interested in Burisma was just a coincidence that involved the son of his opponent?

But, look, more and more is coming out. Let's make sure that you learn whatever you feel you need to know to render a judgment now, when it can inform your decision, and not later.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Nebraska.

Mrs. FISCHER. Mr. Chief Justice, I send a question to the desk on behalf of myself, Senator CRAPO, and Senator RISCH.

The CHIEF JUSTICE. The Senators ask counsel for the President:

The President's counsel has underscored the Administration's ongoing anticorruption focus with our allies. At what point did the United States Government develop concerns about Burisma in relation to corruption and concerns with Russia?

Mr. Counsel PHILBIN. Mr. Chief Justice, I thank the Senators for that question. I think it bears on the answer that I was last giving to the last question.

This is something that became—of course, President Trump, in his conversation with President Zelensky in the July 25 call, as the transcript shows us, brought up a couple of things. He brought up burden-sharing specifically, and he raised the issue of corruption in two specifics: the specific case of potential Ukraine interference in the 2016 election, which he had heard about and asked about, and the incident involving the firing of a prosecutor who, according to public reports, had been looking into Burisma, the company that the Vice President's son was on the board of. That was the President's way of pinpointing specific issues related to corruption.

So when did it become a part of the President's concern, those issues related to corruption in Ukraine? Of course, we have the evidence that everyone in the government—and Fiona Hill testified to this—thought that anti-corruption was a major issue for U.S. policy with respect to Ukraine. When there was a new President elected in April, President Zelensky, that brought the possibility of reform to the forefront.

Then we know that the President was receiving information from his private attorney, Rudy Giuliani, and he spoke in the Oval Office of, Rudy knows about the Ukraine. You guys go talk to him.

He was explaining to the delegation that had just returned from the inauguration for the President, for President Zelensky, that he had concerns about Ukraine because they are all corrupt. He kept saying: It is a corrupt country. I don't know. They tried to get me in the election.

So it draws again on, there is his specific experience with Ukrainian corruption because he knew from the public reports, as in the POLITICO article that has been referenced many times. The POLITICO article in January of 2017 explained a laundry list of Ukrainian Government officials who had been out there attempting to assist the Hillary Clinton campaign and spread misinformation or bad information or assist in digging up dirt on members of the Trump campaign.

Mr. Giuliani had been investigating things related to Ukraine in 2016 and was led to the information about the Burisma situation and Vice President Biden having the prosecutor fired. So that was in January that he had these interviews he turned over to the State Department in March.

Then there were a series, also, of public articles published. John Solomon, in The Hill, published an article in March. Rudy Giuliani tweeted about it in March. There was an ABC story in June. There was a two-part New Yorker story about the Bidens and Burisma in July. Then, on July 22, the Washington Post had an article and explained specifically on just July 22—this is 3 days before the July 25 call—the Washington Post reported that Mr. Shokin, the prosecutor, believed "his ouster was because of his interest in the company," referring to Burisma, and he said that "had he remained in his post, he would have questioned Hunter Biden."

So I think it is a reasonable inference that, as there were these articles being published in close proximity to the time, this was information that was available to the President, and it became available to him as something that was a specific example of potentially serious corruption. And remember, everyone who testified, who was asked about it—does it seem like there is an appearance of a conflict of interest? Does it seem like that is fishy? Everyone testified: Well, yes, there is at least an appearance of a conflict of interest there.

I think it was after the information had come to Mr. Giuliani—long before Vice President Biden had announced his candidacy—that it came to the attention of the President and became something worth raising. Again, President Poroshenko is the one who fired the prosecutor. While he is still the President, there is not really as much of an opportunity or a possibility of raising that. So I think it was in that timeframe, along that arc of the timing, that it came to the President's attention, and that is why it was raised in that timing.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Connecticut.

Mr. BLUMENTHAL. Mr. Chief Justice, I have a question for the counsel for the President.

The CHIEF JUSTICE. Senator BLUMENTHAL asks:

Did anyone in the White House, or outside the White House, tell anyone in the White House Counsel's Office that publication of the Bolton book would be politically problematic for the President?

Mr. Counsel PHILBIN. Mr. Chief Justice, I thank the Senator for the question.

No, no one from inside the White House or outside the White House told us that the publication of the book would be problematic for the President. I think we assumed that Mr. Bolton was disgruntled, and we didn't expect he was going to be saying a lot of nice things about the President, but no one told us anything like that.

The CHIEF JUSTICE. Thank you, counsel.

Case 0:20-cv-61872-AHS   Document 17-1   Entered on FLSD Docket 11/06/2020   Page 22 of 48

The Senator from Texas.

Mr. CRUZ. I send a question to the desk on behalf of myself and Senators MORAN and HAWLEY. It is a question for the House managers.

The CHIEF JUSTICE. The question from the Senators to the House managers:

An August 26, 2019, letter from the Intelligence Community Inspector General to the Director of National Intelligence discussing the so-called whistleblower stated that the Inspector General "identified some indicia of an arguable political bias on the part of the Complainant in favor of a rival political candidate." Multiple media outlets reported that this likely referred to the whistleblower's work with Joe Biden.

Did the so-called whistleblower work at any point for or with Joe Biden? If so, did he work for or with Joe Biden on issues involving Ukraine, and did he assist in any material way with the quid pro quo in which then-Vice President Biden has admitted to conditioning loan guarantees to Ukraine on the firing of the prosecutor investigating Burisma?

Mr. Manager SCHIFF. Mr. Chief Justice, I thank the Senators for the question, and I want to be very careful in how I answer it so as not to disclose or give an indication that may allow others to identify the identity of the whistleblower.

First, I want to talk about why we are making such an effort to protect the identity of the whistleblower.

If you could put up slide 48, this slide shows—it may be difficult for some of you to read, so let me try to—actually, if you could hand me a copy of that as well. I haven't had a chance to distribute that to everyone.

It is not just that we view the protection of whistleblowers as important. Members of this body have also made strong statements about just how important it is to protect whistleblowers. Senator GRASSLEY said: "This person appears to have followed the whistleblower protection laws and ought to be heard out and protected. We should always work to respect whistleblowers' requests for confidentiality."

Senator ROMNEY: "Whistleblowers should be entitled to confidentiality and privacy because they play a vital function in our democracy."

Senator BURR: "We protect whistleblowers. We protect witnesses in our committee."

Even my colleague, the ranking member, Mr. NUNES: "We want people to come forward, and we will protect the identity of those people at all cost."

This has been a bipartisan priority and one that we have done our best to maintain, so I want to be very careful, but let me be clear about several things about the whistleblower.

First of all, I don't know who the whistleblower is. I haven't met them or communicated with them in any way. The committee staff did not write the complaint or coach the whistleblower what to put in the complaint. The committee staff did not see the complaint before it was submitted to the inspector general. The committee, including

its staff, did not receive the complaint until the night before the Acting Director of National Intelligence—we had an open hearing with the Acting Director on September 26, more than 3 weeks after the legal deadline by which the committee should have received the complaint.

In short, the conspiracy theory, which I think was outlined earlier, that the whistleblower colluded with the Intel Committee staff to hatch an impeachment inquiry is a complete and total fiction. This was, I think, confirmed by the remarkable accuracy of the whistleblower complaint, which has been corroborated by the evidence we subsequently gathered in all material respects.

So I am not going to go into anything that could reveal or lead to the revelation of the identity of the whistleblower, but I can tell you, because my staff's names have been brought into this proceeding, that my staff acted at all times with the most complete professionalism.

I am very protective of my staff, as I know you are, and I am grateful that we have such bright, hard-working people working around the clock to protect this country and who have served our committee so well. It really grieves me to see them smeared. Some of them mentioned here today have concerns about their safety, and there are online threats to members of my staff as a result of some of the smears that have been launched against them.

I can tell you there is no one who could understand the plight of Ambassador Yovanovitch more than some of my staff who have been treated to the same kind of smears and now have concerns over their own safety. They acted at all times with the utmost propriety and integrity.

Your Senate Intelligence Committee—and your chairman and vice chairman can tell you—encourage whistleblowers to come to their committee, and so do we. When they do, we try to figure out, is their complaint within the scope of jurisdiction of the intelligence community? And if it is, then we suggest they get a lawyer or we suggest they talk to the inspector general, which is what happened here. The whistleblower did exactly what they should—except, for the President, that is unforgivable because the whistleblower exposed the wrongdoing of the President. In the President's view, that makes him or her a traitor or a spy, and, as the President tells us, there is a way we used to treat traitors and spies.

You wonder why we don't want to call the whistleblower. First of all, we know firsthand what the whistleblower wrote secondhand in that complaint. There is no need for that whistleblower anymore, except to further endanger that person's life. That, to me, does not seem a worthwhile object for anyone in this Chamber or on the other side of this building, in the Oval Office, or anywhere else.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Rhode Island.

Mr. WHITEHOUSE. Mr. Chief Justice, on my own behalf and on behalf of Senators BLUMENTHAL, BOOKER, COONS, KLOBUCHAR, LEAHY, MARKEY, PETERS, and UDALL, I send a question to the desk.

The CHIEF JUSTICE. The question is from Senator WHITEHOUSE and other Senators to the House managers:

The "missing-witness" rule—which dates back to 1893 Supreme Court case Graves v. United States—allows one party to obtain an adverse inference against the other for failure to produce a witness under that party's control with material information. Here, one party, the President, has prevented witnesses within his control from testifying or providing documents. Do the House managers believe Senators should apply the missing witness rule here, and if so, what adverse inferences should we draw about the missing testimony and documents?

Mr. Manager SCHIFF. Mr. Chief Justice, Senators, we do believe that you should draw an adverse inference against the party resisting the testimony of these witnesses, like John Bolton. Courts have long recognized that when a party has relevant evidence within his control, which he fails to produce, that failure gives rise to an inference that that evidence is unfavorable to him.

Courts have frequently drawn adverse inferences where a party acts in bad faith to conceal evidence or preclude witnesses from offering testimony.

I would suggest that it is bad faith when counsel comes before you and says that if you really wanted these witnesses, you should have sued to get them in the House and goes into the courtroom down the street and says: You can't sue to get witnesses before the House.

But that is what has happened here. And you are, I think, not only permitted but absolutely should draw an adverse inference that when a party is making that argument on both sides of the courthouse, that the evidence those witnesses would provide runs against them.

Now, the administration hasn't produced a single document, not one single document. That is extraordinary. They can argue executive privilege and absolute immunity. Most of that has nothing to do with the overwhelming majority of these documents, not a wit. There is no absolute immunity from providing documents. The vast, vast majority don't have anything to do with privilege, and, if they did, there would be redactions, very specific redactions. None of that happened.

Are you allowed to draw an adverse inference that the reason why the President's team, which has possession of those emails regarding inquiries by Ukraine into why the aid was frozen—are you allowed to draw an inference—if they won't show you those emails. Those emails would confirm that Ukraine knew the aid was withheld,

just like the former Deputy Foreign Minister of Ukraine said publicly when she told the New York Times: Yes, we knew; by the end of July, we knew—this is the Deputy Foreign Minister at the time—we knew the aid was frozen, but I was instructed by Andriy Yermak not to mention it. I had a trip planned to Washington to talk to Congress, and I was told not to go. Why? Because they didn't want it public.

Are you entitled to draw an inference that those records they refused to turn over—all the State Department records; the fact that they won't allow John Bolton's notes to be turned over; they won't let Ambassador Taylor's notes to be turned over—should you draw an adverse inference? You are darned right you should.

They say: Well, the President only told Sondland "no quid pro quo." They leave out the other half where Sondland told Taylor: But he said, no quid pro quo, but you have to go to the mike and announce these investigations.

Well, Ambassador Taylor wrote down the notes of that conversation. That took place right after that call with the President. Are you allowed to draw an adverse inference from the fact that they don't want you to see Ambassador Taylor's notes, from the fact they don't want you to see Ambassador Taylor's cable? You are darned right you should draw an adverse inference.

Finally, with respect to who has become a central witness here, I think the adverse inference screams at you as to why they don't want John Bolton. But you shouldn't rely on an inference here, not when you have a witness who is willing to come forward. There is no need for inference here. It is just a need for a subpoena.

The CHIEF JUSTICE. Thank you, Mr. Manager.

Mr. THUNE. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from South Dakota.

Mr. THUNE. I have a question to send to the desk.

The CHIEF JUSTICE. Senator THUNE's question is for counsel for the President:

Would you please respond to the arguments or assertions the House managers just made in response to the previous questions?

Mr. Counsel PHILBIN. Mr. Chief Justice.

Thank you, Senator, for the question.

I haven't read recently the case that was cited about the missing witness rule. So I can't say specifically what is in it, but I am willing to bet that the missing witness rule does not apply when there has been a valid assertion of a privilege or other immunity for keeping the witness out of court. For example, if they tried to subpoena the defendant's lawyer and the defendant said, "Wait, I have attorney-client privilege; you can't subpoena him," they are not going to be able to get an adverse inference from that.

That is critical because, as I have gone through multiple times—and you

know, we keep going back and forth on this—they keep representing that there was a blanket defiance and there was no explanation and there was no legal basis for what the President was doing. And it is just not true. There were letters back and forth. I put them up on the screen. There were specific immunities asserted. There were specific legal deficiencies in the subpoenas that were sent.

This is important because if you are going to impeach the President of the United States, turning square corners and proceeding by the law matters. For the House managers to come here and say it was blanket defiance, it was unprecedented, you have to draw an adverse inference against them because they didn't respond to any of our document subpoenas—all the document subpoenas were issued without authorization. Maybe they disagree with us, but they can't just say we provided no rationale and you have to draw an adverse inference. There is a specific legal rationale provided.

They didn't try to engage in the accommodation process, and they didn't try to go to court. And now, yes, it is true that our position is that when they go to the court, article III courts don't have jurisdiction over that. Their position is, article III courts do have jurisdiction over that.

They believe that they can get a court order to require us to comply with a valid subpoena, but they never tried to establish in court that their subpoenas were valid. We have an assertion of a legal deficiency on one side. They think it is different. They don't want to go to court to get it resolved.

We have the assertion of absolute immunity from congressional compulsion for senior advisers to the President. It has been asserted by virtually every President since Nixon. They try to say: Oh, it is preposterous. It is irrelevant. We don't have to worry about that.

Every President since Nixon, virtually, has asserted that. It has only been addressed by two district courts—trial-level courts. The first one rejected it, and its decision was stayed by the appellate court, which means the appellate court thought probably you got it wrong or, at a minimum, it is a really difficult question; we are not sure about that. And the second district court decision is being litigated right now. They are litigating it. And when Charlie Kupperman went to court, they were trying to do something reasonable to say: Oh, well, we don't want to litigate this with you; you should just agree to be bound by the McGahn decision. What is the saying? Every litigant gets his day in court. Why shouldn't Charlie Kupperman get to have his counsel argue that issue on his behalf? That is what he wanted. He didn't want to say: I am going to trust it to the other people litigating the other case. I've got my case. I want to make the arguments.

But they wouldn't have that. So they mooted out the case. They withdrew the subpoena to moot out the case because they didn't want to go to the hearing in front of Judge Leon on December 10.

They have also pointed out, as if it is some outrage, that documents have been more readily produced under FOIA than in response to their subpoenas. But what that actually shows is that when you turn square corners and follow the law and make a request to the administration that follows the law, the administration follows the law and responds. And that is right. The documents were produced. Information came out. But they didn't get it because they issued invalid subpoenas, and they didn't try to do anything to establish the validity of their subpoenas.

If you are going to be sloppy and issue invalid subpoenas, you are not going to get a response. But if some private litigant follows FOIA and submits a FOIA request, they get a response.

To act like the Trump administration has done some blanket denial of everything simply isn't accurate, and there is no basis for any adverse inference because there is a specific privilege or basis for every reason not to produce something.

The CHIEF JUSTICE. Thank you, counsel.

Ms. HASSAN. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from New Hampshire.

Ms. HASSAN. Thank you, Mr. Chief Justice.

I send a question to the desk for the House managers.

The CHIEF JUSTICE. Senator HASSAN's question is for the House managers:

Did acting Chief of Staff Mick Mulvaney waive executive privilege in his October 17 press conference in which he stated that there was "political influence" in the Trump administration's decision to withhold aid to Ukraine?

Mr. Manager JEFFRIES. Mr. Chief Justice, distinguished Members of the Senate, I thank you for that question.

Mick Mulvaney has absolutely waived executive privilege. He has never asserted executive privilege. In fact, as President's counsel has acknowledged, they have not asserted executive privilege once. President's counsel has said, when we made that point during our opening arguments, that that was technically true. No, it is true. It is not an alternate fact; it is a fact. You have never asserted executive privilege in connection with Mick Mulvaney's testimony or anyone else. It was not asserted as it relates to any of the 17 witnesses who testified, 12 of whom testified publicly.

The other phony arguments that have been articulated, respectfully, are that the House needed to vote in order for the subpoenas to be valid. There is nothing in the Constitution that required the full House to vote, nothing

in Supreme Court precedent, nothing under Federal law, nothing under the House rules. It was a phony argument. Yet the House, after the initial stages of the investigation, did fully vote and fully voted on October 31.

Interestingly enough, Mick Mulvaney was subpoenaed thereafter—not before, thereafter—after the House had voted, subpoenaed on November 7. Here it is. The next day, the White House responded. They responded with a two-page letter dated November 8. There is no mention of executive privilege in the November 8 letter, but here is what it does say: "The Department of Justice (the "Department") has advised me that Mr. Mulvaney is absolutely immune from compelled congressional testimony with respect to matters related to his service as a senior adviser to the President."

What is interesting about this letter from Mr. Cipollone is that it doesn't cite a single legal case for that outrageous proposition—a single legal case for the proposition that Mick Mulvaney is absolutely immune. Why? Because there is no law to support it. The President tried to cheat, he got caught, and then he worked hard to cover it up.

The Senate can get to the truth. You can get to the truth by calling witnesses who can testify. Any privilege issues can be worked out by the Chief Justice of the Supreme Court. The American people deserve a fair trial. The President deserves a fair trial. The Constitution deserves a fair trial. That includes Mulvaney. That includes Bolton. That includes other relevant witnesses.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Alaska.

Ms. MURKOWSKI. Mr. Chief Justice, I send a question to the desk on behalf of myself and Senator YOUNG and Senator CRAPO. The question is to be directed to both parties.

The CHIEF JUSTICE. Thank you.

The question directed to counsel for the President and the House managers:

The Constitution does not specify the standard of proof to be used in trials of impeachment, and the Senate has not adopted a uniform standard by rule, thus, the standard of proof is arguably a question for each individual Senator. In the Clinton trial and now with President Trump, it appears that Republicans and Democrats apply different standards depending on whether the President is a member of their party. What standard of proof should be used in trials of impeachment—preponderance of the evidence, clear and convincing, beyond a reasonable doubt—and why?

I think it is the turn of the House managers to go first.

Ms. Manager LOFGREN. Mr. Chief Justice, Senators, there is no court case on this. The House needs strong evidence, but it has never been decided beyond a reasonable doubt, as the President's counsel has suggested, and, as the question notes, the Constitution does not specify either the House's evidentiary burden of proof or the Senate's.

I would note that the House Judiciary Committee held itself to a clear and convincing standard of proof in the Nixon matter, which requires that the evidence of wrongdoing must be substantially more probable to be true than not and that the trier of fact must have a firm belief in its factuality. In the Clinton case, the House did not commit to any particular burden of proof. And I would recommend against including an express standard; instead, like in Clinton's, simply finding the facts and any inferences from those facts without legal technicalities.

It has been opined that, in the end, it is up to each Senator to make a judgment, and I think there is much truth to that. Your oath holds you to a finding of impartial justice, and I trust that each and every one of you is holding that oath very dear to your heart and will find the facts and lead to a just result for our country, the Constitution, and for a future that hopefully is as free as our past has been.

I yield back.

The CHIEF JUSTICE. Thank you.

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for the question.

I think that the Constitution makes it clear in the terms that it speaks of impeachment, all are related to the criminal law. It speaks of an offense. It speaks of conviction. It speaks of a trial in saying that crimes shall be tried by a jury except in the case of impeachment.

In both that and the gravity of a Presidential impeachment, which is an issue of breathtaking importance for the country and could cause tremendous disruption to our government, both counsel are in favor of traditional criminal standard of proof beyond a reasonable doubt.

In the Clinton impeachment, Senators—both Republicans and Democrats—repeatedly advocated in favor of that standard.

Senator Russ Feingold then said:

In making a decision of this magnitude, it is best not to err at all. If we must err, however, we should err on the side . . . of respecting the will of the people.

Similarly, Senator Barbara Mikulski said:

The U.S. Senate must not make the decision to remove a President based on a hunch that the charges may be true. The strength of our Constitution and the strength of our Nation dictate that the Senate be sure beyond a reasonable doubt.

The preponderance standard is wholly insufficient. That means just 50.1 percent. You think it is a little more likely than not. That is not sufficient to remove the President. Even clear and convincing evidence is not. It has to be beyond a reasonable doubt. As Senator Rockefeller explained at the time of the Clinton impeachment, that means "it is proven to a moral certainty the case is clear." That is the standard the Senators should apply because the gravity of the issue before you would not permit applying any lesser standard.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

Mr. BOOKER. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from New Jersey.

Mr. BOOKER. Thank you, sir.

Mr. Chief Justice, I send a question to the desk to be asked of the House manager.

