UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:20-CV-61872-AHS

ALAN DERSHOWITZ,

     Plaintiff,

v.

CABLE NEWS NETWORK, INC.,

     Defendant.

_____/

**DEFENDANT CABLE NEWS NETWORK, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

GUNSTER, YOAKLEY & STEWART, P.A.
George S. LeMieux, Esq.
Florida Bar No. 16403
Email: glemieux@gunster.com
Eric C. Edison, Esq.
Florida Bar No. 010379
Email: eedison@gunster.com
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
Telephone: (954) 462-2000

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger, Esq.
(*pro hac vice admitted*)
Email: katebolger@dwt.com
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 489-8230

*Counsel for Defendant Cable News Network, Inc.*

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF FACTS ............................................................................................ 3

    A.    The Parties ................................................................................................... 3

    B.    Before CNN's Reporting, Plaintiff Admits His Entire Reputation was "Destroyed" by Giuffre's Allegations ........................................................ 3

    C.    Before CNN's Reporting, Plaintiff Claims He Was Shunned for Defending Trump ............................................................................................................ 3

    D.    Before CNN's Reporting, Plaintiff's Family Did Not Want Him To Represent Trump ........................................................................................................... 4

    E.    Plaintiff's Arguments At The Impeachment Trial ...................................... 4

    F.    Plaintiff Acknowledges He "Slipped Up" With the Wording of the Response ...... 6

    G.    Plaintiff's Response is Condemned Prior to The Reporting At Issue Here ............ 6

    H.    The CNN Reporting At Issue ...................................................................... 7

        1.    Anderson Cooper Full Circle – 6:33 p.m. ...................................... 7

        2.    Lockhart on Erin Burnett OutFront – 7:11 p.m. ............................. 9

        3.    The Begala Op-Ed Column – 8:56 p.m. ...................................... 10

        4.    John Berman's Statements on New Day – January 30, 6:17 a.m. ........... 11

    I.    Numerous Legal Experts Interpreted the Response the Same Way CNN Did ..... 12

    J.    Plaintiff Seeks to Clarify His Comments Online and on CNN ........................... 12

    K.    Procedural History .................................................................................... 13

ARGUMENT ........................................................................................................... 13

I.    Plaintiff Cannot Prove That CNN Acted With Actual Malice ......................... 14

    A.    There Is No Evidence CNN Had Any Actual Doubts About Its Reporting ......... 15

    B.    The Speakers Provided Rational Interpretations of an Ambiguous Argument..... 18

II.    The Statements Constitute Non-Actionable Expressions of Pure Opinion ..................... 23

III.    Plaintiff Cannot Prove Damages ................................................................... 28

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Federal Cases**

*AdvanFort Co. v. Mar. Exec., LLC*,
No. 1:15-CV-220, 2015 WL 4603090 (E.D. Va. July 28, 2015)...........................................18

*Aflalo v. Weiner*,
2018 WL 3235529 (S.D. Fla. July 2, 2018)...........................................................................29

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................................15

*Anderson v. Smith*,
2020 WL 10058207 (M.D. Fla. Mar. 24, 2020) .....................................................................30

*Anheuser-Busch, Inc. v. Philpot*,
317 F.3d 1264 (11th Cir. 2003) ..............................................................................................28

*Berisha v. Lawson*,
973 F.3d 1304 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2424 (2021)...................................15

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) ..................................................................................................24

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)...........................................................................................................19, 23

*Buckley v. Littell*,
539 F.2d 882 (2d Cir.1976).....................................................................................................25

*CACI Premier Tech., Inc. v. Rhodes*,
536 F.3d 280 (4th Cir. 2008) ..................................................................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).................................................................................................................14

*Colodny v. Iverson, Yoakum, Papiano & Hatch*,
936 F. Supp. 917 (M.D. Fla. 1996).........................................................................................26

*Corsi v. Newsmax Media, Inc.*,
519 F. Supp. 3d 1110 (S.D. Fla. 2021) ...................................................................................30

*Daniels v. HSN, Inc.*,
2020 WL 533927 (M.D. Fla. Feb. 3, 2020) ............................................................................29

*Dunn v. Air Line Pilots Ass'n*,
193 F.3d 1185 (11th Cir. 1999) ..............................................................................................15

*Edward Lewis Tobinick MD v. Novella*,
   848 F.3d 935 (11th Cir. 2017) ....................................................................15

*Edwards v. Schwartz*,
   378 F. Supp. 3d 468 (W.D. Va. 2019) ........................................................28

*Egwuatu v. Burlington Coat Factory Warehouse Corp.*,
   2011 WL 2413833 (M.D. Fla. June 10, 2011) ............................................28

*Falic v. Legg Mason Wood Walker, Inc.*,
   347 F. Supp. 2d 1260 (S.D. Fla. 2004) .................................................29, 30

*Flowers v. Carville*,
   310 F. Supp. 2d 1157 (D. Nev. 2004) .........................................................21

*Fortson v. Colangelo*,
   434 F. Supp. 2d 1369 (S.D. Fla. 2006) .................................................24, 26

*Fudge v. Penthouse Int'l, Ltd.*,
   840 F.2d 1012 (1st Cir. 1988) ....................................................................24

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ...................................................................................14

*Horsley v. Rivera*,
   292 F.3d 695 (11th Cir. 2002) ....................................................................24

*Hunt v. Liberty Lobby*,
   720 F.2d 631 (11th Cir. 1983) ....................................................................15

*Kahl v. BNA, Inc.*,
   856 F.3d 106 (D.C. Cir. 2017) .....................................................................2

*Klayman v. City Pages*,
   650 F. App'x 744 (11th Cir. 2016) .............................................................15

*Levan v. Capital Cities/ABC, Inc.*,
   190 F.3d 1230 (11th Cir. 1999) ..................................................................15

*Liberty Lobby, Inc. v. Anderson*,
   1991 WL 186998 (D.D.C. May 1, 1991) ...................................................19

*Lohrenz v. Donnelly*,
   350 F.2d 1272 (D.C. Cir. 2003) .................................................................16

*Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos.*
   30 F. Supp. 2d 1182 (D. Ariz. 1998), *aff'd*, 306 F.3d 806 (9th Cir. 2002) .............................20

*Meisler v. Gannett Co.*,
   12 F.3d 1026 (11th Cir. 1994) ....................................................................15

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ...................................................................................................17

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) .............................................................................15, 16

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ...............................................................................................24, 25

*Miller v. Gizmodo Media Grp.*,
    LLC, 407 F. Supp. 3d 1300 (S.D. Fla. 2019), *aff'd*, 994 F.3d 1328 (11th Cir.
    2021) ...................................................................................................................20

*Mills v. Ala.*,
    384 U.S. 214 (1966) ...................................................................................................28

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) .............................................................................20, 27

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...................................................................................................15

*Newton v. NBC*,
    930 F.2d 662 (9th Cir. 1990) .....................................................................................17

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) .....................................................................................27

*Price v. Viking Penguin, Inc.*,
    881 F.2d 1426 (8th Cir. 1989) ...................................................................................24

*Scobie v. Taylor*,
    2013 WL 3776270 (S.D. Fla. July 17, 2013) ............................................................29

*Secord v. Cockburn*,
    747 F. Supp. 779 (D.D.C. 1990) ...............................................................................18

*Silvester v. Am. Broad. Cos.*,
    839 F.2d 1491 (11th Cir. 1988) .................................................................................15

*Talley v. Time, Inc.*,
    923 F.3d 878 (10th Cir. 2019) ...................................................................................19

*Tillett v. BJ's Wholesale Club, Inc.*,
    2010 WL 11507322 (M.D. Fla. July 30, 2010) ........................................................25

*Time, Inc. v. Pape*,
    401 U.S. 279 (1971) ........................................................................................ *passim*

*Turner v. Wells*,
    198 F. Supp. 3d 1355 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1355 ............................24, 25

*Turner v. Wells*,
   879 F.3d 1254 (11th Cir. 2018) ...................................................................................14, 15, 24

*United States v. Gonzalez-Zea*,
   995 F.3d 1297 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 506 (2021).....................................18

*Zherka v. Amicone*,
   634 F.3d 642 (2d Cir. 2011)...................................................................................................28

**State Cases**

*Blake v. Giustibelli*,
   182 So.3d 881 (Fla. 4th DCA 2016) .....................................................................................30

*Byrd v. Hustler Magazine, Inc.*,
   433 So.2d 593 (Fla. 4th DCA 1983) .....................................................................................24

*Daly v. Morris Publ'g Grp., LLC*,
   2009 WL 5876239 (Fla. 4th Cir. Ct. Mar. 17, 2009)............................................................25

*Edelstein v. WFTV, Inc.*,
   798 So.2d 797 (Fla. 4th DCA 2001) .....................................................................................30

*Freedom Newspapers of Tex. v. Cantu*,
   168 S.W.3d 847 (Tex. 2005)...........................................................................................16, 19

*In re Storms v. Action Wisconsin Inc.*,
   750 N.W.2d 739 (Wis. 2008)................................................................................................21

*Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*,
   811 So.2d 841 (Fla. 4th DCA 2002) .....................................................................................15

*Ortega v. Post-Newsweek Stations, Fla., Inc.*,
   510 So.2d 972 (Fla. 3d DCA 1987) ......................................................................................20

