UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:20-CV-61872-AHS

ALAN DERSHOWITZ,

    Plaintiff,

v.

CABLE NEWS NETWORK, INC.,

    Defendant.
_____/

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

GUNSTER, YOAKLEY & STEWART, P.A.
George S. LeMieux, Esq.
Florida Bar No. 16403
Email: glemieux@gunster.com
Eric C. Edison, Esq.
Florida Bar No. 010379
Email: eedison@gunster.com
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
Telephone: (954) 462-2000

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger, Esq.
(*pro hac vice admitted*)
Email: katebolger@dwt.com
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 489-8230

*Counsel for Defendant Cable News Network, Inc.*

Pursuant to Local Rule 56.1, Defendant submit the following statement of undisputed material facts in support of their motion for summary judgment:

1. Plaintiff Alan Dershowitz is an emeritus professor at Harvard Law School. Declaration of Katherine M. Bolger Ex. 68[1]; Ex. 17 at 333:14-17.

2. Defendant CNN owns and operates numerous news platforms, including the television network CNN and the website CNN.com. *See* Bolger Decl. ¶ 1.

**Plaintiff Alan Dershowitz's Reputation**

3. As a practicing criminal lawyer, Plaintiff's client roster included, among other controversial figures, O.J. Simpson, Mike Tyson, Jeffrey Epstein, and Neo-Nazis. Ex. 17 at 96:21-97:8, 189:24-190:7; Ex. 69 at 4; Ex. 70. Plaintiff was criticized for, and received hate mail as a result of, these representations. Ex. 69 at 5; Ex. 71 at 3 ("Very few people were neutral about me: I had fans and detractors. People either loved or hated my proactive views and the ways in which I expressed them."); Ex. 19 at 34:12-18; Ex. 21 at 50:12-21.

4. Plaintiff enjoys being a controversial figure. *See* Ex. 72 at 4 ("Professionally, I was among the most controversial professors and lawyers in America. And I relished that status. I enjoyed being at the center of controversy for my ideas, principles and legal activities.")

5. In 2008, Plaintiff helped negotiate a favorable plea deal for Jeffrey Epstein in connection with charges that he had sexually abused multiple minor girls. Ex. 73 at 29; Ex. 69 at .

6. In 2014, one of Epstein's victims, Virginia Giuffre, publicly alleged that Plaintiff raped her. Ex. 17 at 47:5-48:8; Ex. 73 at 5.

7. As a result of the Giuffre allegations, Plaintiff received hate mail and numerous invitations to speak were rescinded. *See* Ex. 73 at 38-40; Exs. 71, 74-76.

---

[1] Unless otherwise noted, all exhibits are attached to the Declaration of Katherine M. Bolger filed herewith.

8. Plaintiff responded to the allegations by writing a book titled *Guilt by Accusation*, in which he wrote that "[m]y reputation has been trashed, my family has suffered, my retirement has been ruined, my health has been affected" as a result of the allegations. Ex. 72 at 1-2.

9. Plaintiff has brought libel claims or counterclaims concerning Ms. Giuffre's allegations in at least five separate lawsuits, including: *Edwards & Cassell v. Dershowitz*, No. CACE 15-00072 (Fla. Cir. Ct. Broward Cty.) (against two of Ms. Giuffre's prior lawyers); *Boies v. Dershowitz*, No. 160874/2019 (N.Y. Sup. Ct. N.Y. Cty.) (against one of Ms. Giuffre's lawyers); *Giuffre v. Dershowitz*, No. 1:19-cv-3377 (LAP) (S.D.N.Y.); *Dershowitz v. Netflix, Inc., et al.*, No. 1:21-cv-21961 (S.D. Fla.) (involving a documentary about Epstein); and *Dershowitz v. Non Stop Radio LTD, et al.*, No. 42329-09-20 (Isr. Civ. Ct. Bat Yam) (against a radio news broadcaster).

10. On October 15, 2015, Plaintiff was deposed in the *Edwards* case, where he testified that the Giuffre allegations were "career-destroying." Ex. 77 at 116:24, 117:6.

11. Over the course of more than nine days during 2022, Plaintiff was deposed in the Boies case, where he testified, among other things, that: "as a result of the false accusation," his "entire legacy" and "entire reputation" was destroyed. Ex. 78 at 349:11-15; *see also* Exs. 79-80.

12. Plaintiff has claimed his reputation was damaged because he had become a vocal advocate for Trump's "civil-liberties," and has declared himself a victim of "McCarthyism." Ex. 82; Ex. 73 at 47-48; *see* Exs. 81-94, 105, 115, 116.

