# EXHIBIT G

# TRANSCRIPTS

**Transcript Providers**

**Shows By Category:**

**Return to Transcripts main page**

## Anderson Cooper 360 Degrees

**Proposed GOP Rules for Impeachment Trial Released; Washington Post: Trump's Lawyers, Senate GOP Allies Work Privately to Ensure Bolton Does Not Testify Publicly. Aired on 8-9p ET**

Aired January 20, 2020 - 20:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

[20:00:15]

ANDERSON COOPER, CNN HOST: Good evening from Washington and welcome to a special two-hour program focused entirely on the impeachment trial of President Donald J. Trump which officially begins tomorrow afternoon.

Now, whatever you think the outcome will be, it cannot be understated how historic this moment is. It is one that will be taught in history books, mentioned at the top of any presidential biography or remembered by those who took part and all who witnessed.

This is third time a president has been impeached in almost the 250- year history of our country. And it's also potentially the first time an impeached president, if acquitted, must then run for re-election, which makes findings of the new CNN poll all the more important. It shows 51 percent of Americans believe the Senate should vote to remove President Trump from office, 45 percent disagree. We're going to have a full breakdown of those numbers later on.

Right now, we were focused on the moving pieces of this impeachment trial. We know the arguments that the president and the House Democratic impeachment managers will make.

In a statement today, the White House reiterated its previous arguments, calling the two articles of impeachment, quote, flimsy. Seventeen times they use the word "unconstitutional".

What we did not know until this moment is how Republicans intend to actually structure the trial, the rules, not just whether witnesses could be called but how long both sides will have to make their arguments.

A short time ago, Senate Majority Leader Mitch McConnell provided some much needed clarity, literally hours before the trial was to begin.

Joining me now from Capitol Hill, senior congressional correspondent Manu Raju.

So, what have you learned about the resolution from McConnell?

MANU RAJU, CNN SENIOR CONGRESSIONAL CORRESPONDENT: Well, what McConnell is doing is essentially sending them a fast track that could lead to the president's acquittal potentially as soon as next week if the Republicans that don't break ranks joining Democrats vote for witnesses, or if there's no bipartisan

agreement to get witnesses. Then we could see this happening pretty quickly.

And this is why: because under the resolution, after tomorrow, it's going to be focus exclusively on the debate of the resolution, Democrats will offer amendments to that resolution, once the resolution is adopted that lays out the parameters of the proceedings, then each side will have 24 hours to make their case. First, the Democrats will, then the Republicans will. But those 24 hours can only be used in two days.

So that means Democrats will have on probably on Thursday -- Wednesday and Thursday of this week to make their case. The White House will then, the president's team will have Friday and probably Saturday to make their case, it's possible the White House might not use, the president's team might not use 24 hours to defend him. And at that point, there will be 16 hours of questions that senators would have to ask questions to each side.

Now, once those questions are done, possibly early of next week, then they would move into the question about whether to subpoena any witnesses. And if that is, a good question, if voted down, then there will be a separate vote, which is much different than the Clinton vote that would vote about whether to actually admit the House Democrats at evidence that they have gathered to the impeachment inquiry into the record. In the Clinton case, that was admitted automatically. But here, under the rules, the Senate would actually have to vote, a majority vote, to admit that into the record.

Now, one of those are all done and as I said if Democrats and Republicans both agree to subpoena witnesses and subpoena documents, then they could set up that acquittal vote, and it's very possible that that could be by the middle of the week by next week, and the president could be on his way then have a State of the Union and deliver that address after the proceedings could be finished, Anderson.

COOPER: So, the State of the Union, what, two week -- two Tuesdays from now, correct?

RAJU: Yes, February 4th is the day and that's the day the president wants to be acquitted by.

COOPER: So, the 24 hours that each side has, who determines how they use that 24 hours?

RAJU: When that's given to the Democrats, first, it will first go to the Democrats. Adam Schiff, the lead impeachment manager, will be arguing for a good chunk of that, but they will split it up accordingly among their impeachment managers on their team, the House Democrats will of those 24 hours. So they will split it up how they see fit and the president's team will decide how they see fit. And how to make the arguments over 25 hours time span, but that will -- it could be from the early afternoon to late at night because they are only given two days to session today's to make their case and we'll if they use all 20 hours to decide to move it even quicker, Anderson. COOPER: And, Manu, these rules are very different than the Clinton impeachment rule, correct?

RAJU: Yes, the biggest difference is the one that I alluded to earlier was that the actual requiring evidence to be submitted, they require a vote to allow that evidence to be submitted. So the Democrats have got the information all throughout this impeachment trial, impeachment inquiry in the House, but they might be able to admit that 51 senators don't vote and allow that to go forward.

Now, Republicans are arguing because they say that the Democratic process in their view was a sham process, that they did not give due process to the president.

[20:05:02]

So, they're saying that's why they're saying it's different than Clinton and also different than Clinton that they allowed for four days of opening arguments on both sides over 24 hours. So, about six hours a day, instead of 12 hours a day. So that is also different than Clinton. That's what got Democrats riled up tonight, Anderson, because they're saying Mitch McConnell promises it would be a lot -- it should mirror Clinton's trial, but it's

different in some key ways. But McConnell's office is saying very clearly, they never said it's exactly the same. They said it's similar. And in their view, it's still very similar, Anderson.

COOPER: All right. Manu Raju, Manu, thanks.

Here with our political and legal team, Carl Bernstein, Jeffrey Toobin, Gloria Borger, Kirsten Powers, and former Senator Rick Santorum.

