# **EXHIBIT 5**

# Deposition Transcript

Case Number: 0-20-CV-61872-AHS
Date: July 15, 2022

In the matter of:

# Dershowitz v Cable News Network, Inc.

# Paul Begala

**CERTIFIED COPY**

Reported by:
Sherry Brooks

**CONFIDENTIAL**



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3

 4  -----------------------------x

 5  ALAN DERSHOWITZ,              )
                                  )
 6            Plaintiff,          )
                                  )
 7            V.                  ) Case No.
                                  )
 8  CABLE NEWS NETWORK, INC.,     ) 0-20-CV-61872-AHS
                                  )
 9            Defendant.          )

10  -----------------------------x Pages 1-206

11

12

13                   CONFIDENTIAL

14

15              VIDEOTAPED DEPOSITION OF

16                   PAUL BEGALA

17              FRIDAY, JULY 15, 2022

18                   10:25 A.M.

19                   Washington, DC

20

21

22

23  REPORTED BY:

24  SHERRY L. BROOKS, CERTIFIED LIVENOTE REPORTER

25  JOB NO. 302375
```

```
 1                 A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        SCHWEIKERT LAW, PLLC

 5        BY:  Mark A. Schweikert, Esq.

 6             1111 Brickell Avenue

 7             Suite 1550

 8             Miami, FL  33131

 9             (305) 999-1906

10             Mark@Schweikertlaw.com

11

12   FOR THE DEFENDANT:

13        DAVIS WRIGHT TREMAINE, LLP

14        BY:  Katherine M. Bolger, Esq.

15             1251 Avenue of the Americas

16             21st Floor

17             New York, NY  10020

18             (212) 489-8230

19             KateBolger@dwt.com

20

21

22

23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE WITNESS:

 4        WILLIAMS & CONNOLLY, LLP

 5        BY:   Kevin T. Baine, Esq.

 6              680 Maine Avenue, SW

 7              Washington, DC  20024

 8              (202) 434-5010

 9              KBaine@wc.com

10

11   ALSO PRESENT:

12        Dana Nolan, In-House Counsel for CNN

13        Alan Dershowitz, (Via Zoom)

14        Ryan J. Heathcock, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2  PAUL BEGALA                                   PAGE

 3     Examination by Mr. Schweikert                 6

 4

 5

 6                    E X H I B I T S

 7  EXHIBIT NO.    DESCRIPTION                     PAGE

 8  Exhibit 25    Congressional Record - Washington  78

 9                  Monday, January 27, 2020 - Senate

10  Exhibit 26    Memorandum Dated 1/29/20 to Paul    83

11                  Begala - Subject:  CNN

12  Exhibit 27    Memorandum Dated 1/29/20 to Pat     92

13                  Wiedenkeller - Subject:  CNN

14  Exhibit 28    Congressional Record - Washington  111

15                  Wednesday, January 29, 2020

16                  Senate

17  Exhibit 29    Presenting the Ludicrous Dershowitz 138

18                  Doctrine Document

19  Exhibit 30    Trump Impeachment Defender Presents 140

20                  The Ludicrous Alan Dershowitz

21                  Doctrine (opinion) - CNN

22

23

24

25          (Exhibits attached to the transcript.)
```

```
 1            Washington, DC, Friday, July 15, 2022

 2                 10:25 a.m. - 4:39 p.m.

 3              P R O C E E D I N G S

 4              *     *     *     *     *

 5            THE VIDEOGRAPHER:  Good morning.  We are

 6   on the record and the time is 10:25 a.m. Eastern.  It

 7   is July the 15th, 2022 and this is the beginning of

 8   the deposition of Paul Begala in the matter of

 9   Dershowitz versus Cable News Network, Inc.

10            The case is venued in the U.S. District

11   Court, Southern District of Florida.  The case number

12   is 0:20-CV-61872-AHS.  This deposition is taking

13   place at Williams & Connolly, LLP at 680 Main Avenue,

14   Southwest, Washington, DC.

15            The videographer today is Ryan Heathcock

16   here on behalf of Steno, and the court reporter today

17   is Ms. Sherry Brooks, also here on behalf of Steno.

18            Would counsel now please identify

19   yourselves and state whom you represent, starting

20   with plaintiff's counsel?

21            MR. SCHWEIKERT:  Good morning.  My name is

22   Mark Schweikert and I represent Alan Dershowitz, who

23   is attending virtually via a Zoom link that is being

24   used during this deposition.

25            MR. BAINE:  Good morning.  My name is
```

1    Kevin Baine and I represent Mr. Begala, the witness,

2    this morning.

3              MS. BOLGER:  Kate Bolger on behalf of CNN,

4    and with me is Dana Nolan, who is in-house at CNN.

5              THE VIDEOGRAPHER:  Thank you, Counsel.

6              At this time would the court reporter

7    please swear in the witness?

8                   *      *      *      *      *

9    WHEREUPON,

10                        PAUL BEGALA

11   having been previously first duly sworn, was examined

12   and testified as follows:

13             THE VIDEOGRAPHER:  Counsel, you may

14   proceed.

15             MR. SCHWEIKERT:  Thank you, sir.

16                       EXAMINATION

17             BY MR. SCHWEIKERT:

18        Q.   Good morning.  Could you please state your

19   name for the record?

20        A.   Paul Begala.

21        Q.   And what do you currently do for a living,

22   sir?

23        A.   I'm a political contributor for CNN.

24        Q.   And are you employed by CNN or is that a

25   --

```
 1        A.    No, I'm a contributor, so I'm not an
 2   employee.  I'm a contributor.
 3        Q.    Do you have any other sources of income?
 4        A.    I do.  I do political consulting and
 5   communication consulting.
 6        Q.    Do you -- are you a W-2 employee of --
 7        A.    No, sir.
 8        Q.    -- any business?
 9        A.    No, sir.  I have my own small firm.
10        Q.    What's the name of that firm?
11        A.    Hat Creek Enterprises, Inc.
12        Q.    And that is a political consulting firm?
13        A.    Yes.
14        Q.    Does your firm do any political consulting
15   for Republican candidates?
16        A.    No.
17        Q.    Is it fair to say you -- strike that.
18              Is it fair to say your firm only does
19   political consulting for Democrats?
20        A.    Yes -- well, for Democratic -- not for
21   politicians.  I don't work for politicians.  I work
22   for causes, organizations, and I do some corporate
23   work that's not political.
24        Q.    Have you ever had your deposition taken
25   before?
```

```
 1        A.    Yes, sir.

 2        Q.    Approximately, how many times?

 3        A.    Once.

 4        Q.    Okay.  When was that?

 5        A.     In the early '90s when I was working in

 6   the Clinton White House.  Maybe mid '90s.  I can't

 7   recall.

 8        Q.    Do you understand -- strike that.

 9              Was that in connection with a civil or a

10   criminal --

11        A.    Yes, sir.  It was civil.

12        Q.    And I know it's been a while, so I'm just

13   going to put a few guidelines out there --

14        A.    Yes, sir.

15        Q.    -- to make this as easy as possible for

16   everybody present.

17              The court reporter is literally

18   transcribing work for word everything that's being

19   said, so although in natural conversation you might

20   anticipate what I'm going to say and we might speak

21   faster than I would ask today, for purposes of a

22   clean record, including allowing any of the lawyers

23   present to object, I would ask if we could just slow

24   the pacing down.

25              Please make sure that you allow me time to
```

1  finish my question, take a beat -- perhaps the

2  lawyers will want to interpose an objection -- and

3  then you can answer unless you're instructed not to

4  by your lawyer.

5              Do you understand that guideline?

6       A.    Yes, sir.

7       Q.    Okay.  And if you need to take a break at

8  any time, you're not here as a hostage.  All I would

9  ask is that we not break in the middle -- strike

10 that.

11             All I ask is that we not break while a

12 question is pending.

13      A.    Right.

14      Q.    Is that fair?

15      A.    Oh, yeah.

16      Q.    Okay.  And I like to remind witnesses,

17 particularly those who haven't been deposed in a

18 while or are being deposed for the first time, this

19 is a formal court proceeding.

20             Even though the judge and jury are not

21 here, I would ask that we conduct ourselves just as

22 if we were in the courtroom with the judge present

23 and the jurors present.

24             Do you understand that instruction?

25      A.    Yes, sir.

1       Q.    All right.  Thank you.  Could you tell me
2   the general subject matter of the case in which you
3   were previously deposed in the mid '90s?
4       A.    Someone -- and I don't know who -- was
5   suing about an allegation that FBI files had been
6   misused.
7       Q.    Misused by who?
8       A.    By somebody in the Clinton administration.
9       Q.    And do you recall why you were the subject
10  of a deposition?
11      A.    Yes, sir, I do.
12      Q.    And what was that?
13      A.    Honestly, Mr. Schweikert, I told a joke.
14  I was giving a speech and I had this joke I always
15  used about my Republican friends.  I was talking
16  about a friend of mine.  I said:  "He's a good
17  Republican, but you wouldn't know it by reading his
18  FBI file."
19          I never had anything to do with the FBI
20  files.  I didn't know the person who had been
21  accused.  It was a stupid joke, but it was a joke.
22  Based on that, I was deposed.  I, obviously, wasn't
23  -- I didn't have anything to do with the case, but
24  they asked me to testify, and so I did.
25      Q.    Do you recall the joke?

```
 1        A.    Yes.  It was that joke.  I said -- I can't
 2   remember who it was, but I was with some Republican
 3   at a public event and I said that.  I said:  "He's a
 4   really good guy, and you might not know that just by
 5   reading his FBI file."
 6            It was a big story then that FBI files had
 7   been allegedly misused, so I was making a joke about
 8   -- I shouldn't have made, but that was it.  That was
 9   my involvement and knowledge in the case, and so I
10   was deposed and I was willing to do so, obviously.
11        Q.    Do you recall if you were a witness or a
12   party to that particular litigation?
13        A.    Well, I wasn't -- define "party."
14        Q.    You're a lawyer, correct?
15        A.    Right.  Well, I have a law degree.
16        Q.    In civil cases typically there's a
17   plaintiff and a defendant.  Are you aware of that?
18        A.    Oh, no.  No, sir.  I was a witness.
19        Q.    Okay.  Do you know who was the plaintiff
20   and who was the defendant in that case?
21        A.    No, sir, I don't.
22        Q.    Was any governmental entity a party to
23   that case?
24        A.    I don't know.
25        Q.    And this was during the time that
```

```
 1   President Clinton was in office?

 2        A.    Yes, sir.

 3        Q.    Was anyone else -- strike that.

 4              What was your connection to the White

 5   House at that time?

 6        A.    I was counselor to the President.

 7        Q.    And what -- what does that mean?

 8        A.    I was an assistant to the President of the

 9   United States.  I was a close advisor to the

10   President.

11        Q.    Advising him on what?

12        A.    Policy, politics, communications.

13        Q.    Anything else?

14        A.    Whatever the President asked for.  It's a

15   job that many have held, but it's usually an

16   especially close aide, to tell you the truth.

17        Q.    Had you previously been affiliated with

18   President Clinton before he was elected to office?

19        A.    Yes, sir.

20        Q.    And what was that affiliation?

21        A.    I worked on his campaign.

22        Q.    Did you have a particular role on his

23   campaign?

24        A.    Senior strategist.

25        Q.    And what did you do generally in your role
```

```
 1   as a senior strategist?
 2        A.   I traveled with the candidate and helped
 3   him execute the strategy.
 4        Q.   Did you help devise or shape the strategy?
 5        A.   Yes, sir.
 6             MS. BOLGER:  Objection to the form.
 7             Sorry, Paul.  Just wait to see if there's
 8   an objection.
 9             (Whereupon, Madam Reporter asked for
10   clarification from Counsel.)
11             BY MR. SCHWEIKERT:
12        Q.   I want to make sure I understand you.  You
13   were affiliated with President Clinton and you
14   assisted in the effort to get him elected to The
15   White House, right?
16        A.   Yes, sir.
17        Q.   And then once he was elected, you were a
18   counselor to President Clinton?
19        A.   Ultimately, in his second term.
20        Q.   During his second term?
21        A.   Yes, sir.
22        Q.   Did you have a role during his first term?
23        A.   Not in The White House.
24        Q.   What was -- did you have any role related
25   to President Clinton during his first term?
```

```
 1        A.    I was a political consultant to the
 2   Democratic party and I advised him in that capacity.
 3        Q.    Were you advising him in connection with
 4   his interest to obtain a second term as president?
 5              MS. BOLGER:  Object to the form.
 6              You can answer.
 7        A.    A little.  I wasn't deeply involved in his
 8   reelection.  We had moved to Austin at the time.  I
 9   helped some, but not much, not anything like the
10   first campaign.
11              BY MR. SCHWEIKERT:
12        Q.    As far as -- well, strike that.
13              During President Clinton's first term, are
14   you aware of whether any efforts were made by him or
15   anyone affiliated with him to help his efforts to
16   obtain a second term as President?
17              MS. BOLGER:  Object to the form.
18        A.    If you could clarify that.  I don't
19   understand.
20              BY MR. SCHWEIKERT:
21        Q.    Sure.  I'm just trying to understand if a
22   first-term president has any interest in doing things
23   during the course of that term to try to get elected
24   for a second term, based on your experience?
25              MS. BOLGER:  Object to form.
```

```
 1        A.    I was not a White House staffer the first

 2   term.  I was an outside political consultant, so it

 3   was my own interest, of course, were -- to advance

 4   the President and the party's political interests.

 5             BY MR. SCHWEIKERT:

 6        Q.    And that would include advancing the

 7   possibility that President Clinton was elected for a

 8   second term, correct?

 9             MS. BOLGER:  Object to form.

10        A.    He had not announced until pretty late in

11   his first term that he would seek a second term, but

12   I wanted him to run.  I wanted him to be successful.

13             BY MR. SCHWEIKERT:

14        Q.    What did a political -- strike that.

15             What did you do as a political consultant

16   during his first term?

17        A.    I gave him political advice.

18        Q.    How did you do that?

19        A.    I talked to him.

20        Q.    Any other ways?

21        A.    Occasional memos, but not a ton.

22        Q.    How frequently did you speak with him?

23        A.    Very.

24        Q.    Weekly?

25        A.    Oh, yes.
```

```
 1        Q.    Daily?

 2        A.    Often daily.  Certainly weekly.

 3        Q.    Without obviously intruding upon any

 4   privilege that may apply, is it fair to say that some

 5   of the consulting that you were provided -- strike

 6   that.

 7              Is it fair to say that some of the

 8   consulting you were providing was related to how to

 9   help the President obtain a second term in office?

10              MS. BOLGER:  Object to form.

11        A.    My focus was a little more immediate then,

12   to tell you the truth.  By the time he was really

13   gearing up for his second term, I had moved to Texas

14   and was not in daily touch or weekly touch at all.

15              So the first, I'd say, 2 1/2 or so years

16   of his term I was a political consultant for the

17   Democratic party in Washington advising the President

18   on politics.  And after somewhere in late, mid '95,

19   my wife and I decided to move back to Texas where

20   we're from.  I certainly supported him, but I didn't

21   talk to him or advise him much for that reelection.

22              BY MR. SCHWEIKERT:

23        Q.    In your role as a political consultant,

24   would you provide your opinion about how a particular

25   policy proposal might be received by the Democratic
```

```
 1  party?
 2       A.    Yes, sir.
 3       Q.    Would you advise him in any way about how
 4  to potentially try to persuade people who had
 5  formally voted for Republicans to cross the aisle and
 6  vote in favor of a Democrat in the next election?
 7            MS. BOLGER:  Object to form.
 8       A.    Yes, sir.
 9            BY MR. SCHWEIKERT:
10       Q.    And that was -- strike that.
11            Was it your understanding that that was a
12  general custom of how presidents operated, at least
13  with respect to their first term, receiving
14  consultation from political advisors such as yourself
15  to assist them in trying to obtain a second term?
16            MS. BOLGER:  Object to form.
17       A.    Yes, sir.  That's my -- I know what I
18  know, what I experienced, my understanding of history
19  is.  Yes.
20            BY MR. SCHWEIKERT:
21       Q.    What did you do before 19 -- strike that.
22            When did you graduate university?
23       A.    Undergraduate, 1983.
24       Q.    And that was from where?
25       A.    The University of Texas at Austin.
```

```
 1        Q.    Is that the -- how do you do that thing?

 2        A.    Oh, come on, Mark.  I've got to coach you.

 3        Q.    I'm a Gator, so --

 4        A.    We do it very similar.  Okay.

 5        Q.    What was your bachelors degree?

 6        A.    Government.

 7        Q.    Okay.  And you said you got a law degree;

 8  is that right?

 9        A.    Yes, sir.

10        Q.    Was that also from UT?

11        A.    University of Texas at Austin.

12        Q.    What year was that?

13        A.    '90.

14        Q.    Did you ever sit for a bar exam?

15        A.    Yes, sir.

16        Q.    For which state?

17        A.    Pennsylvania.

18        Q.    Any other states?

19        A.    No, sir.

20        Q.    Did you obtain a bar license?

21        A.    Yes, sir.

22        Q.    Did you ever practice law?

23        A.    No, sir.

24        Q.    Why not?

25        A.    Didn't want to.  Was not -- it was not my
```

```
 1  -- I loved law school and I thought it was
 2  fascinating, but I wanted to work in politics.
 3              MS. BOLGER:  Too smart to be a lawyer.
 4              THE WITNESS:  Not that, but --
 5              BY MR. SCHWEIKERT:
 6       Q.    Did you know that before you applied to
 7  law school?
 8       A.    Pretty much, yes, sir.
 9       Q.    If you can recall, what was your general
10  thinking about going to law school if you were not
11  that interested in actually practicing law?
12       A.    A lot of politics involves law and
13  lawyers, Number 1.  Number 2, my undergraduate
14  degree, which I loved, I didn't think was as
15  intellectually rigorous as I hoped law school would
16  be, honestly, and I thought it would make me sharper,
17  and it did.
18              It was a long time ago and this makes me
19  sound ancient, but tuition at the University of Texas
20  at Austin was $4 a credit.  So I could go almost
21  free, tend bar, or work at the legislature, which I
22  did, worked my way through law school very easily.
23              And I was in love with a girl who was
24  getting two master's degrees and she was like really
25  deep into the University of Texas Grad school, and so
```

1  I wanted to be around her, too, candidly.

2          So I would go and do a campaign, come

3  back.  That's why it took seven years.  I crammed

4  three years of law school into seven.

5      Q.    Which campaigns were you doing during that

6  time that you were cramming law school into a

7  seven-year period?

8      A.    A lot, Mark.  I'll try to remember.  Bob

9  Casey, the late governor --

10     Q.    Okay.

11     A.    -- Casey for governor in 1986 -- well, in

12  '84.  Let me get that -- I skipped one because we

13  lost.

14         In 1984, I worked for Lloyd Doggett who

15  was running for the U.S. Senate in Texas.  In '86, I

16  worked for Bob Casey, who ran for the governor of

17  Pennsylvania and won.  In '87 I worked for Wallace

18  Wilkinson, who ran for governor in Kentucky and won.

19         In 1988, I worked for Dick Gephardt for

20  president.  And when he dropped out, I worked for

21  Frank Lautenberg in his reelection in New Jersey, and

22  he won.

23         And in '90 -- well, '90 is when I

24  graduated law school, so that would be the end of

25  that period.  I may have missed a few, but I think

```
 1  that was it.
 2       Q.    Were any of those -- strike that.
 3             Were any of those candidates affiliated
 4  with the Republican party?
 5       A.    No, sir.
 6       Q.    All of those candidates were affiliated
 7  with the Democratic party?
 8       A.    Yes, sir.
 9             MR. SCHWEIKERT:  And if I could ask, are
10  you -- are you getting the audio okay?  I think Alan
11  is -- Alan Dershowitz is having a little trouble
12  hearing you guys.  Can you politely maybe just move
13  that mic up your lapel?
14             THE WITNESS:  Oh, sure.  You bet.
15             THE VIDEOGRAPHER:  That microphone is not
16  broken.  The speaker is for the Zoom.
17             THE WITNESS:  Thanks, Ryan.
18             MR. SCHWEIKERT:  Oh, thank you very much.
19  I appreciate it, thank you.
20             BY MR. SCHWEIKERT:
21       Q.    Okay.  How did you meet Governor Clinton,
22  I guess?  Was he governor at that time --
23       A.    Yes.
24       Q.    -- or you knew him beforehand?
25       A.    I did not know him.  One of my clients was
```

```
 1   Zell Miller, who was elected governor with my help in
 2   1990.  Zell and Bill Clinton were good friends.
 3            In 1991, I was off in Pennsylvania.  I was
 4   campaign manager for Harris Wofford.  Unbeknownst to
 5   me, Bill Clinton goes to Atlanta to see his friend
 6   Zell Miller to say, I'm going to run for president.
 7   It might have been '90 -- I think it was '91 because
 8   Zell was governor, I know.
 9            So he spent the night at the governor's
10   mansion in Atlanta and stayed up late talking
11   strategy.  And Miller says to him, as I understand it
12   from both Zell and President Clinton -- Zell is gone
13   now.  But Zell says, I'm going to support you.
14   You're the kind of moderate Democrat we need,
15   Southern moderate.  I'll move up my primary to give
16   you a bigger advantage.
17            And by the way, you should hire these boys
18   who are in my campaign, James Carville and Paul
19   Begala.  And according to Zell, Clinton said, I never
20   heard of them.  And Zell said, Well, maybe that's a
21   good thing because the Democrats have lost the five
22   out of the last six.  Maybe we need some new talent.
23            And so I got a call from Zell Miller who
24   said, I'm going to endorse Bill Clinton and you're
25   going to work for him.  That's how he was.  He was a
```

```
 1  marine.  And so Carville and I met with him because
 2  Zell told us to.
 3              (Whereupon, Madam Reporter asked for
 4  clarification from the witness.)
 5      A.    James Carville and I met with the governor
 6  of Arkansas at the instruction of the governor of
 7  Georgia.  And that's how I met him, anyway.
 8              BY MR. SCHWEIKERT:
 9      Q.    What do you think were the reasons that
10  President Clinton was successful in running for
11  office as opposed to the other Democratic candidates
12  who had been unsuccessful previously?
13              MS. BOLGER:  Object to form.
14              You can answer.
15              MR. BAINE:  Other than the fact that you
16  were advising him.
17      A.    It had nothing to do with me.  Believe me,
18  if I had switched teams, he still would have won.
19  Believe me.
20              BY MR. SCHWEIKERT:
21      Q.    If I understood, the Democrats had lost --
22      A.    Five out of six, yes, sir.
23      Q.    Okay -- five out of six.  And then you in
24  some way, shape, or form enter the picture in helping
25  Governor Clinton at the time run for office, right?
```

1     A.     Yes, sir, but Bill Clinton entered the

2   picture and changed American politics, I think.  He

3   certainly changed Democratic party politics.

4         I had worked principally for moderate

5   conservative Democrats.  Clinton was a moderate

6   Democrat.  He believed that Democrats needed to

7   moderate and modernize the Democratic party.  He

8   called it the third way, not the far left, not the

9   far right, the third way.

10        It was very appealing to me.  It was

11  appealing to voters, more importantly.  That's

12  exactly what voters wanted.  They didn't want the

13  extremes of either party.

14        He also conveyed a terrific sense of

15  empathy.  We were in a recession, and he said, I feel

16  your pain and he'd come up very hard.  His father

17  died before he was born, raised by a single mother,

18  and people were drawn to that, and so he had real

19  empathy.

20        I think that's -- it's hard to really

21  explain and define charisma and the intangibles, but

22  he had those as well.

23     Q.    Do you -- well, strike that.

24        You appear to be a very modest gentleman.

25  But do you in any way, at least in your own head,

1  privately take any credit for helping him get

2  elected?

3       A.     I worked my heart out.  I'm very proud of

4  the work I did.  But when I was a kid -- Bum Phillips

5  was the coach of the Houston Oilers, my favorite

6  team, and his daughter was a friend of mine.  I

7  actually knew Coach Phillips a little bit.

8            And Coach used to say about Don Shula:

9  "He can take yours and beat you or take his and beat

10  you -- wait.  He can take youren and beat hisen or he

11  can take hisen and beat youren.  In other words, it

12  doesn't matter.  He's going to win no matter which

13  team he's got.  That's how good he thought Coach

14  Shula was.

15           I had that view about Clinton.  You know,

16  we beat President Bush.  My partner wound up marrying

17  President Bush's political director, and I believe

18  Bush had a great staff.  He had switched those two

19  staffs, and Bush was very talented, same result.

20           I'm proud of what I did.  I'm really

21  proud, but these things are bigger than a political

22  consultant, believe me.

23           This is what the lawyers call admission

24  against interest.  I'm now going to lose all my

25  clients.

```
1         Q.    You know who Alan Dershowitz is, correct?

2         A.    Yes, sir.

3         Q.    When did you first become aware of Mr.

4    Dershowitz?

5         A.    Probably in law school.  Maybe in college.

6    He was very famous, still is.

7         Q.    Famous with respect to what?

8         A.    Constitutional scholar and -- if I may, I

9    have a memory anyway of being, like, in college or

10   law school seeing him on television saying, If you

11   want to be in the free speech club, here's what

12   you've gotta do:  You've gotta even defend the right

13   of Nazis to march in Skokie.

14             And at the point it made an impression on

15   me, and I think he might have been involved in the

16   case.  I don't know, but I remember thinking that,

17   thinking I'd like to be in that club.  That's a very

18   high bar.

19             So anyway, I came -- that was my first

20   memory of him and I remember being deeply impressed

21   because that is a very high bar.

22        Q.    Did you ever -- well, did there come a

23   time were you ever met him personally?

24        A.    Yes, sir.

25        Q.    When was that?
```

1     A.    Several times, mostly I think through CNN.

2  I may have met him through politics or campaigns.  I

3  don't recall.  I distinctly remember he came on some

4  shows I had.  I interviewed him.

5     Q.    What shows are you thinking?

6     A.    I had a show -- it was the worst show in

7  the world.  It was on MSNBC back when I worked there

8  -- and it was called Equal Time, and it was their

9  version of CrossFire.  And the hosts were yours truly

10 and retired Lieutenant Colonel Oliver North.

11          And we had a debate about gay rights, and

12 it was Alan Dershowitz and me against Ollie North and

13 Jerry Falwell -- Reverend Jerry Falwell.  And do you

14 know what, we kicked their butt -- Alan Dershowitz

15 kicked their butt -- I'm sorry.

16          And this is like the '90s or the early

17 2000s.  It wasn't as popular a position to hold then

18 to be for gay rights.  Things like that, I just

19 remember him and always thought well of him and I

20 still do actually.

21    Q.    Did you have any interaction -- well,

22 strike that.

23          You recall President Clinton being the

24 subject of an impeachment charge, right?

25    A.    Yes, sir.

