# **EXHIBIT 6**

# Deposition Transcript

Case Number: 0-20-CV-61872-SINGHAL/HUNT

Date: July 12, 2022

In the matter of:

# Dershowitz v Cable News Network, Inc.

## John Berman

**CERTIFIED COPY**



**Reported by:**
Ellen Sandles

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1
      UNITED STATES DISTRICT COURT
 2    SOUTHERN DISTRICT OF FLORIDA
      --------------------------------x
 3    ALAN DERSHOWITZ,

 4                  Plaintiff,

 5           vs.            No. 0-20-CV-61872-SINGHAL/HUNT

 6    CABLE NEWS NETWORK, INC.,

 7                  Defendant.
      --------------------------------x
 8

 9

10

11              DEPOSITION OF JOHN BERMAN

12                 New York, New York

13               Tuesday, July 12, 2022

14                  **CONFIDENTIAL**

15

16

17

18

19

20

21

22
      Reported by:
23    ELLEN SANDLES
      Stenographic Reporter
24    Job No. 302371

25
```

1                         July 12, 2022

2                         10:25 a.m.

3

4              Deposition of JOHN BERMAN, held at the

5    offices of Davis Wright Tremaine, 1251 Avenue of

6    the Americas, 21st Floor, New York, New York,

7    before ELLEN SANDLES, a Qualified Stenographic

8    Reporter and Notary Public of the State of New

9    York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3         SCHWEIKERT LAW, PLLC

 4         Attorneys for Plaintiff

 5              1111 Brickell Avenue, Suite 1550

 6              Miami, Florida 33131

 7         BY:  MARK A. SCHWEIKERT, ESQ.

 8

 9

10         DAVIS WRIGHT TREMAINE, LLP

11         Attorneys for Defendant

12              1251 Avenue of the Americas

13              New York, New York 10020

14         BY:  KATHERINE M. BOLGER, ESQ.

15              E-mail: katebolger@dwt.com

16

17

18    ALSO PRESENT:

19         Dana Nolan, In-House Counsel, CNN

20         Alan Dershowitz, via Zoom

21         Larry Moscowitz, Legal Videographer

22

23

24

25
```

```
1          IT IS HEREBY STIPULATED AND AGREED,

2     by and between counsel for the respective

3     parties hereto, that the filing, sealing

4     and certification of the within deposition

5     shall be and the same are hereby waived;

6          IT IS FURTHER STIPULATED AND AGREED

7     that all objections, except as to the form

8     of the question, shall be reserved to the

9     time of the trial;

10         IT IS FURTHER STIPULATED AND AGREED

11    that the within deposition may be signed

12    before any Notary Public with the same

13    force and effect as if signed and sworn to

14    before the Court.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      JOHN BERMAN
 2              THE VIDEOGRAPHER:  Good morning, we are
 3      now on the record.  My name is Larry Moscowitz of
 4      STENO, today is June 12th of 2022 and the time is
 5      10:25 a.m. This deposition is being held at the
 6      office of Davis Wright Tremaine, 1251 Sixth
 7      Avenue, New York, New York.  The caption of this
 8      case is Dershowitz vs. Cable News Network, the
 9      name of the witness is John Berman.  At this time
10      the attorneys will identify themselves and the
11      parties they represent, after which our court
12      reporter Ellen Sandles will swear in the witness
13      and we can proceed.
14              MR. SCHWEIKERT:  Good morning, my name
15      is Mark Schweikert, and I represent the plaintiff,
16      Alan Dershowitz.
17              MS. BOLGER:  Kate Bolger on behalf of
18      the defendant, CNN, and with me is Dana Nolan from
19      CNN.
20                      Whereupon,
21                      JOHN BERMAN,
22      after having been first duly sworn by Ellen
23      Sandles, a Notary Public and Stenographic Reporter
24      within and for the State of New York, was examined
25      and testified as follows:
```

```
 1                     JOHN BERMAN
 2                     EXAMINATION BY
 3   MR. SCHWEIKERT:
 4       Q.    Good morning, sir.  Could you please
 5   state your full legal name for the record?
 6       A.    John Spinoza Berman.
 7       Q.    Have you ever been deposed before?
 8       A.    I have not.
 9       Q.    I am going to give you a little bit of
10   guidelines so you're not caught off guard about
11   the proceeding today.  This is a formal court
12   proceeding, even though the judge and the jury are
13   not present, your counsel and myself are officers
14   of the court and I would ask that we conduct
15   ourselves just as if we are in the courtroom.  It
16   is important that the court reporter makes an
17   accurate record, so I will do my best to make sure
18   you are done answering my question before I ask
19   another one, and if you could please extend me the
20   same courtesy and make sure I finished asking a
21   question before you start answering it.
22             Is that fair?
23       A.    Yes.
24       Q.    If you don't understand a question,
25   please let me know, I am happy to try to rephrase
```

```
 1                    JOHN BERMAN
 2   it.  If you do answer a question I am going to
 3   assume that you understood it.
 4            Is that fair?
 5      A.   Yes --
 6            MS. BOLGER:  I object to that
 7   instruction, but carry on.
 8      Q.   If you need a break, that's fine, I
 9   would just ask that we don't break while a
10   question is pending.
11            Is that understood?
12      A.   Yes.
13      Q.   In terms of pacing your lawyer may have
14   some objections, so although in natural
15   conversation we might talk back and forth, if we
16   could slow the pacing down a little bit and maybe
17   take a beat after I ask my question to give your
18   counsel a chance to object, if she's going to, and
19   then you can answer.
20            Sound good?
21      A.   Yes.
22      Q.   Have you ever been a party to a
23   lawsuit?
24      A.   Not to my knowledge.
25      Q.   Do you have a criminal history at all?
```

```
1                    JOHN BERMAN

2       A.    No.

3       Q.    Have you ever been arrested?

4       A.    No.

5       Q.    Without telling me any substantive

6  conversation you may have had with your lawyer,

7  did you do anything to prepare for this

8  deposition?

9       A.    CNN's lawyer or my lawyer?

10      Q.    You have a personal counsel?

11      A.    No.  Which lawyer are you talking

12 about?

13      Q.    CNN's lawyer.

14      A.    We spoke.

15      Q.    Did you do anything other than speak

16 with CNN's lawyer?

17      A.    No.

18      Q.    Did you review any documents?

19      A.    Yes.

20      Q.    What did you review?

21      A.    I reviewed e-mails, and I reviewed --

22 yes e-mails; and the Congressional Record.

23            Does that count as a document?

24      Q.    Yes.  Anything else?

25      A.    No -- newspaper articles.
```

                    JOHN BERMAN

1

2        Q.    Do you recall any particular articles

3   that you reviewed?

4        A.    I reviewed articles that were published

5   on the date in question.

6        Q.    What date is that?

7        A.    I don't remember the exact date.

8        Q.    Did you speak with anyone other than

9   CNN's counsel in preparation for today's

10  deposition?

11       A.    No.

12       Q.    Are you a registered voter?

13             MS. BOLGER:  Object to relevance.

14       Q.    You can answer.

15       A.    Yes.

16       Q.    Are you affiliated with any particular

17  political party?

18             MS. BOLGER:  Object to the question, in

19  addition to everything else.  The question of

20  political bias has been excluded from this case by

21  the court's decision on the motion to dismiss;

22  but, of course, you can answer the question.

23       A.    The question, please repeat it.

24             MR. SCHWEIKERT:  I would just note that

25  any and all relevancy objections are preserved for



JOHN BERMAN

1

2  trial, I would ask that you extend me the courtesy

3  and limit your objections to form or privilege

4  going forward.

5

```
 1                    JOHN BERMAN
 2    ████████████████████████████████████████████
      ████████████████████████████████
 4         Q.    I want to get a general understanding
 5    of your educational background.  I understand you
 6    went to Andover Prep school, right?
 7         A.    Um-hum.
 8         Q.    Is that a "yes"?
 9         A.    Yes.
10         Q.    That's another general guideline I
11    should have given you --
12         A.    I understand.
13         Q.    Did you attend college?
14         A.    Yes.
15         Q.    Where did you go to school?
16         A.    Harvard.
17         Q.    What year did you graduate?
18         A.    1995.
19         Q.    What did you study?
20         A.    It is called "social studies."
21         Q.    Around the time of 1995 when you were
22    in university or shortly after graduation, did you
23    already know you wanted to enter a career in
24    broadcast journalism?
25         A.    No, no.  My first job was at ABC news
```

```
 1                    JOHN BERMAN
 2    not long after I graduated college.
 3         Q.    What was the first job?
 4         A.    I was an overnight weekend desk
 5    assistant at ABC News.
 6         Q.    Sounds like long hours.
 7         A.    Yes.
 8         Q.    If you could briefly just describe your
 9    different employment positions since graduation up
10    through the present day?
11              MS. BOLGER:  Objection to the form.
12         A.    My first job out of college was as an
13    overnight desk assistant at ABC News, which meant
14    that I worked Friday night and Saturday night from
15    midnight to 8:00 a.m. answering phones, making
16    copies, delivering newspapers.  I was then hired
17    as a researcher for the special events unit at ABC
18    News which handled conventions and election
19    coverage.  I was then hired as a researcher for
20    World News Tonight with Peter Jennings, which is
21    of course the flagship evening news broadcast for
22    ABC.  From there, after about a year, I was hired
23    to be Peter Jennings writer and within a year of
24    that I was hired as his head writer -- actually,
25    it was within several months of that -- so I was
```

```
 1                  JOHN BERMAN
 2  Peter Jennings head writer from 1997 to 1999.  In
 3  1999 I became the editorial producer for ABC
 4  covering the campaign of George W. Bush which
 5  meant I was with him on the road for the duration
 6  of the campaign with him from October of 1999 --
 7  actually, through when he was elected president
 8  all the way until July of 2001 in the White House.
 9  And by editorial producer I was covering and
10  reporting on every aspect of what he did, both as
11  a candidate and in the White House.  I then became
12  an on-air correspondent for ABC News, the
13  affiliate news services called News One; I did
14  that for a little less than a year.  Then I became
15  a full network correspondent for ABC covering any
16  range of things including the invasion of Iraq,
17  civil war in Lebanon, tsunamis, natural disasters,
18  political campaigns and was a general assignment
19  reporter for ABC News until 2012, May or June of
20  2012 when I was hired by CNN as an anchor of their
21  early morning news show called Early Start, and at
22  CNN I've had a succession of -- I've anchored a
23  succession of shows:  Early Start, the 11 o'clock
24  show, the 9 o'clock show and New Day.
25       Q.    When was that transition in your career
```

```
 1                     JOHN BERMAN
 2   to an on-air correspondent?
 3        A.    2001 into 2002.  When I was the off-air
 4   producer, I started filing radio reports.  When I
 5   was at the White House as an off-air producer --
 6   editorial producer -- I started doing some
 7   television, late night television.
 8        Q.    Do you hold any professional licenses?
 9              MS. BOLGER:  Objection to the form, you
10   can answer if you understand.
11        A.    I don't understand.
12        Q.    Are you licensed by any governmental
13   authority for any particular purpose, aside from
14   like a driver's license?
15              MS. BOLGER:  Objection to the form, you
16   can answer.
17        A.    Not to my knowledge.
18        Q.    Is it fair to say that you have had a
19   long career as a journalist?
20              MS. BOLGER:  Objection to the form.
21        A.    Yes.
22        Q.    As an anchor at CNN, do you consider
23   yourself a journalist?
24        A.    Yes.
25        Q.    In your opinion, are journalists held
```

```
 1                     JOHN BERMAN

 2   to any sort of ethical standards?

 3              MS. BOLGER:  Objection to the form,

 4   calls for opinion testimony; you can answer.

 5              MR. SCHWEIKERT:  He's a lay witness, he

 6   can give his opinion; form please.

 7        A.    Repeat the question please.

 8        Q.    Sure.  Are you aware of any ethical

 9   standards that apply to your role as a journalist?

10        A.    Whose ethics?  I don't understand the

11   question.  I feel as human beings we are all held

12   to ethical standards.

13        Q.    Does CNN have any ethical standards

14   with respect to its journalism?

15              MS. BOLGER:  Objection to the form, you

16   can answer.

17        A.    Yes.

18        Q.    What are those?

19        A.    What do you mean?

20        Q.    What are the ethical standards that

21   you're thinking of?

22        A.    What are the ethical standards you are

23   asking about?

24        Q.    CNN's ethical standards.

25        A.    When you say "ethical standards," are
```

```
 1                      JOHN BERMAN
 2  you talking about guidelines or are you talking
 3  about expectations?
 4       Q.   We can talk about both.  Why don't we
 5  go with guidelines first?
 6       A.   CNN has a standards guide book.
 7       Q.   What is the purpose of that standards
 8  guide book, to your knowledge?
 9            MS. BOLGER:  Objection to the form.  If
10  you know you can answer.
11       A.   I don't know.
12       Q.   Have you read the standards guide book?
13       A.   When I was hired.
14       Q.   Did you review it from time to time in
15  connection with the performance of your employment
16  responsibilities?
17       A.   I don't remember the last time I
18  reviewed it.
19       Q.   What was the name of that document?
20       A.   I don't know.
21       Q.   Does it contain guidelines with respect
22  to the reporting of events in the media?
23            MS. BOLGER:  Objection to the form.
24       A.   I don't know.
25       Q.   Are there any standards that you're
```

```
 1                    JOHN BERMAN
 2   aware of that apply to your conduct as an on-air
 3   broadcaster for CNN?
 4             MS. BOLGER:  Objection to the form.  In
 5   the world?  Incredibly broad question.
 6             MR. SCHWEIKERT:  Form, please.
 7        A.   I don't understand the question.
 8        Q.   What about the expectations?  You
 9   mentioned there are some expectations.
10             Can you elaborate on that please?
11             MS. BOLGER:  Objection to the form, you
12   can answer.
13        A.   I think that there is an expectation
14   that we work our hardest to tell the best
15   obtainable version of the truth, to report the
16   facts.
17        Q.   Is that expectation to your knowledge
18   enshrined within the guidelines that we were just
19   discussing?
20        A.   I don't remember.
21        Q.   So there are no ethical standards that
22   apply to your on-air reporting of events in
23   connection with your television show, is that
24   right?
25             MS. BOLGER:  Objection to the form.
```

```
 1                      JOHN BERMAN
 2   That mischaracterizes --
 3            MR. SCHWEIKERT:  Would you please limit
 4   it to form and stop instructing the witness?  We
 5   will be speak with the judge later today, and I'm
 6   happy to get clarity on permissible conduct, but
 7   you can also review the rule, it is right there,
 8   "non-suggestive" --
 9            MS. BOLGER:  Why don't you spend your
10   time talking to the witness, not to me --
11            MR. SCHWEIKERT:  But I need to squash
12   this conduct now --
13            MS. BOLGER:  I would talk to the
14   witness if I were taking --
15            MR. SCHWEIKERT:  -- now.  Form only
16   please or privilege.
17            MS. BOLGER:  Is there a pending
18   question?
19            MR. SCHWEIKERT:  Thank you for your
20   agreement.
21        Q.   So there are no ethical standards that
22   apply to your on-air broadcasting of news for CNN,
23   is that right?
24            MS. BOLGER:  Objection to the form;
25   mischaracterizes his testimony.
```

```
                         JOHN BERMAN
 1

 2        A.    Yes, I don't think I said that.

 3        Q.    Then help me understand what standards

 4   apply to your employment as a broadcast journalist

 5   speaking to the American public on television.

 6              Are there any?

 7              MS. BOLGER:  Objection to the form.

 8        A.    I think the expectation is that we work

 9   our hardest to tell the best obtainable version of

10   the truth.

11        Q.    What does that mean "to tell the best

12   obtainable version of the truth"?

13        A.    My understanding of what that means, it

14   means we work our hardest to make sure that we are

15   conveying the facts as we see them to the American

16   people.

17        Q.    What do you do specifically do to

18   ensure that you are conveying the facts to the

19   American people, before you go on live television?

20              MS. BOLGER:  Objection to the form of

21   the question, and a specific instruction:  You may

22   answer that question, of course, as it relates to

23   generalities in the reporting industry, but in

24   answering that question do not reveal any news

25   gathering behavior for any story other than the
```

```
 1                      JOHN BERMAN
 2    one at issue because that would be privileged
 3    under both the New York Constitution and the
 4    Florida State Constitution.
 5               THE WITNESS:  I understand.
 6         A.    I do research, I read, and I attend
 7    and/or watch events.
 8         Q.    Do you independently verify the
 9    accuracy of the representations that you're going
10    to make on television before you make them?
11               MS. BOLGER:  Objection, same
12    instruction; you can answer.
13         A.    Repeat the question please.
14         Q.    Sure.  Do you independently verify the
15    accuracy of the representations you're going to
16    make on television before you make them?
17               MS. BOLGER:  Same objection; same
18    instruction.
19         A.    I don't understand "verify."  I do an
20    enormous amount of research before every
21    broadcast, and I work hard to make sure that what
22    I am reporting on and conveying is what I believe
23    to have happened.
24         Q.    What you believe to have happened based
25    upon materials you independently review or are
```

```
 1                      JOHN BERMAN
 2    there also materials that are provided to you from
 3    others within CNN?
 4              MS. BOLGER:  Objection to the form,
 5    same instruction.
 6         A.    Based on my own observations and based
 7    on the research I do independently, and there are
 8    internal materials that I review from time to
 9    time.
10         Q.    Related to the particular content of a
11    day's broadcast for example?
12              MS. BOLGER:  Objection to the form;
13    same instruction.
14         A.    I try to read a wide array of news
15    about a wide array of subjects, including ones
16    that don't necessarily appear in the broadcast;
17    but I also review extensively things that I do
18    think are going to be in the broadcast.
19              MR. SCHWEIKERT:  I am going to mark as
20    Plaintiff's Exhibit 1 a document that I printed
21    off CNN's website, and I have provided Counsel
22    with a copy.
23              (Plaintiff's Exhibit No. 1 was
24         marked for identification.)
25              MS. BOLGER:  While John takes a look at
```

1                    JOHN BERMAN

2   the document, this does not have a URL or a date,

3   so I have no idea where it comes from; I

4   understand you are representing it comes from the

5   web page, so you must have downloaded it this

6   week, but for the record it has neither a URL or a

7   date.

8        Q.    Take a moment and review Plaintiff's

9   Exhibit 1 and let me know if you have seen it

10  before.

11            (Complying.)

12       A.    I don't remember whether I have seen

13  this specific document.