The CHIEF JUSTICE. Senator BOOKER's question is for the House manager:

Even if a communication or a document is covered by executive privilege, that privilege can be overcome by showing the evidence is important and unavailable elsewhere. On January 22, while this trial was underway, President Trump said, "I thought our team did a very good job. But honestly, we have all the material. They don't have the material." Can you comment on whether executive privilege allows a President to conceal information from Congress, particularly if the evidence cannot be obtained elsewhere?

Mr. Manager JEFFRIES. Thank you, Mr. Chief Justice, and I thank the distinguished Senator from New Jersey for his question.

President Trump alone has the power to assert executive privilege. As counsel admitted on Saturday, the President had not formally invoked it over any document requested in this impeachment inquiry. This has not been asserted as it relates to any single document. Executive privilege gives President Trump a qualified form of confidentiality when he does get advice from his aides in order to carry out the duties of his office.

As I know you are all aware, it is often the case in congressional investigations that a President will claim executive privilege over a very small subset of materials. In that case, what the executive branch usually does and should do is to produce everything that it can and then provide a log of documents in dispute or permit a private review of the documents that have been contested.

That is not what has occurred in this case because the President has ordered the entire executive branch to defy our constitutionally inspired impeachment inquiry. Blanket defiance is what has taken place, and there is no right to do that.

Every court that has considered the matter has asserted that the President cannot assert a privilege to protect his own misconduct, to protect wrongdoing, to protect evidence that the Constitution may have been violated. The President cannot do it.

In an impeachment inquiry, the congressional need for information and its constitutional authority, of course, are at their greatest. It is imperative to investigate serious allegations of misconduct that might constitute high crimes and misdemeanors, and that is what is before you right now.

Let's look at what the Supreme Court has said in circumstances that are closest to what we face today—in U.S. v. Nixon—in the context of a grand jury subpoena. The Supreme Court found that President Nixon's

generalized assertion of privilege must yield to the demonstrated need for evidence in the pending trial, and the Federal court here in DC has recognized that Congress's need for information and for documents during an impeachment inquiry is particularly compelling.

Turning to the facts of this matter briefly, any argument that every single document requested by Congress is subject to privilege or some form of absolute immunity is absurd. There are calendar invitations, scheduling emails, photographs, correspondence with outside parties like Rudolph Giuliani. These are all important pieces of evidence for you to consider and are not the types of materials subject to any reasonable claim of executive privilege.

If you want a fair trial, it should involve documents. Given the nature of these proceedings, documents like Ambassador Bolton's notes and Lieutenant Colonel Vindman's Presidential decision memo should also be provided to you so you can seek the truth, the whole truth, and nothing but the truth.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Louisiana.

Mr. KENNEDY. Senator MORAN, my colleague from Kansas, and I send a question to the desk for counsel for the President.

The CHIEF JUSTICE. Thank you.

The question is for counsel for the President:

What did Hunter Biden do for the money that Burisma holdings paid him?

Ms. Counsel BONDI. Thank you for the question.

Mr. Chief Justice, Senators, as far as we know, Hunter Biden has said he "attended a couple of board meetings a year." Here is what we do know: Hunter Biden did attend one board meeting in Monaco. Now, we also heard that when Zlochevsky—the owner of Burisma—fled the Ukraine, he was living in Monaco. So Hunter Biden did attend a board meeting in Monaco. We also know that Hunter Biden went to Norway on a fishing trip, and he took his daughter and his nephew. So he took two of Joe Biden's children with him on a fishing trip to Norway with Zlochevsky. That is as much as we know, other than his statement that he attended one or two board meetings.

Factually, that is what he said, and the timeline shows that. Again, Devon Archer was on the board with him, and then Hunter Biden remained on the board. Factually, in the record, that is as much as we know that he did involving Burisma and Zlochevsky.

The Norway trip was in June of 2015. He remained on the board until April of 2019. We also know that, prior to then, a Ukrainian court in September of 2016 canceled Zlochevsky's arrest warrant. We also know, on December 15, Vice President Biden called President Poroshenko. Then, in mid-January 2017, Burisma announced all legal proceedings against the company and Zlochevsky had been closed.

The CHIEF JUSTICE. The Democratic leader is recognized.

Mr. SCHUMER. Mr. Chief Justice, I send a question to the desk for both the counsel for the President and the House managers.

The CHIEF JUSTICE. Senator SCHUMER's question reads as follows:

The House Managers say the President demands absolute immunity. The President's counsel disputes this. Can either of you name a single witness or document to which the President has given access to the House when requested?

I believe it is time for counsel for the President to go first.

Mr. Counsel PHILBIN. Mr. Chief Justice, I thank you and Minority Leader SCHUMER for the question.

Let me try to be clear and distinguish a couple of things.

The House managers have said there was blanket defiance. That is the way they characterized it—that we are not going to give you anything and that that is all we said. It was just a blanket defiance. We are not going to respond.

What I have tried to explain several times is that that was not the President's response. There were specifically articulated responses to different requests based on different legal rationales because there were different problems with different subpoenas.

One problem is that all of the subpoenas up until October 31 were not validly authorized. So those subpoenas we said we were not going to respond to because they were not validly issued. It was not an assertion of executive privilege. It was not an assertion of absolute immunity. It wasn't anything else. It was the fact that they were not validly authorized.

They pointed out that, aha, we subpoenaed—I think they mentioned—Acting Chief of Staff Mulvaney after October 31. That is true, but we didn't rely on the fact that the subpoena was not authorized. We pointed out the doctrine of the absolute immunity of senior advisers to the President. This is not some blanket absolute immunity for the entire executive branch. It doesn't apply to all of the subpoenas they issued. As we explained in our brief, it applies to three. There were three people they subpoenaed as witnesses that, on this basis alone, the President declined to make available—Acting Chief of Staff Mulvaney, Legal Advisor to the National Security Council John Eisenberg, and Deputy National Security Adviser Kupperman, I believe, but it is in our brief. It was those three who had immunity—a doctrine asserted by every President since Nixon.

Then there was a different problem with some of the subpoenas. As to some of the other witnesses who were not senior advisers to the President, the President did not assert that they had absolute immunity. Instead, those subpoenas refused to allow those executive branch personnel to have executive branch counsel accompany them. There

is an OLC opinion that has been published—it is online and cited in our trial memorandum—stating it is unconstitutional to refuse to allow executive branch personnel to have the assistance of executive branch counsel to protect privileged information during questioning, and, therefore, it is not valid to force them to appear without that counsel.

The CHIEF JUSTICE. Thank you, Counsel.

Ms. Manager LOFGREN. Mr. Chief Justice and Senators, you know, we have received nothing as part of our impeachment inquiry.

It is worth pointing out that the House committees that subpoenaed before the House vote had standing authority under the House rules, and they were the Oversight Committee, which has the standard authority to investigate any matter at any time, as does the Foreign Affairs Committee. It has the authority, under the rules of the House, adopted January 11, to issue subpoenas. They did, and they were defied.

The idea of absolute immunity has never been upheld by any court, and it is really incomprehensible to think that somehow this concept of absolute immunity has lurked in hiding, for centuries, for Presidents to use it in this day. When you think of the two cases—the Miers case and the McGahn case—the courts completely rejected the idea of absolute immunity.

On the slide, there was a decision recently made in the McGahn case, and here is what it reads: "Stated simply, the primary takeaway from the past 250 years of recorded American history is that Presidents are not Kings . . ." Those are the judge's words, not mine. "[C]ompulsory appearance by dint of a subpoena is a legal construct, not a political one, and per the Constitution, no one is above the law."

The President is not permitted by the Constitution or by the law to assert any kind of absolute immunity. That does not exist in America, and as the judges pointed out, that would be something that a King would assert. I am not saying that, but I will say this. It is something that our Founders set up our checks and balances to prevent. Nobody has absolute power in our system of government—not the Senate and House, not the President, not the judiciary. This is unprecedented and just wrong as a matter of law and as a matter of the Constitution.

Thank you.

The CHIEF JUSTICE. Thank you.

The Senator from Georgia.

Mr. PERDUE. Thank you, Mr. Chief Justice.

I send a question to the desk for both the counsel for the President and the House managers on behalf of Senator CRUZ and me.

The CHIEF JUSTICE. The question, on behalf of Senators CRUZ and PERDUE, reads as follows:

You refused to answer the question on political bias. Are the House Managers refusing

to tell the Senate whether or not the so-called whistleblower had an actual conflict of interest? There are 7 billion people on planet earth; almost all had no involvement in Biden's quid pro quo. Are the House Managers unwilling to say whether the so-called whistleblower was a FACT WITNESS who directly participated in (and could face criminal or civil liability for) Joe Biden's demanding Ukraine fire the prosecutor who was investigating Burisma? And why did you refuse to transmit to the Senate the Inspector General's transcript?

It is addressed to both sides. I think, perhaps, the House managers should go first.

Mr. Manager SCHIFF. With respect to the ICIG, the President and his allies have tried to shift the focus to the inspector general of the intelligence community—a highly respected veteran of the Justice Department—in his handling of the whistleblower's complaint. There was an effort to insinuate wrongdoing on the part of the whistleblower, and there has been an effort to insinuate wrongdoing on behalf of the inspector general.

The briefings that we had with the ICIG related to the unusual and problematic handling of this particular whistleblower's complaint within the executive branch, which diverts sharply from any prior whistleblower's complaint by anyone within the intelligence community. The Intelligence Committee is continuing its ongoing oversight to determine why and how this complaint was initially concealed from the committee in violation of the law.

ICIG Michael Atkinson continues to serve admirably and independently as he is supposed to do.

Like the Senate Intelligence Committee, the House Intelligence Committee does not release the transcripts of its engagements with inspectors general on sensitive matters because doing so risks undercutting an important mechanism for the committee to conduct oversight. The transcripts remain properly classified, in conformity with IC requirements, to protect sensitive information. The ICIG made every effort to protect the whistleblower's identity and briefed us with the expectation that it would not be made public, and we are trying to honor that expectation.

With respect to allegations of bias on the part of the whistleblower, let me just refer you to the conclusion of the inspector general's, which is, after examining the whistleblower, the whistleblower's background, any potential allegations of any bias, the whistleblower drew two conclusions: The whistleblower was credible. Meaning, given whatever issue—perceived or real—the inspector general found that whistleblower to be credible. The inspector general also found that the whistleblower's complaint was urgent and that it needed to be provided to Congress. The inspector general further found that it was withheld from Congress in violation of the law, in violation of the statute. For that, he is being attacked.

Now, counsel for the President rely on an opinion of the Office of Legal Counsel as its justification for violating the Whistleblower Protection Act and not transmitting the complaint to Congress.

The CHIEF JUSTICE. Thank you, Mr. Manager.

Mr. Counsel SEKULOW. Thank you, Mr. Chief Justice and Members of the Senate.

Page 5 of the inspector general's report states: "Although the inspector general's preliminary review identified some indicia of an arguable political bias on the part of the Complainant—" now, that is in the actual statement. He goes on to say "—[involving] a rival political candidate, such evidence does not change his view about the credible nature of the concern," or what appears to be credible; but to argue that it does not include an issue of political bias, the inspector general himself says that that is, in fact—at least he said the preliminary reviews indicate some political bias.

Now, there have been reports in the media that the individual may have worked for Joe Biden when he was Vice President, that he may have had some area under his watch involving Ukraine.

I also thought it was interesting that Manager SCHIFF just talked about the importance of how they control the process as it relates to a whistleblower's reports because of the sensitive nature of those. Do we not think that the sensitive nature of information shared by the President's most senior advisers should not be subject to the same type of protections? Of course, it has to be.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from West Virginia.

Mr. MANCHIN. Mr. Chief Justice, I send a question to the desk for both the President's counsel and the House managers.

The CHIEF JUSTICE. The question from Senator MANCHIN reads as follows:

The Framers took the words "high crimes and misdemeanors" straight out of English law, where it had been applied to impeachments for 400 years before our Constitution was written. The Framers were well aware when they chose those words that Parliament had impeached officials for "high crimes and misdemeanors" that were not indictable as crimes. The House has repeatedly impeached, and the Senate has convicted, officers for "high crimes and misdemeanors" that were not indictable crimes. Even Mr. Dershowitz said in 1998 that an impeachable offense "certainly doesn't have to be a crime." What has happened in the past 22 years to change the original intent of the Framers and the historic meaning of the term "high crimes and misdemeanors?"

It is counsel for the President's turn.

Mr. Counsel DERSHOWITZ. Mr. Chief Justice, Senators, what happened since 1998 is that I studied more, did more research, read more documents, and like any academic, altered my views. That is what happens. That is what professors ought to do, and I keep reading

more, and I keep writing more, and I keep refining my views.

In 1998 the issue before this Senate was not whether a crime was required; it was whether the crime that Clinton was charged with was a high crime. When this impeachment began, the issue was whether a crime was required.

Actually, 2 years earlier, in a book and then an op-ed, I concluded—not on partisan grounds—on completely academic grounds that you could not impeach for abuse of power and that technical crime was not required but criminal-like behavior was required. I stand by that view.

The Framers rejected maladministration. That was the prime criteria for impeachment under British law. Remember, too, the British never impeached Prime Ministers. They only impeached middle-level and low-level people.

So the Framers didn't want to adopt the British approach. They rejected it by rejecting maladministration. And what is a metaphor or what is a synonym for maladministration? Abuse of power. And when they rejected maladministration, they rejected abuse of power.

Mr. Congressman SCHIFF asked a rhetorical question: Can a President engage in abuse of power with impunity? In my tradition we answer questions with questions, and so I would throw the question back: Can a President engage in maladministration with impunity?

That is a question you might have asked James Madison had you been at the Constitutional Convention. And he would say: No. A President can engage in that with impunity, but it is not an impeachable crime. Maladministration is not impeachable, and abuse of power is not impeachable.

The issue is not whether a crime is required. The issue is whether abuse of power is a permissible constitutional criteria, and the answer from the history is clearly, unequivocally no. If that had ever been put to the Framers, they would have rejected it with the same certainty they rejected maladministration.

The CHIEF JUSTICE. Thank you, counsel.

Mr. Manager NADLER. Mr. Chief Justice, Members of the Senate, it was always understood that the prime purpose of impeachment was to deal with abuse of power.

The first draft at the Constitutional Convention said "treason or bribery." That was rejected because it wasn't inclusive enough.

Somebody put—Mason proposed maladministration. Found too vague—so they said "high Crimes and Misdemeanors." That was a well-understood term in English law. It was a well-understood term in the Warren Hastings impeachment going on in England right then, and it meant, primarily, abuse of power. That is the main meaning of high crimes and misdemeanors.

Charles Pinckney said those ''who behave amiss or betray their public trust''; Edmund Randolph, ''misbehaves''; I quoted Justice Story the other day. Every impeachment in American history has been for abuse of power in one form or another.

The idea that you have to have a crime—bribery is right there in the Constitution: ''Treason, Bribery or other . . . crimes.'' Bribery was not made a statutory crime until 1837. So there couldn't have been impeachment?

The fact of the matter is that crimes and impeachment are two different things. Impeachments are not punishments for crimes. Impeachments are protections of the Republic against a President who would abuse his power, who would aggrandize power, who would threaten liberty, who would threaten the separation of powers, who would threaten the powers of the Congress, who would try to arrogate power to himself.

That is why punishment upon conviction for impeachment only goes to removal from office. You can't put him in jail, as you could for a crime. You can't fine him, as you could for a crime.

They are two different things. An impeachable offense need not be a crime, and a crime need not be an impeachable offense—two completely different tests understood that way throughout American history and by all scholars—all scholars—in our history except for Mr. Dershowitz.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from North Carolina.

Mr. BURR. Mr. Chief Justice, I send a question to the desk for counsel to the President.

The CHIEF JUSTICE. Senator BURR asks:

We have seen the House managers repeatedly play video clips of Acting Chief of Staff Mick Mulvaney's press conference, in which they claim he said there was a quid pro quo. How do you respond to the House managers' allegation that Mr. Mulvaney supported their claims in his press conference?

Mr. Counsel PURPURA. Mr. Chief Justice, Members of the Senate, Senator, thanks for the question.

We respond as Mr. Philbin did earlier today with that, which is Mr. Mulvaney has issued two statements—one after his press conference and then one Monday after the New York Times article concerning Mr. Bolton's alleged manuscript—alleged statements in his manuscript.

So I think the easiest thing is just to read them to understand what he said and to put it into context for everyone in the Chamber.

This is from—this is the day of the press conference.

Once again, the media has decided to misconstrue my comments to advance a biased and political witch hunt against President Trump. Let me be clear, there was absolutely no quid pro quo between Ukrainian military aid and any investigation into the 2016 election. The president never told me to

withhold any money until the Ukrainians did anything related to the server. The only reasons we were holding the money was because of concern about lack of support from other nations and concerns over corruption. Multiple times during the more-than 30 minute briefing where I took over 25 questions, I referred to President Trump's interest in rooting out corruption in Ukraine, and ensuring taxpayer dollars were spent responsibly and appropriately. There was never any connection between the funds and the Ukrainians doing anything with the server—this was made explicitly obvious by the fact that the aid money was delivered without any action on the part of the Ukrainians regarding the server.

There was never any condition on the flow of the aid related to the matter of the DNC server.

Then, on January 27, which was Monday, there was a statement from Bob Driscoll, who is Mr. Mulvaney's attorney. Now I will read it in its full.

The latest story from the New York Times, coordinated with a book launch, has more to do with publicity than the truth. John Bolton never informed Mick Mulvaney of any concerns surrounding Bolton's purported August conversation with the President. Nor did Mr. Mulvaney ever have a conversation with the President or anyone else indicating that Ukrainian military aid was withheld in exchange for a Ukrainian investigation of Burisma, the Bidens, or the 2016 election. Furthermore, Mr. Mulvaney has no recollection of any conversation with Mr. Giuliani resembling that reportedly described in Mr. Bolton's manuscript, as it was Mr. Mulvaney's practice to excuse himself from conversations between the President and his personal counsel to preserve any attorney-client privilege.

So I wanted to read those statements in full so that everyone had the full context.

Even after Mr. Philbin referenced the statement after the press conference, the House managers again came back and said Mr. Mulvaney indicated or admitted there was a quid pro quo. That is not true.

If Mr. Mulvaney misspoke or if the words were garbled, he corrected it that day and has been very clear.

Thank you. Thank you, Mr. Chief Justice.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Maryland.

Mr. VAN HOLLEN. Mr. Chief Justice, I send a question to the desk to the President's counsel and the House managers.

The CHIEF JUSTICE. Senator VAN HOLLEN's question is to both parties and the House managers will go first:

What did National Security Advisor John Bolton mean when he referenced ''whatever drug deal Sondland and Mulvaney are cooking up on this'' and did he ever raise that issue in any meeting with President Trump?

Mr. Manager SCHIFF. Mr. Chief Justice, Senators, when John Bolton—and this is according to Dr. Hill's testimony—brought up the drug deal, it was in the context of a July 10 meeting at the White House. There were two meetings that day. There was a meeting that Ambassador Bolton was present for, and then there was a follow-on meeting after Ambassador Bolton abruptly ended the first meeting.

In the first meeting, the Ukrainians naturally wanted to raise the topic of getting the White House meeting that President Zelensky so desperately wanted.

And after raising the issue, at some point Ambassador Sondland said: No, no, we have got a deal. They will get the meeting once they announce the investigations.

And this is the point where Ambassador Bolton stiffened. You can look up Dr. Hill's exact words. I am paraphrasing here. But this is the point where Ambassador Bolton stiffens and he ends the meeting.

Hill then goes, follows Sondland and the delegation into another part of the White House where the meeting continues between the American delegation and Ukrainian delegation, and there it is even more explicit, because in that second meeting, Sondland brings up the Bidens specifically.

Hill then goes to talk to Bolton and informs him what has taken place in the following meeting, and Bolton's response is: Go talk to the lawyers, and let them know I don't want to be part of this drug deal that Sondland and Mulvaney have got cooking up.

So at that point, that specific conversation is a reference to the quid pro quo over the White House meeting. And we know, of course, from other documents, the testimony about the quid pro quo, about the White House meeting, and all the efforts by Giuliani to make sure that the specific investigations aren't mentioned in order to make this happen.

But don't take my word for it. We can bring in John Bolton and ask him exactly what he was referring to when he described the drug deal.

Now, did Bolton describe and discuss this drug deal with the President? Well, it certainly appears from what we know about this manuscript that they did talk about the freeze on aid.

And whether John Bolton understood and at what point he understood that the drug deal was even bigger and more pernicious than he thought, that it involved not just a meeting but involved the military aid, there is one way to find out.

And I would add this in terms of Mr. Mulvaney—

The CHIEF JUSTICE. Thank you, Mr. SCHIFF.

Mr. Manager SCHIFF. Maybe I will add it later.

Mr. HOEVEN. Mr. Chief Justice.

The CHIEF JUSTICE. The President's counsel has 2½ minutes.

Mr. Counsel PHILBIN. Thank you, Mr. Chief Justice. Thank you, Senator, for the question.

The question asks about what Ambassador Bolton meant in a comment that is purported hearsay by someone else saying what he supposedly said. But what we know is that there are conflicting accounts of the July 10 meeting at the White House.

Dr. Hill says that she heard Ambassador Sondland say one thing. He denies that he said that. Dr. Hill says she

went and talked to Ambassador Bolton, and Bolton said something to her about what was said in the meeting where he wasn't there, and he was saying something about it, calling it a drug deal.