*Woodard v. Sunbeam Television Corp.*,
   616 So.2d 501 (Fla. 3d DCA 1993) ......................................................................................20

*Zambrando v. Devanesan*,
   484 So.2d 603 (Fla. 4th DCA 1986) .....................................................................................25

*Zimmerman v. Allen*,
   2014 WL 3731999 (Fla. 18th Cir. Ct. June 30, 2014) ..........................................................19

**Federal Statutes**

**Rules**

Fed. R. Civ. P. 56...............................................................................................................1, 14

Local Rule 7.1.........................................................................................................................31

Rule 12.........................................................................................................................1, 13

**Constitutional Provisions**

First Amendment .................................................................................................... *passim*

Pursuant to Federal Rule of Civil Procedure 56, Defendant Cable News Network, Inc. ('CNN') moves for summary judgment dismissing the claims of Plaintiff Alan Dershowitz ("Plaintiff or "Dershowitz"). In support thereof, CNN states as follows:

**PRELIMINARY STATEMENT**

This lawsuit is about CNN's airing of video clips of a matter of profound public concern – Plaintiff's response to a question posed by Senator Ted Cruz on the floor of the U.S. Senate during the first impeachment trial of former President Donald Trump (the "Response") – and CNN's associated commentary. Plaintiff admits that the Response "was given spontaneously. It [wa]s not written out. Obviously, every single word of it can't be parsed together." Ex. 17 at 402:6-11.[1] But Plaintiff nonetheless asks this Court to do just that – parse all the words together to interpret the Response in the precise manner that Plaintiff wishes after-the-fact, conclude that CNN conspired to defame him, and then award him hundreds of millions of dollars in damages.

This Court, constrained by the limits of Rule 12, declined to dismiss this action at the pleading stage, and suggested that discovery was needed to assess the strength of some of Plaintiff's allegations and CNN's defenses. Discovery is now complete – with over 60,000 pages of documents exchanged and 17 depositions – and the undisputed material facts establish that Plaintiff's claim is baseless. The lynchpin of Plaintiff's claim from the beginning has been his misplaced belief that his Response was clear and there was a conspiracy at CNN to intentionally misquote it and damage his reputation. But the Response was not clear, and Plaintiff himself concedes, he "slipped up" in at least twice in giving it. Moreover, the undisputed evidence has shown there was no such conspiracy. All the CNN witnesses testified they independently watched or read Plaintiff's full Response, independently reacted to his argument, and independently cut the

---

[1] References to "Ex. __" are to the exhibits attached to the Declaration of Katherine M. Bolger, filed herewith.

clips or provided commentary with a belief in the fairness of what they did and truth of what they said. And CNN was far from the only voice criticizing the Response – it was panned in the media, by 200 legal scholars who wrote to Congress urging it to reject Plaintiff's arguments and even by the Republican Senators who opposed the impeachment.

Plaintiff – a conceded public figure – cannot establish that CNN acted with constitutional "actual malice," which he must show by clear and convincing evidence. To the contrary, each and every speaker[2] testified that they believed what they were saying was true at the time they said it. Similarly, each clip targeted by Plaintiff is a verbatim clip of what he said on the floor of the Senate, and each of the four separate decisionmakers who selected the clips testified they independently made the decision to select the clip based on their editorial judgment and believed the clip was fair and accurate. And there is no evidence in the record to contradict such beliefs.

Moreover, the Court need not reach the actual malice issue.  The record establishes the allegedly defamatory statements constitute the non-actionable opinions of those who made them.

Finally, Plaintiff's reputation had already been damaged by the years of accusations of sexual assault by one of the victims of (Plaintiff's former client) Jeffrey Epstein, which he testified already destroyed his "entire legacy" and "entire reputation" (Ex. 78 at 349:11-15), by the decades of criticism about his willingness to represent people like OJ Simpson or Claus von Bulow, and by his self-described "cancelling" for defending President Trump beginning in 2017. He will never be able to carry his burden of demonstrating that CNN's alleged defamation – as opposed to those events – caused him his alleged harm, which independently defeats his claim.

As Judge Kavanaugh held, "[t]o preserve First Amendment freedoms …, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. BNA,*

---

[2] As detailed *infra* the speakers are Anderson Cooper, John Berman, Anne Milgram, Paul Begala and Joe Lockhart.

*Inc.*, 856 F.3d 106, 109-10 (D.C. Cir. 2017). This is just such a lawsuit. This Court should grant the motion for summary judgment.

## STATEMENT OF FACTS

### A.     The Parties

CNN owns and operates numerous news platforms and services, including the television network known as CNN and the website www.cnn.com. 56.1 ¶ 2.[3]

Plaintiff is an emeritus professor at Harvard Law School. *Id.* ¶ 1. He relishes his career-long involvement in controversy and claims he has developed a thick skin after decades of criticism. *Id.* ¶¶ 3-4.

### B.     Before CNN's Reporting, Plaintiff Admits His Entire Reputation was "Destroyed" by Giuffre's Allegations

In 2014, Virginia Giuffre, a victim of Epstein, publicly alleged that Plaintiff sexually assaulted her. *Id.* ¶ 6. The allegation had major repercussions for Plaintiff's professional reputation, including canceled speaking engagements and hate mail, years before the statements at issue here. *Id.* ¶ 7. As he said in 2018, "at age 81 my life and career are no longer being honored but dishonored." Ex. 72 at 10. Plaintiff testified in defamation lawsuits related to the allegations that they were "career-destroying." Ex. 77 at 116:24, 117:6. In January 2022, he testified that the impact of her allegations on his "public life," "reputation," and "legacy" was "devastating," and they "destroyed [his] life, they destroyed [his] happiness, they destroyed [his] health[], … [his] reputation, … [and his] career as a public speaker, they affected [his] writing, [his] sales of books, the readership of [his] books. [He] do[es]n't think any part of [his] life was not affected[.]" Ex. 79 at 468:1-5; Ex. 80 at 622:1-24. *See also* 56.1 ¶ 11.

### C.     Before CNN's Reporting, Plaintiff Claims He Was Shunned for Defending Trump

---

[3] Individual paragraphs in CNN's Statement of Undisputed Material Facts are cited herein as "56.1 ¶ __."

Before any of the CNN reporting at issue, Plaintiff claimed his reputation had been damaged because he had become a vocal advocate for President Trump's "civil-liberties," even going so far as to declare himself a victim of "McCarthyism." 56.1 ¶ 12.

Plaintiff was also criticized by academics and the media for his shifting opinions on impeachment. *See id.* ¶ 13. In 1998, Plaintiff stated that impeachment does not require a crime. *Id.* ¶ 14. In 2018, he appeared to change his mind, writing in a book opposing the hypothetical impeachment of Trump on the grounds that a statutory crime *was* necessary for impeachment. *Id.* ¶ 15. Then, in 2020, Plaintiff pivoted again, arguing that a crime or "crime-like" behavior was necessary. *Id.* ¶ 16. Plaintiff's 2020 position was widely panned by scholars – including those who opposed impeachment of President Trump – as creating too broad a concept of executive power. *Id.* ¶ 18; Ex. 113. In fact, Plaintiff's dubious arguments prompted commentators to publicly wonder "What Happened to Alan Dershowitz?" Exs. 94, 104.

**D.    Before CNN's Reporting, Plaintiff's Family Did Not Want Him To Represent Trump**

In December 2019, the U.S. House of Representatives impeached President Trump on findings he withheld Congressionally authorized military funds from Ukraine to coerce President Zelenskyy to announce an investigation into Joe Biden, Trump's political rival. 56.1 ¶ 19. That month, Trump asked Dershowitz to join his defense team. *Id.* ¶ 20. Plaintiff's family was not supportive of his decision to get involved. *Id.* ¶ 21. In particular, his wife, Carolyn Cohen, was "very firm" that she did not want Plaintiff to do so, was emphatic that Plaintiff claim that he was representing "the Constitution," not Trump, Ex. 18 at 570:14-15, and was angry when Plaintiff stayed in Washington to represent Trump on January 29. Ex. 154.

**E.    Plaintiff's Arguments At The Impeachment Trial**

The impeachment trial began on January 22, 2020. 56.1 ¶ 22. CNN aired (and streamed

online) the trial in its entirety. *Id.* ¶ 23. On January 27, 2020, Plaintiff gave his opening statement against impeachment on behalf of Trump. *Id.* ¶ 26. Those comments were widely criticized as dangerously enlarging the power of the presidency. *Id.* ¶¶ 18, 27.

On January 29, 2020, at approximately 2:10 p.m. EST, Senator Ted Cruz asked Plaintiff, "[a]s a matter of law, does it matter if there was a quid pro quo? Is it true that quid pro quos are often used in foreign policy?" Ex. 29 at S650. Plaintiff answered as follows:

> Yesterday, I had the privilege of attending the rolling-out of a peace plan by the President of the United States regarding the Israel-Palestine conflict, and I offered you a hypothetical the other day: What if a Democratic President were to be elected and Congress were to authorize much money to either Israel or the Palestinians and the Democratic President were to say to Israel "No; I am going to withhold this money unless you stop all settlement growth" or to the Palestinians "I will withhold the money Congress authorized to you unless you stop paying terrorists, and the President said "Quid pro quo. If you don't do it, you don't get the money. If you do it, you get the money"? There is no one in this Chamber who would regard that as in any way unlawful. The only thing that would make a quid pro quo unlawful is if the quo were some way illegal.