13. Plaintiff was also publicly criticized for his shifting legal opinion on impeachment. *See* Ex. 104; Ex. 107 at 3-6; Exs. 107-108.

14. In 1998, Plaintiff had publicly argued that a president could be impeached even if no crime had been committed. Ex. 110 at 10.

15. In 2018, Plaintiff published *The Case Against Impeaching Trump* in which he

3

argued that a crime was required for impeachment. Ex. 17 at 136:24-137:11; Ex. 107 at 4; Ex. 95 at 7.

16. Then, in 2020, Plaintiff argued that a crime or what he termed "criminal-like behavior" was required for an act to be impeachable. *See* Ex. 104; Ex. 107 at 5-6.

17. Plaintiff concedes that his view is outside the mainstream of constitutional scholars of impeachment. Ex. 111 at 29 ("So I ask, Are you all alone on this? Is there some group of academics, or lawyers, who are behind you on your interpretation of the Constitution? Is there a body of thinkers behind you? Are you reinventing the interpretation of the Constitution? Dershowitz shakes his head. 'I have nobody. No,' he says."); Ex. 112 at S616.

18. Plaintiff's position was broadly criticized by scholars prior to his appearance in the Trump impeachment trial proceedings, including among individuals who were otherwise opposed to the impeachment, such as Professor Jonathan Turley, who later wrote that Plaintiff "is fundamentally wrong in maintaining that impeachable offenses must be based on actual crimes or "crime-like" conduct." Ex. 113; *see* Exs. 114, 127, 159.

**The First Impeachment Trial of President Trump & The Response**

19. In December 2019, the U.S. House of Representatives impeached President Trump based on findings that he withheld military funds from Ukraine in order to coerce President Zelenskyy to investigate Joe Biden, President Trump's political rival. *See* Ex. 117.

20. Trump asked Plaintiff to represent him on Christmas Eve 2019. Ex. 17 at 308:19-311:19.

21. The members of Plaintiff's family, especially his wife, Carolyn Cohen, were opposed to Plaintiff's representation of President Trump in the impeachment. Ex. 17 at 312:12-24; Ex. 18 at 91:1-2; Ex 19 at 28:6-7; Exs. 118-121.

22. The impeachment trial in the Senate began on January 22, 2020. *See* Ex. 122.

23. CNN aired and live-streamed the trial in its entirety. *See* Ex. 123; Ex. 15 at 43:2-6.

24. The presidential impeachment was the top news story during late 2019 and through the trial in January 2020. The proceedings were front-page news in national and local newspapers around the country, and were covered extensively – and live-streamed – not only by CNN but numerous network and cable news outlets. *See* Exs. 124-126.

25. The impeachment proceedings remain available to be streamed from the YouTube channel of the Washington Post and from C-SPAN's website.

26. On January 27, 2020, Plaintiff presented his opening statement. *See* Ex. 112; Ex. 17 at 345:17-25.

27. Plaintiff's position was criticized in prominent outlets after his opening statement; he received many critical emails from strangers. Exs. 128-129, 156; Ex. 17 at 324:5-331:5.

28. Although he had not intended to appear again before the Senate, he returned on January 29, 2020 to answer questions from senators ("The Q&A"). *See* Ex. 17 at 374:8-375:4.

29. Cohen, did not want him to stay for any further proceedings beyond those on January 27 and was angry when he did so. Ex. 18 at 139: 24-140:19; Ex. 17 at 375:5-7; Ex. 154.

30. On January 29, 2020, at approximately 2:10 p.m. EST, Plaintiff responded to Senator Ted Cruz's question: "[a]s a matter of law, does it matter if there was a quid pro quo? Is it true that quid pro quos are often used in foreign policy?" Ex. 29 at S650-651 (the "Response"); Bolger Decl. ¶ 33.

31. Plaintiff concluded his Response by saying: "But a complex middle case is: I want to be elected. I think I am a great President. I think I am the greatest President there ever was, and if I am not elected, the national interest will suffer greatly. That cannot be an impeachable offense."

5

Ex. 29 at S651; Ex. 30 at 16:26. The Congressional Record omitted the words "an impeachable offense" from the transcript of the end of Plaintiff's Response, but the video recording of the Response makes clear that Plaintiff did in fact say those words. *Id.*; Bolger Decl. ¶ 34.