Jeff, let's start with you. Just in terms of the legality, the opening salvo by McConnell. What do you think about that?

JEFFREY TOOBIN, CNN CHIEF LEGAL ANALYST: Mitch McConnell is trying to make the farce, I mean, trying to make it a joke. I mean, this is, you know, the trial will start every day at one in the afternoon. Twelve hours would be one in the morning. But that's not how the Senate works. There will be breaks.

So the idea is that McConnell wants to keep most of the evidence in the wee hours so that nobody sees it. And then the real, new atrocity, frankly, that McConnell added today, which I don't think many people saw coming was the idea that the House managers couldn't even present their evidence without a vote from the full Senate, something that's completely new, that was not true in the Clinton trial. And it's all just designed to engineer an acquittal as soon as possible.

GLORIA BORGER, CNN CHIEF POLITICAL ANALYST: I look forward to the statement.

COOPER: What I don't understand though is that if the evidence is -- has to be voted on at the end, is that correct? Like after?

TOOBIN: Yes.

BORGER: After.

COOPER: So, while the House managers are making their arguments, can they not use evidence from the House?

CARL BERNSTEIN, CNN POLITICAL ANALYST: We don't know yet.

TOOBIN: I think it's -- it's -- the answer can't be no. But just as an official matter, it is not received into evidence until -- until later.

RICK SANTORUM, CNN SENIOR POLITICAL COMMENTATOR: Well, I mean, look, the evidence is out there.

TOOBIN: Right.

SANTORUM: I mean, it's not like it's not known. It's not -- nobody is hiding anything. They can certainly refer to what happened in the House.

TOOBIN: Then why this vote?

BORGER: Yes.

BERNSTEIN: There's a lot more evidence to be known. That's what part of this is about.

BORGER: The Government Accountability Office -- they're saying that what the president did was illegal. I mean, they referred to it in their document.

SANTORUM: Yes, there's a lot of things that the GAO said that Obama did was illegal and nobody said anything about it. So, the reality as the GAO represents a Congress. They have a different point of view than the executive branch, and there's always going --

BORGER: But all -- I want to agree with Jeffrey on this. I think this is a perversion of the process that was used with Bill Clinton. Plain and simple, it is condensed to the point where it's laughable, it's a joke. I mean, you want people to sit there for 12 hours a day and listen to this rather than splitting it up as was with Clinton to six or so hours a day just -- just because.

SANTORUM: Whose fault is that?

BORGER: Let me finish, just because the president of the United States would like to have this done conveniently by the State of the Union.

SANTORUM: So, do you think there might of then some motive that Nancy Pelosi held this for a month to be proximate to the State of the Union so he would be under impeachment when he came there? Do you think that have nothing to do with?

(CROSSTALK) BORGER: Nancy Pelosi was actually trying to find out -- no, Nancy Pelosi was actually trying to find out what the rules were going to be. And, by the way, Mitch McConnell was keeping, them in the back pocket until the final day anyway.

(CROSSTALK)

TOOBIN: But, also, Rick, there couldn't have -- even if she turned over the articles earlier, they could not have started the trial before now.

BERNSTEIN: So let's try a bigger view of that.

TOOBIN: Because they were on the Christmas.

SANTORUM: Oh, look, they would've started it and they would have -- and this could have been done in an orderly fashion. Nancy Pelosi should force a shortened process.

BORGER: No.

COOPER: Carl?

BERNSTEIN: We're already down in the weeds. Let's look at the big picture which is that this is the most important moment for the Republican Party since the censure of Joe McCarthy and the impeachment and resignation of Nixon, in which Republicans became great heroes and patriots. Now, we're looking at midnight Mitch and the so-called world's greatest deliberative body really embracing a cover-up that is there for all to see.

That's what this is about. It's about preventing information from becoming known and seen by the American public. Other impeachments, including Andrew Johnson, including Clinton, there has been no problem about knowing the truth of the facts.

We still have a factual problem here because the president and those who work for him, and Mitch McConnell, have repeated the facts from the beginning.

SANTORUM: That is just -- there are facts that could be known. I agree. There's not all the facts that are known.

BERNSTEIN: Let's have them.

SANTORUM: Whose responsibility is that? It's up to the House of Representatives to present the case.

(CROSSTALK)

[20:10:00]

BERNSTEIN: Who wouldn't let documents or witnesses from before the House, Rick?

SANTORUM: There is a way -- there is a way to deal with that problem, you go to the courts and you work through the courts to get that information. They chose not to do that and as a result of that, they don't have -- you're right, they have --

BERNSTEIN: You're calling a president who doesn't cover up and lie all the time and says, all right, we'll give you the evidence.

COOPER: Kirsten?

KIRSTEN POWERS, CNN SENIOR POLITICAL ANALYST: There's another way to do it that you don't go to the courts and you do what other presidents have done where you just actually tell people to go and testify.

BERNSTEIN: That's right.

POWERS: So the way you act like the only way to get people to testify and give you the relevant information is go to the courts is just disproven by history.

BERNSTEIN: That's right.

POWERS: The other question I have is, so, does it have to start at 1:00? Is that --

TOOBIN: Yes.

POWERS: So, that's the other thing. To your point if this is Nancy Pelosi's fault, nobody is making will start at 1:00. It could start in the morning --

TOOBIN: No, John Roberts --

(CROSSTALK)

POWERS: Oh, John Roberts, OK.

BORGER: I mean, he could change the schedule.

SANTORUM: That's the way the Clinton impeachment, we started at 1:00.

BERNSTEIN: But why two days? Tell me, Rick.