```
 1       Q.     Did you have any interactions with Mr.

 2   Dershowitz in connection with President Clinton's

 3   impeachment?

 4       A.     I can't recall.  I may have, but I can't

 5   recall.

 6       Q.     Do you know if Mr. Dershowitz did any work

 7   to assist President Clinton in avoiding being

 8   impeached by Congress?

 9              MS. BOLGER:  Objection to form.

10       A.     I don't know about the work.

11              BY MR. SCHWEIKERT:

12       Q.     What do you know about?

13       A.     I know he publicly supported our position,

14   which means a lot to me and still does, and I will

15   never forget that.  I have a long memory about things

16   like that, and I remember people who stood up for the

17   constitution and President Clinton, and he was one of

18   them.

19       Q.     What did he do to stand up for the

20   constitution --

21       A.     Certainly made public --

22       Q.     Hold on.

23       A.     Sorry.

24       Q.     I'm not trying to be rude, but I know

25   Sherry is --
```

```
 1        A.     Sorry, Sherry.  I talk --
 2        Q.     -- probably getting annoyed with both of
 3   us because I also speak fast in natural conversation.
 4   We need to try to slow it down a little bit.
 5               Okay.  I believe you said something to the
 6   effect you remember people who stand up for the
 7   constitution, right?
 8        A.     In that fight particularly, in that fight,
 9   in that impeachment fight.
10        Q.     Okay.  And what do you remember Professor
11   Dershowitz doing at that time?
12        A.     I remember him -- I can't quote him, but I
13   remember him supporting our position that the
14   impeachment was wrong.
15        Q.     Is it possible to move that microphone
16   closer?
17        A.     Yes, sir.
18               MR. SCHWEIKERT:  It's not muted or
19   anything, is it?
20               THE WITNESS:  I don't know how to work
21   these.
22               THE VIDEOGRAPHER:  No, it's not muted.
23               MR. SCHWEIKERT:  Okay.
24               BY MR. SCHWEIKERT:
25        Q.     What do you remember Professor Dershowitz
```

```
 1   doing to support President Clinton during that
 2   impeachment effort?
 3               MS. BOLGER:  Object to the form.  Asked
 4   and answered.
 5               You can answer.
 6       A.    I remember him making public statements in
 7   support of President Clinton and our position that it
 8   was -- that he hadn't committed an impeachable
 9   offense, shouldn't be impeached, shouldn't be
10   convicted.  Many scholars did, and that was an
11   important part of our defense.
12               BY MR. SCHWEIKERT:
13       Q.    What statements do you recall Mr.
14   Dershowitz making?
15               MS. BOLGER:  Object to the form.
16       A.    I can't recall a particular one, but I
17   know I'm right about this.  I know he was on our side
18   in that fight.
19               BY MR. SCHWEIKERT:
20       Q.    Do you recall what the Articles of
21   Impeachment were that were being brought against
22   President Clinton?
23       A.    Yes, sir.  I have to look them up to be
24   specific, but yes.
25       Q.    Generally, what do you recall about those
```

1    Articles of Impeachment?

2         A.    There was an allegation that in a civil

3    deposition -- the allegation was he had perjured

4    himself and there was an allegation he had obstructed

5    justice in that same civil case.  He was found not

6    guilty.

7              MR. SCHWEIKERT:  Can we go off the record

8    and take a little break real quick?  Apparently, my

9    client is having trouble hearing.

10             THE VIDEOGRAPHER:  We're going off the

11   record.  The time is 10:53 a.m.

12             (A break was taken.)

13             THE VIDEOGRAPHER:  We are back on the

14   record.  The time is 11:06 a.m.

15             Counsel, you may proceed.

16             BY MR. SCHWEIKERT:

17        Q.    I believe before we broke to resolve the

18   technical issue I had been asking you if you recall

19   generally the Articles of Impeachment that were

20   brought against Clinton.

21             Do you remember that question?

22        A.    Yes, sir.

23        Q.    Do you have a general recollection of what

24   those articles were?

25        A.    My recollection is there were four, two

```
 1  clustered around -- in-house.  Two clustered around
 2  an allegation of perjury in a civil deposition, two
 3  about alleged obstruction of justice in that civil
 4  case.  I think they might have dropped one before
 5  they went to the Senate, but don't hold me to that,
 6  Mark.
 7      Q.    Of course.  Do you recall if Alan
 8  Dershowitz got involved in arguing against impeaching
 9  President Clinton?
10          MS. BOLGER:  Objection.  Asked and
11  answered.
12      A.    My recollection is he spoke out publicly
13  in defense of President Clinton and against the
14  impeachment.
15          BY MR. SCHWEIKERT:
16      Q.    What do you recall him speaking out
17  publicly?
18          MS. BOLGER:  Objection.  Asked and
19  answered.
20          MR. SCHWEIKERT:  Form, please.
21      A.    I can't recall the specific comments, but
22  I am quite sure he was on our side in that fight, and
23  that means a lot to me.
24          BY MR. SCHWEIKERT:
25      Q.    And your side was what?
```

```
 1        A.      President Clinton's side and I thought and
 2   still do the side of the constitution, that it was an
 3   unwarranted and unjustified impeachment.
 4        Q.      Why?
 5        A.      Because he hadn't committed anything
 6   approaching an impeachable offense.
 7        Q.      What had he allegedly done?
 8        A.      Allegedly?  But he was innocent.  They --
 9   I'm sorry.
10             THE WITNESS:  I'm being combative and I'm
11   being too fast, Sherry.  I apologize.  Sorry, Mark.
12   I'm revisiting a lot.
13             BY MR. SCHWEIKERT:
14        Q.      I'll restate so it's clean.
15             What had President Clinton allegedly done
16   that led to the Articles of Impeachment?
17        A.      Well, they alleged that being maddeningly
18   cute in not wanting to reveal an affair was somehow
19   perjury.  Now, that's a highly biased description,
20   but I'm highly biased.  That's what they had alleged,
21   and the obstruction of justice was even more
22   attenuated.
23             I thought then and I think now it was raw
24   partisan hatred from the people that ran that
25   impeachment.
```

```
 1        Q.    You were highly biased in favor of
 2  Democratic causes at that time?
 3             MR. BAINE:  Objection to form.
 4        A.    Generally, yes, but President Clinton
 5  particularly.
 6             BY MR. SCHWEIKERT:
 7        Q.    Do you still consider yourself to be
 8  highly biased in favor of Democratics -- strike that.
 9             Do you still consider yourself to be
10  highly biased in favor of Democratic causes?
11        A.    I'm a Democrat.  I don't work for
12  politicians anymore.  I'm not as invested -- I'll
13  never be as invested as I was in Bill Clinton.  He
14  was my political hero, but I'm still a Democrat, very
15  much, so in that sense -- I'm very pro-Democrat.  I'm
16  not hiding the ball on that.
17        Q.    The obstruction -- what had President
18  Clinton allegedly done to obstruct justice?
19             MS. BOLGER:  Object to form.
20        A.    I honestly can't remember the specifics.
21  I thought then and I think now it was nuts, but I
22  don't -- I don't remember and I don't want to say for
23  the record and get it wrong.
24             BY MR. SCHWEIKERT:
25        Q.    Do you recall having any communications
```

1  with Alan Dershowitz around the time of the

2  impeachment allegations?

3         MS. BOLGER:  Objection to the form.  Asked

4  and answered.

5     A.   I don't recall.  I may have.  I can't rule

6  it out, but I don't recall.

7         BY MR. SCHWEIKERT:

8     Q.   Do you recall if anyone affiliated with

9  the White House had any communications with Mr.

10 Dershowitz with respect to the impeachment

11 allegations?

12         MS. BOLGER:  Object to form.

13    A.   I don't recall.  I was part of the White

14 House team that was deeply involved in the

15 impeachment, but I can't remember that specifically.

16         BY MR. SCHWEIKERT:

17    Q.   Who was the team deeply involved in

18 impeachment?

19         MS. BOLGER:  You can answer.

20    A.   A team of White House aides attorneys who

21 defended the President on impeachment.

22         BY MR. SCHWEIKERT:

23    Q.   And just so the record is clear, you have

24 a lawyer here representing you?

25    A.   Yes, sir.

1      Q.    And who is that?

2      A.    Kevin Baine.

3      Q.    Okay.  And Ms. Bolger is also present,

4  correct?

5      A.    Yes, sir.

6      Q.    Is she your lawyer today?

7      A.    She's CNN's lawyer and I'm a contributor

8  for CNN.

9      Q.    Okay.  What did you do to prepare for this

10  deposition?

11      A.    Reread the column at issue, the query and

12  answer at issue, met with my lawyers.

13      Q.    So you consider both the lawyers to be

14  your lawyers?

15      A.    They certainly advised me.

16      Q.    What do you mean -- strike that.

17            Did you have any meetings privately with

18  -- excuse me for not remembering your last name --

19  Kevin?

20            MR. SCHWEIKERT:  Is it Kevin?

21            MR. BAINE:  Yes.

22      A.    I spoke with him privately, yes, sir.

23            BY MR. SCHWEIKERT:

24      Q.    Okay.  And then you also had

25  communications with both Kevin and Kate, correct?

1      A.    Yes, sir.

2      Q.    Did you speak with anyone aside from those

3  two individuals?

4      A.    No, sir.

5      Q.    You mentioned you reviewed the article

6  that you predicted is the subject of the deposition,

7  right?

8      A.    May I --

9      Q.    Sure.

10     A.    -- interject here?  This matters to me.

11  It was an opinion column, not an article.  And I know

12  people who are not in media sometimes conflate the

13  two, but to me, there's a big difference.  It's not a

14  news article.  It was an opinion column.

15     Q.    And what's the difference?

16     A.    An opinion column is just that.  A news

17  article is simply reporting the news and an opinion

18  column is giving an opinion about the news.

19     Q.    You have -- you said you are a contributor

20  for CNN, right?

21     A.    Yes.  Yes, sir.

22     Q.    Do you consider your role as a contributor

23  to be a type of journalism?

24     A.    No, sir.

25          MS. BOLGER:  Object to the form.

```
 1              THE WITNESS:  Sorry, Kate.
 2              MS. BOLGER:  That's okay.
 3      A.    No, sir.
 4              BY MR. SCHWEIKERT:
 5      Q.    How would you define your role as a
 6  contributor?
 7      A.    I am an opinion contributor.  My job is to
 8  give our audience my highly opinionated perspective
 9  on political matters.  They don't bring me in on,
10  obviously, COVID or something.  But on political
11  matters it's my job to provide my experience and
12  insights from my very Democratic point of view for
13  the audience.
14      Q.    And according to you, an opinion
15  contributor is not a journalist, right?
16              MS. BOLGER:  Object to form.
17      A.    Certainly not a reporter and not a
18  journalist.  I think you're right.
19              BY MR. SCHWEIKERT:
20      Q.    Are there any standards that you're aware
21  of that would apply to your work as an opinion
22  contributor?
23      A.    I'm sure CNN has standards.  I don't know
24  that I've read them, to tell you the truth.  I'm
25  sorry.  There's certainly -- I have my own standards,
```

```
 1   if that's what you're getting at.
 2        Q.    Sure.  What are your standards, sir?
 3        A.    I try hard to be fair.  I try very hard to
 4   be accurate.  I try hard to be an advocate and to be
 5   a faithful advocate for the opinion that I'm
 6   presenting.  I try to be interesting.
 7              And this sounds silly, I try to be funny.
 8   I find it really matters in politics when people are
 9   at each other's throat if you can lead in with a
10   little humor.
11        Q.    And do you believe that you comported
12   yourself with those standards that you just described
13   in preparing the opinion piece that is the subject of
14   today's deposition?
15        A.    Yes, sir, I do.
16        Q.    Do you believe your opinion in that piece
17   was accurate?
18        A.    It was certainly an accurate reflection of
19   my opinion.
20        Q.    Do you believe your opinion piece was
21   fair?
22        A.    Yes, sir.
23        Q.    And what do you mean by fair?
24        A.    That's a good question.  Faithful to the
25   subject matter and a fair presentation of my analysis
```

```
 1  of my opinion.
 2       Q.    Do you -- well, is one of your standards
 3  also to be fair to any persons that may be the
 4  subject in whole or in part of one of your opinion
 5  pieces?
 6            MS. BOLGER:  Object to the form.
 7       A.    I try to be, yes, sir.
 8            BY MR. SCHWEIKERT:
 9       Q.    And I believe you also said one of your
10  standards was to be faithful; is that right?
11       A.    Yes, sir.
12       Q.    Could you please explain to me what you
13  meant by that?
14       A.    To not betray my own values and
15  principles.
16       Q.    And what are those values and principles?
17       A.    Well, a lot.  I mean, I believe in this
18  country.  I believe in opportunity.  I believe in
19  democracy very deeply.  I believe in equality.  I
20  believe in opportunity.  I believe in community.
21            My values are deeply shaped by my religion
22  -- I'm a very religious person -- and by my politics.
23  I'm a very political person.
24       Q.    Are there any other personal standards
25  that you believe or strive to comport with when
```

1  preparing opinion pieces for CNN?

2        MS. BOLGER:  Object to the form.

3     A.    I think I covered it.

4        BY MR. SCHWEIKERT:

5     Q.    And you have never read any standards that

6  are applicable to your work as an opinion contributor

7  for CNN?

8     A.    I know I'm required to disclose certain

9  things to CNN, you know, work that I do so that they

10  know if I'm talking about a subject if I'm on the

11  side of that subject.

12        I don't work for politicians anymore, so

13  it doesn't come up as often.  But when I used to, I

14  would disclose that.  I always disclose all my

15  clients to CNN.  But for conflicts of interest

16  purposes they have standards, and I think very good

17  ones.

18     Q.    It appeared you were looking in the

19  direction of your lawyers for a moment.

20     A.    She moved and I wanted to make sure I

21  wasn't interrupting her when she was trying to make a

22  comment or an objection.

23     Q.    And who is she?

24     A.    Kate Bolger.

25        MS. BOLGER:  For the record, I checked a

1  text message from my daughter.

2          BY MR. SCHWEIKERT:

3      Q.    You're aware that today's deposition is

4  being videotaped, correct?

5      A.    Yes, sir.

6      Q.    And that today's deposition is to preserve

7  your testimony for purposes of trial in this lawsuit,

8  right?

9      A.    Yes, sir.

10     Q.    Okay.  And that it's possible that some or

11 all of this videotape may ultimately be presented to

12 the court and jury in this case, right?

13     A.    Yes, sir.

14     Q.    Okay.  Have you ever had any discussions

15 with anyone at CNN with respect to standards that you

16 should apply to your opinions that are submitted to

17 CNN for potential publication?

18          MS. BOLGER:  Object to form.

19     A.    If I may, you mean columns?  I've gotten a

20 lot of advice about how to perform on television as

21 an analyst or a host.  I was an anchor for a while,

22 but do you mean just columns?

23          BY MR. SCHWEIKERT:

24     Q.    Yes.  Just so we're clear, an opinion

25 piece, in your mind, is also called a column?

```
 1        A.     Yes, sir.

 2        Q.     Okay.  And I understand you were also an

 3   on-air talent for CNN, right?

 4        A.     Yes, sir.

 5        Q.     Well, with respect to your work as an

 6   on-air talent, were there standards that you were

 7   made aware of that apply to your role as a broadcast

 8   journalist?

 9        A.     Yes, sir.

10             MS. BOLGER:  Object to form.

11             And you can answer that question, but I

12   would instruct you that to the extent that you talk

13   about news gathering or the production of news

14   unrelated to the news at issue here, you should not

15   discuss the specifics.

16             CNN takes the position that those are

17   privileged according to the Florida statute, the New

18   York State statute, the Florida constitution, and the

19   New York constitution and its (sic) state's

20   constitution.  So do not discuss specifics of any

21   reporting or commenting --

22             THE WITNESS:  Or news gathering --

23             MS. BOLGER:  -- or news gathering or

24   commentating, other than at issue here.  You can

25   obviously talk about what was public but not what was
```

```
 1   outside of the public.
 2              BY MR. SCHWEIKERT:
 3       Q.    Are you aware of any standards that are
 4   memorialized in writing, whether it's digitally or on
 5   a piece of paper, that were provided to you in
 6   connection with your performance as an on-air
 7   broadcaster or commentator?
 8              MS. BOLGER:  I'm going to object to the
 9   form of that and instruct you not to answer.
10              MR. SCHWEIKERT:  On what grounds?
11              MS. BOLGER:  That it is protected by news
12   gathering privilege unrelated to the publication at
13   issue here.
14              MR. SCHWEIKERT:  I asked about written
15   policy -- well, strike that.
16              I asked about written standards, and that
17   in your opinion is privileged?
18              MS. BOLGER:  So the question was written
19   standards that applied to his conduct on air, and
20   that is not at issue in this lawsuit.  So what he
21   knew or did not know about anything he ever said in
22   any other context is not at issue in this lawsuit
23   when it comes to the news gathering.
24              So you may not answer the question.
25              BY MR. SCHWEIKERT:
```

 1      Q.    Are you going to abide by that

 2 instruction?

 3      A.    Yes, sir, I'm going to listen to counsel.

 4      Q.    Okay.  Do you know what -- well, strike

 5 that.

 6            Have you ever been made aware of any

 7 ethical standard that apply to journalists in

 8 general?

 9            MS. BOLGER:  That one you can answer.

10      A.    Yes, sir.

11            BY MR. SCHWEIKERT:

12      Q.    And were you made aware of any of those

13 types of standards while you were employed -- well,

14 strike that -- while you were doing work for CNN in

15 any capacity?

16            MS. BOLGER:  Object to the form.

17            You may answer that question as it comes

18 to the news gathering at issue here, but from -- if

19 it's related to any other news gathering, we would --

20 CNN would assert that that's protected by the news

21 gathering privilege.

22            So you should not answer as to any other

23 work you've done for CNN, but you can certainly

24 answer as to this column.

25            THE WITNESS:  In terms of writing columns?

 1                  MS. BOLGER:  To this column, yes.

 2          A.     I can't recall standards about columns

 3   being written and handed to me.

 4                  BY MR. SCHWEIKERT:

 5          Q.     Are you aware that The New York Times, for

 6   example, publishes their standards of journalism on

 7   their website?

 8          A.     I was not.

 9          Q.     Do you know if CNN has ever made publicly

10   available any of its standards with regard to how its

11   content is reviewed for compliance with any

12   journalistic ethical standards?

13          A.     I'm not aware.

14          Q.     Do you believe as a general concept that

15   transparency is important in a democracy?

16          A.     Certainly governmental transparency.  I've

17   spent a lot of my time in the government and the

18   government has to be transparent, certainly.  I

19   understand companies sometimes.

20          Q.     What about media companies?  Do you

21   believe transparency is important?

22          A.     Yes, and so is privilege.  I taught

23   journalism.  I've never practiced it, but privileges

24   matter.  If somebody tells you something in

25   confidence, you have to hold that in confidence.  So

1  in that sense, transparency is not -- is not the same

2  as it is in the government.

3      Q.    When did you teach journalism?

4      A.    The University of Texas at Austin 1995-6.

5  That's when I told you my wife and I moved back to

6  Austin.

7      Q.    Did -- strike that.

8            Did any of your subject matter materials

9  that you taught to your students include standards

10 that they should consider in potentially working in

11 the field of journalism after they graduated?

12     A.    That's a long time ago, Mark.  I can't

13 recall.  I co-taught the class with a journalist, a

14 really esteemed journalist, so it was a class about

15 politics and the press, and I was the politics guy.

16 But it was in the journalism department.

17     Q.    Do you recall the name of the class?

18     A.    Politics and the Press, I think.

19     Q.    Do you believe that the media has a

20 license to make false representations about

21 politicians?

22     A.    They have the freedom of speech to do it,

23 but as somebody who worked for a lot of politicians,

24 it annoys the heck out of me.

25     Q.    Is that a yes or a no?

1          A.     Can you restate it, please?

2          Q.     Sure.   I understand you're having trouble

3     to (sic) me describing general journalistic standards

4     that you may have taught, right?

5                 MS. BOLGER:   Object to form.

6                 MR. BAINE:   I object to that

7     characterization.

8          A.     I taught the politics side of that class.

9     We had a really esteemed journalist who taught the

10    journalism side, so I want to be clear when I say I

11    taught in the journalism school.   And it was a class

12    about journalism, but my side of it was the political

13    side because that's what they wanted to -- they

14    wanted a journalist and a politician.

15                BY MR. SCHWEIKERT:

16         Q.     Did your side ever include educating

17    students on how to report news related to politics?

18         A.     No, not really.   It was much more here's

19    how politicians describe it; here's how they approach

20    it because some of the kids probably want to get into

21    politics.   Some want to get into journalism.   Some

22    probably did other things.

23         Q.     What do you mean by that?

24         A.     In other words, I would -- I would -- it's

25    a long time ago.   My recollection is I would teach

1  about how politicians approach the press rather than

2  how the press should approach a politician because

3  that's not my side of the relationship.  Right?

4  Here's how politicians think about the press.  Here's

5  how politicians speak to the press.

6      Q.    And do you recall what you generally

7  educated your students about with respect to how

8  politicians viewed the press?

9          MS. BOLGER:  Object to the form.

10      A.    Some.  I remember one that I really wanted

11  to impart on them, my own sense of what the rules are

12  for on the record, off the record, background, et

13  cetera.  I find that laymen get that wrong all the

14  time and they get burned by journalists.

15          And my understanding of it, what I taught

16  my students, was if you say I'm going to trade Max

17  Scherzer, but that's off the record -- Max Scherzer

18  is a --

19          THE WITNESS:  I'm sorry, Sherry --

20  S-C-H-E-R-Z-E-R.

21      A.    -- and then you stop and say, oh, but

22  that's off the record, my understanding of the rules

23  of journalism is tough luck for you, that you have to

24  establish the on-the-record or off-the-record status

25  first and then provide the information.

```
 1              This is a rule that most laymen don't know
 2    and my students didn't know.  So I wanted them to
 3    understand when you talk to a journalist if you're on
 4    my side of the ledger, if you're going into politics
 5    -- if you're on my side of the ledger, when you talk
 6    to journalists, establish the ground rules first
 7    before you ever provide the information.
 8              So things like that, and to me, that was
 9    important that students know how to deal with
10    reporters.
11              BY MR. SCHWEIKERT:
12         Q.   In your view, is it fair of a journalist
13    to report news based upon information obtained after
14    the source had said, off the record?
15              MR. BAINE:  Objection to the form of that
16    question.
17              MS. BOLGER:  Objection to form.
18              MR. BAINE:  You can answer the question.
19              THE WITNESS:  Can you restate it, please,
20    Mark?
21              BY MR. SCHWEIKERT:
22         Q.   I understood you to be drawing a
23    distinction between information acquired on the
24    record versus off the record, right?
25         A.   Yes, sir.  And there's a -- other
```

 1  gradations within that.

 2       Q.    Okay.

 3       A.    There's off the record.  There's deep

 4  background.  There's background.  There's on the

 5  record.

 6       Q.    And is part of the concept that material

 7  acquired on the record may be used in journalistic

 8  publications, whereas information acquired off the

 9  record should not be used in journalistic

10  publications?

11            MS. BOLGER:  Object to the form.

12       A.    My own -- what I taught my students was on

13  the record means use my name, use my quotes and the

14  facts.  So Begala says he's going to trade Max

15  Scherzer.  Quote, I'm trading Scherzer to Los

16  Angeles.  That would be an example of on the record.

17            Background is use the quote but not my

18  name and characterize it in a way that the audience

19  is not misled.  So a source close to the Washington

20  Nationals or with knowledge of the National's front

21  office plans says, quote, I'm going to trade Scherzer

22  to Los Angeles.

23            Deep background, in my understanding --

24  this is how I teach it.  Okay?  It's important for me

25  that students know this when they deal with reporters

```
 1   because I find that they don't tell you this.

 2           Deep background means don't use my name,

 3   don't use the quote, but you can use the information.

 4   So you just say, A source close to the Nationals says

 5   they're going to trade Scherzer, but you don't have a

 6   quote.

 7           Off the record is theoretical and, to my

 8   mind, doesn't exist; that is, this conversation never

 9   happened.  I say it doesn't exist as a practical

10   matter.

11           I tell my students if you say I'm going to

12   trade Max Scherzer and you say off the record, off

13   the record, and the journalist says sure, no problem,

14   we're going to -- I'm going to trade Scherzer,

15   they're going to hunt that done.  They can't unlearn

16   that.  They're going to go to other sources, and so

17   it's going to be in the newspaper tomorrow that the

18   Nats are trading Max Scherzer.

19           So that's my counsel, is that the notion

20   that the conversation never happened outside a

21   confessional does not exist.  Anyway, that's the kind

22   of stuff I did, the practical political side of it.