14       Q.    Do you see under the heading "ethics

15  and compliance" there is a reference to "Warner

16  Media"?

17       A.    I see the first words are "at Warner

18  Media."

19       Q.    Warner Media previously owned CNN

20  before the merger with Discovery --

21            MS. BOLGER:  Objection to the form.

22       Q.    -- is that correct?

23            MS. BOLGER: -- you can answer.

24       A.    The specifics of the ownership

25  structure are not something that is intimately

```
 1                    JOHN BERMAN
 2   known by me.
 3        Q.   As of January 2020 did Warner Media
 4   have any sort of relationship with CNN, also known
 5   as Cable News Network Inc?
 6        A.   Warner Media was and I believe still
 7   is -- which is why I was confused by your question
 8   -- the parent company of CNN.
 9        Q.   Thank you.  You see the heading "ethics
10   and compliance," right?
11        A.   I do.
12        Q.   Underneath it, it reads quote, "at
13   Warner Media we are committed to fostering a
14   business environment where fair, honest and
15   respectful dealing with each other, our customers,
16   competitors, suppliers, government agencies, and
17   communities are everyone's responsibility," end
18   quote.
19             Do you see that?
20        A.   Yes.
21        Q.   It then goes on to say quote, "our
22   unwavering commitment to high ethical standards is
23   a core value strongly supported at every level of
24   management," end quote.
25             Do you see that?
```

```
 1                      JOHN BERMAN

 2      A.    Yes.

 3      Q.    Do you agree with those statements?

 4      A.    Yes.

 5      Q.    Do you agree that CNN is committed to

 6   fair, honest and respectful dealings with

 7   customers, competitors, suppliers?

 8            MS. BOLGER:  Objection to the form.

 9      A.    Yes.

10      Q.    Who are CNN's customers?

11      A.    I believe the viewers are our

12   customers.

13      Q.    The consumers of the content that CNN

14   publishes, is that right?

15            MS. BOLGER:  Objection to the form.

16   This document is not a CNN document; you can

17   answer the question.

18      A.    Viewers are consumers and customers.

19   The way you phrase it, it is a more complicated

20   issue than that because I believe that CNN has

21   other customers than viewers, but I don't

22   understand advertisers and business relationships,

23   like that, and a simple reading of this indicates

24   that it goes far beyond just viewers; but yes,

25   viewers are customers.
```

```
 1                   JOHN BERMAN

 2       Q.    With respect to the reference to

 3   "suppliers," would guests who appear on CNN

 4   programs be considered a supplier to your

 5   understanding?

 6       A.    I don't know --

 7             MS. BOLGER:  Objection to the form.

 8   Again, this is not a CNN document.

 9             MR. SCHWEIKERT:  The form objection is

10   noted, you don't need to elaborate.  We may

11   continue.

12       A.    Please re-ask the question.

13       Q.    Sure.  You know who Mr. Alan Dershowitz

14   is, correct?

15       A.    Yes.

16       Q.    He has appeared on CNN television a

17   number of times over the years, correct?

18       A.    Yes.

19       Q.    Would you consider him to be a supplier

20   of information or content to CNN?

21             MS. BOLGER:  Objection to the form.

22       A.    I honestly have never thought of it

23   like that.

24       Q.    Would you agree that CNN should be

25   fair, honest and respectful when dealing with
```

```
 1                    JOHN BERMAN

 2   guests like Mr. Alan Dershowitz?

 3        A.    Yes.

 4        Q.    Do you see -- you don't have to look to

 5   your lawyer for the answer.

 6        A.    Are there limits to where I can look?

 7        Q.    No, there are no limits but you

 8   understand this deposition is being videotaped,

 9   correct?

10        A.    Yes.

11              MS. BOLGER:  For the record, I wasn't

12   looking at the witness.

13        Q.    If we go back to Plaintiff's Exhibit 1,

14   do you see that reference to "high ethical

15   standards being a core value of Warner Media"?

16        A.    Where are you?

17        Q.    The second sentence reads quote --

18        A.    I see that.

19        Q.    Let me finish my question, please.  Do

20   you see the reference to "high ethical standards

21   being a core value of Warner Media," which you

22   explained to me was in January 2020, and still is

23   today, the parent company of CNN?

24              MS. BOLGER:  Objection to the form;

25   very compound.
```

```
 1                    JOHN BERMAN
 2      A.    I see that.
 3      Q.    What are those high ethical standards?
 4            MS. BOLGER:  Objection to the form.
 5      A.    I don't know.  I would be speculating,
 6  I have not seen this document.
 7      Q.    So you're not able to explain any
 8  standards that apply to CNN's broadcast of news to
 9  the world, other than what you had previously said
10  about trying to obtain the best possible or best
11  information --
12            MS. BOLGER:  Objection to the form of
13  the question.
14      Q.    -- is that right?
15      A.    I don't think that's what I said.
16      Q.    I want to make sure that the jury has
17  had a chance to hear all of the ethical standards
18  that you believe govern your on-air broadcast to
19  the American public.
20            Is there anything else you have not
21  described?
22            MS. BOLGER:  Objection to the form of
23  the question, which was improper and also
24  mischaracterizes the witness' testimony.  You may
25  answer the question.
```

```
 1                      JOHN BERMAN

 2        A.    I try to the best of my ability, and I

 3   work as hard as I can to convey to the audience

 4   the truth and the facts as I see them.

 5        Q.    Do you agree that you need to take

 6   responsibility for the accuracy of your work?

 7              MS. BOLGER:  Objection to the form.  If

 8   you're reading from a document you should show it

 9   to the witness.

10              MR. SCHWEIKERT:  Counsel, I don't know

11   how many times I have to tell you, I don't have to

12   show the witness my work product.  If you want to

13   make that argument in front of a judge I'd be

14   happy to rebut it, but I would ask again that you

15   limit your objections to form or privilege which

16   is your prerogative.

17        Q.    Again, sir --

18        A.    Sorry, I drifted out of frame.  Repeat

19   the question please.

20        Q.    Sure.  Do you agree that as a

21   journalist you should take responsibility for the

22   accuracy of your work?

23              MS. BOLGER:  I will again, for the

24   record remark that if you're reading from a

25   document that you'd like to show to the witness, I
```

```
 1                    JOHN BERMAN
 2   think that would be kind; you can ask whatever
 3   question you want.
 4        Q.    You can answer.
 5        A.    Yes.
 6        Q.    Do you agree that you should verify
 7   information before releasing it?
 8             MS. BOLGER:  Same objection.
 9        A.    Yes.
10        Q.    Do you agree that as a broadcast
11   journalist you should provide context that is
12   important to an accurate understanding of the
13   event that you are reporting?
14             MS. BOLGER:  I'm going to object and
15   give you the instructions about the reporter's
16   privilege; obviously generalities are fine,
17   specifics for this case are fine, don't get into
18   specifics of any other reporting.
19        A.    Yes.
20        Q.    Do you agree that in your role as a
21   broadcast journalism (sic) you should avoid
22   stereotyping?
23             MS. BOLGER:  Objection to the form.
24        A.    Yes.
25        Q.    Do you agree that in your role as a
```

```
 1                    JOHN BERMAN
 2  journalist you should inform your audience when
 3  you are providing advocacy or commentary, as
 4  opposed to objective facts?
 5             MS. BOLGER:  Objection to the form of
 6  the question, and the same instructions.
 7       A.   I think that I try to tell the audience
 8  and work as hard as I can to convey the facts as I
 9  see them, and I think the audience understands
10  that.
11       Q.   How do you know what the audience
12  understands?
13       A.   I don't.
14       Q.   Do you agree that in your role as a
15  broadcast journalism (sic) you should strive to
16  minimize harm?
17             MS. BOLGER:  Objection to the form of
18  the question.  I don't understand it, if you
19  can --
20             MR. SCHWEIKERT:  Again, form.  It
21  doesn't matter if you understand it, it matters if
22  the witness understands --
23             MS. BOLGER:  It does matter if
24  I understand --
25             MR. SCHWEIKERT:  I know, Ms. Bolger,
```

```
 1                       JOHN BERMAN
 2   you would like to derail and interrupt this
 3   proceeding as much as possible, and I will be
 4   happy to provide the court with a copy of the
 5   videotape and the transcript to the court and I
 6   would ask again, that you refrain from interposing
 7   obstructionist tactics to my examination of the
 8   witness.  Can I have that courtesy please?
 9             MS. BOLGER:  Why don't you ask the
10   witness a question?
11             MR. SCHWEIKERT:  I believe I did, and
12   I'll ask it again.
13        Q.    Do you agree that it is in your role as
14   a journalist to strive to minimize harm?
15             MS. BOLGER:  Objection to the form.  I
16   don't understand that question.  If you understand
17   that question, you can answer it.
18        A.    I don't understand.
19        Q.    Do you agree in your role as a
20   broadcast journalist you should show compassion
21   for those who may be affected by your news
22   coverage?
23             MS. BOLGER:  Objection to the form.
24        A.    I try to show compassion.
25        Q.    Do you agree that in your role as a
```

```
 1                   JOHN BERMAN
 2   broadcast journalist you should weigh the
 3   consequences of publishing or broadcasting
 4   information before you put it on air?
 5              MS. BOLGER:  Objection to the form.
 6   What are you reading from?
 7              MR. SCHWEIKERT:  My work product,
 8   Counsel.
 9              MS. BOLGER:  I can see it --
10              MR. SCHWEIKERT:  Are you looking at my
11   privileged information?
12              MS. BOLGER:  No, I am looking at the
13   document you're holding up.
14              MR. SCHWEIKERT:  You don't know what
15   I'm holding up.  If you would like to invade my
16   privilege --
17              MS. BOLGER:  I'd like to know what
18   document you're reading from --
19              MR. SCHWEIKERT:  I don't have to tell
20   you what I'm reading from, what I'm referencing,
21   these are my mental impressions, my work product,
22   and you know that.  Would you like to provide me a
23   copy of your notebook?
24              MS. BOLGER:  I don't know what you're
25   looking at, but you seem to be reading from
```

```
 1                    JOHN BERMAN
 2   something.  I am simply asking you inform the
 3   witness what you're reading from; you can answer.
 4        A.   Please re-ask the question.
 5        Q.   Do you agree in your role as a
 6   broadcast journalist you should weigh the
 7   consequences of publishing information before you
 8   put it on air?
 9             MS. BOLGER:  Objection to the form.
10        A.   I agree that we -- it is a compound
11   question and there are different parts of it.  I
12   don't weigh the consequences of what we are
13   reporting before we put it on the air.
14        Q.   Correct.  For example, hypothetically
15   if you were to report that someone is an alleged
16   pedophile would you consider how that could affect
17   that person and weigh those consequences before
18   putting that information on air?
19             MS. BOLGER:  Objection to the form of
20   the question, hypothetical; you can answer.
21        A.   We do our best to try to report the
22   facts as best as we see them.
23        Q.   By "we" you're referring --
24        A.   I try to report the facts as best as I
25   see them.
```

```
 1                    JOHN BERMAN
 2      Q.    When you are on air are you acting
 3  within the scope of your employment as an employee
 4  of CNN?
 5            MS. BOLGER:  Objection to the form.
 6      A.    I am an employee of CNN when I am on
 7  the air.
 8      Q.    That would be true with respect to
 9  January 2020 through the present?
10      A.    I was an employee in January 2020 and I
11  am an employee now.
12      Q.    You don't go on the air to express your
13  personal beliefs or opinions, do you?
14            MS. BOLGER:  Objection to the form.
15      A.    I try to report the facts as best as I
16  see them, and it is my personal belief that I am
17  reporting the facts as best as I see them.
18      Q.    Have you ever heard of the Society of
19  Professional Journalists?
20      A.    There are different societies; I think
21  so.
22      Q.    Are you a member of any societies
23  related to journalism?
24      A.    A member?  No, I support the Committee
25  to Protect Journalists.
```

```
1                        JOHN BERMAN

2        Q.    I'm sorry?

3        A.    I support the Committee to Protect

4    Journalists.

5        Q.    What is that?

6        A.    It is an organization that protects

7    journalists around the world who are in war zones

8    and hostile environments.

9             MS. BOLGER:  It is perhaps the most

10   well named of all organizations that does exactly

11   what it does.

12            MR. SCHWEIKERT:  I am going to hand you

13   a document that the court reporter will mark as

14   Plaintiff's Exhibit 2 for this deposition, and I

15   will provide a copy to your Counsel.

16            (Plaintiff's Exhibit No. 2 was

17         marked for identification.)

18       Q.    Please take a moment to review

19   Plaintiff's Exhibit 2, and let me know if you have

20   seen it before.

21       A.    I have not seen this before.

22       Q.    Do you see at the top it says "Society

23   of Professional Journalists Code of Ethics"?

24       A.    Yes.

25       Q.    And then there is the acronym "SPJ."
```

```
 1                    JOHN BERMAN
 2          Do you see that?
 3     A.    Yes.
 4     Q.    Do you know of this society?
 5     A.    It is familiar, again, I feel as if
 6  there are different societies that have different
 7  acronyms and names, but this does sound familiar,
 8  yes.
 9     Q.    Do you agree -- and we will just cover
10  the four main pillars on here -- do you agree that
11  in your role as a broadcast journalist you should
12  "seek truth and report it"?
13     A.    Yes.
14     Q.    You see that heading on Plaintiff's
15  Exhibit 2, right?
16     A.    Yes.
17     Q.    And then underneath it there is a
18  number of bullet points that elaborate upon that
19  particular statement, right?
20     A.    Yes.
21     Q.    Do you agree with the statement in
22  Plaintiff's Exhibit 2, and this is under the
23  heading entitled "minimize harm," that quote,
24  "ethical journalism treats sources, subjects,
25  colleagues and members of the public as human
```

```
 1                   JOHN BERMAN
 2  beings deserving of respect," end quote?
 3            MS. BOLGER:  I don't see that -- I
 4  apologize, I see it.
 5       A.   Yes.
 6       Q.   The third heading reads "act
 7  independently" and underneath it in bold it says
 8  quote, "the highest and primary obligation of
 9  ethical journalism is to serve the public," end
10  quote.
11            Do you agree with that?
12       A.   Yes.
13       Q.   And the fourth heading on Plaintiff's
14  Exhibit 2 is "be accountable and transparent."
15            Do you agree with that?
16       A.   Yes.
17       Q.   It says quote, "ethical journalism
18  means taking responsibility for one's work and
19  explaining one's decisions to the public," end
20  quote.
21            Do you agree with that?
22       A.   Yes.
23       Q.   So you agree that there are some
24  ethical standards that apply to journalism in
25  general, but you can't identify for me specific
```

```
 1                    JOHN BERMAN
 2   standards of journalism that apply within CNN.
 3            Is that right?
 4            MS. BOLGER:  Objection, that
 5   mischaracterizes his testimony.
 6       A.   Yeah, I don't believe I said that.
 7       Q.   So that's wrong?
 8       A.   Can you please repeat the question?
 9       Q.   I'd asked you earlier if you could
10   explain to me if there were any standards
11   regarding the ethics related to your reporting of
12   the news on television.
13            Do you recall that?
14       A.   I don't remember if that was the exact
15   language.
16       Q.   Do you recall that general dialogue we
17   had earlier?
18       A.   Yes.
19       Q.   I had pressed you for specific
20   standards that CNN has with respect to its
21   reporting of news.
22            Do you remember that?
23       A.   Yes.
24       Q.   What was the standard that you advised
25   me applies --
```

```
 1                     JOHN BERMAN

 2            MS. BOLGER:  Objection to the form,

 3     asked and answered.  You may answer it again.

 4       A.    I said I try to seek -- I work my

 5     hardest to seek and report on the best obtainable

 6     version of the truth as I see it.

 7            Which is not different than the Society

 8     of Professional Journalists here, "seek truth and

 9     report it."

10       Q.    Do you believe that ethical standards

11     set forth in the Society of Professional

12     Journalists Code of Ethics apply to your reporting

13     of news for CNN?

14            MS. BOLGER:  Objection to the form.

15       A.    Insofar as I have read them, and the

16     ones that you read, I think they are admirable

17     guidelines.

18       Q.    Are they similar to or consistent with

19     the CNN guidelines that you referenced earlier?

20            MS. BOLGER:  Objection to the form.

21       A.    I don't remember the exact specific

22     guidelines, I cannot list them to you now, but I

23     believe these are fair and admirable guidelines.

24       Q.    Are there any standards contained

25     within Plaintiff's Exhibit 2, which is the Society
```

```
 1                      JOHN BERMAN

 2   of Professional Journalists Code of Ethics, that

 3   you believe do not apply to CNN's reporting of the

 4   news?

 5              MS. BOLGER:  Objection to the form.

 6        A.    Not the ones that I have reviewed.  I

 7   have to look at this, I have not reviewed line by

 8   line here.

 9        Q.    Take a moment and do so.

10              (Complying.)

11              MS. BOLGER:  Can you repeat the

12   question?

13              MR. SCHWEIKERT:  The question is

14   pending.

15              MS. BOLGER:  I'd like to hear it.

16        A.    I'd like to repeat the question please.

17              MR. SCHWEIKERT:  Can you read back my

18   question, Madam Court Reporter?

19     (The following was read from the record by the

20      stenographer:  "Q.  Are there any standards

21    contained within Plaintiff's Exhibit 2, which is

22    the Society of Professional Journalists Code of

23     Ethics, that you believe do not apply to CNN's

24            reporting of the news?")

25              MS. BOLGER:  I am going to object.
```

```
 1                        JOHN BERMAN
 2   He's not a 30(b)(6) witness, he's here as John
 3   Berman.  To the extent that the question calls for
 4   testimony about CNN I'm not sure he's qualified to
 5   give it; you can answer the question as to
 6   yourself of course, but for the record he's not a
 7   30(b)(6) witness.
 8        A.    Insofar as I have read this and
 9   digested it -- it is a rather long document -- I
10   don't believe there is anything here that I object
11   to.
12        Q.    Have you had sufficient time to review
13   it carefully?
14        A.    I have reviewed it quickly, but it
15   seems like a fair document.
16        Q.    Is this the first time in your long
17   career as a journalist that you have been made
18   aware of a code of ethics similar to those
19   contained within Plaintiff's Exhibit 2?
20             MS. BOLGER:  Objection to the form.
21        A.    As I said, I have been aware that CNN
22   has guidelines that I read when I was hired.  I
23   didn't know that the Society of Professional
24   Journalists had published a Code of Ethics.
25             MR. SCHWEIKERT:  I am going to provide
```

```
 1                      JOHN BERMAN
 2   you with a document that is marked "highly
 3   confidential restricted material pursuant to
 4   protective order" Bates labeled CNN 1744 through
 5   1758.  I will ask the court reporter to please
 6   mark it Plaintiff's Exhibit 3.
 7             MS. BOLGER:  I will ask that the
 8   transcript be marked highly confidential,
 9   attorneys-eyes only.
10             THE STENOGRAPHER:  The entire
11   transcript or this portion of the transcript?
12             MS. BOLGER:  We are going to mark the
13   entire transcript confidential because the entire
14   transcript relates to news gathering materials
15   which are confidential; we will mark the entire
16   transcript as confidential.  This portion is
17   highly confidential, and Mr. Dershowitz has to
18   leave the meeting.
19             MR. SCHWEIKERT:  He is entitled to hear
20   the evidence presented --
21             MS. BOLGER:  He is not entitled to the
22   highly confidential news gathering; the highly
23   confidential under the protective order.
24   Mr. Rodier and I went around and around and around
25   about this; the rule is that the witnesses and the
```

```
 1                    JOHN BERMAN
 2   parties cannot see this.  He has to leave for this
 3   line of questioning.
 4              MR. SCHWEIKERT:  I don't believe that's
 5   correct.
 6              MS. BOLGER:  We can take a break and we
 7   can look at the agreement --
 8              MR. SCHWEIKERT:  Let's take a
 9   five-minute break.
10              THE VIDEOGRAPHER:  We are going off the
11   record, and the time is 11:00 a.m.
12              (Recess.)
13              THE VIDEOGRAPHER:  We are back on the
14   record, the time is 11:18 a.m.
15              MR. SCHWEIKERT:  We took a break to
16   review the protective order with respect to
17   whether a party, specifically Mr. Dershowitz, can
18   be present for review of materials that have been
19   marked highly confidential restrictive material.
20   It is plaintiff position's that he has a
21   constitutional right to review the evidence
22   relevant to the court proceeding in which he is
23   participating.  Defense counsel disagrees and
24   believes he is not allowed --
25              MS. BOLGER:  I will state my position.
```

```
 1                   JOHN BERMAN

 2          MR. SCHWEIKERT:  Go ahead.

 3          MS. BOLGER:  Regardless whether a party

 4  to a litigation has constitutional rights or

 5  otherwise, obviously there is a protective order

 6  that is entered into this case.  In fact, it was

 7  proposed by Mr. Dershowitz.  The protective order

 8  has paragraph 12, which defines highly

 9  confidential restrictive information, and defines

10  six categories of people that it may be disclosed

11  to; the parties for this case were specifically

12  excluded from this list at the request of

13  Mr. Dershowitz.  Because the protective order

14  defines this litigation he is not permitted to

15  know what is in documents designated highly

16  confidential, restricted information, and for that

17  reason we are asking that Mr. Dershowitz leave now

18  while the document is discussed.  Obviously, he

19  can come back.

20          MR. SCHWEIKERT:  I will note I don't

21  know if the representation that Dershowitz

22  proposed this provision is accurate or not, but

23  given this is a dispute that cannot be resolved at

24  this time I will ask Alan if you could hang up and

25  I will call you once we have finished this line of
```

```
 1                    JOHN BERMAN
 2   questioning.
 3             MR. DERSHOWITZ:  Okay.
 4             THE STENOGRAPHER:  Ms. Bolger said this
 5   transcript is confidential and for the record I
 6   just want to clarify that is your understanding as
 7   well --
 8             MS. BOLGER:  It does not have to be his
 9   understanding --
10             THE STENOGRAPHER:  Okay, I just wanted
11   to make sure for the record.
12             MR. SCHWEIKERT:  I understand their
13   position is that the American public should have
14   no right to any information with the respect to
15   the integrity of CNN's reporting.  Although there
16   may be some confidential information discussed
17   during this deposition, the notion that every
18   single word uttered by the witness must remain
19   confidential is preposterous, I believe, and not
20   consistent with Federal and State law applicable
21   in this case, and we will that issue up as needed
22   with the court.
23             MS. BOLGER:  Not to undercut the
24   rhetoric, Mr. Rodier and I had an agreement that
25   we would designate things confidential in the
```

```
 1                    JOHN BERMAN
 2  discovery stage and then when they were used in
 3  open court we would have discussions about
 4  removing designations.  Consistent with that
 5  representation, we are going to mark things
 6  confidential in the discovery stage and are very
 7  happy to discuss it with you, Mr. Schweikert, at a
 8  later date, but for right now this discovery and
 9  the documents are confidential and we designate
10  the transcript as confidential.  And this
11  document, in particular, is highly confidential.
12            MR. SCHWEIKERT:  I am going to ask the
13  court reporter to mark as Plaintiff's Exhibit 3 a
14  highly confidential, restricted document, Bates
15  labeled CNN 1744 through 1759.  I have also
16  provided defense counsel with a copy of the
17  exhibit.
18            (Plaintiff's Exhibit No. 3 was
19        marked for identification.)
20
```

1

2

JOHN BERMAN







JOHN BERMAN



1                         JOHN BERMAN

2





1          JOHN BERMAN

12        Q.    Have you ever reviewed any standards of

13   business conduct within the course of your

14   employment with CNN?

15             MS. BOLGER:   Objection to the form,

16   asked and answered.

17        A.    Yes, when I was hired the CNN Policy

18   Guide.

19        Q.    That was the only time you've reviewed

20   any standards of business conduct?

21        A.    There are videos that we are required

22   to watch every year.

23        Q.    Does "we" refer to broadcasters or

24   employees in general?

25             MS. BOLGER:   Objection to the form.

```
 1                    JOHN BERMAN

 2       Q.    If you know --

 3       A.    I don't know.

 4       Q.    When was the last time that you can

 5  recall reviewing any standards of business conduct

 6  of CNN?

 7       A.    March.

 8       Q.    Of 2022?

 9       A.    March of 2022 -- yes.

10       Q.    Are those standards that apply to your

11  role as a journalist?

12             MS. BOLGER:  Objection to the form.

13       A.    Are they all?  Please repeat the

14  question.

15       Q.    Are you confused by my question?

16       A.    You say are they pertaining to my role

17  as a journalist -- was that the question?  I'm

18  sorry, really, I do need you to repeat the

19  question.

20             MR. SCHWEIKERT:  Could you read it back

21  please?

22       A.    I'm sorry, to save time, some of

23  them -- some of the videos I think are

24  journalists, some of them --

25       Q.    Hold on, I want to make sure you
```

```
 1                    JOHN BERMAN
 2   understand my question --
 3              MS. BOLGER:  He did answer --
 4              MR. SCHWEIKERT:  He expressed
 5   confusion.  Could you please read back my
 6   question?
 7     (The following was read from the record by the
 8   stenographer:  "Q. Are those standards that apply
 9          to your role as a journalist?")
10        Q.   Are the standards of business conduct
11   that you recall reviewing in approximately March
12   of 2022 applicable, in whole or in part, to your
13   role as a broadcast journalist for CNN?
14        A.   Yes.
15        Q.   Were there standards of business
16   conduct applicable to your role as a broadcast
17   journalist in the calendar year of 2020?
18              MS. BOLGER:  Objection to the form,
19   asked and answered.
20        A.   Were the ones that I reviewed in 2022
21   applicable to 2020?
22        Q.   Were there any standards of business
23   conduct provided to you as an employee of CNN that
24   applied in whole or in part to the performance of
25   your employment duties during the calendar year of
```

```
 1                     JOHN BERMAN

 2    2020?

 3         A.    I don't remember whether I reviewed

 4    similar videos in 2020 or whether we were asked

 5    to; I simply don't remember.

 6         Q.    I didn't ask about videos.  Are the

 7    standards of business conduct that are referenced

 8    in your employment agreement memorialized in

 9    writing in any way?

10         A.    Yes, I believe so.

11         Q.    Was that true to the best of your

12    knowledge for the calendar year of 2020?

13         A.    Yes.

14              MR. SCHWEIKERT:  I am going to hand you

15    a document that I will ask the court reporter to

16    mark as Plaintiff's Exhibit 4, and I will provide

17    a copy to Counsel.

18              (Plaintiff's Exhibit No. 4 was

19          marked for identification.)

20         Q.    Please take a moment to review

21    Plaintiff's Exhibit 4, and let me know if you have

22    seen it before.

23              (Complying.)

24              MS. BOLGER:  Same objection I made

25    earlier which is this doesn't have a URL or a
```

```
                        JOHN BERMAN
 1

 2   date.

 3              MR. SCHWEIKERT:  I will represent I did

 4   print it from a website that I believe was CNN's

 5   website or Warner Media's website.

 6              MS. BOLGER:  For the record, those are

 7   two different websites, that's my concern.

 8              MR. SCHWEIKERT:  If you type in "Warner

 9   Media Standards of Business Conduct" into Google,

10   I am sure it will pop up.

11        A.    Can you repeat the exact question?

12        Q.    Have you seen this document before?

13        A.    Not in this exact form.

14        Q.    Why do you say that?

15        A.    Because I don't think I have ever seen

16   a printed document like this of it.

17        Q.    Have you seen it in other forms, such

18   as PDF?

19        A.    I am saying to you there are versions

20   of these various line items that appear in these

21   videos that we are required to watch from time to

22   time.  So I have not seen this exact document, but

23   much of the content, at least the line items in

24   the table of the contents, are familiar to me.

25        Q.    If I could direct your attention to
```

```
 1                      JOHN BERMAN
 2   page 3 of Plaintiff's Exhibit 4, the second
 3   sentence below the heading "executive summary."
 4            Do you see that?
 5       A.   Yes.
 6       Q.   I am going to read the first two
 7   sentences.  "At Warner Media, LLC we create
 8   content and brands that are recognized and trusted
 9   throughout the world.  One important aspect of
10   that is running our business according to the
11   highest standards of ethics and integrity."
12            Do you see that?
13       A.   I do.
14       Q.   Do you agree with that statement?
15       A.   I do.
16       Q.   Is that a statement that would be true
17   with respect to your role as a broadcast
18   journalism -- journalist during the year of 2020?
19       A.   Yes.
20       Q.   You have probably experienced fumbling
21   with words sometimes, I apologize.
22       A.   Yeah.
23       Q.   Let's go to page 7 of Plaintiff's
24   Exhibit 4.  Are you there?
25       A.   Yes.
```

```
 1                      JOHN BERMAN
 2       Q.    The first sentence reads quote, "we
 3  must act with integrity at all times in doing our
 4  jobs," end quote.
 5             Do you see that?
 6       A.    Yes.
 7       Q.    Then it says quote, "we are committed
 8  to promoting a culture throughout the company of
 9  integrity, honesty, incorruptibility and fair
10  dealing in everything we do," end quote.
11             Do you see that?
12       A.    Yes.
13       Q.    Do you agree with those two statements
14  in Plaintiff's Exhibit 4?
15       A.    Yes.
16       Q.    Did they apply to you as an employee of
17  CNN during calendar year of 2020?
18       A.    Yes.
19       Q.    If we look at the second bullet point
20  on that page the first sentence reads quote "we
21  will be truthful and honest in all statements made
22  in performing our jobs," end quote.
23             Do you see that?
24       A.    Yes.
25       Q.    Is that a true statement with respect
```

```
 1                    JOHN BERMAN

 2  to the performance of your job for CNN?

 3            MS. BOLGER:  Objection to the form.  I

 4  actually didn't understand.

 5       A.    Please repeat the question.

 6       Q.    I will ask a different one.  What does

 7  that sentence mean to you as a broadcast

 8  journalist who has a microphone to a national, if

 9  not international, audience?

10            MS. BOLGER:  Objection to the form.

11       A.    I think it speaks for itself, "we will

12  be truthful and honest in all statements made in

13  performing our jobs."

14       Q.    Do you do so in the performance of your

15  job?

16       A.    I try.

17       Q.    Did you try to do so during the year of

18  2020?

19       A.    Yes.

20       Q.    You can set aside Plaintiff's

21  Exhibit 4.  I'd like to back to Plaintiff's

22  Exhibit 3, your employment agreement.  If we go

23  back to page 2, do you see the reference to the

24  "CNN News Standards and Practices Policy Guide"?

25       A.    What section?
```

```
 1                    JOHN BERMAN

 2        Q.    The fourth line down from the top,

 3   Section 1.2, second page.

 4        A.    Okay.

 5        Q.    Do you see where it says "Standards of

 6   Business Conduct and the CNN News Standards and

 7   Practices Policy Guide"?

 8        A.    Yes.

 9        Q.    We just spoke a little bit about

10   standards of business conduct, right?

11        A.    Yes --

12              MS. BOLGER:  Objection to the form.  We

13   did not speak about that specific document.  If

14   that's the question, you have not spoken about

15   that document.

16              MR. SCHWEIKERT:  If you would like to

17   produce it we could speak about it.

18        Q.    Is there a different standard of

19   business conduct that you believe is referenced in

20   your employment agreement, other than what we just

21   looked at as Plaintiff's Exhibit 4?

22              MS. BOLGER:  Objection to the form.

23   I'm not sure he's the witness best situated, but

24   the documents are named in the agreement, that's

25   not the same name.  I don't understand the
```

```
 1                    JOHN BERMAN
 2  question.
 3       A.    I don't actually know because this is
 4  (indicating) not a CNN document.  I am not even
 5  sure that this is the document you're referring to
 6  here, because this is Turner Broadcasting, this is
 7  Warner Media, I think the names have changed since
 8  this document was published, so...
 9       Q.    So what is Turner Broadcasting System
10  Inc.'s standards of business conduct?
11       A.    I don't know, I don't know if it is
12  different than this.  I know the document you're
13  showing here.
14       Q.    Have you ever seen Turner Broadcasting
15  System Inc.'s standards of business conduct?
16       A.    I don't remember specifically.
17       Q.    What about the reference to the CNN
18  News Standards and Practices Policy Guide?
19       A.    What about it?
20       Q.    Have you seen that?
21       A.    Yes.
22       Q.    What is that document?
23       A.    That is a document that I reviewed when
24  hired which lays out, as it says, the standards
25  and practices they want you to abide by.
```

```
 1                        JOHN BERMAN

 2        Q.     That CNN wants you to abide by?

 3        A.     Yes.

 4        Q.     Those are standards related to your

 5   role as a broadcast journalism? (sic)

 6               MS. BOLGER:  Objection to the form.

 7        A.     Yes.

 8        Q.     When did you last review that

 9   particular document, if you remember?

10        A.     The last time I remember reviewing it

11   was when I was hired, which was 2012.

12        Q.     You don't recall having reviewed CNN

13   News Standards and Practices Policy Guide at any

14   time after 2012?

15        A.     I don't remember.

16        Q.     Do you recall any conversations or

17   meetings where the CNN News Standards and

18   Practices Policy Guide were referenced?

19        A.     I don't remember.

20        Q.     Over the past three years from

21   approximately 2019 through the present, are you

22   aware of any efforts within the company to ensure

23   that its employees, such as yourself, are aware of

24   the news standards and policies applicable to your

25   employment?
```

```
1                     JOHN BERMAN
2              MS. BOLGER:  Objection to the form.
3    Did you say "news standards" or "new standard"?
4         Q.   Did you understand my question?
5         A.   We have been bought three times; new or
6    news?
7         Q.   I am referring to the news standards
8    that are referenced in your employment?
9         A.   Am I aware of any efforts to make us
10   aware of them?
11        Q.   Yes.
12        A.   We, from time to time, are required to
13   review online documents and videos.
14        Q.   Can you be more specific?
15             MS. BOLGER:  Objection to the form.
16   Specifically to the extent it involves
17   communication with an attorney don't reveal the
18   substance of the communications, but otherwise you
19   can talk about it.
20        A.   I don't know if they are from Warner
21   Media or from CNN, they come all at once and they
22   are accessed in the same way.
23        Q.   How are they accessed?
24        A.   Through our online portal.
25        Q.   You said "from time to time," right?
```

```
1                       JOHN BERMAN
2        A.      Yes.
3        Q.      Do you have a general understanding of
4   what "from time to time" means?
5        A.      When they show up and tell us to review
6   them.
7        Q.      Once a quarter?
8        A.      I don't know.
9        Q.      When was the last time you accessed the
10  documents or videos?
11       A.      I remember looking at documents and
12  videos in March; documents and videos in March.
13       Q.      Before that do you recall?
14       A.      I don't remember.
15  ████████████████████████████████████████
    ██████████████████████████████████████████
    ████████████████████████████████████████
    █████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████
    ██████████████████████████████████████████
    ████████████████████████████████████████████████
```