And what he meant by that—I am not going to speculate about it. It is a hearsay report of something he said about a meeting that he wasn't in, characterized in some way, and I am not going to speculate about what he meant by that.

The CHIEF JUSTICE. Thank you.

The Senator from North Dakota.

Mr. HOEVEN. Thank you, Mr. Chief Justice. I have a question for myself and also for Senator PORTMAN and Senator BOOZMAN. It is for the President's counsel, and I am sending it to the desk.

The CHIEF JUSTICE. The question from the Senators is as follows:

In September of 2019, the security assistance aid was released to Ukraine. Yet, the House managers continue to argue that President Trump conditioned the aid on an investigation of the Bidens. Did the Ukrainian President or his government ultimately meet any of the alleged requirements in order to receive the aid?

Mr. Counsel PURPURA. Mr. Chief Justice.

Thanks, Senator, for the question. The very short answer is no. I think that is fair. I think we demonstrated in our presentation on Friday and Monday that the aid was released. The aid flowed. There was a meeting at the U.N. General Assembly. There was a meeting previously scheduled in Warsaw, precisely as President Zelensky suggested, and there was never any announcement of any investigations undertaken regarding the Bidens, Burisma, the 2016 election, no statements made, and no investigations announced or begun by the Ukrainian Government.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Virginia.

Mr. WARNER. Mr. Chief Justice, I send a question to the desk for the House managers.

The CHIEF JUSTICE. Senator WARNER's question is:

Do you know about additional information related to Russia disseminating President Trump's or Rudolph Giuliani's conspiracy theories? Should the Senate have this information before we deliberate on the Articles of Impeachment?

Mr. Manager SCHIFF. Mr. Chief Justice, Senators, I think there are three categories of relevant material here.

The first, we do have access to, and that is the supplemental testimony of Jennifer Williams, and I would encourage you all to read it. I think it sheds light very specifically on the Vice President and what he may or may not know vis-a-vis this scheme. So I would encourage you to read that submission.

There is a second body of intelligence that the committees have been provided that is relevant to this trial that you should also read, and we should figure out the mechanism that would permit you to do so because it is directly relevant to the issues we are discussing and pertinent.

There is a third category of intelligence, too, which raises a very different problem, and that is that the intelligence communities are for the first time refusing to provide to the Intelligence Committee. That material has been gathered. We know that it exists. But the NSA has been advised not to provide it.

Now the Director says that this is the Director's decision, but nevertheless there is a body of intelligence that is relevant to the requests that we have made that is not being provided. That raises a very different concern than the one before this body, and that is, are now other agencies like the intelligence community that we require to speak truth to power, that we require to provide us with the best intelligence, now also withholding information at the urging of the administration? That is, I think, a deeply concerning and new phenomenon. That is a problem that we had previously with other Departments that have been part of the wholesale obstruction, but now it is rearing its ugly head with respect to the IC.

But the shorter answer to the question of, apart from Jennifer Williams, are there other relevant materials? The answer is yes, and I would encourage that you and we work together to find out how you might access them.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The majority leader.

Mr. McCONNELL. Mr. Chief Justice, the next two questions—one from each side—would be the last before we break for dinner. I would ask that following the next two questions, the Senate stand in recess for 45 minutes.

The CHIEF JUSTICE. Thank you.

The Senator from Alabama.

Mr. SHELBY. I send a question to the desk.

The CHIEF JUSTICE. Thank you.

Senator SHELBY's question is directed to counsel for the President:

How does the noncriminal "abuse of power" standard advanced by the House Managers differ from "maladministration"—an impeachment standard rejected by the Framers? Where is the line between such an "abuse of power" and a policy disagreement?

Mr. Counsel DERSHOWITZ. Mr. Chief Justice, I will address this.

Senators, thank you very much for that question because that question I think hits the key to the issue that is before you today.

When the Founders rejected maladministration—and recall that it was introduced by Mason and rejected by Madison on the ground that it would turn our new Republic into a parliamentary democracy where a Prime Minister—in this case, a President—can be removed at the pleasure of the legislature.

Remember, too, that in Britain, impeachment was not used against the Prime Minister, and neither was a vote of no confidence; it was used against lower level people.

So maladministration was introduced by Mason, and Madison said no, it was just too vague and too general.

What is maladministration? If you look it up in the dictionary and you look up synonyms, the synonyms include abuse, corruption, misrule, dishonesty, misuse of office, and misbehavior.

Even Professor Nikolas Bowie, a Harvard professor who was in favor of impeachment, so this is an admission against interest by him—he is in favor of impeachment—he says abuse of power is the same as misconduct in office, and he says that his research leads him to conclude that a crime is required.

By the way, the Congressman was just completely wrong when he said I am the only scholar who supports this position. In the 19th century, which was closer in time to when the Framers wrote, Dean White of Columbia Law School wrote that "the weight of authority"—by which he meant the weight of scholarly authority and the weight of judicial authority—this was in 1867—"the weight of authority is in favor of requiring a crime." Justice Curtis came to the same conclusion. Others have come to a similar conclusion.

You ask what happened between 1998 and the current time to change my mind. What happened between the 19th century and 20th century to change the minds of so many scholars? Let me tell you what happened. What happened is that the current President was impeached.

If, in fact, President Obama or President Hillary Clinton would have been impeached, the weight of current scholarship would clearly be in favor of my position because these scholars do not pass the "shoe on the other foot" test. These scholars are influenced by their own bias, by their own politics, and their views should be taken with that in mind. They simply do not give objective assessments of the constitutional history.

Professor Tribe suddenly had a revelation himself. At the time Clinton was impeached, he said: Oh, the law is clear. You cannot—you cannot—charge a President with a crime while he is a sitting President.

Now we have our current President. Professor Tribe got woke, and with no apparent new research, he came to the conclusion: Oh, but this President can be charged while sitting in office.

That is not the kind of scholarship that should influence your decision.

You can make your own decisions. Go back and read the debates, and you will see that I am right that the Framers rejected vague, open-ended criteria—abuse of power.

And what we had was the manager making a fundamental mistake again. She gave reasons why we have impeachment. Yes, we feared abuse of power. Yes, we feared criteria like maladministration. That was part of the reason. We feared incapacity. But none

Case 0:20-cv-61872-AHS Document 17-1 Entered on FLSD Docket 11/06/2020 Page 29 of 48 [CORRECTION]

of those made it into the criteria because the Framers had to strike a balance. Here are the reasons we need impeachment, yes. Now, here are the reasons we fear giving Congress too much power. So we strike a balance. How did they strike it? Treason, a serious crime; bribery, a serious crime; or other high crimes and misdemeanors—crimes and misdemeanors akin to treason and bribery. That is what the Framers intended. They didn't intend to give Congress a license to decide whom to impeach and whom not to impeach on partisan grounds.

I read you a list of 40 American Presidents who have been accused of abuse of power. Should every one of them have been impeached? Should every one of them have been removed from office? It is too vague a term.

Reject my argument about crime. Reject it if you choose to. Do not reject my argument that abuse of power would destroy—destroy—the impeachment criteria of the Constitution and turn it, in the words of one of the Senators at the Johnson trial, to make every Member of the Senate, every Member of Congress, be able to define it from within their own bosom.

We heard from the other side that every Senator should decide whether you need proof beyond a reasonable doubt or proof by a preponderance. Now we hear that every Senator should decide on abuse of power.

The CHIEF JUSTICE. Thank you, counsel.

Mr. Counsel DERSHOWITZ. Thank you, Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Maryland.

Mr. CARDIN. Mr. Chief Justice, I have a question on behalf of Senator MARKEY and myself, and I send it to the desk.

The CHIEF JUSTICE. Thank you.

The question is as follows:

Supreme Court Justice Byron White, in a concurring opinion in Nixon v. United States (1993), acknowledged that the Senate "has very wide discretion in specifying impeachment trial procedures," but stated that the Senate "would abuse its discretion" if it were to "insist on a procedure that could not be deemed a trial by reasonable judges." If the Senate does not allow for additional evidence and the testimony of key witnesses with firsthand knowledge of President Trump's actions and intentions, would a "reasonable judge" conclude these proceedings constitute a constitutionally fair trial?

Mr. Manager SCHIFF. I think the answer is no. I don't know that we need to look to the words of a prior Justice to tell us that a trial without witnesses is not really a trial. It is certainly not a fair trial. If the House moves forward with impeachment and it comes before the Senate and wants to call witnesses and wants to make its case and is told "Thou shalt not call witnesses," that is not a fair trial.

I think the American people understand that without reading the case law. They go to jury duty themselves every year, and they see that the first thing that takes place after a jury is sworn in is the government makes its opening statement, the defense makes theirs, and then begins the calling of witnesses.

I do want to take this opportunity to respond to Professor Dershowitz' arguments while they are fresh. You can say a lot of things about Alan Dershowitz, but you cannot say he is unprepared. He is not unprepared today. He was not unprepared 21 years ago. And to believe that he would not have read 21 years ago what Mason had to say or Madison had to say or Hamilton had to say—I am sorry, I don't buy that. I think 21 years ago he understood that maladministration was rejected but so was a provision that confined the impeachable offenses to treason and bribery alone was rejected.

I think the Alan Dershowitz from 21 years ago understood that, yes, while you can't impeach for a policy difference, you can impeach a President for abuse of power. That is what he said 21 years ago. Nothing has changed since then.

I don't think you can write off the consensus of constitutional opinion by saying they are all Never Trumpers. All the constitutional law professors—in fact, let's play a snippet from Professor Turley, who was in the House defending the President, and see what he had to say recently.

(Text of Videotape presentation:)

Professor TURLEY. Abuse of power, in my view, is clear. You can impeach a President for abuse of power and you can impeach a President for noncriminal conduct.

Mr. Manager SCHIFF. We can't argue plausibly that his position is owing to some political bias, right? Just a few weeks ago, he was in the House arguing a case for my GOP colleagues that the President shouldn't be impeached.

Now, he did say: Well, if you can actually prove these things, if you can prove—as, indeed, we have—that the President abused his power by conditioning military aid to help his reelection campaign, yes, that is an abuse of power. You can impeach with that kind of abuse of power, and that is exactly what we have here.

We are not required to leave our common sense at the door. If we are to interpret the Constitution now as saying that a President can abuse their power—and I think the professor suggested before the break that he can abuse his power in a corrupt way to help his reelection and you can't do anything about it—you can't do anything about it because if he views it as in his personal interest, that is just fine. He is allowed to do it.

None of the Founders would have accepted that kind of reasoning. In fact, the idea that the core offense that the Founders protected against—that core offense is abuse of power—is beyond the reach of Congress through impeachment would have terrified the Founders. I mean, you can imagine any number of abuses of power—a President who withholds aid from another country at war as a thank you for that adversary allowing him to build a Trump Tower in a country. OK, that may not be criminal, but are we really going to say that we are going to have to permit a President of the United States to withhold military aid as a thank you for a business proposition?

Now, counsel acknowledges that a crime is not necessary but something akin to a crime. Well, we think there is a crime here of bribery or extortion—conditioning official acts for personal favors. That is bribery. It is also what the Founders understood as extortion. And you cannot argue—even if you argue, well, under the modern definition of bribery, you have got to show such and such—you cannot plausibly argue that it is not akin to bribery. It is bribery. But it is certainly akin to bribery.

That is the import of what they would argue—that, no, the President has a constitutional right. Under article II, he can do anything he wants. He can abuse his office and do so sacrificing national security, undermining the integrity of the elections, and there is nothing Congress can do about it.

The CHIEF JUSTICE. Thank you, Mr. Manager.

RECESS

The CHIEF JUSTICE. We are in recess.

There being no objection, at 6:32 p.m., the Senate, sitting as a Court of Impeachment, recessed until 7:25 p.m.; whereupon the Senate reassembled when called to order by the CHIEF JUSTICE.

The CHIEF JUSTICE. The Senate will come to order.

Ms. McSALLY. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Arizona.

Ms. McSALLY. I send a question to the desk on behalf of myself and Senators SCOTT of Florida, HAWLEY, and HOEVEN.

The CHIEF JUSTICE. Thank you.

The question is for counsel for the President from Senator McSALLY, Senator SCOTT from Florida, Senator HAWLEY, and Senator HOEVEN:

Chairman SCHIFF just argued that "we think there's a crime here of bribery or extortion," or "something akin to bribery." Do the articles of impeachment charge the President with bribery, extortion, or anything akin to it? Do they allege facts sufficient to prove either crime? If not, are the House Managers' discussion of crimes they neither alleged nor proved appropriate in this proceeding?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for that question.

No, the Articles of Impeachment do not charge the crime of bribery, extortion, or any other crime. And that is a critical point because, as the Supreme Court has explained, "No principle of procedural due process is more clearly established than that of notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge . . . are among the constitutional rights of every accused."

That was the Supreme Court in Cole v. Arkansas.

The Court has also explained that for over 130 years, a court cannot permit—it has been the rule that "a court cannot permit the defendant to be tried on charges that are not made in the indictment against him." That is the rule in criminal law, and it is also the case for impeachments.

It is the House's responsibility to make an accusation and a specific accusation in Articles of Impeachment. The House had the opportunity to do that, and they did that. The charges that they put in the articles were abuse of power on a vague standard that they made up and obstruction of Congress. They put some discussion about other things in a House Judiciary Committee report, but they did not put that in the Articles of Impeachment.

And if this were a criminal trial in an ordinary court and Mr. SCHIFF had done what he just did on the floor here and start talking about crimes of bribery and extortion that were not in the indictment, it would have been an automatic mistrial. We would all be done now, and we could go home. Mr. SCHIFF knows that because he is a former prosecutor.

It is not permissible for the House to come here, failing to have charged—failing to have put in Articles of Impeachment any crime at all, and then to start arguing that, actually, oh, we think there is some crime involved, and, actually, we think we actually proved it, even though we provided no notice we were going to try to prove that.

It is totally impermissible. It is a fundamental violation of due process.

Scholars have pointed out those rules apply equally in cases of impeachment. Charles Black and Philip Bobbitt explained in their work "Impeachment: A Handbook" that is regarded as one of the authorities—collecting sources of authority on impeachments:

The senator's role is solely one of acting on the accusations (Articles of Impeachment) voted by the House of Representatives. The Senate cannot lawfully find the president guilty of something not charged by the House, any more than a trial jury can find the defendant guilty of something not charged in the indictment.

So what Manager SCHIFF just attempted here was totally improper. It would have resulted in a mistrial in any court in this country. There is nothing that has been introduced in the facts that would satisfy the elements of the crime of extortion or bribery either.

To attempt—after making their opening, after not charging anything in the articles that is a crime, after not specifying any crime, after providing no notice that they are going to attempt to argue a crime—in the question-and-answer session, to try to change the charges that they have made against the President of the United States and to say that actually there is bribery and extortion is totally unacceptable. It is not permissible, and this body should not consider those arguments. They are not permissible bounds for argument. They are not included in the Articles of Impeachment, and they should be ignored.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from New Mexico.

Mr. UDALL. Thank you for the recognition, Mr. Chief Justice. Mr. Chief Justice, I have sent a question to the desk. I am joined in this question by Senators BLUMENTHAL, LEAHY, and WHITEHOUSE.

The CHIEF JUSTICE. Thank you. The question from Senator UDALL, joined by Senators BLUMENTHAL, LEAHY, and WHITEHOUSE, to the House managers:

The President's counsel has argued that Hunter Biden's involvement with Burisma created a conflict of interest for his father Joe Biden. President Trump, the Trump organization, and his family, including those who serve in the White House, maintain significant business interests in foreign countries and benefit from foreign payments and investments. By the standard the President's counsel has applied to Hunter Biden, should Mr. Kushner and Ms. Trump's conflicts of interest with foreign governments also come under investigation?

Mrs. Manager DEMINGS. Mr. Chief Justice, and to the Senators, thank you so much for that question. Let me just preface what I am about to say with this statement: This has been a tough few days. It has been a trying time for each of us and for our Nation.

But I just want to say this in response to the question that has been posed. I stand before you as the mother of three sons. I am sure that many of you in this Chamber have children—sons and daughters—and grandchildren that you think the world of. My children's last name is Demings. So, when they go out to get a job, I wonder if there are people who associate my sons with their mother and their father.

I just believe, as we go through this very tough, very difficult debate about whether to impeach and remove the President of the United States, that we stay focused. The last few days we have seen many distractions. Many things have been said to take our minds off of the truth, off of why we are really here.

In my former line of work, I used to call it working with smoke and mirrors, anything that will take your attention off of what is painfully obvious, what is there in plain view.

The reason why we are here has nothing to do with anybody's children, as we have talked about. The reason why we are here is because the President of the United States, the 45th President, used the power of his office to try to shake down—I will use that term because I am familiar with it—a foreign power to interfere into this year's election. In other words, the President of the United States tried to cheat and then tried to get this foreign power, this newly elected President, to spread a false narrative that we know is untrue about interference in our election.

That is why we are here. And it really would help, I believe, the situation if the Attorney General, perhaps—the Department of Justice has been pretty silent—would issue a ruling or an opinion about any person of authority, especially the President of the United States, using or abusing that authority to invite other powers into interfering in our election.

So, Mr. Chief Justice, I will just close my remarks as I began them. Let us stay focused. This doesn't have anything to do with the President's children or the Bidens' children. This is about the President's wrongdoing.

Thank you.

The CHIEF JUSTICE. Thank you.

The Senator from Idaho.

Mr. CRAPO. Mr. Chief Justice, on behalf of myself and Senators RISCH, CRUZ, GRAHAM, BRAUN, MORAN, and BOOZMAN, I send a question to the desk for the counsel for the President.

The CHIEF JUSTICE. The question from Senator CRAPO and the other Senators for the counsel for the President:

Does the evidence in the record show that an investigation into the Burisma-Biden matter is in the national interest of the United States and its efforts to stop corruption?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for that question. And the straightforward answer is, yes, the evidence does show that it would be in the interest of the United States. In fact, the evidence on that point is abundant.

Here is what we know: Hunter Biden was appointed to the board of an energy company in Ukraine without any apparent experience that would qualify him for that position. He was appointed shortly after his father, the Vice President, became the Obama administration's point man for policy on Ukraine.

We know that his appointment raised several red flags at the time. Chris Heinz, the stepson of the then-Secretary of State, severed his business relationship with Hunter citing Hunter's lack of judgment in joining the board of that company, Burisma, because Burisma was owned by an oligarch who was repeatedly under investigation for corruption, for money laundering, and other offenses.

Contemporaneous press reports speculated that Hunter's role with Burisma might undermine U.S. efforts led by his father then, at that time, to promote the U.S. anticorruption message in Ukraine.

The Washington Post said: "The appointment of the Vice President's son to a Ukrainian oil board looks nepotistic at best, nefarious at worst."

There were other articles. There was one that reported: "The credibility of the United States was not helped by the news that . . . Hunter had been on the board of the directors of Burisma."

There was another article saying: "Sadly, the credibility of Mr. Biden's

message may be undermined by the association of his son with a Ukrainian natural-gas company, Burisma Holdings, which is owned by a former government official suspected of corrupt practices.''

And it went on: Reports from the Wall Street Journal said that activists here—that is, in the Ukraine—say that the U.S.'s anti-corruption message is being undermined as his son receives money from a former Ukrainian official who is being investigated for graft.

At the same time, within the Obama administration, officials raised questions. The Special Envoy for Energy Policy, Amos Hochstein, raised the matter with the Vice President. Similarly, Deputy Assistant Secretary of State Kent testified that he, too, voiced concerns with Vice President Biden's office.

Everyone who was asked in the proceedings before the House of Representatives agreed that there was at least an appearance of a conflict of interest when Mr. Biden's son was appointed to the board of this company. That included Ambassador Yovanovitch, Deputy Assistant Secretary Kent, Lieutenant Colonel Vindman, Jennifer Williams, Ambassador Sondland, Dr. Fiona Hill, and Ambassador Taylor. They all agreed there was an appearance of a conflict of interest.

Even in the transcript of the July 25 telephone call, President Zelensky himself acknowledged the connection between the Biden and Burisma incident, the firing of the prosecutor who reportedly had been looking into Burisma, when Vice President Biden openly acknowledged he leveraged a billion dollars in U.S. loan guarantees to make sure that that particular prosecutor was fired. He openly acknowledged it was an explicit quid pro quo: You don't get a billion dollars in loan guarantees unless and until that prosecutor is fired. My plane is leaving in 6 hours, he said on the tape.

And when the President, President Trump, raised this in the July 25 call, President Zelensky recognized that this related to corruption, and he said: ''The issue of the investigation of the case''—and he's referring to the case of Burisma—''is actually the issue of making sure to restore the honesty, so we will take care of that . . .'' And he later said in an interview that he recognized that President Trump had been saying to him things are corrupt in Ukraine, and he was trying to explain, no, we are going to change that; there is not going to be corruption.

So that explicit exchange in the July 25 call shows that President Zelensky recognized that that Biden-Burisma incident had an impact on corruption and anti-corruption. And so it was definitely undermining the U.S. message on anti-corruption, and it was a perfectly legitimate issue for the President to raise with President Zelensky to make clear that the United States did not condone anything that would seem to interfere with legitimate investigations and to enforce the proper anti-corruption message.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Illinois.

Mr. DURBIN. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Thank you. Senator DURBIN's question is directed to the House managers:

Would you please respond to the answer that was just given by the President's counsel?