> Now, we talked about motive. There are three possible motives that a political figure can have: One, a motive in the public interest, and the Israel argument would be in the public interest; the second is in his own political interest; and the third, which hasn't been mentioned, would be in his own financial interest, his own pure financial interest, just putting money in the bank. I want to focus on the second one for just one moment.

> Every public official whom I know believes that his election is in the public interest. Mostly, you are right. Your election is in the public interest. If a President does something which he believes will help him get elected—in the public interest—that cannot be the kind of quid pro quo that results in impeachment.

> I quoted President Lincoln, when President Lincoln told General Sherman to let the troops go to Indiana so that they could vote for the Republican Party. Let's assume the President was running at that point and it was in his electoral interests to have these soldiers put at risk the lives of many, many other soldiers who would be left without their company. Would that be an unlawful quid pro quo? No, because the President, A, believed it was in the national interest, but B, he believed that his own election was essential to victory in the Civil War. Every President believes that. That is why it is so dangerous to try to psychoanalyze the President, to try to get into the intricacies of the human mind.

> Everybody has mixed motives, and for there to be a constitutional impeachment

5

based on mixed motives would permit almost any President to be impeached.

*Id*. at S650-51. Plaintiff later continued:

> Now, we may argue that it is not in the national interest for a particular President to get reelected or for a particular Senator or Member of Congress—and maybe we are right; it is not in the national interest for everybody who is running to be elected—but for it to be impeachable, you would have to discern that he or she made a decision solely on the basis of, as the House managers put it, corrupt motives, and it cannot be a corrupt motive if you have a mixed motive that partially involves the national interest, partially involves electoral, and does not involve personal pecuniary interest.

*Id*. at S651 ("Sole Corrupt Motive Argument"). Plaintiff then gave an example of "purely corrupt" motive, which he defined as a personal pecuniary motive. He concluded his answer by stating:

> But a complex middle case is: I want to be elected. I think I am a great President. I think I am the greatest President there ever was, and if I am not elected, the national interest will suffer greatly. That cannot be an impeachable offense.

*Id.* (the "Greatest President Argument").[4]

## F. Plaintiff Acknowledges He "Slipped Up" With the Wording of the Response

At his deposition, Plaintiff acknowledged that the Response was "given spontaneously." *Id.* at 402:6-11. He conceded he might have "slipped up" when, in the blue sentence above (the "Illegal Quo Line"), he referred only to a "quo" being "in some way illegal," claiming "I thought I said quid or quo. That's what I meant." *Id.* at 397:3-10. He also admitted that his reference to Lincoln sending troops to Indiana "wasn't a quid pro quo, but … was related to quid pro quo" (*id.* at 392:2-393:23), even though, in the Response itself, he said it was one.

## G. Plaintiff's Response is Condemned Prior to The Reporting At Issue Here

Plaintiff's Response was immediately condemned. Congressman Adam Schiff decried the argument from the floor of the Senate, and even the Republican Senators were horrified by the

---

[4] The words "an impeachable offense" were not included in the transcript in the Congressional Record, but the video recording of Plaintiff's answer makes clear that he concluded his remarks with these words. Ex. 30; 56.1 ¶ 31.

Response, with one Senator recommending that Plaintiff be fired immediately. 56.1 ¶ 34. The Response was also pilloried in the media, with news organizations focusing in particular on the portion of the Response in purple above (the "Public Interest Argument"). For example, at 3:35 p.m. on January 29, 2020, the *New York Times* tweeted that Plaintiff "argued that anything a president does to get re-elected could be considered in the nation's interest and is therefore not impeachable" (Ex. 161), and later reported that Plaintiff "went far further" than the President's defense had previously tried to go. Ex. 130 at 14. At 3:57 p.m., *Business Insider* noted that "experts and critics of the president immediately took issue with Dershowitz's argument which suggested the president's defenders believe Trump can do anything he wants in service of his own political interests." Ex. 158.[5] Verified Twitter users, commenting in real time, expressed similar sentiments. For example, Garry Kasparov tweeted at 2:29 p.m.: "Wow, Dershowitz is actually making the King Louis XIV argument right now! Trump is good for the country, so anything he does to stay in power is the national interest, even if corrupt or illegal." Ex. 137 at 17.[6] By 4:23 p.m. even Plaintiff's family had seen the commentary and criticisms – as his daughter asked in a text to her mother, "Did dad actually say what folks are saying he said? That if you believe it's in the country's best interest for you to be president you can do whatever to make that happen?" Ex. 139.

**H.    The CNN Reporting At Issue**

**1.    Anderson Cooper Full Circle – 6:33 p.m.**

Only after Plaintiff's Response had been aired live in full by CNN (and other outlets), and had been widely criticized, did CNN publish any of the content at issue here. The first statement

---

[5] At 2:15 p.m., the *Washington Post* live-blog coverage included a summary entitled "Dershowitz argues that a president is immune if he views his reelection as in the public interest." Ex. 131 at 11. And, the *Daily Mail* published an article at 5:29 p.m. headlined "ANYTHING Donald Trump does to get himself re-elected is UNIMPEACHABLE says Alan Dershowitz - because he believes it is in the public interest." Ex. 157.

[6] A survey of all verified Twitter users reacting to Plaintiff's Response showed overwhelmingly negative sentiments toward Plaintiff's argument, before any of the statements were aired or published. *See* Ex. 102-103; 56.1 ¶ 38.

was on the online program Anderson Cooper Full Circle at 6:33 p.m., where Anne Milgram, the former Attorney General for New Jersey (and current head of the DEA) appeared as a guest to answer questions about impeachment posed by Cooper and viewers of the show. 56.1 ¶¶ 41, 52.

Chuck Hadad, the supervising producer, put the show together. He testified that using his own independent judgment, he understood Plaintiff's Response to be newsworthy, but, at five minutes, it was too long to be included in its entirety. *Id.* ¶ 43. Hadad supervised the creation of a clip centered around Plaintiff's Public Interest Argument, which Hadad believed 'accurately represented [Plaintiff's] argument and got to … the crux, the most newsworthy moment." Ex. 9 at 56:8-13.[7] Hadad then supervised the drafting of the question to be posed to Milgram. 56.1 ¶ 47.

Meanwhile, Cooper also watched the Response in full. *Id.* ¶ 48. Cooper thought anyone with "any sense of news judgment" would – and did – focus on the Public Interest Argument and thought it was appropriate to discuss with Milgram. Ex. 8 at 86:15-87:3. Milgram independently reviewed the Response and thought it articulated an expansive view of presidential power. 56.1 ¶ 51. Milgram and Cooper had the following colloquy:

> *Milgram*: What's also really interesting though is that this is actually a step further than some of the arguments that the president's lawyers made in their trial brief when they basically said that look, this was all within the president's authority. The president has the authority to do whatever he wants in foreign policy. Basically sort of saying even if he benefits personally and they didn't say that part explicitly, but even if he benefited personally, it would be okay. And all they said was the president has vast authority. This view of the executive power that Dershowitz basically announced today would make the president a king. It would put the president beyond the rule of law. And, you know, you and I are talking about a quid pro quo here of exchanging, withholding military aid. But we could think of a lot of other things that there is no version, you know, could you kill your opponent, could you, you know, leak dirt on someone. There's countless –
>
> *Cooper*: There's no rules.
>
> *Milgram*: There's no limit to basically how badly behaved people could be. And they could actually commit crimes, which we know, you know, Dershowitz is

---

[7] The clip contained the Public Interest Argument, and then cut to the Sole Corrupt Motive Argument. Ex. __.

essentially saying it doesn't matter what the quid pro quo is as long as you think you should be elected. That, it's never been announced in the law. I've never heard anyone else argue it. It cannot possibly be right.

Ex. 53. Hadad, Cooper, and Milgram testified they believed that the statements made and clip used were fair and accurate at the time they were made. *See* 56.1 ¶¶ 53-54.

### 2. Lockhart on Erin Burnett OutFront – 7:11 p.m.

The second statement at issue was made by Joe Lockhart, former press secretary to President Clinton,  on January 29 at 7:11 p.m. during an appearance on the Erin Burnett OutFront show ("EBOF"). *Id.* ¶¶ 55, 65. In preparing for the EBOF for January 29, Susie Xu (the Executive Producer) watched the Response live. *Id.* ¶ 57. Xu testified that she thought the Response was newsworthy, a belief that was affirmed when Xu watched an exchange between Wolf Blitzer and Jake Tapper on CNN. *Id.*[8] Xu requested that a member of her staff edit a clip that focused on the language discussed by Blitzer and Tapper but added more context than what Blitzer and Tapper had paraphrased. *Id.* ¶ 59. In Xu's independent editorial discretion, the clip that she used – which contained the entire Public Interest Argument – was fair and accurate. *Id.* ¶¶ 59-60.

Meanwhile, Lockhart watched the entire Response live at his home and tweeted four times criticizing it, stating that Plaintiff was making a "crazy" and "corrupt argument" that if President Trump "think[s] it's in the public interest for him to be reelected … he can do whatever he wants." *See* Ex 63. Lockhart reached these conclusions independently and did not discuss his tweets with anyone from CNN. 56.1 ¶ 62.