32. Plaintiff did not have prepared remarks for the Q&A and the Response was a spontaneous answer. Ex. 17 at 402:6-11. He also testified that he misspoke at points during his Response and acknowledged that people "made mistakes" about his argument. *Id.* at 397:3-10, 392:2-393:23, 404:15-407:23, 415:9-23, 432:20-21.

33. Congressman Adam Schiff, who was serving as a House manager, expressed outrage at Plaintiff's Response from the Senate floor. Ex. 29 at S651.

34. Dershowitz's Response alarmed a number of Republican senators, including Sen. Roy Blunt, who told Trump's team afterward to fire Dershowitz on the spot. Ex. 155.

35. The Response received widespread coverage. *See* Ex. 2 at ¶ 25; Ex. 4 at ¶ 26.

36. Media outlets reporting on the Response focused on the portion of the Response defined in the Bolger Declaration as the "Public Interest Argument." Exs. 130 at 15; 131 at 2, 10, 12; 132-136; 157-158; 160.

37. Verified Twitter users also condemned Plaintiff's argument and his expansive view of presidential power. Ex. 137.

38. A survey of all verified Twitter users that mentioned Plaintiff's name or Twitter handle in the hours after he gave his Response showed overwhelmingly negative sentiment about the Response before the publication of the first allegedly defamatory statement at 6:33 p.m. *See* Ex. 103 at 11-13; Ex. 102 (Spreadsheet of Extracted Tweets).

39. Plaintiff received emails criticizing his argument prior to any of the CNN statements at issue. Ex. 138.

40. At 4:23 p.m., Plaintiff's daughter Ella Dershowitz sent text messages to her mother that said: "Did dad actually say" that "if you believe it's in the country's best interest for you to be president you can do whatever to make that happen." Ex. 139.

**Defendant CNN and Its Reporting on the Response**

41. On January 29, 2020, CNN contributor Anne Milgram (former Attorney General for the State of New Jersey and now head of the Drug Enforcement Administration), appeared on Anderson Cooper's online program, Anderson Cooper Full Circle ("ACFC") to discuss the impeachment trial. Ex. 52; Ex. 48.

42. Chuck Hadad, a supervising producer for ACFC, was responsible for putting together the Full Circle clip. Ex. 2 ¶¶ 2-3. He had watched the impeachment trial live and thought that the Response was newsworthy. *Id*. ¶ 12; Ex. 9 at 27:24-28:19.

43. The Response was too long for a single sound bite, so Hadad worked with a production assistant to cut down the clip. Ex. 9 at 50:15-22; Ex. 2 ¶¶ 14-17; Ex. 41.

44. Based on his years of experience and editorial judgment, Hadad felt that the Response was newsworthy and, accordingly, focused the Full Circle clip around the Public Interest Argument with additional statements from the Response that followed. Ex. 2 ¶¶ 18-19.

45. No one instructed Hadad to exclude the Illegal Quo Line from the Full Circle clip; he did so because he did not understand the sentence to qualify the Public Interest Argument. Ex. 2 ¶¶ 23-24.

46. Hadad and Cooper each believed that the Full Circle clip was fair and accurate. Ex. 9 at 52:9-23, 56:8-13; Ex. 2 ¶¶ 4, 18, 37. Ex. 8 at 48:3-8.

47. Hadad also supervised the drafting of the questions that Cooper ultimately posed to Milgram. Ex. 47; Ex. 2 ¶¶ 25, 28-32.

48. Cooper and Milgram actively followed the impeachment proceedings as they unfolded, and watched the Response in full, and each believed the Response (and the portion included in the Full Circle clip in particular) was newsworthy. Ex. 8 at 44:4-9, 86:15-87:3; Ex. 16 at 48:18-20, 65:19-66:7.

49. Cooper thought that Plaintiff's argument was different than any of the theories on impeachment that Plaintiff had advanced previously. Ex. 8 at 58:19-59:25, 82:22-83:15.

50. Cooper found Plaintiff's argument ambiguous at points. Ex. 8 at 59:5-22; 84:2-10; 90:17-92:10.

51. Milgram understood the Response to advocate for expansive presidential power. Ex. 16 at 33:5-14. Milgram's opinion was formed by watching the impeachment proceedings and the "totality of" Plaintiff's statements, and not by the clip that ran during the ACFC episode. *Id.* at 53:2-15.

52. At approximately 6:33 p.m. the ACFC clip was shown and Cooper and Milgram discussed the Response. Bolger Decl. ¶ 56; Ex. 52 at 3:07; Ex. 53; Ex. 48.