SANTORUM: Because they want to get it in before the State of the Union, I'm sure. If they aren't, they're crazy. They need to get in before the State of the Union.

BERNSTEIN: How about being -- how about being (INAUDIBLE) with cover- up?

(CROSSTALK)

COOPER: Did Bill Clinton have a State of the Union --

(CROSSTALK)

TOOBIN: He gave a speech at State of Union in the middle of the trial. I remember it there, I mean --
COOPER: Those polls numbers actually go up?

BORGER: Absolutely.

TOOBIN: And the fascinating thing, and again, history will tell us who was right -- Bill Clinton did not acknowledge the impeachment process, he said as he over -- over and over again, I'm going to go back to work for the American people. He didn't interfere, he didn't complain, and all the president, this president does is talk about how it's a witch hunt, it's a farce.

You know, we'll know next November who was right.

SANTORUM: I'm going to agree with you on this. I think that Bill Clinton handled it -- I was there, Bill Clinton handled it with a plump (ph). I mean, he was -- he was contrite, you know, did focus on not talking about this issue, he didn't want to talk about it, for a lot of reasons obviously. But he focused on doing the work for the American public.

I think Republicans know that the president will not do that and if the president is engaged in that in the trial during the State of the Union, it may not be a very pretty show.

COOPER: But that doesn't -- that is a --

SANTORUM: Look, Republicans have every right to --

COOPER: Protect the president.

SANTORUM: -- protect the president, just like the Democrats have every right to try to drag the president through.

BORGER: So, is this the right thing to do, protecting the president?

SANTORUM: I think it is the right thing to do.

(CROSSTALK)

SANTORUM: Look, there is no question as to how this is going to turn out, so the reason to hold this and delay this doesn't make a lot of sense.

COOPER: All right. We are going to take a break. We're just getting started.

We're on for two hours tonight. There's a lot to cover.

We have breaking news from "The Washington Post" reporting about the latest Republican plans surrounding former national security adviser John Bolton if -- if witnesses are, in fact, called before the Senate. If Bolton is called and wants to go, agrees to go.

Later, the new CNN polling on the eve of President Trump's impeachment trial, what the American say the Senate should do.

(COMMERCIAL BREAK)

[20:17:06]

COOPER: There's more breaking news tonight. "The Washington Post" reports that even if the Senate votes to allow witness testimony in the Senate impeachment trial, Republicans are quietly working out plans to keep former national security adviser John Bolton from testifying publicly. Sharing the byline on the story is "Washington Post" reporter and CNN political analyst, Rachael Bade. She joins us now by phone.

So, Rachael, the president's attorneys and his allies in the Senate, how would they try to stop Bolton from testifying publicly if enough Republicans did agree to have witnesses come forward and Bolton agreed to come forward?

RACHAEL BADE, CNN POLITICAL ANALYST (via telephone): Good evening, Anderson.

Yes, so we are hearing that they are trying to put together this sort of contingency plan if they lose this battle over witnesses and whether or not to call. There are sort of two options that they're looking at. The first one, the president has sort of floated this notion that he could claim executive privilege over Bolton's testimony, to keep him from saying anything.

We are hearing from Republicans that the White House has also talked about if Bolton were to not listen to the White House asserting executive privilege, they could go to a court and appeal for some sort of injunction that would stop him from testifying until they could litigate what could or could not be said under executive privilege. Now, that could take months, so we are starting to see that happen right now, on another investigation that the Democrats are doing.

But there's other option that we just heard about today from our Republican sources on both sides of the Pennsylvania Avenue, and that is this notion that they could go into a classified briefing, basically that would mean that anything Bolton says would be hidden. But I think it's pretty clear that what Republicans are trying to do is they're trying to make sure that if Bolton comes to the Senate, anything he says will not be put out on the spotlight and will be hidden.

COOPER: Is it even clear -- I mean, from the sources you are talking to, do they have a sense of what -- of where Bolton is in terms of how critical he is of events? I mean, we know through the testimony of two people that he had, you know, called in a drug deal. But we don't really know where his head is at or what he's willing to say.

BADE: Yes, I think he's really a wildcard. I mean, we heard speculation on both sides, both Democrats and Republicans, people do not know if he's going to be helpful to the Democrat's case, if he's going to be helpful to the Republicans' case.

I have talked to Republicans who sort of float this notion that a guy who was a lifeline -- or a lifelong Republican and served in GOP administration and is a former Fox News, you know, TV star, is he going to really turn on the president and offer something that will make him be more likely to be removed from office? There are Republicans who think he wouldn't do that because he would be ousted and would not be able to get a job in sort of GOP lines of work.

But, you know, you see the evidence that these witnesses testify and how brought forward and that is his underlings saying that he told them point blank that what he was seeing on Ukraine was a, quote, drug deal, and he told them to raise the issue top White House lawyers who clearly thought there was some legal problems here.

[20:20:07]

And so, I think Republicans, they're just not willing to sort of play a game here in terms of seeing what he's going to say. They'd rather just block at even though they don't know exactly what he would testify to.

COOPER: Rachael Bade, appreciate it, of "Washington Post". The story is there now, thanks so much.

Back with our legal and political team.

Is it ethical, Jeff, for a majority party to be coordinated with the White House, how to deal with potential witness testimony?

TOOBIN: You know, when the Framers set up the impeachment process, they knew that the senators would be politicians. They could have said, you know, this would go to a jury like any other -- any other jury.

So I don't have a problem with the president talking to the senators of his party. I mean, that's just realism.

The problem is that they are setting up a process that is a farce. They are setting up a process that is designed not to disclose any information. That's the problem.