23           I was very proud.  My governor, George W.

24   Bush, came to that class once.  He did.  He was my

25   substitute teacher once.  John Kennedy, Jr., my close
```

 1  friend who I was working for his magazine, he came.

 2  I mean, I loved that class.

 3          I wanted the students to have the -- from

 4  my side of the ledger.  The journalist was good about

 5  explaining how journalists operate, and we would

 6  tussle.

 7          BY MR. SCHWEIKERT:

 8  Q.    Were there any other considerations that

 9  you taught your students during that class about --

10  A.    Yes.

11  Q.    -- what information is fair to use in

12  reporting news?

13          MS. BOLGER:  Object to the form.

14  A.    No, sir.  I left that more to the

15  journalists.  I'm much more on the source side and I

16  would -- the other thing that's absolutely essential

17  honestly, never, ever, ever, ever, lie; do not lie.

18  It's okay to say I'm not free to say.  It's okay to

19  say none of my business, but you can't lie.

20          Ethically, I think it's wrong.  But also

21  if a journalist believes you're a liar, it's going to

22  ruin your career with her.  She's not going to come

23  back to you.  So if you say to her -- if she says,

24  Hey, are you going to trade Scherzer and you say, no,

25  we love Max; he's never leaving, and then two days

1  later he's in Los Angeles, she's never going to trust

2  you again, but also it's an unethical thing.  You're

3  a liar then.

4           That's a huge thing, and people think

5  politicians or political actors or anybody talking to

6  the press lies all the time.  That's not what I want,

7  so I try to instill that certainly.  But, again,

8  that's my perspective of it as someone who has dealt

9  with the press from the other side.

10          I'm not a reporter, never have been a

11  journalist.  I'm on the other side of it.

12          BY MR. SCHWEIKERT:

13  Q.   Would you agree that someone providing an

14  opinion piece to a media company for potential

15  publication should never lie?

16  A.   Yes, sir.

17  Q.   What -- is there anything else that

18  someone who is providing opinion pieces to a media

19  company should never do, according to you?

20          MS. BOLGER:  Objection.

21  A.   A lot.

22          BY MR. SCHWEIKERT:

23  Q.   Like what?

24  A.   I -- I've tried very hard and I followed

25  -- I don't use bad language in print.  I have a potty

 1  mouth, as my wife says, you know, things like that.

 2      Q.    Do you believe it's appropriate for

 3  someone providing an opinion piece to use potentially

 4  offensive stereotypes?

 5          MS. BOLGER:  Object to the form.

 6      A.    Wow.  As a general matter, no, but we live

 7  in a very sensitive time and sometimes a little

 8  politically correct.  And so what yesterday was

 9  appropriate, tomorrow is not.  And for old guys like

10  me, that's sometimes a little baffling.  The

11  nomenclature shifts quickly.

12          BY MR. SCHWEIKERT:

13      Q.    Would you agree that analogizing someone's

14  statements as the equivalent of justifying the

15  genocide of Jews during World War II to be an

16  appropriate stereotype for an opinion writer?

17          MS. BOLGER:  Object to the form.

18          MR. BAINE:  Objection to the form of the

19  question.

20      A.    I'm not familiar with that.  One of my

21  many rules in politics is never ever compare anything

22  to the Holocaust, ever.  I've seen Democrats do it.

23  I've seen Republicans do it, and I think it is always

24  a mistake because there is nothing to compare that

25  to.

1              BY MR. SCHWEIKERT:

2       Q.    Does the word Hitler remind you of the

3   Holocaust?

4       A.    Yes, sir.

5       Q.    Are there any other things that you

6   believe someone who is preparing an opinion piece for

7   potential publication in the media should be wary of?

8              MS. BOLGER:  Object to the form.

9       A.    It's very broad.  I think I've tried my

10  best to cover as best I can having -- you know, just

11  off the top of my head, so I'm sure there are that I

12  have that I'm not thinking of in this instant moment.

13             BY MR. SCHWEIKERT:

14      Q.    And you can't recall any particular

15  standards that CNN may have made you aware of that

16  applied to your work as an opinion contributor for

17  CNN?

18             MS. BOLGER:  Object to the form.  Asked

19  and answered.

20      A.    That's correct.

21             BY MR. SCHWEIKERT:

22      Q.    What about guidelines?

23             MS. BOLGER:  Object to the form.  Asked

24  and answered.

25      A.    Could you define that?

```
 1                 BY MR. SCHWEIKERT:
 2        Q.    What does guidelines mean to you?
 3        A.    Yeah, I guess just what you said, right,
 4   rules.  Maybe a guideline is not as enforceable as a
 5   rule.  I don't know.  You tell me what you mean by
 6   that.
 7        Q.    I will accept your definition of not as
 8   enforceable as like a rule.  It's a guideline, right,
 9   something that should guide you but is not
10   necessarily a black and white line in the sand?
11              Is that fair?
12        A.    Yes, sir.  That makes sense to me.
13        Q.    Are you aware of any guidelines that CNN
14   may have provided to you in connection with your work
15   as an opinion contributor?
16              MS. BOLGER:  Object to the form.  Asked
17   and answered.
18        A.    I can't think of one right now, no.
19              BY MR. SCHWEIKERT:
20        Q.    Did you have carte blanche to submit any
21   content for potential publication by CNN in your role
22   as an opinion contributor?
23              MR. BAINE:  Object to form.
24              You can answer.
25        A.    To submit, I suppose, yes.  But the way I
```

```
 1   operate is I would do a pitch.  In other words, I
 2   would email and afterwards say, Hey, I want to write
 3   a column about the Nebraska Senate race.  And she may
 4   say, Nobody cares about Nebraska; go away, or sure,
 5   let's see it.
 6            BY MR. SCHWEIKERT:
 7       Q.   Did you have carte blanche with respect to
 8   the rhetoric that you used in writing opinion pieces
 9   that were considered for publication by CNN in your
10   role as a contributor?
11            MS. BOLGER:  Object to the form.
12       A.   In what I submit, but, of course, it's not
13   a tweet.  It's not -- it doesn't go straight to the
14   audience.
15            BY MR. SCHWEIKERT:
16       Q.   In your role as a contributor, did you
17   have an expectation that CNN would review your piece
18   and make a determination if it was appropriate for
19   publication?
20       A.   Yes, sir.
21       Q.   And do you believe CNN did that with
22   respect to the opinion piece that's the subject of
23   today's deposition?
24       A.   Yes, sir.
25       Q.   Do you recall how -- strike that.
```

```
 1              Do you recall how you were made aware of
 2    -- strike that.
 3              What led you to prepare a draft opinion
 4    regarding Mr. Dershowitz's statements with respect to
 5    a quid pro quo during Trump's first impeachment
 6    trial?
 7              MS. BOLGER:  Object to the form.
 8        A.    My recollection is I received an email
 9    asking me if I wanted to write a column on it.
10              BY MR. SCHWEIKERT:
11        Q.    Do you recall where you were?
12        A.    Yes, sir.
13        Q.    Where was that?
14        A.    Denver Airport.
15        Q.    Did you comply with that request -- strike
16    that.
17              Did you comply with that request and
18    prepare a piece -- an opinion piece for CNN's
19    consideration?
20        A.    Yes, sir.
21        Q.    Tell me everything you did in connection
22    with -- strike that.
23              What did you do to ensure that the opinion
24    you were proposing to be published on CNN comported
25    with your standards of being accurate, fair, and
```

```
 1  faithful?
 2            MS. BOLGER:  Object to the form.
 3            You can answer.
 4       A.   Can you restate that?  I missed the
 5  beginning of it.  I'm sorry.
 6            MR. SCHWEIKERT:  Sherry, would you mind
 7  reading that back?
 8            (The reporter read back the question.)
 9       A.   That's -- that's how I write.  That's what
10  I do.
11            BY MR. SCHWEIKERT:
12       Q.   Did you -- did you watch the entirety of
13  the impeachment trial?
14       A.   That's my recollection, yes, as much as I
15  could.  I think I watched all of it.
16       Q.   Contemporaneously --
17       A.   Yes, live.  I'm sorry, Mark.
18       Q.   We're getting a little --
19       A.   Go ahead.
20            MR. SCHWEIKERT:  I ask very predictable
21  questions, I know, and you're very friendly and I
22  appreciate that.  But to make Sherry's life easier
23  and the record cleaner, let's be unnaturally slow,
24  please.
25            BY MR. SCHWEIKERT:
```

1      Q.    You believe you watched the entirety of

2   Trump's first impeachment trial; is that right?

3      A.    Yes, sir.

4      Q.    Did you watch it contemporaneously or at

5   some later time?

6      A.    Contemporaneously.

7      Q.    Do you recall watching Mr. Dershowitz's

8   argument on January 27th?

9      A.    Yes, sir.

10      Q.    Do you recall watching Mr. Dershowitz's

11   answers during the Q and A portion on January 29th?

12      A.    Yes, sir.

13      Q.    And had you -- and you had watched both of

14   those events before you prepared a draft of your

15   opinion piece for CNN's consideration?

16      A.    Yes, sir.

17      Q.    And you believed that your draft opinion

18   piece comported with your standards of being

19   accurate, fair, and faithful?

20      A.    Yes, sir.

21      Q.    Did you do anything specifically to ensure

22   that the opinion you were expressing in your proposed

23   piece was accurate?

24      A.    Yes, sir.

25            MS. BOLGER:  Object to form.  Asked and

 1   answered.

 2              Answer again.

 3              MR. SCHWEIKERT:  I did not ask yet, and,

 4   please, form only.

 5              MS. BOLGER:  Mark, just for the record --

 6   because we keep doing this -- asked and answered is

 7   actually not a form objection.  I checked.  I'm

 8   allowed to say asked and answered.

 9              MR. SCHWEIKERT:  Not to the extent that

10   you are suggesting to the witness that he should

11   respond to my question in the sense that it already

12   had been asked or I told you before which that could

13   be construed as.

14              I will stipulate with you that if you

15   assert a form objection that encompasses an asked and

16   answered objection.

17              MS. BOLGER:  I choose not to stipulate to

18   that because I think they're not the same thing.

19              (Simultaneously speaking.)

20              MR. SCHWEIKERT:  If you prefer to continue

21   to make argumentative and suggestive speaking

22   objections -- and I would ask again, Counsel, please,

23   refrain.

24              You can assert your objections.  I cannot

25   control your behavior, but I can ask you to comply

```
 1  with Rule 30, which says that objections should be
 2  stated in a concise, nonargumentative, and
 3  nonsuggestive manner.
 4           (Simultaneously speaking.)
 5           MS. BOLGER:  And I will just for the
 6  record say that out of respect for your continued
 7  request that I do so, I actually looked it up.  And
 8  under Rule 30, asked and answered is a different
 9  objection than form, and that is why I'm saying asked
10  and answered.
11           MR. BAINE:  Let me add one thing.  I think
12  the witness has demonstrated today that he formed his
13  own answers by himself.  He's not taking cues from
14  anybody.
15           MR. SCHWEIKERT:  Of course.  I'm not
16  saying that, Kevin.
17           MR. BAINE:  Okay.
18           MR. SCHWEIKERT:  And the conduct today has
19  been different than what I believe I experienced in
20  some other depositions, so I was not suggesting that
21  anything improper had occurred today.
22           I was just reminding Ms. Bolger, who is
23  aware of my position because I've already submitted
24  it in part to the court, that I do not believe
25  speaking objections that could be construed as
```

```
 1  attempts to guide the testimony are appropriate.
 2           She has stated her counterposition, and
 3  the record will reflect what the record reflects.
 4           BY MR. SCHWEIKERT:
 5      Q.   So I will ask my question again.
 6      A.   Yes, sir.
 7      Q.   What did you do specifically to ensure
 8  that your opinion piece was accurate?
 9           MS. BOLGER:  Objection.  Asked and
10  answered.
11      A.   I referred to the CNN news account of that
12  Q and A that CNN sent me, in addition to having
13  watched it myself.
14           BY MR. SCHWEIKERT:
15      Q.   Do you recall that a woman by the name of
16  Pat Wiedenkeller contacted you to ask for a draft
17  opinion?
18      A.   Yes, sir.
19      Q.   And do you recall that she provided a
20  hyperlink to an article?
21      A.   Yes, sir.
22      Q.   Is that a yes?
23      A.   Yes, sir.
24      Q.   And is that the article that you were just
25  referencing?
```

1      A.    Yes, sir.

2      Q.    Okay.  So you reviewed that article in

3  connection with considering whether your opinion

4  piece was accurate, right?

5      A.    Yes, sir.

6      Q.    Did you do anything else?

7      A.    No, sir.

8      Q.    Did you -- okay.

9            What did you specifically do to ensure

10  that your opinion piece that you were drafting for

11  CNN's consideration was fair?

12            MS. BOLGER:  Object to the form.  Asked

13  and answered.

14      A.    I don't have a separate process.  That's

15  how I try -- that's how I try to conduct myself.

16            BY MR. SCHWEIKERT:

17      Q.    Did you do anything specifically to ensure

18  that the opinion piece you were drafting for CNN's

19  consideration was faithful?

20            MS. BOLGER:  Object to the form.  Asked

21  and answered.

22      A.    That's how I operate, yes, sir.

23            BY MR. SCHWEIKERT:

24      Q.    Did you do anything other than review the

25  article that was given to you by way of a hyperlink

1  in an email from Pat Wiedenkeller?

2       A.    I can't recall.  I may have looked at

3  other articles on my laptop while I was writing it,

4  but I know I relied on the article that Pat sent me.

5       Q.    Did you go back and rewatch any portion of

6  Mr. Dershowitz's statements on January 27th or

7  January 29th?

8       A.    No, sir, not at that moment, not when I

9  was writing --

10      Q.    Did you --

11      A.    -- that I recall, to be fair.

12      Q.    Fair enough.  As you were authoring your

13 draft piece, did you consider in your mind statements

14 that you recalled hearing Mr. Dershowitz make on

15 January 27th or January 29th?

16           MS. BOLGER:  Object to the form.

17 Compound.

18      A.    The 29th, yes.  The 27th, no.

19           BY MR. SCHWEIKERT:

20      Q.    Okay.  And what do you think you know with

21 respect to statements on January 29th?

22           MS. BOLGER:  Object to the form.

23      A.    That Professor Dershowitz was asked a

24 question by Senator Cruz and he responded.

25           BY MR. SCHWEIKERT:

```
 1        Q.    What was his response?
 2              MR. BAINE:  Object to the form.
 3        A.    His -- as I recall -- I don't have it in
 4   front of me.  As I recall, his response -- well, the
 5   question, more importantly, was about a quid pro quo,
 6   which was at the heart of the matter in that
 7   Ukraine-related case.
 8              And the question was limited to something
 9   like must a quid pro quo be about something illegal
10   in order to be impeachable, or something like that,
11   that Senator Cruz had asked.
12              Professor Dershowitz began by saying,
13   Well, if a quid pro quo is illegal, then it's
14   unlawful or some tautology like that.  And then he
15   said there's -- I may get this in the wrong order.
16   Okay?  This is my memory.
17              This is very much a law professor.
18   There's three cases here.  There's three instances.
19   One is purely pecuniary interest, and that's
20   obviously wrong:  I'll give you your weapons if you
21   build me a hotel; the money goes in my bank.  He said
22   that's clearly wrong.
23              There's clearly public policy, and he used
24   an example that's very close to my heart:  Stop
25   paying Palestinian terrorists or we won't give you
```

1  any more money.  I strongly believe in that.  Anyway,

2  I'll get to it later.

3            The third case is the more difficult case

4  he said where there's mixed motives, and this is

5  where all my red flags went up as a campaign guy.  He

6  seemed to me, in my opinion, to be saying if you're

7  pursuing your reelection; that is, ipso facto in the

8  national interest, and so, therefore, what you do

9  cannot be criminal, cannot be impeachable.

10            That's what set off the red flag.  I do

11  remember, now that you said this before Pat emailed

12  me, seeing a tweet from CBS, the lead of which was

13  just that, something like -- again, this is memory --

14  but something like Dershowitz says, if you're

15  pursuing your reelection, you can't do anything

16  illegal, something like that.

17            I don't have it quite right.  I don't mean

18  to besmirch CBS, but that's -- that also was in my

19  head, that they had tweeted that even before I had

20  heard from Pat.

21            BY MR. SCHWEIKERT:

22      Q.    Did you make any attempt to contact Mr.

23  Dershowitz?

24      A.    No, sir.  I'm smiling because I've been

25  through a Senate impeachment trial.  It would never

 1   occur to me -- we're not close enough -- but also

 2   he's probably pretty busy.

 3       Q.    Did you consider the draft opinion piece

 4   to be rather -- strike that.

 5            You recalled some of the examples Mr.

 6   Dershowitz gave in talking about potential motives a

 7   president could have --

 8       A.    Yes, sir.

 9       Q.    -- in engaging a quid pro quo, right?

10       A.    Yes, sir.

11       Q.    Do you recall him giving any example that

12   referenced former President Lincoln?

13       A.    I do and I remember because that wasn't a

14   quid pro quo.  There was no this for that in his

15   example.  He's says -- I'm sure he's right.  I intend

16   to check the history.

17            He says Lincoln ordered Sherman to allow

18   the troops to go vote in Indiana in the election of

19   1864, I presume, his -- Lincoln's reelection.

20            And Professor Dershowitz says that was

21   clearly in Lincoln's political interest, but also he

22   believed it was in the national interest because that

23   would help his -- Lincoln's reelection to help win

24   the war.  That's what Professor Dershowitz said, and

25   he's like, none of us would say that's impeachable.

```
 1            I will note, again, that's not a quid pro
 2   quo.  So now we're beyond even just this-for-that
 3   exchanges, right?  Tell the Palestinians I won't give
 4   you any more of my taxpayers' money if you don't stop
 5   paying tariffs.
 6            This is like way beyond quid pro quo.
 7   This is like basic exercises of presidential power
 8   where troops are moved.  So that was not a quid pro
 9   quo, even though the question was.  So his answer
10   went beyond Senator Cruz's question.
11       Q.   You don't believe that that example
12   implied a quid pro quo between Lincoln and General
13   Sherman?
14       A.   That's correct, I do not believe that.  I
15   believe it was a straight exercise of presidential
16   power.  There's no quid pro quo between a president
17   and a general.
18       Q.   But you would --
19       A.   The president says yes -- I'm sorry.
20            The president gives an order.  The general
21   says yes, sir.  There's no this for that in that
22   relationship.  There cannot be or we don't have
23   civilian control in the military.
24       Q.   Would you agree that General Sherman's
25   responsibilities at that time included doing his best
```

```
 1   to win the war?
 2            MS. BOLGER:  Object to the form.
 3        A.   Yes, sir.
 4            BY MR. SCHWEIKERT:
 5        Q.   And would you agree that General Sherman
 6   reducing the number of soldiers in his army for
 7   purposes of allowing them to vote in favor of a
 8   particular president could potentially be harmful to
 9   his effort to win the war?
10            MS. BOLGER:  Objection to the form.
11        A.   I have no idea.  I've never served in the
12   military.  That's way beyond me.  I wasn't even
13   familiar with the story until Professor Dershowitz
14   told it.  I'm taking it at face value because I'm
15   quite sure he's right because he's a smart guy.
16            I just wasn't familiar with that piece of
17   history.  So I take it as true because he said it,
18   but it's not a quid pro quo at all in my mind, and
19   this is something I know about.
20            I'm not in the military, but I did serve
21   in the White House at the highest levels, and there
22   is no quid pro quo between a president and his
23   generals.  There cannot be, so that's now moving
24   beyond the foreign policy examples that the professor
25   was using about the Palestinians.
```

```
 1              BY MR. SCHWEIKERT:
 2        Q.     That was your interpretation, even though
 3   Mr. Dershowitz's example referencing Lincoln was made
 4   in response to a question specifically about quid pro
 5   quo?
 6        A.     Yes, sir.  I thought -- I thought we're
 7   getting beyond quid pro quo here.
 8        Q.     What did you understand Mr. Dershowitz's
 9   argument to have been two days prior on January 27th?
10        A.     I can't remember it, Mark.  I'm sorry.
11        Q.     Did you do anything around the time that
12   you were preparing your draft opinion to consider
13   what he had also said on January 27th as well as
14   January 29th?
15        A.     Not that I recall.  I was really struck by
16   that question and answer and I tried to limit my
17   commentary to simply that.  I did limit my
18   commentary.
19        Q.     Did you review the transcript -- strike
20   that.
21              Did you review any transcript of the
22   Congressional Record in preparing for this
23   deposition?
24        A.     Yes, sir.
25        Q.     When was that?
```

1        A.      Yesterday and probably a couple weeks ago.

2   I've looked at it several times since I was noticed

3   to be deposed.

4        Q.      Does that include the portion of Mr.

5   Dershowitz's argument on January 27th?

6        A.      No, sir, I did not review that.  I didn't

7   know you were going to be asking about it.

8        Q.      Well --

9               THE WITNESS:  May I get a glass of water?

10              MR. SCHWEIKERT:  Of course.

11              MS. BOLGER:  Do you want to take a break

12   or do you just want to get a glass of water?

13              THE WITNESS:  If it's okay with you, I

14   just need a glass of water.  I don't need a break

15   just yet, but I want to get a little bit of water.

16              MR. SCHWEIKERT:  Okay.

17              THE WITNESS:  Okay.  Thank you.

18              BY MR. SCHWEIKERT:

19        Q.      So you did not review any transcript of

20   Mr. Dershowitz's argument on January 27th in

21   preparing for this deposition, right?

22        A.      That's correct.

23        Q.      Did you watch any videos?

24        A.      Not from January --

25              MS. BOLGER:  Objection.

```
 1              Go ahead.
 2              THE WITNESS:  Sorry, Kate.
 3       A.    Not from January 27th, no, sir.  I did
 4  watch -- I'm volunteering.  But I did watch the video
 5  of the Q and A with Senator Cruz, as well as read the
 6  Congressional Record.
 7              BY MR. SCHWEIKERT:
 8       Q.    And I don't want to know what your lawyers
 9  may have told you, and they know that.  I understand
10  you're very friendly, but if you can just answer my
11  questions, we can move along and be out of here.
12       A.    Certainly.  I'm trying to be completely
13  transparent.
14       Q.    If you feel there's context that you need
15  to provide to me, please, by all means.  You don't
16  need to volunteer.
17              (Simultaneously speaking.)
18       A.    This is why I would have been a terrible
19  lawyer, Mark.
20              BY MR. SCHWEIKERT:
21       Q.    It's all right.
22              Did you hear any audio -- strike that.
23              Did you listen to any audio from January
24  27th or January 29th of 2020 in preparing for this
25  deposition?
```

```
 1                  MS. BOLGER:  Objection to the form.
 2                  MR. BAINE:  When you say audio, are you
 3     distinguishing from video?  You already asked him
 4     about video.
 5                  MR. SCHWEIKERT:  Yeah.
 6          A.     No, sir, I didn't.  The audio -- it was an
 7     audio/videotape.
 8                  BY MR. SCHWEIKERT:
 9          Q.     Got you, okay.  Did you consider that it
10     may be important to review the entirety of Mr.
11     Dershowitz's statements during the impeachment trial
12     in preparing to answer questions about the opinion
13     piece you wrote on January 29th, 2020?
14                  MS. BOLGER:  Object to the form.
15          A.     No, sir.
16                  BY MR. SCHWEIKERT:
17          Q.     Did you understand that the Q and A
18     portion of the impeachment trial was with respect to
19     the arguments that had been presented by the lawyers
20     in the prior days?
21          A.     Yes, sir.
22                  MS. BOLGER:  Object to the form.
23          A.     Yes, sir.
24                  BY MR. SCHWEIKERT:
25          Q.     It's a crude example, but sometimes in
```

```
 1  college you get a lesson and then afterwards some

 2  students stay after class to ask questions of the

 3  professor, right?

 4      A.    Yes, sir.

 5      Q.    And, essentially, that's what the Q and A

 6  portion on January 29th was, right, an opportunity

 7  for the senators to ask any questions that they had

 8  with respect to the arguments they had previously

 9  been presented?

10            MR. BAINE:  Objection to the form.

11      A.    That's not really the purpose.  Okay.  The

12  purpose is for those senators to try to persuade the

13  other senators to vote to convict or acquit.  That's

14  what they're doing.

15            They're giving either the managers or the

16  President's counsel a chance to make an argument they

17  believe -- as senators, they know their colleagues --

18  that they believe will move their colleagues.

19            That's what that really -- I'm sorry.  I

20  don't think I'm like disabusing you of any innocence

21  here, but they're trying to convict and remove the

22  President of the United States of America or trying

23  to acquit the President of the United States of

24  America.

25            And the senators, they know each other,
```

```
 1  and so they -- I talked to a lot of senators during
 2  the -- not a lot.  I talked to some senators during
 3  the Clinton impeachment -- during the trial and they
 4  would say, we need this; we have to have that.
 5          So that's, I think, what that Q and A is
 6  really about.
 7          MR. SCHWEIKERT:  Okay.  I'm going to hand
 8  you a document I will mark as Exhibit 1 (sic).  I'm
 9  not going to continue my consecutive numbering to
10  this deposition.
11          MS. BOLGER:  I've got to confess, Mark, I
12  like the consecutive numbering.  It's disappointing.
13          MR. SCHWEIKERT:  I guess we could try,
14  but, candidly, some of these are going to be
15  redundant of others.
16          BY MR. SCHWEIKERT:
17     Q.   All right.  For ease of reference I am
18  going to attempt to continue my deposition numbering
19  and I will mark you -- I'm going to hand you a
20  document I am marking as Plaintiff's Exhibit 25.
21          MS. BOLGER:  Do you know -- Mark, they're
22  in the other room.  I can get them if you want, and I
23  can tell you even what the document number was if
24  you'd like me to just grab them real quick so you
25  don't have to do it again.
```

```
1              MR. SCHWEIKERT:  That's all right.  We'll
2   do 25.
3              (Exhibit Number 25 was marked for
4   identification and was attached to the deposition.)
5              MR. SCHWEIKERT:  I have copies for the
6   lawyers.
7              BY MR. SCHWEIKERT:
8       Q.    Do you recognize the document I have
9   marked as Plaintiff's Exhibit 25?
10      A.    Yes, sir.
11      Q.    And what is it?
12      A.    It's a copy -- a photocopy of the
13  Congressional Record or a printout from the
14  Congressional Record.
15      Q.    The Congressional Record from January
16  27th, 2020?
17      A.    Yes, sir.
18      Q.    Have you seen this Congressional Record
19  before?
20      A.    No, sir.
21      Q.    And I will have some questions for you
22  about it, but only with respect to Mr. Dershowitz's
23  statements beginning on page S609 through S616.
24      A.    Yes, sir.
25      Q.    I'd like you to have the opportunity to
```

 1  review it.  It might take a while.  We can take a

 2  break.

 3          MR. BAINE:  In other words, you want him

 4  to read the whole seven pages of three columns each?

 5          MS. BOLGER:  That he's never seen before.

 6          MR. SCHWEIKERT:  He said he did see it.

 7     A.    No.  I said I have not seen it.

 8          BY MR. SCHWEIKERT:

 9     Q.    Okay.  Oh, you haven't seen it?

10     A.    No, sir.

11     Q.    Okay.  But you recall hearing the

12  arguments made in Congress?

13     A.    I watched it 2 1/2 years ago, but other

14  than that -- if you'd like me to read it, I'm happy

15  to read it.

16     Q.    Yes, I would.

17     A.    Tell me where on 609 because I see --

18     Q.    At the bottom on the middle column --

19          (Simultaneously speaking.)

20     A.    Oh, there's Mr. Dershowitz, okay.  Sorry.

21  I went to the wrong --

22          MR. BAINE:  If you're going to ask him to

23  read seven pages of single-spaced, double-column

24  text, let's take a break.

25          MR. SCHWEIKERT:  Yes, of course.  We can