1          JOHN BERMAN

2







1

2

JOHN BERMAN





1          JOHN BERMAN



1     JOHN BERMAN



1        JOHN BERMAN
2



1          JOHN BERMAN

2



1          JOHN BERMAN
2





```
 1                      JOHN BERMAN
 2
```

```
 5              MR. SCHWEIKERT:  You are this thin,
 6    Kate.  Please stop instructing the witness, I
 7    really don't appreciate it.  If you want to sit in
 8    the chair and raise your hand and swear to tell
 9    the truth you can, but I don't think you do.
10              MS. BOLGER:  Did you just question my
11    honesty?  Did you just question my honesty on the
12    record in a proceeding?  Because that is the
13    second time my friend, and I would be careful --
14              MR. SCHWEIKERT:  I called out conduct
15    that is obstructionist --
16              MS. BOLGER:  I would be careful
17    questioning my honesty.  Is there a pending
18    question?
19              MR. SCHWEIKERT:  You don't have to
20    raise your voice.
21              MS. BOLGER:  How dare you question my
22    honesty!  You may ask a question of the witness,
23    but you may not question my integrity.
24              MR. SCHWEIKERT:  Then stop inserting
25    objections other than what you are entitled to
```

```
 1                    JOHN BERMAN
 2   under Rule --
 3             MS. BOLGER:  Are you going to ask the
 4   witness a question or not?
 5             MR. SCHWEIKERT:  Please don't interrupt
 6   me when I'm talking.  I would ask that you comply
 7   with the rules and refrain from making statements
 8   on the records other than form or privilege
 9   objections which could be construed as an attempt
10   to either coach the witness or interfere with my
11   fair examination.
12             MS. BOLGER:  Larry, I am going to ask
13   you to keep time of the amount of time that
14   Counsel is speaking to me rather than the witness,
15   so I can subtract it from the seven hours.  Why
16   don't you ask your question of the witness who's
17   here?
18             MR. SCHWEIKERT:  Larry, you don't have
19   to do anything.  I am hiring you, just run the
20   videotape please.
21             MS. BOLGER:  I can ask to keep time.
22   Why don't you ask the question?
23
```



1                    JOHN BERMAN



19        Q.    With that, I will accept Counsel's

20   offer to take a lunch break, we can go off the

21   record and I don't believe there will be any

22   further references to this document, so I will ask

23   Mr. Dershowitz to join us after lunch.  We can

24   break.

25              THE VIDEOGRAPHER:  We are going off the

```
 1                    JOHN BERMAN

 2   record, the time is 12:11 p.m.

 3              (Lunch Recess.)

 4              THE VIDEOGRAPHER:  We are back on the

 5   record, the time is 12:52 p.m.

 6        Q.   Mr. Berman, what is your understanding

 7   of Mr. Dershowitz's allegations in this case?

 8        A.   I have not read the Complaint against

 9   us.

10        Q.   So you have no understanding of the

11   claims being made by Mr. Dershowitz against CNN?

12              MS. BOLGER:  Objection to the form.

13        A.   My understanding is that he has an

14   issue with our coverage around the first

15   impeachment trial of Donald Trump.

16        Q.   What is your understanding of that

17   issue?

18              MS. BOLGER:  Objection to the form.

19        A.   He objects to how we covered his

20   arguments.

21        Q.   Do you have any more specific of an

22   understanding than that?

23        A.   I have not read the specific argument.

24   I understand he has objections to how CNN covered

25   the arguments that he made in defense of Donald
```

```
 1                    JOHN BERMAN
 2   Trump.
 3        Q.    You are aware Alan Dershowitz has been
 4   practicing law a long time, right?
 5        A.    Yes.
 6        Q.    Renowned as a constitutional scholar
 7   over the course of his career, right?
 8              MS. BOLGER:  Objection to the form.
 9        A.    Was he appellate or constitutional?  I
10   don't know what he taught at Harvard.
11        Q.    When did you first become of who Alan
12   Dershowitz was?
13        A.    Grew up in England, I was aware, I was
14   a news junkie, I was aware of the Klaus von Bulow
15   trial, and I'd like to think I was aware before
16   the movie Reversal of Fortune, but I don't
17   specifically remember.
18        Q.    When did you first become aware of Alan
19   Dershowitz's argument with respect to the type of
20   conduct that is required in order for a president
21   to be impeached?
22              MS. BOLGER:  Objection to the form.
23        A.    Which argument?
24        Q.    What's the distinction are you drawing?
25        A.    He has made different arguments over
```

```
 1                    JOHN BERMAN
 2   his career.
 3        Q.    What is the first you can recall?
 4        A.    The first one I remember was around the
 5   time of Bill Clinton's impeachment trial where he
 6   talked about -- where he said abuse of power was
 7   impeachable.
 8        Q.    It is your position that the argument
 9   has changed over the years?
10              MS. BOLGER:   Objection to the form.
11        A.    My position is, I think, he has had
12   different arguments at different times.
13        Q.    What are the other arguments that you
14   think he has had at different times?
15        A.    He wrote a book in 2018 where my memory
16   of it is that he said that in his mind impeachment
17   required a statutory crime.
18        Q.    Do you recall what book?
19        A.    I don't remember the title.
20        Q.    Did it happen to be The Case Against
21   Impeaching Trump?
22        A.    I don't remember the title.
23        Q.    The book that you're thinking of, did
24   you read it?
25        A.    Yes.
```

```
 1                    JOHN BERMAN

 2      Q.    Why did you read it?

 3      A.    We had him on as a guest.

 4      Q.    When did you first have him on as a

 5  guest to discuss his argument regarding

 6  impeachment?

 7      A.    Which argument?

 8      Q.    Skip that.  Let's skip past the '90s

 9  and let's talk about 2010 onwards.

10            Is that fair?

11      A.    Okay.

12      Q.    When is the first time that you can

13  recall Alan appearing on CNN to share his legal

14  argument about the type of conduct that can be

15  impeachable?

16            MS. BOLGER:  Objection to the form.

17      A.    I don't remember if his argument was --

18  we had him on after he wrote the book.

19      Q.    What is your understanding of the

20  argument he was making in the book?

21            MS. BOLGER:  Objection to the form,

22  asked and answered; you can answer again.

23      A.    I don't remember the specific details

24  he went into, but I think in the book he largely

25  argued that impeachment required a statutory
```

```
 1                      JOHN BERMAN
 2   crime.
 3        Q.    Is that the last version of his
 4   argument, in your opinion, which has changed over
 5   time?
 6        A.    No.
 7        Q.    Bring me up-to-date.  Are there any
 8   other arguments that he has made that are
 9   different from the ones you previously
10   described --
11             MS. BOLGER:  Objection to the form of
12   the question.
13        Q.    In your opinion?
14        A.    Yes.
15        Q.    What are they?
16        A.    When he was serving as defense for
17   President Donald Trump in his first impeachment
18   trial he talked about crimes or crime-like
19   activities.
20        Q.    Any other arguments that you're
21   thinking of?
22             MS. BOLGER:  Objection to the form.  If
23   you don't understand the question --
24        A.    Yeah --
25             MR. SCHWEIKERT:  Stop instructing the
```

```
 1                        JOHN BERMAN

 2     witness.  Kate, I put on the record at an outset

 3     if he doesn't understand a question he can tell

 4     me.  I don't need you to remind him, which could

 5     be construed as an attempt to coach the witness.

 6               MS. BOLGER:  I objected to that

 7     instruction at the beginning of this deposition.

 8               MR. SCHWEIKERT:  I object to your

 9     repeated attempts to coach the witness on how to

10     answer my questions, and I again ask you to comply

11     with Rule 30 to state your argument in a

12     non-suggestive manner to the form of the question

13     or to assert a privilege if you think it applies.

14     Anything else beyond that will be the subject of

15     an appropriate motion.

16               MS. BOLGER:  John, if you don't

17     understand the question you do not have to answer

18     it, you should ask for clarification.

19          A.    Can you repeat the question please?

20          Q.    We're talking about how you believe

21     Alan Dershowitz's arguments have evolved over

22     time, correct?

23          A.    I didn't say that they "evolved."

24          Q.    Changed.

25          A.    I didn't say that; I said that he made
```

```
 1                    JOHN BERMAN
 2   different arguments at different times.
 3        Q.    I just to make sure I understand what
 4   you believe those different arguments are; you've
 5   described some, are there any others?
 6        A.    Others that what?  Other arguments to
 7   what effect?
 8        Q.    What we're talking about today, sir,
 9   what is the subject of this deposition.
10        A.    Which is?
11        Q.    The argument he made regarding
12   impeachable conduct by a president of the United
13   States?
14        A.    Which argument?
15        Q.    I am asking you.
16              MS. BOLGER:  I object to the form.
17   It's clear you guys are talking past each other.
18   Why don't you just ask him a question?
19        Q.    Do you recall Mr. Dershowitz appearing
20   on your broadcast on or about January 20, 2020?
21        A.    Yes, I believe he appeared on the
22   broadcast around that time.
23        Q.    I am going to play a video clip, it's
24   available on YouTube, it is dated January 20, 2020
25   entitled "Dershowitz in 1998, doesn't have to be
```

```
 1                      JOHN BERMAN
 2  crime to impeach," and I am going to begin playing
 3  at the four minute and 52 second mark, okay?
 4            MS. BOLGER:  Objection, the witness
 5  can't see it, and I don't know what YouTube
 6  channel it is, so let me know because you're
 7  asking him questions.
 8            MR. SCHWEIKERT:  It is the CNN's
 9  YouTube channel.
10       Q.    Listen to the argument -- excuse me,
11  the broadcast.
12            (Video played.)
13       Q.    Did you have a chance to watch that
14  excerpt from the broadcast?
15            MS. BOLGER:  I object.  If the witness
16  wants to watch the full broadcast he would be
17  entitled to do so, but obviously he can answer
18  questions.
19       A.    Can you ask the question?
20       Q.    Do you recall that broadcast?
21       A.    I saw it right now.  I recall having
22  him on, I don't recall that specific broadcast.
23       Q.    But it is fair to say that as of
24  January 20, 2020 you understood that Alan's
25  argument about the type of conduct that was
```

```
 1                          JOHN BERMAN
 2   required in order to impeach the president was
 3   unlawful or illegal criminal conduct, right?
 4       A.    What I said there was that the argument
 5   he was making, just prior to that broadcast, was
 6   that he was arguing that impeachment required a
 7   statutory crime, and that he had argued something
 8   different before.
 9       Q.    And, in fact, that argument that
10   impeachment requiring a crime or criminal-like
11   behavior is the very argument he made on the floor
12   of Congress during Trump's first impeachment,
13   right?
14            MS. BOLGER:  Objection to the form.
15       A.    That argument requiring a crime is
16   different than criminal-like, I believe.  I think
17   there is a difference between crime and
18   criminal-like.  I'm not sure I fully understand
19   what criminal-like means.
20       Q.    Then let's just focus on crime.  It's
21   fair to say that Alan's argument on the floor of
22   Congress during Trump's first impeachment was that
23   in order to impeach a president there needed to be
24   criminal conduct --
25            MS. BOLGER:  Objection to the form.
```

```
 1                    JOHN BERMAN
 2      Q.    Correct?
 3      A.    I think he also said criminal-like in
 4   the impeachment trial.
 5             MR. SCHWEIKERT:  I am going to give you
 6   a document I am marking Plaintiff's Exhibit 5, and
 7   a copy for your Counsel.
 8             (Plaintiff's Exhibit No. 5 was
 9          marked for identification.)
10      Q.    I will represent that Plaintiff's
11   Exhibit 5 is a printout of the Congressional
12   Record from January 29, 2020.  It's very long, I
13   am only going to be focusing on page number 50
14   when Mr. Alan Dershowitz responds to the Chief
15   Justice's question submitted by Ted Cruz.
16             MS. BOLGER:  I have a question related
17   to this exhibit.  You were talking about
18   Mr. Dershowitz's argument.  As I understand it,
19   Mr. Dershowitz appeared twice before the Senate.
20   I don't think they are both in this transcript.
21   If you are talking about both can you please just
22   have some clarity in the question?
23      Q.    I will direct your attention to the
24   question and answer that I just described --
25             MS. BOLGER:  Objection to the form.
```

```
 1                    JOHN BERMAN
 2   That is my confusion.
 3               MR. SCHWEIKERT:  I know you are
 4   confused, you have been confused all day because
 5   you want the witness to express confusion to
 6   obstruct my examination --
 7               MS. BOLGER:  I am entitled to know --
 8               MR. SCHWEIKERT:  You are entitled to
 9   form and privilege, Kate, and please stop --
10               MS. BOLGER:  I am entitled to ask you
11   questions --
12               MR. SCHWEIKERT:  No, you're not.  I'm
13   entitled to ask the witness, you're entitled to
14   object, so please --
15               MS. BOLGER:  Then for the record, this
16   is not a record of Mr. Dershowitz's argument, it
17   is a record of Mr. Dershowitz's answer to the
18   question.  All I am asking is to make it clear
19   when you talk to the witness about this.
20        Q.   I have provided you with a transcript
21   from the Congressional Record during the Q & A
22   portion following argument by both sides during
23   Trump's impeachment trial.
24               Have you had a chance to review the
25   Q & A that I described?
```

```
                            JOHN BERMAN
 1

 2        A.    This Q & A yes, I don't have page

 3   numbers here.  Can you read me the part where it

 4   begins just to verify that we're looking at the

 5   same thing?

 6        Q.    At the bottom the Chief Justice says

 7   quote, "the question is addressed to counsel for

 8   the president:  As a matter of law, does it matter

 9   if there was a quid pro quo?  Is it true that quid

10   pro quos are often used in foreign policy," end

11   quote.

12              Do you see that?

13        A.    Yes, we are in the same place.

14        Q.    And Mr. Dershowitz's statements in

15   response to that question are laid out in the

16   transcript, right?

17        A.    Yes.

18        Q.    Have you had a chance to read

19   Mr. Dershowitz's answer to that question?

20        A.    Yes, I have.

21              MS. BOLGER:  But not here.

22        A.    But not here right now, no.

23              MR. SCHWEIKERT:  Would you stop telling

24   the witness how to testify?

25              MS. BOLGER:  I'm not, I was trying to
```

```
 1                  JOHN BERMAN
 2   clarify the record.  I don't think you gave him
 3   time --
 4             MR. SCHWEIKERT:  He answered my
 5   question under oath and you are trying to modify
 6   his sworn testimony.  That is entirely improper
 7   and sanctionable, and it has to be like the
 8   twentieth time you have done it today, and I am
 9   happy to address it with the magistrate when we
10   talk to him in an hour-and-a-half.
11        Q.   You were telling me earlier that you
12   were confused about my reference to crime-like or
13   crime-type behavior --
14        A.   Mm-hmm.
15             MS. BOLGER:  Objection to the form.
16        Q.   Is that a "yes"?  You said "mm-hmm."
17        A.   No -- it was a yes here, I am not sure
18   I agree with what you were saying I said before;
19   not in this section, he doesn't talk about crime
20   or crime-like.
21        Q.   I was referencing our prior Q & A.
22        A.   Yes, you were referencing our prior
23   Q & A.
24        Q.   Do you believe that Mr. Dershowitz's
25   answer to the Chief Justice's question was
```

```
 1                    JOHN BERMAN

 2    ambiguous in any way?

 3               MS. BOLGER:  Objection to the form.

 4        A.    This answer?

 5        Q.    Yes.

 6        A.    Ambiguous how?

 7        Q.    I'm asking you, sir.

 8        A.    What do you mean by "ambiguous"?

 9        Q.    What does it mean to you?

10               MS. BOLGER:  Objection to the form.

11        A.    Confusing or unclear.

12        Q.    Did you believe that Mr. Dershowitz's

13    answer to the Chief Justice's question, that is

14    reflected in the Congressional Record that we have

15    marked as Plaintiff's Exhibit 5, was confusing or

16    unclear in any way?

17        A.    Yes.

18        Q.    Yet, you went on the air and told your

19    audience that Mr. Dershowitz was not ambiguous,

20    didn't you?

21        A.    I said he was not ambiguous?

22        Q.    Do you recall stating on the air that

23    Mr. Dershowitz's answer to the Chief Justice's

24    question quote "blows your mind," end quote?

25        A.    I don't remember if I used that exact
```

```
 1                      JOHN BERMAN
 2   language.
 3        Q.    But you did prepare for this
 4   deposition, right?
 5        A.    I prepared for this deposition.
 6        Q.    And you understood that one of
 7   Mr. Dershowitz's claims is the remarks you made on
 8   air on January 29th, 2020 mischaracterized his
 9   answer to the Chief Justice's question, right?
10             MS. BOLGER:  Objection to the form.
11        A.    Yes.
12        Q.    But you didn't review the transcript of
13   that broadcast or watch the video in whole or in
14   part of that broadcast?
15             MS. BOLGER:  Objection to the form.  I
16   think that calls for privilege information.  If
17   you can answer without talking about
18   communications with me you can answer, but
19   otherwise don't answer.
20        A.    I reviewed the broadcast.
21        Q.    The video?
22        A.    Yes.
23        Q.    But you don't recall stating that
24   Mr. Dershowitz's answer quote, "blows your mind,"
25   end quote?
```

```
 1                    JOHN BERMAN
 2        A.    I don't specifically recall that
 3   language.
 4        Q.    I am going to show you an excerpt of
 5   that broadcast.
 6              (Video played.)
 7        Q.    Do you recall that excerpt from the
 8   broadcast of your program on January 29, 2020?
 9        A.    I just saw the excerpt.
10        Q.    That was you saying that
11   Mr. Dershowitz's argument "blows your mind,"
12   right?
13        A.    That was me saying it, yes.
14        Q.    You also characterized his argument as
15   being that the president "can do anything --
16   anything -- and never be impeached," right?
17        A.     If he's running for re-election and if
18   what he is doing is in the interest of his
19   re-election.
20        Q.    I didn't hear you explain that.  Is
21   that what you said in the broadcast we just
22   listened to?
23        A.    You will have to replay it.
24              MR. SCHWEIKERT:  Why don't we look at
25   the transcript, Plaintiff's Exhibit 6.
```

```
 1                    JOHN BERMAN
 2            (Plaintiff's Exhibit No. 6 was
 3         marked for identification.)
 4      A.    I have it.
 5      Q.    Take a moment and review Plaintiff's
 6 Exhibit 6 and let me know if you have seen it
 7 before.
 8            (Complying.)
 9      A.    Yes.
10      Q.    Is Plaintiff's Exhibit 6 a transcript
11 of your broadcast on the morning of January 30,
12 2020?
13            MS. BOLGER:  A portion of the
14 broadcast, right.
15      A.    Yes, yes.
16      Q.    This transcript contains an excerpt of
17 the video we just watched, right?
18      A.    Yes.
19      Q.    You see on page 9 of the exhibit your
20 first comment quote, "and Josh, if you look at
21 what he says there, it blows your mind.  He says
22 if a president is running for re-election because
23 he thinks getting elected will help America he can
24 do anything, anything.  And that redefines the
25 presidency and, frankly redefines America," end
```

```
  1                    JOHN BERMAN
  2    quote.
  3            Right?
  4       A.    Yes.
  5       Q.    If we move to page 10 of the
  6    transcript, do you see your next -- do you see
  7    your comment on page 10, your first comment?
  8            MS. BOLGER:  Objection to the form.
  9       A.    Just read it to me so we make sure
 10    we're looking at the same comment.
 11       Q.    You say in part quote, "you say
 12    Watergate would be allowed under this framework.
 13    Watergate's chump change under this framework,
 14    right," end quote.
 15       A.    That's what I say, yes.
 16       Q.    You were representing that according to
 17    Alan Dershowitz President Nixon could not have
 18    been impeached for Watergate, right?
 19            MS. BOLGER:  Objection to the form.
 20       A.    It says, "you say Watergate would be
 21    allowed under this framework."  So I was
 22    responding to a previous guest who had talked
 23    about Richard Nixon.
 24       Q.    Then you say quote, "you can do
 25    anything under this framework.  And Dershowitz
```

```
 1                     JOHN BERMAN

 2    wasn't ambiguous here," end quote.

 3         A.    Yes.

 4         Q.    So according to you on January 30th

 5    when you were participating in this broadcast

 6    there was no ambiguity in Mr. Dershowitz's answer

 7    to the Chief Justice's question, right?

 8         A.    There was no ambiguity in the part

 9    where he was saying that if you are running for

10    re-election and you think your re-election is in

11    the self-interest it is not impeachable.

12         Q.    But that is only an excerpt of the

13    entire answer that he gave to the Chief Justice's

14    question, right?

15         A.    It is something he said twice, it is

16    not an excerpt, it is something he said twice

17    within that answer.

18         Q.    And you believe that is an accurate

19    characterization of his answer to the Chief

20    Justice's question?

21         A.    Yes, I believe that then and I believe

22    that now; yes.

23         Q.    Even though on January 20th you had

24    stated during your broadcast that Alan

25    Dershowitz's position was that a crime or
```

```
 1                        JOHN BERMAN

 2   statutory crime was required to impeach the

 3   president, right?

 4              MS. BOLGER:   Objection to the form.

 5         A.     This was a different argument that he

 6   was making than I heard before.  I had not heard

 7   him make the president running for re-election

 8   argument before.  If a president is running for

 9   re-election and he does something that he thinks

10   is in his self interest than the action cannot --

11   if the president does something running for

12   re-election and he thinks his re-election is the

13   public interest, then the action cannot be

14   impeachable.  That is not an argument I had heard

15   before; I had not heard that argument on January

16   20th.  The first time I believe I had heard that

17   argument was when he made it in the answer to that

18   question at the impeachment trial.

19         Q.     Did you do any research before you went

20   on the air on January 30th, the day after

21   Mr. Dershowitz gave the answer we're discussing to

22   the Chief Justice?

23         A.     The answer was on the 29th, and the

24   broadcast was the 30th?

25         Q.     Yes.
```

```
1                     JOHN BERMAN

2       A.    Research...I watched the hearing and I

3   read reporting on the hearing.

4       Q.    Did you hear Mr. Dershowitz say quote,

5   "the only thing that would make a quid pro quo

6   unlawful was if the quo were in some way illegal,"

7   end quote?

8             MS. BOLGER:  Objection to the form.

9   Please point where that is.

10      Q.    It's the last sentence --

11      A.    Yes, yes, that was part of his answer.

12  I watched the hearing and I watched him say that;

13  yes.

14      Q.    That was an essential part of his

15  answer, wasn't it?

16      A.    He said it as part of an answer to a

17  question about whether quid pro quos happen in

18  foreign policy, and then after he said that he

19  went onto this new argument about running for

20  re-election and actions being in the interest of

21  re-election and believing that those actions were

22  within the public interest, and that was an

23  argument I had not heard before and it seemed

24  disconnected from the previous statement, and

25  frankly, the language that he used before was --
```

```
 1                    JOHN BERMAN

 2   he was talking about a quid pro quo being unlawful

 3   if the quo were in some way illegal.  So I didn't

 4   see how that related to the very next thing.

 5        Q.    Mr. Dershowitz was answering one

 6   question posed to him by the Chief Justice that

 7   had been submitted by Ted Cruz, right?

 8        A.    Mm-hmm.

 9        Q.    Is that a "yes"?

10        A.    Sorry --

11        Q.    Is that a "yes"?

12        A.    Yes.

13        Q.    He was answering just one question,

14   right?

15        A.    Well, it's two questions.

16        Q.    He was answering those two questions

17   that were posed to him by the Chief Justice,

18   right?

19        A.    Yes.

20        Q.    His answer to those two questions is

21   what is set forth in the Congressional Record,

22   right?

23        A.    Yes.

24        Q.    His answer was not just that one

25   sentence that was featured on your show, and that
```

```
 1                       JOHN BERMAN
 2    you used to tell your audience that what
 3    Mr. Dershowitz had said "blows your mind," right?
 4              MS. BOLGER:  Objection to the form.
 5         A.    There was more than one sentence that
 6    we used on the show.
 7         Q.    Right, but you took his argument out of
 8    context, didn't you?
 9         A.    No, he said that twice, sir.
10         Q.    Immediately after he had said "the only
11    thing that would make a quid quo pro unlawful was
12    if the quo were in some way illegal, right?
13         A.    He's talking about quid pro quos there,
14    and then he's talking about actions taken when you
15    are running for re-election, if you think those
16    actions are within the public interest.
17         Q.    He was answering the specific questions
18    posed to him during that proceeding, right?
19              MS. BOLGER:  Objection to the form, you
20    can answer.
21         A.    He was answering two questions posed by
22    the Chief Justice.
23         Q.    If I was to take some of your testimony
24    today, maybe one sentence, and try to use it to
25    characterize you having said something that is not
```

```
 1                      JOHN BERMAN
 2   necessarily accurate when you put it in the
 3   complete context that would not be fair, would it?
 4               MS. BOLGER:  Objection to the form.
 5        A.    He said it more than once.
 6        Q.    That's wasn't my question.  Context is
 7   important, right?
 8               MS. BOLGER:  Objection to the form.
 9        A.    Yes.
10        Q.    How did your viewers have appropriate
11   context to understand Alan's answer to the
12   question when your broadcast only played a single
13   sentence of his very detailed answer to those
14   questions?
15               MS. BOLGER:  Objection to the form.
16        A.    We played more than a single sentence.
17        Q.    But you did just play that single
18   sentence and then follow it up by saying it blows
19   your mind, right?
20               MS. BOLGER:  Objection to the form.
21   The witness just testified they didn't play a
22   single sentence.
23        A.    Repeat the question please.
24        Q.    Should we watch the video clip again?
25        A.    I saw the video clip.
```

```
1                   JOHN BERMAN
2        Q.    The sentence that you broadcast on that
3   day was quote, "if a president does something
4   which he believes will help him get elected in the
5   public interest that cannot be the kind of quid
6   pro quo that results in impeachment," end quote.
7              Right?
8        A.    Yes.
9        Q.    That is one sentence, right?
10       A.    No, because we played more than that.
11       Q.    I am talking about the clip we just
12  watched was one sentence followed by you saying
13  that Mr. Dershowitz's argument was that "a
14  president can do anything -- anything, and never
15  be impeached," right?
16       A.    I think the clip that we played was
17  more than one sentence.  I think it begins with
18  "every public official whom I know believes that
19  his election is in the public interest."
20       Q.    Let's look at the transcript.  Can you
21  show me in the Congressional Record where
22  Mr. Dershowitz said "a president can do anything
23  and never be impeached so long as he believes it's
24  in the public interest"?
25       A.    No, those were not the exact words that
```

```
 1                        JOHN BERMAN
 2   he used.
 3        Q.    He never said that, right?
 4        A.    Those were not the words that he used.
 5        Q.    According to you, his argument wasn't
 6   ambiguous was it?
 7              MS. BOLGER:   Objection to the form.
 8        A.    What was not ambiguous to me and was an
 9   argument I had not heard before was the statement
10   that I want to get re-elected, "I think I am a
11   great president...if I am not elected the national
12   interest will suffer greatly, so the action cannot
13   be impeachable" -- an action cannot be impeachable
14   if I'm doing it to get re-elected.  That was
15   something I had not heard before and he said
16   versions of it twice.
17        Q.    Unless the quid pro quo is in some way
18   illegal, right?
19        A.    He didn't say that when he was making
20   those two statements, he didn't qualify that
21   exactly; that's not how I heard it when he said it
22   out loud.
23        Q.    You took out of context one sentence to
24   drive viewership, to drive ratings for your
25   company and your personal financial benefit,
```

```
 1              JOHN BERMAN
 2   right?
 3              MS. BOLGER:  Objection to the form.
 4        A.    No.
 5        Q.    No?  Then why didn't you present the
 6   full context of his argument on that day?
 7        A.    I feel I presented the full context of
 8   the argument that he was making, which was a novel
 9   argument as far as I was aware.  I had not heard
10   it before that if you believe your action is in
11   the public interest, and I am trying to get
12   re-elected in your view in the public interest,
13   then the action cannot be impeachable.  That was
14   the context, I had not heard that argument before,
15   he said it twice.  And I believed then, and I
16   believe now, that we presented that in an accurate
17   way.
18        Q.    You believe that despite the fact that
19   your broadcast did not include Mr. Dershowitz's
20   premise that the only thing that would make a quid
21   pro quo unlawful is if the quo were in some way
22   illegal?
23              MS. BOLGER:  Objection to the form of
24   the question.
25        A.    Repeat the question please.
```

```
 1                    JOHN BERMAN
 2      Q.    You believed that Mr. Dershowitz was
 3 arguing that a president could do anything so long
 4 as he thought it was in the public interest and
 5 never be impeached, even though Mr. Dershowitz had
 6 preceded that statement by saying quote "the only
 7 thing that would make a quid pro quo unlawful is
 8 if the quo were in some way illegal," end quote.
 9           Right?
10           MS. BOLGER:  Objection to the form.
11      A.    He said -- again, there are two times
12 he talks about running for re-election here and
13 his election being in the public interest.  The
14 second time he says it he talks about the word
15 "impeachable."  He said "it cannot be impeachable.
16 I think I am a great president, I think I am the
17 greatest president there ever was and if I am not
18 elected the national interest will suffer greatly,
19 that cannot be impeachable."  That action cannot
20 be impeachable.
21           He's talking about actions that the
22 president takes.  It did not -- it seemed to me
23 that he was establishing a new, expansive view of
24 when a president running for re-election or what
25 they can do and have it not be impeachable.
```