Ms. Manager GARCIA of Texas. Mr. Chief Justice, Senators, the President sought Ukraine's help in investigating the Bidens only after reports suggested Vice President Biden might enter the 2020 Presidential race and would seriously challenge President Trump in the polls. President Trump had no interest in Biden's Obama-era Ukraine work in 2017 or 2018 when Biden was not running against him for President.

None of the 17 witnesses in the impeachment inquiry provided any credible evidence—no credible evidence—to support the allegation that former Vice President Biden acted inappropriately in any way in Ukraine. Instead, witnesses testified that the former Vice President was carrying out official U.S. policy in coordination with the international community when he advocated for the ouster of a corrupt Ukrainian official.

In short, the allegations are simply unfounded. President Trump's own handpicked special envoy to Ukraine, Ambassador Kurt Volker, knew they were unfounded too. He testified that he confronted the President's attorney, Mr. Giuliani, about these conspiracy theories and told him that ''it is simply not credible to me that Joe Biden would be influenced in his duties as Vice President by money or things for his son or anything like that. I've known him a long time. He's a person of integrity, and that is not credible.''

Giuliani acknowledged that he did not find one of the sources of these allegations, a former Ukrainian prosecutor, to be held credible. So even Giuliani knew the allegations were false.

Our own Justice Department confirmed that the President never spoke to the Attorney General about Ukraine or any investigation into Vice President Biden. If President Trump genuinely believed that there was a legitimate basis to request Ukraine's assistance in law enforcement investigations, there are specific formal processes that he should have followed. Specifically, he could have asked the DOJ to make an official request for assistance through the mutual legal assistance treaty.

It is worth noting, the President only cares about Hunter Biden to the extent that he is the Vice President's son and, therefore, a means through which to smear a political opponent. But President Trump specifically mentioned Vice President Biden in asking for the removal of the former prosecutor on that July 25 call. That is what he wanted, not an investigation into Hunter Biden. This is yet another reason you know that there is no basis for investigating Vice President Biden.

Can we get slide 52 up?

The timing shows clearly that despite the fact that this conduct occurred in 2015, it wasn't until Vice President Biden began consistently beating Trump in national polls in the spring of 2019 by significant margins that the President targeted Biden. He was scared of losing. The President wanted to cast a cloud over a formidable political opponent. This wasn't about any genuine concern of wrongdoing. The evidence proves that. This was solely about the President wanting to make sure that he could do whatever it took to make sure that he could win. So he froze the critical money to Ukraine to coerce Ukraine to help him attack his political opponent and secure his reelection.

The President of the United States cannot use our taxpayer dollars to pressure a foreign government to do his personal bidding. No one is above the law.

I yield back.

The CHIEF JUSTICE. The Senator from South Carolina.

Mr. SCOTT of South Carolina. Thank you, sir.

I send a question to the desk on behalf of myself, Senators CRAPO and GRAHAM, for the White House counsel.

The CHIEF JUSTICE. The question is from Senator SCOTT of South Carolina and other Senators to the White House counsel:

House managers claim that the Biden/Burisma affair has been debunked. What agency within the government or independent investigation led to the debunking?

Mr. Counsel HERSCHMANN. Mr. Chief Justice, Members of the Senate, there is no evidence in the record about any investigation, let alone debunked, shammed, discredited, or, as Manager JEFFRIES told you tonight, phony.

The House managers haven't cited any evidence in the record because none exists. A couple of days ago, I read to you a quote and statement from Vice President Biden dealing with corruption in Ukraine. What I didn't tell you was he made those statements before the Ukrainian Parliament directly.

He spoke about the historic battle of corruption. He spoke about fighting corruption, specifically in the energy sector. He spoke about no sweetheart deals. He said oligarchs and nonoligarchs must play by the same rules:

Corruption siphons away resources from the people. It blunts economic growth, and it affronts the human dignity.

Those were Vice President Biden's words. So the real question is this. Is corruption related to the energy sector in Ukraine run by a corrupt Ukrainian oligarch who is paying our Vice President's son and his son's business partner millions of dollars for no apparent

Case 0:20-cv-61872-AHS   Document 17-1   Entered on FLSD Docket 11/06/2020   Page 32 of 48

legitimate reason while his father was overseeing our country's relationship with Ukraine merit any public inquiry, investigation, or interest? The answer is yes.

Simply saying it didn't happen is ridiculous. With all due respect to the House managers and citing to our children, the message to our children, especially when you oversee a corruption in trying to root it out in another country, is to make sure your children aren't benefiting from it. That is what should be happening—not to sit there and say that it is OK.

The House managers don't deny that there is a legitimate reason to do an investigation. They just say it was debunked; it is a sham; it is delegitimate; but they don't tell you when it happened.

We all remember the email that Chris Heinz sent. Keep this in mind. He is the stepson of the then-Secretary of State, John Kerry. He sends an official email to the State Department, to the chief of staff to John Kerry, and special assistant. The subject is Ukraine. There is no question when you look at that email that it is a warning shot to say: I don't know what they are doing, but we are not invested in it.

He is taking a giant step back.

Think about the words, and remember the video that we saw about Hunter Biden. What did he say? I am not going to ''open my kimono''—I am not going to ''open my kimono''—when he was asked how much money he was making. In one month—in one month alone—Hunter Biden and his partner made almost as much as every Senator and Congressman—just in one month alone—what you earn in a year. And you don't think that merits inquiry?

Does anyone here think, when they say it is a debunked investigation that didn't happen, that we wouldn't remember if there was testimony of Hunter Biden, Joe Biden, Secretary of State John Kerry, his stepson, their business partner, his chief of staff, and special assistant? How can you tell the American people it doesn't merit inquiry when our Vice President's son is supposedly doing this for corporate transparency in Ukraine? He is going to oversee the legal department of a Ukrainian company; he is going to help them.

And if you look at his statement that I read to you beforehand, there is another part of it from October 2019. If you want to know whether he thought it dealt with outside of Ukraine in just Burisma—he said he was ''advising Burisma on its corporate reform initiatives, an important aspect of fueling Burisma's international growth and diversity.''

Listen to this statement by Hunter Biden's attorney: ''Vibrant energy production, particularly natural gas, was central to Ukraine's independence and to stemming the tide of Vladimir Putin's attack on the principles of a democratic Europe.''

Do you think he understood, when he was getting the millions of dollars,

what his father was doing? The only problem is, that statement didn't come out until October of 2019. Only when the news stories started to break, only when the House managers raised these issues, did people start to talk about it.

Tell us where we saw Joe Biden, Hunter Biden, and John Kerry testify about it. Tell us where you did it when you did your impeachment hearings. I don't remember seeing that testimony. I don't remember seeing the bank records. We put the bank records in front of you. The people are entitled to know exactly what was going on.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Oregon.

Mr. MERKLEY. Thank you, Mr. Chief Justice.

On behalf of the Senator from New Mexico, MARTIN HEINRICH, and myself, I have a question to send to the desk.

The CHIEF JUSTICE. The question from Senator MERKLEY and other Senators is for counsel to the President:

Please clarify your previous answer about the Bolton manuscript. When, exactly, did the first person on the President's defense team first learn of the allegations in the manuscript? Secondly, Mr. Bolton's lawyer publicly disputes that any information in the manuscript could reasonably be considered classified. Was the determination to block its publication on the basis that it contains classified information made solely by career officials, or were political appointees in the White House Counsel's office, or elsewhere in the White House, involved?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, to address your question specifically, the allegation that came out in the New York Times article about a conversation that is allegedly reported in the manuscript between the President and Ambassador Bolton and officials, lawyers in the White House Counsel's Office learned about that allegation for the first time on Sunday afternoon when the White House was contacted by the New York Times.

In terms of the classification review, it is conducted at the NSC. The White House Counsel's Office is not involved in classification review, determining what is classified or not classified.

I can't state the specifics. My understanding is that it is conducted by career officials at the NSC, but it is handled by the NSC. I am not in a position to give you full information on that. My understanding is, it is being done by career officials. But it is not being done by lawyers in the White House Counsel's Office.

I hope that answers your question, Senator.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Alaska.

Mr. SULLIVAN. Mr. Chief Justice, I send a question to the desk on behalf of myself and Senator LANKFORD for the President's counsel.

The CHIEF JUSTICE. Thank you.

The question from Senators SULLIVAN and LANKFORD to the counsel for the President:

There has been conflicting testimony about how long the Senate might be tied up in obtaining additional evidence. At the beginning of this trial, the minority leader offered 11 amendments to obtain additional evidence in the form of documents and depositions from several federal agencies. If the Senate had adopted all 11 of these amendments, how long do you think this impeachment trial would take?

Mr. Counsel SEKULOW. Mr. Chief Justice, Members of the Senate, it would take a long time. It would take a long time just to get through those motions.

But there have been 17 witnesses. We are talking about, now, additional witnesses that the managers have put forward and that Democratic Leader SCHUMER has discussed. He has discussed four witnesses in particular, as if this body—if it were to grant witnesses—would say: Yes, you get those four witnesses. And the White House and the President's counsel get what?

Mr. SCHUMER. Whatever you want.

Mr. Counsel SEKULOW. Whatever I want. That is what you said, Mr. SCHUMER.

Whatever I want? Here's what I want. I want ADAM SCHIFF. I want Hunter Biden. I want Joe Biden. I want the whistleblower. I want to also understand there may be additional people within the House Intelligence Committee that have had conversations with that whistleblower—that I get anybody we want. By the way, if we get anybody we want, we will be here for a very long time.

The fact of the matter is, we are not here to argue witnesses tonight, which, obviously, is an undercurrent. But to say that this is not going to extend this proceeding—months, because understand something else: Despite the, you know, executive privilege and other nonsense, I suspect Manager SCHIFF—smart guy—he is going to say: Wait a minute, I have some speech and debate privileges that may be applicable to this.

I am not saying that they are. But they may raise it. It would be legitimate to raise it. So this is a process that we would be—this would be the first of many weeks.

I think we have to be clear. They put this forward in an aggressive and fast-paced way, and now they are saying ''Now we need witnesses''—after 31 or 32 times you said you proved every aspect of your case. That is what you said.

He just said he did. Well, then, I don't think we need any witnesses.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from New Jersey.

Mr. MENENDEZ. Mr. Chief Justice, I send a question to the desk and refer it to the House managers.

The CHIEF JUSTICE. The question is from Senator MENENDEZ to the House managers:

President Trump has maintained that he withheld U.S. security assistance to Ukraine because he was concerned about corruption.

Yet, his purported concern about corruption did not prevent his Administration from sending congressionally-appropriated assistance to Ukraine more than 45 times between January 2017 and June 2019, totaling more than $1.5 billion. So why did the President suddenly become concerned about corruption in early 2019?

Mr. Manager CROW. Mr. Chief Justice, Senator, thank you for the question.

He became concerned about corruption supposedly in early 2019 because Vice President Biden was running for election for the Presidency. That is what the overwhelming amount of the evidence shows because there is no other legitimate reason, as your question points out.

First, the publicly released records of President Trump's April 21 and 25 calls to President Zelensky never mentioned the word "corruption" despite the fact that the talking points for these calls prepared by his own staff listed "corruption."

Second, in May 2019, the State Department certified to Congress Ukraine had "taken substantial actions for the purposes of decreasing corruption" and met the anti-corruption benchmarks this very body established when it appropriated $250 million of those funds.

Third, by the time of the July 25 call, President Zelensky had already established his anti-corruption bona fides, having introduced a number of reform bills in Ukraine.

Fourth, on July 26, the day after his call with President Zelensky, President Trump spoke to Ambassador Sondland, who was in Ukraine. The one question the President asked Ambassador Sondland was not about corruption but about whether or not President Zelensky was going to do the investigations.

Fifth, the released aid—as your question points out, Senator, the President released the aid in 2017 and in 2018, and he released it in 2019 only after having gotten caught. In the words of Lieutenant Colonel Vindman and other witnesses, the conditions on the ground had not changed.

So we are hearing a lot tonight about the concerns about corruption, Burisma, Russia, but the facts still matter here. We are here for one reason and one reason only: The President of the United States withheld foreign aid that he was happy to give in the 2 prior years; that suddenly, we are to believe, something changed, the conditions on the ground changed, and he had an epiphany about corruption within a week of Vice President Biden announcing his candidacy. It doesn't make any sense.

One other thing I will say with regard to the aid is, this assertion that President Trump has been the strongest supporter of Ukraine—I talked about this earlier. Let's just assume that to be the case, and if it is the case, as the President's counsel has contended over and over again, then there is, of course, no reason to withhold the aid, because nothing has changed.

This leads us inevitably to only one conclusion, and that is that the President of the United States used taxpayer dollars—the American people's money—to withhold aid from an ally at war to benefit his political campaign.

Do not be distracted by Russian propaganda, by conspiracy theories, by people asking you to look in other directions. That is what this is about. That will not change. The facts will continue to come out. Whether this body subpoenas them or not, the facts will come out. The question now is, Will they come out in time, and will you be the ones asking for them when you are going to be making the decision in a couple of days to sit in judgment?

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Wisconsin.

Mr. JOHNSON. Mr. Chief Justice, I send a question to the desk for the President's counsel.

The CHIEF JUSTICE. Thank you.

The question is from Senator JOHNSON for the President's counsel:

*If House Managers were certain it would take months to litigate a subpoena for John Bolton, why shouldn't the Senate assume lengthy litigation and make the same decision as the House made—reject a subpoena for John Bolton?*

Mr. Counsel SEKULOW. Mr. Chief Justice, Members of the Senate, I think that is precisely the point. And the fact is that if, in fact, we are to go down that road of a witness or witnesses that had national—in the case of Ambassador Bolton, high-ranking NSA—this is an individual that is giving the President advice at the highest level. The Supreme Court has been very consistent on that. That is where privileges are at their highest level. The presumed privilege, actually, is what the Supreme Court has said.

And in a situation like this, I think we are going down a road—if the Senate goes down this road—of a lengthy proceeding with a lot more witnesses. And then I want to ask this question and just plant it as a thought: Is that going to be the new norm for impeachment? You put an impeachment together in a couple of weeks. We don't like what the President did. We get it through in a 2-day proceeding in front of the Judiciary Committee. We wrap it up and we send it up here and say: Now go figure it out. Because that is what this is really becoming. That is what this actually is.

So I think, if we are looking at the institutional interests that are at stake here, this is a very dangerous precedent because what they are doing—what they are saying is basically: We have enough to prove our case—that is what Manager Schiff says—but not really, so we really need more evidence—not because we need it; because we want it. But we didn't want it bad enough when we were in the House, so we didn't get it. So now you issue the subpoena, and then let's duke it out in court and see what happens.

It sounds like, to me, that this is—they are acting like this is some mu-

nicipal traffic court proceeding. I remind everybody that we are talking about—under their Articles of Impeachment, they are requesting the removal of the President of the United States. So, you know, they are already saying in the media that their ongoing investigation here—they are going to continue to investigate. So are we going to be doing this every 3 weeks, every month except in the summer? There is an election months away. The people should have a right to vote. My colleague Pat Cipollone, the White House counsel, said that.

So when I look at all of this, whether it is the late need of witnesses after you prove your case, whether privileges apply or not apply—Senator SCHUMER said: We get anybody we want—we would be here for a very, very long time, and that is not good for the United States.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Democratic leader is recognized.

Mr. SCHUMER. I have a question for the desk.

The CHIEF JUSTICE. Senator SCHUMER's question is for the House managers:

*Would you please respond to the answer that was just given by the President's counsel?*

Mr. Manager SCHIFF. I think we can all see what is going on here, and that is, if the House wants to call witnesses, if you want to hear from a single witness, if you want to hear what John Bolton has to say, we are going to make this endless. We, the President's lawyers, are going to make this endless. We promise you, we are going to want ADAM SCHIFF to testify. We want Joe Biden to testify. Hunter Biden. We are going to want the whistleblower. We are going to want everyone in the world. If you dare, if you have the unmitigated temerity to want witnesses in a trial, we will make you pay for it with endless delay. The Senate will never be able to go back to its business.

That is their argument.

How dare the House assume there will be witnesses in a trial. Shouldn't the House have known when they undertook its investigation that the Senate was never going to allow witnesses; that this would be the first impeachment trial in the history of the Republic with no witnesses?

So Mr. Sekulow wants me to testify. I would like Mr. Sekulow to testify about his contact with Mr. Parnas or Mr. Cipollone about the efforts to implement the President's fight on all subpoenas. I would like to ask questions about—well, I would like to ask questions of the President and put him under oath. But we are not here to indulge in fantasy or distraction; we are here to talk about people with pertinent and probative evidence.

And you know something? I trust the man behind me, sitting way up, whom I can't see right now, but I trust him to

make decisions about whether a witnesses is material or not, whether it is appropriate to out a whistleblower or not, whether to—whether a particular passage in a document is privileged or not. It is not going to take months of litigation, although that is what the President's counsel is threatening.

They are doing the same thing to the Senate they did to the House, which is, you try to investigate the President, you try to try the President, we will tie you and your entire Chamber up in knots for weeks and months. And you know something? They will if you let them.

You don't have to let them. You can subpoena John Bolton. You can allow the Chief Justice to make a determination in camera whether something is relevant, whether it deals with Ukraine or Venezuela, whether it is privileged or it isn't, whether the privilege is being misapplied to hide criminality or wrongdoing. We don't have to go up and down the courts; we have a perfectly good Chief Justice sitting right behind me who can make these decisions in real time.

So don't be thrown off by this claim: Oh, if you even think about it, we are going to make you pay with delays like you have never seen. We are going to call witnesses that will turn this into a circus.

It shouldn't be a circus. It should be a fair trial. You can't have a fair trial without witnesses.

I think when I was asked that question before, I answered in the affirmative—in the negative. You can't have a fair trial without witnesses, and you shouldn't presume that when a House impeaches, the Senate trials from now on will be witness-free. That is not what the Founders intended. If it was, they would have made you the court of appeals. But they didn't. They made you the triers of fact. They expected you to hear from witnesses. They expected you to evaluate their credibility.

Don't take my word for it about John Bolton. Look, I am no fan of John Bolton's—although I like him a little more than I used to—but you should hear from him. You should want to. Don't take General Kelly's view for it. Make up your own mind whether you are to believe him or Mick Mulvaney. Will you believe John Bolton or the President? Make up your own mind.

Yes, we proved our case, counsel. We proved it overwhelmingly. But you chose to contest the fact that the President withheld military aid to coerce an ally. You chose to contest it. You chose to make John Bolton's testimony relevant, pertinent. If you had stipulated the President did as he is charged, then you might make the argument that you are making here, but you haven't. You contested it. And now you want to say: But the Senate shall not hear from this witness. That is not a fair trial. It is not even the appearance of fairness. You can't have a fair trial without basic fairness.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Louisiana.

Mr. CASSIDY. Mr. Chief Justice, I send a question to the desk on behalf of myself and Senator RISCH, both to the White House counsel and the House managers.

The CHIEF JUSTICE. Thank you.

Question from Senator CASSIDY and Senator RISCH to both parties, beginning with the President's counsel first:

We saw a video of Mr. NADLER saying: "There must never be a narrowly voted impeachment or an impeachment supported by one of our major political parties and opposed by the other. Such an impeachment will lack legitimacy, will produce divisiveness and bitterness in our politics for years to come, and will call into question the very legitimacy of our political institutions." Given the well-known dislike of some House Democrats for President Trump and the stated desire of some to impeach before the President was inaugurated, and the strictly partisan vote in favor of impeachment, do the current proceedings typify that which Mr. NADLER warned against 20 years ago?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for the question. The simple answer is yes. These are exactly the sort of proceedings that Manager NADLER warned against 20 years ago. It was a purely partisan impeachment. And it has been clear that at least some factions on the other side of the aisle—the Democratic side of the aisle—have been intent on finding some way to impeach the President from the day he was sworn in and even before the day he was sworn in, and that is dangerous for our country.

To allow partisan venom and enmity like that to take hold and become the norm for driving impeachments is exactly what the Framers warned against. It is in Federalist No. 65. Hamilton warned against it. He warned against persecution by an intemperate and designing majority in the House of Representatives, and that is exactly what the Framers did not want impeachment to turn into. Yet that is clearly what it is turning into here.

Both Manager NADLER and Democratic Leader SCHUMER, in the video that we saw, were prescient in forewarning that, if we start to go down this road, one thing that seems to be sure in Washington is that what goes around comes around. If it is done once to one party, it will happen again to the other party and then to the other party once the Office of the President changes hands. Then we will be in a cycle. It will get worse and worse, and it will be more and more, and every President will be impeached. That is not what the Framers intended, and this body shouldn't allow it to happen here.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

Mr. Manager JEFFRIES. The evidence is overwhelming that President Trump pressured a foreign government to target an American citizen for personal and political gain as part of

President Trump's corrupt effort to cheat and solicit foreign interference in the 2020 election.

There is a remedy for that type of stunning abuse of power, and that remedy is in the Constitution. That remedy is impeachment and the consideration of removal, which is what this distinguished body is doing right now. That is not partisan. That is not the Democratic Party's playbook. That is not the Republican Party's playbook. That is the playbook in a democratic republic given to us in a precious fashion by the Framers of the Constitution.

The impeachment in this instance, of course, and the consideration of removal is necessary because President Trump's conduct strikes at the very heart of our free and fair elections. As North Carolinian delegate William Davie noted at the Constitutional Convention, "If he be not impeachable whilst in office, he will spare no efforts or means whatsoever to get himself reelected."