Lockhart then appeared on EBOF on a panel with Burnett, two legal analysts, and political commentator Scott Jennings. During the panel, Burnett and Lockhart had the following exchange:

*Burnett*: What did you make when you heard that? I mean, everybody did respond

---

[8] Plaintiff does not complain of this exchange and suggests Tapper and Blitzer correctly presented his Response. Compl. ¶ 9. He also erroneously claims that the "entire clip" of his Response was aired before the Tapper/Blitzer colloquy. *Id.* But that is incorrect – no clip was aired during that discussion. *See* 56.1 ¶ 58.

to that sort of saying, wait, what did he say.

*Lockhart*: Yes. I mean, having to work in about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country. But that doesn't give you a license to commit crimes or to do things that are unethical, so it was absurd.

And what I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authority and from Hitler, from all of the authoritarian people who rationalized and in some cases, genocide, based on what was in the public interest. It was startling and I still can't believe he went on the floor of the Senate and made that argument."

*See* Ex. 67 at 5. Jennings then criticized Lockhart for comparing the President to Stalin,

Mussolini, and Hitler and Lockhart responded as follows:

[T]hat argument, that rationalization is exactly the rationalization that these authoritarian dictators made, which is we will do these things, because – yes, they're in my interest, but it's in the public interest. …. [I]t is that argument that's so dangerous that you can commit any act as long as in [your] head you believe it's good for the country ….

*Id.* at 6. Lockhart testified his statement was "an argument and opinion that I believe is appropriate,

and it is an argument and an opinion that I believe today." Ex. 11 at 64:7-11.

### 3. The Begala Op-Ed Column – 8:56 p.m.

The third allegedly defamatory statement is an op-ed column written by Paul Begala, which

originated when Pat Wiedenkeller, then an opinion editor at CNN, watched the Response live. 56.1

¶ 68. Wiedenkeller wrote to Paul Begala, campaign manager and advisor to President Clinton, and

Political Contributor on CNN, and asked him to write an opinion column about it. *Id.*

Begala testified that he had watched the entire Response live and was taken aback by

Plaintiff's argument. *Id.* ¶¶ 69-70. As a result, before he was contacted by CNN at 4:01 p.m., he

tweeted that the argument was "Akin to Nixon telling David Frost, 'If the President does it, it isn't

illegal.' Only this time it's 'If the President thinks it will help his re-election, and he thinks his re-

elections helps the country, it isn't illegal.'" Ex. 141. As soon as he saw Wiedenkeller's email, he

responded "on it," and quickly submitted a draft of the column that was published at 8:56 p.m.

56.1 ¶¶ 72-73. Plaintiff alleges he was defamed by the following language:

> The Dershowitz Doctrine would make presidents immune from every criminal act, so long as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it.

Ex. 144 at 2. Begala testified that he stands by his interpretation of the Response, and, indeed, still holds that opinion now. 56.1 ¶ 75.

Ultimately, a video clip containing the Public Interest Argument (followed by the Blitzer-Tapper discussion) was added to the webpage with the Begala column. *Id.* ¶ 77. That clip was edited by Brett Harman, a video programming producer at CNN, although it was not cut specifically for Begala's column. *Id.* Harman independently selected which portion of the Response to edit based on the Blitzer-Tapper exchange, and believed the clip he used was fair and accurate. *Id.* ¶ 79. Harman, on the one hand, and Weidenkeller and Begala, on the other, did not communicate about the clip.

### 4.     John Berman's Statements on New Day – January 30, 6:17 a.m.

The next challenged statement was made by John Berman on New Day at 6:17 a.m. on January 30. Berman co-anchored New Day (CNN's morning show) and had watched the Response live. *Id.* ¶ 82. Berman was surprised by the Response because it was a "new argument," both from the President's legal team and from Plaintiff in particular. Ex. 6 at 82:15-83:18; 106:10-13. A clip containing the Public Interest Argument was prepared by New Day producers and Berman instructed his team to also cut a clip of the Greatest President Argument. 56.1 ¶ 85.[9] Berman and producer Izzy Povich, who had ultimate responsibility for the content of New Day, both testified

---

[9] Berman's email with this instruction began, "Dersh-o-nuts...need this for all panels." Ex. 145. Berman testified that he used the phrase "Dersh-o-nuts" because, while he respected Plaintiff as a lawyer in other contexts, he thought the argument in the Response was "alarming" and a "stunning expansion" of the bounds of presidential power. Ex. 6 at 154:23-155:8, 157:3-8.

they believed the clips were fair and accurate. 56.1 ¶ 88.[10]

Plaintiff alleges he was defamed by Berman's statement that "the president's defense team seems to be redefining the powers of the president, redefining them towards infinity," and that "if you look at what [Plaintiff] says there, it blows your mind. He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything. And that redefines the presidency and, frankly, redefines America." Ex. 36 at 6. Berman testified "I believed then, and I believe now, that we presented that in an accurate way." Ex. 6 at 106:15-17.

## I.  Numerous Legal Experts Interpreted the Response the Same Way CNN Did

In the days that followed, the Response was met with a chorus of condemnation from legal experts and scholars independent of CNN, who interpreted the Response the way CNN commentators and journalists did. 56.1 ¶¶ 95-97.[11] In fact, the legal community was so disturbed by Plaintiff's arguments, that nearly 200 "professors of law and scholars of the American constitution" sent a letter to the Senate to repudiate Plaintiff because his arguments would "give the president carte blanche to corrupt American electoral democracy." Ex. 150 at 1, 3; 56.1 ¶ 98.

## J.  Plaintiff Seeks to Clarify His Comments Online and on CNN

Unhappy with the coverage of his Response, Plaintiff attempted to "clarify" his position. On January 30, he took to Twitter to denounce "CNN, MSNBC and some other media" that "willfully distorted [his] answers." Ex. 151 at 14. That same day he published an opinion piece in *The Hill* entitled "I never said president could do anything to get reelected," in which he claimed "the media" was "deliberately distorting and mischaracterizing" his argument. Ex. 110 at 157.[12]

---

[10] The Full Circle clip, EBOF clip, web clip and New Day clip are referred to collectively as the "clips."

[11] For example, renowned law professor Erwin Chemerinsky stated that Plaintiff's argument was "absurd and outrageous," and meant that "a president could break any law or abuse any power and say that it was for the public interest because the public interest would be served by his or her election." Ex. 146.

[12] Plaintiff received numerous emails showing that his Response was not remotely as clear to viewers as he claims. 56.1 ¶ 39.

CNN also gave Plaintiff a chance to explain on air why he thought he had been misinterpreted. On January 30, Plaintiff was interviewed by Wolf Blitzer for nearly 15 minutes, where he criticized CNN for "distorting" his argument and later expressed the same grievances for almost 18 minutes on a different CNN show. 56.1 ¶¶ 100-101. Plaintiff was also asked to appear on Anderson Cooper's show, but did not reply. *Id.* ¶ 102.

## K.    Procedural History

Plaintiff filed this action asserting one count of defamation on September 15, 2020 (ECF No. 1). CNN moved to dismiss the complaint and on May 25, 2021, accepting all allegations of the complaint as true as it was required to do on a Rule 12 motion, the Court denied CNN's motion. ECF No. 28 ("MTD Op.") at 5. The Court held that determining whether the statements constituted non-actionable opinion "require[d] a more fully developed record," and that Plaintiff had sufficiently pleaded actual malice, but acknowledged that "[w]hether the evidence adduced will ultimately satisfy Dershowitz' burden of proving actual malice by clear and convincing evidence remains to be seen." *Id.* at 16, 20. After the parties commenced discovery, Plaintiff filed an amended complaint, which added the Milgram/Cooper statements to his claim. *See* ECF No. 66 ("Compl."). Discovery is now complete, and this motion follows.

## ARGUMENT

This Court should grant summary judgment because Plaintiff has failed to carry his burden to establish each element of his claim. Fed. R. Civ. P. 56(a). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To do so, Plaintiff bears the burden of proving: (1) publication of a statement to a third party; (2) falsity; (3) actual malice; (4) actual damages; and (5) the statement was defamatory. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). Plaintiff cannot meet this burden.

Plaintiff's claim is highly unusual. Because he admits, as he must, that the clips repeat

verbatim what he said on the floor of the Senate, neither CNN nor this Court understand him to be asserting a claim on the airing of the clips alone. *See* MTD Op. at 9. Instead, he claims "CNN" concocted a "deliberate scheme" to "fool its viewers into believing" Plaintiff had "actually said and meant what the CNN hosts and panel guests knew was the exact opposite of what he said," by showing a video clip of his Response that did not include the Illegal Quo Line, and then having commentators deliberately mischaracterize his arguments. Compl. ¶¶ 8-11, 18. The evidence in the record confirms this theory is utterly baseless, and there was no such "scheme." None of the statements were made with "actual malice," and the statements were, in any event, non-actionable expressions of the speakers' opinions. For those reasons – and because Plaintiff also cannot show that he was damaged by any of the statements – the Court should grant summary judgment.