53. At the time she made the statements, Milgram believed her statements were fair and accurate, and still believes that to be the case. Ex. 16 at 58:2-5.

54. Cooper and Hadad each believed Milgram's statements were fair and accurate. Ex. 8 at 82:14-19; Ex. 9 at 117:18-22.

55. On January 29, 2020, Joe Lockhart, CNN contributor and former press secretary for President Bill Clinton, appeared on Erin Burnet OutFront ("EBOF") as a Political Commentator. Ex. 64 at 5; Ex. 11 at at 24:15-22.

56. Susie Xu was the Executive Producer of EBOF. Ex. 4 ¶ 3.

57. Xu had watched the Response live and believed in her independent editorial

judgment that it was newsworthy. Ex. 14 at 25:22-27:4; Ex. 4 ¶ 11. This belief was reinforced by watching Wolf Blitzer and Jake Tapper's coverage of the impeachment trial. *Id*. ¶ 15.

58. Specifically, at approximately 3:38 p.m. during the first recess in the proceedings that followed Plaintiff's delivery of the Response, Blitzer and Tapper discussed the Response and quoted a portion of the Public Interest Argument on air. Ex. 4 ¶ 15. There was no video clip of the Response shown in conjunction with this discussion. Ex. 3 ¶ 29; Ex. 56 at 38:21; Ex. 57 at 3-4.

59. Xu directed a member of her staff to cut a clip of the Response to align with, but expand on, Blitzer and Tapper's coverage. Ex. 4 ¶ 17. This clip included the Public Interest Argument in full. *Id*.; Ex. 66. Xu did not believe that the Illegal Quo Line qualified or altered the meaning of the Public Interest Argument. Ex. 4 ¶¶ 24-25.

60. Xu believed that the EBOF clip was fair and accurate. Ex. 14 at 113:10-23;131:24-132:5; Ex. 4 ¶¶ 4, 18, 28.

61. Burnett, who watched the impeachment proceedings live, also thought that the EBOF clip was fair and accurate. Ex. 7 at 99:15-16; 100:10-18; 102:5-17.

62. Lockhart had watched the impeachment trial live and posted opinions about the Response on Twitter while he was watching in real time. Ex. 11 at 39:9-41:5; 44:6-9; Ex. 63. He formed these opinions, and wrote his tweets, without any input from anyone at CNN. Ex. 11 at 41:6-12, 75:4-17; Ex. 7 at 119:3-8.

63. Lockhart testified that Plaintiff's argument set off "alarm bells." Ex. 11 at 103:12-19. He also testified that he thought the argument was, at times, confusing. *Id*. at 53:10-16.

64. At 7:09 p.m., Lockhart, Erin Burnett, Scott Jennings, and two legal analysts discussed the Response. Ex. 67 at 4-6; Ex. 66 at 9:23.

65. At 7:11 p.m., Lockhart commented on the Response on EBOF. The opinions he

9

expressed were based on watching the impeachment trial, and hearing Plaintiff's full Response, and not by the clip of the Response shown on EBOF during his appearance. Ex. 11 at 52:24-53:4, 64:7-11, 82:21-83:24.

66. Lockhart believed then, and believes now, that his interpretation of Plaintiff's Response was accurate, and he conveyed an argument and opinion that he believed was (and is) appropriate in light of Plaintiff's Response. Ex. 11 at 46:4-18, 64:7-9.

67. Neither Xu nor Burnett believed that Lockhart's interpretation was inaccurate or unreasonable. Ex. 14 at 84:19-85:3; Ex. 7 at 96:22-97:17, 102:10-17, 103:19-20.

68. At 4:41 p.m., CNN opinion editor Pat Wiedenkeller contacted CNN contributor Paul Begala by email to solicit an opinion piece for CNN.com about the Response. Ex. 140. Wiedenkeller had watched the impeachment trial and believed that the Response was newsworthy. Ex. 13 at 37:10-11; 62:20-63:20.

69. Begala had watched the impeachment trial – and Plaintiff's Response – live and also believed that the Response was newsworthy. Ex. 5 at 61:1-12, 82:6-19, 100:12-101:10.

70. Begala found Plaintiff's argument "dangerous." Ex. 5 at 159:18-21. He found the Illegal Quo Line to be meaningless. *Id*. at 152:6-9.