I don't care if they talk to each other, I think it's -- it's realistic when you have a Senate jury that they -- you know, that there will be a certain degree of coordination. The problem is the result they have come up with which this Bolton idea is just further proof that they don't want the public to learn anymore than it already knows.

COOPER: Rick, do you think -- do you think the White House, Rick, is afraid of Bolton?

SANTORUM: I suspect that they don't want any wild cards, of course. I mean, that's -- any White House would not want somebody who they don't their testimony to be testifying at a Senate trial. That's why this should have been done by the House.

And so, you can --

BORGER: But it couldn't have been done by the house. SANTORUM: It could've been done by the House if they -- if they took

the time to do. They didn't take the time to do it.

BORGER: But wait a minute, what if the president has said, as Ronald Reagan inside what if during the Iran Contra, what if he said I don't have anything to hide, I'd want everybody to testify and to tell the truth. Ronald Reagan could have been in the heap of trouble during Iran Contra, and he did the opposite.

And what they are doing now is trying to hide Bolton in a classified setting, trying to hide him from the American public because they are afraid of what he is going to say.

SANTORUM: Again, if you are the one being accused, remember, this was started by House Democrats, they have the burden of proof, they have not met the burden of proof, and so, you can say --

BERNSTEIN: It was started by the conduct of the president.

SANTORUM: They're reviewing the role of somebody who was being aggressively attacked by one party in the House and they are defending themselves and doing in the way -- you may say they don't like the way they're defending themselves. It is not their responsibility to prove the president's innocence. It's their responsibility to respond to the House.

BORGER: Bolton didn't want to testify before the House. He thought it was a circus, right? He said, I'm willing to testify, or his attorney said, I am willing to testify before the Senate if you subpoena me. He had said he was willing to do.

He didn't say in a classified setting. He didn't talk about privilege. He said, I'm willing to tell my story. They're afraid of the story because we know a lot of this story, right? We know that he said it was a drug deal.

POWERS: Isn't it just common sense that if you are innocent and there are people who are working for you and know that you are innocent, he is maintaining his innocence, and the people who actually have firsthand information about that, wouldn't you want them to testify? And the only reason you wouldn't want them to testify is because they're not going to back up your story that you're innocent. I mean, this is just common sense.

SANTORUM: Again, that's -- that's -- you can certainly make that conclusion. I don't -- I think that's a rational conclusion to make. But I think you can also make the conclusion that the White House counsels have which is they have privileged information and they're going to protect -- the White House has a responsibility to protect their privilege and they're going to do that.

And I think that's another legitimate and rational way of looking at this story.

BORGER: But that's why they wanted the witnesses in the McConnell statement, the rules, that's why they said the witnesses have to be deposed first. So if they depose the witnesses first, one would presume there would not be any surprises and then they would decide perhaps as they decided during the Clinton trial to show on video what they mutually agreed. They could show to the American public.

So, it wouldn't perhaps getting -- privilege wouldn't be an issue, or classified information --

SANTORUM: Privileges always an issue.

BORGER: Or classified information wouldn't be an issue.

(CROSSTALK)

SANTORUM: The difference in classified information, it's privilege.

BORGER: You can negotiate that. You can negotiate that if what you wanted was the truth.

SANTORUM: Again. I would just say one of the things careful what you wish for. Because if we go beyond the record which came from the House and bring in extraneous witnesses related -- then what's good for the goose is good for the gander.

BORGER: That's true.

SANTORUM: And you're going to see Joe Biden. You're going to see Hunter Biden. Who knows who else you're going to see. It will -- you want to talk about a free-for-all mess, that's what you're looking at.

COOPER: All right. More to discuss. We're going to take another quick break.

Coming up next, new CNN polling on the eve of the impeachment trial. What Americans think the Senate should do when we continue?

(COMMERCIAL BREAK)

[20:29:19]

COOPER: So, our breaking news tonight, we have the Republican resolution outlining their rules for the Senate impeachment trial which were just released. Among the proposals, House managers and president's legal team each getting 24 hours to make their opening arguments. That could mean long 12-hour days, each going late into the night when most Americans may not be watching television.

It's the same time frame as President Clinton's impeachment trial, but in a more condensed scheduled, two days, as opposed to four. Democrats are pushing back, alleging that key facts will be delivered in late hours, simply because Republicans don't want American people to actually hear those facts. It could be a reason for that.

A new CNN poll is -- we showed you at the top of the broadcast that just 51 percent of Americans believe that President Trump should be removed from office, 45 percent disagree.

Our political director David Chalian joins us now with more on the polling.

So, more than half the country wants to see the president removed from office.

DAVID CHALIAN, CNN POLITICAL DIRECTOR: Yes, and that's about where it was back in October, November. It seems sort of when the facts are central to the conversation. You see not towards the President's favor when it's about process. It tends to move a little bit towards his favor.

But look at some of the demographic trends we see underneath that number, Anderson. Take a look at the gender gap. I mean, I think this is astonishing. 59 percent of women say convict and remove compared to 42 percent of men. Take a look at the racial breakdown. You'll see 86 percent of African-Americans say convict and remove 65 percent of Hispanics, 42 percent of white Americans in this poll. And then the age divide also younger voters under 45, 56 percent of them say convict and remove. If you're over 45, 47 percent of those say convict and remove.

COOPER: And whether or not the Senate trial should include witnesses. People have opinions on that.

CHALIAN: Yes, I think this is probably the most significant number in this poll. Sixty-nine percent of Americans in this poll say there should be witnesses that were not part of the House process included in this Senate trial and take a look at it by party.