```
 1   even do lunch, if you'd like.
 2              MR. BAINE:  Let's break -- break for
 3   lunch.
 4              THE VIDEOGRAPHER:  This concludes Volume
 5   No. 1 in the deposition of Paul Begala for Alan
 6   Dershowitz versus Cable News Network.
 7              We are now off the record.  The time is
 8   12:02 p.m. Eastern.
 9              (Whereupon, at 12:02 p.m., a
10               luncheon recess was taken.)
11                         -  -  -
12        A F T E R N O O N   S E S S I O N
13                                    (1:17 p.m.)
14   Whereupon,
15                   PAUL BEGALA
16   was called for continued examination, and having been
17   previously duly sworn was examined and testified
18   further as follows:
19              THE VIDEOGRAPHER:  This is the beginning
20   of Volume No. 2 in the video recorded deposition of
21   Paul Begala.  The time is 1:17 p.m. Eastern.
22              Counsel, you may proceed.
23                   EXAMINATION (CONTINUED)
24              BY MR. SCHWEIKERT:
25        Q.    Have you had the chance to review Mr.
```

1    Dershowitz's argument on January 27th, 2020?

2         A.    Yes, sir.

3         Q.    Now that you've read his statements on

4    January 27th, do you think it was fair, accurate, and

5    faithful to write in your op-ed that Alan Dershowitz

6    does not believe bribery is an impeachment offense?

7         A.    I did not write that.

8         Q.    Didn't you write:  "Bribery statutes,

9    gone"?

10        A.    Yes, sir.

11        Q.    You did?

12        A.    Yes, sir.

13        Q.    And that was in reference to Mr.

14   Dershowitz's comments on the floor of Congress,

15   right?

16        A.    Yes.

17              MS. BOLGER:  Object to the form.

18              THE WITNESS:  Sorry.

19              MS. BOLGER:  That's okay.

20              BY MR. SCHWEIKERT:

21        Q.    Now, that you have reviewed Mr.

22   Dershowitz's argument on January 27th, 2020, do you

23   think it was fair, accurate, and faithful to provide

24   your opinion that Alan Dershowitz was advocating that

25   bribery is not an impeachment offense?

1    MS. BOLGER:  Object to the form.

2    A.    Mark, I did not argue that.  That's very

3    important.  I argued the standard he laid out would

4    lead to that.  I certainly wouldn't say that

5    Professor Dershowitz thinks bribery is okay.

6          The standard he laid out would lead to

7    that if you run it out far enough:  The next

8    president, the one after that, the one after that.

9    That's what I was saying, that the standard he

10   articulated to Senator Cruz was very different from

11   what he said two days earlier because it introduced a

12   new element; that is, seeking reelection, which is in

13   the public interest, means what you do is not a

14   crime.

15         That's what I was sounding the alarm bell

16   about.  I didn't mean to say -- and I hope I didn't

17   say that Dershowitz believes bribery is okay.  I said

18   there's a doctrine here that he's introduced that can

19   be very dangerous.

20         That was the point I was trying to make to

21   sounding an alarm bell about -- the case wasn't even

22   a bribery case, obviously, with -- Mr. President --

23   president Trump was never accused of bribery in this,

24   but those other matters.

25         And I think that's the danger of the

1    argument he laid out to Senator Cruz, which is

2    different from the argument he laid out two days

3    earlier.

4             BY MR. SCHWEIKERT:

5        Q.   Do you recall characterizing Mr.

6    Dershowitz's argument as bonkers?

7        A.   Yes, sir.

8        Q.   Do you recall characterizing it in your

9    draft as looney tunes?

10       A.   Yes, sir.

11       Q.   And this is obviously a topic I would like

12   to talk more about, but let me just create a more

13   robust evidentiary record before we do so.

14            MR. SCHWEIKERT:  I'm going to hand you a

15   document I will mark as Plaintiff's Exhibit 26.

16            (Exhibit Number 26 was marked for

17   identification and was attached to the deposition.)

18            BY MR. SCHWEIKERT:

19       Q.   It's Bates labeled Begala 1, and attached

20   to it is CNN's 666 through 667, which is an article

21   dated January 29th, 2020 at 4:25 p.m.  And I will ask

22   you if this article is the one hyperlinked in the

23   first page of that exhibit?

24       A.   Thank you.

25            MR. SCHWEIKERT:  Let me give copies to

 1  counsel.

 2              MR. BAINE:  Thank you.

 3              MS. BOLGER:  Just for the record -- sorry.

 4  I just want to point out that the -- the -- sorry --

 5  the publication -- the column attached -- or the

 6  article attached to the CNN 666 through 667 is not an

 7  attachment to the email.  I just wasn't sure about

 8  that, for the record, and I wanted to make sure it

 9  was.

10              BY MR. SCHWEIKERT:

11      Q.    Do you recognize the first page of

12  Plaintiff's Exhibit 26 Bates labeled Begala 1?

13      A.    Yes, sir.

14      Q.    It's an email from Pat Wiedenkeller dated

15  January 29th, 2020, 4:41 p.m. to you, Paul Begala,

16  right?

17      A.    Yes, sir.

18      Q.    And within the body of the email Ms.

19  Wiedenkeller writes, in part:  "This is quite a thing

20  and getting quite a" -- strike that.

21              In the body of the email, Ms. Wiedenkeller

22  writes in part:  "This is quite a thing and getting

23  quite a bit of attention," followed by a hyperlink to

24  a CNN website, right?

25      A.    Yes, sir.

```
 1        Q.    Do you recall receiving this email?

 2        A.    Yes, sir.

 3        Q.    Did you click on that hyperlink?

 4        A.    Yes, sir.

 5        Q.    And if we look at the two pages appended

 6   to, first, Bates label CNN 666 through 667, I'd like

 7   to know if this is a printout of the article that you

 8   saw when you clicked on the hyperlink in Ms.

 9   Wiedenkeller's email?

10              MS. BOLGER:  Just for the record, this is

11   not a public-facing document.

12        A.    It seems to be.  I don't recall it

13   specifically, but I remember that Pat sent me --

14   yeah.  She sent me an article summarizing the

15   professor's argument and this seems to be it.

16              BY MR. SCHWEIKERT:

17        Q.    And this is the only content that you

18   reviewed in connection with preparing your draft of

19   the opinion piece that you subsequently submitted to

20   CNN for its consideration?

21              MS. BOLGER:  Object to the form.

22   Misstates testimony.

23              THE WITNESS:  I'm sorry, Kate.  I couldn't

24   hear you.

25              MS. BOLGER:  I said:  "Object to the form.
```

 1   Misstates testimony."

 2        A.     What I recall -- I distinctly -- I recall

 3   clicking on this hyperlink and I don't remember if I

 4   looked at other things.  I very well may have online

 5   because I was online at the time, but I just -- I

 6   don't recall right now.

 7              BY MR. SCHWEIKERT:

 8        Q.     Okay.  You didn't review whether in

 9   writing or through audiovisual means Mr. Dershowitz's

10   statements on January 27th and January 29 after you

11   had received this email from Ms. Wiedenkeller and

12   before you sent her your draft opinion, did you?

13              MS. BOLGER:  Objection.  Compound.

14        A.     I don't -- I'm quite sure I did not review

15   the January 27th presentation before I wrote the

16   column.  I certainly had -- recall seeing the query

17   and the colloquy with Senator Cruz live and then

18   within hours writing the piece bolstered by this news

19   account and maybe others.

20              As I say, I do remember seeing -- before

21   Pat ever emailed me -- a CBS lead, just a lead.  I

22   don't know if I -- I don't remember if I clicked on

23   the article, but a lead that was almost identical to

24   this one, a member of President Donald Trump's legal

25   team arguing on the Senate floor once -- this is CNN,

```
 1   not CBS.
 2            But it was similar, that a politician
 3   trying to win reelection is acting in the national
 4   interest and, therefore, quid pro quo aimed at
 5   boosting reelection chances cannot be impeachable.
 6   CBS had a lead very similar to that that I remember
 7   seeing.
 8            BY MR. SCHWEIKERT:
 9       Q.   Is the article that is part of Plaintiff's
10   Exhibit 26 an opinion piece?
11       A.   Sorry.  I don't --
12            MR. BAINE:  I'm sorry.  Isn't this Exhibit
13   1?
14            MS. BOLGER:  No.  It's Exhibit 26.
15            MR. BAINE:  Oh, okay.
16       A.   Mark, the one labeled CNN, unlucky number
17   666 at the bottom, that one?
18            BY MR. SCHWEIKERT:
19       Q.   Correct.
20       A.   It's a news story, I'm quite sure.  So no,
21   not an opinion piece.
22       Q.   And did you understand at the time that
23   news stories were supposed to comport with the
24   journalistic standards of which you were aware at the
25   time?
```

1    A.    Yes, sir.

2          MS. BOLGER:  Object to the form.

3          THE WITNESS:  Sorry.

4          BY MR. SCHWEIKERT:

5    Q.    And you relied upon this article as being

6    an accurate presentation of objective facts?

7    A.    Yes, sir.

8    Q.    Do you recall where you were when you

9    actually started drafting something?  Had you boarded

10   a plane at that time?

11   A.    My memory, which is reasonably clear on

12   this, was that I was sitting at the gate in Denver.

13   In other words, I landed from Washington, checked my

14   email, saw the request from Pat, responded, went to

15   my next gate so I wouldn't miss my next flight, sat

16   at the gate, and wrote there on my laptop.

17   Q.    And who is Pat Wiedenkeller?

18   A.    She's an editor at CNN.com Opinion.

19   Q.    Did you speak to her by telephone on the

20   day of January 29th, 2020?

21   A.    No, sir.

22   Q.    Had you previously spoken with her in

23   person or by phone?

24         MR. BAINE:  About this?  Is that what you

25   mean?

 1              MR. SCHWEIKERT:  No.  I'll ask a better

 2   question.

 3              THE WITNESS:  Yes, sir.

 4              BY MR. SCHWEIKERT:

 5       Q.    When did you first get introduced to Pat

 6   Wiedenkeller?

 7       A.    I can't recall, but this wasn't the first

 8   time certainly.  She was an editor with whom I worked

 9   with great regularly.

10       Q.    Okay.  Do you know if she -- well, strike

11   that.

12              Do you know if you and her shared similar

13   political beliefs?

14              MS. BOLGER:  Object to the form.

15       A.    I have no idea.

16              BY MR. SCHWEIKERT:

17       Q.    Do you know her daughter?

18       A.    No, sir.  I don't -- I didn't know she had

19   a daughter, but -- so no.

20       Q.    You were not aware she had a daughter who

21   worked at The New York Times?

22       A.    No, sir.

23              MS. BOLGER:  Object to form.  Just to

24   remind you that when Ms. Wiedenkeller answered those

25   questions she told you that was private information

```
 1  and she was uncomfortable with it being shared.
 2           MR. SCHWEIKERT:  I am not aware of any law
 3  that would protect an adult child's occupation from
 4  being presented as evidence to the extent the court
 5  deems it relevant at trial.  So while Ms.
 6  Wiedenkeller's preference is observed, I do not
 7  believe that's a legal basis for excluding that
 8  information.
 9           BY MR. SCHWEIKERT:
10      Q.   Did you speak with anyone while you were
11  drafting your opinion piece?
12      A.   Not to my memory, no.  I didn't have much
13  time.
14      Q.   Do you specifically recall not speaking
15  with anyone --
16      A.    I can't swear to that because I am under
17  oath, but I was under quite a time crunch.  And Pat
18  had said that, we need something quick, so I -- I
19  have no memory of calling anybody.  And as a matter
20  of practice, I wouldn't have called anyone.
21      Q.   Do you have any memory of someone calling
22  you with respect to --
23      A.   No, sir.
24      Q.   -- this --
25      A.   No.  And I --
```

1    Q.    I know -- my questions are predictable, I

2  know.

3    A.    I think I remember that.

4    Q.    I'm just saying for the court reporter's

5  purposes, if we could just slow down a little bit, it

6  will make for a much cleaner record.

7    A.    Right.  I'm sorry.  Go ahead, Mark.  Let's

8  do that again.

9    Q.    Do you recall anyone calling you with

10 respect to Ms. Wiedenkeller's request that you write

11 an opinion piece?

12   A.    No, sir, I do not recall that at all.

13   Q.    What about text messages?

14   A.    No, sir.  I'm not a big texter.  My kids,

15 you know, they're young; they do that.  They text me.

16 That's about it.  I don't like it.

17   Q.    Do you know what Slack is?

18   A.    I know what it is.  I've never used it.

19   Q.    Do you know the application called

20 WhatsApp?

21   A.    Yes, sir.

22   Q.    Have you ever -- strike that.

23         Did you use that on the day of January

24 29th in connection with preparing your draft?

25   A.    No, sir.

```
 1              MR. SCHWEIKERT:  I'm going to hand you a
 2   document that I will mark as Plaintiff's Exhibit 27.
 3   Take a moment.  Please review it --
 4        A.    Yes, sir.
 5              (Exhibit Number 27 was marked for
 6   identification and was attached to the deposition.)
 7              BY MR. SCHWEIKERT:
 8        Q.    -- and then I'll ask you if you've seen it
 9   before.
10              MS. BOLGER:  And since Paul is reviewing
11   the document, I'll just take this opportunity to
12   designate the transcript confidential.  We're
13   discussing confidential documents produced by CNN.
14              And as Mr. Schweikert and I have discussed
15   before, CNN will designate these transcripts
16   confidential in their entirety and that at a later
17   date we can talk about dedesignating portions of it
18   as needed to file in a public record, but for now in
19   discovery we're designating the transcript as
20   confidential.
21              MR. SCHWEIKERT:  Correct.  I have no
22   problem with a preliminary global designation subject
23   to potential dedesignations at a later date.
24              THE WITNESS:  Okay.  I've read it.
25              BY MR. SCHWEIKERT:
```

```
 1        Q.    Do you know what Plaintiff's Exhibit 27
 2   is?
 3        A.    Yes, sir.
 4        Q.    And what is it?
 5        A.    An email from me to Pat Wiedenkeller of
 6   CNN.
 7        Q.    And what's the date and time of your
 8   email?
 9        A.    January 29th, 2020, 5:20 and 53 minutes
10   (sic) p.m.
11        Q.    And your email address --
12              MR. BAINE:  53 seconds.
13        A.    53 seconds.  Sorry.
14              BY MR. SCHWEIKERT:
15        Q.    And your email address is
16   ███████████████████████
17        A.    Yes, sir.
18        Q.    What is Hat Creek Ent?
19        A.    That's my company, named after the Hat
20   Creek Cattle Company from Lonesome Dove, my favorite
21   book.
22              My accountant thinks I'm nuts.  I have two
23   calves, though, and they're both Longhorns, but
24   that's why I picked it.  It's my favorite book.
25              MS. BOLGER:  A lot of stereotypes right
```

```
 1   there, Paul.
 2           THE WITNESS:  I know, very stereotypical.
 3           BY MR. SCHWEIKERT:
 4      Q.    As of January 2020, did you have any email
 5   addresses within -- ███████████████████████████
     ██████████████████████████
 7      A.    No, sir.  Haven't had it for many, many,
 8   many years.
 9      Q.    Did you use any other email addresses in
10   performing your role as a contributor with CNN?
11      A.    Sometimes.  I have another one.  This is
12   confidential, right?  I have a confidential email
13   because I get bothered sometimes.  I want to be
14   private.
15      Q.    Of course.
16      A.    I have one that I generally use for
17   business.  I was surprised Pat had this one because I
18   generally had this first one, but I guess I used them
19   interchangeably sometimes without knowing it:
20   PB-accounts -- but they're all in the same --
21   @hatcreek.com.
22           That's the same -- they go in the same
23   box.  It's just one that I use for slightly more
24   public things.
25      Q.    Do you recall receiving or sending any
```

1  emails related to your opinion piece that's the
2  subject of today's deposition, that email you just
3  described for me?
4       A.    No.  This is everything that I did on
5  that, and I checked.  I'm not just recalling.  I've
6  checked.  I've looked.
7       Q.    And do you -- did you send your email to
8  Pat before you boarded the plane?
9       A.    I can't recall if I was like boarding and
10  -- I don't remember.
11       Q.    Do you see that Pat sent you her email at
12  4:41 p.m. and you replied -- strike that.
13            Do you see that Pat sent you her email at
14  4:41 p.m. and then you sent her a draft of your
15  opinion piece at 5:20 p.m.?
16       A.    Yes, sir.
17       Q.    Did it ever occur to you not to write a
18  draft op-ed so quickly?
19       A.    No, sir.  I am fast.  I wrote a whole book
20  in seven days.  It went to Number 1 -- I'm sorry.
21  You said before I was humble.  I'm not humble about
22  that.  I'm a very fast writer.
23       Q.    Did it ever occur to you not to submit a
24  draft opinion piece that contained arguably
25  inflammatory rhetoric in such a short time period?

 1              MR. BAINE:  Objection to the form of the

 2   question.

 3              THE WITNESS:  Do you advise I answer it?

 4              MR. BAINE:  Yes, go ahead.

 5       A.    Most of my columns have arguably

 6   inflammatory rhetoric.  I'm an opinion writer and I'm

 7   fast.  This is particularly fast.  I was asked for

 8   something quick, but -- so I -- I'm not sure if I'm

 9   giving a yes or no, but that's my practice.  I write

10   quickly.  I try to have an interesting point of view.

11              BY MR. SCHWEIKERT:

12       Q.    Can you recall any op-ed pieces where you

13   previously made an analogy between the subject matter

14   of the piece and Adolf HItler?

15              MS. BOLGER:  Object to form of the

16   question.

17       A.    I can't recall that.

18              MS. BOLGER:  Hold on.  I'll instruct the

19   witness only to answer as to public-facing documents.

20       A.    I can't recall that.

21              BY MR. SCHWEIKERT:

22       Q.    Are you aware of any opinion piece that

23   has been published by any media company in which you

24   related the subject matter of the piece to Mussolini?

25              MS. BOLGER:  Object to form of the

```
 1  question.
 2       A.    This doesn't.  I can't recall if I ever
 3  have.  I just can't recall.
 4            BY MR. SCHWEIKERT:
 5       Q.    By this, you mean --
 6       A.    This column, the email that's in my hand
 7  that you gave me, Exhibit 27.
 8       Q.    It does not reference Mussolini?
 9       A.    Actually, I don't think so.  No, sir.
10       Q.    Do you know if the version of your op-ed
11  that was ultimately published referenced Mussolini?
12       A.    I can't recall, but I don't think so.
13       Q.    Do you know if the version of your op-ed
14  that was ultimately published by CNN referenced
15  Hitler?
16       A.    I don't think so.
17       Q.    Do you recall using the words Hitler and
18  Mussolini in any of your drafts of the op-ed that you
19  submitted to CNN?
20       A.    No, sir.  I am quite sure I did not.  I --
21  I've worked in Israel.  I don't play around with
22  Hitler and -- I don't approve of it.
23       Q.    Do you recall drafting any language that
24  referenced other dictators in your draft of the
25  op-ed?
```

 1            MS. BOLGER:  Objection of the form.  Show

 2    him the document.

 3        A.    I'm looking at the document you gave me.

 4    I reference autocrats who I believe Mr. Trump

 5    admires:  Soon-to-be supreme leader Vladimir Putin,

 6    as well as other autocrats, like Turkey's Erdogan,

 7    E-R-D-O-G-A-N; Egypt's Sisi, S-I-S-I; and North

 8    Korea's Kim Jong, J-O-N-G, un.  I referenced them in

 9    the piece.

10            BY MR. SCHWEIKERT:

11        Q.    And that's shown on page CNN page 76,

12    right?

13        A.    Yes, sir.  Yes, sir.

14        Q.    And in the following paragraph, your draft

15    reads:  "All he seeks is dictatorial power.  That's

16    all," right?

17        A.    Yes, sir.

18        Q.    And by he, you're referring to President

19    Trump?

20        A.    Yes, sir.

21        Q.    Can you please read into the record the

22    final sentence of your draft op-ed?

23        A.    "Mr. Trump and his enablers now openly

24    seek to put him above the law, turning Franklin's

25    admonition on its head, giving us a dictatorship if

1  we allow it."

2      Q.    Do you recall writing that statement?

3      A.    Yes, sir -- well, yeah.  I mean, I

4  remember it in the piece.

5      Q.    Is one of the enablers that you're

6  referencing Professor Dershowitz?

7      A.    No.  No.  It's the Republican party.  I'm

8  talking about the -- I don't even think Dershowitz is

9  a Republican, at least I hope he's not.  He used to

10  be a Democrat.

11          No.  I'm talking about the Republican

12  party.  They're supposed to be the party of limited

13  government, and now they're backing a guy who I fear

14  and think is seeking massive power.  And I worried

15  that that doctrine might allow that.

16          But no, I don't -- it's not my business to

17  know somebody's politics.  I don't think of Alan

18  Dershowitz as a Republican.

19      Q.    What doctrine?

20      A.    Well, I called it the Dershowitz Doctrine.

21  It's the argument that if you're seeking your

22  reelection, then things you do can't be a crime if

23  the election is in the public interest.

24          But that's what I was talking about there,

25  that the party of limited government was enabling

1  him, Mr. Trump, to seek unlimited power.

2      Q.    By way of advancing, according to you, the

3  so-called Dershowitz Doctrine, right?

4      A.    I don't say that at the end.  That's --

5  that's broadening it out to critique his party rather

6  than simply Professor Dershowitz's argument.

7      Q.    Did you genuinely -- strike that.

8          Did you believe at the time that you wrote

9  this draft that Professor Dershowitz was making an

10  argument in favor of providing the U.S. President

11  with dictatorial power?

12      A.    I was making the argument that what

13  Professor Dershowitz said on the floor of the Senate

14  in answer to Senator Cruz's question opened the door

15  -- created the doctrine.

16          He's trying to win a case and he's trying

17  to win an argument in a much more narrow fashion.  I

18  was worried that that would set a precedent that

19  future presidents would say if I'm pursuing my

20  reelection I can do anything.  That was my worry, not

21  that in that instant case -- I did not think and did

22  not say Dershowitz today said he thinks bribery is

23  good.

24          I said -- or what I was trying to say, my

25  opinion then and now still is, if you tell a

1  politician anything they do is in the public interest

2  and, therefore, anything goes, that's going to lead

3  to meddling.  That's going to lead to catastrophe.

4  It's going to lead to dictatorship.

5          And that's what I was trying to do here,

6  and I honestly meant no disrespect to Mr. Dershowitz,

7  who I think is brilliant and I hope is still a

8  Democrat.  But I was trying to say, look, this can be

9  pulled and it will be.  This is the floor of the

10 Senate.

11         When I worked for President Clinton's

12 impeachment, I went back like Professor Dershowitz,

13 and I read the federalist papers, but I also looked

14 at Barbara Jordan, one of my wife's professors, one

15 of my heroes.  And I looked at what she said, and

16 she's long gone, but those words live on.

17         Honestly, Mark, I was really concerned

18 that not today and not Trump, but that 50 years from

19 now -- just like I was looking at Barbara Jordan from

20 40 years ago -- someone's going to look and say, oh,

21 look, if I'm pursuing my reelection and it's in the

22 national interest, then that -- that cleanses me of

23 liability for any act, any criminal -- otherwise

24 criminal act.

25         That's what frightened me.  That's why I

1  was trying to raise red flags.

2      Q.    But you did tie your interpretation that

3  the Republicans were seeking expansive power as being

4  premised upon statements that the brilliant Professor

5  Dershowitz made during the impeachment trial, right?

6          MR. BAINE:  Object to the form.

7          MS. BOLGER:  Objection to the form of the

8  question.

9          THE WITNESS:  May I answer it?

10         MR. BAINE:  Yes.

11     A.    I believe that Trump and his enablers -- a

12 lot of Republicans are not for Trump or his enablers,

13 okay -- but Trump and his enablers -- I believe this.

14 They'll use anything they can, any doctrine, any

15 means they can to advance their power.

16         And I don't -- I don't think that was the

17 intent.  I don't think -- Dershowitz says he didn't

18 vote for Trump.  I believe him, but I think that then

19 could be used by other people to excuse either Mr.

20 Trump or any future President, Joe Biden today, to do

21 anything he wants in terms of his reelection.

22         And I think that's really dangerous.

23 That's really dangerous.  That's why I used such

24 inflammatory language because I wanted to sound an

25 alarm.