1                       JOHN BERMAN

2        Q.    Right.  According to you quote "this

3   means a president can do anything," end quote.

4              Right?

5        A.    That's what I said.

6              MS. BOLGER:  That's out of context.

7        Q.    Oh, context is important, isn't it?

8        A.    Context is important.

9        Q.    You did not provide your audience on

10  January 30th with the full context of

11  Mr. Dershowitz's argument or answer in response to

12  the Chief Justice's question, did you?

13       A.    We played two separate clips of him

14  talking about an expansive view of what a

15  president can do when running for re-election.  It

16  was not clear to me what the limitations were that

17  he was placing on that; it was very expansive.  He

18  said if I am doing it to get re-elected and I

19  think getting re-elected is in the public

20  interest, it cannot be impeachable.

21       Q.    But sir, if we look at the transcript

22  of your broadcast it was clear to you, you

23  literally say quote "you can do anything under

24  this framework and Dershowitz wasn't ambiguous

25  here," end quote.

```
 1                    JOHN BERMAN
 2            Those are your words, right?
 3       A.    He was unambiguous in that when you
 4   were running for re-election committing acts --
 5   yes, he was unambiguous in if you believe your
 6   actions are in -- if you believe that getting
 7   re-elected is in the public interest your actions
 8   cannot be impeachable.
 9       Q.    So you understood Mr. Dershowitz to be
10   arguing that a president could commit genocide,
11   and so long as he thought it was in the public
12   interest, he could never be impeached.
13            Is that right?
14            MS. BOLGER:   Objection to the form of
15   the question; hypothetical.
16       A.    I was not arguing he could commit
17   genocide.
18       Q.    You were arguing that the president
19   could do anything and never be impeached, weren't
20   you?
21       A.    I was reporting that my view of what
22   Alan Dershowitz was saying in this argument was
23   that if a candidate believes his re-election is in
24   the public interest -- and Professor Dershowitz
25   said all candidates believe that -- then what he
```

SEED 

```
 1                    JOHN BERMAN
 2   does cannot be impeachable.  The broader context
 3   of this, again, you talked about that, is that
 4   there was not a crime alleged in this impeachment
 5   trial.
 6                MR. SCHWEIKERT:  I will give you
 7   another document I will mark as Exhibit 7.
 8                (Plaintiff's Exhibit No. 7 was
 9            marked for identification.)
10        Q.    A copy to your Counsel.  Take a moment
11   and review Plaintiff's Exhibit 7, and let me know
12   if you have seen it before.
13        A.    I reviewed it.
14        Q.    What is it?
15        A.    This is what we call a guest file to
16   prepare for a segment on New Day.
17        Q.    What is the purpose of a guest file in
18   general?
19        A.    To prepare for those segments with
20   those specific guests.
21        Q.    Who prepares them?
22        A.    Segment producers.
23        Q.    Who was the segment producer for your
24   January 30, 2020 broadcast we have been
25   discussing?
```

```
 1              JOHN BERMAN

 2         MS. BOLGER:  Objection to the form.

 3    A.    I don't know.

 4    Q.    Did you have more than one segment

 5 producer in January 2020?

 6    A.    Yes, there are several segment

 7 producers.

 8    Q.    Any of the people on this e-mail your

 9 segment producers for that day's broadcast?

10    A.    I don't know want to assume anything --

11         MS. BOLGER:  Don't.

12    A.    I don't know want to assume anything,

13 so I don't know.

14    Q.    You don't know who your segment

15 producers were in January of 2020?

16         MS. BOLGER:  Objection to the form.

17    A.    Some of the people on this e-mail list

18 are segment producers.

19    Q.    Which people?

20    A.    Russ Finkelstein is a segment producer.

21    Q.    Anyone else?

22    A.    Aparnaa is a segment producer and Anna

23 Kaminsky is a segment producer.

24    Q.    Anyone else?

25    A.    I don't know for sure.
```

```
 1                    JOHN BERMAN
 2        Q.    You see that this e-mail was sent on
 3   January 30th at 12:38 a.m.?
 4        A.    Yes.
 5        Q.    It was a little after midnight, right?
 6        A.    Yes.
 7        Q.    Did you review this e-mail before going
 8   on air?
 9        A.    Yes -- let me rephrase that.  I review
10   the e-mails about the segments before I go on air.
11   I don't remember reviewing this.
12        Q.    One of your guests during the broadcast
13   was Joshua Geltzer, right?
14        A.    Yes.
15        Q.    Who is he?
16        A.    Well, it says here he is a professor at
17   Georgetown Law and a senior director for
18   counterterrorism -- former -- at the National
19   Security Council.
20        Q.    If we look down the page into the body
21   of the e-mail there is a heading "guest POV Joshua
22   Geltzer."
23              Do you see that?
24        A.    Yes.
25        Q.    Does POV mean "point of view"?
```

```
1                    JOHN BERMAN

2        A.    Yes.

3        Q.    Below that it says "on the arguments

4   being made in the Senate."

5              Do you see that?

6        A.    Yes.

7        Q.    The e-mail goes on to state quote,

8   "Dershowitz appears to think virtually nothing is

9   is impeachable," end quote.

10             Do you see that?

11       A.    Yes.

12       Q.    Was that Joshua Geltzer's point of

13   view?

14       A.    This e-mail would indicate that.

15       Q.    And Mr. Geltzer did not think that

16   Dershowitz had suggested that a president could do

17   anything and never be impeached for it, so long as

18   he thought it was in the public interest, right?

19             MS. BOLGER:   Objection to the form.

20   How could he know that?

21       A.    I don't know what Geltzer thought.

22       Q.    He says right here, "virtually

23   nothing."  "Virtually" is a qualification, right?

24       A.    Okay.

25       Q.    Do you agree with me?
```

```
 1                    JOHN BERMAN
 2       A.    Yes.
 3       Q.    Geltzer was not providing the point of
 4  view that nothing is impeachable, was he?
 5             MS. BOLGER:  Objection to the form.
 6       A.    Geltzer says "appears to think
 7  virtually nothing is impeachable."
 8       Q.    That was one of your guest's point of
 9  view, right?
10             MS. BOLGER:  Objection to the form.
11       A.    That was Geltzer's point of view.  He
12  also said "no one has ever seriously argued that
13  abusing public office for private political
14  benefit is somehow acceptable."
15             Again, that's what I was saying, I took
16  it when I saw it at the time I thought that
17  Professor Dershowitz was making an argument I had
18  not seen before, which is that if you were running
19  for re-election and you believe your re-election
20  is in the public interest then the actions you
21  take are not and could not be impeachable.  That I
22  took as a novel argument, and that's what Geltzer
23  seems to be suggesting as well.
24       Q.    Isn't it true that Mr. Dershowitz was
25  answering a question about whether a quid pro quo
```

```
 1                    JOHN BERMAN
 2   by a president with the head of a foreign
 3   government, such as Ukraine, could ever be
 4   impeachable?
 5           MS. BOLGER:  Objection to the form.
 6       A.    The question was "As a matter of law,
 7   does it matter if there was a quid pro quo?  Is it
 8   true that quid pro quos are often used in foreign
 9   policy?"  That was the question.
10       Q.    And Mr. Dershowitz responded by saying
11   "the only thing that would make a quid pro quo
12   unlawful is if the quo were in some way illegal,"
13   right?
14       A.    He says that, but then goes on to
15   say -- goes on to talk about what a president
16   running for re-election can do; the actions that a
17   president running for re-election can take, which
18   was an argument that I had not heard before and it
19   was my opinion at the time, and it is my opinion
20   now, was an expansion of an argument about what is
21   not impeachable.
22       Q.    But Mr. Dershowitz was specifically
23   answering a question about quid pro quo, right?
24           MS. BOLGER:  Objection to the form,
25   asked and answered.  You can answer it again.
```

```
 1                    JOHN BERMAN
 2        A.    The question was "As a matter of law,
 3   does it matter if there was a quid pro quo?  Is it
 4   true that quid pro quos are often used in foreign
 5   policy?"
 6             That was the question he asked, but the
 7   answer he gave -- it seemed to me at the time as I
 8   was looking at it, as I was watching it --
 9   expanded beyond that and he seemed to double down
10   on that answer that I found was novel at the end
11   of his answer. "I want to be elected.  I think I
12   am a great president.  I think I am the greatest
13   president there ever was, and if I am not elected,
14   the national interest will suffer greatly; that
15   cannot be impeachable," was an argument I had not
16   heard before.
17        Q.    Because that conduct would not be
18   unlawful, right?
19             MS. BOLGER:  Objection to the form.
20        A.    I don't know that.
21        Q.    If you look at the entire answer you
22   can see he's answering a question about quid pro
23   quos being impeachable, right?
24             MS. BOLGER:  Objection to the form.
25        A.    He's not asked that question, sir.
```

```
1                        JOHN BERMAN
2    He's asking "As a matter of law, does it matter if
3    there was a quid pro quo?  Is it true that quid
4    pro quos are often used in foreign policy?"
5               The second question is "Is it true that
6    quid pro quos are often used in foreign policy?"
7    does not refer to impeachment at all, nor does the
8    first part of the question.  It says "As a matter
9    of law, does it matter if there was a quid pro
10   quo?"  That doesn't refer to impeachment.
11        Q.    Even though the impeachment proceeding
12   in which Mr. Dershowitz was answering questions
13   from the senators was with respect to, in part,
14   whether then President Trump could be impeached
15   for allegedly engaging in a quid pro quo, right?
16               MS. BOLGER:  Objection to the form.
17        A.    What's the question, sir?
18        Q.    That's what the impeachment was about,
19   quid pro quos, right?
20        A.    The impeachment was about whether
21   Donald Trump abused his power.
22        Q.    By doing what allegedly?
23        A.    By pressuring President Zelensky to
24   investigate the Biden family.
25        Q.    Which was characterized as a quote,
```

```
 1                    JOHN BERMAN

 2   "quid pro quo," right?

 3        A.   It was characterized by some -- part of

 4   it was characterized by some as a quid pro quo,

 5   that was not the entire basis from my memory, and

 6   I haven't read the articles of impeachment, but my

 7   memory that was not the only part of it.

 8        Q.   And yet it's your position that

 9   Mr. Dershowitz presented an argument during the

10   Q & A that a president could do anything he wanted

11   so long as he thought it was in the public

12   interest he could never be impeached.

13             That is much broader than a quid pro

14   quo, right?

15             MS. BOLGER:  Objection to the form.

16        A.   What I heard him make as an argument

17   twice within this answer was that a president,

18   when running for re-election, if he believes that

19   the re-election is in the public interest, the

20   actions that candidate takes cannot be

21   impeachable.

22        Q.   Regardless of whether there is an

23   alleged quid pro quo, is that your position?

24             MS. BOLGER:  Objection to the form,

25   asked and answered a bunch of times.
```

```
 1                     JOHN BERMAN
 2      A.     What was the question with the quid pro
 3   quo?
 4      Q.     Mr. Dershowitz was specifically asked
 5   about quid pro quos.  He was answering questions
 6   about quid pro quos and yet the narrative that you
 7   presented to your viewers was much broader than
 8   just quid pro quos, wasn't it?
 9           MS. BOLGER:  Objection to the form, you
10   can answer.
11      A.     He was asked two questions, he was
12   asked whether quid pro quos are normal in foreign
13   policy or often used in foreign policy, and then
14   he was asked "As a matter of law, does it matter
15   if there was a quid pro quo?"  Those were the two
16   questions he was asked.  The answer I believed to
17   be novel seemed to go far beyond the issues of
18   quid pro quos.  He was talking about actions that
19   a president takes when running for re-election.
20      Q.     Are you aware that the court has found
21   that CNN's coverage of Mr. Dershowitz's answer was
22   not a fair and accurate report of what had
23   occurred?
24           MS. BOLGER:  I am going to object, I
25   think you're misstating the court's opinion.  You
```

```
 1                     JOHN BERMAN
 2  can answer the question.
 3       A.    I have not read the judge's opinion.
 4       Q.    Can you point to me anywhere in the
 5  transcript where you informed your viewers about
 6  how you were thinking that Alan was confused and
 7  making a new argument?
 8             MS. BOLGER:  Objection to the form of
 9  the question.  Actually, I don't understand the
10  question.
11       A.    Can you repeat the question?
12       Q.    I will withdraw it.
13             On that day, did you have an ear piece
14  in your ear?
15       A.    Yes.
16       Q.    Who has the ability to communicate to
17  you through that ear piece?
18       A.    There are producers in the control
19  room, and the director in the control room.
20       Q.    Do you recall who the producers and the
21  director in the control room were on that day?
22       A.    I don't remember who the director was,
23  the producers in the control room would have
24  been -- well, Izzy Povich, who was the senior
25  producer, and then Javi Morgado who was the
```

```
 1                      JOHN BERMAN
 2   executive producer of the show.
 3        Q.    Do you recall if anyone provided you
 4   with any particular statement to make on the air
 5   that day?
 6              MS. BOLGER:  Objection to the form of
 7   the question.
 8        A.    One more time?
 9        Q.    Let me back up, I will withdraw that.
10              Was there a teleprompter in front of
11   you on that day?
12        A.    Yes.
13        Q.    Did you stick to the words that were
14   just on the teleprompter or did you say other
15   things that were not on the teleprompter?
16        A.    When?
17        Q.    During the broadcast.
18        A.    The whole broadcast?
19        Q.    Yes.
20        A.    During the whole broadcast I sometimes
21   read off the teleprompter, I sometimes veer off
22   the teleprompter.
23        Q.    What about your statement that quote,
24   "you can do anything under this framework and
25   Dershowitz wasn't ambiguous here," end quote.
```

```
 1                    JOHN BERMAN

 2          Do you recall if that was on the

 3   teleprompter?

 4     A.    My questions are not, the questions I

 5   ask when I am engaging with guests are largely not

 6   on teleprompter.

 7     Q.    I am asking about these two statements,

 8   sir; they end with periods.  They are not

 9   questions.

10     A.    Are they not?  Which?

11     Q.    Page 10 of Exhibit 6.

12     A.    That is part of a question, that's part

13   of a back and forth with a guest, that would not

14   be on prompter.

15     Q.    How was the content for this particular

16   broadcast prepared in general?  Was there a

17   meeting beforehand?  I am trying to understand the

18   logistics.

19          MS. BOLGER:  Objection to the form.

20     A.    Starting at what point?

21     Q.    Well, this alleged breaking news didn't

22   come into existence until after Mr. Dershowitz

23   made his statements in response to the Chief

24   Justice's question, right?

25     A.    We have a 5:30 p.m. conference call, we
```

```
                          JOHN BERMAN
```

1

2    have a 4:30 a.m. conference call, and then I spend

3    tons of time in between and around then reading,

4    writing and preparing for my segments.