The Framers of the Constitution understood that perhaps this remedy would one day be necessary. That is why we are here right now.

The American people should decide an American election, not the Ukrainians, not the Russians, not the Chinese—the American people. That is why this President was impeached. That is why it is appropriate for the Democrats and the Republicans—both sides of the aisle—not as partisans but as Americans, to hold this President accountable for his stunning abuse of power.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Vermont.

Mr. SANDERS. Mr. Chief Justice, I send a question to the desk for the House managers.

The CHIEF JUSTICE. Thank you.

Senator SANDERS asks the House managers:

Republican lawyers have stated—on several occasions—that two people, Senator JOHNSON and Ambassador Sondland, were told directly by President Trump that there was no quid pro quo in terms of holding back Ukraine aid in exchange for an investigation into the Bidens. Given the media has documented President Trump's thousands of lies while in office—more than 16,200 as of January 20—why should we be expected to believe that anything President Trump says has credibility?

Mr. Manager SCHIFF. Well, I am not quite sure where to begin with that question except to say that if every defendant in a trial could be exonerated just by denying the crime, there would be no trial. It doesn't work that way.

I think it is telling that when Ambassador Sondland spoke with President Trump, the first words out of his mouth, according to Sondland, were "no quid pro quo." That is the kind of thing you blurt out when you have been caught in the act and say: It was not me. I didn't do it.

Even then, the President couldn't help himself because the other half of that conversation was "no quid pro

quo'' but that Zelensky needs to go to the mic, and what is more, he should want to—no quid pro quo but quid pro quo.

This reminds me of something that came up earlier. Why would the President—when he is on the call of July 25 and knows that there are other people listening, why on Earth would the President engage in this kind of shakedown with others being within earshot? You know, I think this question comes up in almost every criminal trial. Why would the defendant do that?

Sometimes it is very hard to fathom, and sometimes it is just that people make mistakes. In this case, I think the President truly believes that he is above the law. He truly believes that he is above the law. It doesn't matter who is listening. It doesn't matter who is listening. If it is good for him—I guess this is a version of Dershowitz' argument—if it is good for him, it is good for the state because he is the state. If it helps his reelection, it is good for America, and whatever means he needs to effectuate his election, whether it is withholding military aid or what have you, as long as it helps him get elected, well, it is good for America because he is the state. This is why I think he is so irate when people come forward and blow the whistle, not just the whistleblower but people like John Bolton or General Kelly.

You might ask the question: Why do so many people who leave this administration walk away from this President with such conviction that he is undermining our security that you cannot believe what he says? Think about this: The President's now former Chief of Staff, General Kelly, doesn't believe the President of the United States; he believes John Bolton.

I mean, can everybody be disgruntled? Can it all be a matter of bias? I think we know the answer. I think we know the answer. I mean, how do you believe a President to whom the Washington Post has documented so many false statements? The short answer is, you can't.

I remember, early in his Presidency, many of us talked about how once as President, you lose your credibility, and once as President, your country or your friends or allies around the world cannot rely on your word and just how disruptive and dangerous it is to the country. So we can't accept the denial. It is a false denial.

Indeed, if you look at the Wall Street Journal article that Senator JOHNSON was interviewed in, when he had that conversation with Sondland and had that sinking feeling because he didn't want those two things tied together, everyone understood they were tied together. It was as simple as two plus two equals four.

So can you rely on a false exculpatory? You can't with this President any more than you can with any other accused and probably, given the President's track record, a lot less than other accused. But at the end of the day, we have people with firsthand knowledge who don't have to rely on his false exculpatory. You don't have to rely on Mick Mulvaney's recanting what you all saw so graphically on TV. How does somebody say, without a doubt, this was a factor, that this is why he did it?

By the way, Alan Dershowitz lost a criminal case in which he argued that if a corrupt motive is only part of the motive, you can't convict. And the court said: Oh, yes, you can. If a corrupt motive is any part of it, you can convict. So he has lost that argument before, and he makes this argument again before this court. It shouldn't be any more availing here than it was there.

At the end of the day, though, there is no more interested party here than the President of the United States, and I think we have seen he will say whatever he believes suits his interest. Let's instead rely on the evidence and rely on others, and one is just a subpoena away.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Colorado.

Mr. GARDNER. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Thank you. The question from Senator GARDNER is for counsel to the President:

> Arguments have been made that any assertion of protection from disclosure is indicative of guilt and that the House's assertion of Impeachment power cannot be questioned by the Executive. Is that interpretation of the House's Impeachment power consistent with the Constitution, and what protects the Executive from the House abusing the Impeachment power in the future?

Mr. Counsel PHILBIN. Mr. Chief Justice and Senators, thank you for that question.

The House managers' assertion that any effort to assert a privilege or assert a legal immunity to decline disclosing information is somehow a sign of guilt is not the law. It is, actually, fundamentally contrary to the law.

Legal privileges exist for a reason. We allow people to assert their rights. It is a basic part of the American justice system. Asserting your rights—asserting privileges and immunities to process rights even if it means limiting the information that might be turned over to a tribunal—is not and cannot be treated as evidence of guilt.

To the second part of the question, as to the House managers' theory that the power of impeachment means that the President can't resist any subpoena that they issue pursuant to the power of impeachment, it is not consistent with the Constitution. The Constitution gives the House the sole power of impeachment, which means only that the House is the only place—the only part of the government—that has that power. It doesn't say that they have a paramount power of impeachment that destroys all other constitutional rights or privileges or immunities. It doesn't mean that executive privilege suddenly disappears.

The House managers a number of times have cited Nixon v. United States or—I might get it reversed now—United States v. Nixon. It was the case involving the President in 1974. The Supreme Court determined that, in that particular case, after a balancing of interests, assertions of executive privilege would have to give way, but it did not say that there was just an absolute, blanket rule that anytime there is an allegation of wrongdoing or that there is an impeachment going on in the background, that executive privilege just disappears. That is not the rule from that case. In fact, even in that context, the Court pointed out that there may be an absolute immunity or privilege in the field of foreign relations and national security, which is the field we are dealing with here.

The Framers recognized that there could be partisan and illegitimate impeachments. They recognized that the House could impeach for the wrong reasons, but they didn't leave the executive branch totally defenseless to that. Executive privilege and immunities rooted in executive privilege, such as the absolute immunity for senior advisers, still applies even in the context of an impeachment. That is part of the checks and balances in the Constitution. They don't fall away simply because the House says: Ah, now we want to proceed on impeachment.

It is necessary for the proper functioning of the government and the separation of powers for the executive branch to retain that ability to protect confidentiality interests, to protect the prerogatives of the Office of the Presidency. For any President to fail to assert those rights and to protect them would do lasting damage to the Office of the Presidency for the future.

I think that is a critical point to understand in that there is a danger in the legal theory that the House managers are proposing here because it would do lasting damage to the separation of powers—to the structure of our government—to have the idea be that, as soon as the House flips the switch that they want to start proceeding on impeachment, the executive has no defenses and has to open every file and display everything. That is not the way the Framers had it in mind, because the executive branch has to have still its defenses for its sphere of authority under the Constitution. That is part of the checks and balances.

And before I sit down, I would just like to close by going back to the Senator who asked the question about the review process in the Bolton book. I believe I was clear about this, but I just want to make 100 percent sure to the extent the Senator was asking for an assurance that only career officials in the NSC review it for classification review.

I can't make that assurance because it is an NSC process, and I am not sure. At the levels of the process, there might be other reviews. So I didn't intend to give and I don't want it to be

understood as giving that assurance to you.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Massachusetts.

Ms. WARREN. Mr. Chief Justice, I send a question to the desk for House managers and counsel to the President.

The CHIEF JUSTICE. Thank you. The House managers will respond first to this question from Senator WARREN.

If Ukrainian President Zelensky called President Trump and offered dirt on President Trump's political rivals in exchange for President Trump handing over hundreds of millions in military aid, that would clearly be bribery and an impeachable offense. So why would it be more acceptable—and somehow not impeachable—for the reverse, that is, for President Trump to propose the same corrupt bargain?

Mr. Manager NADLER. Bribery is obviously an impeachable offense. Bribery is contained within the accusation at the House level of abuse of power.

We explained in the Judiciary Committee report that the practice of impeachment in the United States has tended to envelope charges of bribery within the broader standard of other high crimes and misdemeanors. That is the historical standard.

The elements of bribery are clearly established here. The abuse of power is clearly established. When the President of the United States offers something—extorts a foreign power to get a benefit for himself, withholds military aid in order to get that foreign power to do something that would help him politically—that is clearly bribery, it is clearly an abuse of power, and there is no question about it.

Now, by the way, the question was raised earlier as to what the proper standard of proof is. People pointed out the Constitution doesn't say. But the highest standard of proof is beyond a reasonable doubt, and these facts have been proven not beyond a reasonable doubt, beyond any doubt.

The CHIEF JUSTICE. Thank you, Mr. Manager.

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for the question.

I think what this hypothetical shows, what Manager NADLER shows, is this is an effort to try to smuggle into Articles of Impeachment that do not mention any crime the idea that there is some crime alleged here. There is not, and I went through that earlier.

The Articles of Impeachment specify a theory of the charge here that is abuse of power. They do not allege the elements of bribery or extortion. They don't mention bribery or extortion.

If the House managers had wanted to bring those charges, they had to put them in the Articles of Impeachment, just the way a prosecutor, if he wants to put someone on trial for bribery, he has got to put it in the indictment.

If you don't, and you come to trial and then try to start arguing that, "well, actually, we think there is bribery going on here," that is impermissible. It is prosecutorial misconduct.

And so a hypothetical that is contrary to what the facts were here, to try to suggest that maybe there is some element of bribery, that is all beside the point. We have specific facts. We have evidence that has been presented in the record. We have a specific Article of Impeachment. It doesn't say bribery. It doesn't say extortion. And there is no way to get that into this case at this point because the House managers had the opportunity to frame their case. They had every opportunity to frame it any way they wanted because they controlled the whole process. They controlled all the evidence that went in. They controlled all the evidence with the witnesses that were called, and they could frame it any way they wanted, and they didn't put in any crime. There is no crime asserted here. It is not part of the Articles of Impeachment, and it can't be considered now.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Kansas.

Mr. MORAN. Thank you, Mr. Chief Justice. I submit to the desk a question on my behalf and on behalf of Senator CORNYN.

The CHIEF JUSTICE. The question from Senator MORAN and Senator CORNYN is for counsel to the President:

Is it true that in these proceedings that the Chief Justice can rule on the issue of productions of exhibits and the testimony of witnesses over the objection of either the managers or the President's counsel? Would a determination by the Chief Justice be subject to judicial review?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for the question, and let me answer it this way—lay out my understanding of the process.

If we were going to start talking about subpoenaing witnesses, subpoenaing documents, having things come into evidence that way, the first question would be subpoenas would have to be issued to the witnesses or for the documents, and if those subpoenas were resisted on the grounds of some privilege or immunity, then that would have to be sorted out because if the President asserted, for example, the immunity of a senior adviser to the President or an executive privilege over certain documents, then the Senate would have to determine whether it was going to fight that assertion and how—through some accommodation process and negotiation—or if the Senate were going to go to court to litigate that. And that whole process would have to play out. That would be the first stage, and that would have to be gone through anytime the President resisted the subpoena on the witnesses or documents. That would take a while.

That is what the House managers decided not to do in the House of Representatives.

Then, once there had been everything resolved on a subpoena, or something

like that, it sounds like the question asks further, in terms of questions here in the trial, of admissibility of particular evidence. It is my understanding, then, that the Presiding Officer—the Chief Justice—could make an initial determination if there were objections to admission of evidence, but that all such determinations can be challenged by the Members of the Senate and would be subject to a vote.

So it would not be—I think there were some suggestions earlier—that we don't need any other courts; we don't need anything involved with anyone else because the Chief Justice is here.

That is not correct. On the subpoenas at the front end, that is not going to be something that is determined just—with all respect, sir—just by the Chief Justice. That is something that would have to be sorted out at the courts or by negotiation with the executive branch.

Then, once we are here on specific evidentiary objections, if we have a witness and there are objections during depositions that have to be resolved, or by a witness on the stand, if there are objections to particular documents—authentication or things like that—the Chief Justice could make an initial ruling, but every one of those rulings could be appealed to this body to vote by a majority vote on whether the evidence would come in or not.

And you might have to consider rules, whether you are going to have the Federal Rules of Evidence apply or some modified rules of evidence, and all of that would have to be sorted out.

I don't think that we would get to the stage, then, of any determinations in evidence here being in any way appealed out to the courts, but that would be a process that this body would have to decide what would be admissible in evidence in the trial.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Minnesota.

Ms. SMITH. Thank you. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Thank you.

The question from Senator SMITH is to the House managers:

The President has stated multiple times in public that his actions were perfect—yet he refuses to allow Bolton, Mulvaney, and others to testify under oath. If the President's actions are so perfect, why wouldn't he allow fact witnesses to testify under oath about what he has said publicly?

Mr. Manager SCHIFF. Well, the short answer is, if the President were so confident that this was a perfect call and that those around him would agree that there was nothing nefarious going on, he would want witnesses to come and testify. But, of course, he doesn't. He doesn't want his former National Security Advisor to testify. He doesn't want his current Chief of Staff to testify. He doesn't want those that were heading OMB to testify. He doesn't want you to hear from any of them.

Now, I think that is pretty indicative that he knows what they have to say

and he doesn't want you to hear what they have to say. He doesn't want you to see any of the myriad of documents that he has been withholding from this body as he did from the House.

But I also want to address the last question, if I could. Is the Chief Justice empowered under the Senate rules to adjudicate questions of witnesses and privilege? And the answer is yes.

Can the Chief Justice make those determinations quickly? The answer is yes.

Is the Senate empowered to overturn the Chief Justice? Under certain circumstances.

Is the vote 50 or is the vote two-thirds? That would be something that we would have to discuss with the Parliamentarian and with the Chief Justice.

But the Chief Justice has the power to do it, and, what is more, under the Senate rules, you want expedited process? We are here to tell you: We will agree with the Chief Justice's ruling on witnesses, on their materiality, on the application or nonapplication of privilege. We agree to be bound by the Chief Justice. We will not seek to litigate an adverse ruling, and we will not seek to appeal an adverse ruling.

Will the President's counsel do the same? And, if not, just as the President doesn't trust what these witnesses have to say, the President's lawyers don't want to rely on what the Chief Justice's rulings might be.

Now, why is that? They, as we, understand the Chief Justice will be fair. I am not for a moment suggesting they don't think the Chief Justice is fair—quite the contrary. They are afraid he will be fair. They are afraid he will make a fair ruling. That should tell you something about the weakness of their position.

They don't want a fair trial with witnesses. They don't want a fair Justice to adjudicate these questions. They just want to suggest to you that they will delay and delay and delay.

I think it was Thomas Paine who said: Those who would enjoy the blessings of liberty must undergo the rigors of defending it—the fatigues of defending it.

Is it too much fatigue for us to hear from a witness? Is that how little effort we are willing to put into the blessings of freedom and liberty? Is that how little fatigue we are willing to incur?

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Nebraska.

Mr. SASSE. I send a question to the desk on behalf of myself, TIM SCOTT, and MARCO RUBIO.

The CHIEF JUSTICE. Thank you.

The question from Senator SASSE and also on behalf of Senator SCOTT from South Carolina and Mr. RUBIO, directed to counsel for the President:

Mr. Cipollone pointed Senators to the "golden rule of impeachment." In elaborating on that rule, can you offer your views on the limiting principles—both in the nature of offenses that should be considered

and in the proximity to elections—for future impeachments, toward the end of safeguarding public trust by putting guardrails on both parties?

Mr. Counsel CIPOLLONE. Thank you, Mr. Chief Justice, Members of the Senate.

In elaborating on the golden rule of impeachment, I would say principle No. 1, if we listen to what the Democratic Senators said in the past and the House managers and other Members of the House, that should guide us, and that principle is—and it is a principle based on precedent that you shouldn't have a partisan impeachment.

If you have a partisan impeachment, that, in and of itself, is a dangerous thing because that means that there is not the bipartisan support that even the Speaker of the House has said you would need to even begin to consider the impeachment of a President because it is the overturning of an election. They don't dispute that it is the overturning of an election.

In addition, it is the removal of this President from an election that is occurring just months from now, which I think is another important principle.

I think the other important fact here is that there is actually bipartisan opposition to this impeachment. Democrats voted against it in the House of Representatives. That is an important principle.

The other principle would be that if you have a process that is unprecedented—if you have a process that is unprecedented—that should be something that ought to be considered. Always in the past there has been a vote authorizing an impeachment. Why? Because they say the House is the sole authority of impeachment—but that is the House, not the Speaker of the House at a press conference. That is another important consideration.

Another important consideration is all of the historical precedents related to rights given to a President in a process have been violated. We haven't seen anything like that in our history. The President's counsel wasn't able to attend, wasn't allowed to cross-examine witnesses, wasn't allowed to call witnesses; and they are coming here and basically asking you, No. 1, to call witnesses that they had refused to pursue, but, more importantly, I think what they are saying is, do what they did—only call witnesses that they want. Don't allow the President to call witnesses that the President wants. That doesn't work. That is not due process.

The other important principle there is, we have a lot about fairness, but in the American justice system fairness is about fairness to the accused. Fairness is about fairness to the accused. So how can you suggest that what we are going to do is, we are going to have a trial. We will get the witnesses and prosecutors that we want, even though you got to call no witnesses in the House. You got to cross-examine none of the witnesses that we called, and have we got a deal for you: Let's call

another witness, but you call none. That is another principle.

And I think the reality is that what Professor Dershowitz said is true. I think, when you are thinking about impeachment, as much as we can as human beings, we should think about it in terms of a President is a President regardless of party, and how would we treat a President of our own party in similar circumstances? I think that is the golden rule of impeachment.

I don't think we have to guess here because I think we have lots of statements from Democrats when we were here last time around and principles. As I said, I agree with them, I agree with those principles. I just ask that they be applied here.

That is my answer. Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Illinois.

Mr. DURBIN. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Thank you.

Senator DURBIN asks the House managers:

If President Trump were to actually invoke executive privilege in this proceeding, wouldn't he be required to identify the specific documents or communications containing sensitive material that he seeks to protect?

Mr. Manager NADLER. As stated before, executive privilege is a very limited privilege that must be claimed by the President. He has at no time claimed executive privilege. Rather, he has claimed absolute immunity, a nonexistent concept that every court that has ever considered it has rejected. Instead, he has simply said: We will oppose all subpoenas. We will deny to the House all information—all information. Whatever they want, they can't have. This is way beyond the pale, and it is intended to be because he fears the facts.

The facts are, he tried to extort a foreign government through withholding military aid that this Congress had voted—he broke the law to withhold the aid that this Congress had mandated be sent to them in order to pressure them into announcing an investigation of his political opponent. Those are the facts. Those facts are proven beyond any doubt at all.

So what do we have? We have a diversion after diversion, diversions about what Hunter Biden may have done in Ukraine—irrelevant, whatever he did in Ukraine. The question is, Did the President withhold foreign military aid in order to extort a foreign government into helping him rig an American election?

We hear diversions about privilege. We hear questions about witnesses. We know he is telling the Senators don't allow witnesses. Why? Because he knows what the witnesses will say.

We hear arguments from his counsel: Well, we have taken enough time with witnesses. The House shouldn't have voted if it didn't have proof positive. We had proof positive. We voted it. It

doesn't mean we shouldn't have more proof if it comes forward.

There is no argument that Mr. Bolton shouldn't be permitted to testify. He is not going to waste our time. He has told us he will testify with a subpoena.

So all of these questions are diversions. They are diversions by a President who is desperate because we have proven the facts that he threatened a foreign government—not just threatened them, did, in fact, withhold mandated American military aid from them in order to blackmail them into serving his political purposes, for private political purposes. We know that. Everything else is a diversion.

No witnesses—because maybe those witnesses will testify in a way he doesn't want.

Privilege—when you are dealing with accusations of wrongdoing against the President, the Supreme Court told us in the Nixon case, privilege yields.

So all of these arguments are diversions. Keep your eye on the facts. The facts we have proven. And let's see if the additional witnesses—and as Mr. SCHIFF said, witnesses should not be a threat, not to the Senate, not to anybody else. And it is not going to waste too much time because the Chief Justice can rule on relevant questions—questions of relevancy or privilege or anything else.

But the facts are the facts. The President is a danger to the United States. He has tried to rig the next election. He has abused his power and he must be brought to heel and the country must be saved from his continuing efforts to rig our elections.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Utah.

Mr. ROMNEY. Mr. Chief Justice, I submit a question to the desk.

The CHIEF JUSTICE. Thank you.

The question from Senator ROMNEY is for the counsel for the President:

On what specific date did President Trump first order the hold on security assistance to Ukraine and did he explain the reason at that time?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senator, thank you for the question.

I don't think that there is evidence in the record of a specific date—the specific date—but there is testimony in the record that individuals at OMB and elsewhere were aware of the hold as of July 3, and there is evidence in the record of the President's rationale from even earlier than that time. There is an email from June 24 that has been publicly released. It was publicly released in response to a FOIA request that is from one DOD staffer up to the Chief of Staff of DOD—excuse me, sorry—from the Chief of Staff down to a staffer from DOD relating on the subject line: POTUS follow-up. Follow-up from a meeting with POTUS, President of the United States, explaining questions that had been asked about Ukraine assistance, which were

specifically: What was the funding used for, i.e., did it go to U.S. firms; who funded it; and what do other NATO members spend to support Ukraine?