## I.    Plaintiff Cannot Prove That CNN Acted With Actual Malice

The Court should grant summary judgment because, based on the undisputed record, Plaintiff cannot show that any allegedly defamatory statement was published with "actual malice," which, as a conceded public figure, he must prove by clear and convincing evidence. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). This standard applies now, at summary judgment.[13] "Actual malice" does not mean common-law malice in the sense of ill will or spite; it means knowledge of falsity or reckless disregard for the truth. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Moreover, "reckless disregard" does not mean recklessness in the typical objective sense of gross negligence. It is, instead, a purely "subjective test" that addresses the defendant's state of mind. *Turner*, 879 F.3d at 1273. Essentially, "reckless disregard" means the defendant actually, subjectively believed that a statement was very likely false, but went ahead and published

---

[13] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986) ("[T]he appropriate summary judgment question [is] whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.").

it anyway. *Id.* (test "focus[es] on whether the defendant 'actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false.'") (citation omitted).[14] This standard is so high that, in reviewing cases against media defendants brought by public figures, the Eleventh Circuit last found a triable issue of fact in 1983.[15]

### A.   There Is No Evidence CNN Had Any Actual Doubts About Its Reporting

There is nothing in the record – let alone clear and convincing evidence – showing that any CNN witness "*in fact* entertained serious doubts as to the truth" of CNN's reporting.[16] *Berisha*, 973 F.3d at 1312 (citation omitted). To the contrary, every person involved in either editing the clips or making the statements testified they believed the clips and statements were fair and accurate, and had no doubts on that front, having watched Plaintiff's entire Response. *See supra* Stmt. of Facts, § H. In light of these "professions of good faith," summary judgment must be granted unless Plaintiff can point to clear and convincing evidence the statements were

> [f]abricated by the defendant, … the product of his imagination, or … based wholly on an unverified anonymous telephone call … [or that] the publisher's allegations [were] so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Michel*, 816 F.3d at 703 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)). There is zero evidence to support any of these contentions. The statements were based on a direct interpretation

---

[14] Neither "a failure to investigate" nor "a departure from reasonable journalistic standards" constitutes actual malice. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016).

[15] *See Michel*, 816 F.3d 686 (affirming dismissal of complaint for failure to plausibly plead actual malice); *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2424 (2021); *Klayman v. City Pages*, 650 F. App'x 744 (11th Cir. 2016) (affirming summary judgment); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230 (11th Cir. 1999); *Meisler v. Gannett Co.*, 12 F.3d 1026 (11th Cir. 1994); *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491(11th Cir. 1988). *Cf. Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983). The results of more recent cases against non-media defendants are similar. *See, e.g., Turner*, 879 F.3d 1254; *Edward Lewis Tobinick MD v. Novella*, 848 F.3d 935 (11th Cir. 2017); *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185 (11th Cir. 1999).

[16] In a case against a news organization, "the state of mind required for actual malice would have to be *brought home* to the persons in the … organization having responsibility for the publication." *Sullivan*, 376 U.S. at 287 (emphasis added). *See also Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So.2d 841, 847 (Fla. 4th DCA 2002).

of Plaintiff's Response – one that was widely shared by countless other scholars, commentators and media outlets. *See supra* Stmt. of Facts, §§ G, I. There was no actual malice. In fact, CNN invited Plaintiff on air the next day to clarify his Response and accuse CNN of distorting his arguments.  This fact alone undercuts any claimed actual malice. *See, e.g.*, *Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005) ("prompt follow up article quoting [plaintiff's] version of his remarks and the opinions of his supporters is evidence of the absence of actual malice, not the opposite'); *cf. Lohrenz v. Donnelly*, 350 F.2d 1272, 1286 (D.C. Cir. 2003) ("reporting perspectives at odds with the publisher's own 'tends to rebut a claim of malice'").

Ultimately, Plaintiff's claim of actual malice rests entirely on his fanciful theory of a grand "scheme" by CNN to harm his reputation by deliberately "distorting" his Response. But the undisputed evidence shows there was absolutely no such scheme, deliberate or otherwise. First, contrary to what Plaintiff claimed, there was not a single "video clip" that CNN played "time and time again." Compl. ¶ 10. Instead, there were four clips of varying lengths that were each *independently* created by the staffs of the programs and the digital staff. 56.1 ¶¶ 45, 59, 77, 79, 85.

Moreover, the individuals responsible for the content of the clips (Hadad, Xu, Berman and Harman) each testified that they edited and/or selected the clips based on their own, independent editorial judgment because they believed the clips were newsworthy, fair and accurate. *Id* ¶ 42, 44, 45, 48, 57, 79, 80, 82, 85. This is confirmed not only by the undisputed testimony but by the contemporaneous written communications. *See id*. They also testified that the decision not to include the Illegal Quo Line in the various clips, a decision they made individually, was not the result of any "deliberate" effort to "omit" an "essential" portion of Plaintiff's Response (Compl. ¶¶ 8-9), but was instead simply an editorial function to cut the Response for length, just as those portions about Israel or Abraham Lincoln were also cut. *See* 56.1 ¶¶ 43, 45, 59, 81, 84. *Cf. Miami*

*Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials – whether fair or unfair – constitute the exercise of editorial control and judgment.").[17] They did not think the Illegal Quo Line was "essential" because they did not understand it to qualify the Public Interest Argument. 56.1 ¶¶ 45, 59, 81, 84.

And the speakers each testified they reached their own independent conclusions about the Response by watching it live, and not based on any of the clips. *Id.* ¶¶ 51, 65, 71, 78, 90. They did not speak to one another or to Jeff Zucker (the then-President of CNN) about the clips or their statements, and they were not told to adhere to a particular "narrative" (Compl. ¶ 8) about Plaintiff. *Id.* ¶¶ 51, 62, 65, 72, 89. As Joe Lockhart emphasized, he conveyed "[his] argument and [his] opinion and no one else's." Ex. 11 at 64:7-11. The undisputed record shows that was true for all of the speakers.[18]

Plaintiff also cannot establish actual malice based on the theory that the speakers were aware that, in his opening statement two days earlier, Plaintiff had argued to the Senate that a crime or crime-like conduct is necessary for impeachment.[19] That theory fails because the speakers understood Plaintiff to take a new and different position on January 29, *i.e.*, that a president cannot be impeached for acts taken in the interest of reelection. *See, e.g.*, 56.1 ¶¶ 49, 83. And even if

---

[17] *See also Newton v. NBC*, 930 F.2d 662, 686 (9th Cir. 1990) ("Editorial decisions about broadcasts are best left to editors, not to judges and juries."). Other outlets – including ABC, CBS, and the New York Post – also clipped or quoted the Public Interest and/or Greatest President Arguments without including the Illegal Quo Line. Exs.134, 135, 160; 56.1 ¶ 36.

[18] While Berman's executive producer forwarded him an email from Zucker discussing Plaintiff, Berman received the email after the segment had already been written. *See* 56.1 ¶ 92. Berman testified that he made his editorial decisions independently before he received the email. Ex. 6 at 195:22-196:8.

[19] In addition, three of the Commentators who actually spoke the Challenged Statements (Begala, Lockhart and Milgram) were not CNN employees, they were independent contractors. "Multiple courts have held that actual malice 'cannot be imputed from one defendant to another absent an employer-employee relationship.'" *AdvanFort Co. v. Mar. Exec., LLC*, No. 1:15-CV-220, 2015 WL 4603090, at *7 (E.D. Va. July 28, 2015) (collecting cases); *see also Secord v. Cockburn*, 747 F. Supp. 779, 787 (D.D.C. 1990) (granting summary judgment where "the undisputed facts in the record before this Court provide that the author is an independent contractor").

Plaintiff's January 27 remarks were to be read in conjunction with his January 29 Response, trying to argue that this changes the meaning of the Response is a red herring. On January 27, Dershowitz argued that a crime or crime-like conduct was *necessary* for impeachment, but he never said it was always impeachable. As such, it does not contradict the notion that acts done in the interest of getting reelected are not impeachable regardless of whether a crime or "crime like" behavior are in play.[20]

In sum, each decisionmaker independently determined which moments from the Response were the most newsworthy, and either independently edited clips to illustrate those moments or independently commented on what they believed was the most important point of the Response. And all testified without equivocation that they believed the clips and the statements were fair and accurate – the very opposite of actual malice. *Id.* ¶¶ 46, 53, 54, 60, 61, 75, 76, 79, 88, 91, 94.

**B.     The Speakers Provided Rational Interpretations of an Ambiguous Argument**

Plaintiff's actual malice theory is also defeated by the well-established principle that a speaker's "deliberate choice" of how to characterize an event that "bristled with ambiguities" is "not enough to create a jury issue of 'malice'" – even if the statement "arguably reflect[s] a misconception" – where the speaker was simply "adopt[ing] one of a number of possible rational interpretations" of the ambiguous situation. *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512–13 (1984); *Zimmerman v. Allen*, 2014 WL 3731999, at *6 (Fla. 18th Cir. Ct. June 30, 2014). Even giving Plaintiff the benefit of every doubt, it is indisputable that CNN's reporting "rationally interpreted" Plaintiff's remarks.