71. At 4:01 p.m. he had tweeted his reactions to the Response, which he believed to be setting a dangerous precedent. Ex. 141; *see also* Ex. 5 at 157:16-18. His opinion on the Response was based on his interpretation of the statements made by Plaintiff in the Response, and was not influenced by anyone at CNN. *Id.* at 117:16-118:25.

72. Begala responded to Wiedenkeller's email and proceeded to draft his article. Ex. 142. He was not told by anyone at CNN what to say in his column. Ex.5 at 90:10-23

73. After he submitted a draft to Wiedenkeller, the final, edited Begala column was

published on CNN.com at 8:56 p.m. Ex. 143; Ex. 144.

74. The Begala column appeared in a section of the CNN website called "Political Op-Eds Social Commentary," and includes an Editor's Note stating that Begala is a "Democratic strategist and CNN political commentator," and "[t]he opinions expressed in this commentary are his." Ex. 144.

75. Begala believed that statements made in his column were fair and accurate, and stands by his interpretation of the Response and his opinions. Ex. 5 at 61:17-20; 124:11-14.

76. Wiedenkeller believed that the Begala column reflected a reasonable opinion about the Response. Ex. 13 at 97:6-13.

77. After the Begala column was published online, a video clip containing the Public Interest Argument was added to the top of the page containing the column. Ex. 59; Ex. 3 ¶ 3. This clip was created by Brett Harman, a video programming producer at CNN. *Id*.

78. Harman was not involved in placing the clip on the webpage with the Begala Column. Ex. 3 ¶ 5.

79. Harman selected the clip based on his independent editorial judgment and believed that it was fair and accurate. Ex. 10 at 149:25-150:18; Ex. 3 ¶¶ 4, 28.

80. Harman believed that the Public Interest Argument was newsworthy and wanted to use the same portion of the Response discussed by Jake Tapper, but wanted to include more of the language than the precise portion that Tapper had quoted on air in order to give the viewer more context. Ex. 3 ¶¶ 14-21; Ex.10 at 149:25-150:18. No one told him which portions of the Response to use (or not to use). Ex. 3 ¶ 27.

81. Harman did not understand the Illegal Quo Line to change the meaning of the Public Interest Argument. Ex. 3 ¶ 26.

82. John Berman, a co-anchor on CNN's morning show, New Day, had watched the Response live and believed it to be newsworthy. Ex. 6 at 100:2–13; 125:23-126:11; Ex. 3 ¶11.

83. Berman was surprised by Plaintiff's statement and believed that Plaintiff was expressing a new argument on impeachment that he had not previously put forth. Ex. 6 at 82:11-84:10; 106:9-13; Ex. 1 ¶ 29.

84. Berman did not understand the Illegal Quo Line to qualify the Public Interest Argument. Ex. 6 at 105:5-22; 107:11-24; Ex. 1 ¶¶ 30-31.

85. A clip containing the Public Interest Argument was prepared by New Day producers and Berman instructed his team by email to cut a clip of the portion of the Response defined in the Bolger Declaration as the Greatest President Argument. Ex. 1 ¶¶ 3, 20-21. No one told Berman what portions of the Response should be included in the clips for New Day. *Id.* ¶ 34.

86. Berman's email to his staff began "Dersh-o-nuts...need this for all panels." Ex. 145. Berman used the phrase "Dersh-o-nuts" because, while he respected Plaintiff as a lawyer in other contexts, he thought the argument in the Response was "alarming" and a "stunning expansion" of the bounds of presidential power. Ex. 6 at 154:23-155:8, 157:3-8.

87. At approximately 6:17 a.m. on January 30, 2020, a clip showing Plaintiff making the Public Interest Argument was aired on CNN during New Day, and Berman commented on the Response on air. Ex. 1 ¶ 37; Ex. 35-36.

88. Berman and CNN head of morning programming Izabella Povich both believed that the clip of the Response used during the New Day episode was fair and accurate. Ex.1 ¶¶ 4, 23, 24, 40; Ex. 6 at 146:25-147:16; Ex.12 at 167:23-168:2.

89. Berman was not told by anyone what to say or what narrative to advance when he commented on the Response. Ex. 1 ¶¶ 14, 26, 36-37, 40.

90. Berman's opinion on the Response was informed by viewing the Response in its entirety, not portion that was shown in the New Day clip. Ex. 6 at 100:2–13; 132:13-21.

91. Berman believed (then and now) that his interpretation of the Response and his statements about the Response were fair and accurate. Ex. 6 at 98:18-22, 106:7-17; Ex. 1 ¶¶ 5, 40.