Forty-eight percent of Republicans, see that number their, bottom left column there, 48 percent of Republicans say there should be witnesses, 44 percent of Republicans say there shouldn't be. That is the number that Chuck Schumer hopes to use as some political leverage to find those four Republicans to come to his side.

COOPER: And what about the numbers of people believing the President abused his powers?

CHALIAN: Yes, more people than say convicted remove. I mean, 58 percent say that he did indeed violate the abuse of power, 57 percent say he did indeed obstruct Congress. This means that you're talking about people who don't think he should be convicted and removed from office who do actually think he's guilty of doing what he's alleged to have done.

COOPER: David Chalian, stay with us while we bring in our team.

Kirsten, it's interesting because that sort of aligns with the argument that some Republicans could take which is well don't like what he did, it was inappropriate, but it's not impeachable offense.

KIRSTEN POWERS, USA TODAY COLUMNIST: Well, I mean, I think that was the thing that jumped out to me the last thing that you said was the fact that so many people actually believe that the things are actually in the impeachment articles happened, but they don't believe that he should be impeached is troubling to me. And

people can have opinions on it, but I think if they had more information, they would understand that these actually are impeachable offenses and I would like to hear from them why they don't think that they are.

COOPER. Well, I mean, yes, as you know, Alan Dershowitz is arguing that very thing which is that whatever you may think of these, these are not impeachable. Lauren Strive (ph) and others disagree with this.

POWERS: Yes, there's a lot of people that disagree with that. And I think that that's what this is for. That's what the impeachment trial is for, for people to present their case. And I think we're going to hear a very airtight case that this is exactly the type of behavior that the Founders envisioned when they came up with the idea of impeachment.

COOPER: Gloria it is remarkable, though, that if 51 percent of the country, according this poll, want to see the President removed? That's way more than, I don't know. I think Clinton have like 30 percent?

UNIDENTIFIED FEMALE: Right.

GLORIA BORGER, CNN CHIEF POLITICAL ANALYST: Clinton was much more popular. Also, don't forget Clinton was a popular President Donald Trump's popularity rating is, David, you know this better than I do but--

CHALIAN: Well his approval rating today is at 43 percent

BORGER: -- 43 percent, Clinton was much higher than that. But if you look at these numbers on the two articles of impeachment, which are abuse of power and obstruction of Congress, the public is there. The public says we believe this.

Now, the difficulty for Republicans is that while they might want to say, well, you know, he wasn't -- this wasn't the right thing for him to do, inappropriate, but not impeachable. The President himself will not allow them to say this was inappropriate.

His lawyers are saying it was perfectly appropriate. He is saying it was perfect. So, if they stray from that argument, they risk his wrath. And with Bill Clinton, Bill Clinton encouraged them to go on the floor and dump on him and say this was awful, this was terrible, but don't impeach him over an impropriety or et cetera, et cetera. This President will not allow them to do that and that is the political problem that they really face in this impeachment.

COOPER: And Carl, you know Jeff Toobin -- you also have been very critical of these new rules that are released by McConnell, do you think people who are watching or who may tune in occasionally in this really care or that -- I mean, it seems like this -- these kind of tactics work?

CARL BERNSTEIN, JOURNALIST AND AUTHOR: I don't know -- look, everything that Trump has done has worked in terms that he wants them to work. In terms of holding his base.

What Mitch McConnell -- what these numbers mean, or something Mitch McConnell understands. That his party on the hill does not like this President of the United States. Many of them, I'll ask Rick Santorum, 30 percent, 40 percent, 50 percent of the Republicans in the Senate despise Donald Trump, think that he is corrupt and unfit to hold office.

[20:35:06]

COOPER: Do you think that's really true?

BERNSTEIN: Yes. Because I think -- and I think it's time the press really -- that we really start talking to the principal legislative assistance to the senators to find out what their boss's really think. Because certainly --

JEFFREY TOOBIN, CHIEF LEGAL ANALYST: You know who cares what they really think? Let's have them at what they vote, I mean, that's the thing.

BERNSTEIN: Well, that's right. And McConnel knows there are four or five that are wavering on some of these procedural questions.

And if one of them, particularly Susan Collins, who reveres Margaret Chase Smith, who took on Joe McCarthy, where to get up --

TOOBIN: Don't get too (INAUDIBLE).

(CROSSTALK)

BERNSTEIN: Exactly, no but she's --

TOOBIN: Don't get Toobin started on Collins.

BERNSTEIN: She's craven, she's craven, has been cowardly and we have no reason --

COOPER: I got to get a break in. We'll let Jeff stew on Susan Collins for a moment. When we come back, more new polling numbers, look at how many Republicans want witnesses at the trial more on than that ahead.

(COMMERCIAL BREAK)

COOPER: We're now in the new CNN polling on the eve of President Trump's impeachment trial, again 51 percent of Americans saying the Senate should vote to convict and remove President Trump from office. The number not wavering much of the last several months, you see it from September until now.

[20:40:10]

Back with our team. You also, David Chalian, that the number of women who want to see the President --

CHALIAN: Fifty-nine percent.

COOPER: Yes.

CHALIAN: I mean we see a gender gap in almost every bit of polling around President Trump. That is pretty significant. And by the way, if he loses reelection, it will be because of women voters across the country.

But look at that, 59 percent want him removed, convicted or removed, 42 percent of men say that. So you just see that's a 17 point gender gap. And we see this time and again in every aspect around President Trump's political standing.

COOPER: Rick, as somebody who'd like to see the President reelected, how do you -- what do you do about that problem?