```
 1              BY MR. SCHWEIKERT:
 2       Q.    So why did you refer to it as, quote, the
 3   Dershowitz Doctrine, end quote?
 4       A.    Professor Dershowitz articulated it and,
 5   frankly, there is for me as a writer a real appeal in
 6   alliteration.
 7       Q.    But you did not believe that was Professor
 8   Dershowitz's true intent, right?
 9              MS. BOLGER:  Object to the form.  I don't
10   understand.
11       A.    I like to believe the best in people,
12   particularly somebody like him.  I was -- what I said
13   and what I meant then and now is that in my opinion
14   people will take this doctrine meant to just win a
15   trial at the moment and run with it.  That's what I
16   was trying to say, and that's what I did say.
17              I -- sorry.  I still think it's a good --
18   it's my opinion then and it's my opinion now.  Now,
19   others -- there are a lot of people I know and love
20   who support Trump.  Okay?  It's like family members.
21   They completely disagree.  That's what makes America.
22              It doesn't mean I'm right, but it means my
23   opinion is honestly derived, and I stand by it.
24              BY MR. SCHWEIKERT:
25       Q.    Would you have had the same opinion if the
```

1  impeachment trial had concerned a Democratic

2  President?

3      A.    That's a really good question and that's a

4  hard one.  It really is, Mark.  That's a hard one.

5  Let me put it this way:  You always think if the shoe

6  was on the other foot.  This is a different example,

7  but I'm kind of proud of this.

8          You know, I can't stand Trump.  I don't

9  support him at all.  He signed the First Step Act,

10 which was a criminal justice reform bill that my

11 friend Van Jones worked on.  And before I went on TV

12 to talk about it, I thought to myself just that, what

13 would I -- because I can't stand Trump.  I don't like

14 anything about him.

15         I thought, what would I say if Hillary

16 signed that?  So I went on TV and I said, "This is

17 really good.  This is going to help the country.

18 It's going to be a big part of Trump's legacy."

19         And I thought the anchor was going to fall

20 out of his chair because I really try.  I really do

21 -- I'm serious.  There are not very many things -- I

22 was for moving the embassy and I was for a lot of his

23 Israel policies, but on domestic policies, there's

24 very little that he did that I supported.

25         So I hope -- I really do -- I hope I would

```
 1   have the integrity to call them as I see them.
 2   That's the best I can give you.  I'm under oath.  I'm
 3   not going to sugarcoat it.  That's my best answer,
 4   Mark, but I do have one or two times where I thought
 5   Trump did something really good.
 6            And I didn't include any snide comments or
 7   anything.  I was honest and said, Look, this is
 8   great; hard for me to do.
 9       Q.    I disagree with you on that.
10       A.    On the First Step Act?
11       Q.    No.  I'm just joking.
12            Could you please read into the record the
13   paragraph you wrote that's shown on the page Bates
14   labeled CNN 76?  It begins, "The Dershowitz
15   Doctrine."
16       A.    "The Dershowitz Doctrine would make
17   Presidents immune from every criminal act, so long as
18   they could plausibly claim they did it to boost their
19   reelection effort.  Campaign finance laws" --
20            THE WITNESS:  Am I going too fast, Sherry?
21       A.    "The Dershowitz Doctrine would make
22   Presidents immune from every criminal act, so long as
23   they could plausibly claim they did it to boost their
24   reelection effort.  Campaign finance laws:  Out the
25   window.  Bribery statutes:  Gone.  Extortion:  No
```

```
 1  more.  This is Donald Trump's fondest dream, to
 2  literally be able to shoot someone on Fifth Avenue
 3  and get away with it."
 4           BY MR. SCHWEIKERT:
 5       Q.    Thank you.
 6       A.    Yes, sir.
 7       Q.    Did you believe at the time that you wrote
 8  this that that was an accurate, fair, and faithful
 9  characterization of Mr. Dershowitz's statements
10  during the impeachment trial?
11       A.    No.  I wasn't trying to -- I wasn't saying
12  this is what he said.  I was saying this is what it
13  would do.  This is what others will do with that.
14  This is what it will do.
15           I'm not quoting Professor Dershowitz.  He
16  didn't say anything like that, but what I'm saying is
17  the argument he led out -- he laid out -- forgive me
18  -- the argument he laid out will be abused to justify
19  all manner of things by politicians seeking their
20  reelection.
21           I don't say Dershowitz says this.  I say
22  this is a doctrine that would do this.  I think it's
23  an important distinction.
24       Q.    But it's a doctrine you labeled the
25  Dershowitz Doctrine, right?
```

```
 1        A.    Sure.  It's alliterative, but also it was
 2   propounded by Alan Dershowitz on the floor of the
 3   United States Senate in a forum that, I'm telling
 4   you, 50 years from now people will study.
 5        Q.    Was it propounded on the floor of the
 6   Senate on January 27th, 2020?
 7        A.    No.  That's really important.  No, sir, it
 8   was not.
 9        Q.    You didn't see anything in the
10   Congressional Record of January 27th, 2020 which is
11   Plaintiff's Exhibit 25 of this deposition that would
12   support your characterization of the, quote,
13   Dershowitz Doctrine, end quote, right?
14             MS. BOLGER:  Object to the form.
15        A.    I saw nothing in his January 27th
16   presentation that I found alarming.  I disagreed with
17   some of it, but I didn't tweet a word about it
18   because I didn't find anything alarming.  I didn't
19   write a column.  I didn't do anything.
20             I disagree if I were to get into the weeds
21   with Professor Dershowitz about how he analyzes the
22   impeachment standards, and he's very artful in
23   dancing around Alexander Hamilton, and yeah, I have
24   my views, but I went back and looked.
25             I didn't even tweet a thing and I'm a
```

```
 1   pretty prodigious tweeter because I'm an opinionated
 2   person.  So I had no fundamental -- certainly no
 3   alarm bells went off when I listened to him on
 4   January 27th.
 5             January 29, ding, ding, ding, a lot of
 6   alarm bells went off because this to me -- and I've
 7   reread it per your request, the January 27th
 8   presentation.  This introduces something different
 9   and new, and it's an exception that I fear swallows
10   the rule, the rule being obviously a president can't
11   bribe someone -- well, no.
12             Obviously, the President can't be bribed;
13   the President receives a bribe in his pecuniary
14   interest.  That's what the professor said.  That's
15   why I wrote it because I thought this is an exception
16   that swallows the rule, the exception being seeking
17   reelection cleanses you of criminal liability because
18   it's a mixed motive.
19             BY MR. SCHWEIKERT:
20        Q.   But you agree that your characterization
21   in the paragraph beginning "The Dershowitz Doctrine"
22   is not supported by anything that Mr. Dershowitz said
23   on January 27th, 2020, right?
24             MS. BOLGER:  Object to the form.
25        A.   I can't say anything, but it's certainly
```

```
 1  not what I heard him say on the 27th.  It is what I
 2  heard him say on the 29th.
 3             BY MR. SCHWEIKERT:
 4       Q.    Well, if it is supportive, I'd like you to
 5  direct us to that.
 6       A.    Fair point.  I don't recall -- and I have
 7  just read it -- him introducing this exception, this
 8  reelection exception on the 27th.  And I just reread
 9  it and I didn't see it there either, so I'm just
10  trying to be careful.
11       Q.    Did you see where Mr. Dershowitz said on
12  January 27th that he would have made the same
13  argument if it had been Hillary Clinton that was the
14  subject of impeachment?
15       A.    Yes, sir.
16       Q.    And would you have attacked him under
17  those circumstances?
18             MS. BOLGER:  Object to the form.
19       A.    I really love Hillary, so I might as well
20  just shut up.  I certainly -- I am appalled.  Look,
21  this is going to apply to Democrats.  We have a
22  Democrat in The White House now.
23             If we had a doctrine that said pursuing
24  your reelection is in the national interest and,
25  therefore, anything goes, I would speak out against
```

```
 1   it.  I would.  I mean, (inaudible) isn't infallible.
 2           But, you know, that's a good question.  I
 3   mean, I do have a partisan bias, but I think that
 4   telling politicians whose reelection is the most
 5   important thing in their life -- many of them -- all
 6   of them -- that anything goes -- and this is what's
 7   genius about it, though, and I'm not sure I
 8   appreciated it at the time.
 9           I've never done a trial.  You have.  What
10   a gift it would be if you knew for certainty the
11   first thing on the mind of every juror.  Hey, Alan
12   Dershowitz does because he's smart.  He knew the
13   first thing on the mind of every one of those
14   senators is, how is this going to affect my
15   reelection?
16           And I'm sorry if that sounds cynical, but
17   I went through an impeachment trial and it's the
18   first thing they're thinking of.  If I vote to
19   acquit, will it help me get reelected?  If I vote to
20   convict, will it help me get reelected?  And I know
21   some of them probably have loftier standards.
22           So he -- the genius of this argument,
23   which I admire, but I think it's prone to terrible
24   abuse in the future, is that he told those senators
25   your reelection, he says in the main or mostly -- he
```

1  qualified it a little bit -- but it is in the public

2  interest.  It is.

3           Therefore, it's not some kind of a vile

4  motive.  It's not some kind of a terrible motive like

5  pecuniary interest is, and that's how it was genius.

6  It was probably effective, but it's too big.  It's

7  too big an exception.

8           BY MR. SCHWEIKERT:

9      Q.    You agree that his discussion of motives

10  was with respect to the alleged quid pro quo that the

11  House managers were using in an attempt to impeach

12  Trump, right?

13           MS. BOLGER:  Object to the form.

14      A.    No, Mark.  I thought he was going very

15  broad in that answer.  It's why he brought up Lincoln

16  again, which as we discussed this morning was not a

17  quid pro quo.  He seemed to really want to say, if

18  you're seeking your reelection, that is a cleansing

19  motive.  It's a defense, and I think that's really

20  problematic.

21           MR. SCHWEIKERT:  I'm going to hand you a

22  document that I will mark as Plaintiff's Exhibit

23  number 28.

24           (Exhibit Number 28 was marked for

25  identification and was attached to the deposition.)

```
 1              BY MR. SCHWEIKERT:
 2       Q.    And for the record, I believe it's also
 3  been previously marked as Plaintiff's Exhibit 5.  I
 4  just don't happen to have that original exhibit.
 5              Copies for counsel.
 6              MS. BOLGER:  I'm sorry.  What number are
 7  we on, 28?
 8              MR. BAINE:  Twenty-eight.
 9              MS. BOLGER:  Thank you.
10              BY MR. SCHWEIKERT:
11       Q.    Take a moment, if you will, and review
12  plaintiff's Exhibit 28.  Let me know if you've seen
13  it before.
14              MS. BOLGER:  Oh, Mark.  I have your copy.
15  It's marked up.
16              MR. SCHWEIKERT:  I always do that.
17       A.    I have seen this before, Mark.
18              MS. BOLGER:  It's okay.  You don't have to
19  give me one.  I'll look with counsel.
20              MR. SCHWEIKERT:  Thank you.
21              BY MR. SCHWEIKERT:
22       Q.    I'm sorry, sir?
23       A.    Yes, I have seen this before.
24       Q.    And what is Plaintiff's Exhibit 28?
25       A.    Well, it's the Congressional Record from
```

1  the first Trump impeachment trial of January 29,

2  2020.

3       Q.    And that was the day of the Q and A

4  portion of the trial, right?

5       A.    Yes, sir.

6       Q.    When did you last see this?

7       A.    Oh, this morning I probably looked at it

8  again because I knew this was at issue.

9       Q.    Have you had a chance to review in its

10 entirety Mr. Dershowitz's answer to the questions

11 presented by Senator Ted Cruz?

12      A.    Yes, sir.

13      Q.    Can you find any support in Mr.

14 Dershowitz's statements on January 29th for your

15 assertions in your draft opinion piece that:  "The

16 Dershowitz Doctrine would make presidents immune from

17 every criminal act, so long as they could plausibly

18 claim they did it to boost their reelection effort?

19 Campaign finance laws:  Out the window.  Bribery

20 statutes:  Gone.  Extortion:  No more.

21           "This is Donald Trump's fondest dream, to

22 literally be able to shoot someone on Fifth Avenue

23 and get away with it"?

24      A.    Yes, sir, I can.

25      Q.    Please point out that for me.

1        A.    On page S650, Professor Dershowitz tells

2   Senator Cruz:  "Every public official whom I know

3   believes that his election is in the public interest.

4   Mostly, you are right.  Your election is in the

5   public interest.  If a president does something which

6   he believes will help him get elected in the public

7   interest, that cannot be the kind of quid pro quo

8   that results in impeachment."

9        Q.    I'm sorry.  I should know where this is,

10  but --

11       A.    It's in the third column on 650, right in

12  the middle of the page.

13            THE WITNESS:  Did you get it, Sherry?  Did

14  I go too fast?

15            BY MR. SCHWEIKERT:

16       Q.    Let me repeat the question so I can follow

17  along.

18       A.    Yes, sir.

19       Q.    Well, could you -- can you point to me

20  where you believe there is support for the assertion

21  you made in your draft op-ed that:  "The Dershowitz

22  Doctrine would make presidents immune from every

23  criminal act, so long as they could plausibly claim

24  they did it to boost their reelection effort.

25            "Campaign finance laws:  Out the window.

```
 1   Bribery statutes:  Gone.  Extortion:  No more.  This
 2   is Donald Trump's fondest dream, to literally be able
 3   to shoot someone on Fifth Avenue and get away with
 4   it."
 5             MS. BOLGER:  Objection.  Asked and
 6   answered.
 7        A.   Yes.  I just went through that.  I'm happy
 8   to go through it again, if you like.  I might have
 9   gone too fast for Sherry.
10             The professor in the course of his answer
11   to Senator Cruz includes this:  "Every" -- "every
12   public official whom I know believes that his
13   election is in the public interest.  Mostly, you are
14   right.  Your election is in the public interest.
15             "If a president does something which he
16   believes will help him get elected in the public
17   interest, that cannot be the kind of quid pro quo
18   that results in impeachment."
19             That is the line I'm quite sure I quoted
20   in the column as well.
21             BY MR. SCHWEIKERT:
22        Q.   And did you have the opportunity to review
23   the entirety of his answer that frames that sentence
24   you just read?
25             MS. BOLGER:  Object to the form.
```

1        A.    Yes, sir.

2              BY MR. SCHWEIKERT:

3        Q.    Did you see where in one of the earlier

4  paragraphs he concludes, "The only thing that would

5  make a quid pro quo unlawful is if the quo were in

6  some way illegal"?

7        A.    Yes, sir, I did.

8        Q.    And then he discusses in the next

9  paragraph three possible motives.

10       A.    Can I respond to the -- I'm sorry.  You're

11 asking the question.  May I respond to that?

12       Q.    In a moment.

13       A.    Yes, sir.

14       Q.    And in the next paragraph he discusses

15 three possible motives, right?

16       A.    Right.

17       Q.    And one of those motives is if the

18 President had a purely financial interest, which he

19 characterizes as a purely corrupt motive, that could

20 be impeachable, right?

21       A.    Yes, sir.

22       Q.    But you go on -- strike that.

23              But you told me that the next paragraph

24 somehow includes exculpatory language that so long as

25 the President thinks what he's doing is in the public

```
 1  interest he could never be impeached.
 2      A.    Yes, sir.
 3            MS. BOLGER:  Object to the form.  Is there
 4  a pending question?  I actually don't know what the
 5  question is.  I'm not being coy.  I don't know what
 6  the question.
 7            MR. SCHWEIKERT:  Well, you did just
 8  interrupt me.  I did not finish.
 9            THE WITNESS:  I'm enjoying the
10  conversation.  It's a good debate.
11            BY MR. SCHWEIKERT:
12      Q.    How is what Mr. Dershowitz was saying in
13  response to Senator Ted Cruz's questions any
14  different than the argument he had just presented two
15  days before?
16      A.    In a fundamental way, and I think radical,
17  when he talks about motive.  Now we talked about the
18  motive.  So on the 27th, again, I saw nothing
19  alarming.  I didn't fully agree with him, but I saw
20  nothing alarming in the presentation and said nothing
21  public or private, and nothing in the column is about
22  his January 27th presentation.
23            On the 29th he introduced something new,
24  something he did not refer to on the 27th and that is
25  the cleansing effect of the motive being self- --
```

```
 1  reelection rather, rather than personal pecuniary
 2  interest.
 3            Right?  He says on the 29th, that if the
 4  motive is your personal financial enrichment, it is
 5  impeachable.  It is.  And I'm quite sure he's right,
 6  but if the motive is your reelection, it cannot --
 7  his words -- it cannot be the kind of quid pro quo,
 8  so the motive matters.  Motive matters all the time.
 9            I'm sure all your cases turn on motive,
10  many of them.  Motive matters.  And so what I heard
11  him to say, which is why I was so alarmed, is that if
12  your motive is your personal pecuniary interest --
13  and the example he uses is a great one:  Build me a
14  hotel and put my name on it, which is straight to
15  money in the bank, I think is the phrase the
16  professor used -- that's clearly impeachable under
17  the Dershowitz Doctrine.  Right?
18            Professor Dershowitz says -- and I think
19  he's right.  But if the motive is reelection, I hear
20  him to say anything goes.  It cannot be the kind of
21  quid pro quo if the motive is reelection, which is in
22  the national interest.
23            That's the gravamen of my opinion piece,
24  and I still think my opinion is valid.  And I think
25  I'm right, but --
```

```
 1        Q.    If you agree that Mr. Dershowitz did give

 2   at least one example of when bribery could be grounds

 3   for impeachment, why did you subsequently opine in

 4   your draft article, quote, bribery statutes, gone,

 5   end quote?

 6              MR. BAINE:  Wait before you answer.

 7              Objection to the form of the question.

 8              THE WITNESS:  May I answer?

 9              MR. BAINE:  Yes.

10        A.    Because he didn't rule out all bribery.

11   Bribery goes two ways.  He clearly ruled out --

12   clearly it's impeachable -- let me be clear -- under

13   Professor Dershowitz's analysis.

14              A president receiving a bribe advancing

15   his pecuniary interest, Professor Dershowitz says

16   that's impeachable.  I agree.

17              If I'm seek my reelection, I'm not going

18   to take a bribe.  I might offer one.  I might give

19   one, and that is in the national interest because

20   I've got to be reelected or the union will collapse.

21   The country will die.

22              I have to be reelected, so I'm going to

23   bribe -- Hillary Clinton is going to call the

24   governor of Pennsylvania and say I'm rich now and

25   I'll give you $1 million bucks if you rig the vote
```

```
 1   count for me.  Right?
 2             That's clearly bribery, but it's not in
 3   her pecuniary interest.  She's losing money, so
 4   that's what's so alarming about this, is that half of
 5   bribery is still allowed, I fear.
 6             Again, I don't think that's what Professor
 7   Dershowitz was trying to say in the moment, but what
 8   I was trying to do was analyze it, offer my opinion
 9   as to where this will lead if we adopt it.
10             BY MR. SCHWEIKERT:
11        Q.    Is it fair to say that at the time that
12   you wrote this draft opinion piece you believed there
13   were, in fact, bribery statutes under which if a
14   president violated the elements of the crime he or
15   she could be impeached, correct?
16        A.    My belief, yes, sir.  That's my belief.
17        Q.    So why were you so absolute then in your
18   draft opinion piece that bribery statutes are gone
19   if, in fact, as I believe you just said there were
20   some circumstances, according to Professor
21   Dershowitz, in which a president could commit
22   criminal bribery and still be impeached?
23             MS. BOLGER:  Object to form.
24             MR. BAINE:  Objection to the form of the
25   question.
```

```
 1        A.    Because of motive.  Bribery in pursuit of
 2   personal pecuniary interest, clearly out.  That is
 3   impeachable.  Let me be accurate.  Bribery in pursuit
 4   of my reelection, clearly in, and that's problematic
 5   to me I guess because I'm a campaign guy and the
 6   professor is not.  He's a scholar.
 7             I am telling you, I loved all my clients,
 8   but they really want to win.  So do I.  Okay?  And
 9   it's like -- there's this guy Tim Miller who has a
10   new book about his experience in the Republican
11   party, which I highly recommend because it summoned
12   back the -- the smell of cordite and the -- you know,
13   the drive that we have in this business to win.
14             I'm sure lawyers have it.  It's --
15   campaign people, presidents, politicians have got to
16   have guardrails because they all honestly believe --
17   even the professor says this -- if they don't win the
18   country will topple.
19             And so I worry -- I really do -- that if
20   we tell them you can't take a bribe -- that's still
21   illegal -- but you can give one; you can offer one,
22   they'll do it tomorrow.  And maybe I'm too cynical
23   about politicians.  But I've worked all around the
24   world and that's one of the things they have in
25   common, is they all think that if they don't win the
```

```
 1  country will collapse.
 2      Q.    But where did Professor Dershowitz say
 3  that a president can commit bribery?
 4            MS. BOLGER:  Objection to the form.
 5            MR. BAINE:  Objection to the form.
 6      A.    I mean, I tried my best to articulate it.
 7  I'm happy to try again.  When he said if a
 8  president's motive -- motive is not pecuniary
 9  self-interest, but instead the national interest as
10  defined by my reelection, it cannot, cannot be the
11  kind of quid pro quo that results in impeachment.
12            So Hillary bribing -- this is a
13  hypothetical.  She never bribed anybody.  Hillary
14  bribing the governor of Pennsylvania is a quid pro
15  quo, I think, and should very much be impeachable had
16  she won the election, right, saying my candidate won.
17            BY MR. SCHWEIKERT:
18      Q.    Do you know whether motive is an element
19  of any campaign finance violation?
20      A.    I don't know --
21            MS. BOLGER:  Object to form.
22      A.    I don't know, Mark, but I bet.  I just
23  don't know.  I, thank God, never run afoul of those
24  laws.
25            BY MR. SCHWEIKERT:
```

1      Q.     So you didn't know at the time that you
2  wrote your draft opinion piece whether motive was
3  even a consideration in determining whether campaign
4  finance laws had been violated, yet you wrote Mr.
5  Dershowitz's argument with respect to motive
6  allegedly --
7      A.     Right.
8      Q.     -- through campaign finance laws, out the
9  window?
10     A.     In terms of impeachment, yes.  Yes.  If
11 the motive for any violation is if the President does
12 something which he believes will help him get elected
13 in the public interest, that cannot be the kind of
14 quid pro quo that results in impeachment.  So yes.
15         I just don't know the statute in terms of
16 criminal liability, but a president is not criminally
17 liable.  Right?  We impeach them.  The Office of
18 Legal Counsel says Mr. Mueller cannot indict Mr.
19 Trump, even if he wants to because presidents can't
20 -- that's our justice department.
21         So I don't know and to me it doesn't
22 matter for this argument for my column.  My column is
23 about impeachment.  And if the motive for a quid pro
24 quo is reelection in the national interest, I read --
25 I hear Professor Dershowitz saying, well, then that

 1  cannot be the subject of impeachment.  I think that's

 2  really dangerous.

 3          BY MR. SCHWEIKERT:

 4      Q.   Well, you're an attorney, right?

 5      A.   Yes, sir.  I am an educated licensed

 6  attorney.  I never practiced.

 7      Q.   Did you consider how a reasonable person

 8  reading your article might possibly interpret or

 9  misinterpret your so-called Dershowitz Doctrine?

10          MS. BOLGER:  Object to form.

11      A.   I thought it was very clear and I think it

12  holds up.  People can disagree with my opinion, but I

13  think I stated it very clearly and I still -- I still

14  hold to that opinion.  It's my opinion.

15          BY MR. SCHWEIKERT:

16      Q.   But you don't know if motive is an element

17  that needs to be established in order to prove a

18  violation of campaign finance laws as a lawyer.  How

19  is a layperson who reads your article supposed to

20  know?

21      A.   They don't need to.

22          MS. BOLGER:  Object to the form.

23          THE WITNESS:  Sorry.

24      A.   They don't need to.  They need to know

25  that at least one guy is sounding an alarm that says,

1   Hey, the President's lawyer is saying if he's doing

2   it in pursuant of his reelection, that's okay.  So,

3   see, that's the motive.  That's the motive that I was

4   focused on.

5          I don't know the elements of the crime.

6   There's probably 100 campaign laws.  I don't know the

7   elements.  As I said, I've never tangled with them,

8   thank God, but I know in impeachment the professor

9   said I believe -- I understood him -- I understood

10  his argument to say if the motive is reelection.

11         And, again, in his defense, he's trying to

12  win an argument in a room full of politicians about a

13  particular issue:  The President allegedly

14  withholding Ukrainian aid for allegedly digging up

15  dirt.

16         And I'm very, very appalled by that.  I

17  think it is impeachable.  I think they should have

18  impeached him and removed him.  I think if that's not

19  abuse of power, nothing is, but he disagrees.  And on

20  the 27th he lays out as to why, but I didn't write

21  about that.

22         What I wrote about, though, was something

23  I know more about, which is reelection and the

24  politician's drive.  You know, Mr. Madison said, If

25  men were angels, we wouldn't need a constitution.

```
 1  And, boy, having been in hundreds of campaign
 2  headquarters, that's true.
 3              BY MR. SCHWEIKERT:
 4      Q.    Can you direct me to any statements of
 5  Professor Dershowitz that you believe your assertion
 6  in your draft op-ed that, quote, extortion:  no more,
 7  end quote?
 8      A.    He wasn't --
 9              MS. BOLGER:  Object to the form.
10      A.    Yeah.  I -- no is the short answer.  He
11  did -- he simply said if the motive -- so I just
12  pulled a bunch of crimes out of my head, like if the
13  motive is reelection, that's cleansing.  That's
14  absolution.  And, again, that's really troubling.
15              (Whereupon, there was an interruption.)
16              THE WITNESS:  May I get a glass of water?
17              MR. BAINE:  Do you want to take a break?
18  Why don't we just take a break?  It's been an hour or
19  so.
20              MR. SCHWEIKERT:  Okay.  Let me just finish
21  this and we'll --
22              BY MR. SCHWEIKERT:
23      Q.    So if, as you sit here today, you're
24  unaware of any statements by Professor Dershowitz
25  that would support your assertion in your draft op-ed
```

```
 1   "extortion:  no more," how is this draft a fair,
 2   accurate, and faithful characterization of Mr.
 3   Dershowitz's presentation during the impeachment
 4   trial?
 5            MR. BAINE:  Objection to the form of that
 6   question.
 7            MS. BOLGER:  Objection.
 8            MR. BAINE:  You might want to look at
 9   that.
10            THE WITNESS:  Sherry, could you reread the
11   beginning of that, please?
12            (The reporter read back the question.)
13            THE WITNESS:  Thank you.
14       A.   I don't allege -- I don't claim that Mr.
15   Dershowitz specifically talked about extortion or
16   whatever other crimes I referenced.
17            In fact, that's the problem, is that I'm
18   trying to show the reader that this could open the
19   door.  Right?  I certainly don't say Dershowitz
20   endorses extortion.  I would never say that, but I do
21   say that anything a politician can do to advance her
22   reelection she'll do, which is why we need
23   guardrails.
24            And I think in his zealous effort to
25   acquit the President of a particular allegation of
```

1    quid pro quo the professor opened the door to all

2    matters of mischief.  That's what the column says,

3    and that's still my opinion.

4            But I certainly don't say, Hey, Alan

5    Dershowitz says let's go commit extortion or any of

6    those other crimes.  I don't, and I didn't think any

7    fair-minded reader can conclude that.

8            BY MR. SCHWEIKERT:

9    Q.    President Trump was not on trial for

10   alleged extortion, was he?

11   A.    Right.  Right.  Correct.  That's my point.

12   I was doing reductio ad absurdum, right, which you

13   know we do this to test.  I did.  Something may sound

14   real good as you present it in the instant case, but

15   to see if it's the sort of thing that we want in our

16   constitutional law 50 years from now, let's tease it

17   out.

18           Let's see can this lead to -- and if it

19   leads to harmful or, in this case, any even ludicrous

20   conclusions, you realize, wait, that's a bad rule.

21   Let's go back.  That's what I was doing, and it goes

22   back to ancient Greece.

23           Rhetoricians have used this for millennia,

24   and I employed it in this column and I think very

25   effectively.

```
 1        Q.    But Mr. Dershowitz's answer to the
 2   questions posed by Senator Ted Cruz were with respect
 3   to quid pro quo, which is a form of bribery, right?
 4             MS. BOLGER:  Objection to the form.
 5        A.    No.  Quid pro quo can be completely
 6   innocent.  He says that.  No.  If the Palestinians
 7   don't stop funding terrorism, we're not going to fund
 8   the Palestinians.  That's quid pro quo, this for
 9   that.
10             So no.  The questioning -- and Cruz is
11   certainly right about this in his question.  Is it
12   true that quid pro quos are often used in foreign
13   policy?  Of course, every day.  They should be.  Quid
14   pro quo is not a criminal act at all.  It's not.  It
15   just means this for that.  Right?
16             And so I have no problem with a quid pro
17   quo that's not a criminal act.  When the professor
18   says the only thing that would make quid pro quo
19   unlawful is if the quo -- by the way, it should be
20   the quid as well, but whatever -- if the quo were in
21   some way illegal.
22             So it's unlawful if it's illegal.  Okay.
23   I'm with you, sir.  But then he says, If the motive
24   is reelection, it can't be illegal.  That's how I got
25   to my analysis, and I think it holds up.  I still
```

 1  think I'm right.

 2          BY MR. SCHWEIKERT:

 3      Q.    To be fair, he did say it would be a

 4  complex middle case, right?

 5      A.    Right.  Right.

 6      Q.    A complex middle case to be resolved by

 7  whoever was sitting in judgment of the facts as

 8  applied to the law at that time, right?

 9          MS. BOLGER:  Object to the form.

10      A.    That's a good point, Mark.  But what I

11  took that to mean is if reelection is in the mix and

12  pecuniary self-interest is not, I bet you he would

13  even say that reelection plus pecuniary self-interest

14  is still impeachable; still unlawful.  I bet you he

15  would.  I'm being fair to him because he's clear

16  about that, crystal clear.

17          You take a bribe, you make the Ukrainians

18  build a hotel for you, you're going to jail or you're

19  getting kicked out of office under the Dershowitz

20  Doctrine.

21          But I read this to say that there's a

22  cleansing effect of the pursuit of reelection.  And,

23  again, I think it's genius because if you really

24  notice, he shifts the subject of the sentence; that

25  is.