5          Q.    Who was on that conference call?

6          A.    Which one?

7          Q.    The 5:30 p.m.

8          A.    It's the New Day staff.

9          Q.    What is -- do you recall the general

10   purpose of that call?

11              MS. BOLGER:  Objection to the form.

12         A.    The 5:30 conference call is a daily

13   conference call to talk about the broad plan for

14   the next day.

15         Q.    Was it planned that you were going to

16   tell your viewers that Mr. Dershowitz had said

17   things that "blows your mind"?

18              MS. BOLGER:  Objection to the form.

19         A.    I don't remember if it was planned.  I

20   remember if it was 5:30 and the statement that he

21   made was earlier I was of the view -- it blew my

22   mind as I watched it earlier, so my mind would

23   have been blown by 5:30 p.m.

24              MR. SCHWEIKERT:  Let's take a break.

25              THE VIDEOGRAPHER:  The time is

```
 1                    JOHN BERMAN

 2   1:52 p.m.  We are going off the record.

 3            (Recess.)

 4            THE VIDEOGRAPHER:  We are back on the

 5   record, the time is 2:07 p.m.

 6       Q.    You said before we broke for the break

 7   that Alan Dershowitz had argued that so long as

 8   the president does something he thinks is in the

 9   public interest he can never be impeached.

10            Right?

11            MS. BOLGER:  Objection to the form of

12   the question.

13       A.    What I was reporting on was Professor

14   Dershowitz's argument that he made in response to

15   the question here that "if a president is running

16   for re-election and he believes that re-election

17   is in the public interest then the action he takes

18   in the process of that re-election, the action

19   cannot be impeachable."

20       Q.    And you were looking at the

21   Congressional Record that has been marked as an

22   exhibit, right?

23       A.    Those were the arguments that he made

24   when I watched the hearing then, and --

25       Q.    I am talking about before the break,
```

```
 1                     JOHN BERMAN
 2   you were directing me --
 3               MS. BOLGER:  You were interrupting
 4   the --
 5        Q.    -- to where in the transcript there
 6   was alleged support for your characterization of
 7   Alan's argument.
 8               Do you remember that?
 9               MS. BOLGER:  Objection to the form of
10   the question.
11        A.    I don't specifically remember that.
12        Q.    You referred to the sentence shown here
13   in the Congressional Record that reads quote, "If
14   a president does something which he believes will
15   help him get elected - in the public interest -
16   that cannot be the kind of quid pro quo that
17   results in impeachment," end quote.
18               Do you see that?
19        A.    Yes.
20        Q.    You referenced that yet you omitted the
21   phrase "quid pro quo," didn't you?
22               MS. BOLGER:  Objection to the form --
23        A.    Oh, I don't remember if I omitted quid
24   pro quo.  He said it here, and then he talks about
25   actions in the public interest again later.  He
```

```
 1                      JOHN BERMAN
 2   said versions of this twice, and we played both of
 3   them over the course of the broadcast.  He goes on
 4   to say "I want to be elected.  I think I am a
 5   great president.  I think I am the greatest
 6   president there ever was, and if I am not elected,
 7   the national interest will suffer greatly, that
 8   cannot be impeachable."  So again, those were the
 9   two graphs (ph) that I had not heard before and
10   that I was referring to and struck me as new and
11   newsworthy.
12        Q.    Just like on your broadcast, today you
13   are continuing to take Mr. Dershowitz's words out
14   of context to suit your own ends, right?
15             MS. BOLGER:  Objection to the form of
16   the question.
17        A.    What is the question?
18        Q.    You said earlier that Mr. Dershowitz
19   was arguing for this incredibly broad expansive
20   new power.
21             Right?
22             MS. BOLGER:  Objection to the form of
23   the question.  I think he did.
24        A.    I thought then in 2020, and I think now
25   that the case that he made here, which is that
```

1                    JOHN BERMAN

2   when you are running for re-election if you think

3   your re-election is in the public interest then

4   the actions you take cannot be impeachable.  I

5   thought that is a new argument, I still think that

6   is an argument that is newsworthy and strikes me

7   as expansive.

8        Q.    Where does he say "the actions you take

9   cannot be impeachable"?  He doesn't say that in

10  here, does he?

11       A.    He's talking about various scenarios of

12  things that a candidate running for re-election

13  can do.

14       Q.    He's talking about various scenarios of

15  quid pro quos, right?

16       A.    In this answer he's talking -- he's

17  asked about quid pro quos.

18       Q.    Right.  Yet you keep saying he was

19  making some new argument expanding the

20  presidential power beyond anything that you had

21  ever been aware of, right?

22            MS. BOLGER:  Objection to the form of

23  the question.

24       A.    I thought then, and I think now that

25  the way he's making that argument -- because I

```
1                        JOHN BERMAN
2    don't see how there is a distinction, I didn't see
3    then and I don't see now -- that there is a
4    distinction between a type of action in a quid pro
5    quo or a different type of action you're taking
6    when running for re-election.
7         Q.   You don't see a distinction between an
8    alleged abuse of power based on a quid pro quo
9    versus a crime such as robbery.
10             You can't see that distinction?
11             MS. BOLGER:  Objection to the form.
12        A.   I thought then, and I think now that
13   what he was suggesting is if a president running
14   for re-election takes actions -- the president
15   running for re-election wants to get re-elected,
16   he thinks the re-election is in the public
17   interest, then the actions he takes cannot be
18   impeachable.  That's what struck me as a novel
19   argument.  The question was about quid pro quos --
20   it wasn't by the way about whether quid pro quos
21   were impeachable -- but the question was about
22   quid pro quos.
23        Q.   He literally said "that cannot be the
24   kind of quid pro quo that results in impeachment."
25             You see that, right?
```

```
 1                      JOHN BERMAN

 2        A.     In this paragraph he does say that,

 3   yes.

 4        Q.     And you heard that on his broadcast,

 5   right?

 6               MS. BOLGER:  Objection to the form.

 7        Q.     Yes?

 8        A.     Yes.

 9               MS. BOLGER:  No, he didn't hear that on

10   his broadcast.

11        A.     I said -- well, please repeat the

12   question.

13        Q.     The clip -- we can play it again if we

14   need to -- but the clip included the sentence that

15   "if a president does something which he believes

16   will help him get elected - in the public interest

17   - that cannot be the kind of quid pro quo that

18   results in impeachment."

19               Right?

20        A.     That was that one clip, yes.

21        Q.     And you proceeded to argue that

22   Mr. Dershowitz was claiming you could do anything

23   under this framework, didn't you?

24               MS. BOLGER:  Objection to the form of

25   the question.
```

```
 1                        JOHN BERMAN

 2       A.    The case that I made then, and I still

 3  believe this to be true, he was presenting a very

 4  expansive view of what a president can do running

 5  for re-election that cannot be impeached.  That

 6  was the first time I remember then, and I remember

 7  now, someone making the case that if your

 8  re-election is in the public interest you can take

 9  actions that may or may not be impeachable.

10       Q.    But that is not what he said, the clip

11  that you aired in part literally said "that cannot

12  be the kind of quid pro quo that results in

13  impeachment."  That's very different than any

14  action he wants to take, right?

15            MS. BOLGER:  Objection to the form of

16  the question, asked and answered.

17       A.    My view then, and my view now is he was

18  taking an expansive view, one I had not heard

19  before about the actions that a president running

20  for re-election can take and whether or not they

21  are impeachable.  They are something I had not

22  heard before that struck me as a very new and

23  newsworthy argument that was expansive.

24       Q.    This wasn't a new argument, this was a

25  supplement to what he had presented previously
```

```
 1                    JOHN BERMAN
 2   during the impeachment proceeding, right?
 3             MS. BOLGER:  Objection to the form of
 4   the question.
 5        A.    I don't remember having heard the
 6   argument before, that when a president is running
 7   for re-election, and he thinks the re-election is
 8   in the public interest that he can take actions --
 9   whatever those actions are -- I had not heard that
10   before, and I found that to be very newsworthy,
11   and it seemed very expansive and it seems
12   expansive to me now.
13        Q.    You said quote, "to take actions" end
14   quote, yet the transcript in the Congressional
15   Record is limited to quid pro quos, isn't it?
16             MS. BOLGER:  Objection to the form.
17   Where are we?  I am lost.  Where are you pointing
18   to?
19        Q.    Do you see that?
20        A.    Yes.
21             MS. BOLGER:  I do not.  Where are we,
22   what are you looking at?  Can you explain --
23             MR. SCHWEIKERT:  The third paragraph in
24   the right-hand column --
25             MS. BOLGER:  Of the Congressional
```

```
 1                    JOHN BERMAN
 2    Record?
 3               MR. SCHWEIKERT:  Yes.
 4               MS. BOLGER:  Sorry, you just referenced
 5    the transcript.  I got you.
 6         Q.    How is your characterization that a
 7    president "can take any action" accurate and
 8    honest, consistent with the code of ethics we've
 9    talked about when Alan, in fact, was very precise
10    that he was talking about quid pro quos?
11               MS. BOLGER:  Objection to the form of
12    the question, you can answer.
13         A.    I felt then what I was watching -- it
14    was my opinion when I was watching then, and it's
15    my opinion now that he was offering an expansive
16    view for what a president running for re-election
17    can do, and a quid pro quo is an action; it is an
18    action.  And I don't know that the phrase "quid
19    pro quo" in any way limits the type of action that
20    could take; so I did not then, and I do not now
21    see that phrase as limiting.
22         Q.    A quid pro quo is an action, but it is
23    not any action.  Those are two different concepts,
24    aren't they?
25               MS. BOLGER:  Objection to the form of
```

```
 1                    JOHN BERMAN

 2   the question.

 3        A.    I don't know that that is the case --

 4   the answer to your question is no, because the

 5   quid pro quo are two actions.

 6        Q.    It is a type of agreement, right, "this

 7   for that" essentially?

 8        A.    Yes.

 9        Q.    And an allegedly illegal agreement in

10   the context of this proceeding.

11             MS. BOLGER:  Objection to the form of

12   the question.  It's totally false.

13        A.    Yeah --

14             MR. SCHWEIKERT:  Would you stop

15   testifying please?

16             MS. BOLGER:  You're misleading the

17   witness.

18        A.    The answer to that -- please rephrase

19   the question.

20        Q.    Mr. Dershowitz's answer was specific to

21   quid pro quos, and yet you expanded upon that to

22   encompass that a president can quote, "do anything

23   under this framework" --

24             MS. BOLGER:  Objection to the form of

25   --
```

```
 1                    JOHN BERMAN

 2    Q.    -- that's what you said.

 3          MS. BOLGER:   That's not a question.

 4    A.    Mr. Dershowitz was asked a question

 5  about quid pro quos, he was not asked if they were

 6  impeachable in this case.   In the answer that he

 7  gave he presented an argument about presidents

 8  running for re-election, and the actions that they

 9  can take that I had not heard before and seemed

10  expansive to me.   I do not see how quid pro quos

11  somehow limiting the type of actions that a

12  president takes when running for re-election.   I

13  thought then, and I still think now it is a very

14  expansive view of immunity from impeachment.

15    Q.    But what you said on your broadcast was

16  quote, "this means a president can do anything,"

17  end quote.   You didn't limit it to quid pro quos

18  like the question presented to Mr. Dershowitz, did

19  you?

20    A.    I thought then, and I think now, I

21  don't find quid pro quo to be limiting.   I don't

22  see why the phrase "quid pro quo" limits actions

23  you can take.

24    Q.    So under your view, Mr. Dershowitz was

25  justifying genocide if he thought that that would
```

```
 1                    JOHN BERMAN
 2   increase his vote in an election?
 3              MS. BOLGER:   Objection to the form of
 4   the question.   We have actually done genocide
 5   before in this deposition, but you can answer.
 6        A.    I did not -- I did not think Alan
 7   Dershowitz was advocating for genocide.
 8        Q.    How is the viewer supposed to know that
 9   when the words coming out of your mouth are
10   literally "this means a president can do
11   anything"?
12        A.    The words were coming out of Alan
13   Dershowitz's mouth.   We played the clip of him
14   saying that, and then we played another clip when
15   he said it again.
16        Q.    Sir, he never said "a president can do
17   anything," did he?
18        A.    He said "Every public official whom I
19   know believes that his election is in the public
20   interest.   Mostly you are right.   Your election is
21   in the public interest.   If a president does
22   something which he believes will help him get
23   elected - in the public interest - that cannot be
24   the kind of quid pro quo that results in
25   impeachment."
```

```
 1                    JOHN BERMAN
 2            And then later he says "I want to be
 3    elected.  I think I am a great president.  I think
 4    I am the greatest president there ever was, and if
 5    I am not elected, the national interest will
 6    suffer greatly, that cannot be impeachable."
 7            He's offering -- my view then and my
 8    view now -- he was offering an expansive view
 9    about what cannot be impeachable for a president
10    running for re-election.  I didn't think then, and
11    I do not think now that quid pro quo somehow
12    limits that action.
13        Q.   You were just referring to the
14    Congressional Record that's been marked as an
15    exhibit, right?
16        A.   Yes.
17        Q.   I did not see the word "impeachable,"
18    that you just deliberately inserted to the end of
19    that sentence, didn't you?
20        A.   I think you would see it if you watch
21    the clip on television.
22        Q.   It is not in this transcript, is it?
23        A.   I think you will see that part of
24    the --
25        Q.   Sir, my question is specific.  It is
```

```
 1                        JOHN BERMAN
 2   not in this transcript --
 3              MS. BOLGER:  Hey, the witness is
 4   answering the question --
 5              MR. SCHWEIKERT:  And the court will
 6   instruct him it's a "yes" or "no" ma'am --
 7              MS. BOLGER:  Let him answer --
 8              MR. SCHWEIKERT:  You can stop with your
 9   obstructionism and let him answer.  If the
10   question calls for a "yes" or "no" --
11       Q.    Show me where it says the word
12   "impeachable" that you decided to insert into this
13   transcript.
14       A.    It does not say it in the Congressional
15   Record, it says it on the broadcast that we aired
16   in another clip that we aired as part of this
17   discussion.
18              MS. BOLGER:  We have to get on the
19   phone with the court in nine minutes.
20              MR. SCHWEIKERT:  That's fine, we are
21   not stopping.
22       Q.    You were literally using this
23   Congressional Record to justify your position, and
24   you inserted a word that was not in this document,
25   didn't you?
```

```
1                         JOHN BERMAN
2         A.     The word is not in this document.  If
3    you watch the show that we aired on television, it
4    is in one of the clips that we aired in the show.
5         Q.     You continue to deliberately want
6    people to believe your characterization, as
7    opposed to what is actually reflected in the
8    public record, right?
9         A.      In this case, it was Alan Dershowitz's
10   characterization.  It was what he said on TV.
11        Q.     You are deliberately misleading the
12   jurors in this case by trying to tell them that it
13   says "impeachable" in the Congressional Record
14   when that word does not appear at the end of that
15   sentence --
16             MS. BOLGER:  Objection, that is enough.
17   The witness isn't misleading anybody.  The witness
18   told you it is not in the Congressional Record, it
19   is in the videotape.  Your question is wrong --
20             MR. SCHWEIKERT:  Form, form, form --
21             MS. BOLGER:  I am not going to let the
22   witness answer a deliberately misleading
23   question --
24             MR. SCHWEIKERT:  Form, form, form.
25        Q.     Your testimony is there were words said
```

```
 1                      JOHN BERMAN
 2    on the floor of the Senate that are not reflected
 3    in the Congressional Record, is that it?
 4         A.    Yes.
 5         Q.    And those words allegedly justify you
 6    going on TV and saying that a president can do
 7    anything and never be impeached so long as he
 8    thinks it's in the public interest, right --
 9              MS. BOLGER:  Objection to the form of
10    the question.
11         A.    Can you repeat the question?
12         Q.    It was a "yes" or "no."
13         A.    What "yes" or "no" question?
14              MR. SCHWEIKERT:  Can you read back my
15    question please?
16     (The following was read from the record by the
17      stenographer:  "Q. Your testimony is there were
18    words said on the floor of the Senate that are not
19    reflected in the Congressional Record, is that it?
20    A. Yes.  Q. And those words allegedly justify you
21      going on TV and saying that a president can do
22      anything and never be impeached so long as he
23       thinks it's in the public interest, right?
24     Followed by Objection, and Witness asking for a
25              repeat of the question.)
```

```
 1                        JOHN BERMAN
 2        Q.    It does not reflect in this
 3   Congressional Record that Mr. Dershowitz said "I
 4   think I am the greatest president there ever was,
 5   and if I am not elected the national interest will
 6   suffer greatly, that cannot be impeachable."
 7              That's the words you put there, that is
 8   not shown in this record, is it?
 9        A.    I agree with you, it is not in the
10   Congressional Record.
11        Q.    Isn't the more plausible explanation
12   that he was going to restate his prior argument
13   that that cannot be the kind of quid pro quo that
14   results in impeachment?
15        A.    I'm sorry, I don't know what he was
16   going to do or not do --
17        Q.    I thought you did know.  You said you
18   heard it --
19              MS. BOLGER:  Let him answer the
20   question, you're badgering the witness.
21              MR. SCHWEIKERT:  I'm not badgering the
22   witness, it's called cross-examination.  I know
23   you don't like it because it goes to the heart of
24   the matter --
25              MS. BOLGER:  Let him answer the
```

```
 1                      JOHN BERMAN

 2   question.

 3        A.    I agree it is not in the Congressional

 4   Record.  He said it in the Senate of the United

 5   States.

 6        Q.    You just said you don't know what he

 7   said.

 8        A.    I do know what he said -- please play

 9   the clip.  Do you not know he said it?

10        Q.    Sir, you literally just said "I don't

11   know what he said" and now you're trying --

12        A.    You were asking me what he meant, and I

13   said I don't know what he meant.  Now you're

14   talking about what he said; I do know what he said

15   because I saw it at the time and I have since seen

16   it again, and I have seen a transcript of the

17   show.  He used that phrase when he was there.  It

18   is not the Congressional Record, I agree with you

19   on that.  Do you want to play it?  We have it.

20        Q.    You will have the chance to present

21   your case.

22            MS. BOLGER:  We have to get on a call

23   with the court in four minutes.

24            MR. SCHWEIKERT:  We can take a break.

25            THE VIDEOGRAPHER:  We are going off the
```

```
 1                    JOHN BERMAN
 2    record, the time is 2:26 p.m.
 3              (Recess.)
 4              THE VIDEOGRAPHER:  We are back on the
 5    record, the time is 3:02 p.m.
 6        Q.    I want to back up briefly to
 7    Plaintiff's Exhibit 5, the Congressional Record.
 8        A.    Yes, sir.
 9        Q.    Particularly the page where we were
10    discussing what appears to be the omitted
11    remainder of Mr. Dershowitz's sentence.
12        A.    Yes.
13        Q.    Do you see the paragraph right above
14    it?
15        A.    Yes.
16        Q.    Starting "if a hypothetical president"?
17        A.    Yes.
18        Q.    Could you read that for me please?
19        A.    Out loud?
20        Q.    Yes.
21        A.    "If a hypothetical president of the
22    United States said to a hypothetical foreign
23    leader of a foreign country:  Unless you build a
24    hotel with my name on it and unless you give me a
25    million-dollar kickback, I will withhold the
```

```
 1                        JOHN BERMAN
 2    funds.  That is an easy case.  This is purely
 3    corrupt and in the purely private interest."
 4         Q.    And therefore impeachable, right?
 5         A.    Oh, I don't know.
 6         Q.    You don't know?  Wasn't Mr. Dershowitz
 7    describing the different types of motives that a
 8    president could have, and giving an example of
 9    what he considered an easy case with a purely
10    corrupt motive that could justify impeachment?
11         A.    The exact question again please?
12         Q.    In answering the Chief Justice's
13    question, part of Mr. Dershowitz's answer included
14    a discussion of motive, right?
15         A.    Yes.
16         Q.    And the paragraph you just read about
17    the hypothetical president asking for his name to
18    be put on a hotel in exchange for a kickback, that
19    was Mr. Dershowitz giving an example of a purely
20    corrupt motive which would be impeachable, right?
21              MS. BOLGER:  Objection to the form of
22    the question.
23         A.    I don't know if he's making that
24    argument in that case, that that can be
25    impeachable there.
```

```
 1                      JOHN BERMAN
 2       Q.    Let's back up then further and put it
 3   in context.  Can you read the full paragraph at
 4   the top of that page?
 5             MS. BOLGER:  Objection to the form.
 6       A.    Beginning with --
 7       Q.    "Now."
 8       A.    "Now, we may argue that it is not in
 9   the national interest for a particular president
10   to get re-elected or for a particular senator or
11   member of Congress - and maybe we are right; it is
12   not in the national interest for everybody who is
13   running to be elected - but for it to be
14   impeachable, you would have to discern that he or
15   she made a decision solely on the basis of, as the
16   House managers put it, corrupt motives, and it
17   cannot be a corrupt motive if you have a mixed
18   motive that partially involves the national
19   interest, partially involves electoral, and does
20   not involve personal pecuniary interest."
21       Q.    Thank you.  Did you see in that
22   paragraph where he said in part "for it to be
23   impeachable you would have to discern that he or
24   she made a decision solely on the basis of, as the
25   House managers put it, corrupt motives."
```

```
 1                      JOHN BERMAN

 2              Do you see that?

 3       A.     Yes, he does say that.

 4       Q.     He's, in fact, saying that there are

 5  circumstances when a president can be impeached,

 6  regardless of whether he thinks it's in the public

 7  interest or not, right?

 8              MS. BOLGER:  Objection to the form.

 9       A.     He's talking about -- I'm sorry, the

10  part I am talking about is the other case where he

11  said -- and I had not heard him say before -- that

12  if he thinks being re-elected is in the public

13  interest then actions he takes toward being

14  re-elected by definition, he says, cannot be

15  impeachable.

16       Q.     Where?  I don't see that, "by

17  definition cannot be impeachable."  Is there

18  something that you're referring to, to support

19  that opinion?

20              MS. BOLGER:  Objection to the form.

21       A.     Again, what I am saying -- when I refer

22  to "that cannot be impeachable" that is a phrase

23  that as you stipulate does not appear in the

24  Congressional Record, but he did say out loud on

25  the Senate floor.
```

```
1                        JOHN BERMAN
2        Q.    Do you know whether he completed his
3   thought or whether maybe he was cut off by the
4   Chief Justice?
5        A.    Oh, I don't know.  What I heard him say
6   was "that cannot be impeachable."
7        Q.    You don't know whether he had concluded
8   his thought before the Justice says "Thank you,
9   Counselor," do you?
10       A.    I don't know, I can't know what Alan
11  Dershowitz was going to say or not say after that,
12  I do know that when I was watching it at the time
13  and when I've seen it since, it seemed to me he
14  completes his thought -- me -- when he says
15  "that cannot be impeachable."
16       Q.    You didn't suggest to your audience
17  that he may not have finished his thought he was
18  attempting to convey before the Chief Justice
19  said, "Thank you, Counselor," did you?
20            MS. BOLGER:  Objection to the form.
21       A.    I did not.  I did not think he had been
22  cut off, it was not my opinion having seen at the
23  time that he was cut off, so I did not report
24  that.
25       Q.    Even though virtually the entirety of
```

```
 1                         JOHN BERMAN

 2    his prior statements were with regard to quid pro

 3    quos, you zeroed in on the last few sentences that

 4    were being uttered by Mr. Dershowitz and that we

 5    don't know if they were complete or not, right?

 6              MS. BOLGER:  Objection to the form.

 7        A.    It was my opinion that they were

 8    complete and this phrase -- this paragraph we are

 9    talking about -- is very similar to the earlier

10    one where he's talking about a theory which was

11    new to me, and I believed to be newsworthy then

12    and now, and he said twice, so we played twice

13    both parts, where he is talking about a president

14    running for re-election, actions that a president

15    takes when running for re-election.  That's what I

16    was referring to.

17        Q.    And you reference back to the sentence

18    "if a president does something which he believes

19    will help him get elected in the public interest

20    that cannot be the kind of quid pro quo that

21    results in impeachment," right?

22              MS. BOLGER:  Objection to the form of

23    the question.

24        A.    That was one of the clips that we

25    played.
```

JOHN BERMAN

1

2      Q.    His entire answer was in the context of

3  quid pro quos, yet you deliberately decided to

4  only explain to your audience that Mr. Dershowitz

5  was arguing that a president can do anything so

6  long as he thought it was in the public interest,

7  right?