So from the very beginning, in June, the President had expressed his concern about burden-sharing, what do other NATO members do. Similarly, in the July 25 transcript, there was—the President asked President Zelensky specifically. He raised the issue of burden-sharing. Again, showing that was his concern. In addition, there was, I believe, Mr. Morrison, who testified that he was aware from OMB that the President had expressed concerns about corruption and that there was a review process to consider corruption in Ukraine.

So the evidence in the record shows that the President raised concerns at least as of June 24; that people were aware of the hold as of July 3; the President's concerns about burden-sharing were in the email on June 24; they were reflected in the July 25 call. Similarly, there is testimony from later in the summer that the President had raised concerns about corruption in Ukraine. So that is the evidence in the record that reflects the President's concerns. Thank you.

The CHIEF JUSTICE. Thank you, counsel. The Senator from Nevada.

Ms. CORTEZ MASTO. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. The question from Senator CORTEZ MASTO is to the House managers:

The President's counsel has claimed that the President was unfairly excluded from House impeachment processes. Can you describe the due process President Trump received during House proceedings compared to previous presidents? Did President Trump take advantage of any opportunities to have his counsel participate?

Mrs. Manager DEMINGS. Mr. Chief Justice, and to Senators, thank you so much for that question.

Let me make this plain. The President is not the victim here. The victim in this case is the American people. President Trump was invited to attend and participate in all of the Judiciary Committee hearings. He could have had Mr. Cipollone, Mr. Sekulow, or any of the other attorneys who have joined at the counsel table participate throughout the Judiciary Committee proceedings in the House. They could have attended all of the Judiciary hearings, and imagine this—cross-examine witnesses, raise objections, present evidence favorable to the President, if they had any to present, and they could have requested to have President Trump's own witnesses called.

But President Trump refused to participate. He wrote to the House, and I quote: "If you are going to impeach me, do it now, fast, so we can have a fair trial in the Senate. . . ."

In every event, President Trump was asked, and indeed legally required, to provide evidence during the Intelligence Committee investigation, but he refused, as we have already said

over and over again, to produce any documents or allow witnesses to testify. We thank God for the 17 public servants who came forward in spite of the President's efforts to obstruct.

In addition, Republican Members in Congress had an equal opportunity to ask questions during the depositions and the hearings in both the Intelligence and the Judiciary Committee hearings. Republican Members called three witnesses during the Intelligence Committee's hearings and an additional witness during the Judiciary Committee hearing.

Of course, a House impeachment inquiry is not a full-blown criminal trial. We do know that. But this is a trial, and, obviously, the President is being afforded every due process right during these proceedings.

The CHIEF JUSTICE. Thank you.

Ms. MURKOWSKI. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Alaska.

Ms. MURKOWSKI. I send a question to the desk.

The CHIEF JUSTICE. Thank you. Senator MURKOWSKI's question is for the House managers:

In early October, Mr. Cipollone sent the letter saying none of the subpoenas issued by the House were appropriately authorized and thus invalid. When the House passed their resolution authorizing the impeachment inquiry, and granting subpoena power to the Intelligence and Judiciary Committees, the body could have addressed the deficiency the White House pointed out and proclaimed those subpoenas as valid exercises of the impeachment inquiry. Alternatively, the House could have reissued the subpoenas after the resolution was adopted. Please explain why neither of those actions took place.

Ms. Manager GARCIA of Texas. Mr. Chief Justice, Senator, I appreciate your question.

These arguments, plain and simple, are a red herring. The House's impeachment inquiry and its subpoenas were fully authorized by the Constitution, House rules, and precedent. It is for the House, not the President, to decide how to conduct an impeachment inquiry.

The House's autonomy to structure its own proceedings for impeachment inquiry is rooted in two provisions of article I of the Constitution. First, article I vests the House with the "sole Power of Impeachment." It contains no requirements—no requirements—as to how the House must carry out that responsibility.

Second, article I states that the House is empowered to determine the rules of proceedings. Taken together, these provisions give the House sole discretion to determine the manner in which they investigate, deliberate, and vote for grounds of impeachment.

In exercising its responsibility to investigate and consider the impeachment of a President of the United States, the House is constitutionally entitled to relevant information from the executive branch concerning the President's misconduct. The Framers, the courts, and past Presidents have

Case 0:20-cv-61872-AHS Document 17-1 Entered on FLSD Docket 11/06/2020 Page 39 of 48

recognized and honored Congress's right to information in an impeachment investigation and is critical as a safeguard to our system of divided powers; otherwise, a President could hide his own wrongdoing to prevent Congress from discovering impeachable misconduct, effectively nullifying—nullifying—Congress's impeachment power.

That is precisely what President Trump has tried to achieve here. The President has asserted the power to determine for himself which congressional subpoenas he will respond to and those that he will not. The President's counsel would have you believe that each time anyone in the executive branch gets a subpoena, it is open season for creative lawyers in the White House and DOJ to start inventing theories about House rules and parliamentary precedent.

This is not how the separation of powers works, and to accept that argument would wholly undermine the House's and Senate's ability to provide oversight of the executive branch. It would also make impeachment a nullity.

The President argues that there was no resolution fully authorizing the impeachment inquiry, but, again, there is no requirement for the full House to take a vote before conducting an impeachment inquiry. President Trump and his lawyers invented this theory.

As Chief Judge Howell of the U.S. District Court in DC has stated, and this is a direct quote: "This [claim] has no textual support in the U.S. Constitution [or] the governing rules of the House.''

The Constitution itself says nothing about how the House may exercise its sole power of impeachment, but instead confirms the House shall have the sole power to determine the rules of its own proceedings. This conclusion is also confirmed by precedent. Numerous judges have been subjected to impeachment investigations in the House and even impeached by the House and convicted by the Senate without any previous vote of the House authorizing an impeachment inquiry.

As recently as the 114th Congress, the Judiciary Committee considered impeaching the IRS Commissioner following a referral from another committee and absent a full House vote. The Judiciary Committee began an investigation into President Nixon's misconduct for 4 months before approval of a full House resolution.

The House rules also do not preclude committees from inquiring into the potential grounds for impeachment. Instead, those rules vest the relevant committees of the House with robust investigatory powers, including the power to issue subpoenas.

Each of the three committees that conducted the initial investigation of President Trump's conduct in Ukraine—Intelligence, Oversight, and Foreign Affairs—indisputably had oversight jurisdiction over these matters.

The President's counsel has pointed to the Nixon impeachment with a full House.

The CHIEF JUSTICE. Thank you very much. Thank you.

Ms. Manager GARCIA of Texas. Thank you. I yield back.

The CHIEF JUSTICE. The Senator from Rhode Island.

Mr. WHITEHOUSE. Mr. Chief Justice, I send a question to the desk, and because my question references an earlier question, I have attached that earlier question as a reference to provide it to the Office of the Parliamentarian in case it should be of interest.

The CHIEF JUSTICE. Thank you. The question from Senator WHITEHOUSE is to counsel for the President:

White House counsel refused to answer a direct question from Senator COLLINS and Senator MURKOWSKI, saying he could only cite to the record. Five minutes afterward White House counsel read recent newspaper stories to the Senate from outside the House record. Could you please give an accurate and truthful answer to the Senators' question: Did the President ever mention the Bidens in connection to corruption in Ukraine before Vice President Biden announced his candidacy in April 2019? What did the President say, to whom, and when?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senator, thank you for the question.

I don't think that I refused to answer the question at all. We had been advised by the House managers that they were going to object if we attempted to introduce anything that was not either in the public domain—so things like that that are out there we could refer to—or things that were in the record. And so I can't—I am not in a position to go back into things that the President might have said in private, and there has been no discovery into that. It is not part of this inquiry, so I can't go telling now about things that the President might have said to Cabinet Members. I am not in a position to say that. I can tell you what is in the public, and I can tell you what is in the record. I answered the question fully to the best of my ability based on what is in the public domain and what is in the record.

I would like to take a moment to also respond to the last question that was posed by Senator MURKOWSKI with respect to the vote on authorizing the issuance of subpoenas because there has always been a vote from the full House to authorize any impeachment inquiry into a Presidential impeachment. It was that way in the Johnson impeachment. It was that way in the Nixon impeachment.

There have been references to the fact that the House Judiciary Committee began some investigatory work before the House actually voted on the resolution—I think it was Resolution 803—to authorize the impeachment inquiry. But all that work was simply gathering things that were in the public domain or that had been already gathered by other committees, and

there was no compulsory process issue. And in fact, Chairman Rodino of the House Judiciary Committee specifically determined, when there was a move to have the House Judiciary Committee issue subpoenas after the Saturday Night Massacre, that the committee lacked the authority to issue any compulsory process until there had been a vote by the full House authorizing the committee to do that.

This is not some esoteric special rule about impeachments. As I have tried to explain, this is just a fundamental rule under the Constitution about how authority had been given by ''we the people'' to Chambers of the legislature, either the House or the Senate. Once it is given there to the House, how does it get to a committee? It can only get down to a committee if it is delegated by the House. That can only happen if the House votes. There is no standing rule that gives the House Judiciary Committee authority to use the power of impeachment as opposed to the authority to legislate. There is no rule that gives you the power to use the authority of impeachment to issue compulsory process.

Rule 10 doesn't mention impeachment at all. The word doesn't appear in it. That is why it has always been the understanding that there must be a vote from the House to authorize the House Judiciary Committee or in this case—it was contrary to all prior practice—it was given to Manager SCHIFF's committee and other committees the authority to use the power of impeachment to issue subpoenas.

It was very clear to the House of Representatives that the position of the executive branch was that all of the subpoenas issued before H. Res. 660 were invalid on their face, and Senator MURKOWSKI's question is exactly correct: There was no effort in H. Res. 660 either to attempt to retroactively authorize those subpoenas or to say that those subpoenas—to retroactively authorize those subpoenas or then to reissue them under H. Res. 660, so the subpoenas remained invalid. There was no response from the House to that. Thank you.

The CHIEF JUSTICE. Thank you, counsel.

Mr. HAWLEY. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Missouri.

Mr. HAWLEY. Mr. Chief Justice, I send to the desk a question for both counsel for the President and the House managers on my own behalf and on behalf of Senator CRUZ, Senator DAINES, and Senator BRAUN.

The CHIEF JUSTICE. Thank you. The President's counsel will respond first to the question from Senator HAWLEY and the other Senators:

When he took office, Viktor Shokin, Ukraine's Prosecutor General, vowed to investigate Burisma. Before Vice President Joe Biden pressed Ukrainian officials on corruption, including pushing for the removal of Shokin, did the White House Counsel's Office or the Office of the Vice President legal counsel issue ethics advice approving Mr.

Biden's involvement in matters involving corruption in Ukraine or Shokin, despite the presence of Hunter Biden on the board of Burisma, a company widely considered to be corrupt? Did Vice President Biden ever ask Hunter Biden to step down from the board of Burisma?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for the question.

We are not aware of any evidence that then-Vice President Biden sought any ethics opinion. We are aware that both Amos Hochstein and Deputy Assistant Secretary of State Kent testified—excuse me—Amos Hochstein is in the public domain. Deputy Assistant Secretary of State Kent testified in the proceedings before the House that they each raised the issue with Vice President Biden of the potential appearance of a conflict of interest with his son Hunter being on the board of Burisma. Deputy Assistant Secretary Kent testified that although he raised that issue with the Vice President's office, the response was that the Vice President's Office—the Vice President was busy dealing then with the illness of his other son, and there was no action taken. So from what we know, there wasn't any effort to seek an ethics opinion. We are not aware of an ethics opinion having been issued. Although the issue was flagged for the Vice President's Office, we are not aware that Vice President Biden asked his son to step down or that any other action was taken. And I believe that Vice President Biden has said that he never discussed—he said publicly he never discussed his son's overseas business dealings with him.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

Mrs. Manager DEMINGS. Mr. Chief Justice and Senator, I appreciate your question. The facts about Vice President Biden's conduct are clear and do not change. Let's go through them.

First, every witness asked about this topic testified that Mr. Shokin was widely considered to be a corrupt and ineffective prosecutor who did not prosecute corruption. Shokin was so corrupt that the entire free world—the United States, the European Union, the International Monetary Fund—pressed for his office to be cleaned up. So I would caution you to be skeptical of anything that Mr. Shokin claims.

Second, witnesses, including our own anti-corruption advocate, Ambassador Yovanovitch—remember that very dedicated anti-corruption Ambassador—testified that Shokin's removal made it more likely that investigations of corrupt European—Ukrainian companies would move forward. Let me repeat that. The dismissal of Shokin made it more likely that Burisma would be investigated.

Third, Burisma was not under scrutiny at the time Joe Biden called for Shokin's ouster, according to the National Anti-Corruption Bureau of Ukraine, an organization several witnesses testified is effective at fighting corruption.

Shokin's office investigated Burisma, but the probe focused on a period before Hunter Biden joined the company. But, again, another investigation was warranted. Dismissing Shokin would have made that more likely.

The CHIEF JUSTICE. Thank you.

Mr. KING. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Maine.

Mr. KING. Mr. Chief Justice, I have a question for the House managers I will send to the desk.

The CHIEF JUSTICE. Thank you.

Senator KING's question for the House managers reads as follows:

Mr. Rudolph Giuliani was in Ukraine exclusively on a political errand—by his own admission—so doesn't the President's mention of Giuliani by name in the July 25th call conclusively establish the real purpose of the call?

Mr. Manager NADLER. Mr. Chief Justice, Members of the Senate, Mr. Giuliani played a key role in President Trump's monthslong scheme to pressure Ukraine to announce political investigations to benefit the President's reelection campaign. Remarkably, the President's defense is wrapping themselves in Rudy Giuliani's involvement in Ukraine while trying to minimize his role.

There is overwhelming evidence—not just testimony but texts, call records, and other corroborating documents—establishing Mr. Giuliani's key role in executing the President's pressure campaign beginning in early spring 2019 with a smear campaign against Ambassador Yovanovitch and then throughout the summer. Everyone knew that Rudy Giuliani was the gatekeeper to the President on Ukraine.

On May 10, Mr. Giuliani canceled the trip to Ukraine, during which he planned to dig up dirt on former Vice President Biden and on a discredited conspiracy theory after his plans became public. He admitted: "We're not meddling in an election, we're meddling in an investigation." He explained that someone can say it is improper, and this isn't—"[Someone] could say it's improper. And this isn't foreign policy—I'm asking them to do an investigation that they're already doing and that other people are telling them to stop." He was talking about the investigations of the Bidens.

During a May 10 appearance on FOX News, Giuliani also said that he canceled his trip because there are enemies of Trump's around President Zelensky.

Mr. Giuliani's associate Lev Parnas produced a set of documents to the House Intelligence Committee that included a letter—and I believe we have slide 50 here—Mr. Giuliani sent to President-elect Zelensky during this time period. In the letter dated May 10, Mr. Giuliani informed Zelensky that he represented President Trump as a private citizen, not as President of the United States.

He also requested a meeting with President Zelensky on May 13 and 14,

along with Victoria Toensing, in his "capacity as personal counsel to President Trump and with his knowledge and consent."

Mr. Giuliani confirmed President Trump's knowledge of actions with regard to Ukraine, stating: "He . . . knows what I'm doing, sure, as his lawyer." He added:

My only client is the president of the United States. He's the one I have an obligation to report to, tell him what happened.

President Trump repeatedly instructed senior American and Ukrainian officials to talk to Rudy, demonstrating that Mr. Giuliani was a key player in the corrupt scheme.

In the May 23 Oval Office meeting to discuss Ukraine policy, President Trump directed his handpicked three amigos to talk to Rudy. In response, Ambassador Sondland testified: "Secretary Perry, Ambassador Volker and I worked with Mr. Rudy Giuliani on Ukraine matters at the express direction of the President of the United States."

After two explosive White House meetings on July 10 in which Ambassador Sondland explicitly conveyed the President's demand for political investigations to Ukrainian officials, top Ukrainian aide Andriy Yermak texted Ambassador Volker: "I feel that the key for many things is Rudy."

And what was Rudy asking? Investigations of two American citizens—not corruption in general; investigations. In fact, he wasn't even asking for an investigation; he was just asking for an announcement of an investigation so that American citizens—the Bidens—could be smeared.

On the July 25 call with President Zelensky, President Trump mentioned Rudy Giuliani by name no less than four times and informed Zelensky that Rudy very much knows what is happening. He told President Zelensky: "Mr. Giuliani is a highly respected man." He added, "Rudy very much knows what is happening."

In August, Mr. Giuliani met with a top Ukrainian aide and conveyed that Ukraine must issue a public statement announcing investigations.

Ambassador Sondland and Volker then worked closely with Giuliani and the Ukrainians to ensure that the planned statement would meet Mr. Giuliani's demands. Specifically, Mr. Giuliani insisted that the statement include specific references to Burisma and the 2016 election and Biden.

Throughout this process, Sondland stated that he knew that they needed the approval of Giuliani for the press statement and that they knew Giuliani represented the interest of the President.

Rudy Giuliani admitted on live television to pressuring Ukraine to look into Joe Biden—not into corruption; into Joe Biden.

In September 2019, Chris Cuomo asked Giuliani: "So you did ask Ukraine to look into Joe Biden?"

In response, Giuliani insisted: "Of course I did."

Mr. Giuliani insisted that Ukraine look at an American citizen on behalf of his client, President Trump.

Finally, during the pendency of the impeachment proceedings, Mr. Giuliani has not ceased in his efforts to dig up dirt to benefit the President.

In December, he again traveled to Ukraine to meet with Ukrainian officials, which he described as a secret assignment, and after which, the President reportedly called him immediately upon landing and asked, ''What did you get?'' to which Mr. Giuliani responded, ''More than you can imagine.''

It is worth noting that in Ms. Raskin's presentation about Giuliani—

The CHIEF JUSTICE. Thank you, Mr. Manager.

Mr. Manager NADLER.—he repeated requests for investigations into Biden, not into corruption.

Mr. RUBIO. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Florida.

Mr. RUBIO. I send a question to the desk on behalf of myself, Senators SASSE, BRAUN, RISCH, MCSALLY, ROBERTS, and HOEVEN.

The CHIEF JUSTICE. Thank you.

The question from Senator RUBIO and the other Senators is for counsel for the President:

How would the Framers view removing a President without an overwhelming consensus of the American people and on the basis of Articles of Impeachment supported by one political party and opposed by the other?

Mr. Counsel DERSHOWITZ. Mr. Chief Justice, thank you.

Senators, Alexander Hamilton addressed that issue very directly. He said the greatest danger of impeachment is if it turns on the votes of one party being greater than the votes of another party in either House. So I think they would be appalled to see an impeachment going forward in violation of the Schumer rule and the rules of other Congressmen that were good enough for us during the Clinton impeachment but seemed to have changed dramatically in the current situation.

The criteria that have been set out are so lawless, they basically paraphrase Congresswoman MAXINE WATERS, who said: There is no law. Anything the House wants to do to impeach is impeachable. That is what is happening today. That places the House of Representatives above the law.

We have heard much about, no one is above the law. The House of Representatives is not above the law. They may not use the MAXINE WATERS—Gerald Ford made the same point, but it was about the impeachment of a judge. Judges are different; there are many of them. There is only one President.

But to use that criteria, that it is whatever the House says it is, whatever the Senate says it is, turns those bodies into lawless bodies, in violation of the intent of the Framers.

Manager SCHIFF confused my argument when he talked about intent and motive.

You have said I am not a constitutional lawyer, but you admitted I am a criminal lawyer. And I have taught criminal law for 50 years at Harvard.

There is an enormous distinction between intent and motive. If somebody shoots somebody, the intent is that when you pull the trigger, you know a bullet will leave and will hit somebody and may kill them. That is the intent to kill them. Motive can be revenge. It could be money. It almost never is taken into consideration, except in extreme cases. There are cases where motive counts.

But let's consider a hypothetical growing out of a situation that we have discussed. Let's assume that President Obama had been told by his advisers that it really is important to send lethal weapons to the Ukraine, but then he gets a call from his pollster and his political adviser, who says: We know it is in the national interest to send lethal weapons to the Ukraine, but we are telling you that the leftwing of your party is really going to give you a hard time if you start selling lethal weapons and getting into a lethal war, potentially, with Russia. Would anybody here suggest that was impeachable? Or let's assume President Obama said: I promised to bomb Syria if they had chemical weapons, but I am now told by my pollsters that bombing Syria would hurt my electoral chances. Certainly not impeachable at all.

So let me apply that to the current situation. As you know, I said previously there are three levels of possible motive.

One is, the motive is pure—only interest is in the way of what is good for the country. In the real world, that rarely happens.

The other one is, the motive is completely corrupt—I want money, kickback.

But then there is the third one that is so complicated and that is often misunderstood. When you have a mixed motive—a motive in which you think you are doing good for the country, but you are also doing good for yourself. You are doing good for me; you are doing good for thee. You are doing good, and you altogether put it in a bundle in which you are satisfied that you are doing absolutely the right thing. Let me give you a perfect example of that from the case.

The argument has been made that the President of the United States only became interested in corruption when he learned that Joe Biden was running for President. Let's assume hypothetically that the President was in his second term, and he said to himself: You know, Joe Biden is running for President. I really should now get concerned about whether his son is corrupt because he is not only a candidate—he is not running against me; I am finished with my term—but he could be the President of the United States. And

if he is the President of the United States and he has a corrupt son, the fact that he has announced his candidacy is a very good reason for upping the interest in his son. If he wasn't running for President, he is a has-been. He is the former Vice President of the United States. OK, big deal. But if he is running for President, that is an enormous big deal.