In *Pape*, Time Magazine wrote an article about a government report. The article quoted from the report but did not make clear that certain incidents discussed there had merely been

---

[20] *Cf. United States v. Gonzalez-Zea*, 995 F.3d 1297, 1304 n.7 (11th Cir. 2021) (noting fallacy of "conflat[ing] the concepts of what … is necessary … versus what is sufficient"), *cert. denied*, 142 S. Ct. 506 (2021).

alleged in a lawsuit. The Court held that, because the report was "extravagantly ambiguous," and because the article was a "rational interpretation" of it, Time did not act with actual malice. The Court emphasized that the "considerations" underlying the actual malice rule "apply with even greater force to the situation where the alleged libel consists in the claimed misinterpretations of the gist of a lengthy government document," warning that "[w]here the document reported on is so ambiguous as this one was, it is hard to imagine a test of 'truth' that would not put the publisher virtually at the mercy of the unguided discretion of a jury." *Id.* at 287, 291.[21] Following the Supreme Court's lead, courts around the country repeatedly "have held that a plaintiff does not create a jury issue of actual malice by demonstrating that a publisher misinterpreted his source material." *Liberty Lobby, Inc. v. Anderson*, 1991 WL 186998, at *8 (D.D.C. May 1, 1991) (citing *Pape*, 401 U.S. at 290).[22] "These cases establish that when a writer is evaluating or giving an account of inherently ambiguous materials …, the First Amendment requires that the courts allow latitude for interpretation." *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 315 (D.C. Cir. 1994).

Here, as in *Pape* and its progeny, Plaintiff's response was ambiguous – certainly "every single word of it can't be parsed," as Plaintiff himself noted. Ex. 17 at 402:6-11. Plaintiff admits the Response was "spontaneous, that he misspoke and that "people misunderst[ood]" and "made

---

[21] Later, in *Bose*, the Court held that, in a product review of a speaker system, inclusion of the allegedly false characterization about the way it sounded could not raise an inference of actual malice. The Court "refused to permit recovery for choice of language which, though perhaps reflecting a misconception, represented 'the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies.'"

[22] *See, e.g.*, *Talley v. Time, Inc.*, 923 F.3d 878, 900 (10th Cir. 2019) (holding that plaintiff had not shown actual malice where, "[a]t most, the Defendants misinterpreted the statement" of an interviewee) (collecting cases); *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 296 (4th Cir. 2008) (holding that, where information on defense contractor from sources was "susceptible to at least two rational interpretations," then the adoption of one such interpretation did not constitute reckless disregard for the truth); *Freedom Newspapers*, 168 S.W.3d at 850 (granting summary judgment where plaintiff political candidate "never used the explicit words stated in the ... article," but "the standard is whether that summary was a rational interpretation of what he said"); *Zimmerman*, 2014 WL 3731999, at *8 ('rational interpretation doctrine" set forth in *Pape* and *Bose* "precludes, as a matter of law, a finding that the [defendant's] description of the non-emergency call as containing a 'racial epithet' was disseminated with actual malice," given that "[t]he tape recording itself is, at best, ambiguous).

mistakes about" what he meant. *Id.* at 402:6-11, 415:9-23, 432:19-24. And before any of the CNN speakers said anything about the Response, other media organizations, social media users, Congressmen, and people across the political spectrum offered interpretations of it, including many that agreed with CNN's interpretation. *See, e.g.*, Ex. 132 (headline in *The Week*: "Alan Dershowitz just argued presidents can do whatever they want to get re-elected"); 56.1 ¶¶ 34, 36.[23]

CNN's interpretation, even if somehow incorrect, was plainly "rational."[24] Plaintiff's central claim rests on the alleged "omission" of the Illegal Quo Line by CNN – a line that he admits was not exactly what he intended to say. Ex. 17 at 397:3-10. But the notion that excluding one line of allegedly qualifying material from a source suggests actual malice has been explicitly rejected by courts. *See, e.g., Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos.* 30 F. Supp. 2d 1182, 1196–97 (D. Ariz. 1998) (plaintiff's "add[ing] qualifications regarding … his statement" not enough to "render … paraphrase of his statement irrational"), *aff'd*, 306 F.3d 806 (9th Cir. 2002). This is particularly so where, as here, the purported "qualification" is itself ambiguous. *See Flowers v. Carville*, 310 F. Supp. 2d 1157, 1164–65 (D. Nev. 2004) ("[a]t most the qualifying language … made the reports ambiguous," and "Defendants' statements are a rational interpretation of that ambiguity"); *In re Storms v. Action Wisconsin Inc.*, 750 N.W.2d 739, 751–54 (Wis. 2008)

---

[23] A number of the speakers were aware of this fact. *See, e.g.,* Ex. 11 (Lockhart) at 89:17-25 (noting that "judging from comments [he] saw on Twitter, many others" shared his interpretation); Ex. 5 (Begala) at 188:25-189:4 ("I'm not the Lone Ranger. … Lots and lots of people … heard it the way I heard it.").

[24] These statements are also privileged. The media has "a qualified privilege to report on matters brought out in public proceedings." *Ortega v. Post-Newsweek Stations, Fla., Inc.*, 510 So.2d 972, 975 (Fla. 3d DCA 1987). "It is not necessary that [the report] be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings." *Woodard v. Sunbeam Television Corp.*, 616 So.2d 501, 503 (Fla. 3d DCA 1993) (quoting Restatement (Second) of Torts § 611 cmt. f (1977)). Because the statements were a supportable interpretation of the Response, the fair report privilege should apply. This Court's decision, at the motion-to-dismiss stage where Plaintiff's allegations must be accepted as true, does not preclude a finding of fair report at summary judgment. *See Miller v. Gizmodo Media Grp.*, LLC, 407 F. Supp. 3d 1300, 1311 (S.D. Fla. 2019) (finding fair report because "[s]ummary judgment presents a higher bar" and such finding was not precluded by contrary ruling at the motion-to-dismiss stage), *aff'd*, 994 F.3d 1328 (11th Cir. 2021). At the motion-to-dismiss stage, the Court did not have the full record that it has now.

("admonition" in pastor's sermon did not make the defendant's interpretation of the sermon irrational where "[i]t is unclear what [the pastor] meant by the admonition").

Plaintiff himself admits he misspoke when he said that an illegal "quo" could make the "quid pro quo" unlawful, but said nothing about what would happen if the "quid" were "illegal." And Plaintiff could not adequately explain the distinction he was trying to draw between "unlawful" and "illegal." Ex. 17 at 404:15-407:23. It's no wonder then that CNN's witnesses found that line confusing, and pointed out that it's a nonsensical tautology.[25] Far from clarifying his Response, the Illegal Quo Line only made it murkier.[26]

Even if that line made any logical sense, it is not at all apparent – and certainly not explicitly stated – that this single line stated once at the beginning of his five-minute long Response qualified the Public Interest Argument. As Anderson Cooper aptly summarized, "[i]f he wanted to qualify it all with that sentence, he would have put them together." Ex. 8 at 88:15-89:7.[27] The two are in entirely separate paragraphs separated by a discussion of motive. And Plaintiff never said that the Illegal Quo Line overrode – or was even connected to – his broader argument that a politician acting in his own electoral interest would make impeachment improper.[28]

---

[25] *See, e.g.*, Ex. 5 at 152:6-9 (Begala: "[H]e said if the quo is illegal, then it's unlawful. And I'm sorry …, but my answer to that is, duh."); *see also* The Late Show With Stephen Colbert, YouTube, https://youtu.be/cXXPRImhn_E, at 6:14-:36 ("So, the only way it would be illegal is if it's…*illegal*.").

[26] Plaintiff was not making an abstract argument – he was defending Trump against removal from office for withholding congressionally authorized funds from Ukraine unless Zelenskyy announced an investigation into Joe Biden. That action had been determined by the U.S. Government Accountability Office to be illegal. Ex. 33.

[27] *See also* Ex. 8 (Cooper) at 90:17-92:10 ("I think it is hard to expect any reader or listener to equate one confusing sentence in which he is not talking about crimes, he is not talking about bribery …[I]t seems like a weird way to phrase something that seems so important."); Ex. 5 (Begala) at 148:24-149:21 ("If he had carefully roped off criminal conduct, it would be a very different standard…."); Ex. 6 (Berman) at 105:5-22 ("He didn't say that when he was making those two statements, he didn't qualify that exactly; that's not how I heard it when he said it out loud.").

[28] Tellingly, when Plaintiff has tried to summarize his argument after the fact, he takes pains to make the qualification much more explicit. For example, at his deposition, he characterized his "basic thesis" as being that "If a president engages in a *lawful constitutionally authorized* quid pro quo, the fact that he had mixed motives does not turn an *innocent* act into an impeachable act," Ex. 17 at 388:23-389:16 (emphasis added); *see also id.* at 390:12-17, 392:12-23. Of course, the Response he delivered on the floor of the Senate included none of these qualifications.

Even if the Illegal Quo Line made logical sense *and* qualified everything that followed, the final paragraph of the Response – misquoted in the Congressional Record – further reinforces that the statements are a rational interpretation of the Response. Plaintiff's Response culminated with the Greatest President Argument. As Berman pointed out, this sentence "doubles down" on the Public Interest Argument, and supports the speakers' reasonable interpretation that Plaintiff was advocating for his client that any action taken in a president's political interests is not impeachable. *See, e.g.*, Ex. 6 at 107:11-110:5, 114:15-116:16.[29]

Indeed, all of the other speakers also testified they reviewed the Response and believed their interpretation was grounded in the words Plaintiff spoke, and none of the speakers understood the Illegal Quo Line to contradict their interpretation. Specifically, Milgram testified that, "based on all of what [Plaintiff] said … and [her] legal training and experience," she reached the "opinion … that [Plaintiff] essentially said that a president could do virtually anything and avoid impeachment so long as they were acting in what they believed was the public interest." Ex. 16 at 44:14-45:20. Cooper noted that "everybody across the political spectrum focused on [Plaintiff] with this unveiling of this new rationale" to oppose impeachment, and that he did not understand Plaintiff to be qualifying his more "dramatic" Public Interest and Greatest President Arguments with the single Illegal Quo Line "several paragraphs" earlier. Ex. 8 at 86:15-87:3. Begala explained, "I did not hear Professor Dershowitz to say if the President is acting in his reelection interest and his action is not a criminal offense it's okay. I did not hear him say that. In fact, I heard the opposite." Ex. 5 at 148:24-149:21. Lockhart emphasized that, from his "political perspective," Plaintiff's argument "was going to make this standard [for impeachment] so impossible to reach that the President is not going to be held accountable." Ex. 11 at 48:22-50:23. In the end, the most

---

[29] Berman emphasized that "two times" during the Response Plaintiff seemed to be "establishing a new, expansive view" of what a president running for re-election can do "and have it not be impeachable." Ex. 6 at 107:11-24.