92. While Berman was on the air, Povich forwarded Berman an email she had received from then-CNN president Jeff Zucker in which Zucker wrote that the "real[] story" was that the Trump defense team's theory could expand presidential power. Ex. 37. By the time Berman received this email, the segment with his statement already had been prepared, and he made his editorial decisions independently before he received the email. Ex. 1 ¶¶ 36, 37.

93. Zucker had watched the Response in full. Ex. 15 at 22:4-11.

94. Zucker believed that CNN's coverage of the Response was fair and accurate. Ex. 15 at 42:18-20; 59:11-20.

**The Criticism Continues & Aftermath of the Response**

95. The Response was the subject of fierce criticism by scholars and commentators. Among others, constitutional law professor Erwin Chemerinsky was quoted calling Plaintiff's Response "absurd and outrageous," and that Plaintiff's argument meant that "a president could break any law or abuse any power and say that it was for the public interest because the public interest would be served by his or her election." Ex. 146 at 5. *see also* Exs. 147-149.

96. Professor Neal Katyal, the former Acting Solicitor General of the United States described Plaintiff's position as "inane," and said it "would allow a president to do literally anything and destroy re-elections as a check on presidential behavior." Ex. 146.

97. Professor Jonathan Turley wrote an article published on January 30, 2020, in which he referred to the Public Interest Argument as "surprising and baffling." Ex. 114.

98. Nearly 200 "professors of law and scholars of the American constitution" sent a letter to the U.S. Senate to repudiate Plaintiff's position. Ex. 150.

99. Following the media coverage, Plaintiff claimed that the Response had been mischaracterized. On January 30 he tweeted that "CNN, MSNBC and some other media" "willfully distorted [his] answers." Ex. 151 at 14. On the same day, he published an opinion piece in *The Hill* entitled "I never said president could do anything to get reelected," in which he claimed "the media" was "deliberately distorting and mischaracterizing" his argument. "I never said president could do anything to get reelected," in which he claimed "the media" was "deliberately distorting and mischaracterizing" his argument. Ex. 110 at 157.

100. On January 30, Plaintiff asked CNN anchor Wolf Blitzer to appear on Blitzer's show. Ex. 152. Plaintiff was interviewed on the program later that evening. Exs. 96-97.

101. On January 31, Plaintiff was interviewed about the Response by CNN anchor Chris Cuomo. Exs. 98-101.

102. Plaintiff was also invited by email to appear on Cooper's show, but Plaintiff did not reply to the invitation. Ex. 54; Ex. 2 ¶ 38.

103. Plaintiff also later published a book entitled *Defending the Constitution*. Ex. 110. The book includes, among other items, the transcript of his response to Senator Cruz's question, his article for the *Hill*, and a final epilogue entitled, "The Dershowitz Doctrine: The Danger of Demonization by Distortion." *Id.* at 157.

104. Plaintiff purported to summarize his Response during his deposition. Ex. 17 at 388:23-389:16, 390:12-17; 392:12-23.

**Plaintiff's Alleged Damages**

105. Plaintiff is not seeking – and has withdrawn any claim for – damages based on lost

income or work opportunities. *See* Ex. 153 at 6-7; *compare* ECF 1 ¶ 19, *with* ECF 66 ¶ 19.

106.   Plaintiff is not seeking to recover damages for loss of friendships.  ECF 105 at 145:6-13.



**CERTIFICATE OF SERVICE**

15

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed and served via the Court's CM/ECF portal on this 11th day of October 2022 to Mark Schweickert, Esq., mark@schweikertlaw.com, Schweickert Law, 1111 Brickell Avenue, Suite 1550, Miami, Florida 33131, and John B. Williams, Esq., jbwilliams@williamslopatto.com, Williams Lopatto PLLC, 1629 K Street, NW, Suite 300, Washington, DC 20006, *Counsel for Plaintiff*.

**GUNSTER, YOAKLEY & STEWART, P.A.**
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
Telephone: (954) 462-2000

By: /s/ *George S. Lemieux, Esq.*
George S. LeMieux, Esq.
Florida Bar No. 16403
Email: glemieux@gunster.com
Eric C. Edison, Esq.
Florida Bar No. 010379
Email: eedison@gunster.com

**DAVIS WRIGHT TREMAINE LLP**
Katherine M. Bolger, Esq.
(*pro hac vice admitted*)
Email: katebolger@dwt.com
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 489-8230

*Counsel for Defendant Cable News Network, Inc.*