RICK SANTORUM, (R) FORMER U.S. SENATOR, PENNSYLVANIA: Well, I mean, that's a foundational problem that goes way beyond impeachment, and you know, they are trying, I think desperately trying to do some things to address that gender gap. I mean, if you look at the defense authorization back, they put in paid family leave which a -- a parental leave which again very much appealing to suburban voters on that regard. He's pushing for a broader upgrade parental leave program.

There's a limited amount the President can do on a policy point of view. Most of it has to do with tone and

style. And that's been problematic for him.

TOOBIN: You mean that there's a limited amount he could do because he doesn't want to do it?

SANTORUM: No, no.

TOOBIN: It's not like he -- it's I mean.

SANTORUM: Well, no. Yes, there's a limit value because you're popular (ph) that you went through with the Congress.

BERNSTEIN: Turn out more men in Pennsylvania in the election is just --

BORGER: Well, I also think --

SANTORUM: Well, that, with the Congress is not cooperating really.

POWERS: Well, he's got -- his fundamental argument also doesn't resonate with women as much. I mean, he is completely based on grievance that you are being -- things are being taken away from you, the country is being overrun by people and taking away your privilege, basically, and I don't think women generally feel like that is their position in society.

SANTORUM: If there's any part of this, there's a grievance. It's the Democratic Party, not the Republican Party.

POWERS: And so white men are -- white men, white men are his base. White men are his base and it's because they're convinced that all the brown people are coming to take everything away from them and ruin the country.

SANTORUM: I think that's an error, of number one --

POWERS: How about --

SANTORUM: If there's any party that is -- a party that's -- just listen, the Democratic debate last week, you want to hear grievance. It's one grievance.

POWERS: There's only -- all the (INAUDIBLE) does is complain about, a, how everybody is persecuting him and then how everyone is persecuting the people who vote for him.

SANTORUM: I will agree that that is based on grievance of personal persecution but as far as broader, no, I don't agree.

POWERS: And also -- no. And also grievance of his voters, of the fact that you know that the liberals are anti-Christian on persecuting Christians, and it's based on this idea that there --

SANTORUM: Yes, that there's religious persecution going on in the world?

POWERS: In this country? There is no -- no.

SANTORUM: And here in this country? Oh, come on.

POWERS: In this country.

SANTORUM: In this country.

POWERS: Religious persecution.

SANTORUM: Absolutely.

POWERS: What would you count as persecution?

SANTORUM: Go on a college campus and see if there is.

POWERS: That is not persecution.

SANTORUM: Of course it is.

POWERS: Persecution like what happens in the Middle East, perhaps when you actually get murdered.

SANTORUM: There -- it's degrees of persecution. But there certainly --

POWERS: But that is not persecution. People are not agreeing with you. It's not persecution.

SANTORUM: -- a denial of religious freedom.

POWER: This is (INAUDIBLE) we're talking about.

SANTORUM: It's not nearly as bad I would agree with you as it is around the world.

POWERS: It's not --

(CROSSTALK)

TOOBIN: No, and religious persecution --

SANTORUM: But it's a serious issue.

TOOBIN: What William Barr thinks as religious persecution is having store, you know, bakery owners and innkeepers and restaurant owners --

POWERS: Serving gay people.

TOOBIN: -- being forced to allow --

SANTORUM: Little Sisters of the Poor.

TOOBIN: -- being allowed to discriminate against gay people.

SANTORUM: Catholic charities.

TOOBIN: That's what religious freedom is.

SANTORUM: Yes. All of those things are in fact religious discrimination.

TOOBIN: That's exactly right. Rick, this is what you want. You want gay people barred from stores, from restaurants --

SANTORUM: No, it's ridiculous.

TOOBIN: -- from the -- well, it is.

SANTORUM: It's absurd.

TOOBIN: It's not absurd.

SANTORUM: It is absolutely absurd.

TOOBIN: The administration is in court asking for this.

SANTORUM: They're not asking for that at all. No one's barring anybody from anything --

TOOBIN: You think just -- you can't buy anything.

SANTORUM: No, what you're -- and of course that is a -- Jeffrey, you know that. It's not true.

TOOBIN: I know it. There are lawsuits about this.

SANTORUM: The reality is it's about participating in ceremonies that they religiously object to. It has nothing to do with selling a bagel to someone.

POWERS: Baking a cake is not (INAUDIBLE) to ceremony.

(CROSSTALK)

BERNSTEIN: In fact their -- in fact a position has been taken on bagels, that indeed people who own these places have a right if their religious beliefs prohibit it not to give a bagel with a cream cheese to a gay person.

SANTORUM: Now well, I would -- then you know what, I would be on the other side of that suit because I think they have --

BERNSTEIN: Well, come on over.

SANTORUM: -- obligation to do so. When it comes to do -- comes to other things, they don't.

COOPER: All right. We've gotten in the weeds in the bagels --

(CROSSTALK)

POWERS: Sorry. That was my fault.

COOPER: Let's take a walk and in a moment we're going to stick -- Jeff's going to stick around.

Up next, we're going to dissect the White House legal strategy. Joining us is Alan Dershowitz, who is working with the President's legal team. And as he will say, he's not on the legal team. He's defending the Constitution. We'll talk about it ahead.

(COMMERCIAL BREAK)

[20:48:46]

COOPER: Earlier today, President Trump's legal team issued a trial memorandum responding to House articles of impeachment, "After focus- group testing various charges for weeks, House Democrats settled on two

flimsy Articles of Impeachment that alleged no crime or violation of law whatsoever, much less 'high Crimes and Misdemeanors,' as required by the Constitution."