```
 1              He begins by saying, "Every public
 2   official whom I know believes that his" -- it should
 3   be his or her, but I'll give him a pass.  He's old
 4   like me -- "his election is in the public interest."
 5   But then the next sentence he shifts, "Mostly, you
 6   are right."
 7              Okay.  That's genius.  He's telling Ted
 8   Cruz, you are a good person.  You -- not just Ted,
 9   all of them.  Your reelection is in the national
10   interest, and I'm telling you their hearts swell.  I
11   couldn't see them, but -- so I -- it was brilliant in
12   that sense.
13              But I think it's liable to be exploited by
14   unscrupulous presidents in the future.  That's why I
15   wrote the column.
16              BY MR. SCHWEIKERT:
17        Q.   The cleansing effect of the so-called
18   Dershowitz Doctrine --
19        A.   Of the motive of -- I'm sorry.
20        Q.   I know.  I'm so predictable.
21        A.   No.  My fault.  I'm sorry.
22              MR. BAINE:  You're all talking over each
23   other.  It really might be time for a break because
24   everybody is talking --
25              MR. SCHWEIKERT:  A couple more questions,
```

```
 1   and then yes, I will give you that break that I
 2   promised.
 3              THE WITNESS:  Okay.
 4              BY MR. SCHWEIKERT:
 5       Q.    The cleansing effect of the Dershowitz
 6   Doctrine would include allowing Donald Trump to shoot
 7   someone on Fifth Avenue and not be impeached,
 8   according to your op-ed, right?
 9              MS. BOLGER:  Object to the form.
10       A.    Ad absurdum.  Right?  At the most extreme
11   and absurd example.  Right?  If you stretch it as far
12   as you can -- that's as far as I could come up with
13   -- that's why we can't have this doctrine.  That's
14   why we can't tell politicians, even in the case that
15   he thinks is mixed -- I don't.
16              I think the Ukrainian thing is pure
17   personal political self-interest.  There's no gain
18   for America in withholding javelin missiles from
19   Ukrainians who are fighting for their lives against a
20   very evil Russian invader, but he believes it's
21   mixed.
22              He wants to get reelected.  He wants to
23   dig up dirt on, I guess, Biden's son or something,
24   but also the national interest is served by his
25   reelection, so that's mixed and that's cleansed and I
```

 1  think that's dangerous.
 2          BY MR. SCHWEIKERT:
 3      Q.    But Mr. Dershowitz never applied his
 4  argument with respect to mixed motives --
 5      A.    Right.
 6      Q.    -- to shooting someone -- strike that.
 7          But Mr. Dershowitz never applied his
 8  argument regarding mixed motives to a president
 9  shooting someone on the street and never being able
10  to be impeached, did he?
11          MS. BOLGER:  Objection to the form.
12      A.    That's correct, I did to demonstrate that
13  the argument was flawed at its inception, while
14  useful to Mr. Dershowitz and Mr. Trump.  While flawed
15  -- it was flawed at its inception because it can't
16  hold up under being -- a reductio ad absurdum test.
17          I certainly don't say that Mr. Dershowitz
18  was advocating that Mr. Trump -- and even Trump was
19  speaking metaphorically, I'm quite sure.  And so --
20  but that's the most extreme.  Right?  So you take it
21  to the most extreme and you see if it still holds up,
22  and it doesn't.
23          BY MR. SCHWEIKERT:
24      Q.    And you then in your -- well, strike that.
25          This language we've been talking about,

```
 1   the paragraph that begins "The Dershowitz Doctrine,"
 2   that ultimately was in the final version that was
 3   published by CNN, right?
 4        A.   I don't have it in front of me, but I'll
 5   --
 6             MR. BAINE:  Objection to the form.
 7             MR. SCHWEIKERT:  We'll look at that in a
 8   moment.
 9        A.   I'm sure --
10             BY MR. SCHWEIKERT:
11        Q.   A couple more and then we can break.
12        A.   Yes, sir.
13        Q.   In the paragraph right below the one we've
14   been discussing --
15        A.   In the column or the Senate trial?
16        Q.   Excuse me.  In your draft of the op-ed --
17        A.   Okay.  Right.
18        Q.   -- there's a paragraph that begins, "Allow
19   me to use a technical term."
20             Do you see that?
21        A.   Yes, sir.
22        Q.   You then refer to the so-called Dershowitz
23   Doctrine as bonkers --
24        A.   Yes.
25        Q.   -- as looney tunes? as frightening, right?
```

1      A.     Right.

2      Q.     Did you ever consider that a reasonable

3  person who read your op-ed might believe that you

4  were characterizing Professor Dershowitz himself, a

5  constitutional scholar, as advocating for a bonkers

6  or a looney tunes or a frightening position regarding

7  impeachment?

8           MS. BOLGER:  Object to form.

9      A.     I think he was perhaps unwittingly stating

10  an argument that could be used in ways that were just

11  bonkers, not that he is.  And, again, every time I

12  refer to him personally, of course, I compliment him.

13  I say he's a brilliant legal scholar, and he is.

14           So it's not personal, but I think the

15  doctrine he espoused, perhaps even unwittingly, he --

16  in his defense, this wasn't the 27th where he was

17  carefully prepared.

18           He's speaking extemporaneously, but holy

19  moly does he open an exception here that swallows the

20  rule.

21           BY MR. SCHWEIKERT:

22      Q.     Well, why didn't you then qualify your

23  op-ed by saying his argument on the 27th was this, in

24  your understanding, and yet then in an extemporaneous

25  answer to a question on the 29th he said something

```
 1  else and that lead you to have the opinion that you
 2  set forth in your op-ed?
 3           MS. BOLGER:  Object to form.
 4      A.    I said that would only strengthen my
 5  argument because it shows how outrageous this is,
 6  that he's shifted his position from two days before
 7  and now he's saying, if you are seeking your
 8  reelection.
 9           So I could have.  It didn't occur to me at
10  the moment because his January 27th presentation was
11  not outrageous to me, so it didn't stand out.  And I
12  suppose I could have said, Hey, you gave a -- I
13  disagreed with it -- perfectly reasonable
14  presentation a couple days earlier, but now he's
15  really espoused a doctrine that could be terribly
16  damaging.
17           I could have said that.  I think it would
18  have strengthened the piece.  It would have
19  strengthened my opinion and my argument.  I don't
20  think it weakens it at all.
21           MR. BAINE:  Okay.  Can we take that break
22  now?
23           MR. SCHWEIKERT:  One last question.
24      A.    Yes, sir.
25           BY MR. SCHWEIKERT:
```

1      Q.    But it certainly would have provided more

2  context to a reader of your op-ed if you were to have

3  clarified exactly what Mr. Dershowitz had argued

4  during the trial and then included the additional

5  context of what he said during the Q and A, right?

6      A.    No.  On the 27th he didn't talk about

7  reelection.  Again, that's what I'm an expert in is

8  politicians seeking election.  That's my expertise.

9           Professor Dershowitz knows the

10 constitution better than I ever will.  I know

11 politicians better than he ever will, and he didn't

12 say anything about that on the 27th.  So I don't

13 think that that lets him off the hook, frankly.

14           I think that when he turns to politicians

15 and says, When you're seeking your reelection,

16 anything goes, whoa, they're going to run with it,

17 they are.  And that's -- so I don't think it

18 strengthens his case at all that two days before he

19 was -- well, I disagreed with parts of it -- he was

20 perfectly reasonable.

21           This was completely unreasonable, I think,

22 this argument on the 29th where he says, if a

23 president does something which he believes will help

24 him get elected in the public interest, that cannot

25 be the kind of quid pro quo that results in

```
 1  impeachment.

 2              You allow that and you're going to have

 3  Hillary calling the governor of Pennsylvania and

 4  offering him a $1 million bribe.

 5              MR. SCHWEIKERT:  We can take a break.  I

 6  want to be considerate.  Off the record.

 7              THE VIDEOGRAPHER:  This concludes Volume

 8  No. 2 of the deposition of Paul Begala in the case

 9  Dershowitz versus Cable News Network.

10              We are now off the record.  The time is

11  2:27 p.m. Eastern.

12              (A break was taken.)

13              THE VIDEOGRAPHER:  This is the beginning

14  of Volume No. 3 in the video recorded deposition of

15  Paul Begala.  The time is 2:46 p.m. Eastern.

16              Counsel, you may proceed.

17              BY MR. SCHWEIKERT:

18       Q.    I would like to show you a document I'm

19  going to mark as Plaintiff's Exhibit 29.

20              (Exhibit Number 29 was marked for

21  identification and was attached to the deposition.)

22              MR. SCHWEIKERT:  A copy for counsel.

23              BY MR. SCHWEIKERT:

24       Q.    Let me know if you've seen it before.

25              MS. BOLGER:  For the record, this document
```

 1   has neither URL nor Bates stamp.  We don't know where
 2   it came from.  I'm sure, Mr. Schweikert, you can make
 3   a representation that clears that right up.
 4              MR. SCHWEIKERT:  Yeah.  I will represent
 5   this is a printout from the CNN website earlier this
 6   week of the article entitled, quote, Presenting the
 7   Ludicrous Dershowitz Doctrine, end quote, by Paul
 8   Begala, which was updated 9:11 p.m. Eastern Standard
 9   Time on January 29th, 2020.
10              BY MR. SCHWEIKERT:
11        Q.    My question for you, Mr. Begala, is could
12   you please just review Plaintiff's Exhibit 29 and let
13   me know if you've seen it before?
14        A.    Yes, sir.
15        Q.    And what is it?
16        A.    This is a printout of the column I wrote
17   for CNN on January 29th.
18              MS. BOLGER:  For the record, it does have
19   weird line breaks and repetition in it.  I think it's
20   not a particularly clean copy.  Like, if you look at
21   the second page, the "seriously" paragraph is
22   repeated twice.  So for the record, I'm not totally
23   sure it's complete.
24              MR. SCHWEIKERT:  That's why I don't like
25   printing from websites.

```
 1              I'm going to give you another document I
 2   will mark as Plaintiff's Exhibit 30, which I will
 3   represent is the same article but printed using
 4   Safari's reader mode so as to remove all of the ads
 5   and other graphics.
 6              (Simultaneously speaking.)
 7              (Exhibit Number 30 was marked for
 8   identification and was attached to the deposition.)
 9              BY MR. SCHWEIKERT:
10        Q.    And I will represent that essentially
11   Exhibit 29 and Exhibit 30 are identical with respect
12   to the written content.
13        A.    Mark, you gave me two copies.
14        Q.    If you could take a moment and review
15   Exhibit 30 and let me know if you've seen it before.
16        A.    Yes, sir, I have.
17        Q.    And what is Exhibit 30?
18        A.    A column I wrote for CNN.com Opinion on
19   January 29, 2020.
20        Q.    Is this a version of your draft op-ed that
21   we were discussing this morning, which was ultimately
22   -- strike that.
23              Is Plaintiff's Exhibit 30 a version of the
24   draft op-ed that we were previously discussing that
25   was published by CNN on its website?
```

1          MS. BOLGER:  Object to the form.

2     A.    Yes.

3          THE WITNESS:  Sorry.

4          MS. BOLGER:  Object to the form.

5     A.    Yes, sir, it is.

6          BY MR. SCHWEIKERT:

7     Q.    Is Exhibit 30 a version of your op-ed that

8 was published by CNN?

9          MS. BOLGER:  Object to the form.

10    A.    It seems to be, yes, sir.

11         BY MR. SCHWEIKERT:

12    Q.    Is there anything that suggests it is not

13 that?

14    A.    No, sir.

15    Q.    And before the break we had spent some

16 time discussing your draft op-ed, in particular the

17 paragraph that began, "The Dershowitz Doctrine."

18         Do you recall that?

19    A.    Yes, sir.

20    Q.    And do you see that paragraph in

21 Plaintiff's Exhibit 30?

22    A.    Yes, sir.

23    Q.    And so the record is clear, could you

24 please read the paragraph beginning, "The Dershowitz

25 Doctrine" from Plaintiff's Exhibit 30 into the

```
 1  record?
 2      A.   Yes, sir.  "The Dershowitz Doctrine would
 3  make presidents immune from every criminal act, so
 4  long as they could plausibly claim they did it to
 5  boost their reelection effort.  Campaign finance
 6  laws:  Out the window.  Bribery statutes:  Gone.
 7  Extortion:  No more.
 8           "This is Donald Trump's fondest figurative
 9  dream, to be able to shoot someone on Fifth Avenue
10  and get away with it."
11      Q.   Thank you.
12      A.   Yes, sir.
13      Q.   Now, before we took our last break, you
14  were telling me about some of your thoughts on what
15  Alan Dershowitz's arguments were during the
16  impeachment trial, right?
17      A.   Yes, sir.
18      Q.   I'd like to look specifically at some of
19  the arguments Mr. Dershowitz made on January 27th and
20  I would direct your attention to Plaintiff's Exhibit
21  25, page S614, the paragraph beginning, "By the
22  standards."
23           Please let me know when you see that.
24      A.   614.  Could you tell me which column it
25  is?
```

```
 1        Q.    Yes.  The first column on the left-hand
 2   side.
 3        A.    And how does it begin again?
 4        Q.    Four paragraphs down, it begins, "By the
 5   standards applied."
 6        A.    Okay.  Yes, sir.  I see it.
 7        Q.    Do you see that?
 8        A.    Yes, sir.
 9        Q.    Okay.  And then if you look at the second
10   column on that page, the second paragraph down ends
11   in part "at the time legitimate."
12        A.    Yes, sir.
13        Q.    Do you see that?
14        A.    Yes.
15              MS. BOLGER:  No, I don't.  Where are you?
16              THE WITNESS:  The second column --
17              MR. SCHWEIKERT:  It begins -- the
18   paragraph begins, "Yet this is --
19              THE WITNESS:  Yes, exactly.
20              MR. SCHWEIKERT:  Everyone with me?
21              MR. BAINE:  Yes.
22              MR. SCHWEIKERT:  Okay.
23              BY MR. SCHWEIKERT:
24        Q.    Could you please read into the record that
25   portion of Mr. Dershowitz's statements on January
```

1  27th beginning, "By the standards," through the end,

2  "at the time legitimate"?

3      A.    Yes, sir.

4            MS. BOLGER:  Wait, the whole column?  Are

5  you saying the whole column?

6            MR. SCHWEIKERT:  Yes.

7      A.    "By the standards" and all the way through

8  to the second --

9            MR. BAINE:  You want him to read one, two,

10  three, four, five, six, seven, eight, nine, ten, 11

11  paragraphs?

12            MR. SCHWEIKERT:  Yes.

13            MR. BAINE:  I object to that.  You can put

14  it in the record.  You can read it yourself.  You can

15  read it into the record.

16            He's not here to read ten (sic) paragraphs

17  of Mr. Dershowitz's arguments.

18            BY MR. SCHWEIKERT:

19      Q.    If you would like to read it quietly to

20  yourself, that's fine, too.

21            MR. BAINE:  That's fine.

22      A.    Okay.

23            MR. SCHWEIKERT:  That's fine.

24      A.    I'm a TV guy.  We read stuff out loud all

25  the time.

```
 1              BY MR. SCHWEIKERT:
 2        Q.    It's more important that you process it
 3   and understand it.
 4        A.    Okay.  I'm sorry to be glib.
 5        Q.    Let's take a moment and please review that
 6   portion.
 7              (Whereupon, the witness read the requested
 8   text.)
 9              THE WITNESS:  Okay.  I've read it.
10              BY MR. SCHWEIKERT:
11        Q.    Did you see that Mr. Dershowitz did, in
12   fact, address a president's interest in reelection on
13   January 27th?
14              MS. BOLGER:  Object to the form.
15        A.    Yes, as a mixed motive.
16              BY MR. SCHWEIKERT:
17        Q.    Right.  And in that portion of Mr.
18   Dershowitz's statement, he cited an example of
19   President Lincoln sending soldiers home to vote for
20   his political party, right?
21        A.    Yes, sir.
22        Q.    That was an example of an instance where
23   Lincoln had a personal motive of reelection and also
24   a motive that was in the public interest because he
25   believed that his reelection would serve the public,
```

1   right?

2        A.    Yes, and Professor Dershowitz says -- I'm

3   sure he's right -- that Professor Blackman -- whoever

4   that is -- says the interest there was not only

5   Lincoln's reelection, but keeping Indiana in the

6   Republican party, therefore, in the union and in the

7   war, which is actually kind of different -- it's

8   probably why he picked it.  It's such an extreme

9   example of a partisan interest being the national

10  interest.

11            That's how I read it.  So I never heard

12  that story before.  It's not a quid pro quo, but it's

13  a fascinating case.  But, again, it doesn't -- to me,

14  it's not at all comparable to telling the President

15  of Ukraine who's lost 15,000 citizens to Putin's

16  thugs, Hey, I know you need these javelin missiles

17  and congress ordered me to ship them to you, but you

18  got to do me a favor.

19            To me, that's like one of the most

20  outrageous things a president has ever done, and I

21  don't blame Dershowitz for that.  He wasn't telling

22  Trump to do that.  I'm sure he would have opposed it,

23  but that's the case that I think that, right, that

24  caused all of this, the actual case.

25            It wasn't President Lincoln trying to save

1  the union by keeping Indiana in the union.  I'm sure

2  he's right.  If Indiana had gone Democratic, they

3  probably would have quit the union.  I'm ashamed to

4  say as a Democrat that my party was the party of

5  slavery back then.

6        Q.   Did the quid pro quo -- strike that.

7        Did the alleged quid pro quo, as you've

8  described it involving President Trump, constitute a

9  violation of any criminal law?

10       A.   I don't know.  I'm not a criminal lawyer.

11       Q.   Are you aware that Professor Dershowitz

12  asserted the position that that alleged quid pro quo

13  did not constitute a violation of any criminal

14  bribery law?

15       MS. BOLGER:  Object to the form.

16       A.   I'm not aware of that.  I didn't know that

17  he took that -- I thought he was arguing the

18  constitutional 30,000 foot argument.  I thought the

19  facts were left to other lawyers on the President's

20  team, but I haven't reread the record, so I did not

21  know that.

22       BY MR. SCHWEIKERT:

23       Q.   Are you aware that his legal argument was

24  if a president was acting partially in his personal

25  interest in getting reelected but also partially in

1  what he believed the public interest; namely, his

2  reelection, that is a mixed motive case in which

3  there is no specific criminal violation and,

4  therefore, no grounds for an impeachment?

5          MS. BOLGER:  Object to the form.

6      A.    That is the Dershowitz Doctrine.  That's

7  what set off the alarm bells.  Yes, sir.  That's my

8  understanding, too, of what Professor Dershowitz was

9  articulating, and I found that alarming.

10          BY MR. SCHWEIKERT:

11     Q.    In other words, if a President allegedly

12  does something that does not constitute a violation

13  of any criminal law the fact that the President may

14  have been acting partially in his personal interest

15  in getting reelected did not transform that legal act

16  into an impeachable offense?

17          MR. BAINE:  Objection to the form of the

18  question.

19          MS. BOLGER:  Object to form.

20          BY MR. SCHWEIKERT:

21     Q.    You can answer.

22          MR. BAINE:  I don't know what you're

23  asking, but you can try to answer it, if you can.

24     A.    I did not hear Professor Dershowitz to say

25  if the President is acting in his reelection interest

```
 1   and his action is not a criminal offense it's okay.

 2   I did not hear him say that.  In fact, I heard the

 3   opposite.

 4           What I understood him to mean was if a

 5   president commits an act, even if it's otherwise a

 6   criminal act, if his motive is not criminal, if his

 7   motive is not pecuniary for personal financial gain,

 8   then it cannot be -- if I may, I'll go back to the

 9   29th.

10           But a complex middle case -- and this is

11   Professor Dershowitz answering Senator Cruz.  A

12   complex middle case is, I want to be elected.  I

13   think I'm a great president.  I think I'm the

14   greatest president there ever was.  And if I'm not

15   elected, the national interest will suffer greatly.

16   That cannot be -- and then the Congressional Record

17   runs out, but the rest of the sentence is an

18   impeachable offense.

19           So, to me, that's saying anything goes.

20   If he had carefully roped off criminal conduct, it

21   would be a very different standard.

22           BY MR. SCHWEIKERT:

23   Q.    I'm trying to understand where this

24   cleansing effect was advocated in your position.

25   That complex middle case that you referenced --
```

1         A.      Yes, sir.

2         Q.      -- did that involve an alleged crime

3     committed by the President?

4         A.      That's how I viewed it.

5              MS. BOLGER:   Hold on.   Object to form.

6     Objection to the form.   I truly did not understand

7     that question.   Object to form.

8              You can answer, if you did.

9         A.      I understood it.   I just disagree with it.

10             I think it does.   It does not rope off

11    criminal conduct and what -- the whole case is

12    alleged impeachable conduct, certainly perhaps

13    criminal.

14             So, no.   I believe he was saying that in a

15    case of mixed motives, so long as one of those

16    motives is reelection and not pecuniary, it cannot be

17    an impeachable offense.   And that is a

18    get-out-of-jail free card, I think.

19             Again, this is -- I keep saying -- it's

20    real important.   It's an opinion.   And, again, my

21    family and friends who voted for Trump would think my

22    opinion is full of beans, but that's what makes

23    America.   It makes our Thanksgiving dinners

24    interesting.

25             But that's my opinion.   I really think

1  that, and I've read it and reread it and thought
2  about it and studied it, and that's where I land.
3          It may not have been his intent, but
4  that's why I wanted to pull that thread to show, hey
5  guys -- gals -- sorry -- hey, people, this could
6  really go haywire if we adopt this standard that if
7  you think it's in the national interest because
8  you're being reelected, anything goes.
9          BY MR. SCHWEIKERT:
10  Q.    But he did say earlier in his response to
11  the questions, "the only thing that would make a quid
12  pro quo unlawful is if the quo were in some way
13  illegal," right?
14  A.    Right.
15  Q.    And that was --
16  A.    But if the motive --
17  Q.    Hold on -- that was in effect him roping
18  off illegal conduct as always being impeachable?
19  A.    Right, but not illegal if the motive is
20  reelection.  That's the cleansing effect.  That's the
21  thing.
22          Okay.  If I shoot a guy, I go to jail,
23  unless I'm in uniform and he's in uniform and we're
24  at war.  Then I get a medal.  Motive matters.  Right?
25          So you can't just say if it's illegal it's

1  unlawful, which is what he said, which is kind of
2  hilarious tautology at the beginning.  He said if the
3  quo -- and I'm sure he meant the quid as well -- if
4  either pieces of the exchange are criminal, I'll give
5  him that.
6          But he said if the quo is illegal, then
7  it's unlawful.  And I'm sorry.  Again, I'm a middling
8  student from a state school, but my answer to that
9  is, duh.
10         The interesting case is what he raises
11 that he really hones in on, the complex middle
12 ground, and I think he just gets it wrong.  He gives
13 these guys and gals too much license.  But, of
14 course, if it's a crime, it's criminal.  But then if
15 your motive is the good of the country, it's not a
16 crime.
17         That's how I read this.  And, again, I
18 meant no disrespect to a brilliant man.  And every
19 time I referred to him personally, I said that, but I
20 still think I'm right.  It's not only my opinion.
21 It's correct.
22         BY MR. SCHWEIKERT:
23 Q.    So if the President -- strike that.
24         So according to Mr. Dershowitz's position
25 expressed on the floor of Congress during the

1  impeachment trial, if the President -- a hypothetical
2  president had engaged in criminal bribery, that would
3  be grounds for impeachment, right?
4            MS. BOLGER:  Object to the form.  Asked
5  and answered.
6            MR. BAINE:  Objection.
7       A.    My understanding --
8            MR. BAINE:  According -- according to the,
9  quote, Dershowitz Doctrine.  Is that your question?
10           MR. SCHWEIKERT:  According to --
11      A.    That he stated the position on the floor,
12  right?
13           BY MR. SCHWEIKERT:
14      Q.    Correct.
15      A.    I don't know.  Maybe I'm not getting it.
16  Maybe I'm not a good enough lawyer.
17           (Simultaneously speaking.)
18           MS. BOLGER:  If you can answer, you can
19  answer.
20      A.    What I think you're saying is --
21           MR. BAINE:  Let's -- let's just get a
22  question and an answer.
23           THE WITNESS:  Yes, sir.
24           BY MR. SCHWEIKERT:
25      Q.    Do you -- strike that.