8              MS. BOLGER:   Objection to the form of

9  the question.

10     A.    Again, I thought then and I think now,

11 that he was making a new argument about what a

12 president can do while running for re-election.

13 And I believed then, and I continue to believe

14 now, that a quid pro quo does not limit the

15 actions that a president can take.

16     Q.    Do you see how in that last paragraph

17 of his remarks it begins "but a complex middle

18 case is."

19              Do you see that excerpt?

20     A.    Yes.

21     Q.    He had moved on from giving an example

22 of a purely corrupt motive to a more complex case

23 where there's mixed motives, right?

24              MS. BOLGER:   Objection to the form of

25 the question.

```
 1                    JOHN BERMAN
 2        A.    My understanding then, and my
 3   understanding now was in that last paragraph he
 4   was talking about the same activity he had talked
 5   about earlier; that a president running for
 6   re-election believes his re-election is in the
 7   public interest, and any action he takes to get
 8   elected is not impeachable.
 9        Q.    Even though those words are not
10   reflected anywhere in the Congressional Record,
11   right?
12        A.    Which words?
13        Q.    Your words that you just said sir.
14              MS. BOLGER:  Objection to the form.
15        A.    I was telling you my opinion of the
16   argument that he was making, what I thought then
17   and what I think now, which seemed to be an
18   expansion of what is or is not impeachable.
19        Q.    Is it your job as a journalist to offer
20   your opinion or to objectively report facts?
21              MS. BOLGER:  Objection to the form.
22        A.    My job is to report the best obtainable
23   version of the truth, and what I believed -- my
24   opinion of the truth at that time was that Alan
25   Dershowitz was making an argument that I had not
```

```
 1                    JOHN BERMAN

 2   heard him make before about a president running

 3   for re-election, and the actions he or she might

 4   take and whether or not they are impeachable.  And

 5   I believed that was newsworthy.

 6        Q.    You thought in those fleeting remarks

 7   he all of a sudden presented an entirely different

 8   argument other than describing his opinion about

 9   when a president could be impeached for an alleged

10   quid pro quo, is that right?

11             MS. BOLGER:  Objection to the form.

12   Sorry, I lost you.  Could you read that again?

13        A.    Do you mind repeating the question?

14             MR. SCHWEIKERT:  Could you read it back

15   please?

16     (The following was read from the record by the

17    stenographer:  "Q. You thought in those fleeting

18    remarks he all of a sudden presented an entirely

19      different argument other than describing his

20   opinion about when a president could be impeached

21    for an alleged quid pro quo, is that right?")

22             MS. BOLGER:  Objection to the form, you

23   can answer the question.

24        A.    I thought then, and what I think now

25   seeing and reading it, is he was presenting a case
```

```
 1                    JOHN BERMAN
 2   that I had not heard before about a president
 3   running for re-election; the actions that a
 4   president can take when running for re-election,
 5   and whether or not those actions can be
 6   impeachable.
 7        Q.    So as far as you're concerned,
 8   Mr. Dershowitz was claiming that a president can
 9   do anything -- anything, right?
10        A.    My reporting -- my opinion of what he
11   said was that it was a novel argument that a
12   president running for re-election, if he thinks
13   the actions are in the public interest, those
14   actions cannot be impeachable.
15        Q.    But you did not explain to your
16   audience that there were different motives that
17   Mr. Dershowitz had discussed leading up to those
18   remarks, did you?
19              MS. BOLGER:   Objection to the form of
20   the question.
21        A.    We played those two different clips
22   where he talks about what a president does in his
23   or her self-interest when running for election --
24   re-election.
25        Q.    And you omitted his hypothetical
```

```
1                       JOHN BERMAN
2    president with a purely corrupt motive of wanting
3    his name on a hotel in exchange for a kickback,
4    right?
5         A.    I did not omit it, I didn't report that
6    because that was not related to what I am talking
7    about here, which is this new argument that when
8    you are doing something to get re-elected because
9    you believe being re-elected is in the public
10   interest.
11        Q.    It was not a new argument, it was in
12   fact the same argument he had previously made on
13   your show on January 20th, wasn't it?
14        A.    I did not then, and I don't now
15   remember it being an argument he had made before
16   in terms of a president running for re-election,
17   the actions that a president takes.
18        Q.    Did you do your best as a journalist to
19   take special care not to misrepresent or
20   oversimplify Mr. Dershowitz's statements in
21   reporting on the first impeachment trial to your
22   audience?
23        A.    I tried my best to report the facts as
24   I saw them at the time.  I did my best to present
25   to the audience the facts as I saw them, the
```

```
 1                      JOHN BERMAN
 2   arguments I believe were being made at the time.
 3        Q.    Did you ever become aware that
 4   Mr. Dershowitz believed CNN, including yourself,
 5   had mischaracterized his statements on the floor
 6   of the Senate?
 7        A.    I am vaguely aware in the days that
 8   followed he did appear on CNN.
 9        Q.    He did appear on CNN to do what?
10        A.    To discuss the reporting about the case
11   that he made before the American people.
12        Q.    What is your understanding of that
13   subsequent discussion he presented on CNN?
14        A.    I don't remember whether I saw them; I
15   don't know whether he was clarifying what he said
16   or arguing it was portrayed incorrectly, but he
17   was not happy with how it was portrayed.
18        Q.    You're aware Mr. Dershowitz is claiming
19   it was a deliberate mischaracterization of his
20   remarks by CNN, right?
21        A.    Yes.
22        Q.    Yet you continue to believe to this day
23   that Mr. Dershowitz had supposedly argued for this
24   new expansive power that a president could never
25   be impeached for doing anything -- anything, so
```

```
 1                    JOHN BERMAN

 2   long as he believes it is in the public interest,

 3   right?

 4             MS. BOLGER:  Objection to the form of

 5   the question.

 6        A.   I believed then, and I believe now that

 7   he was making a case that I had not heard before

 8   about a president running for re-election, and

 9   that the actions that a president can take while

10   running for re-election.

11        Q.   You went to Harvard, right?

12        A.   Yes, I did.

13        Q.   Hard school to get into?

14        A.   Yes.

15        Q.   Consider yourself a smart guy?

16        A.   Yes --

17             MS. BOLGER:  Objection.

18        Q.   Have you ever referred to

19   Mr. Dershowitz or any of his public comments as

20   "Dersh-o-nuts"?

21        A.   There is an e-mail that I have now

22   reviewed where that is in the subject line.

23        Q.   Were you referring to -- who is

24   Dersh-o-nuts; what does that mean?

25        A.   I don't remember exactly what I was
```

```
 1                    JOHN BERMAN

 2   referring to then.  I can tell you that I believe

 3   it was my opinion then, and it is my opinion now

 4   that the argument he was making was a vast

 5   expansion, a stunning expansion of what can and

 6   cannot be impeachable.  And the way I read that

 7   now is I interpret the "nuts" part to be as

 8   referring to that argument.

 9              MR. SCHWEIKERT:  I am going to mark

10   this document as Plaintiff's Exhibit 8.

11              (Plaintiff's Exhibit No. 8 was

12        marked for identification.)

13        Q.    Take a moment and review Plaintiff's

14   Exhibit 8, and let me know whether you have seen

15   it before.

16        A.    Yes.

17        Q.    What is it?

18        A.    This is an e-mail to the person who was

19   -- to a CNN producer asking to have a sound bite

20   ready for the show.

21        Q.    You sent the original e-mail shown in

22   this chain on January 30, 2020 at 4:52 a.m.

23              Right?

24        A.    That's what it says here, yes.

25        Q.    You sent it to Melanie Moffitt?
```

```
 1              JOHN BERMAN
 2     A.    Yes.
 3     Q.    I think you said she was a producer,
 4  but could you describe more specifically what her
 5  role is?
 6     A.    Melanie Moffitt is a producer on the
 7  show who would occasionally fill in as my anchor
 8  producer.
 9     Q.    Why did you send her an e-mail with the
10  subject line reading quote, "Dersh-o-nuts... need
11  this for all panel," end quote?
12     A.    I don't specifically remember sending
13  this e-mail.  I send a lot of e-mails, but this
14  e-mail indicates that I wanted this sound bite to
15  be ready for the broadcast.
16     Q.    Because you wanted to characterize
17  Mr. Dershowitz as "nuts," right?
18              MS. BOLGER:  Objection to the form of
19  the question.
20     A.    No, I wanted it to be ready for the
21  panel because I thought it was newsworthy.
22     Q.    But you refer to him or his statements
23  as "Dersh-o-nuts," right?
24     A.    The subject line is that, yes.
25     Q.    It is not a respectful moniker for
```

```
 1                   JOHN BERMAN
 2   someone, is it?
 3        A.    I believed the argument he was
 4   making -- I believed then and I believe now -- the
 5   argument he was making was one I had not heard
 6   before, and was a vast expansion of an
 7   interpretation of what is and is not impeachable;
 8   and was alarming to some people.
 9        Q.    Didn't we discuss earlier this morning
10   one of the ethical principles for journalists is
11   showing compassion for those who might be affected
12   by coverage?  Do you recall that?
13             MS. BOLGER:  Objection to the form.
14        A.    Yes.
15        Q.    How is referring to Mr. Dershowitz or
16   his statements as "Dersh-o-nuts" showing
17   compassion for Mr. Dershowitz?
18        A.    It is not about compassion, it is a
19   reflection of what I believe, I think it is a
20   reflection of what my opinion was of the statement
21   that he was making...and also -- yeah...
22             MS. BOLGER:  You can answer.
23             MR. SCHWEIKERT:  There is no question.
24             MS. BOLGER:  He wants to say to
25   something.
```

```
 1                     JOHN BERMAN

 2        A.    You keep referring to this code of

 3   ethics, this is not a legally enforceable

 4   document.

 5        Q.    Are you testifying that there are no

 6   ethical standards that govern your work as a

 7   broadcast journalist for CNN?

 8        A.    No.

 9              MS. BOLGER:  Objection to the form of

10   the question.

11        Q.    There are ethical standards, correct?

12        A.    Yes.

13        Q.    We discussed some of them this morning,

14   do you remember that?

15        A.    Yes --

16              MS. BOLGER:  Objection to the form.

17        Q.    And you agreed with me that some of

18   those standards applied, right?

19              MS. BOLGER:  Objection to the form.  He

20   did not do that; you are making that up.

21              MR. SCHWEIKERT:  Are you accusing me of

22   lying?

23              MS. BOLGER:  No, you're misstating his

24   testimony.  Let him answer the question.

25        A.    Can you repeat the question?
```

1                    JOHN BERMAN

2        Q.    We discussed ethical standards

3    applicable to journalists this morning, right?

4        A.    Yes.

5        Q.    You agreed that some of the standards I

6    highlighted were applicable to your work at CNN,

7    right?

8              MS. BOLGER:   Objection to the form, I

9    don't think he did that.

10       A.    We talked about ethical standards.   I

11   agree there are standards.

12       Q.    What are they in your words?

13       A.    To try to obtain and report the best

14   obtainable version of the truth.   To work my

15   hardest to present the best obtainable version of

16   the truth to the American people.

17       Q.    And the best and obtainable version of

18   the truth was to hyper-focus on the last few

19   sentences that Mr. Dershowitz was making in

20   response to the Chief Justice's question, as

21   opposed to presenting information about the entire

22   context of his statement, is that right?

23       A.    We played two separate clips, it wasn't

24   just one, there were two separate clips.   It was

25   an argument he made not just once, but twice in

```
 1                    JOHN BERMAN
 2   this answer that we focused on.
 3        Q.    Who is Jeff Zucker?
 4        A.    Jeff was the president of CNN.
 5        Q.    Was he the president during
 6   January 2020?
 7        A.    Yes, he was.
 8        Q.    Was he still the president the
 9   following month in February?
10        A.    Yes.
11        Q.    What role at that time did Mr. Zucker
12   play in shaping the content that CNN was
13   publishing?
14             MS. BOLGER:  Objection to the form.
15        A.    Jeff Zucker was the president of CNN,
16   he guided the editorial direction of our coverage
17   as president, but what I report on TV and what I
18   say on TV is my decision and my choice.
19        Q.    Did you have any communications with
20   Mr. Zucker about your program on the morning of
21   January 30th before it occurred?
22        A.    Did I have any --
23             MS. BOLGER:  Objection to the form.
24   I'm sorry, I phased out -- sorry Mark; do it
25   again.
```

```
 1                    JOHN BERMAN

 2        Q.    Your broadcast was on the morning of

 3   January 30th, correct?

 4        A.    Yes.

 5        Q.    Did you have any communications with

 6   Jeff Zucker about that broadcast before it

 7   occurred?

 8        A.    Direct communications where Jeff

 9   e-mailed me or I e-mailed Jeff?

10        Q.    Any.

11        A.    I did not e-mail Jeff, and I don't

12   think Jeff e-mailed me directly.

13        Q.    Did you speak with him on the phone?

14        A.    Not to my memory, no.

15        Q.    Did you speak with him in person?

16        A.    Not to my memory, no.

17        Q.    Did you tell him that your

18   characterization of Mr. Dershowitz or his argument

19   was "Dersh-o-nuts"?

20        A.    No -- did I tell him my

21   characterization in an e-mail?  No.

22             MR. SCHWEIKERT:  I am going to hand you

23   a document I will mark as Plaintiff's Exhibit 9.

24             (Plaintiff's Exhibit No. 9 was

25        marked for identification.)
```

```
 1                        JOHN BERMAN

 2         Q.    Take a moment and review Plaintiff's

 3   Exhibit 9, and let me know if you have seen it

 4   before.

 5         A.    Okay.

 6         Q.    Can you identify Plaintiff's Exhibit 9

 7   please?

 8         A.    This is an e-mail from the senior

 9   executive producer on the show, Izzy Povich -- she

10   was at the time -- that she sent to me and others.

11         Q.    What is your understanding of the

12   purpose of her e-mail?

13              MS. BOLGER:   Objection to the form; if

14   you know.

15         A.    I can tell you what it says.  She says

16   "Jeff is into this angle as we discussed."

17         Q.    What angle?

18              MS. BOLGER:   If you know; objection to

19   form.

20              MR. SCHWEIKERT:   Stop coaching the

21   witness for probably the thirtieth time.

22         A.    All I can tell you is what is attached

23   here which is a CNN.com article that says

24   "Republican theory for Trump acquittal unleashed

25   unrestrained presidential power."
```

```
 1                 JOHN BERMAN
 2       Q.    Do you see that Mr. Jeff Zucker had
 3  e-mailed Izzy Povich and several others on
 4  January 30th at 6:06 a.m. writing quote, "this is
 5  really the story," end quote?
 6       A.    Yes, I see that.
 7       Q.    And then Izzy forwarded that e-mail to
 8  you and others?
 9       A.    Yes.
10       Q.    And Izzy wrote in her e-mail "FYI, Jeff
11  is into this angle as we discussed," end quote.
12             Right?
13       A.    Yes.
14       Q.    What is an "angle" in journalism?
15       A.    This aspect of the story.
16       Q.    What did you discuss about this aspect
17  of the story?
18       A.    I don't know exactly what she is
19  referring to in this e-mail.
20       Q.    Earlier you were telling me about a
21  5:30 call the day before, and then a 4:30 call on
22  the day of January 30th, is that right?
23       A.    Every day there is a 5:30 p.m. call the
24  night before, and a 4:30 a.m. call in the morning
25  before.
```

```
 1                    JOHN BERMAN

 2      Q.    Was this angle discussed during that

 3  4:30 a.m. call?

 4            MS. BOLGER:  Objection to the form of

 5  the question.

 6      A.    I don't specifically remember the

 7  contents of those specific conference calls.

 8      Q.    Those are conference calls?

 9      A.    Yes.

10      Q.    Are there any other collaborations

11  between CNN employees in preparation for the

12  broadcast?

13            MS. BOLGER:  Objection to the form of

14  the question.  If you understand you can answer.

15      A.    Collaboration.  What do you mean by

16  "collaboration"?

17      Q.    Was there any other meetings after that

18  4:30 --

19            MS. BOLGER:  Objection to the form.

20  I'm lost, sorry.  What call?

21      A.    The 4:30 a.m. call?

22      Q.    Yes.

23      A.    There are no further meetings.  After

24  4:30 I am in the office, in my office working.

25  There are people in the office, there may be
```

```
 1                    JOHN BERMAN
 2   interactions, I don't remember if I interacted
 3   with humans -- I don't talk to a lot of people
 4   face-to-face between 4:30 and 6:00 because there
 5   is not a lot of time.
 6        Q.    And you don't recall any discussions
 7   with Izzy Povich or these other folks identified
 8   on her e-mail?
 9        A.    Specific discussions outside of the
10   conference calls?  No, I don't remember a specific
11   discussion.
12        Q.    Her e-mail says "Jeff is into this
13   angle as we discussed," right?
14        A.    Yes, okay.
15        Q.    You don't recall that discussion?
16        A.    Not specifically, no.
17        Q.    Generally, what would you do when you
18   were told Jeff Zucker was into a particular angle
19   that you're going to present on the air?
20             MS. BOLGER:  Objection to the form.
21   Same instructions, don't give any examples of any
22   specific news gathering other than this one; we
23   take the position it's privileged.
24        A.    Generally speaking, I would try to
25   understand what angle he's talking about, or what
```

```
 1                      JOHN BERMAN
 2    he's talking about.  In this case, I would --
 3    insofar as I could look at the article and see
 4    what the article is about I would take a look at
 5    it and see if I understood it.
 6         Q.   Do you recall doing anything to acquire
 7    a better understanding of what Izzy meant by
 8    saying "Jeff is into this angle"?
 9              MS. BOLGER:  Objection to the form.
10         A.   I don't recall doing anything to get a
11    better understanding of what she wrote.
12         Q.   Had you previously had any
13    communications with Jeff Zucker regarding Alan
14    Dershowitz and his appearance on behalf of the
15    presidency during the first impeachment trial?
16              MS. BOLGER:  Objection to the form.
17         A.   I don't recall having a discussion, a
18    specific interaction between me and Jeff about
19    Alan Dershowitz.
20         Q.   You were never directed to take a
21    particular stance with respect to characterizing
22    Alan's statements on the floor of Congress?
23              MS. BOLGER:  Objection to the form.
24         A.   Directed to take a stance is not
25    something that happens; I was not directed to take
```

```
 1                     JOHN BERMAN

 2   a stance.

 3       Q.    Well, isn't Izzy essentially telling

 4   you that "Jeff is into this angle and therefore

 5   it's something that should be focused on," right?

 6       A.    She is telling me "Jeff is into this

 7   angle as we discussed."  What I say on TV is

 8   ultimately my decision.

 9       Q.    Who writes the content on that

10   teleprompter?

11       A.    Are you talking about the copy that we

12   read at the beginning of segments?

13       Q.    I believe you told me there is a

14   teleprompter from which some of your remarks are

15   made and there is also extemporaneous --

16       A.    There are two types.  There is copy

17   where you're reading the news, then there are

18   segments with questions and answers.  I don't like

19   to read questions, I like to have conversations.

20   Copy is what is written and read from the

21   prompter.  A draft of that is written by a writer

22   overnight, then I tend to rewrite it

23   aggressively -- sometimes overly aggressively the

24   writers will tell you -- I rewrite much of my own

25   copy.
```

1                        JOHN BERMAN

2        Q.    Do you recall rewriting the copy for

3    the broadcast on the morning of January 30, 2020?

4        A.    I don't specifically remember rewriting

5    because I rewrite copy every morning; I don't

6    specifically remember rewriting copy, but I will

7    tell you I rewrite copy every morning.  Almost

8    everything I say is rewritten.

9        Q.    Is that copy written in like a Word

10   document or some other format?

11       A.    It is written in a program called

12   iNEWS.

13       Q.    Who do you recall was the writer on

14   that day who submitted to you the first draft of

15   the copy?

16       A.    I don't know.

17       Q.    Is it just one writer that prepares the

18   draft copy or is it a team?

19       A.    Different writers -- we call them

20   "pages" -- write different pages.

21       Q.    Do you recall any of those writers that

22   were working on the copy for this broadcast?