So the difference—the House managers would make—is whether the President is in his first term or in his second term, whether he is running for reelection or not running for reelection. I think they would have to concede that, if he was not running for reelection, this would not be a cross motive but would be a mixed motive but leaning on the side of national interest. If he is running for reelection, suddenly that turns it into an impeachable offense.

The CHIEF JUSTICE. Thank you. Thank you, counsel.

The Senator from Minnesota.

Ms. KLOBUCHAR. Mr. Chief Justice, I submit a question to the desk directed to the House managers.

The CHIEF JUSTICE. Thank you. The question is from Senator KLOBUCHAR to the House managers:

I was on the trial committee for the last impeachment trial in the Senate, which involved Judge Thomas Porteous, who was ultimately removed. During that time, the Senate trial committee heard from 26 witnesses, 17 of whom had not previously testified in the House. What possible reason could there be for allowing 26 witnesses in a judicial impeachment trial and hearing none for a President's trial?

Mr. Manager SCHIFF. Mr. Chief Justice, Senator, as you know, I am quite familiar with the Porteous impeachment. Someone asked me the last time I tried a case. The answer is probably 30 years ago except for the impeachment of Thomas Porteous, when I last spent some quality time with you.

There is no difference in terms of the Constitution. I would say that the need for witnesses in the impeachment trial of a President of the United States is a far more compelling circumstance than the impeachment of a judge. Now, you might say, well, in the impeachment of a judge, how is it possible that the time of the Senate could be occupied by calling witnesses; that, as precious as your time is, we would occupy your time calling dozens of witnesses, but in the impeachment of a President, it is not worth the time; it is too much of an imposition.

Again, I would argue that the imperative of calling judges and having a fair trial when we are adjudicating the guilt of a President of the United States is paramount.

Now, we have always argued that the trial should be fair to the President and the American people. And, yes, it is a big deal to impeach a President and remove that President from office. It is also a big deal if you leave in place a President when the House has proven that President has committed impeachable misconduct and is likely to

continue committing it—because there is no doubt, I think, from the record that not only did the President solicit Russian interference in 2016 but solicited Ukraine's interference in the upcoming election, solicited China's interference—as my colleague just said, had Rudy Giuliani, his personal agent, in Ukraine doing the same kind of thing just last month.

And Senator, in response to that question, isn't it dispositive that Giuliani, the personal agent of the President, is running this Biden operation rather than any department of government? Isn't that really dispositive of whether this was policy or politics? And I think the answer is yes.

Giuliani has made it abundantly clear: I am not here doing foreign policy. That is the President's own lawyer. I am not here to do foreign policy.

Now, Professor Dershowitz just made a rather astounding argument that an investigation of Joe Biden that is unwarranted, unmerited, suddenly becomes warranted if he runs for President. Now, he posited that in the President's second term, but it doesn't matter whether he is in his first term or his second term. An illegitimate investigation of Joe Biden doesn't somehow become legitimate because he is running for President unless you view your interests as synonymous with the Nation's interests.

I think it is the most profound conflict for a President of one party, whether he is running for reelection or not, to suggest that all of a sudden an investigation of a leading candidate in the opposite party is justified because now they are running for President. I mean, you really have to step aside from what is going on to imagine that anyone could make that argument; that running for office, running for President now, means that you are a more justified target of investigation than when you weren't. That cannot be. That cannot be. But that is essentially what is being argued here.

To get to conclude, Senator, the case for witnesses in a Presidential impeachment where either, on the one side, you remove a President or, on the other side, you leave in place a President who may pose a continuing risk to the country is far more compelling to take the time to hear from witnesses than a corrupt Louisiana judge who only impacts those who come before his court.

All of us come before the court of the American people.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Montana.

Mr. DAINES. Mr. Chief Justice, I send a question to the desk on behalf of myself and Senator LANKFORD and Senator HAWLEY.

The CHIEF JUSTICE. Thank you. The question from Senators DAINES, LANKFORD, and HAWLEY is for counsel for the President:

Over the past 244 years, eight judges have been removed from office by the U.S. Senate but never a President. The eight judges have been removed for bribery, perjury, tax evasion, waging war against the United States, and other unlawful actions. How do the current impeachment articles differ from previous convictions and removals by the Senate?

Mr. Counsel DERSHOWITZ. Mr. Chief Justice, there is an enormous difference between impeaching and removing a judge, even a justice, and impeaching and removing a President. No judge, not even a Chief Justice, is the judicial branch. You are the head of the judicial branch, but there is a judicial branch.

The President is the executive branch. He is irreplaceable. There isn't always a Vice President. Remember, we had a period of time when there was no Vice President. We needed a constitutional amendment.

So there is no comparison between impeaching a judge and impeaching a President. Moreover, there is a textual difference. The Constitution provides that judges serve during good behavior. That is the Congressman SCHIFF standard, and it is a great standard. We wish everybody served only during good behavior. But the Constitution doesn't say that the President shall serve during good behavior. The big difference is the President runs every 4 years, and the public gets to judge his good behavior. Judges don't run, and so there is only one judge of the good behavior; namely, the impeachment process.

So to make a comparison is to make the same mistake that when people compare the British system to the American system. We have heard a lot of argument that we adopted the British system by adopting five words: "other high crimes and misdemeanors." Yes, those words may have been borrowed from Great Britain, but the whole concept of impeachment was not. First of all, impeachment no longer exists in Great Britain; but when it did, it only operated for low-level and middle-level people. All the impeachment trials that have been cited involve this guy in India, this guy in the commerce, this guy here, this guy there—utterly replaceable people.

In the British system, on the other hand, you can get rid of the head of state—the head of government, rather, by a simple vote of no confidence. That is what the Framers rejected. The Framers rejected that for a President. And so the notion that we borrowed the British system has it exactly backward. We rejected the British system.

We did not want a President to serve at the pleasure of the legislature. We wanted the President to serve at the pleasure of the voters.

Judges don't serve at the pleasure of the voters, so there needs to be different criteria and broader criteria, and those criteria have been used in practice. For the most part, judges have been impeached for criminal and removed for criminal behavior.

But take an example that was given. If a judge is completely drunk and incapacitated and cannot do his job, it is easy to imagine how a judge might have to be removed for that.

But the President—there is an amendment to the Constitution, the 25th Amendment, specifically provided because there was a gap in the Constitution. And, please, Members of the Senate, it is important to understand, your role is not to fill gaps that the Framers deliberately left open.

Good arguments have been made: Why is it important to make sure people don't abuse their power, people don't commit maladministration? But the Framers left open, left those gaps. Your job is not to fill in the gaps. Your job is to apply the Constitution as the Framers wrote it, and that doesn't include abuse of power and obstruction of Congress.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Delaware.

Mr. COONS. Mr. Chief Justice, I send a question to the desk for the President's counsel.

The CHIEF JUSTICE. Thank you. The question from Senator COONS to the President's counsel is this:

The President's brief states, "Congress has forbidden foreigners' involvement in American elections." However, in June 2019, President Trump said if Russia or China offered information on his opponent, "[t]here's nothing wrong with listening," and he might not alert the FBI because: "Give me a break. Life doesn't work that way." Does President Trump agree with your statement that foreigners' involvement in American elections is illegal?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senator, thank you for the question.

I think Congress has specified specific ways in which foreigners cannot be involved in elections. Foreigners can't vote in elections. There are restrictions on foreign contributions to campaigns—things like that.

When the whistleblower originally made a complaint about this July 25 call, and that was reviewed by the inspector general for the intelligence community, he framed that whistleblower's complaint and wrote a cover letter framing it in terms of those laws. And he said that there might be an issue here related to soliciting a foreign contribution to a campaign, a thing of value, foreign campaign interference.

That was specifically reviewed by the Department of Justice. The Department of Justice concluded that there was no such violation here. So that is not something that is involved in this case.

President Trump's interview with ABC that you cited does not involve something that is a foreign campaign contribution, something that is addressed by the law as passed by Congress. He was referring to the possibility that information could come from a source, and I think he pointed out in that interview that he might contact the FBI, he might listen to something.

But mere information is not something that would violate the campaign finance laws. And if there is credible information, credible information of wrongdoing by someone who is running for a public office—it is not campaign interference for credible information about wrongdoing to be brought to light, if it is credible information.

So I think that the idea that any information that happens to come from overseas is necessarily campaign interference is a mistake. That is a non sequitur. Information that is credible, that potentially shows wrongdoing by someone who happens to be running for office, if it is credible information, is relevant information for the voters to know about, for people to be able to decide on who is the best candidate for an office.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The majority leader is recognized.

RECESS

Mr. McCONNELL. Mr. Chief Justice, I recommend we take a break until 10 p.m. and then finish up for the evening.

There being no objection, at 9:44 p.m., the Senate, sitting as a Court of Impeachment, recessed until 10:07 p.m.; whereupon the Senate reassembled when called to order by the CHIEF JUSTICE.

Mr. McCONNELL. Mr. Chief Justice, my understanding is we will finish up at about 11 p.m.

The CHIEF JUSTICE. Thank you.

The Senator from Georgia.

Mrs. LOEFFLER. I send a letter to the desk on behalf of myself, Senators BLACKBURN, HYDE-SMITH, COTTON, HAWLEY, BARRASSO, PERDUE, FISCHER, and CORNYN.

The CHIEF JUSTICE. Thank you.

The question from Senator LOEFFLER and Senators BLACKBURN, HYDE-SMITH, COTTON, HAWLEY, BARRASSO, PERDUE, FISCHER, and CORNYN is for counsel for the President:

As a fact witness who was coordinating with the whistleblower, did Manager SCHIFF's handling of the impeachment inquiry create material due process issues for the President to have a fair trial?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, thank you for that question.

And I believe the short answer is yes, it did create a material due process issue. And as I explained the other day in a portion of my argument, there were three major due process violations: the lack of an authorization, so that the whole proceeding started in an illegitimate and constitutionally invalid manner; second, the lack of basic due process protections related to fundamental rights to present evidence, cross-examine witnesses, present witnesses; and the final one is that Manager SCHIFF or his staff had some role in consulting with the whistleblower that remains secret to this day. And all attempts to find out about that, to ask questions about that were shut down. Manager SCHIFF said today that he had

no contact with the whistleblower, that it was only his staff. But the extent to which there was some consultation there hasn't actually been probed by any question.

All the questions that Republican Members of the House tried to ask about that were shut down. And any questions as a result of questions into determining who the whistleblower was and what his motivations and bias were also shut down.

The inspector general for the intelligence community noted—we heard that earlier this evening—in his letter to the Acting Director of the DNI that the whistleblower had the indicia of political bias because the whistleblower had connections with a Presidential candidate of another party.

But the testimony from the inspector general of the intelligence community remains secret. It was in executive session. It hasn't been forwarded from HPSCI to the House Judiciary Committee and, therefore, is not part of the RECORD here. There hasn't been any ability to probe into the relationships between the whistleblower and others who are materially relevant to the issues in this inquiry.

If the whistleblower, as is alleged in some public reports, actually did work for then-Vice President Biden on Ukraine issues, exactly what was his role? What was his involvement when issues were raised? We know from testimony the questions were raised about the potential conflict of interest that the Vice President then had when his son was sitting on the board of Burisma. Was the alleged whistleblower involved in any of that and in making decisions to not do anything related to that? Did he have some reason to want to put the deep six on any question raising any issue about what went on with the Bidens and Burisma and firing Shokin and withholding $1 billion in loan guarantees and in forcing a very explicit quid pro quo: You won't get this $1 billion until you fire him.

We don't know. And because Manager SCHIFF was guiding this whole process, because he was the chairman in charge of directing the inquiry and directing it away from any of those questions, that creates a real due process defect in the record that has been presented here.

So yes, that is a major problem and major defect in the way the House proceedings occurred that infects this record. It means that it is not a record that could be relied upon to reach any conclusion other than an acquittal for the President.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Michigan.

Mr. PETERS. Mr. Chief Justice, I have a question for the House managers that I will send to the desk.

The CHIEF JUSTICE. Thank you.

Senator PETERS asks the House managers:

Does an impeachable abuse of power require that a President's corrupt plan actually succeed?

Ms. Manager LOFGREN. Mr. Chief Justice and Senators, the answer is no. Just as, although this is not a criminal offense, if you attempted murder but didn't succeed, you would not be innocent. The President has attempted to upend the constitutional order for his own personal benefit. He used the powers of the—let's put up slide 11, if we could. He has used the powers of his office to solicit foreign interference, and we know this by the President's own statements, the Acting Chief of Staff's confession, substantial documentary evidence, and witness testimony. And this has grave consequences for our national security, for threatened election security, as well as undermining U.S. credibility and our values abroad.

Now, because the President continues to act in this manner, we believe that this is an ongoing threat. While the impeachment was going on, the President's personal lawyer, Mr. Giuliani, was in Ukraine, continuing this scheme, and when he landed—he was still taxiing—the President and he were on the phone.

The President was asking him: What did you get? What did you get?

So this is an ongoing matter. The fact that he had to release the aid after his scheme was revealed does not end the problem.

I have listened with great interest to the back-and-forth in the questions. It is hard because I want to get up and answer all of the questions, and I can't, but I do think that the President has made it clear that he believes he can do whatever he wants—whatever he wants—and there is no constraint that is being recognized by the Congress.

Mr. Mulvaney, as we have noted, has acknowledged that the President directly tied his hold on military aid to his desire to get Ukraine to conduct a political investigation, and he told us to just get over it.

The President's lawyers have suggested we should not believe our eyes because Mr. Mulvaney—when I was a kid, they would say: Don't believe your lying eyes—walked that back later. We have an opportunity, actually, to hear from a witness who directly spoke to the President, who, apparently, can tell us that the President told him that the only reason this aid was held up was to get dirt on the Democrats.

If we just think about it—put Ukraine to one side—if a Chief Executive called the Department of Justice and said, "I want you to investigate my political opponents. I want you to announce an investigation," there wouldn't be any question that that would be an improper use of Presidential power. It is really no different when you follow a foreign government except that it is worse because one of the things that the Founders worried about was the involvement of foreign governments in our matters, in our elections. So, yes, the fact that he

didn't succeed in that particular instance does not mean that we are safe.

I was stunned to hear that now, apparently, it is OK for the President to get information from foreign governments in an election. That is news to me, you know, that the election campaign laws prohibit accepting anything of value. A thing of value is information. If you or I accepted material information from a source—an email, a database, and the like—without paying for it or from a foreign nation, that would be illegal; but the thought that this—as we go forward in this trial itself, we are creating additional dangers to the Nation by suggesting that things that have long been prohibited are now suddenly going to be OK because they have been asserted in the President's defense.

I yield back.

The CHIEF JUSTICE. Thank you.

The Senator from Wyoming.

Mr. BARRASSO. Mr. Chief Justice, I send a question to the desk on behalf of myself and Senators RISCH, HAWLEY, and MORAN.

The CHIEF JUSTICE. Thank you.

The question is from Senators BARRASSO, RISCH, HAWLEY, and MORAN for counsel to the President:

Can the Senate convict a sitting U.S. President of obstruction of Congress for exercising the President's constitutional authorities or rights?

Mr. Counsel PHILBIN. Mr. Chief Justice and Senators, thank you for the question.

I think the short answer is, constitutionally, no, the Senate may not convict the President for exercising his constitutional authorities.

The theory that the House managers have presented—I think Professor Turley, in testifying before the House, made it very clear—is itself an abuse of power by Congress and is dangerous for the structure of our government because the fundamental proposition at the heart of the obstruction of Congress charge that the House managers have brought is that the House can simply demand information.

If the executive branch resists, even if it provides lawful rationales—perhaps ones that the House managers disagree with but that are consistent with longstanding precedents and principles applied by the executive branch—and if the House managers disagree with them, they jump immediately to impeaching the President. That is dangerous for our structure of government. We are talking about principles here—one based on simply the failure of the House to proceed lawfully.

We have heard a lot about the President is not above the law, but as Professor Dershowitz pointed out, the House of Representatives is not above the law. It has to turn square corners. It has to proceed by the proper methods to issue subpoenas to the executive branch.

So, if the House has an issue about subpoenas and if the House attempts to subpoena a senior adviser to the Presi-

dent and the President asserts the immunity of the senior adviser—a doctrine that has been asserted by virtually every President since President Nixon and goes back earlier than that—then there is a confrontation between the branches. That doesn't suggest an impeachable offense. What it suggests—what it shows—is a separation of powers in operation. That friction between the branches is part of the constitutional design.

It was Justice Louis Brandeis who explained that the separation of powers was enshrined in the Constitution not because it was the most efficient way to have government, but because the friction that it caused and the interaction between the branches was part of a way of guaranteeing liberty by ensuring that no one branch could aggrandize power to itself.

What the House managers are suggesting here is directly antithetical to that fundamental principle. What they are suggesting is, once they decide they want to pursue impeachment and when they make demands for information to the Executive, the Executive has no defenses. It can have no constitutional authorities or prerogatives to raise in response to those subpoenas. It has to just turn over everything or it is an impeachable offense. What that would lead to, as Professor Turley explained, is transforming our system of government by elevating the House and making it, really, a parliamentary system.

As Professor Dershowitz was explaining, in the parliamentary system, the Prime Minister can simply be removed by a vote of no confidence, but if you make it so easy to impeach the President—all the House has to do is demand some information, goad a response from a President that this is contrary to the principles that all Presidents before me have asserted, and I am going to stick by the executive branch's prerogatives—then the House can say: Well, that is it. You will be impeached.

If the votes are there to remove the President, you make the President dependent on the legislature, and that is what Gouverneur Morris warned against specifically during the Constitutional Convention. He warned the Framers, when we make a method for making the President amenable to justice, we should make sure that we do not make him dependent on the legislature.

It was the parliamentary system's making it easy to remove the Chief Executive that the Framers wanted to reject, and this theory of obstruction of Congress would create exactly that system of easy removal, effectively a parliamentary system of a vote of no confidence. That is not the structure of the government that the Framers enshrined in the Constitution for us.

Thank you.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Connecticut.

Mr. BLUMENTHAL. Thank you, Mr. Chief Justice.

Mr. Chief Justice, I send a question to the desk on behalf of myself and Senators WARNER, HEINRICH, and HARRIS.

The CHIEF JUSTICE. Thank you.

The question from Senator BLUMENTHAL and Senators WARNER, HEINRICH, and HARRIS reads as follows:

Before the break, the President's Counsel stated that accepting "mere information" from a foreign source is not something that would violate campaign finance law, and that it is not campaign interference to accept "credible information" from a foreign source about someone who is running for office. Under this view, acceptance of the kinds of propaganda disseminated by Russia in 2016—on Facebook and other social media platforms, using bots, fake accounts and other techniques to spread disinformation—would be perfectly legal and appropriate. Isn't it true that accepting such a thing of value is, in fact, a violation of law? And isn't it true that it is one of the highest priorities of our Intelligence Community, including the CIA, NSA, DNI, and FBI, to do everything possible to prevent such foreign interference or intervention in our elections?

Mr. Manager SCHIFF. It is, without question, among the very highest priorities of our intelligence agencies and our law enforcement to prevent foreign interference in our election of the type and character that we saw in 2016.

When Russia hacked the databases of the Democratic National Committee—the DCCC—when they began a campaign of leaking those documents and when it engaged in a massive and systemic social media campaign, our intel agencies and law enforcement had been devoting themselves to preventing a recurrence of that type of foreign interference.

If I am understanding counsel and the President correctly—and I think that I am—they are saying that not only is that OK to willingly accept that but that the very allegation against the President that Bob Mueller spent 2 years investigating didn't amount to criminal conspiracy. That is, Did he prove beyond a reasonable doubt the crime of conspiracy? Again, we are talking about something separate from collusion here, although my colleagues keep confusing the two. Bob Mueller didn't address the issue of collusion. What he did address was whether he could prove the elements of criminal conspiracy, and he found that he could not.

What counsel for the President is now saying is that, even if he could have, that is OK. It is now OK to criminally conspire with another country to get help in a Presidential election, as long as the President believes it would help his campaign, and, therefore, it would help our country. That is now OK. It is OK to ask for that help. It is OK to work with that power to get that help. That is now OK.

It has been a remarkable evolution of the Presidential defense. It began with "none of that stuff happened here." It began with "nothing to see here." It migrated to, OK, they did seek investigations of the President's political

rival, and then it became, OK, those investigations were not sought by official channels to official policy. They were sought by the President's lawyer in his personal capacity. Then it migrated to, OK, we acknowledge that, while the President's lawyer was conducting this personal political errand, the President withheld the money, but we think that is OK.

We have witnessed over the course of the last few days and the long day today a remarkable lowering of the bar to the point now where everything is OK as long as the President believes it is in his reelection interest. You could conspire with another country to get its help in your election either by its intervening on your behalf to help you or by its intervening to hurt your opponent.

Now, we are told that that is not only OK, but it is beyond the reach of the Constitution. Why? Because abuse of power is not impeachable. If you say abuse of power is impeachable, well, then, you are impeaching Presidents for mere policy. Well, that is nonsense. They are not the same thing.