Plaintiff could say is that the speakers simply misunderstood his statements. But given the ambiguity of the Response (which many of the witnesses noted),[30] a rational – even if incorrect – interpretation cannot and does not constitute actual malice.[31]

## II. The Statements Constitute Non-Actionable Expressions of Pure Opinion

Plaintiff's claim fails not only because he cannot show actual malice but also because the record establishes that the statements are not actionable because they are expressions of opinion, not fact. At the motion to dismiss stage, this Court held that determining whether the statements constituted pure opinion – though a question for law for the Court – "require[d] a more fully developed record." MTD Op. at 16. Now that there is such a record, it is clear the statements are non-actionable opinion. "A false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So.2d 593, 595 (Fla. 4th DCA 1983). "[S]tatements that are not readily capable of being proven false, and statements of pure opinion are protected

---

[30] *See, e.g.*, Ex. 7 (Burnett) at 83:16-20 ("I would say Mr. Dershowitz made several, many arguments, some of which contradicted each other during his presentation."); Ex. 11 (Lockhart) at 53:11-16 ("I remember watching this in realtime and focusing on the entirety of it, and …, being mostly influenced by the end, which was incredibly confusing to me where he talked about mixed motives, and things that just made no sense to me."); Ex. 8 (Cooper) at 59:5-25 (explaining that, on his show, he was "expressing surprise at this new argument and confusion about it").

The fact that Berman stated during his commentary that "Dershowitz wasn't ambiguous here" (Ex. 36 at 7) does not remove his statements from the *Pape* framework, which is not limited to situations where a commentator is equivocal about what the underlying source said. To the contrary, the very issue in *Pape* was that the defendant made a "deliberate choice" to interpret the government report to be asserting facts about the plaintiff police officer. 401 U.S. at 290. Because that deliberate choice was "one of a number of possible rational interpretations of a document that bristled with ambiguities," the Court was unwilling to infer actual malice. *Id.* Here, Berman was undoubtedly "deliberate" in interpreting that Plaintiff "was arguing in what when you are were running for re-election committing acts … if you believe that getting re-elected is in the public interest your actions cannot be impeachable." Ex.6 at 108:3-8. But that does not make Plaintiff's actual Response so unambiguous that the Court can infer actual malice from Berman choosing an interpretation Plaintiff allegedly did not intend.

[31] In his Complaint, Plaintiff tried to liken this case to *Masson v. New Yorker*, in which the Supreme Court held that a writer placing words in quotation marks that an interview subject never said – and which "material[ly] change[d]" what the subject said – could be indicative of actual malice. 501 U.S. at 517. Plaintiff argued the decision allows him to recover because CNN made "changes [to] the meaning of what [he] said." Compl. ¶ 10. But *Masson* weighs *against* Plaintiff. Plaintiff is not claiming that CNN misquoted him – nor could he, since the clips depict Plaintiff speaking on the floor of the Senate. Rather, "he is arguing that CNN simply did not show *enough* of his Response and that the speakers misinterpreted his argument. But *Masson* explicitly reaffirmed "the protection for rational interpretation" of ambiguous sources laid out in *Pape* and *Bose*. 501 U.S. at 519.

from defamation actions by the First Amendment." *Turner*, 879 F.3d at 1262.[32] "When a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise, rather than claim[ing] to be in possession of objectively verifiable false facts, the statement is not actionable.'" *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (citation omitted). "'Commentary or opinion based on facts that are set forth in the article or which are otherwise known or available to the reader or listener are not the stuff of libel.'" *Turner v. Wells*, 198 F. Supp. 3d 1355, 1366 (S.D. Fla. 2016) (citation omitted), *aff'd*, 879 F.3d 1355.

In deciding whether a statement is one of opinion, the court must "examine the statement in its totality and the context in which it was uttered or published." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379-80 (S.D. Fla. 2006) (citation omitted); *see also Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (calling an anti-abortion activist an "accomplice" to the recent murder of an abortion doctor was not actionable). "Statements made in the course of a political debate are … more likely to be understood as opinion." *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1433 (8th Cir. 1989); *see also Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1017 (1st Cir. 1988) ("In the charged context of a debate over a matter of public concern, the reader will expect a certain amount of hyperbole and loose characterization – in short, a certain amount of opinion.").

Here, with the benefit of a full record, it is clear the statements are opinion. The statements appeared in panel discussion programs and an op-ed that were overtly commenting on the impeachment trial. And the statements themselves are laced with language that informs "any reasonable reader [or viewer] that the conclusions contained within were the [speakers'] opinions." *Turner*, 198 F. Supp. 3d at 1367-68.

- The **Milgram/Cooper Statements** contain rhetorical language including "would make the President a king" and it's a "real head scratcher." Ex. 53 at 3-4.

---

[32] *See also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20-21 (1990).

- The **Lockhart Statement**, which uses language like, "un-American," and "what you hear from Stalin, … Mussolini, … Hitler,"" is quintessential "rhetorical hyperbole." *Milkovich*, 497 U.S. at 20. *See, e.g., Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir.1976) (use of term "fascist" is protected opinion"); *Daly v. Morris Publ'g Grp., LLC*, 2009 WL 5876239 (Fla. 4th Cir. Ct. Mar. 17, 2009) (collecting cases in which courts rejected claims based upon comparisons to Adolf Hitler, and other infamous Nazi war criminals).

- The **Begala Statement** appears in an opinion column within a section of the CNN website called "Political Op-Eds Social Commentary," and includes an Editor's Note stating that Begala is a "Democratic strategist and CNN political commentator," and "[t]he opinions expressed in this commentary are his." Ex. 144 at 1. It also uses subjective language ("bonkers," "ludicrous") that could never be proven true or false. *Id.* at 2.

- The **Berman Statement** uses rhetorical hyperbole such as "the president's defense team seems to be redefining the powers of the president, redefining them towards infinity," and that the argument Plaintiff "seems" to be making "blows your mind." Ex. 36 at 6.

In short, the statements bear the hallmarks of opinion. Plaintiff, however, has argued that, despite this context, they are stripped of their constitutional protections for two reasons.

*First*, he argues by omitting the Illegal Quo Line from the clips, CNN did not fully disclose underlying facts. But under Florida law, "for an opinion to be pure and non-actionable, it need not necessarily be based upon facts that the communicator sets forth explicitly in the exact publication – facts 'otherwise known or available to the reader or the listener as a member of the public' will suffice." *Tillett v. BJ's Wholesale Club, Inc.*, 2010 WL 11507322, at *6 n.12 (M.D. Fla. July 30, 2010) (citation omitted); *see also Zambrando v. Devanesan*, 484 So.2d 603, 606 (Fla. 4th DCA 1986) (statement is on of "pure opinion where the facts are already known to the audience."). In *Rasmussen v. Collier County Publishing Co.*, the court held the defendant's editorials were opinion because they were "based on facts disclosed in the articles themselves or in the extensive coverage that [defendant] afforded to the … controversy." 946 So. 3d 567, 571 (Fla. 2d DCA 2006). In *From v. Tallahassee Democrat, Inc.* the court held that statements criticizing the plaintiff's performance as a tennis pro were pure opinion because they were based on facts known in the Tallahassee tennis

community" at the "Winewood Country Club." 400 So.2d 52, 57 (Fla. 1st DCA 1981). And in *Hay v. Independent Newspapers, Inc.*, the court held calling Plaintiff a "crook" was opinion based in part on facts in the article and in part on facts "known or readily available to the reader as a member of the public." 450 So. 2d 293, 295 (Fla. 2d DCA 1984).[33]

Here, there is no question that the facts on which the speakers based their opinions were known to the public. It is not reasonable for Plaintiff to contend that arguments made on the floor of the U.S. Senate – and aired in their entirety live on CNN – are somehow undisclosed. The impeachment trial was the most important news story in America at the time, and it received coverage across all media, including network and cable TV stations, newspapers, online and even ordinary social media users. 56.1 ¶¶ 23-25. Plaintiff's Response, in particular, was indisputably one of the biggest stories that day, and, even before the CNN statements, was highlighted by coverage from countless news organizations – much of which agreed with CNN's interpretation. *Id.* ¶¶ 34-39. The underlying "facts" that form the basis of the statements (including the Response in full) were indisputably fully "available" from both CNN and countless other media outlets and sources – far more so than the coverage of a local crime story in *Rasmussen*, the publicly available legal filings in *Hay*, or the "tennis pro's situation at the Winewood Country Club" in *From*.