They also write, "The diluted standard asserted here would permanently weaken the presidency and forever alter the balance among the branches of government in a manner that offends the constitutional design established by the Founders."

Later they write, "-- each article is impermissibly duplicitous. Each article presents a smorgasbord of multiple, independent acts as possible basis for conviction. As a result, the Articles invite the danger of an unconstitutional conviction if less than two-thirds of senators agree that any particular act was an abuse of power or obstruction."

Back with me out here in Washington, CNN Chief Legal Analyst, Jeffrey Toobin, and we're joined by one of President Trump's team of defenders, Harvard professor emeritus, Alan Dershowitz, who is -- he is pointing out will be speaking on behalf of the President strictly on constitutional grounds. Professor Dershowitz is the author of The Case Against Removing Trump.

Professor Dershowitz, so let me start, the argument put forward by the President's attorneys, arguments that you've made as well, that impeachment requires a crime. I want to play something you said back in 1998 for our viewers.

[20:50:11]

(BEGIN VIDEO CLIP)

ALAN DERSHOWITZ, PART OF PRESIDENT TRUMP'S IMPEACHMENT DEFENSE TEAM: It certainly doesn't have to be a crime. If you have somebody who completely corrupts the Office of President and who abuses trust and who poses great danger to our liberty, you don't need a technical crime.

(END VIDEO CLIP)

COOPER: So you also recently said without a crime, there can be no impeachment. Back then you said that it certainly doesn't have to be a crime if you have somebody who completely corrupts the Office of President, who abuses trust, and who poses great danger to our liberty, you don't need a technical crime.

DERSHOWITZ: Well, that's true. You don't need a technical crime. That's my position today. I've said right from the beginning, you need criminal-like behavior akin to bribery and treason. Remember that in Clinton case --

COOPER: That's not what you said then.

DERSHOWITZ: --it wasn't -- that's what I said then.

COOPER: You didn't --

DERSHOWITZ: It's what I said now. Well, you need a technical crime.

COOPER: No, you didn't say criminal-like behavior. You said completely corrupts the Office of President.

DERSHOWITZ: Let me --

COOPER: Abuses trust.

DERSHOWITZ: Let me be very clear.

COOPER: Imposes great danger.

DERSHOWITZ: Because the issue -- that issue was not before anybody. Clinton -- in the Clinton case, he was charged with a crime. Now the issue is whether or not you need criminal type behavior. I've done a lot more research back then. I took the word of many academics who said that.

COOPER: So you were wrong then? DERSHOWITZ: I've now done the reason -- no, I wasn't wrong. What I -- I have a more sophisticated basis for my argument now having read just this courtesy's opinion and other opinions. It's very clear now that what you need is criminal-like behavior akin to bribery and treason. What is very clear is obstruction of justice, obstruction -- I'm sorry, obstruction of Congress or abuse of power aren't even close to what the framers had in mind.

TOOBIN: What is --

DERSHOWITZ: And I will show that during my speech by going through all of the debates in Congress.

TOOBIN: OK. What --

DERSHOWITZ: Blackstone's commentaries.

TOOBIN: --what is clear --

DERSHOWITZ: Yes.

COOPER: OK, Jeff, go ahead.

TOOBIN: --what is clear is that Alan was right in 1998 and he is wrong now. I mean, the two --

DERSHOWITZ: Well.

TOOBIN: --for the two statements cannot be reconciled. I mean one is to right.

DERSHOWITZ: Yes, you can.

TOOBIN: Or one is wrong. And the one in 1998 was right. I mean the idea --

DERSHOWITZ: No.

TOOBIN: I mean look, every single law professor that has looked at this issue except you seems to think that there is a --

DERSHOWITZ: How about professor -- do you know that professor--

TOOBIN: Let me --

(CROSSTALK)

DERSHOWITZ: --do you know Professor Bowie --

TOOBIN: --let me complete, why not--

(CROSSTALK)

DERSHOWITZ: In which he just told --

COOPER: Don't talk over each other. DERSHOWITZ: -- he just lied.

(CROSSTALK)

DERSHOWITZ: Professor Bowie --

COOPER: Don't talk over each other.

DERSHOWITZ: -- who is a Professor at Harvard takes my view. Read his article, Jeffrey. Don't make up stories about every professor. Read Professor Bowie's article in the Harvard Law Review where he quotes with approval Justice Curtis' argument.

(CROSSTALK)

DERSHOWITZ: He's completely on my side.

COOPER: You keep talking about Justice Curtis --

DERSHOWITZ: So please withdraw that argument that no --

TOOBIN: No, that's not what was wrong then.

DERSHOWITZ: --professor has said it. You --

TOOBIN: Well I didn't say everyone.

DERSHOWITZ: --so you're saying that Professor Bowie doesn't exist? You did say everyone.

TOOBIN: I --

DERSHOWITZ: You said every law professor.

TOOBIN: -- virtually. OK, virtually everyone.

DERSHOWITZ: We now know. Now you're saying you're wrong. OK. So now you're admitting you're wrong.

TOOBIN: All right, I'm admitting that it's not every single law professor.

DERSHOWITZ: We all make -- we all --

TOOBIN: OK, now right.

DERSHOWITZ: --improve and change our views when we --

TOOBIN: Right. That's right.

DERSHOWITZ: --focus more on the issue. And I focused more on the issue.

COOPER: OK. So --

DERSHOWITZ: And I'm now completely convinced that the issue --

TOOBIN: Buy you our keep quoting Justice Curtis--

DERSHOWITZ: --requires -- yes.