```
 1            Mr. Dershowitz's position, one of them --
 2    strike that.
 3            Didn't Mr. Dershowitz make the legal
 4    argument that if a President commits criminal bribery
 5    he can be impeached?
 6            MS. BOLGER:  Object to the form.
 7       A.    No, not really, Mark.  No.  What he said
 8    is if the President receives a bribe he can be
 9    impeached, but the incentives in a reelection are not
10    to receive bribes.  They would be to offer a bribe.
11            And then if -- if I'm -- I can't be the
12    president.  If Hillary is the president and she
13    offers a bribe to the governor of Pennsylvania, that
14    is against her pecuniary interest, right?  She's
15    losing money.  She's a rich lady.  But she's out $1
16    million bucks in my hypothetical, so that's not in
17    her pecuniary interest.  It's in her reelection
18    interest.
19            In my hypothetical she beat Trump and
20    American is great.  In that hypothetical, she's the
21    president and she's bribing the governor of
22    Pennsylvania.  That has to be impeachable, but if
23    it's in the -- I think -- in my doctrine, the Begala
24    doctrine, she's out.
25            But I worry that what -- so she's up on
```

```
 1  impeachment trial and she pulls out page S651 of the
 2  January 2020 Congressional Record and says, Hey, when
 3  Mr. Trump was being tried Professor Dershowitz said
 4  if the motive is reelection, it can't be impeachable.
 5            BY MR. SCHWEIKERT:
 6       Q.    But that specific argument regarding mixed
 7  motives was confined to a hypothetical instance where
 8  there was no alleged criminal conduct, right?
 9       A.    That's not what I understood.  If you
10  could point me to --
11       Q.    There were mixed motives -- three
12  different mixed motives.  What was your understanding
13  of the first one?
14            MS. BOLGER:  Object to form.
15            BY MR. SCHWEIKERT:
16       Q.    Well, not mixed -- strike that.  Three
17  instances of types of motives that a hypothetical
18  president could have.
19       A.    My understanding was the first was the
20  easiest to dismiss.
21       Q.    Which is?
22       A.    Receiving a bribe, soliciting a bribe,
23  receiving one.  He did not say offering one, which is
24  the real worry for me as a political hack.  He said
25  if the President -- effectively -- I do have it in
```

```
 1  front of me -- well, I do have it in front of me.  I
 2  can't find the spot.
 3          Instead of holding those javelin missiles
 4  back if the President said -- if he held them back
 5  instead of dirt on Biden's kid -- I'm holding back
 6  this money unless you build me a hotel with my name
 7  on it -- that's what Professor Dershowitz said in one
 8  hypothetical, and he says that's clearly impeachable.
 9  I'm looking for it, Mark, if you could help me.
10      Q.   You don't believe that Mr. Dershowitz had
11  advocated that if the President had paid a bribe in
12  exchange for his name being put on the front of a
13  building in some foreign country that would be an
14  impeachable offense?
15          MS. BOLGER:  Objection to the form.  Look
16  at what he said.
17      A.   Yeah, that's not what he said and -- when
18  you introduce the reelection.  That's why I think he
19  didn't get at it because the reelection incentives,
20  to me, and the bribery statutes go the other way,
21  especially for a wealthy president.
22          I'm going to buy votes in West Virginia.
23  No Republican needs to anymore.  Whatever.  I'm going
24  to buy votes in a swing state, 50 bucks a vote.  I'm
25  rich.  That's bribery, but it's in the pursuit of
```

```
 1   West Virginia staying in the Republican party.  Just
 2   like Lincoln letting the troops vote, the argument
 3   would be.  It's not what I believe.
 4           But see, that's what I believe, is that
 5   self-enrichment was the one easy case where Professor
 6   Dershowitz says well, clearly -- self-enrichment,
 7   clearly that's impeachable, but self-reelection
 8   cannot be.
 9           He says that.  That's how he concludes the
10   answer to Ted Cruz.  I think I'm the greatest
11   president there ever was.  And if I'm not elected,
12   the national interest -- that cannot be -- that's not
13   a middle ground anymore.  That's not, gee, in some
14   cases it will and some -- he's like that cannot be
15   grounds for impeachment, and I just think he's wrong.
16           I disagree.  I don't think he's wrong.  I
17   strongly disagree and I think it can lead to really
18   dangerous precedents.
19           BY MR. SCHWEIKERT:
20      Q.   When Professor Dershowitz said the only
21   thing that would make a quid pro quo unlawful is if
22   the quo were in some way illegal.  That could have
23   included getting your name on the front of a hotel
24   which could be a pecuniary interest --
25      A.   Right.
```

1    Q.    -- because you could receive profits from

2  having the hotel, right?

3    A.    Right.  Right.  But that's not a

4  reelection motive.  That's a pecuniary motive, and

5  Professor Dershowitz was very strong on that and

6  he's, I think, right.

7    Q.    That would be a crime under a bribery

8  statute --

9    A.    Yes.

10    Q.    -- and, therefore, impeachable?

11    A.    Yes, sir.

12    Q.    So we agree if there's illegal conduct

13  Professor Dershowitz took the legal position the

14  President can be impeached for that?

15        MS. BOLGER:  Object to the form.

16        MR. BAINE:  Objection to the form of the

17  question.

18    A.    I think it's overbroad.  I think what the

19  professor said is if the President is advancing his

20  personal pecuniary interest -- that's a very discrete

21  form of crime, very discrete.

22        That's not breaking into the Democratic

23  headquarters at the Watergate building.  It's just

24  taking money and putting it in the bank, and I

25  remember he used that phrase, putting it in the bank.

1   It was very evocative.  That's all he roped off was a

2   pecuniary motive, self-interest financial --

3   financial self-interest.

4         And he says if you're seeking your

5   reelection, that cannot be grounds for impeachment if

6   your motive -- and he --

7         BY MR. SCHWEIKERT:

8     Q.   Unless it involves illegal conduct?

9     A.   He didn't say that.

10     Q.   The only thing that would make a quid pro

11  quo unlawful is if the quo were in some way illegal?

12     A.   Right, but it's not illegal if my motive

13  is different.  Just like if I shoot a guy and he's in

14  the enemy's uniform and I'm in my country's uniform,

15  I get a medal.  But if I shoot a guy just because I'm

16  a bad person, I go to prison.

17         The motive matters, and he's saying, I

18  fear, I believe -- my opinion is that he's saying, if

19  the motive behind a presidential action is mixed and

20  it all involves reelection, not making money, then

21  it's okay.  And that's what I find dangerous.

22     Q.   Are you saying that a president could

23  bribe American voters and as a matter of law never be

24  impeached?

25         MS. BOLGER:  Object to the form.

```
 1              MR. BAINE:  Objection to the form of the
 2   question.  Are you asking what his opinion is or what
 3   his opinion of Mr. Dershowitz's argument is?
 4              THE WITNESS:  That's the question I was
 5   going to ask.  I'm not sure if you mean my own view.
 6              BY MR. SCHWEIKERT:
 7        Q.    Is it your -- strike that.
 8              Do you believe that Mr. Dershowitz was
 9   advocating that a hypothetical president could bribe
10   American voters in violation of criminal bribery laws
11   and never be impeached?
12        A.    I don't think he was arguing that at all.
13   I think he was just trying to get his client
14   acquitted, but the standard he set would allow that,
15   I believe.
16        Q.    But in that instance, he would be giving
17   the bribe, correct?
18              MS. BOLGER:  Let him finish.  You didn't
19   let Paul finish.
20        A.    Right.  He'd be giving -- the President
21   would be giving the bribe.
22              BY MR. SCHWEIKERT:
23        Q.    And it would be impeachable conduct,
24   right?
25        A.    Not under the Dershowitz Doctrine.  If he
```

1  gave the bribe in pursuit of his reelection, that

2  cleanses everything.  That's my concern.  I don't

3  think that's what he argued.  It's not.  If he had

4  argued that, I wouldn't have needed to write the

5  column.

6          His doctrine can be applied, though, in a

7  whole host of absurd, frightening -- and I use that

8  word -- frightening and ludicrous cases.

9          Again, bad enough, I think, to withhold

10  aid from people fighting for their lives against an

11  evil dictator, not just bad enough.  That's about the

12  worst thing a president can do, but he -- he's a

13  lawyer.  He's defending his client.  I understand

14  that.

15          But if that's cleansing, if the motive in

16  this case -- let's talk about this actual case.  The

17  case -- the motive I believe for Mr. Trump

18  withholding those javelin missiles to save lives was

19  not our foreign policy.

20          He wasn't saying -- like, Obama refused to

21  give Zelensky offensive weapons, and I hated that.  I

22  thought he was wrong.  He thought it was not in

23  America's interest, that -- well, they'll fall in the

24  wrong hands.  Okay.  I thought that was wrong,

25  totally wrong, but that wasn't impeachable.  That was

1  just the President conducting foreign policy in a way

2  I disagree.

3           Trump withholds it also.  Different

4  motive.  He doesn't withhold it because he's worried

5  about them falling in the hands of terrorists or

6  whatever Obama's reason was.  Trump's reason, I

7  believe, and the record shows, was to pressure the

8  Ukrainians into digging up dirt on his opponent's

9  kid.

10          That's political self-interest.  That's

11  political reelection and that cannot cleanse him of

12  the conduct of withholding weapons from the

13  Ukrainians, I think.  Again, that's an argument I'm

14  making.

15      Q.    Let's briefly take a look at the

16  Congressional Record for January 27th --

17      A.    Yes, sir.

18      Q.    -- Plaintiff's Exhibit 25, in particular

19  -- if I can find my note.

20          Wasn't the legal issue that Professor

21  Dershowitz was arguing was whether abuse of power and

22  obstruction of Congress were impeachable offenses

23  within the meaning of the constitution?

24          MS. BOLGER:  Object to the form.

25          MR. BAINE:  On January 27th.

```
 1        A.    On January 27th.
 2              MS. BOLGER:  Where are we looking?
 3              BY MR. SCHWEIKERT:
 4        Q.    Do you recall that?
 5              MR. BAINE:  I just want to know whether
 6   you're asking what he's arguing on the 27th or the
 7   29th?
 8              MR. SCHWEIKERT:  I'm talking on the 27th.
 9              MR. BAINE:  Okay.  Thank you.
10              BY MR. SCHWEIKERT:
11        Q.    And I'd like to verify or look at S609 --
12        A.    Oh, thank you.
13        Q.    -- third column, last paragraph reads:
14   "Do charges of abuse and obstruction rise to the
15   level of impeachable offenses under the
16   constitution?"
17        A.    Wait.  I'm sorry.  How does the paragraph
18   -- I'm on 609 on the third column.
19              MS. BOLGER:  The paragraph begins, "The
20   first issue is."
21              MR. BAINE:  Towards the bottom.
22        A.    I see.  The first is whether the evidence
23   presented by the House --
24              MS. BOLGER:  Mark, just because I've lost
25   the plot, is there a pending question?
```

```
 1              BY MR. SCHWEIKERT:
 2      Q.    Are you aware that one of the legal -- are
 3  you aware that the legal argument that Professor
 4  Dershowitz was making was to answer the question of
 5  whether charges of abuse of power and obstruction of
 6  Congress rose to the level of impeachable offenses
 7  under the constitution?
 8      A.    Yes, sir.  That is the essence of what he
 9  seemed to be arguing on the 27th, that question.
10      Q.    And neither one of those alleged acts
11  constitute any -- strike that.
12            And neither one of those alleged acts
13  constituted a crime under United States law, correct?
14            MR. BAINE:  Object to the form.
15      A.    That's what Professor Dershowitz alleges.
16  I'm sure he's right.
17            BY MR. SCHWEIKERT:
18      Q.    Are you aware of any statute that
19  prohibits -- strike that.
20            Are you aware of any statute that
21  criminalizes abuse of power?
22      A.    No, sir -- well, there are probably
23  various -- as a general matter, I don't know of a
24  crime like that, but, again, I'm not a criminal
25  lawyer.  He goes to great lengths, the professor
```

 1  does, to talk about -- he's making the argument there

 2  has to be a crime.

 3          And I don't have a strong opinion about

 4  that, although I will come down the side that there

 5  was not because there are a great many things the

 6  President does that can be horribly abusive but maybe

 7  not violating the criminal code.

 8          And if you're an originalist, which I am

 9  not, it has to be -- it can't be a crime because

10  there were no crimes.  There was no federal criminal

11  code when they adopted the constitution.  There was

12  none.  There's not a single federal statute obviously

13  because there wasn't -- you know, it's like the big

14  bang.

15          There was nothing before the constitution

16  in terms of America because there was no America, so

17  it's preposterous to me to say it has to be in

18  today's version of the criminal code, which has

19  changed enumerable times since the founding.  I just

20  don't agree, but that's not what I was writing about.

21          And I'm certainly likely to be wrong, but

22  that's my view, is that an impeachable offense -- in

23  fact, I'm kind of where the professor is where he

24  says crime-like activity.  It's a phrase I never

25  heard before and he was mocked for, but I understand

```
 1  what he's getting at.
 2          We give our president trillions of
 3  dollars, millions of troops, thousands of nuclear
 4  weapons.  He has 11 aircraft carriers, 11, run on
 5  nuclear reactors.  Xi Jinping has one.  Nobody has
 6  two.  And so we have to have guardrails on these
 7  people, we have to.
 8          And I say this as someone who served a
 9  president.  I believe in presidential power, but
10  that's -- that's -- and this is what -- I think the
11  professor does a great job on the 27th of taking us
12  into that debate.  Right?  And he's in a different
13  place than I am.  He is where Madison, in particular,
14  was.
15          We don't want the presidency to become a
16  handmaiden of the legislator.  We don't want the
17  president to serve at the sufferance of the Senate.
18  That is not my worry today, man.  It's not, and I've
19  served in the -- on the staff in the House and the
20  Senate and The White House.
21          Article 2 is trampling Article 1.  It's a
22  different article -- sorry -- (inaudible).  That's a
23  column I should write one day.
24  Q.    Is it -- strike that.
25          Did you believe that Professor Dershowitz
```

1    was arguing that a president could engage in

2    noncriminal conduct with a partially financial

3    motivation and partially motivated by his interest in

4    reelection and never be impeached?

5              MR. BAINE:  Object to the form.

6              MS. BOLGER:  Objection to the form.

7              THE WITNESS:  I'm sorry to do this to you,

8    Sherry, but could you read that back?  Because it was

9    complicated.

10             MR. SCHWEIKERT:  Hold on.  I'll withdraw

11   the question.  Could we take a little break?

12             THE WITNESS:  Yes, sir.  Thank you.

13             MR. SCHWEIKERT:  Five minutes?

14             THE WITNESS:  Okay.

15             THE VIDEOGRAPHER:  We're going off the

16   record.  The time is 3:20 p.m. Eastern.

17             (A break was taken.)

18             THE VIDEOGRAPHER:  The time is 3:39 p.m.

19   Eastern.  We are back on the record.

20             Counsel, you may proceed.

21             BY MR. SCHWEIKERT:

22        Q.   Thank you.  When you had the chance to

23   review Mr. Dershowitz's statements as reflected in

24   the Congressional Record for January 27th, did you

25   see Mr. Dershowitz say that "no one is above the law,

```
 1   not the President and not Congress"?

 2        A.    I did not, but it sounds like him.

 3        Q.    Well, I'll direct your attention to

 4   Plaintiff's Exhibit 25, in particular page S611,

 5   middle column, last sentence.

 6              MR. BAINE:  What page?

 7              MR. SCHWEIKERT:  611.

 8              MR. BAINE:  Thank you.

 9        A.    Right.  I see that.

10              BY MR. SCHWEIKERT:

11        Q.    You see that --

12        A.    Yes, sir.

13        Q.    -- Professor Dershowitz was saying, "no

14   one is above the law, not the President and not

15   Congress," right?

16        A.    Yes, sir.

17        Q.    He was making no argument about any

18   cleansing effect based upon motive, right?

19        A.    Yes, sir.

20        Q.    And on the 27th, he also made the argument

21   that criminal bribery is always impeachable

22   regardless of whether the President is giving or

23   receiving the alleged bribe?

24        A.    I did not see that.

25              MS. BOLGER:  Object to form.
```

```
 1                  BY MR. SCHWEIKERT:
 2       Q.    If we look to the first column on that
 3  page, second paragraph up from the bottom, beginning,
 4  "So the position."
 5                  Do you see that?
 6       A.    I see that paragraph.
 7                  MS. BOLGER:  I don't.  I'm sorry.  Where
 8  are you?
 9                  MR. SCHWEIKERT:  The second paragraph up
10  from the bottom in the first column.
11                  BY MR. SCHWEIKERT:
12       Q.    Professor Dershowitz said:  "So the
13  position that I have derived from history would
14  include -- and this is a word that will upset some
15  people -- criminal-like conduct akin to treason and
16  bribery."
17       A.    Right.
18       Q.    Do you see that?
19       A.    Yes, sir.
20       Q.    He's not qualifying whether the President
21  is allegedly giving or allegedly receiving the bribe,
22  right?
23                  MS. BOLGER:  Object to the form.
24       A.    He's not talking about bribery.  He's
25  talking about this, I think, very interesting rule of
```

```
 1   construction, which when we were teaching the kids to
 2   read is context clues.
 3           So he's trying to get to high crimes and
 4   misdemeanors.  That's what every constitutional
 5   scholar wrestles with, and I read a ton about that
 6   when Clinton was being impeached.  So the fact that
 7   it's linked to treason and bribery has got to mean
 8   something.  That's what he's getting at here.
 9           Again, I'm not saying that Professor
10   Dershowitz thinks bribery is okay.  I'm just saying
11   that the cleansing effect of the Dershowitz Doctrine
12   would allow some future president to commit that.
13   There's no allegation that Trump did bribe anybody or
14   was bribed or anything.
15           BY MR. SCHWEIKERT:
16   Q.    Do you agree that at least under the
17   argument presented on January 27th, which you had the
18   opportunity to read over the lunch break, that Alan
19   Dershowitz was arguing that criminal bribery is
20   impeachable as a matter of law regardless of who is
21   giving and receiving the bribe?
22           MS. BOLGER:  Object to form.  Asked and
23   answered.
24   A.    Yeah.  I covered that as best I can.  I'm
25   happy to try again.
```

```
 1              The truth is he just didn't.  He's using
 2    bribery and treason as context clues to help us
 3    figure out the hard case, which is high crimes and
 4    misdemeanors.  But, I mean, I'll stipulate that
 5    bribery is bad, but then the cleansing effect -- two
 6    days later he says, if you're doing something in
 7    pursuit of your reelection, it cannot be.
 8              I just keep coming back to that.  That's
 9    what I wrote the column about.
10              BY MR. SCHWEIKERT:
11        Q.    Is it your --
12        A.    I don't know his -- I mean, I guess I know
13    his views because he states them.  I'm not alleging
14    that he's saying go bribe.  I'm alleging that he
15    issued a doctrine -- yeah, he rolled out a theory by
16    which you can stretch it so it swallows the whole
17    rule of law.
18        Q.    At the time that you wrote your op-ed on
19    January 29th, did you believe that Alan Dershowitz
20    was advocating that a president could commit treason
21    against the United States and so long as he was
22    plausibly believing that doing so was in the public
23    interest that president could never be impeached?
24              MS. BOLGER:  Object to form.
25        A.    I've said this before and I hope I've got
```

```
 1   it -- I'm making it clear.  I'm not saying that
 2   Professor Dershowitz said that.  I'm saying the rule
 3   articulated by Professor Dershowitz can lead to that.
 4   I don't raise treason in the piece at all, so I don't
 5   have an opinion about that.
 6             BY MR. SCHWEIKERT:
 7      Q.    But you raise murder?
 8      A.    As a figurative matter.  That's -- even I
 9   said Trump didn't really mean that.  I hope he
10   didn't.
11      Q.    Isn't it true that your op-ed nowhere
12   mentions the words, "illegal," "unlawful," or
13   "corrupt"?
14             MS. BOLGER:  Object to the form.
15      A.    I don't know.
16             BY MR. SCHWEIKERT:
17      Q.    Well, is it true that in your op-ed you
18   didn't note for the readers that Mr. Dershowitz had
19   taken the position that purely corrupt and illegal
20   and unlawful quid pro quos were impeachable as a
21   matter of law?
22             MR. BAINE:  Objection to the form.
23             MS. BOLGER:  Object to form.
24      A.    Unless you're doing that act in pursuit of
25   your reelection.  And, again, that -- that's a
```

```
 1   different motive and so that then cleanses you.  And

 2   again, I want to be careful.  I didn't write the

 3   column to say Dershowitz endorses X.

 4           I said he put out a statement as a zealous

 5   advocate, a standard that would lead to his client's

 6   acquittal, which is his job.  But some future

 7   presidential aide is going to look at that and some

 8   future president and run with it to an absurd

 9   conclusion.

10           That was the rhetorical device I used to

11   test the argument Mr. Dershowitz was making that day.

12           BY MR. SCHWEIKERT:

13   Q.    Well, you were, in fact, taking a snippet

14   of Mr. Dershowitz's almost two-day argument on the

15   floor of Congress to an absurd conclusion that --

16   A.    Right.

17   Q.    -- a former Harvard Law professor was

18   suggesting a president could do anything he wants,

19   including shooting someone, committing extortion,

20   violating campaign finance laws, so long as he

21   thought plausibly that it was in the public interest

22   to do those things he could never be impeached?

23           MR. BAINE:  Object to form of the

24   question.

25           MS. BOLGER:  Object to the form.
```

```
 1              MR. BAINE:  It was so long.  I don't
 2   remember the beginning of the question.
 3              MS. BOLGER:  Argumentative, combative,
 4   long, and very confusing.
 5              MR. SCHWEIKERT:  Objections are noted.
 6       A.    My argument was that the standard he set
 7   would be prone to abuse, and I still believe that.  I
 8   did not say Mr. Dershowitz was endorsing any
 9   particular bad behavior whatsoever.  He was trying to
10   get his client acquitted.  And in doing so, he laid
11   out a standard that would lead to -- I did not say he
12   advocated.
13              Nobody thinks Alan Dershowitz supports
14   treason or bribery or any of that stuff, I hope.  I
15   certainly don't talking about my own opinion.  But he
16   laid out a standard in advocating for his client that
17   would open the door to -- it led to its absurd
18   conclusion to ludicrous results.
19              That's why it's a bad standard.  I'm not
20   saying he's for the ludicrous result.  I'm saying the
21   standard he's articulating today is -- can lead --
22   would lead to a ludicrous result tomorrow.
23              BY MR. SCHWEIKERT:
24       Q.    Were there any federal statutory crimes
25   that President Trump was alleged to have committed
```

```
 1  that were the subject of his first impeachment trial?
 2       A.    I don't know.
 3            MS. BOLGER:  Object to the form.
 4       A.    I don't know.
 5            BY MR. SCHWEIKERT:
 6       Q.    You don't know even though you listened to
 7  the impeachment proceedings contemporaneously on the
 8  27th as well as the 29th; is that right?
 9       A.    Oh, I've watched the whole thing, but that
10  was two years and nine months ago.
11       Q.    So what were the federal statutory crimes,
12  if any, that President Trump was alleged to have
13  violated that formed the basis of the House manager's
14  argument that he should be impeached and removed from
15  office?
16            MS. BOLGER:  Objection.  Asked and
17  answered.
18       A.    I don't recall.
19            BY MR. SCHWEIKERT:
20       Q.    There weren't any, were there?
21       A.    I don't recall.
22       Q.    That was the whole issue.  There is no
23  alleged criminal statute violated.  Therefore, can
24  noncriminal conduct ever rise to the level of an
25  impeachable offense under the constitution, right?
```

```
 1              MS. BOLGER:  Objection.
 2              MR. BAINE:  You know, you've gotten beyond
 3    asking questions.  You're just arguing with him about
 4    how he interpreted the argument, and we've gone on
 5    for three days repeating the same argument.  That's
 6    all that's happening here.  There are no questions of
 7    trying to elicit new information.  It's getting close
 8    to harassment.
 9              BY MR. SCHWEIKERT:
10         Q.    You can answer.
11         A.    I mean, I kind of enjoy it.  I used to
12    host Crossfire.
13              MR. BAINE:  Well, this isn't Crossfire.
14    This is a deposition.
15              THE WITNESS:  I'm sorry.
16              MR. BAINE:  And I really think you should
17    move on to a different subject instead of beating
18    this dead horse as you have for the last hour or so.
19              Go ahead.
20              MS. BOLGER:  I'm sorry.  I don't know what
21    the question is.
22         A.    Mark, as I understand, you're saying the
23    House managers didn't allege a specific federal
24    offense in their impeachment articles.  I honestly
25    don't recall.  At arguendo, perhaps that's true.
```

1          Professor Dershowitz says criminal-like

2    conduct can be impeachable, and I certainly think

3    that's true.  I do not believe, having been through

4    an impeachment, that you can only limit impeachment

5    to the U.S. criminal code.  I just don't, and maybe

6    I'm wrong.

7          But just as a citizen, I want stronger

8    guardrails on my president or we won't have a

9    republic.  We'll have a dictatorship.  That's just my

10   opinion.  I could be wrong.  Others will disagree.

11   That's the whole point of having an opinion section

12   of your news site, is that people can opine and maybe

13   you agree; maybe you disagree.  That's America.

14   That's what I was trying to do.

15          BY MR. SCHWEIKERT:

16   Q.    Wouldn't it have been a more accurate,

17   fair, and faithful opinion of your interpretation of

18   Mr. Dershowitz's arguments on the floor of Congress

19   if you had included within your op-ed his premise

20   that a quid pro quo involving illegality can always

21   be a basis for impeachment?

22          MS. BOLGER:  Objection to form.

23   A.    No, because the illegality is cleansed by

24   the motive in the same way that me shooting someone

25   is cleansed if I'm in the Army and he's in the

 1   opposing Army.
 2            To me, it doesn't -- sorry -- but you
 3   asked me to comment on Professor Dershowitz's
 4   argument.  It doesn't strengthen his argument that he
 5   says the only thing that would make a quid pro quo
 6   unlawful is if the quo were in some way illegal.
 7            Again, he's speaking off the top of his
 8   head, and I know -- I'm quite sure he meant the quid
 9   also, either part of the exchange.  He can't have
10   meant only the "that."  Right?
11            So I'm sure he's -- but that doesn't tell
12   me anything when he later says it cannot be
13   impeachable if the motive is reelection.  Right?
14   It's illegal, but it's not illegal if your motive is
15   reelection.
16            It's illegal to shoot someone, but I get a
17   medal if I shoot someone if I'm in the Army.  The
18   motive matters, and that's how I read the professor's
19   argument here.
20            BY MR. SCHWEIKERT:
21       Q.   Did you make a deliberate decision to omit
22   Mr. Dershowitz's argument that a quid pro quo can be
23   impeachable if the quid or the pro, as you now
24   acknowledge, was in some way illegal?
25            MS. BOLGER:  Object to form.  Asked and

1    answered.   That's exactly the same question.

2            You can answer it again.

3            MR. SCHWEIKERT:  He now says it goes both

4    ways, which I appreciate, so I won't --

5        A.    The guy is a genius.  Everybody is going

6    to --

7            MR. BAINE:  You're talking over each

8    other.

9            MS. BOLGER:  Right.  You can answer the

10   question.

11           MR. BAINE:  Do you have the question in

12   mind?

13           THE WITNESS:  Yes, sir, I do --

14           MR. BAINE:  Answer the question.

15           THE WITNESS:  -- but Mark is rewriting a

16   statement.

17       A.    I'm sorry.  Mark, I think you're rewriting

18   the professor's statement.  He doesn't say

19   impeachable at all here.  He says the only thing that

20   would make a quid pro quo unlawful is if the quo were

21   in some way illegal, unlawful; illegal.

22           He's not talking about impeachment.  He's

23   simply talking about legal and illegal, and he's a

24   brilliant criminal lawyer.

25           But then a few minutes later he says, If

```
 1   you're pursuing your reelection -- a complex middle

 2   case:  I want to be elected.  I think I'm a great

 3   president.  I think I'm the greatest president there

 4   ever was.  And if I'm not elected, the national

 5   interest will suffer greatly.  That cannot be a

 6   subject of impeachment.

 7            That swallows the illegal is unlawful

 8   argument at the beginning.  It just swallows it

 9   whole.

10            BY MR. SCHWEIKERT:

11       Q.   Is there any reason why the version --

12   strike that.

13            Is there any reason why your op-ed

14   published by CNN did not include the words illegal,

15   unlawful, or corrupt?

16            MS. BOLGER:  Object to form.  Asked and

17   answered.

18       A.   No.  I mean, it's a 500-word piece that I

19   think really succinctly sounds an alarm bell about a

20   really dangerous argument.