23       A.    I don't know which writers were writing

24   that day, but again, I will tell you I rewrite the

25   copy substantially almost every day.

```
 1                    JOHN BERMAN
 2        Q.    So you would expect there to be
 3   rewrites of the copy from January 30, 2020 in
 4   iNEWS?
 5        A.    Yes.
 6              MS. BOLGER:  Objection to the form.
 7        A.    Yes.  I rewrite the copy in iNEWS.
 8        Q.    The questions, who prepares those?
 9        A.    Segment producers prepare segments,
10   sometimes segment producers suggest questions.  I
11   do not remember if the segment producers suggested
12   questions for those segments that day.  I will
13   tell you, as I rewrite almost all of my copy, no
14   matter what the suggested questions are I,
15   generally speaking, prepare almost all of my own
16   questions.
17              MR. SCHWEIKERT:  I am going to show you
18   another document, Plaintiff's Exhibit 10.
19              (Plaintiff's Exhibit No. 10 was
20              marked for identification.)
21        A.    Okay, I see this.
22        Q.    Do you know what Plaintiff's Exhibit 10
23   is?
24        A.    This is an e-mail exchange, it is an
25   extension of the e-mail you showed me I believe in
```

```
 1                        JOHN BERMAN
 2    Exhibit 9, where I respond to Izzy's e-mail and I
 3    say "send him my open" and then I misspell
 4    "seriously."
 5         Q.    What did you mean by that?
 6         A.    Out of one million and half e-mails I
 7    don't remember specifically writing this, but my
 8    interpretation of what I'm reading is I was saying
 9    to Izzy -- the time on this is 6:10 a.m. -- "send
10    him my open" which means what I just read on TV;
11    send him what I just read on TV.
12         Q.    Was that, in part, because you believed
13    your open was supportive of the angle that Jeff
14    Zucker was really into?
15              MS. BOLGER:  Objection to the form.
16         A.    I wanted to send him the open because I
17    wanted him to see the case, wanted him to see how
18    I was presenting the news, presenting the
19    arguments that Professor Dershowitz was making.  I
20    wanted him to see how I was presenting that.
21         Q.    Why?
22         A.    Because -- I don't remember exactly
23    why, but I don't remember writing this e-mail
24    telling her why, but she's saying Jeff was into
25    this angle as we discussed, I told Izzy "send him
```

```
 1                    JOHN BERMAN

 2   my open, seriously."

 3        Q.   And she responds "yep," right?

 4        A.   Okay.

 5        Q.   Do you know if she sent Jeff Zucker

 6   your open?

 7        A.   I don't know.

 8        Q.   Do you ever get any feedback from

 9   Jeff --

10        A.   I don't remember if I got any feedback

11   from Jeff Zucker.

12             MR. SCHWEIKERT:  I am going to hand you

13   an exhibit --

14        A.   Again, I am going to say again, my

15   e-mail is 6:10, so I am sending something I've

16   already delivered on TV.

17             MR. SCHWEIKERT:  I am going to hand you

18   a document I'm marking as Plaintiff's Exhibit 11.

19             (Plaintiff's Exhibit No. 11 was

20             marked for identification.)

21        A.   Okay.

22        Q.   Do you recognize Plaintiff's

23   Exhibit 11?

24        A.   I recognize it because -- yes, I do.

25        Q.   What is it?
```

```
 1                    JOHN BERMAN
 2      A.    This is an e-mail -- this is sort of
 3  have part of the same -- it's a different e-mail
 4  thread.  I don't appear to be on this e-mail, but
 5  it's Izzy responding to Jeff's e-mail, she says
 6  "Berman knocked this out of the park in his A1 if
 7  you didn't see."  She seems to be saying I focused
 8  on whatever aspect he was asking about.
 9      Q.    And Mr. Zucker responds to Izzy, right?
10      A.    Yeah, he says "I did.  But we didn't
11  discuss it.  I would make it the entire next
12  block.  This is the whole point.  They're not
13  getting witnesses.  We know that.  But in the
14  process they're changing the fabric of America."
15  And Izzy responds "yes, that is our entire B
16  block."
17      Q.    Did you ever become aware of why
18  Mr. Zucker wrote in this e-mail to Izzy, in part,
19  "we didn't discuss it"?
20            MS. BOLGER:  Objection to the form of
21  the question.
22      A.    I don't know why he said that; I see
23  this e-mail here.
24      Q.    Around that time, was it typical for
25  you to discuss angles with Jeff Zucker before
```

```
 1                    JOHN BERMAN

 2  going on air?

 3            MS. BOLGER:  Objection to the form.

 4       A.    I rarely had the chance to discuss

 5  angles with Jeff before going on the air.

 6       Q.    Did you receive any negative criticism

 7  internally for your characterization of

 8  Mr. Dershowitz's statements on the floor of

 9  Congress?

10       A.    Not that I remember.

11       Q.    Did you ever have any in-person or

12  telephone conversations with Jeff Zucker about

13  your characterization of Alan Dershowitz's

14  statements during the impeachment trial?

15            MS. BOLGER:  Objection to the form.

16       A.    Discussion with Jeff?  Not that I

17  remember; in-person or on the phone.

18       Q.    Around that time, was it relatively

19  common for you to speak to Mr. Zucker from time to

20  time?

21            MS. BOLGER:  Objection to the form.

22       A.    "Relatively common."  What do you mean?

23       Q.    You're an anchor on one of CNN's shows,

24  right?

25       A.    Yes.
```

```
 1                       JOHN BERMAN
 2        Q.    Did Mr. Zucker want to speak with you
 3   or other anchors about the content that CNN was
 4   broadcasting --
 5              MS. BOLGER:  Objection to the form.
 6   How could he know what Jeff Zucker wants?  Come
 7   on, ask him a good question.  You can answer if
 8   you --
 9              MR. SCHWEIKERT:  Would you stop
10   coaching the witness?  If he's aware he can speak,
11   if he doesn't know he will tell me, he doesn't
12   need you to remind him to say "I don't know,"
13   which you have done forty times right after we got
14   off the phone with the magistrate judge's chambers
15   telling everybody that such conduct would not be
16   tolerated.  So please stop --
17              MS. BOLGER:  But she was not on the
18   call, Dana was here.
19              MR. SCHWEIKERT:  Please...if he doesn't
20   know he will tell me.
21        Q.    My question sir, did Mr. Zucker have
22   any meetings with you or other anchors with
23   respect to the content that CNN was broadcasting?
24              MS. BOLGER:  Objection to the form.
25        A.    I don't know if he met with other
```

```
                           JOHN BERMAN
 1
 2    anchors.  I don't remember meeting with Jeff or
 3    speaking with Jeff about this.
 4         Q.    But, in general, around that time,
 5    would you have a Friday meeting or a Friday call
 6    with Mr. Zucker; anything like that?
 7              MS. BOLGER:  Objection to the form.
 8    Him personally or --
 9         A.    Me personally or a group?
10         Q.    I believe I asked you or a group.
11         A.    I don't remember talking with Jeff in
12    person or on the phone about this.  There is a
13    9:00 a.m. conference call that Jeff ran every day
14    that I was on usually, but that was as a -- I was
15    listening to the conference call.
16         Q.    Did you have a 9:00 a.m. conference
17    call after your broadcast on the morning of
18    January 30, 2020?
19         A.    There is a 9:00 a.m. conference call
20    every day.
21         Q.    So that's a "yes"?
22         A.    Yes.
23         Q.    Do you recall any discussion from
24    anyone during that call on that day about your
25    angle with respect to Mr. Dershowitz's impeachment
```

```
 1                    JOHN BERMAN

 2   comments?

 3             MS. BOLGER:  Objection to the form.

 4        A.    I don't remember what was discussed on

 5   that conference call, I do know that there is,

 6   there are communications about that conference

 7   call that I have seen since.

 8        Q.    E-mail communications?

 9        A.    I don't remember if it's e-mail or text

10   or digital.

11        Q.    What have you seen since that you're

12   recalling?

13        A.    A communication between Izzy Povich and

14   me.

15        Q.    Are you referring to one of the

16   exhibits we discussed?

17        A.    Not that you have shown me yet, no.

18        Q.    Who was on that 9:00 a.m. call on

19   January 30, 2020?

20             MS. BOLGER:  Objection to the form.

21        A.    I do not know who was on or not on the

22   call, but the call is open to CNN employees.

23        Q.    Who typically would participate?

24             MS. BOLGER:  Objection to the form.

25        A.    I don't know who was on there or not
```

```
 1                        JOHN BERMAN
 2    every day, but it is the various bureau chiefs or
 3    heads weigh in, and then oftentimes correspondents
 4    will be there and I try to listen when I can.
 5         Q.    Are there typically e-mails in advance
 6    of the call with respect to maybe the agenda or
 7    the topics to be discussed?
 8         A.    No.
 9         Q.    Were there, as a course of practice,
10    did the people on the call correspond via e-mail
11    afterwards with respect to items or issues that
12    came up?
13              MS. BOLGER:  Objection to the form.
14         A.    As a matter of course?
15         Q.    Was it a common course of business for
16    CNN at that time to have any sort of e-mail
17    communications regarding the 9:00 a.m. conference
18    call after it happened?
19              MS. BOLGER:  Objection to the form.
20         A.    Conference for CNN.  Who at CNN?
21         Q.    Whoever was -- I'm asking you sir.
22         A.    I don't understand.  E-mail
23    communication from whom about the conference call?
24         Q.    Were there subsequent e-mail
25    communications about the 9:00 a.m. conference call
```

```
1                        JOHN BERMAN

2    as a general matter of course?

3              MS. BOLGER:  Objection to the form.

4         A.    I don't know what you mean by

5    "general," I don't know that there's often

6    people -- I don't know who e-mails each other

7    about the call.

8         Q.    You did tell me that the 9:00 a.m.

9    call happened every day, right?

10        A.    Yes.

11        Q.    Were e-mails subsequently sent to you

12   with respect to information discussed during a

13   particular call?

14             MS. BOLGER:  Objection to the form.

15        A.    Which call?  I don't remember --

16        Q.    That never happened?

17        A.    I don't know.  I don't remember getting

18   e-mails about the 9:00 a.m. call.  I am on the

19   9:00 a.m. call often, so it would be strange to

20   receive e-mails, but remember the 9:00 a.m. call

21   is 21 hours before my next show.  And, as a matter

22   of course what is discussed there very often has

23   very little to do with ultimately what is in our

24   show, our show is so far in advance it doesn't

25   necessarily impact it going forward.
```

```
 1                         JOHN BERMAN
 2        Q.    Your testimony is that there are not
 3   any follow-up communications regarding information
 4   that had been discussed during the 9:00 a.m. call?
 5               MS. BOLGER:  Objection to the form --
 6        A.    Ever?  Or that day?
 7        Q.    So it does happen?
 8        A.    I don't have any memory of a lot of
 9   communication or any specific communication about
10   the 9:00 a.m. call after the 9:00 a.m. call.
11   There are times when during or if something is
12   said specifically about you, or I might have a
13   conversation or exchange about something that was
14   said specifically.
15        Q.    So to the best of your knowledge, there
16   has been instances where matters discussed on the
17   call were later communicated about in e-mail.
18               Is that right?
19               MS. BOLGER:  Objection to the form.
20        A.    I don't know what others do after the
21   call.  I can only say that I don't remember
22   getting a lot of communication regularly from the
23   product of the 9:00 a.m. call.
24        Q.    In January of 2020, who was normally on
25   the 9:00 a.m. call?
```

1                          JOHN BERMAN

2                MS. BOLGER:  Objection, asked and

3     answered.  You can answer again.

4          A.    I don't know who listens on a daily

5     basis.  I will tell you again, the 9:00 a.m. call

6     Jeff usually ran it, he was the first person to

7     talk, say "good morning," and call on various

8     bureau chiefs around the country to report what's

9     happening in their region.

10         Q.    How many bureau chiefs were there

11    around the country at that time approximately?

12               MS. BOLGER:  I have been remiss in not

13    giving my standard objection.  You should talk

14    about the calls generally, not any specific news

15    gathering -- to the extent you start to veer on

16    any other news gathering practices you may not

17    answer that question.

18         A.    Generally, it is Washington,

19    International, Domestic, Digital.  I don't think I

20    am leaving them out.  They were the ones called on

21    to report what's happening in their region.

22         Q.    Besides bureau chiefs and Jeff Zucker

23    you mentioned correspondents would sometimes be on

24    the call, right?