They are not the same thing as Professor Turley has argued. They are not the same thing as Bill Barr has argued. They are not the same thing as Professor Dershowitz argued 21 years ago, and they are not the same thing today. They are just not. You can't solicit foreign interference, and the fact that you are unsuccessful in getting it doesn't exonerate you. The failed scheme doesn't make you innocent.

A failed scheme doesn't make you innocent. If you take a hostage and you demand a ransom and the police are after you and you release the hostage before you get the money, it doesn't make you innocent. It just makes you unsuccessful—an unsuccessful crook—but it doesn't mitigate the harmful conduct.

And this body should not accept nor should the American people accept the idea put out by the President's lawyers today that it is perfectly fine—unimpeachable—for the President of the United States to say "Hey, Russia" or "Hey, Ukraine" or "Hey, China, I want your help in my election" because that is the policy of the President. We are calling that policy now. It is the policy of the President to demand foreign interference and withhold money from an ally at war unless they get it. That is what they call policy.

I am sorry; that is what I call corruption, and they can dress it up in fine legalese, but corruption is still corruption.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Maine.

Ms. COLLINS. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Thank you.

The question from Senator COLLINS is for the House managers:

The House Judiciary Committee report accompanying the Articles of Impeachment asserted the President committed criminal bribery as defined in 18 U.S.C., section 201, and Honest Services Fraud as defined in 18 U.S.C., section 1346, but these offenses are not cited in the Articles of Impeachment. Did the President's actions as alleged in the Articles of Impeachment constitute violations of these Federal criminal laws, and if so, why were they not included in the Articles?

Mr. Manager JEFFRIES. Thank you, Chief Justice, and thank you, Senator, for your question.

Our article I alleges corrupt abuse of power—corrupt abuse of power connected to the President's effort to try to cheat in the 2020 election by pressuring Ukraine to target an American citizen, Joe Biden, solely for personal and political gain and then to solicit foreign interference in the 2020 election. And the scheme was executed in a variety of ways.

Now, Professor Dershowitz has indicated, based on his theory of what is impeachable, that it has to either be a technical criminal violation, though the weight of constitutional authority says the contrary, but he said that it should be something that is either a criminal violation or something akin to a criminal violation—akin to a criminal violation.

And what we allege in article I falls into that category because what happened here is that President Trump solicited a thing of value in exchange for an official act. The thing of value was phony political dirt in the form of an investigation sought against Joe Biden, his political opponent, and he asked for it explicitly on that July 25 call and through his intermediaries repeatedly in the spring, throughout the summer, into the fall—solicited a thing of value in exchange for two official acts.

One official act was the release of $391 million in security aid that was passed by this Senate and by the House on a bipartisan basis, and the President withheld it without justification. Witnesses said there was no legitimate public policy reason, no legitimate substantive reason, no legitimate foreign policy or national security reason for withholding the aid. It was withheld to solicit foreign interference.

Yes, that is akin to a crime. That is your standard, sir.

The President also solicited that political dirt in exchange for a second official act: the White House meeting that the Ukrainian leader desperately wanted—so much so that he mentioned it on the July 25 call, and even when President Trump met with President Zelensky at the sidelines of the U.N. in late September, the President of Ukraine brought up the Oval Office meeting again because it was valuable to him. The President withheld it—withheld that official act—to solicit foreign interference in the 2020 election.

That is not acceptable in America. That undermines our democracy. That is a stunning, corrupt abuse of power. And yes, sir, it is akin to a crime.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from New York.

Mrs. GILLIBRAND. Mr. Chief Justice, I send a question to the desk on behalf of Senators CASEY, MURPHY, ROSEN, and myself for the House managers.

The CHIEF JUSTICE. Thank you, Senator from New York.

The question from Senators GILLIBRAND, CASEY, MURPHY, and ROSEN is to the House managers:

How do the President's actions differ from other holds, and how is the hold and release of congressionally appropriated assistance to foreign countries supposed to work?

Mr. Manager CROW. Chief Justice, thank you, Senators, for the question.

To be very clear, what the President did is not the same as a routine withholding or reviewing of foreign aid to ensure that it aligns with the President's policy priorities or to adjust the geopolitical developments because, indeed, if that were the case, if the President had engaged that process, had gone through the interagency review process, had gone through the routine congressional certification process, we would have the documents, we would have the testimony, we would have the facts to back that up.

But, indeed, what we have are none of those facts, none of those documents, and in an almost 2-month period, none of the individuals who would normally be involved in that process were aware of the reason for the hold.

Now, let's look at some prior holds in the cases of Obama's—President Obama's—temporary holds. Congress was notified of the reasons for those holds, and it was always done in the national interest, whether it be corruption, national security, in support of our alliances—never the President's own personal interests.

But let's look at even President Trump's other holds in Afghanistan because of concerns about terrorism or in Central America because of immigration concerns. They were done for reasons related to official U.S. policy. They weren't concealed. They were public—widely publicized—and had engaged not only Congress but the Department of Defense, Department of State, and the entire apparatus that is involved in conducting those holds—again, none of which happened here.

So all of this goes to show—the evidence shows that there is no legitimate policy reason. Why violate the Impoundment Control Act? Why keep all of the people involved in these holds in the dark?

The President's agencies and advisers confirmed repeatedly that the aid was in the best interests of our country's national security, including Secretary Esper, Secretary Pompeo, Vice President PENCE, Ambassador Bolton. Over and over again, everybody was imploring the President to release the hold—to no avail.

The evidence also shows that even the process was unusual, as I talked about earlier, and you have heard, over

the last week, a career OMB official, Mr. Sandy, explain that Mr. Duffey, the President's handpicked political appointee who has refused to testify at the President's direction, took over responsibility to authorize the aid.

Mr. Sandy confirmed that, in his entire career at OMB, he had never seen or experienced career officials having their apportionment authority removed by a political appointee. Senators, this is what we are talking about. There has been a lot of discussion.

You haven't heard from me in a little while. I suspect there is a reason for that. I suspect it is because we don't want to talk about the big issue. We don't want to talk about what happened here.

The President abused his authority, put the interests of himself over the interests of the country, over the interests of our national security, over the interests of our free and fair elections. That is what we are here to talk about. That is what happened. That is what the evidence shows.

There is no evidence that shows a legitimate engagement of U.S. policy processes to forward legitimate ends.

The CHIEF JUSTICE. Thank you, Mr. Manager.

The Senator from Missouri.

Mr. BLUNT. Mr. Chief Justice, I send a question to the desk on behalf of myself, Senators MCCASKILL—MCSALLY, rather—LANKFORD—it was a terrifying moment—on behalf of myself, Senator MCSALLY, Senator LANKFORD, Senator GARDNER, Senator CAPITO, and Senator WICKER. This is a question for the President's counsel.

The CHIEF JUSTICE. Thank you.

The question from Senator BLUNT and other Senators is for the counsel for the President:

What does the supermajority threshold for conviction in the Senate, created by the Framers, say about the type of case that should be brought by the House and the standard of proof that should be considered in the Senate?

Mr. Counsel DERSHOWITZ. Mr. Chief Justice, Senators, there were several debates among the Framers, of course: Should you have impeachment at all? We talked about that—what the criteria for impeachment should be. But then there was another debate: Who should have the ultimate responsibility for deciding whether the President should be removed?

James Madison suggested the Supreme Court of the United States as a completely nonpartisan institution.

Alexander Hamilton was concerned about that issue, as well, but he said the Supreme Court would be inappropriate because the judicial branch should not become involved directly as a branch—OK to preside over the trial—because ultimately an impeached President can be put on trial for crimes if he committed crimes.

And Hamilton said that if he were to be put on trial, he would then be put on trial in front of the same institution—

the judiciary—that had already impeached him, and they might have a predisposition.

So in the course of the debate, it was finally resolved that the Senate, which was a very different institution back at the founding—obviously, Senators were not directly elected; they were appointed by the legislature. They were supposed to serve as an institution that checked on the House of Representatives—more mature, more sober, elected for longer periods of time, with an eye to the future, not so concerned about pleasing the popular masses.

Remember, the Framers were very concerned about democracy. Nobody ever called the United States a democracy—"a Republic, if you can keep it," not a democracy—very great concern about that.

And then, when it came time to assign it to the Senate, there was discussion about what the criteria and what the—obviously—vote should be. The selection of a two-thirds supermajority was plainly designed—plainly designed—to avoid partisan impeachments, plainly designed to effectuate the very wise philosophy espoused by the Congressman and the Senator during the Clinton campaign; that is, during the Clinton impeachment.

Never ever have an impeachment or removal that is partisan. Always demand that it be a widespread consensus, a widespread national agreement, and bipartisan support. What better way of assuring bipartisan support than requiring a two-thirds vote because almost in every instance, in order to get a two-thirds vote, you need Members of both parties.

The Johnson case was a perfect example. In order to get that vote, you needed not only the party that was behind the impeachment, but you needed people from the other side as well, and when seven Republicans dissented based, I believe, largely on the arguments of Justice Curtis and others—arguments I paraphrased here the other day—it lost by merely one vote. The Clinton impeachment, if you remember correctly, achieved a 50/50 split. Am I right about that? I think I am right about that. And it only lost—and it could have been 51-to-49. It wouldn't have been enough.

So I think it is plain that not only does the two-thirds requirement serve as a check on the House, but I think it sends a message to every Senator. It sends a message even to those Senators who would be in the one-third to reconsider because if you are voting for a partisan impeachment, you are violating the spirit of the two-thirds requirement.

There are many institutions where at the end of the day—for example, political conventions—they seek a unanimous vote just to show unity. I would urge some Senators who favor impeachment to look at the two-thirds and say: If there is not going to be a two-thirds, there shouldn't be an im-

peachment, and therefore, we are going to vote against impeachment even though we might think that the criteria for impeachment has been satisfied.

Do not vote for impeachment, do not vote for removal, unless you think the criteria articulated by the Senator and the Congressman and, I believe, by the Constitution and by Hamilton are met, namely, bipartisan, almost universal concern by the United States of America. That criteria is not met, and the two-thirds requirement really illustrates the importance the Framers gave to that criteria.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Connecticut.

Mr. MURPHY. Mr. Chief Justice, I send a question to the desk.

The CHIEF JUSTICE. Thank you.

The majority leader.

Mr. McCONNELL. Mr. Chief Justice, while the question is coming up, I understand that there are two more Democratic questions and two more Republican questions.

The CHIEF JUSTICE. Thank you.

The question from Senator MURPHY is to the President's counsel:

The House Managers have committed to abide by rulings by the Chief Justice regarding witness testimony and the admissibility of evidence, and that they will not appeal such rulings. Will the President's Counsel make the same commitment, thus obviating any concerns about an extended trial?

Mr. Counsel SEKULOW. Mr. Chief Justice, Members of the Senate, we had this question. We will say it very clearly. We are not willing to do that, and we are not willing to do that because of the constitutional framework upon which an impeachment is based and the constitutional privileges that are at stake, with no disrespect at all to the Chief Justice.

That is not the constitutional design. It is the same thing they are doing again. Surrender the constitutional prerogatives you have, and then we will proceed in this way. Give us documents, give us witnesses, and if you don't, we are going to charge you with obstruction of Congress.

In this case, it is "We are willing to live," according to the managers, "by whatever the Chief Justice decides." But that is not the way the constitutional framework is set up, and it is putting us in exactly the same spot again: Give up your right to challenge a subpoena in court; rely only on the person who is here—by the way, again, with no disrespect to the Chief Justice. The Chief Justice is here as the Presiding Officer of this proceeding.

So the President is not willing to forgo those rights and privileges that he possesses under the Constitution, under article II, for expediency. They tried that below in the House. We trust that will not be the decision here in the Senate.

Thank you, Mr. Chief Justice.

The CHIEF JUSTICE. Thank you, counsel.

Case 0:20-cv-61872-AHS Document 17-1 Entered on FLSD Docket 11/06/2020 Page 47 of 48

The Senator from Mississippi.

Mr. WICKER. Mr. Chief Justice, I send a question to the desk for Professor Dershowitz on behalf of myself and Senators McSALLY and MORAN.

The CHIEF JUSTICE. The question for counsel to the President, directed to Professor Dershowitz, by Senators WICKER, McSALLY, and MORAN, is this:

Professor Dershowitz: You stated during your presentation that the House grounds for impeachment amount to the "most dangerous precedent." What specific danger does this impeachment pose to our republic? To its citizens?

Mr. Counsel DERSHOWITZ. Thank you, Mr. Chief Justice. Thank you, Senators.

I came of age during the period of McCarthyism. I then became a young professor during the divisive time of the Vietnam war. I, as you, lived through the division during the Iraq war and 9/11 and following 9/11.

I have never lived at a more divisive time in the United States of America than today. Families have broken up. Friends don't speak to each other. Dialogue has disappeared on university campuses. We live in extraordinarily dangerous times. I am not suggesting that the impeachment decision by the House has brought that on us. Perhaps it is merely a symptom of a terrific problem that we have facing us and likely to face us in the future.

I think it is the responsibility of this mature Senate, whose job it is to look forward, whose job it is to ensure our future, to make sure the divisions don't grow even greater.

Were the President of the United States to be removed today, it would pose existential dangers to our ability to live together as a people. The decision would not be accepted by many Americans. Nixon's decision was accepted—easily accepted. I think that decisions that would have been made in other cases would be accepted. This one would not be easily accepted because it is such a divided country, such a divided time.

If the precedent is established that a President can be removed on the basis of such vague and recurring and open-ended and targeted terms as "abuse of power"—40 Presidents have been accused of abuse of power. I bet you all of them have. We just don't know some of the charges against some of them, but we have documentation on so many. If that criteria were to be used, this would just be the beginning of a recurring weaponization of impeachment whenever one House is controlled by one party and the Presidency is controlled by another party.

Now the House managers say there are dangers of not impeaching, but those dangers can be eliminated in 8 months. If you really feel there is a strong case, then campaign against the President. But the danger of impeachment will last my lifetime, your lifetime, and the lifetime of our children.

So I urge you respectfully, you are the guardians of our future. Follow the constraints of the Constitution. Do not allow impeachment to become a normalized weapon, in the words of one of the Framers. Make sure that it is reserved only for the most extraordinary of cases, like that of Richard Nixon. This case does not meet those criteria.

The CHIEF JUSTICE. Thank you, counsel.

The Senator from Arizona.

Ms. SINEMA. Mr. Chief Justice, I submit a question to the President's counsel.

The CHIEF JUSTICE. Thank you.

The question from Senator SINEMA to President's counsel is this:

The administration notified Congress of the hold of the Northern Triangle countries' funds in 2019, announced its decision to withhold aid to Afghanistan in September 2019, and worked with Congress for months in 2018 regarding funds being withheld due to Pakistan's lack of progress meeting its counterterrorism responsibilities. In these instances, the receiving countries knew the funds were being withheld to change behavior and further publicly-stated American policy. Why, when the administration withheld the Ukraine security assistance, did it not notify Congress, or make Ukraine or partner countries publicly aware of the hold and the steps needed to resolve the hold?

Mr. Counsel PHILBIN. Mr. Chief Justice, Senator, thank you for the question.

I think that, in all of those instances that were listed in the question, it was clear that withholding the aid was meant to send a signal. It was done publicly, and it was meant to send a signal to the country. I think that in the testimony before the House here, Ambassador Volker made clear that he and others hoped that the hold would not become public because they did not want there to be any signal to the Ukrainians or to others.

People have talked here—the House managers talked about how, well, even if the aid, when it was withheld, didn't lead to anything not being purchased over the summer, it was still dangerous because it sent a signal to the Russians. The whole point was, it wasn't public. The Ukrainians didn't know. The Russians didn't know. It wasn't being done to send a signal; it was to address concerns.

The President had raised concerns, and he wanted time to have those concerns addressed. He wanted to understand better burden-sharing—the issue that is reflected in the June 24 email that I referred to earlier; it is referred to in the July 25 call transcripts—and he wanted to understand corruption issues. He raised corruption issues.

Over the course of the summer, the testimony of Mr. Morrison in particular below explained that there were developments on corruption. President Zelensky had just been elected in April. At that time, multiple witnesses testified that it was unclear. He had run on a reform agenda, but it was unclear what he would be able to accomplish because it was unclear whether or not he would secure a majority in the Ukrainian Parliament. Those elections didn't occur until July. That is when the July 25 call occurred.

He won the majority in Parliament, but the Parliament was not actually going to be seated until later in August. Mr. Morrison testified that when he and Ambassador Bolton were in Kyiv in August, around August 27, that the Parliament had just been seated, and Zelensky and his Ministers were tired because they had been up all night. They kept the Parliament up late in session to pass the reform agenda right then, including things like eliminating immunity for members of the Parliament from corruption, prosecutions, and the legislature just set up the newly formed corruption court.

So these developments were positive developments, but then Mr. Morrison testified that President Zelensky, when he spoke to Vice President PENCE in Warsaw, discussed these things, and President Zelensky went through what he was doing, and then that information was relayed back to the President.

So the hold had been in place so that the President could, within the U.S. Government, privately consider this information, not to send a signal to the outside world.

This plays into some of the ideas that the House manager presented that somehow this was terrible; it sent a signal to the Russians. Part of the whole point, Ambassador Volker explained, was that there was concern that it not become public because it would then not send a signal. That is what happened until the POLITICO article came out on August 28. I think that is the best way to understand the difference and approach there. Thank you.

The CHIEF JUSTICE. Thank you, counsel.

Mr. YOUNG. Mr. Chief Justice.

The CHIEF JUSTICE. The Senator from Indiana.

Mr. YOUNG. I send a question to the desk on behalf of myself and Senator BRAUN.

The CHIEF JUSTICE. Thank you. The Senator from Indiana and Senator BRAUN ask both parties the following question:

We were promised by House managers that the evidence supporting each article of impeachment would be "overwhelming" and "uncontested." Virtually every day, House managers have insisted that the Senate cannot have a trial without witnesses. Do both parties agree that the Senate has included in evidence in this trial the testimony of every single witness from which the House heard before they voted, except for the intelligence community IG report that Chairman SCHIFF kept secret?

We begin with the House managers.

Mr. Manager SCHIFF. Let me take this opportunity, if I can, to answer a few questions. First, is the fact that the testimony of the witnesses before the House sufficient to relieve the Senate of an obligation to have a trial? And the answer is no. There is no reason, and, indeed, every other Senate trial—impeachment trial in history—has involved witnesses who did not testify before the House. This will be the

first departure. It shouldn't be if it is to be a fair trial.

I want to quickly respond to a couple of other points. The question was asked: Why didn't we charge bribery? And the answer is we could have charged bribery. In fact, we outlined the facts that constitute bribery in the article, but "abuse of power" is the highest crime. The Framers have it in mind as the highest crime. The facts we allege within that do constitute bribery, but had we charged bribery within the "abuse of power" article, I can assure you that counsel here would be arguing: You have charged two offenses within the same article. That makes that invalid. We wouldn't have had Alan Dershowitz making that argument because he says abuse of power is not impeachable. They would have had Jonathan Turley here making that argument. If we split them into two separate articles—one for abuse of power and one for bribery—they would have argued you have taken one crime and made it into two.

The important constitutional point here is not that the acts within abuse of power constitute bribery—although they do. The important point is we charged a constitutional crime—the most serious crime. The Founders gave the President enormous powers, and their most important consideration was that the President not abuse that power, and they provided a remedy, and that remedy is impeachment.

One final point. Mr. Sekulow said that is not how the Constitution works. The Constitution doesn't allow the Chief Justice to make those decisions, but, you know, he doesn't say the Constitution prohibits. The Constitution permits it if they will agree, but they won't. And he said it is the same as in the House, and it is the same as in the House. And it is the same in this way: If they were operating in good faith, if they really wanted a fair resolution, if they weren't just shooting for delay, they would allow the Chief Justice to make these decisions.

But what they do not want is they do not want you to hear John Bolton. And why? Because when you hear, graphically, a man saying the President of the United States told me to withhold aid from our ally, to coerce foreign assistance in his election, when the American people hear that firsthand—not filtered through our statements—they will recognize impeachable conduct when they see it.

The CHIEF JUSTICE. Thank you, Mr. Manager.

Mr. Sekulow, you have 2½ minutes.

Mr. Counsel SEKULOW. Thank you, Mr. Chief Justice.

With regard to the last statement, I am just going to say: Asked and answered. I have answered the question about the issue of moving forward if there were witnesses and our view on that. I don't have to say anything else.

Now, with regard to the question that was actually presented, 29 times—

29 times—the House managers have used the phrase "overwhelming, uncontested, sufficient." "Proved" they said 31 times. Now, that is just what the record says.

It is true that the record from the House was accepted provisionally subject to evidentiary objections, but they are the ones who have said "overwhelmingly" and "proved." Now, we, of course, disagree with their conclusions as a matter of fact and as a matter of law. But for them to come up here and to argue "proved" and "overwhelmingly" a total of, I guess, 64 times in a couple of days, tells me a lot about what they want.

What we are asking for is this proceeding to continue, and with that, we are done.

Thank you, Mr. Chief Justice

The CHIEF JUSTICE. Thank you, counsel.

The majority leader is recognized.

---

## ADJOURNMENT UNTIL 1 P.M. TOMORROW

Mr. McCONNELL. Mr. Chief Justice, I ask unanimous consent that the trial adjourn until 1 p.m., Thursday, tomorrow, January 30, and this order also constitute the adjournment of the Senate.

There being no objection, at 11:05 p.m., the Senate, sitting as a Court of Impeachment, adjourned until Thursday, January 30, 2020, at 1 p.m.