**Second**, Plaintiff argues that the statements were not opinion because they contain a false fact – *i.e.* he claims the statements falsely attribute to him the argument that a president can commit crimes and not be impeached so long as he acted in his electoral interest. Compl. ¶ 8. But this alleged "fact" is a reasonable interpretation of the Response, in which he admits he "slip[ped]" up and of which he concedes "every single word… can't be parsed together." The statements are

---

[33] *See also Fortson*, 434 F. Supp. 2d at 1382; *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917, 923–24 (M.D. Fla. 1996) (opinion where article both disclosed facts and referred to lawsuit "which is a 'readily available' matter of public record just as the *Hay* plaintiff's criminal charge was").

therefore protected opinion. *See, e.g.*, *Moldea*, 22 F.3d at 315. In *Moldea*, the court held "when a reviewer offers commentary that is tied to the work being reviewed, and that is a supportable interpretation of the author's work, that interpretation does not present a verifiable issue of fact that can be actionable in defamation." *Id*. at 313. The *Moldea* court addressed whether a book review attacking the quality of the plaintiff's journalism were actionable as opinion. The Court first emphasized this was "a genre in which readers expect to find spirited critiques of literary works that they understand to be the reviewer's description and assessment of texts that are capable of a number of possible rational interpretations." *Id.* at 311-12. The court then held the review was "actionable only when the interpretations are unsupported by reference to the written work." *Id.* at 315, 317-19. *See also Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995) ("personal interpretation of the available information and not a verifiable factual assessment").

The statements at issue here are just like the commentary at issue in *Moldea*. Panel discussion shows and op-eds are genres the public understands contain subjective interpretations of events, not unlike book reviews commenting on a work. And, as discussed above, the statements were indisputably "tied to" and contain a "supportable interpretation" of the Response for the same reasons that they represent a "rational interpretation" under *Pape*.

Ultimately, the clips contain video of arguments Plaintiff made on the floor of the Senate in defense of the President, and the statements constitute a discussion of those arguments. CNN and its commentators *should* be discussing the Response. For "whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Ala.*, 384 U.S. 214, 218 (1966). The speakers' statements make clear they were speaking out because they believed Plaintiff was making an argument that was "surprising" (Cooper) and

"blows your mind" (Berman), but also one they believed was "dangerous" (Begala), "un-American" (Lockhart), and would make the President a "king" (Milgram). As Lockhart explained, "I was concerned about our democracy, and sometimes alarm bells … need to be rung." Ex. 11 at 102:12-21. Plaintiff himself has made a career exercising his freedom to express his views, including during the impeachment trial where he assailed other legal scholars for making arguments "influenced by their own bias, by their own politics." Ex. 29 at S671. Both CNN's speech and Plaintiff's speech are entirely in keeping with the reality that "[t]he arena of political discourse can at times be rough and tough." *Zherka v. Amicone,* 634 F.3d 642, 647 (2d Cir. 2011); *see also Edwards v. Schwartz*, 378 F. Supp. 3d 468, 514 (W.D. Va. 2019) (one who "enter[s] a political arena … must 'accept the banging and jostling of political debate'"). Defamation claims have no place in that arena. The statements are opinion and summary judgment should be granted.

## III.    Plaintiff Cannot Prove Damages

This Court should grant summary judgment on the separate ground that Plaintiff, who is required to prove that he was damaged by the statements, will never be able to show that the statements were the proximate cause of his reputational damage. *Anheuser-Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266-67 (11th Cir. 2003) (affirming dismissal of defamation claims because plaintiff failed to prove actual damages); *see also Egwuatu v. Burlington Coat Factory Warehouse Corp.*, 2011 WL 2413833, at *5 (M.D. Fla. June 10, 2011) ("[n]o evidence in the record supports [plaintiff's] claim of damages resulting from any alleged defamatory statement made by [defendant]"). That's because Plaintiff has already claimed his reputation was destroyed by numerous factors *besides* the statements.[34] In January, he testified under oath that his entire

---

[34] Just months ago, Plaintiff wrote "Three events occurred over the past several years that resulted in my cancellation by many individuals and institutions. They are as follows (1) I defended President Trump against what I believe was an unconstitutional impeachment; (2) I defended Jeffrey Epstein and helped him get a favorable plea bargain; (3) I was falsely accused of having sex with a woman, connected to Epstein, who I never met. These are the only three

reputation – professional and personal – was "destroyed" by Virginia Giuffre's allegations. And as long ago as 2018, he lamented that he had been ostracized for his Trump support. 56.1 ¶ 12. Even as to the Response itself, it had been lambasted by just about everyone who watched, before any of the statements were published by CNN. *See Id.* ¶¶ 34-39. For this reason alone, he will never be able to bear his burden of proving the statements as opposed to all the other things he has talked about was the proximate cause of his damaged reputation.

In addition, Florida law recognizes a distinction between a claim of defamation *per se* and defamation *per quod*. A statement is considered defamatory *per se* where, "considered alone and without innuendo" it conveys a defamatory meaning. *Aflalo v. Weiner*, 2018 WL 3235529, at *2 (S.D. Fla. July 2, 2018). A statement is defamatory *per quod* when "explanation of context" is necessary to "demonstrate the defamatory meaning." *Scobie v. Taylor*, 2013 WL 3776270, at *2 (S.D. Fla. July 17, 2013). Under either rubric, Plaintiff cannot prove damages.

If the claim is one for libel *per quod*, Plaintiffs' claim fails because he cannot prove special damages. *Daniels v. HSN, Inc.*, 2020 WL 533927, at *6 (M.D. Fla. Feb. 3, 2020).[35] "Special damages are actual, out of pocket losses which must be proven by specific evidence as to the time, cause and amount," which Plaintiff has not even *pleaded. Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004). Indeed, he expressly *disclaimed* any claim for damages based on lost wages or economic opportunities. 56.1 ¶ 105. The only even remotely "out of pocket" loss that he tries to claim are ████████████████████████████████ ████████████████████████████████ This is not the type of harm that qualifies as special

---

events that would possibly explain the cancellations." Ex. 73 at 29.

[35] The allegedly defamatory sting at issue in this case is that CNN made Plaintiff look like an "intellectual who had lost his mind." Compl. ¶ 8. But in order to have an opinion on the soundness of Plaintiff's argument, a viewer would need to have knowledge of (a) the text of the U.S. Constitution, and (b) the scholarly and/or political consensus on how the clause should be interpreted. That this broader context is necessary makes this an action for defamation *per quod*.

damages.[36] And, in any event, based on the evidence in the record, Plaintiff cannot establish these losses were proximately caused by the alleged defamation. *See Falic*, 347 F. Supp. 2d at 1268–69.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████

Even if Plaintiff's claim were construed as one for defamation *per se*, he has not met his burden of establishing actual damages. Under the common law, courts presumed general damages with a *per se* claim; under Florida Supreme Court law, however, there are no presumed damages where the claim is asserted against a "media defendant." *See Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) ("Florida law … eliminates presumed damages for defamation *per se* actions against media defendants") (citing *Mid-Florida Television Corp. v. Boyles*, 467 So.2d 282 (Fla. 1985)); *see also Edelstein v. WFTV, Inc.*, 798 So.2d 797, 797-98 (Fla. 4th DCA 2001) (affirming dismissal for failure to "plead and prove actual injury" in case against media defendant); *Blake v. Giustibelli*, 182 So.3d 881, 884-85 (Fla. 4th DCA 2016). Here, as discussed above, Plaintiff has not and cannot prove that his reputation was harmed by CNN's reporting – as opposed to all the other things he alleges caused him to be "cancelled" or "damaged every part of his life." For this, independent reason, the Court should grant summary judgment.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), CNN respectfully requests oral argument on this motion.

---

[36] █████████████████████████████████████████████████████████████████

Because the motion raises important First Amendment considerations as well as evidentiary issues to which the Court alluded in its decision on CNN's prior motion to dismiss, CNN believes that oral argument would assist the Court's decision-making process. CNN estimates that a total of two to three hours will be required for argument

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed and served via the Court's CM/ECF portal on this 11th day of October, 2022 to Mark A. Schweikert, Esq., mark@schweikertlaw.com; Schweikert Law, *Counsel for Plaintiff*, 1111 Brickell Avenue, Suite 1550, Miami Florida, 33131, and to John B. Williams, Esq., jbwilliams@williamslopatto.com; Williams Lopatto PLLC, *Counsel for Plaintiff*, 1629 K Street, NW, Suite 300, Washington, DC 20006

> **GUNSTER, YOAKLEY & STEWART, P.A.**
> 450 East Las Olas Boulevard, Suite 1400
> Fort Lauderdale, Florida 33301
> Telephone: (954) 462-2000
> By: /s/ George S. LeMieux, Esq.
> George S. LeMieux, Esq.
> Florida Bar No. 16403
> Email:  glemieux@gunster.com
> Eric C. Edison, Esq.
> Florida Bar No. 010379
> Email: eedison@gunster.com
>
> **DAVIS WRIGHT TREMAINE LLP**
> Katherine M. Bolger, Esq.
> (*pro hac vice admitted*)
> Email: katebolger@dwt.com
> 1251 Avenue of the Americas
> New York, NY 10020
> Telephone: 212-489-8230
> *Counsel for Defendant Cable News Network, Inc.*