TOOBIN: --that Justice Curtis was not in a Supreme Court argument. He was making an argument to the Senate.

DERSHOWITZ: That's right.

TOOBIN: And the point that you say, you know, I don't know what criminal-like behavior is you keep talking about.

DERSHOWITZ: Well, I'll tell you what it is.

TOOBIN: The criminal -- let me finish. Criminal -- the idea that you can only impeach a president for criminal or criminal-like behavior is absurd on its face. Think about some examples.

DERSHOWITZ: Yes.

TOOBIN: Suppose a President goes to a religious commune and refuses to speak or talk to anyone. You think that President could be impeached? It's clearly legal, but of course not that person would be impeached.

DERSHOWITZ: No, he couldn't be.

TOOBIN: What if he --

DERSHOWITZ: Let me explain why. Let me explain why. So when the framers sat down to discuss whether to have impeachment or not, one of the major issues was a president would become incapacitated. Madison talks about that Gouverneur Morris talked about that. And that was a good reason for having impeachment. You don't want an incapacitated president.

When it came time to articulate the criteria, they didn't include that because it isn't criminal and because it's open-ended and subject to abuse. So for 150 years, we didn't have a procedure for removing an incompetent president. It required the 25th Amendment to that that after Woodrow Wilson became incapacitated. So there's an enormous difference between what we think --

COOPER: You know -- OK.

DERSHOWITZ: --should be a ground for removal.

COOPER: Well let me just --

DERSHOWITZ: And what the framers put in as a ground for removal.

COOPER: --OK, let--

DERSHOWITZ: And so--

COOPER: --professor let me just ask you-- DERSHOWITZ: --you're going to come up with a lot of hypotheticals.

COOPER: --well I -- Professor, let's have a--

DERSHOWITZ: But the framers had to decide what's covered.

COOPER: Right. Professor, let's just not talk about a hypothetical. I just I want to go back. Previously you said, it doesn't have to be a crime if the guy -- if the person in office completely corrupts the office of President and who abuses trust and poses a great danger to our liberty, that is impeachable. Now you're saying criminal-like. So you're not -- so corrupting the Office of the President, is that in your criminal-light or criminal-like --

[20:55:18]

DERSHOWITZ: No.

COOPER: --of behavior?

DERSHOWITZ: No, it's not.

COOPER: So it's not.

DERSHOWITZ: And that was rejected.

COOPER: So --

DERSHOWITZ: That was rejected by the framers.

COOPER: OK. So you were wrong.

DERSHOWITZ: I have --

COOPER: But so you were wrong back then?

DERSHOWITZ: I was saying that I'm much more correct right now having done multiple --

COOPER: Much more correct.

TOOBIN: That's the issue.

DERSHOWITZ: Let me explain, please don't shut me off. You are two against one here. Let me make my point.

COOPER: No. I'm not on anyone's side.

DERSHOWITZ: I did not --

COOPER: I'm trying to understand rationally what you're saying.

DERSHOWITZ: -- I did not -- well listen, maybe you'll understand if you listen. I didn't do research back then. I relied on what professor said.

COOPER: OK, so you're wrong.

DERSHOWITZ: Because -- please let me finish, because that issue was not presented in the Clinton impeachment. Everybody knew that he was charged with a crime. The issue is whether it was a hard crime. Now the issue is whether a crime or criminal-like behavior is required. I've done all the research --

COOPER: OK, so you didn't do the research back then.

DERSHOWITZ: -- in 22 years ago --

COOPER: Got it.

DERSHOWITZ: I didn't do the research back then --

COOPER: OK.

DERSHOWITZ: -- because that wasn't an issue.

COOPER: So you're wrong, OK.

DERSHOWITZ: I've done the research now. I wasn't wrong. I am just far more correct now than I was then.

TOOBIN: OK, what --

DERSHOWITZ: I said you didn't need a technical crime back then.

TOOBIN: OK, but --

DERSHOWITZ: I still don't think you need a technical crime. And I think your viewers are entitled to hear my argument without two bullies jumping on everything I say.

COOPER: Oh come on.

DERSHOWITZ: I'm trying to --

TOOBIN: Please.

DERSHOWITZ: --pinpoint and nitpick on what I said. Let's talk about what the issues are --

TOOBIN: Let's talk -- yes, and so I -- can we just talk.

DERSHOWITZ: -- instead of trying to attack the messenger.

TOOBIN: --can I --

COOPER: I don't think anybody's attacking the messenger.

TOOBIN: --but I think --

COOPER: I think a lack rationally. I mean look, I'm not a lawyer nor have I studied law and I didn't go to Harvard, but I just -- what you're saying, the words you are speaking do not jibe with what you said in the past and yet you're not saying what you said in the past is wrong, so.

DERSHOWITZ: I didn't say it was --

COOPER: We're out of time actually.

DERSHOWITZ: I didn't say it was wrong. I'm saying -- what --

COOPER: Right.

DERSHOWITZ: -- I'm saying now is right and they're very similar when I talk about technical crimes.

COOPER: OK.

DERSHOWITZ: And you'll hear my argument laid out in far more detail, uninterrupted when I speak on the Senate floor.

COOPER: All right, Jeff Toobin, Professor Dershowitz, I appreciated as always. Thank you.

Stay with us much more ahead as the Senate prepares for only the third impeachment trial in U.S. history. We'll talk to key Democratic Senator, one of the jurors about the state of play and Professor Laurence Tribe from Harvard joins us also.

(COMMERCIAL BREAK)