21            BY MR. SCHWEIKERT:

22       Q.   Your opinion about the alleged absurd

23   conclusion from this so-called cleansing effect --

24   strike that.

25            You gave some examples in your op-ed of
```

```
 1   the alleged absurd conclusions that could be drawn

 2   from this so-called cleansing effect, right?

 3        A.   Yes, sir.

 4        Q.   Did you intend for those examples to be

 5   ludicrous?

 6        A.   Yes, sir.

 7        Q.   Did you intend for those examples to be

 8   perceived as looney tunes?

 9             MR. BAINE:  Objection.

10             MS. BOLGER:  Objection to the form.  What

11   are we talking about?  Where are we in the piece?

12             MR. SCHWEIKERT:  I'm asking questions.

13             MS. BOLGER:  I understand that.  I'm

14   asking you to tell me where we are.

15             BY MR. SCHWEIKERT:

16        Q.   Your draft included the expression "looney

17   tunes," right?

18        A.   Yes, sir.  Yes, sir.

19        Q.   And did you include --

20        A.   And someone --

21        Q.   Did you include that expression to

22   highlight the insanity -- strike that.

23             Did you include that expression to

24   underscore the purported insanity of the argument

25   made by a former Harvard Law School professor?
```

1          MR. BAINE:  Objection to the form.

2     A.    No.  No.  I worry not that anybody is

3  going to think that Alan Dershowitz is not of sound

4  mind.  He's a brilliant man.  I was showing the

5  reader that this brilliant man's very effective

6  argument to a roomful of politicians can be exploited

7  to absurd lengths, reductio ad absurdum.  That's what

8  I was saying.

9          And there's nobody who I know who could

10  question Dershowitz's brain.

11          BY MR. SCHWEIKERT:

12     Q.    So why didn't you include the words

13  "illegal, unlawful, or corrupt"?

14          MS. BOLGER:  Object to form.

15          MR. BAINE:  Objection to form.

16          MS. BOLGER:  Asked and answered.  This is

17  the third time.

18     A.    If I may, I do use the word "brilliant" to

19  describe your client.  I do not retract that or

20  regret it.  I think he is.  At another place I called

21  him a legendary legal mind.  He is.  So it's -- my

22  quarrel is not with him.  It's with an argument he

23  made to get his client acquitted, which I respect.  I

24  do.

25          But holy smokes, those 100 senators and

```
 1  every president who is going to follow could take
 2  that argument and run with it to absurd and ludicrous
 3  and frightening extremes.  That's the reason I wrote
 4  the article (sic).  That's what the article says, and
 5  I stand by it.
 6          It's not an article -- forgive me.  I'm
 7  tired and I'm concluding with the same mistake I
 8  wagged my finger at you for, the opinion column.
 9  Forgive me, Mark.
10          BY MR. SCHWEIKERT:
11      Q.    If someone else characterized Mr.
12  Dershowitz's argument as being the type of argument
13  that justified Hitler systematically exterminating
14  Jewish people, would you condemn that analogy?
15          MS. BOLGER:  Objection to the form of the
16  question.
17      A.    I'm not familiar with it.  I had the honor
18  of knowing Tom Lantos who is the only congressman who
19  had been in one of Hitler's camps.  He's a survivor.
20  He's gone now.  I don't take that lightly.  That's a
21  -- politicians on both sides of the aisle will do
22  this.
23          I hear some on the right talking about
24  vaccines as if that were somehow comparable to the
25  Holocaust, and I've heard Democrats say it.
```

```
 1              I try and I believe I live by this to
 2   never equate anything to that, and I think anybody
 3   who does that on either side of the aisle is making a
 4   terrible mistake against history.  It's very
 5   offensive.
 6              BY MR. SCHWEIKERT:
 7      Q.    It should be condemned, right?
 8              MS. BOLGER:  Object to the form.
 9      A.    I certainly don't approve of it.  If I
10   hear it, do I run out and say I condemn it?  There's
11   a controversial Congresswoman from Georgia who says a
12   lot of things, and I don't agree with any of them.  I
13   try not to run out and -- it draws more attention to
14   it.
15              So that's why I say I'm hesitating when
16   you say condemn.  It's not that I approve of it.
17   It's that sometimes if you call attention to really
18   hysterical comments it does more harm than good.
19   Sometimes, sometimes.
20              BY MR. SCHWEIKERT:
21      Q.    Are you aware that another commentator on
22   CNN made a statement analogizing Alan Dershowitz's
23   argument on the floor of Congress to the
24   justifications that are given to rationalize Hitler
25   and his atrocious acts?
```

```
 1              MS. BOLGER:  Object to form.  Misstates
 2   the statement.
 3              But you can answer the question.
 4        A.    It's not something I would ever say.
 5              BY MR. SCHWEIKERT:
 6        Q.    Do you know Joe Lockhart?
 7        A.    Oh, yes, I know Joe.
 8        Q.    If Joe Lockhart had compared Alan
 9   Dershowitz to Hitler, would you condemn him for that?
10              MS. BOLGER:  Object to the form.
11        A.    I'd tell him not to.
12              BY MR. SCHWEIKERT:
13        Q.    Why?
14        A.    I just stated.
15        Q.    Because it's a very offensive
16   characterization of someone, right?
17              MS. BOLGER:  Object to the form.
18        A.    Yeah.  As you can see in this op-ed, I
19   like inflammatory rhetoric.  I like hot controversial
20   statements, but we all need to have some boundaries.
21   And for me, that is one of them.
22              And as I say, I'm sorry to say I've seen
23   Democrats do it.  I've also seen Republicans do it,
24   and more recently oddly in this whole vaccine debate
25   I've seen that used, and it's appalling.
```

```
 1            People comparing Dr. Fauci to Dr. Mengele.
 2   Good Lord, maybe you don't like the vaccine, but that
 3   should be out of bounds, you know?
 4            I'm all for saying Fauci is full of beans
 5   and don't take his shot if that's your free speech
 6   rights, but there ought to be boundaries.  And I say
 7   this as someone, as you can tell, who -- I like
 8   pushing the boundaries, but there ought to be
 9   boundaries still.
10            BY MR. SCHWEIKERT:
11       Q.   When you described Mr. Dershowitz's
12   arguments as leading to ludicrous potential ends, did
13   you inform the potential readers of your article not
14   to take those assertions seriously?
15            MR. BAINE:  Objection to form.
16       A.   I would want my readers to take reductio
17   ad absurdum arguments seriously but not literally.
18   That's because they're designed to draw you to a
19   ludicrous or absurd conclusion, but I take them
20   seriously, but not literally.
21            BY MR. SCHWEIKERT:
22       Q.   Do you believe that your article was clear
23   that you were making reductio ad absurdum arguments
24   to a reasonable person who did not go to Harvard,
25   didn't go to UT, or my almamateur?
```

```
 1        A.    Not everybody can go to UT or Florida,
 2   Mark.
 3              Absolutely, yes, sir.  And that's why I
 4   used words like "looney tunes," which prudentially
 5   somebody took out.  I don't know who, but I prefer it
 6   the way it is.  I prefer it the way it published,
 7   rather than drafted.  We all make mistakes.
 8              But it's certainly ludicrous.  I still
 9   think it's bonkers, and that tells the reader I'm
10   taking you to a ludicrous place.  I'm taking you far
11   beyond the four corners of the argument made on the
12   Senate floor.
13              But that's my job as an opinion columnist
14   is to -- in this instance to tease it out to the
15   absurd conclusion.  But yeah, I definitely think the
16   reader -- people take it however they take it, but
17   that's certainly how I intended it.
18              MR. SCHWEIKERT:  Let's take a five-minute
19   break.  Maybe even less.
20              THE VIDEOGRAPHER:  Going off the record.
21   The time is 4:02 p.m. Eastern.
22              (A break was taken.)
23              THE VIDEOGRAPHER:  This is the beginning
24   of Volume No. 4 in the video recorded deposition of
25   Paul Begala in the case of Dershowitz versus Cable
```

1  News Network, Inc.

2       The time is 4:18 -- excuse me -- 4:19 p.m.

3  Eastern.  We are back on the record.

4       Counsel, you may proceed.

5       MR. SCHWEIKERT:  Thank you, sir.

6       BY MR. SCHWEIKERT:

7  Q.    Mr. Begala, you've been expressing today

8  your opinion regarding an interpretation of things

9  that Mr. Dershowitz said during the first impeachment

10 trial, right?

11 A.    Yes.

12      MS. BOLGER:  Object to the form.

13      BY MR. SCHWEIKERT:

14 Q.    Having reviewed -- well, strike that.

15      Having refreshed your recollection with

16 respect to some things Mr. Dershowitz said on the

17 27th and the 29th, is it at least plausible that one

18 interpretation of his argument could be that if a

19 president commits bribery, extortion, or murder and

20 has a mixed motive doing so, including a motive to

21 get reelected, that motive would not cleanse the

22 criminality?

23      MS. BOLGER:  Object to the form.  Calls

24 for a hypothetical.

25 A.    It's not how I heard it and it's -- I can

```
 1   tell you I'm not the Lone Ranger.  Right?  Lots and
 2   lots of people -- Laurence Tribe, who I don't know
 3   but I follow on Twitter, right -- lots of people
 4   heard it the way I heard it.
 5             But it's completely plausible, I guess, to
 6   answer your question more directly that someone could
 7   have a different interpretation.  It really is.
 8             I think my opinion is right, but it's my
 9   opinion.  Therefore, it's not a fact, you know, like
10   water is wet.  It's an opinion, and I do respect
11   people that have a different opinion.  It's been my
12   whole career, so, I guess, yes, it's plausible.
13             I still think I'm right.  I think I
14   arrived at a helpful alarm bell, so I think -- you
15   know, that's my opinion, but, of course, I don't
16   think I am the only way to look at this.
17             BY MR. SCHWEIKERT:
18        Q.   Your opinion regarding how to interpret
19   his argument is not the only plausible
20   interpretation, right?
21             MS. BOLGER:  Object to the form.  Asked
22   and answered.
23        A.   Yes, sir.
24             MR. SCHWEIKERT:  I just wanted to make it
25   cleaner.
```

1           BY MR. SCHWEIKERT:

2       Q.    Do you recall approximately how long it

3   took you like from beginning to end to come up with

4   your first draft?

5       A.    From the time signatures I can -- I can

6   guess, if that's okay.

7       Q.    No.  I don't want you to guess.  If you

8   need to refer to something, you can.  I was asking if

9   you recall -- you know, did you get it all done

10  before you boarded or did you do a little bit before

11  you boarded? a little bit on the plane?

12      A.    I don't recall with that much specificity,

13  but it was a very -- I'd say roughly 40 minutes.  It

14  was a very fast draft.

15      Q.    Is that a typical amount of time for you

16  in drafting an op-ed for CNN?

17           MS. BOLGER:  Objection to the form of the

18  question.  It seeks information related to the

19  publication of other stories related to CNN.

20           Do not answer that question as to any

21  other stories other than the one at issue.  CNN would

22  take the position that what you do when you put

23  together your stories are news gathering materials.

24           MR. SCHWEIKERT:  Hold on.  I want the

25  record to be clear on this privilege.  The amount of

```
 1   time it takes someone to write generally a draft
 2   op-ed is privileged under the sources you cited.  Is
 3   that --
 4              MS. BOLGER:  Under the Florida statute,
 5   the New York State statute, the New York
 6   constitution, the Florida constitution, and the
 7   United States Supreme Court news gathering materials,
 8   broadly defined as times when an editorial person
 9   makes an editorial decision are protected from
10   disclosure unless the plaintiff can overcome it by
11   meeting a three-part test, which I'm happy to
12   articulate for you.
13              MR. SCHWEIKERT:  That's all right.
14              MS. BOLGER:  For right now, I'm
15   instructing the witness --
16              (Simultaneously speaking addressed by the
17   reporter.)
18              MR. SCHWEIKERT:  Your objection is noted.
19              MS. BOLGER:  For the present purpose, I'm
20   instructing the witness not to answer as to any
21   editorial activity or news gathering activity related
22   to anything other than the article at issue.
23              BY MR. SCHWEIKERT:
24        Q.    You mentioned you publish books, right?
25        A.    Yes, sir.
```

1     Q.     Okay.  Do you know how many words --
2   strike that.
3          Ms. Wiedenkeller had asked to you write
4   500 words for your op-ed that could possibly be
5   published by CNN, right?
6     A.     Yes, sir.
7     Q.     In your experience as a writer, how long
8   does it typically take you to write a 500-word piece?
9     A.     It varies greatly.  For me, not very long
10  because I'm fast.
11    Q.     Were you --
12    A.     If I can explain?
13    Q.     Sure.
14    A.     I came into this business as a speech
15  writer, so I had to turn around things very, very
16  quickly.  So I flew on the plane with Bill Clinton
17  and we would be in transit, we would be in the car
18  and I'd have to write something.
19          It's just -- it's a talent over many, many
20  years -- many years that I developed because you have
21  to turn things around quickly in a campaign, in like
22  minutes.  Thirty minutes is a lot in a campaign.  I
23  often would produce a statement for a candidate in
24  less than 30 minutes.
25    Q.     What was that expression, speed trap?  Is

```
 1  that what you -- maybe I -- I might have misheard you
 2  when you said a speed trap.
 3       A.    No.
 4            MS. BOLGER:  You definitely misheard him.
 5       A.    No.  I didn't say speed --
 6            MR. BAINE:  You heard speech writer maybe.
 7       A.    Writer.
 8            (Simultaneously speaking.)
 9            BY MR. SCHWEIKERT:
10       Q.    I'm not trying to put words in your mouth.
11  I just literally -- that's what I thought I heard.
12       A.    Yeah.  I got into this business as a
13  speech writer writing statements for politicians, so
14  I'm a writer at heart.  And that's where I'm most
15  comfortable, even though I work on television mostly,
16  but I am a writer in my training.
17       Q.    In preparing the op-ed that has been the
18  subject of today, did you have any expectation that
19  once you provided a draft to CNN it would assist you
20  in verifying the accuracy, the fairness, or the
21  faithfulness of the piece before it's published?
22            MS. BOLGER:  Objection.  Asked and
23  answered and compound.
24            THE WITNESS:  May I answer it?
25            MS. BOLGER:  You can -- sorry.
```

1       A.     Yes.

2              BY MR. SCHWEIKERT:

3       Q.     Are you aware of any other op-eds that

4   were published around the same time that interpreted

5   Mr. Dershowitz's argument differently than you?

6       A.     Not that I call to mind now.  I'd be happy

7   to look at any.

8       Q.     But you did generally agree that there was

9   more than one plausible interpretation that a

10  reasonable person could draw from the statements made

11  by Mr. Dershowitz at Congress?

12             MS. BOLGER:  Object to the form.

13             You can answer it.

14      A.     Yes, sir.

15             BY MR. SCHWEIKERT:

16      Q.     Did you ever see a New York Times piece

17  describing Mr. Dershowitz's answer to Senator Ted

18  Cruz's question?

19      A.     I can't recall one now, but, again, if

20  you've got one you want me to review, I'm happy to.

21      Q.     What about -- strike that.

22             Did you ever -- strike that.

23             Do you recall reviewing any content

24  published by The Wall Street Journal with respect to

25  Mr. Dershowitz's answer to Senator Cruz's question?

```
 1        A.    A news story or an editorial?

 2        Q.    Both.

 3        A.    I don't subscribe to The Wall Street

 4  Journal, so it's less likely.  I do subscribe to the

 5  New York Times.  It's less likely.  It doesn't mean I

 6  wouldn't see it.  It's less likely.  I don't recall

 7  one.

 8        Q.    Have you ever read any of Mr. Dershowitz's

 9  books regarding impeachment?

10        A.    No, sir.

11        Q.    Are you still a CNN contributor today?

12        A.    Yes, sir.

13        MR. SCHWEIKERT:  Final break.  I promise.

14  I'm so close.  I just need to --

15        THE VIDEOGRAPHER:  The time is 4:27 p.m.

16  Eastern.  We are off the record.

17            (A break was taken.)

18        THE VIDEOGRAPHER:  The time is 4:32 p.m.

19  Eastern.  We are back on the record.

20            Counsel, you may proceed.

21        MR. SCHWEIKERT:  All right.

22        BY MR. SCHWEIKERT:

23        Q.    I will represent to you that around the

24  time of your op-ed The Wall Street Journal published

25  a piece which read in part:  "The media claims that
```

```
 1  defense lawyer, Alan Dershowitz, said a president can
 2  do anything to further his reelection, as long as he
 3  thinks it's in the national interest.  That isn't
 4  what he said.  The Harvard professor said explicitly
 5  that a president be impeached for criminal acts."
 6          Based on my representation of that
 7  excerpt, does that change your opinion at all, as you
 8  sit here today?
 9      A.   No, sir.
10          MS. BOLGER:  Object to the form.
11          BY MR. SCHWEIKERT:
12      Q.   But that is at least one plausible
13  interpretation of Mr. Dershowitz's argument, right?
14      A.   Yes, sir.
15          MS. BOLGER:  Object to form.  If you're
16  going to ask about an article, show him the article.
17          MR. SCHWEIKERT:  I can represent as an
18  officer of the court --
19          MS. BOLGER:  You can't then ask him if
20  it's a plausible interpretation.  He has to be able
21  to see it.
22          MR. SCHWEIKERT:  If you'd like to show him
23  on redirect, you can show him whatever.
24          BY MR. SCHWEIKERT:
25      Q.   Okay.  Next question:  Around that same
```

```
 1   time The New York Times reported on Mr. Dershowitz's
 2   position as follows -- and again, this is my good
 3   faith representation --
 4        A.    Yes, sir.
 5        Q.    -- "Some Democratic senators and other
 6   critics accused him of suggesting that even Nixon was
 7   not impeachable, despite his clear crimes, but that
 8   accusation is incompatible with Mr. Dershowitz's main
 9   argument that an impeachable high-crime and
10   misdemeanor requires an indictable offense."
11             Based on my representation that that was
12   published by The New York Times, does that affect
13   your opinion in any way regarding Mr. Dershowitz's
14   argument?
15             MS. BOLGER:  Object to the form.
16        A.    No.  I stand by my opinion.  I think my
17   opinion is right.
18             BY MR. SCHWEIKERT:
19        Q.    But that would be at least one plausible
20   interpretation, right?
21             MS. BOLGER:  Object to the form.
22        A.    Supposing what they're saying is true.  I
23   don't remember what he said about Nixon.  I don't
24   even know if Nixon was charged with a crime.  They
25   never got to it.  They had hearings, but they didn't
```

1   impeach him because he resigned.

2          So I -- it's certainly a plausible

3   interpretation, a plausible argument.  This was a

4   very complicated set of arguments that the professor

5   is making.  I am certain that my opinion is the right

6   one, but it's because it's my opinion, and I don't

7   think less of people with a different opinion.  I try

8   not to.

9          BY MR. SCHWEIKERT:

10  Q.    Well, knowing what you know today, having

11  reviewed the exhibits, would you have done it --

12  anything differently in drafting your op-ed on

13  January 29th?

14  A.    I thought about that.  I did think you

15  were going to ask that, Mark, and, you know, the

16  short answer is yes.

17         This thing I mentioned earlier today, I

18  should have told the readers that -- now, this is

19  getting into Dershowitz's head, which is probably a

20  bad thing, but I believe that the genius of the

21  argument about reelection was he was talking about

22  people for whom reelection is more important than

23  their dog Spot.  Right?

24         So I should have told the readers that.  I

25  should have brought the readers in there.  I've been

1  in the room.  Right?  It didn't have anything to do,
2  frankly, with the issue we're litigating, but I think
3  that is an insight that I probably should have
4  brought to it later.  I've reflected on it.
5          The rest of it, though, I'm very
6  comfortable with my opinion.  I am.  It's my opinion.
7  Others are free to disagree with it.  That's what
8  makes America.  Having gone through all of this, I'm
9  completely comfortable with what I said.
10          That's something that I left out that I
11  thought would have been an interesting insight.  It
12  probably makes Dershowitz look a little better
13  because he's so smart.  But that piece of it I think
14  my audience should have known, Hey, I've been there;
15  I think this might have been why he said that, you
16  know, to (inaudible) with the jury, which is his most
17  important job.
18          But that's the only thing and that's not
19  changing anything.  I wouldn't change a word, not a
20  syllable, but I would have added that piece, which is
21  just conjecture, though.  I don't really know why he
22  did it.  But it certainly had that effect, I believe,
23  knowing politicians.  I think it had the effect of
24  politicians going, Oh.
25      Q.   Knowing what you know today, if you had

1   the opportunity to rewrite that op-ed, would you have

2   included Mr. Dershowitz's premise that quid pro quos

3   involving illegal or unlawful conduct or a purely

4   corrupt motive are impeachable under the

5   constitution?

6          MR. BAINE:  Objection to the form.

7      A.   It's not what he said, Mark.  He said if

8   they're illegal, they're unlawful, and I thought that

9   was a tautology and kind of not worthy of mentioning.

10  I'm certainly not going to ridicule him because he

11  was speaking extemporaneously on the floor of the

12  Senate.

13         But I guarantee you, if he were writing

14  it carefully, he would have said it the way you said

15  it, but he didn't.  So I left it out, and it wasn't

16  -- it didn't -- to me, it certainly doesn't clear

17  Dershowitz of the doctrine.  Right?

18         To me it doesn't because I believe that

19  the doctrine says if you -- if you're seeking

20  reelection it can't be illegal because you lack the

21  motive, so I would not have put that.  I don't regret

22  leaving that out.

23         BY MR. SCHWEIKERT:

24     Q.   So nothing that you have reviewed today

25  changes your opinion about how you would have

1   characterized the Dershowitz Doctrine in your draft
2   op-ed if you had a do-over?
3        A.    Yes, sir.  That's correct.
4             MR. SCHWEIKERT:  Well, thank you, Mr.
5   Begala.  I know it's not always comfortable, but
6   you've been civil, professional, and I appreciate
7   that.
8             THE WITNESS:  And you have, too.
9             MR. SCHWEIKERT:  You have the read or
10  waive?  Do you guys want to put it on the record?
11            MS. BOLGER:  No.
12            THE VIDEOGRAPHER:  If there are no more
13  questions --
14            THE WITNESS:  No re-direct?
15            THE VIDEOGRAPHER:  -- this concludes --
16            MR. SCHWEIKERT:  I mean, I'm sorry.  I'm
17  sorry.  He's right.  Thank you.  I assumed there
18  wasn't.
19            I will tender the witness if any lawyer on
20  the other side has questions.
21            MS. BOLGER:  No redirect from CNN.  I want
22  -- the only thing I would just repeat is that the
23  transcript is designated confidential.
24            MR. SCHWEIKERT:  Thank you.  We can go off
25  the record.

```
 1            THE VIDEOGRAPHER:  This concludes Volume
 2   No. 4 of the deposition of Paul Begala and concludes
 3   today's deposition of Mr. Begala in the case,
 4   Dershowitz versus Cable News Network.
 5            We are now off the record.  The time is
 6   4:39 p.m. Eastern.  Thank you all, very much.
 7            THE REPORTER:  Reading and signing?
 8            MS. BOLGER:  Yes, reading and signing.
 9            THE REPORTER:  And would you like a copy,
10   Ms. Bolger?
11            MS. BOLGER:  I certainly would.
12            Would you mind sending me a rough?  You
13   can do it on Monday.
14            THE REPORTER:  Yes.
15            And, Mr. Schweikert, when would you like
16   the transcript?
17            MR. SCHWEIKERT:  Regular is fine.
18            THE REPORTER:  eTran, hardcopy, or both?
19            MR. SCHWEIKERT:  Just an eTran.  And can
20   you include the exhibits as like PDFs as well?
21            THE REPORTER:  Yes.
22            Ms. Bolger, would you like exhibits?
23            MS. BOLGER:  Yes, sure.
24            THE REPORTER:  Okay.  Hardcopy, eTran, or
25   both?
```

1          MS. BOLGER:  eTran is fine.

2          (Signature having not been waived, the

3    videotaped deposition of Paul Begala was concluded at

4    4:39 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF WITNESS

 2

 3

 4

 5       I, PAUL BEGALA, do hereby declare under penalty

 6  of perjury that I have read the entire foregoing

 7  transcript of my deposition testimony, or the same

 8  has been read to me, and certify that it is a true,

 9  correct, and complete transcript of my testimony

10  given on Friday, July 15, 2022, save and except for

11  changes and/or corrections, if any, as indicated by

12  me on the attached Errata Sheet, with the

13  understanding that I offer these changes and/or

14  corrections as if still under oath.

15

16  _____ I have made corrections to my deposition.

17  _____ I have NOT made any changes to my deposition.

18

19

20  Signed

21  _____

22  PAUL BEGALA

23  Dated this _____ day of _____ of 20___.

24

25
```

```
 1        ERRATA SHEET

 2   Deposition of:  PAUL BEGALA
     Date taken:  July 15, 2022
 3   Case:  Dershowitz v. Cable News Network, Inc.
     PAGE LINE
 4   _____ _____  CHANGE:  _____

 5          REASON:   _____

 6   _____ _____  CHANGE:  _____

 7          REASON:   _____

 8   _____ _____  CHANGE:  _____

 9          REASON:   _____

10   _____ _____  CHANGE:  _____

11          REASON:   _____

12   _____ _____  CHANGE:  _____

13          REASON:   _____

14   _____ _____  CHANGE:  _____

15          REASON:   _____

16   _____ _____  CHANGE:  _____

17          REASON:   _____

18   _____ _____  CHANGE:  _____

19          REASON:   _____

20   _____ _____  CHANGE:  _____

21          REASON:   _____

22   _____ _____  CHANGE:  _____

23          REASON:   _____

24   Signed _____

25   Dated _____
```

```
 1                    REPORTER CERTIFICATE
 2   WASHINGTON, DC
 3
 4        I, Sherry L. Brooks, a Notary Public within and
 5   for the Jurisdiction aforesaid, do hereby certify
 6   that the foregoing deposition of PAUL BEGALA appeared
 7   before me on Friday, July 15, 2022, pursuant to
 8   notice, at the time and place indicated; that said
 9   deponent was by me duly sworn to tell the truth, the
10   whole truth, and nothing but the truth; that the
11   testimony of said deponent was correctly recorded by
12   machine shorthand by me and thereafter transcribed
13   under my supervision with computer-aided
14   transcription; that the deposition is a true record
15   of the testimony given by the witness; and that I am
16   neither of counsel nor kin to any party in said
17   action, nor interested in the outcome thereof.
18        IN WITNESS WHEREOF, I have hereunto set my hand
19   and official seal this 21st day of July 2022.
20
21        Sherry L. Brooks
22        SHERRY L. BROOKS, CLR and Notary Public
23
24   Commission Expires:  November 30, 2025
25
```



















