25         A.    Listen, I think they listen in. I don't

```
 1                    JOHN BERMAN
 2   know.
 3        Q.    Anyone else who would be on that call?
 4        A.    I don't know who listens on a daily
 5   basis, I think anyone is invited.
 6        Q.    Do you recall who was the bureau chief
 7   for Washington in January of 2020?
 8             MS. BOLGER:  Objection, only answer to
 9   information that is public.  This is not relevant.
10   If it is not public you may not answer --
11             MR. SCHWEIKERT:  The name of CNN's
12   bureau chief?
13             MS. BOLGER:  If it's public he can
14   answer it.
15        A.    Sam Feist is CNN's Washington bureau
16   chief.  Actually, the one who reports on the
17   Washington news --
18             MS. BOLGER:  If it is public --
19             THE WITNESS:  It is public --
20             MS. BOLGER:  -- you can answer it, but
21   if there is something about the call that is not
22   related to this litigation you cannot answer.
23             MR. SCHWEIKERT:  He just said it is
24   public.
25        Q.    Please continue.
```

```
 1                    JOHN BERMAN
 2          MS. BOLGER:  Mr. Feist is public.
 3     A.    Virginia Moseley is a vice president
 4  for news gathering on all the talks about who
 5  weighs in and what's happening in Washington.
 6     Q.    What about the Digital --
 7     A.    I don't know about the Digital people.
 8     Q.    Do you recall the International --
 9     A.    No.
10     Q.    What was the fourth category of bureau
11  chiefs?
12     A.    Domestic.
13     Q.    Do you recall who was the domestic
14  bureau --
15     A.    I don't recall who it was then.
16     Q.    Do you know if CNN has a document
17  retention policy?
18     A.    I don't know.
19     Q.    Do you know if e-mails, for example,
20  are purged from time to time as a matter of
21  policy?
22     A.    I don't specifically remember, I
23  remember there being a change sometime in the last
24  several years that after a certain amount of days
25  they were deleted automatically.  But I don't know
```

```
 1                      JOHN BERMAN
 2   how long that is.
 3        Q.    Do you recall how you became aware of
 4   that?
 5        A.    Oh, I --
 6              MS. BOLGER:  Objection.  If it is a
 7   lawyer who told you, don't tell him that;
 8   otherwise you can answer.
 9        A.    My general memory it was merely an
10   e-mail forwarded saying "after X number of days
11   they will be deleted."
12        Q.    Your e-mail address just to confirm is
13   what?  Your work e-mail address.
14        A.    ███████████████████████████
15        Q.    Do you also have ████████████████?
16        A.    Yes, and ███████████ works also, I
17   believe.  I don't remember if we were Warner Media
18   back then; all three work.
19        Q.    Are they three separate e-mail
20   accounts?
21        A.    No, they are all the same thing.
22        Q.    Let's go to --
23              MS. BOLGER:  If you are about to switch
24   topics --
25              (Discussion about break.)
```

```
 1                  JOHN BERMAN

 2              MR. SCHWEIKERT:  Let's mark this as

 3      Plaintiff's Exhibit 12.

 4              (Plaintiff's Exhibit No. 12 was

 5              marked for identification.)

 6      A.    Okay.

 7      Q.    Do you recognize Plaintiff's

 8      Exhibit 12?

 9      A.    Yes.

10      Q.    What is it?

11      A.    This is a text message exchange between

12      Izzy Povich, who was a senior executive producer,

13      and me.

14      Q.    Do you know if this is from your phone

15      or hers?

16      A.    I believe this is from my phone.

17      Q.    Is that a work-provided phone?

18      A.    I don't believe this is a work-provided

19      phone but my -- no, I don't believe this is a

20      work-provided phone, but my texts go to my

21      work-provided phone also.  I don't distinguish

22      between personal and private texts. (sic)

23      Q.    How many phones do you have?

24      A.    I have two phones.

25      Q.    What are the numbers?
```

```
 1                     JOHN BERMAN
 2           MS. BOLGER:  You're not answering that,
 3      you're not permitted to answer that question.
 4           MR. SCHWEIKERT:  What is the basis for
 5      the privilege?  I want the record to be clear --
 6           MS. BOLGER:  Florida privacy law.
 7           MR. SCHWEIKERT:  It is relevant
 8      information and I am entitled to it.  Are you
 9      literally going to instruct him not to provide his
10      telephone number?
11           MS. BOLGER:  Absolutely.
12           MR. SCHWEIKERT:  We will take it up,
13      and I will apologize if we have to come back and
14      continue this deposition over such a petty issue,
15      but your Counsel is going to dig herself in a hole
16      --
17           MS. BOLGER:  Those are his private cell
18      phone numbers, he's not required to give them to
19      you --
20           MR. SCHWEIKERT:  He just testified he
21      communicates by his personal phone for work, and
22      now you're saying -- all right, we will take it
23      up.
24      Q.    How many phones?
25      A.    Two phones.
```

```
 1                    JOHN BERMAN
 2        Q.    Do you use any personal e-mail
 3   addresses to communicate for work?
 4        A.    For work, no; as a rule, no.  Have I
 5   ever?  I think I have sent an e-mail from my Gmail
 6   account mistakenly over time, but no, I use the
 7   work e-mail.
 8        Q.    If we look at the content of your
 9   message it looks like you texted Izzy on
10   January 30, 2020 at 9:09 a.m.
11             Is that right?
12        A.    Yes.
13        Q.    Can you read your message into the
14   record please?
15        A.    I said "like ten times I said this,
16   exactly this."
17        Q.    What is "this"?
18        A.    I don't remember what it is.
19        Q.    Is it the information that has been
20   redacted above?
21             MS. BOLGER:  Actually, I did the
22   redactions.  I can represent to you, as I have to
23   the court, that the nonresponsive redactions in
24   these text messages relate to things unrelated to
25   this action.  That is what we told Judge Raag
```

```
 1                    JOHN BERMAN
 2  Singhal --
 3       Q.    When you say "like ten times I said
 4  this" with three exclamation points, what are you
 5  referring to?
 6       A.    I don't know exactly; I don't know
 7  exactly.
 8            MS. BOLGER:  No assumptions, no
 9  speculation.
10       Q.    Is it likely you were responding to a
11  message you had received?
12            MS. BOLGER:  Again, cannot speculate;
13  you can answer if you are not speculating.
14       A.    I don't know, but -- I don't know.
15       Q.    "Like ten times I said this," you
16  write, "exactly this."
17            But you don't know what that is?
18       A.    As I sit here now I don't know what
19  that is.
20       Q.    And Izzy responds "yes, this is not
21  aimed at us and we need to keep going at it."
22            Do you see that?
23       A.    Yes.
24       Q.    What is your understanding of that
25  message?
```

```
 1                      JOHN BERMAN
 2        A.     I don't remember what I was referring
 3   to, so I don't fully remember -- I don't remember
 4   what she's responding to.
 5        Q.     You "need to keep going at it" means
 6   what?
 7        A.     I don't know.
 8        Q.     Attacking Mr. Dershowitz?
 9        A.     I don't know.
10        Q.     Characterizing him as "Dersh-o-nuts"?
11        A.     I don't believe I attacked
12   Mr. Dershowitz and I don't remember what this is
13   referring to.
14        Q.     You did call him "Dersh-o-nuts" in an
15   e-mail, right?
16        A.     The subject line said "Dersh-o-nuts"
17   and I believe I was referring to the argument he
18   was making.
19        Q.     And then it looks like this
20   conversation continues, is that right?
21             MS. BOLGER:  I will again represent
22   that the redacted materials relate to news
23   gathering for stories other than the one at issue.
24             MR. SCHWEIKERT:  I am going to ask the
25   court to review that in camera.
```

```
1                    JOHN BERMAN

2        A.    I don't know, I don't know what is

3   discussed after this.

4        Q.    Did you text Izzy a lot in January of

5   2020?

6        A.    I don't remember how much I texted Izzy

7   in January of 2020, but I texted Izzy from time to

8   time when she ran the show.

9        Q.    On both your personal and work phones?

10       A.    My texts get sent from both, they get

11  recorded on both phones.

12       Q.    Did you have any text message exchanges

13  with Izzy regarding Mr. Dershowitz or his

14  statements on the floor of Congress?

15       A.    Not to my knowledge.

16       Q.    Is that what Plaintiff's Exhibit 12 is,

17  communication about Mr. Dershowitz --

18       A.    I don't know, I don't know if this is

19  specifically about Mr. Dershowitz.

20            MR. SCHWEIKERT:  Let's take a five

21  minute break.

22            THE VIDEOGRAPHER:  We are going off the

23  record, the time is 4:01 p.m.

24            (Recess.)

25            THE VIDEOGRAPHER:  We are back on the
```

```
 1                    JOHN BERMAN

 2   record, the time is 4:10 p.m.

 3       Q.    Isn't it true that on at least three

 4   occasions today you were reading from the

 5   Congressional Record and omitted the words "quid

 6   pro quo" in response to questions; isn't that

 7   true?

 8            MS. BOLGER:  Objection to the form.

 9       A.    I didn't omit anything, I read from the

10   Congressional Record parts that I thought were

11   newsworthy and relevant to the discussion we were

12   having.

13       Q.    So you did leave out words in reciting

14   from the Congressional Record, right?

15            MS. BOLGER:  Objection to the form.

16       A.    I didn't read the whole Congressional

17   Record.

18       Q.    Why not?

19       A.    It is very long, there is a lot of

20   pages.  I read out loud the sections that I

21   thought were relevant.

22       Q.    And you deliberately omitted on at

23   least three occasions the words "quid pro quo"

24   while reading that pertinent section of the

25   Record, right?
```

```
 1                    JOHN BERMAN

 2              MS. BOLGER:  Objection to the form,

 3     asked and answered.  You don't have to raise your

 4     voice and ask the same question -- just answer the

 5     question.

 6         A.    I didn't omit anything, I read the

 7     parts that I thought were pertinent to the

 8     questions you were asking.

 9         Q.    And you didn't think it was pertinent

10     to the questions that I was asking that what

11     Mr. Dershowitz really said was in the context of a

12     quid pro quo.

13              Is that right?

14              MS. BOLGER:  Objection to the form.

15         A.    I read the parts that I thought were

16     relevant, and I will only say again, I don't think

17     that a quid pro quo was in any way limiting as to

18     what I understood to be an argument that I had not

19     heard before from Professor Dershowitz that a

20     president running for re-election, if he thought

21     the election was in the public interest, the

22     actions that he took could not be impeachable.  I

23     didn't feel a quid pro quo was in any way

24     eliminating; I didn't "omit," by your language,

25     anything.
```

```
 1                        JOHN BERMAN
 2        Q.    It did appear that you were reading
 3   from the Congressional Record, yet omitted three
 4   words in this sentence on at least three different
 5   occasions when I asked you questions --
 6              MS. BOLGER:  Objection to the form,
 7   asked and answered.  The record will speak for
 8   itself.  You may answer it one more time --
 9        Q.    -- do you recall that?
10        A.    I read to you the parts that I thought
11   were most pertinent involving what I then
12   believed, and I still believe was a novel argument
13   from Professor Dershowitz that a president running
14   for re-election if he believes the actions he was
15   taking -- if he believes his election was in the
16   public interest, the actions he was taking were
17   not impeachable.
18        Q.    So not only did you mischaracterize
19   Alan's argument during your broadcast on the
20   morning of January 30th, but you are continuing to
21   mischaracterize his statements in this proceeding
22   in front of the jury.
23              Is that right?
24              MS. BOLGER:  Objection to the form.
25        A.    I don't believe I mischaracterized them
```

```
 1                          JOHN BERMAN
 2   then, and I don't believe that I am
 3   mischaracterizing them now.
 4        Q.    If you were reading a sentence and you
 5   omitted three words from that sentence, would you
 6   agree that's a mischaracterization?
 7              MS. BOLGER:  Objection to the form of
 8   the question.
 9        A.    I do not believe that I omitted
10   anything that was pertinent to what I believed to
11   be newsworthy, which was in this case a new
12   argument Professor Dershowitz was making about
13   what is or is not impeachable for a president
14   running for re-election.
15        Q.    Isn't it the job of a journalist to
16   objectively report the news to the public?
17              MS. BOLGER:  Objection to the form of
18   the question.
19        A.    Our job is to work our hardest and
20   present to the people the best obtainable version
21   of the facts.
22        Q.    And it's your testimony that the best
23   obtainable version of the facts does not include a
24   full quotation of the sentence that you were
25   reading from, from the Congressional Record.
```

```
 1                         JOHN BERMAN

 2              Is that right?

 3              MS. BOLGER:  Objection to the form.

 4   It's now the fourth or fifth time; asked and

 5   answered.  You may answer it again, but this is

 6   the last time you're answering the question.

 7         A.    The parts that I read to you, I

 8   believe, were the most relevant to answer your

 9   questions about what I then, and still now believe

10   was a novel argument, and an important new

11   argument coming from Professor Dershowitz about a

12   president running for re-election, about the

13   actions that he takes and whether or not those

14   actions are impeachable.  And I thought then, and

15   I think now that "quid pro quo," those words don't

16   in any way limit the actions -- aren't limiting to

17   those actions.

18         Q.    You admit that in quoting from the

19   Congressional Record you omitted words that were

20   in the sentence in answering questions today,

21   didn't you?

22              MS. BOLGER:  Objection to the form.

23   Asked and answered.  You may answer it again, but

24   the next time I'm going --

25              MR. SCHWEIKERT:  It is a "yes" or "no"
```

```
 1                    JOHN BERMAN
 2   question, he is being evasive, that is a basis for
 3   a motion for a sanction --
 4            MS. BOLGER -- you can answer it
 5   again --
 6            MR. SCHWEIKERT:  If your Counsel wants
 7   to continue trying to instruct you how to evade
 8   what is critical to the resolution of the issues
 9   in this case she can, at her own risk, but I just
10   want a simple "yes" or "no" -- and then you can
11   explain.
12       Q.   Could you please extend me that
13   courtesy?
14       A.   Could you please repeat the exact
15   question again?
16       Q.   Yes.  Isn't it true that in quoting
17   from the Congressional Record that was marked as
18   an exhibit you omitted certain words in response
19   to my question?
20            MS. BOLGER:  Objection to the form.
21   Asked and answered, you may answer it again.
22       A.   I don't remember what words I did and
23   did not use in response to your questions.  What I
24   was reading to you from the Congressional Record
25   were the arguments that I thought were newsworthy
```

```
 1                    JOHN BERMAN
 2   or important -- and I thought then, and I still
 3   think now -- were new and again, a very important
 4   and perhaps controversial interpretation of what
 5   is and is not impeachable; and again, I don't
 6   believe the words "quid pro quo" were in any way
 7   limiting to what actions that a president can or
 8   cannot take in trying to get re-elected.
 9        Q.   Are you aware of whether The New York
10   Times reported that Mr. Dershowitz had allegedly
11   argued that a president can never be impeached so
12   long as whatever he's doing is in the public
13   interest according to him?  Are you aware of that?
14             MS. BOLGER:  Objection to the form.
15        A.   I don't know exactly what The New York
16   Times reported.
17        Q.   Are you aware of how The Washington
18   Post reported on Alan's answer to the Chief
19   Justice's question that we have been discussing
20   today?
21        A.   As I sit here right now, I don't
22   remember how The Washington Post reported on it.
23        Q.   Would it surprise you if The Washington
24   Post or The New York Times reported that
25   Mr. Dershowitz had argued that a quid pro quo is
```

```
 1                      JOHN BERMAN
 2   impeachable, if the quo is illegal?
 3            MS. BOLGER:  Objection to the form.
 4       A.    I don't know what The New York Times or
 5   The Washington Post reported on that.  I do
 6   remember that at the time again, my view of what
 7   Professor Dershowitz at the time said was that it
 8   was newsworthy, and I don't think I was alone in
 9   thinking that.
10       Q.    Are you aware of anyone at CNN
11   criticizing Alan Dershowitz's representation of
12   President Trump during the first impeachment?
13            MS. BOLGER:  Objection to the form.
14       A.    Criticizing it?  "Anyone at CNN."
15   You're talking about a CNN employee?
16       Q.    Yes.
17       A.    I don't remember anyone criticizing
18   Alan Dershowitz; I remember a lot of analysis
19   about his defense of the former president.
20       Q.    What do you remember?
21       A.    I don't remember -- I remember
22   analysis; we talked about it, obviously we just
23   saw us talking about it that day.
24       Q.    Did you ever criticize to anyone Alan
25   Dershowitz for representing President Trump during
```

```
 1                    JOHN BERMAN
 2   the first impeachment proceeding?
 3            MS. BOLGER:   Objection to the form.
 4        A.    I don't remember criticizing Alan
 5   Dershowitz for representing him; I don't remember
 6   criticizing him for representing him.
 7        Q.    After your broadcast on the morning of
 8   January 30, 2020 were you ever told not to have
 9   Alan Dershowitz appear as a guest on your
10   broadcast?
11        A.    I don't remember.
12        Q.    Are you aware of anyone at CNN ever
13   being advised not to permit Mr. Dershowitz to
14   appear as a guest on a broadcast by CNN after
15   January 29, 2020?
16        A.    I am not aware of it.  I do believe he
17   did appear as a guest after that though.
18        Q.    What do you mean by that?
19        A.    I believe he was on the air after that
20   day as a guest on CNN.
21        Q.    What about subsequent to that?  Did
22   there come a time where you or anyone else at CNN
23   were directed not to allow Alan Dershowitz to
24   appear as a guest on any CNN programming?
25        A.    I'm not aware of that.
```

```
 1                    JOHN BERMAN

 2       Q.    Do you know someone by the name of

 3  Smerconish?

 4       A.    Michael Smerconish.

 5       Q.    Who is Michael Smerconish?

 6       A.    Michael Smerconish hosts a show called

 7  "Smerconish" on Saturday mornings at 9:00 a.m.  He

 8  also is a radio host.

 9       Q.    Are you aware that the Saturday morning

10  after your broadcast Michael Smerconish canceled

11  Alan Dershowitz's appearance on his program based

12  upon an instruction from the top?

13       A.    I am not aware of that.

14       Q.    You never received such an instruction?

15       A.    I don't remember ever receiving such an

16  instruction.

17       Q.    Did your producers or anyone affiliated

18  with your show receive such an instruction?

19       A.    I wouldn't know what they received.

20       Q.    Do you recall any antagonism within CNN

21  regarding President Trump and the impeachment

22  process?

23            MS. BOLGER:  Objection to the form.

24       A.    I don't understand -- antagonism

25  between whom?
```

```
1                    JOHN BERMAN

2        Q.    Were your colleagues at CNN and

3   yourself generally supportive of the first

4   impeachment trial or not supportive of it?

5             MS. BOLGER:  Objection to the form of

6   the question.

7        A.    Neither.

8        Q.    You had no support one way or the

9   other?

10            MS. BOLGER:  Objection to the form of

11  the question.

12       A.    My job was to report on the impeachment

13  trial.

14       Q.    Accurately, honestly, and fairly,

15  right?

16       A.    My job was to work my hardest to the

17  best of my ability to report what was happening in

18  the impeachment trial.

19       Q.    As you were directed to do so by the

20  higher-ups at CNN, right?

21            MS. BOLGER:  Objection to the form.

22       A.    Our job is to report the facts as best

23  as we can.

24       Q.    In the context that would allow an

25  uninformed viewer to actually understand the facts
```

```
 1                    JOHN BERMAN
 2   objectively, right?
 3        A.    Our job is to work our hardest to
 4   present the best obtainable version of the facts.
 5   We broadcast the impeachment trial, so people
 6   could watch it for themselves.
 7        Q.    Did you ever learn about any other
 8   commentators' characterizations of Alan
 9   Dershowitz's statements on the floor of Congress
10   on January 29, 2020?
11             MS. BOLGER:   Objection to the form.
12        A.    Other besides whom?
13        Q.    Anybody that may have commented on air
14   at CNN on that day.
15        A.    I don't know who else reported.
16        Q.    Do you know who Joe Lockhart is?
17        A.    Yes.
18        Q.    Who is he?
19        A.    Joe Lockhart was a former Clinton press
20   secretary and former spokesperson for the NFL who
21   was, I believe, at that time a CNN political
22   commentator.
23        Q.    Do you know if Joe Lockhart appeared on
24   Erin Burnett's show on the evening of January 29,
25   2020?
```

```
 1                       JOHN BERMAN

 2       A.    I don't know.

 3       Q.    Have you ever heard any comments by Joe

 4  Lockhart with respect to Alan Dershowitz's

 5  statements during the Q & A at the first

 6  impeachment trial?

 7       A.    I don't remember.

 8             MR. SCHWEIKERT:  I am going to mark

 9  Plaintiff's Exhibit 13.

10             (Plaintiff's Exhibit No. 13 was

11             marked for identification.)

12       Q.    Take a moment to review Plaintiff's

13  Exhibit 13 and let me know if it is a document you

14  have seen before.

15       A.    I have not seen this document before.

16       Q.    I will represent this is a transcript

17  filed by CNN with the court that is presiding over

18  this case.  I'd like you to take a look briefly at

19  page 7 of the exhibit.

20       A.    Okay.

21       Q.    If you could please read the entire

22  comment by Joe Lockhart towards the top of that

23  page?

24       A.    Beginning with "Yes.  I mean"?

25       Q.    Yes.
```

```
 1                    JOHN BERMAN
 2        A.    "Yes.  I mean, having to work in about
 3   dozen campaigns, there is always the sense that,
 4   boy if we win, it's better for the country.  But
 5   that doesn't give you a license to commit crimes
 6   or to do things that are unethical, so it was
 7   absurd.  And what I thought when I was watching it
 8   was this is un-American.  This is what you hear
 9   from Stalin.  This is what you hear from
10   Mussolini, what you hear from authority and
11   Hitler, from all of the authoritarian people who
12   rationalized and in some cases, genocide, based on
13   what was in the public interest.  It was startling
14   and I still can't believe he went on the floor of
15   the Senate and made that argument."
16        Q.    I will represent to you that
17   Mr. Lockhart was referring to Alan Dershowitz
18   going on the floor of the Senate and making that
19   argument.
20             Do you agree with him?
21             MS. BOLGER:  Objection to the form.
22        A.    This is not how I presented what Alan
23   Dershowitz said at the time, and it is not how I
24   would present it now.
25        Q.    How would you present it now?
```

```
 1                      JOHN BERMAN
 2         A.    I would say that he offered an argument
 3    that I had not heard before which is an extremely
 4    expansive view of what is and is not impeachable
 5    for a president running for re-election.
 6         Q.    You would not qualify that with regard
 7    to a quid pro quo?
 8              MS. BOLGER:  Objection to the form.
 9         A.    Again, I do not feel that a quid pro
10    quo is in any way limiting to what actions a
11    presidential candidate can or cannot take; you can
12    commit almost any action in a quid pro quo.
13         Q.    What you said in your broadcast as
14    reflected in Plaintiff's Exhibit 6 was quote "this
15    means a president can do anything," end quote.
16              Right?
17              MS. BOLGER:  Are you going back to
18    Exhibit 6?
19         Q.    Do you not remember that?
20              MS. BOLGER:  He is entitled to look at
21    the document you're quoting --
22              MR. SCHWEIKERT:  You don't have to tell
23    him what to do.  I know you would love to testify,
24    but he's a grown man, if he's confused he can tell
25    me.  If he needs to refer to a document he can.
```

```
 1                    JOHN BERMAN

 2        Q.    Second paragraph from the bottom on

 3   page 10 of Plaintiff's Exhibit 6.

 4        A.    Yes.

 5        Q.    You said "this means a president can do

 6   anything," right?

 7        A.    "This means a president can do

 8   anything."  It was part of the discussion we

 9   already talked about; if the president is running

10   for re-election and he thinks it is in the public

11   interest for him to get re-elected, a president

12   can do anything.

13        Q.    So, under your interpretation what

14   would prevent a president from committing

15   genocide, as Mr. Lockhart says?

16        A.    That's not the language I would have

17   used.  I would hate to think of a presidential

18   candidate committing genocide.  That's not the

19   language I would have used.

20        Q.    Are you offended by Joe Lockhart's

21   comments regarding Alan and the arguments he made?

22        A.    It's not the argument that I would have

23   made.

24        Q.    Why not?

25        A.    I don't think it is necessary to make
```

```
 1                    JOHN BERMAN

 2    the point that Professor Dershowitz was offering

 3    an incredibly expansive view of what a president

 4    can and cannot do when running for re-election,

 5    whether or not that's impeachable.

 6         Q.    It wasn't not just necessary, it was

 7    offensive, right?

 8              MS. BOLGER:  Objection to the form of

 9    the question.

10         A.    It is not the argument that I made.

11         Q.    Did you ever have any communications

12    with Mr. Lockhart about his commentary that he

13    provided on Erin Burnett's broadcast?

14         A.    I don't remember ever talking to Joe

15    Lockhart about his appearance on Erin Burnett.

16         Q.    Have you ever spoken to him?

17         A.    I've spoken to Joe.

18         Q.    You call him "Joe"?

19         A.    Joe Lockhart I suppose --

20         Q.    Do you know him pretty well?

21         A.    I haven't talked to Joe Lockhart

22    in...years.  I don't remember the last time I have

23    spoken to Joe Lockhart.

24         Q.    Is he one of the commentators that may

25    have been involved on these 9:00 a.m. conference
```

```
 1                      JOHN BERMAN
 2   calls?
 3        A.    I don't know if the commentators or
 4   contributors are on the 9:00 a.m. call.
 5        Q.    Do you know who Paul Begala is?
 6        A.    Yes.
 7        Q.    Who is he?
 8        A.    Paul Begala is also a CNN political
 9   commentator; and Paul, of course, is a famous
10   political strategist who helped in Bill Clinton's
11   first election.
12              MR. SCHWEIKERT:  Let's take a brief
13   five-minute break.
14              THE VIDEOGRAPHER:  We are going off the
15   record, the time is 4:33 p.m.
16              (Recess.)
17              THE VIDEOGRAPHER:  We are back on the
18   record, the time is 4:40 p.m.
19        Q.    We were discussing before the break
20   your statement on air that "under this framework a
21   president can do anything and not been impeached,"
22   right?
23        A.    I -- yes.
24        Q.    So --
25        A.    If he's trying to get re-elected, and
```

```
 1                      JOHN BERMAN
 2  if the actions that he's taking are in the process
 3  of getting re-elected because he thinks getting
 4  re-elected is in the public interest.
 5       Q.    According to what you told the American
 6  public, could a president be impeached for
 7  treason?
 8       A.    A president could be impeached for
 9  treason because of the Constitution.
10       Q.    Could a president be impeached for
11  bribery?
12       A.    Treason and bribery, yes.
13       Q.    Could a president be impeached for high
14  crimes and misdemeanors?
15       A.    The Constitution says high crimes and
16  misdemeanors.
17       Q.    Are you aware that Alan Dershowitz has
18  repeatedly taken the position in his books, in his
19  commentary that a president can always be
20  impeached for treason, bribery and high crimes and
21  misdemeanors?
22       A.    I am aware that Alan Dershowitz says in
23  his book that it would take specific crimes to
24  impeach a president.  I am aware in 1998 he said
25  an abuse of power is impeachable.  I don't
```

```
 1                    JOHN BERMAN

 2  specifically remember him writing about treason or

 3  bribery, but I believe those are not

 4  controversial.

 5       Q.    Is it your position that Alan

 6  Dershowitz does not believe a president can be

 7  impeached for treason?

 8       A.    No.

 9            MS. BOLGER:  Objection to the form.

10       Q.    Is it your position that Alan

11  Dershowitz does not believe a president could be

12  impeached for bribery?

13       A.    No.

14       Q.    Is it your position that Alan

15  Dershowitz does not believe that a president could

16  not be impeached for high crimes and misdemeanors?

17            MS. BOLGER:  Objection to the form of

18  the question.

19       A.    Alan Dershowitz, my understanding of

20  what he wrote in 2018 was that he believed

21  impeachment required a statutory crime.  Again, in

22  1998 he did not, he thought it was abuse of power,

23  and crime-like -- so, high crimes and

24  misdemeanors, I don't know exactly how he feels

25  because there are other things that people
```

```
 1                        JOHN BERMAN
 2   consider high crimes and misdemeanors that I don't
 3   know whether Alan Dershowitz thinks a president
 4   can be impeached for those.
 5        Q.    You agree that the Constitution refers
 6   to impeachment for treason, bribery, high crimes
 7   or misdemeanors, right?
 8        A.    Yes.
 9        Q.    Is it your position that despite the
10   presence of those specific words in the
11   Constitution, Alan Dershowitz nonetheless believes
12   a president can (sic) be impeached for doing
13   anything so long as he believes it is in the
14   public interest?
15        A.    I didn't believe then, and I don't
16   believe now that Alan Dershowitz thought that
17   treason and bribery were not impeachable.
18        Q.    So your representation to the American
19   public on your broadcast that under Alan's
20   framework a president can do anything was not
21   accurate, right?
22        A.    I did not believe then, and I do not
23   believe now that Alan Dershowitz thinks that a
24   president can't be impeached for treason or
25   bribery.
```

```
 1                      JOHN BERMAN
 2        Q.    Where in the transcript of your
 3   broadcast did you explain to your audience that
 4   there were circumstances in your interpretation of
 5   Alan's argument when the president could be
 6   impeached, despite you saying that a president
 7   could do anything?
 8        A.    I was not thinking about treason and
 9   bribery.
10        Q.    And you didn't make that clear to your
11   audience, did you?
12        A.    I do not remember making that clear to
13   my audience.
14        Q.    In fact, you may have led some people
15   to believe that Alan Dershowitz was arguing that a
16   president could never be impeached, right?
17        A.    My memory of it, I didn't believe then,
18   and I don't believe now that anyone was disputing
19   the issue of treason and bribery.
20        Q.    Do you see those words or
21   qualifications to that effect in this transcript?
22        A.    No.
23        Q.    Are you aware that Paul Begala wrote an
24   article which is the subject of this lawsuit?
25        A.    I am now.
```

```
 1                    JOHN BERMAN
 2        Q.    If you learned about it through your
 3   counsel I don't want to know that, but aside from
 4   that have you ever reviewed his article or
 5   discussed his thoughts on Alan Dershowitz's
 6   answers to the Chief Justice's questions?
 7        A.    I don't remember ever having done so.
 8        Q.    Are you on a first name basis with Paul
 9   Begala as well?
10             MS. BOLGER:   Objection to the form of
11   the question.
12        A.    When I see Paul Begala I refer to him
13   as "Paul."
14        Q.    How often do you see him?
15        A.    I don't remember the last time I saw
16   Paul.
17        Q.    How often do you speak to him?
18        A.    I don't remember the last time I spoke
19   to Paul.
20        Q.    What about e-mail?
21        A.    The last message I believe I got from
22   Paul when I was in the hospital, and he wished me
23   well; and that was in April.
24        Q.    Of 2022?
25        A.    Of 2022.
```

```
 1                      JOHN BERMAN
 2        Q.    Do you recall having any communication
 3   with Mr. Begala that referenced Alan Dershowitz's
 4   statements during the first impeachment trial?
 5        A.    I don't remember.
 6              MR. SCHWEIKERT:  I think I am close,
 7   but I need to give my client the courtesy of one
 8   last call.
 9              THE VIDEOGRAPHER:  We are going off the
10   record, the time is 4:47 p.m.
11              (Recess.)
12              THE VIDEOGRAPHER:  We are back on the
13   record, the time is 4:52 p.m.
14        Q.    I'd like to direct your attention to
15   Plaintiff's Exhibit 6, the transcript of your
16   broadcast on January 30th; specifically page 9.
17              Are you there?
18        A.    Yes.
19        Q.    Do you see your first comment on that
20   page?
21        A.    Yes.
22              MS. BOLGER:  Hold on.  Is that "And
23   Josh?"
24              MR. SCHWEIKERT:  Yes.
25              MS. BOLGER:  It's not his first comment
```

```
 1                    JOHN BERMAN
 2   on the page.
 3        A.    Page 9.  What are the first words?
 4        Q.    "And Josh."  I apologize.  Do you see
 5   where it says "Berman"?
 6        A.    Yes.
 7        Q.    Second sentence you reported that Alan
 8   Dershowitz "says if a president is running for
 9   re-election because he thinks that getting elected
10   will help America, can do anything, anything.  And
11   that redefines the presidency and frankly,
12   redefines America."
13              Right?
14        A.    That's what I said, yes.
15        Q.    That's what you reported to your
16   audience on January 30, 2020, right?
17        A.    Yes.
18        Q.    I want to be absolutely clear, as you
19   sit here today in July of 2022 it is your position
20   that Alan Dershowitz has always believed that I
21   president can be impeached for at least bribery
22   and treason, right?
23              MS. BOLGER:  Objection to the form.
24        A.    I have no reason to doubt that Alan
25   Dershowitz thinks that a president could be
```

```
 1                     JOHN BERMAN

 2   impeached for treason and bribery if -- treason

 3   and bribery were not a discussion then and are not

 4   a discussion now, and are not in dispute.

 5        Q.   I appreciate that clarification, but I

 6   don't see anything like that in the transcript of

 7   your reporting on January 30th, do you?

 8        A.   We were talking about Alan Dershowitz's

 9   comments, and we were talking about his expansion

10   of what a president can and cannot do when running

11   for re-election; and again, treason and bribery

12   were not in dispute at the time.

13        Q.   So as of January 30, 2020 you

14   understood that Alan Dershowitz did, in fact, take

15   the position that a president could be impeached

16   for bribery and treason, right?

17             MS. BOLGER:  Objection to the form.

18        A.   I had no reason to doubt that Alan

19   Dershowitz did not think a president could be

20   impeached for treason or bribery; treason and

21   bribery were not something discussed during that

22   impeachment and was not part of our discussion

23   over the course of that day.

24        Q.   And as of the time of that broadcast,

25   you also understood that Alan Dershowitz believed
```

```
 1                         JOHN BERMAN

 2   a president could also be impeached for high

 3   crimes and misdemeanors, although the meaning of

 4   which was the subject of debate, right?

 5              MS. BOLGER:  Objection to the form.

 6        A.    At that time -- in 2018 Alan Dershowitz

 7   wrote a brook where he said a president could be

 8   impeached for statutory crimes.  In what he was

 9   presenting to the American people in defense of

10   advocating for Donald Trump were crimes and

11   crime-like behavior, but then in that statement

12   when he was answering the Chief Justice and talked

13   about what a president can and can't do when

14   running for re-election, he talked about a

15   president's interest.  If he felt that his

16   election was in the public interest, his actions

17   could not be impeachable.

18        Q.    So according to you, if the president

19   thought that bribing a foreign country was in his

20   interest of getting elected he could never be

21   impeached for that, right?

22              MS. BOLGER:  Objection to the form.

23        A.    It was not my -- I did not believe

24   then, I don't -- I have no reason to think that

25   Alan Dershowitz ever thought that treason and
```

```
 1                   JOHN BERMAN
 2   bribery were not impeachable, and I will only add
 3   that treason and bribery were not part of the
 4   discussion in that impeachment, and they were not
 5   part of our discussion on that day.
 6              MR. SCHWEIKERT:  I do not have anything
 7   further, I may have some follow-up if your Counsel
 8   has questions, but otherwise I will be -- most
 9   likely the subject of a disagreement -- adjourning
10   pending some rulings that I will be seeking from
11   the court with respect to some discovery issues
12   that arose today.
13              MS. BOLGER:  What are those discovery
14   issues?
15              MR. SCHWEIKERT:  I do not believe that
16   these text messages are properly redacted, I do
17   believe I am entitled to know his phone numbers
18   because he uses both phones for work purposes.
19              MS. BOLGER:  What would you do with
20   that information if you have it?  The court has
21   already quashed the request for any call logs.
22              MR. SCHWEIKERT:  Do you have any
23   questions?
24              MS. BOLGER:  What would you do with --
25              MR. SCHWEIKERT:  Are you going to
```

```
1                      JOHN BERMAN
2    un-redact his text messages and --
3               MS. BOLGER:  His text messages are
4    redacted for news gathering for other matters.
5               MR. SCHWEIKERT:  Privilege can be
6    challenged.
7               MS. BOLGER:  What would you do with the
8    phone numbers --
9               MR. SCHWEIKERT:  Am I supposed to tell
10   you my litigation strategy --
11              MS. BOLGER -- in light of the
12   Magistrate Judge's ruling that you're not entitled
13   to call logs -- confer with me.
14              MR. SCHWEIKERT:  I am conferring with
15   you.  I asked if you would provide them, you said
16   "no," and they were somehow protected under some
17   law, and I commented I did not believe the
18   redactions of his text messages are appropriate
19   because it appears he was specifically referring
20   to the preceding message, yet we have no idea what
21   it is, and if the court agrees that I am not
22   entitled to know that information, then the
23   privilege will be upheld.  If they disagree,
24   perhaps I will get a complete copy.
25              MS. BOLGER:  We have no intention of
```

```
  1                    JOHN BERMAN

  2   producing Mr. Berman again, you have had your shot

  3   with him; I have no questions.

  4              MR. SCHWEIKERT:  Thank you very much.

  5   I appreciate it; we can go off the record.

  6              THE WITNESS:  Thank you.

  7              THE VIDEOGRAPHER:  We are going off the

  8   record, the time is 4:59 p.m. --

  9              THE STENOGRAPHER:  Ms. Bolger, do you

 10   need a copy of the transcript?

 11              MS. BOLGER:  I do yes, please,

 12   expedited.  You can call me Kate.

 13              (Time Noted:  4:59 p.m.)

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

```
 1

 2                    C E R T I F I C A T E

 3    STATE OF NEW YORK     )

 4                          : ss.

 5    COUNTY OF NEW YORK    )

 6

 7              I, ELLEN SANDLES, a Notary Public and

 8    Stenographic Reporter within and for the State of

 9    New York, do hereby certify:

10              That JOHN BERMAN, the witness whose

11    deposition is hereinbefore set forth, was duly

12    sworn by me and that such deposition is a true

13    record of the testimony given by the witness.

14              I further certify that I am not related

15    to any of the parties to this action by blood or

16    marriage, and that I am in no way interested in

17    the outcome of this matter.

18              IN WITNESS WHEREOF, I have hereunto set

19    my hand this 19th day of July, 2022.


20

21              _____

22                   ELLEN SANDLES

23

24

25
```

```
1                         I N D E X

2

3   TESTIMONY              EXAMINATION BY           PAGE
    PAGE
4

5    Mr. Berman   Examination/Mr. Schweikert     6

6

7   PLAINTIFF'S
    EXHIBITS              DESCRIPTION             PAGE
8

9    EXHIBIT 1   Printout from CNN's website re:    21
                 Ethics and compliance
10   EXHIBIT 2   Document:  Society of Professional  35
                 Journalists Code of Ethics
11   EXHIBIT 3   Highly confidential:  Witness'      46
                 employment agreement; Bates 1744 -
12               1759
     EXHIBIT 4   Warner Media Standards of Business  55
13               Conduct
     EXHIBIT 5   Printout of  Congressional Record   89
14               from January 29, 2020
     EXHIBIT 6   Transcript of 1/30/2020 broadcast   96
15
     EXHIBIT 7   Guest file to prepare for segment  110
16               on New Day
     EXHIBIT 8   E-mail to CNN producer, January    155
17               30, 2020 referencing
                 "Dersh-o-nuts"
18   EXHIBIT 9   E-mail from Izzy Povich, senior    161
                 exec producer, 1/30/2020
19   EXHIBIT 10  E-mail exchange, response to       169
                 Exhibit 9, 1/30/2020
20   EXHIBIT 11  E-mail from Izzy Povich to Jeff    171
                 Zucker re: Berman's open on New
21               Day
     EXHIBIT 12  Text message exchange between Izzy 184
22               Povich and Witness
     EXHIBIT 13  Transcript filed by CNN w/the      202
23               court

24

25
```















































