# **<u>EXHIBIT 7</u>**

# Deposition Transcript

Case Number: 0:20-cv-61872-AHS
Date: July 21, 2022

In the matter of:

# Dershowitz v Cable News Network, Inc.

## Erin Burnett

**CERTIFIED COPY**

Reported by:
Ellen Sandles

**CONFIDENTIAL**



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

ERIN BURNETT        Confidential        JOB NO. 306736
JULY 21, 2022

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
 2   ---------------------------------x
     ALAN DERSHOWITZ,
 3
                    Plaintiff,
 4
 5        vs.                  No. 0:20-cv-61872-AHS
 6
     CABLE NEWS NETWORK, INC.,
 7
                    Defendant.
 8   ---------------------------------x
 9
10
11            DEPOSITION OF ERIN BURNETT
12               New York, New York
13             Thursday, July 21, 2022
14                **CONFIDENTIAL**
15
16
17
18
19
20
21
22
     Reported by:
23   ELLEN SANDLES
     Stenographic Reporter
24   Job No. 306736
25
```

```
 1                        July 21, 2022

 2                        10:11 a.m.

 3

 4           Deposition of ERIN BURNETT, held via

 5    Zoom Videoconference, before ELLEN SANDLES, a

 6    Qualified Stenographic Reporter and Notary Public

 7    of the State of New York.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential

1  A P P E A R A N C E S:

2

3       SCHWEIKERT LAW, PLLC

4       Attorneys for Plaintiff

5             1111 Brickell Avenue, Suite 1550

6             Miami, Florida 33131

7       BY:  MARK A. SCHWEIKERT, ESQ.

8             E-mail:  mark@schweikertlaw.com

9

10      DAVIS WRIGHT TREMAINE, LLP

11      Attorneys for Defendant

12            1251 Avenue of the Americas

13            New York, New York 10020

14      BY:  KATHERINE M. BOLGER, ESQ.

15            E-mail: katebolger@dwt.com

16

17

18  ALSO PRESENT:

19      Kelly Black-Holmes, In-House Counsel, CNN

20      Alan Dershowitz, via Zoom

21      Gary Williamson, Legal Videographer

22

23

24

25

ERIN BURNETT                            Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1        IT IS HEREBY STIPULATED AND AGREED,

 2    by and between counsel for the respective

 3    parties hereto, that the filing, sealing

 4    and certification of the within deposition

 5    shall be and the same are hereby waived;

 6        IT IS FURTHER STIPULATED AND AGREED

 7    that all objections, except as to the form

 8    of the question, shall be reserved to the

 9    time of the trial;

10        IT IS FURTHER STIPULATED AND AGREED

11    that the within deposition may be signed

12    before any Notary Public with the same

13    force and effect as if signed and sworn to

14    before the Court.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     ERIN BURNETT

 2            THE VIDEOGRAPHER:  Good morning, we are

 3   on the record at 10:11 a.m. Eastern time on

 4   July 21, 2022 to begin the deposition of Erin

 5   Burnett in the matter of Dershowitz vs. Cable News

 6   Network Inc. This case is venued in the Florida

 7   Southern District court, the case number is

 8   0-20-CV-61872-SINGHAL/HUNT.  This deposition is

 9   taking place via Zoom videoconference, the legal

10   videographer is Gary Williamson on behalf of

11   STENO, and the court reporter is Ellen Sandles,

12   also on behalf of STENO.

13            Would counsel please identify

14   yourselves and state whom you represent?

15            MR. SCHWEIKERT:  Good morning, my name

16   is Mark Schweikert, I represent the plaintiff,

17   Alan Dershowitz.

18            MS. BOLGER:  Kate Bolger on behalf of

19   CNN, with me in the room and the witness is Kelly

20   Black-Holmes, in-house counsel at CNN.

21            THE VIDEOGRAPHER:  Would the reporter

22   please swear in the witness?

23            THE STENOGRAPHER:  The attorneys

24   participating in this deposition acknowledge that

25   I am not physically present in the deposition room
```

ERIN BURNETT
JULY 21, 2022                          Confidential                          JOB NO. 306736

```
 1                         ERIN BURNETT

 2   and that I will be reporting this deposition

 3   remotely.  They further acknowledge that, in lieu

 4   of an oath administered in person, I will

 5   administer the oath remotely.  The parties and

 6   their counsel consent to this arrangement and

 7   waive any objections to this manner of reporting.

 8   Please indicate your agreement by stating your

 9   name and your agreement on the record.

10             MR. SCHWEIKERT:  Thank you,

11   Ms. Sandles.  Mark Schweikert, plaintiff's

12   attorney, I agree.

13             MS. BOLGER:  Kate Bolger, I agree too.

14             Whereupon,

15                      ERIN BURNETT,

16   after having been first duly sworn by Ellen

17   Sandles, a Notary Public and Stenographic Reporter

18   within and for the State of New York, was examined

19   and testified as follows:

20                   EXAMINATION BY

21   MR. SCHWEIKERT:

22        Q.   Good morning.  Could you please state

23   your legal name for the record?

24        A.    Sure, my legal name is Erin Isabelle

25   Burnett.
```

```
 1                      ERIN BURNETT

 2       Q.    Have you ever been known by any other

 3   names?

 4       A.    No.

 5       Q.    Are you currently employed?

 6       A.    Yes.

 7       Q.    Where are you employed?

 8       A.    I am employed by CNN.

 9       Q.    Were you employed by CNN during the

10   calendar year of 2020?

11       A.    Yes, I was.

12       Q.    What was your employment position

13   during 2020?

14       A.    I am an anchor, and I think chief

15   economics and business correspondent is my exact

16   title, but I basically anchor my own program

17   called "Erin Burnett Out Front," and I did in

18   2020.

19       Q.    Do you consider your role as an anchor

20   to be equivalent to a journalist?

21       A.    Yes, I do.

22       Q.    What is your current salary today?

23             MS. BOLGER:   Objection to the form.

24   The question of Ms. Burnett's salary is not at

25   issue, she is not one of the speakers of the
```

```
 1                  ERIN BURNETT

 2   allegedly defamatory statements, I am going to

 3   instruct the witness not to answer that question.

 4              MR. SCHWEIKERT:  I will note that the

 5   credibility of a witness is always at issue in

 6   every case, and in every case compensation being

 7   paid to a witness who is testifying on behalf of

 8   an employer is evidence from which a reasonable

 9   person could make a credibility determination.  I

10   am not aware of any privilege that applies, but I

11   understand you are instructing the witness not to

12   answer a fundamental question that bears upon her

13   credibility.

14              Is that right, Ms. Bolger?

15              MS. BOLGER:  The witness is not going

16   to answer the question.

17              MR. SCHWEIKERT:  And the privilege,

18   any?

19              MS. BOLGER:  The witness is not going

20   to answer the question.

21              MR. SCHWEIKERT:  So there is no

22   privilege, you're just literally instructing this

23   witness not to answer a relevant question

24   regarding her credibility.

25              MS. BOLGER:  The witness is not going
```

Confidential

```
 1                    ERIN BURNETT
 2   to answer the question.
 3        Q.   How would you describe your job as a
 4   journalist?
 5             MS. BOLGER:  Objection to the form.
 6             (Witness doesn't respond.  Ms. Bolger
 7   instructs her regarding "objection to the form"
 8   and suggests she can answer the last question.)
 9        A.   Okay.  My job as a journalist is to
10   report the news and bring information to people to
11   inform them.
12        Q.   Are you aware of any standards, in
13   general, that apply to the reporting of news by
14   journalists in the United States of America?
15             MS. BOLGER:  Objection to the form.
16        A.   I'm not aware of any overall standards,
17   no.  Our job is to report the news, inform the
18   public and speak truth to power.
19        Q.   Truth though is a standard, right?
20             MS. BOLGER:  Objection to the form.
21        A.   Of course.
22        Q.   It's not your job to speak lies, is it?
23             MS. BOLGER:  Objection to the form, you
24   can answer.
25        A.   No.
```

```
 1                    ERIN BURNETT
 2        Q.   Were there any standards that CNN asked
 3   you to abide by with respect to your performance
 4   of your job as an anchor in January of 2020?
 5             MS. BOLGER:  Objection to the form.
 6        A.   CNN has a standards and practices
 7   booklet which we all always adhere to.
 8        Q.   Are there any standards in that booklet
 9   that relate to the reporting of news?
10             MS. BOLGER:  Objection to the form.
11        A.   Well, that reporting of news is what we
12   do; so our standards and practices are applicable
13   to the reporting of news, yes.
14        Q.   What did you understand to be CNN
15   standards applicable to reporting news on
16   January 29, 2020?
17             MS. BOLGER:  Objection to the form.
18        A.   I guess our job would be to inform the
19   public of the news of the day, and to speak truth
20   to power as I see my job every day; I would have
21   seen it exactly the same on that day as any other.
22        Q.   What do you mean by "speak truth to
23   power"?
24        A.   Our job, we should be unafraid to speak
25   the truth, to air truth.  Just because someone is
```

```
 1                     ERIN BURNETT

 2   powerful doesn't mean that we are cowed by that or

 3   afraid of that; that's an important role of a

 4   journalist.

 5        Q.    Any other roles of a journalist you

 6   believe are important with respect to reporting

 7   news?

 8             MS. BOLGER:  Objection to the form.

 9        A.    I would say what I said before:  Our

10   job is to report news and to inform the public.

11        Q.    Does the CNN standards booklet you

12   referenced contain the phrase quote, "speak truth

13   to power," end quote?

14        A.    I don't have it in front of me.  That's

15   how I interpret our job.  I don't have the booklet

16   in front of me.

17        Q.    What else do you recall being in that

18   booklet during January 2020 that applied to your

19   job as an anchor for CNN?

20             MS. BOLGER:  Objection to the form,

21   misstates her testimony.  You can answer.

22        A.    Again, I don't -- I told you generally

23   how I see our job, right, to inform the public and

24   that's what I would have done every day; that

25   would be consistent with CNN's standards and
```

1              ERIN BURNETT

2    practices of which the specific details I am not

3    going to be able to recall for you any specific

4    ones, unless you have them.

5         Q.    Was one of the standards that in your

6    role as an anchor you could inform the public of

7    anything that you wanted?

8              MS. BOLGER:  Objection to the form.

9         A.    I'm not sure I totally understand your

10   question.  We would inform the public about events

11   that happened on that day.

12        Q.    During the month of 2020 was one of the

13   standards to report events in a fair and accurate

14   manner?

15             MS. BOLGER:  Objection to the form.

16   You asked for the month of 2020; that's a year.

17   You might want to clarify that.

18        Q.    Was one of the standards that applied

19   on January 29, 2020 to report the news in a fair

20   and accurate manner?

21             MS. BOLGER:  Objection to the form.

22        A.    Yes, I consider my job to be reporting

23   the news in a fair and accurate manner on any day.

24        Q.    How do you as a journalist ensure that

25   the news you are reporting is done in a fair

```
 1                        ERIN BURNETT

 2   manner?

 3              MS. BOLGER:  Erin, I am going to give

 4   you an instruction which is that you may answer as

 5   to the news gathering for this particular speech

 6   that is at issue in this lawsuit or you can answer

 7   as to your general practices.  But you should not

 8   answer as to the specifics for any story other

 9   than this one, those specifics would be protected

10   by the news gathering privilege articulated in

11   Florida State statutes, New York State statutes,

12   Florida State Constitution, New York State

13   Constitution and the United States Constitution.

14   So just stick to generalities or the reporting you

15   did for this reporting.

16              THE WITNESS:  Okay, thank you; I

17   understand.

18         A.    Mark, do you mind in that context

19   repeating the question please?

20         Q.    Sure.  In performing your role as an

21   anchor for CNN on January 29, 2020, what did you

22   do to ensure that news reporting was done in a

23   fair manner?

24         A.    On that day, as on any other, I would

25   be abreast of what was happening in the news, I
```

```
 1                    ERIN BURNETT
 2   would discuss that with my executive producer and
 3   senior team, and we would make decisions then
 4   about what we put in our program.
 5        Q.    Who was on your -- did you say "senior
 6   team"?  I'm sorry.
 7        A.    Susie Xu is the executive producer.
 8        Q.    Who was on your team for your show Out
 9   Front on that day?
10        A.    The team can change over time, but the
11   person that I would have a direct conversation
12   with would be Susie Xu; so Susie Xu and I would
13   have had direct conversations.
14        Q.    Do you recall having direct
15   conversations with Susie Xu prior to your
16   broadcast on January 29, 2020?
17        A.    I don't recall the exact conversations,
18   but yes, those conversations would have occurred.
19        Q.    So you don't remember anything about
20   any conversations that occurred with the executive
21   producer of your program before you went on air on
22   January 29, 2020, is that right?
23             MS. BOLGER:  Objection to the form,
24   that's not what the witness said.  You can answer.
25        A.    What I said was we would have had
```

1          ERIN BURNETT

2  conversations because we do every single day about

3  the program because that's our job, and I do not

4  recall the specific conversations which occurred

5  on January 29, 2020.

6      Q.    So you do not recall the specific

7  conversations you had with Susie Xu on January 29,

8  2020, correct?

9      A.    That is correct.

10      Q.    Do you recall, in general, the subject

11  matter of any communications you may have had with

12  your executive producer before going on air on

13  January 29, 2020?

14      A.    No, prior to this particular case I

15  would not be able to tell you what I talked about

16  on January 29th, I had no recollection at all.

17  Obviously, now I know it was the day of the

18  impeachment proceedings, so I do know what we were

19  talking about, I am aware of that, but that's the

20  best I can answer your question.

21      Q.    Without telling me anything that you

22  may have learned from your attorneys, do you have

23  any general understanding of the gist of

24  Mr. Dershowitz's case against CNN?

25          MS. BOLGER:  Erin, as you saw from

```
 1            ERIN BURNETT
 2   Mark's question he's not asking anything you
 3   learned from me or from Kelly.  You can answer the
 4   question --
 5        A.    Just so I understand, Mark, your
 6   question is there anything beyond?  I'm sorry,
 7   could you ask again?
 8        Q.    When did you first become aware that
 9   Mr. Dershowitz had filed a lawsuit against CNN
10   with respect to the reporting of news covering the
11   impeachment trial in January of 2020?
12            MS. BOLGER:  Objection to the form.
13        A.    I am not exactly sure -- I would have
14   found out from CNN's attorneys, Mark, at some
15   point.  I don't exactly remember when that was to
16   be frank with you.  I remember getting the call to
17   inform me; but I'm sorry, I don't remember exactly
18   when.
19        Q.    Have you ever reviewed the Complaint
20   filed by Mr. Dershowitz in this case?
21        A.    No.
22        Q.    What do you think this case is about?
23        A.    My understanding is it's about the
24   coverage of the impeachment hearing which
25   Mr. Dershowitz was obviously involved with on
```

1                      ERIN BURNETT

2    January 29, 2020.

3         Q.    Do you have any more specific of an

4    understanding that you independently acquired from

5    any source other than your attorneys?

6         A.    No, only from my attorneys.

7         Q.    Did you do anything to prepare for this

8    deposition?

9         A.    I did, I reviewed the tape from that

10   day from my program.

11        Q.    Did you review anything else?

12        A.    No, the tape and the transcript that

13   went with that tape.

14        Q.    Anything else?

15        A.    No.

16        Q.    Did you review any portion of

17   Mr. Dershowitz's statements on the floor of

18   Congress during Trump's first impeachment trial in

19   January 2020?

20        A.    I have seen that, but I have not read

21   the whole thing.

22        Q.    Are you referring to a written

23   transcript of that impeachment proceeding?

24        A.    Yes.

25              MS. BOLGER:  Objection to the form.

ERIN BURNETT                    Confidential                    JOB NO. 306736
JULY 21, 2022

1                         ERIN BURNETT

2        Q.     When do you recall reviewing portions

3    of the transcript of the impeachment proceeding in

4    January 2020?

5        A.     Portions of the transcript, just in

6    recent days as I knew I was going to be speaking

7    with you.  Obviously, the time I would have seen

8    what he said was on January 29th, 2020.

9        Q.     So preparing for the deposition you

10   reviewed the tape of your broadcast, the

11   transcript of your broadcast and portions of the

12   transcript of the Congressional Record.

13            Is that right?

14       A.     Yes.

15       Q.     Anything else?

16       A.     Not that I recall, those are the key

17   items.

18       Q.     Do you have any documents or items in

19   front of you, ma'am?

20       A.     I do not, and I do not have those

21   documents here.

22       Q.     Do you have a cell phone?

23       A.     No, I do not, it's outside the room.

24       Q.     Is anybody else present with you in

25   that location from which you are testifying?

```
 1                        ERIN BURNETT

 2        A.    No, not in this room.

 3        Q.    Are you at the office or at home?

 4              MS. BOLGER:  You don't need to know

 5   that Mark, she's by herself in a room.

 6              MR. SCHWEIKERT:  Excuse me, Ms. Bolger,

 7   you insisted adamantly that my client represent to

 8   you that his wife was not present or listening to

 9   depositions because allegedly everything that CNN

10   ever does is confidential, and the American public

11   is not entitled to any transparency, and yet now

12   you are telling me that it is inappropriate for me

13   to ask where the witness is located while she is

14   testifying under oath.

15              Is that literally your position, ma'am?

16              MS. BOLGER:  Mark, we're not going to

17   do this thing where you yell at me for fun --

18              MR. SCHWEIKERT:  Yell at you for fun?

19   Your obstruction efforts --

20              MS. BOLGER:  Erin, if you want to tell

21   Mark where you are that's fine, but obviously do

22   not tell him your address --

23              MR. SCHWEIKERT:  I didn't ask for an

24   address --

25        A.    I am in a house Mark.
```

1               ERIN BURNETT

2      Q.   Okay.  And nobody else is in that room

3   in the house with you?

4      A.   No one else --

5           MS. BOLGER:  Asked and answered.

6           MR. SCHWEIKERT:  Ms. Bolger, please;

7   form.

8           MS. BOLGER:  Asked and answered is not

9   a form objection.

10          MR. SCHWEIKERT:  It is an objection

11  that is preserved for trial.  I believe it is a

12  form objection and as I offered, I will stipulate

13  it can come under the umbrella of form, which I

14  believe it falls, so it does not continue to

15  appear that you are trying to improperly coach the

16  witness to respond to my questions by saying

17  things such as "I already answered that" or "you

18  already asked me that," which has occurred on a

19  number of --

20          MS. BOLGER:  Mark, if you want to speak

21  fine, I'll do that --

22          MR. SCHWEIKERT:  Would you please let

23  me make my record?  If you need to respond I will

24  give you that courtesy, but this sort of feigned

25  annoyance is not productive, we are officers of

1                       ERIN BURNETT

2    the court and I would ask that you conduct

3    yourself accordingly.  Just because the judge is

4    not present doesn't give you license to behave in

5    any manner that you see is fit to disrupt my

6    attempt to obtain truthful testimony, which may or

7    may not ultimately be admissible.  I am literally

8    here to ask questions, and the witness is here to

9    answer them.

10            You have the right to object to the

11   form, you have the right to instruct the witness

12   not to answer based upon privilege, and you may

13   have some other rights under other rules, but to

14   make characterizations about me or attack my

15   integrity as an attorney, as you have done

16   relentlessly throughout the prior depositions, is

17   completely out of bounds, and I want to make sure

18   that does not continue because we still have to

19   complete this deposition followed by another

20   deposition later today.  That's my position.

21            MS. BOLGER:  Let the record reflect

22   that the plaintiff yelled at me for most of that

23   speech.  Carry on, Mark.

24            MR. SCHWEIKERT:  The deposition is

25   being videotaped, nobody is yelling, but I am

1                          ERIN BURNETT

2    being firm because I am frustrated with the

3    continued --

4              MS. BOLGER:  Okay, go on, Mark, are you

5    going to ask questions, let's go --

6              MR. SCHWEIKERT:  Can I make my record

7    please?

8              MS. BOLGER:  No --

9              MR. SCHWEIKERT:  You just accused me of

10   yelling, and I want to explain that I am

11   frustrated with the egregious, unethical, unlawful

12   conduct you keep displaying just because the judge

13   is not present.  We know you would not even come

14   close to engaging in this behavior in the

15   courtroom -- I would hope, maybe I don't know that

16   -- so please, extend me the professional courtesy

17   that I have done my best to extend you when you

18   took depositions, and that I have tried to extend

19   to the witnesses despite the fact that maybe some

20   of the questions I am asking are difficult or make

21   them uncomfortable.  That's my record.

22             MS. BOLGER:  Is there a pending

23   question?

24        Q.    Aside from the video, the transcript of

25   your broadcast and portions of the Congressional

```
 1                     ERIN BURNETT
 2   Record, anything else that you reviewed in
 3   preparing to testify today?
 4        A.    No, not that I recall.  And I am trying
 5   to rack my brain just to make sure, but no, those
 6   are the key items as far as I understand them from
 7   my testimony.
 8        Q.    Aside from your attorneys, did you
 9   speak with anyone?
10        A.    No.
11        Q.    Do you recall doing anything on
12   January 29, 2020 to ensure that the news you were
13   planning to report to your audience on your
14   program was accurate?
15             MS. BOLGER:  Objection to the form.
16   Erin, you are here to answer questions about one
17   segment on your show, not the whole show.  You may
18   answer whatever you can about that one segment on
19   your show, but you're not going to answer any
20   other segments on that day.
21        A.    So Mark, I'm sorry can you repeat the
22   exact question again since I now know it's that
23   specific segment?
24        Q.    Yes, and just so we are clear going
25   forward, ma'am, I am not interested in anything
```

```
 1                    ERIN BURNETT

 2   other than the broadcast or the portion of the

 3   broadcast with respect to Mr. Dershowitz's

 4   statements on the floor of Congress.  I may ask

 5   general questions about other things, but I will

 6   let you know when I am being general.  To the

 7   extent that I am referring to a broadcast it will

 8   be that part of the broadcast, okay?

 9        A.   Yes.

10        Q.   Do you recall doing anything to ensure

11   that the news you were going to report on your

12   program on January 29th, with respect to

13   statements Mr. Dershowitz had made to Congress

14   earlier that day, were accurate?

15             MS. BOLGER:  Objection to the form, you

16   can answer.

17        A.   The best I can answer that would be, of

18   course, we always strive to make sure what we do

19   is accurate as journalists; but I do not recall

20   the specific conversations we would have had about

21   the show on January 29, 2020.

22        Q.   So, generally then, and without

23   divulging any news gathering unrelated to this

24   case, how would you customarily have tried to

25   ensure that the news being reported on a
```

```
 1                    ERIN BURNETT
 2   particular broadcast was accurate?
 3            MS. BOLGER:  I think that is a very
 4   difficult answer to give without invading the
 5   privilege.  So just please be thoughtful and do
 6   not give any specifics related to any news
 7   gathering you have done, you can speak in
 8   generalities or about the --
 9        A.    Okay.  So Mark, Susie Xu and I would
10   have conversations throughout the day about the
11   program, and the structure of the program and what
12   we include in the program; and that's the main
13   conduit between the two of us.
14        Q.    Do you rely on Ms. Susie Xu to help you
15   ensure that the news you're going to report is
16   fair and accurate?
17            MS. BOLGER:  Objection, asked and
18   answered.  You can answer again.
19        A.    Susie Xu and I are very much a team, we
20   are executive producers of the program; so yeah.
21        Q.    But her role as an executive producer
22   is different from your role as an anchor, right?
23        A.    Well, I feel -- I don't know that the
24   titles matter so much, I think I am executive
25   producer also -- yes, we are a team, we work
```

Confidential

```
1                    ERIN BURNETT
2    together; it's a conversation.
3         Q.    What generally are you customarily
4    doing when you are working together to prepare for
5    a show that will comport with your standard of
6    speaking truth to power?
7              MS. BOLGER:  Objection to the form of
8    the question; and again, Erin, if it refers to any
9    specifics just this episode and generalities.
10        A.    Right.  So in our role of informing the
11   public and as journalists we, like I said, we have
12   conversations throughout the day on what to cover.
13   You're speaking specifically about this day, so we
14   would have been watching the hearings and have had
15   conversations throughout the day as they went on,
16   and we decided how to put our program together.
17        Q.    Do you recall any sort of written
18   materials that were prepared and subsequently used
19   by you during that broadcast?
20              MS. BOLGER:  Objection to the form.
21        A.    I do not.  We have scripts which we
22   print out every night -- we have a news program,
23   we will puts scripts in there and print them and
24   hand them to the anchor.  Those are not
25   necessarily adhered to always, right, but that is
```

```
 1                    ERIN BURNETT

 2   our standard practice and probably the industry

 3   standard as well.

 4        Q.    Was there a teleprompter in the studio

 5   you on the day of the broadcast in question?

 6        A.    I will answer that question; of course

 7   there was, I don't actually recall it, but yes, as

 8   standard practice there would be a teleprompter

 9   and there certainly was on that day.

10        Q.    As a brief aside -- I'm not sure how

11   much deposition questions you've had -- but some

12   of my questions might seem silly, but as an

13   attorney I have to do something called "laying a

14   foundation."  I can't just presume that there was

15   a teleprompter --

16        A.    I understand.

17        Q.    -- so please excuse me if some of my

18   questions seem a little elementary.

19              Would the script that was prepared for

20   that day appear on the teleprompter?

21              MS. BOLGER:  Objection to the form.

22        A.    It would appear in the teleprompter,

23   and I would have a copy in my hand in most cases;

24   yes.

25        Q.    Do you recall who contributed to the
```

ERIN BURNETT                      Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1                        ERIN BURNETT
 2   writing of the script for that particular
 3   broadcast?
 4              MS. BOLGER:  Objection to the form.
 5   Again, that is the segment at issue.
 6        A.    I do not recall who would have been a
 7   part of the segment at issue.
 8        Q.    As a matter of custom around that time,
 9   would you and Ms. Xu generally collaborate on the
10   scripts for a particular broadcast?
11              MS. BOLGER:  Objection to the form.
12        A.    Yes, we would, in conjunction with
13   segment producers who are assigned to segments;
14   individual segments.
15        Q.    Do you know if there was a segment
16   producer assigned to the segment in which
17   Mr. Lockhart appeared and made some comments about
18   Professor Dershowitz?
19              MS. BOLGER:  Objection to the form.
20        A.    So, Mark, I am answering this as best I
21   can.  I would have had no recollection of this in
22   any way, shape or form in our sort of discussions
23   in preparing for this; I believe it may have been
24   Rebecca Samuels, but I am not really the best
25   person to confirm that for you.  I think it may
```

```
 1                    ERIN BURNETT

 2  have been, Mark, in discussions preparing to speak

 3  to you.

 4        Q.    Okay.  Based upon -- is there something

 5  you're looking at ma'am?

 6        A.    No, I am looking down at my hands --

 7              MS. BOLGER:  We've done that already --

 8        A.    -- I have a cup of coffee, I have a

 9  pencil and I have my reader.

10        Q.    Would you mind if you could show me if

11  there is anything on your desk?

12              MS. BOLGER:  No, there is no reason to

13  be suspicious of the witness.

14        A.    There is a pot, Mark, from the kitchen

15  that my thing is resting on.

16        Q.    Your lawyer knows that if and when you

17  testify in court you will not be allowed to bring

18  materials to the stand, unless you are provided

19  them by the court --

20        A.    Correct.

21        Q.    -- and if we were doing this under

22  usual conditions we would all be in the room

23  together and I'd be able to visually observe if

24  there was anything on the table, and I'm just

25  asking for that --
```

```
 1                      ERIN BURNETT

 2        A.    You have my word that there is no paper

 3   and there is no cell phone in this room.

 4        Q.    Is there anything else on the table in

 5   front of you, aside from the device through which

 6   you are appearing and your coffee mug?

 7        A.    No.

 8              MS. BOLGER:  She just literally showed

 9   you a pencil and a pair of reading glasses, Mark.

10        Q.    Aside from you, the executive producer

11   and the segment producer, would it have been

12   customary around that time for anybody else to

13   have provided input in preparing the script for a

14   particular segment of a broadcast?

15              MS. BOLGER:  Objection to the form.

16        A.    That would not have been customary.

17        Q.    Were there individuals that are

18   considered writers that worked in connection with

19   your show during that time frame?

20              MS. BOLGER:  Objection to the form.

21        A.    No, the way our show is structured we

22   have a writer, but he would not be involved in a

23   segment.  He writes teases and other things; he

24   would not be involved in the segment, that would

25   be the segment producer as I mentioned.
```

```
 1                     ERIN BURNETT

 2      Q.    What are "teases"?

 3      A.    The things that you read before you go

 4   to commercial.

 5      Q.    Do you recall if you had preplanned the

 6   questions or prompts that you intended to use

 7   during the segment at issue?

 8           MS. BOLGER:  Objection to the form.

 9      A.    So as I said, I don't recall obviously,

10   specifically anything from any given day.

11   Obviously, the customary thing would be that yes,

12   because I am involved in discussions throughout

13   the day about what we're going to include and how

14   we're going to include them, and making sure

15   everybody in a segment is involved in a segment;

16   so yes, I would be involved with that.

17      Q.    Were the drafts of the questions

18   customarily included in the script that was

19   typically prepared for a particular broadcast?

20           MS. BOLGER:  Objection to the form.

21      A.    I'm sorry, so you're asking would there

22   be drafts that I would review?  Is that your

23   question?

24      Q.    I understand you write a script, and my

25   question is, is part of that script including
```

1                    ERIN BURNETT

2    potential questions to ask a guest for example?

3              MS. BOLGER:  Objection to the form.  I

4    think you guys are talking past each other.

5         A.    Mark, we would discuss what we wanted

6    to put in, we would know in this case who the

7    panelists are, and we would create a conversation;

8    each of those panelists are chosen for their

9    expertise relevant to the issue at hand.  That

10   would be true in any case and certainly true in

11   this one.

12        Q.    Was one of the panelists chosen for the

13   segment at issue a gentleman by the name of Joe

14   Lockhart?

15             MS. BOLGER:  Objection to the form.

16        A.    Yes, obviously he was there that day;

17   yes.

18        Q.    Did you consider Mr. Lockhart to hold

19   an expertise in a particular subject matter at

20   that time?

21             MS. BOLGER:  Objection to the form.

22        A.    Yes, Joe is a contributor for the

23   network.  He is obviously a political operative

24   and he has worked on many campaigns, so that is

25   why he was present, along with Scott Jennings, who

1                    ERIN BURNETT

2    also fulfilled the same sort of description I just

3    gave you; so, yes.

4         Q.    Did you have an understanding in

5    January of 2020 of what the role of a contributor

6    for CNN was?

7              MS. BOLGER:  Objection to the form.

8         A.    Yes, we have many contributors, as

9    you're no doubt well aware, and they fulfill

10   various areas of expertise on any given story.  So

11   their job is to appear on the network when

12   requested, and talk about their area of expertise,

13   whatever that may be.

14        Q.    At that time, did you consider

15   contributors to be journalists reporting news on

16   behalf of CNN?

17             MS. BOLGER:  Objection to the form.

18        A.    Some contributors may be -- I'm not

19   familiar obviously with the full roster of

20   contributors, Mark, I wouldn't even pretend to be,

21   it's quite extensive -- so some contributors may

22   be, but the contributors obviously we were using

23   on that day were not, they were fulfilling other

24   roles.

25        Q.    What other roles were those?

1               ERIN BURNETT

2        A.    Joe Lockhart and Scott Jennings were

3   political operatives, and Ryan Goodman and Laura

4   Coates -- Ryan Goodman is not a contributor, Laura

5   Coates I believe was, I'm not sure, but she is

6   obviously a lawyer with extensive legal

7   experience.

8        Q.    Who chose those panelists for the

9   segment at issue?

10       A.    I don't recall, obviously we can all

11  see what roles they are fulfilling, but I don't

12  recall how we made the decision on that day; I'm

13  sorry.

14       Q.    As a matter of custom, is that a

15  decision that would be made by someone on your

16  team?

17            MS. BOLGER:  Objection to the form.

18       A.    Customarily, it is a combination of

19  things.  You know, when you are in the middle of a

20  big story and there is a certain core roster of

21  contributors, sometimes they are allocated to

22  shows so you know who is available in your hour

23  and who isn't; sometimes you seek them out.  It

24  would very much depend, so that would be how it

25  ordinarily would work.  I can't tell you how it

```
 1                        ERIN BURNETT
 2   worked on that day, I truthfully don't know.
 3        Q.    As a matter of custom, would you
 4   typically be involved in selecting a particular
 5   panelist?
 6             MS. BOLGER:  Objection --
 7        A.    Mm-mmm...it very much would depend,
 8   Mark, like I said, often it is a combination of
 9   things so I wouldn't really be able to tell you on
10   that day.  You simply have people who are
11   available, other times it is a discussion of who
12   might be the right fit, and it is a combination of
13   those two things.
14        Q.    I appreciate that, but I am trying to
15   understand if there is a person or a group of
16   people that generally, as a matter of custom,
17   would make the decision to bring on a particular
18   panelist.  Could you help me --
19             MS. BOLGER:  Objection to the form.  I
20   don't think there was a question, is there a
21   question there?
22             MR. SCHWEIKERT:  I did, I said, "could
23   you help me understand that please?"
24             MS. BOLGER:  That question has been
25   asked and answered, you can answer it again.
```

```
1                      ERIN BURNETT

2        A.    So Mark, in the case of a panel like

3   this which is mostly contributors I would often be

4   less involved in that selection because it is

5   contributors.  This being said, if there are three

6   contributors who are made available by the network

7   in our hour, we would have a discussion on which

8   one to use.  That's a general comment on how this

9   would work, because I don't recall how it worked

10  in this specific instance.

11       Q.    And I understand, nobody is a computer,

12  I don't expect people to have perfect memories.  I

13  am trying to understand generally how things were

14  done around that time.  When you reference that

15  customarily "we would have a discussion" were you

16  referring to yourself and producers?

17             MS. BOLGER:  Objection to the form.

18       A.    That conversation that I would have had

19  would have been between myself and Susie Xu.

20       Q.    I believe you referenced a "roster" of

21  potential panelists, did you not?

22       A.    Yes.

23       Q.    What did you mean by that?

24       A.    The network has a roster of

25  contributors on a variety of topics:  airplanes,
```

ERIN BURNETT                    Confidential                   JOB NO. 306736
JULY 21, 2022

```
 1                    ERIN BURNETT
 2   politics, whatever it might be in the news, who
 3   are contributors that the network can call upon
 4   for their expertise during times of high interest
 5   in their subject matter.  So in a high news
 6   environment during the impeachment there would
 7   have been a lot of people who had expertise
 8   relevant to that issue, and we would have had
 9   access to them.  As I said, some of them who were
10   in high demand would be "today they available at
11   these three hours, and tomorrow they are available
12   at those three hours," and then the people who
13   control those hours would be able to use them or
14   not use them.
15       Q.   Their availability for a particular day
16   would be shown on the roster you're describing?
17            MS. BOLGER:  Objection to the form.
18       A.   So I have never -- I am using the word
19   "roster" just generally, the network has people
20   that are contributors.  I don't know where that is
21   stored or in what form that is stored, but the
22   booking team and executive producers would have
23   access to that so they would know exactly "today
24   we have these people," and it is a combination,
25   like I said, of "here are people who are available
```

1                    ERIN BURNETT

2   who we know are of high interest," and the show

3   saying "well, we have interest in these specific

4   topics and here is our ideas of who we may want to

5   reach out to on those."

6        Q.   Do you know what was done after

7   Mr. Lockhart was selected as a potential panelist

8   to get him on the show?

9             MS. BOLGER:  Objection to the form,

10  misstates testimony.  You can answer.

11       A.   I would not have been a part of that

12  process.

13       Q.   As a matter of custom, who would have

14  been a part of the process of contacting the

15  panelist and seeing if they were available to

16  appear for a particular segment?

17       A.   That would be someone on our booking

18  staff.

19       Q.   Do you recall who was on your booking

20  staff on January 29, 2020?

21       A.   Some of them I do, but I have no idea

22  who would have reached out to Joe Lockhart.

23       Q.   Who are the people you do recall?

24       A.   Let's see...our current head of

25  booking, I don't know when -- January 2020, that

1             ERIN BURNETT

2   was right before COVID, right, so that would have

3   been right before our new head of booking came in.

4   A lot of our booking staff that was on the show at

5   the time now changed roles.  Katie Steinmatz

6   (ph) -- she's no longer with the company -- Bob

7   Hand.  It was right before our current head of

8   booking was hired, so I'm trying to think who was

9   doing it at the time.  Honestly, for this sort of

10  thing you're better to ask Susie Xu, Mark,

11  because -- Matt Frazier (ph) would have been there

12  at the time, he now no longer is with the show.

13  If you are looking for a personnel list I am not

14  really the right person.  Right now, it is a

15  different group of people predominantly.

16       Q.   I appreciate it.  I am looking for you

17  to tell me what you recall to the best of your

18  recollection, and I believe you just did so; so I

19  appreciate that.

20            As a matter of custom around that time,

21  how would the booking person contact a potential

22  panelist for a segment?

23            MS. BOLGER:  Objection to the form, you

24  can answer if you know.

25       A.   So again, I don't know in this

```
 1                        ERIN BURNETT
 2    particular case how it was done.  It is usually
 3    done via text or e-mail for a contributor or
 4    phone; one of those methods.
 5         Q.    As part of that initial contact for a
 6    panelist, does the booking person provide any
 7    context about why they are being contacted as a
 8    potential panelist?
 9              MS. BOLGER:  Objection to the form.
10         A.    I honestly am not sure Mark.  Sometimes
11    it might be as simple as "hey" -- fill in the
12    blank -- "are you available" because they are
13    contributors, so the bookers just reach out and
14    then later the segment producer would follow up to
15    talk about the segment.  Sometimes the bookers are
16    like "hey" -- blank -- "are you available to talk
17    about blank, we saw you have been saying a lot on
18    social media, so what do you think?"  It is some
19    sort of combination of that.  I can't tell you on
20    this particular day who would have had any
21    substantive conversation with Joe first.
22         Q.    I have heard the expression
23    "pre-interview."  Does that mean anything to you?
24         A.    Yes.
25         Q.    What is a pre-interview?
```

ERIN BURNETT                    Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1                    ERIN BURNETT
 2        A.    A pre-interview is something that we
 3   often do in advance of a segment, either the
 4   booker or the segment producer will have a
 5   conversation with the potential guest to find out
 6   what their thoughts are on the topic, and that
 7   helps us to construct the strongest panel to
 8   inform the public, and know the point of view of
 9   the guest.  Those conversations often, but do not
10   always happen, and I have no idea if they happened
11   on this particular day.
12        Q.    Did you say one of the reasons for the
13   pre-interview was to obtain a potential panelist's
14   point of view on a particular subject for a
15   segment?
16             MS. BOLGER:  Objection to the form.
17        A.    Yes, that is often what they can be
18   used for, to understand someone's point of view on
19   something.  So you don't have three people saying
20   the same thing.
21        Q.    Are you aware of whether there are
22   notes or any sort of digital or hard copy in which
23   a segment producer would memorialize a potential
24   guest's point of view?
25             MS. BOLGER:  Objection to the form.
```

```
 1                      ERIN BURNETT

 2       A.    Sometimes if there is a pre-interview

 3   notes will be sent around, yes.  I have no

 4   recollection of whether any were sent around on

 5   this day or whether I read them.

 6       Q.    But as a matter of custom, there were

 7   occasions when a panelist would appear on your

 8   program around that time and you did not have a

 9   prior understanding of what they were going to say

10   when you asked them a question?

11             MS. BOLGER:  Objection to the form,

12   misstates testimony.

13       A.     No, so we would always have known

14   someone's role and what they were playing; their

15   expertise, their role on the panel.  And the panel

16   had Scott Jennings, and you had Joe Lockhart and

17   you had legal expertise; so you had political and

18   legal expertise.  So we would always construct a

19   panel in that way, but that doesn't mean we would

20   know any details specifically of what a person was

21   going to say in every case.

22       Q.    As a matter of custom around that time,

23   would the panelists be provided with a draft of

24   your question or a prompt that would proceed their

25   comments?
```

ERIN BURNETT                        Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1                    ERIN BURNETT

 2     A.   No.

 3     Q.   As a matter of custom, do you do

 4  anything before the broadcast goes live to let the

 5  panelists know sort of the choreography of the

 6  program that's about to air?

 7          MS. BOLGER:  Objection to the form.

 8     A.   You're all sitting on set, you may

 9  exchange pleasantries or say how you are, "I'm

10  going to start with you."  It would very much

11  depend.

12     Q.   Do you recall any conversations on

13  January 29th before your broadcast went live with

14  Mr. Joe Lockhart?

15     A.   I do not recall anything with Joe

16  Lockhart.

17     Q.   How do you know Joe Lockhart?

18          MS. BOLGER:  Objection to the form.

19     A.   Just via his role as contributor at

20  CNN.

21     Q.   Do you recall approximately when you

22  would have met him?

23     A.   No, I'm sorry, I don't, but it would

24  have been in that context.

25     Q.   How long have you been an anchor for
```

1                    ERIN BURNETT

2    Out Front?

3         A.    More than ten years.

4         Q.    Have you ever worked for any media

5    company other than CNN?

6         A.    Yes, I have.

7         Q.    I don't need your resume, I am trying

8    to generally understand your prior experience.

9    Could you let me know briefly what other media

10   companies you had previously worked for?

11        A.    I worked for Bloomberg News, and I

12   worked for CNBC, and as part of that I did work on

13   MSNBC and NBC news.

14        Q.    Approximately when were you hired by

15   CNN in any capacity?

16        A.    Well, actually that's an interesting

17   question.  I originally came to CNN as an

18   assistant for an anchor named Willow Bay.  I left

19   CNN thinking that I would do something different,

20   and I did a lot of other things, came back into

21   news via those other companies, and then was hired

22   by CNN as an anchor in the spring of 2011 -- yes,

23   spring of 2011.  My program launched in

24   October 2011.

25        Q.    Had Joe Lockhart previously appeared as

```
 1                       ERIN BURNETT
 2   a panelist on your program during January of 2020
 3   before his appearance on the 29th?
 4             MS. BOLGER:  Objection to the form of
 5   the question.  Erin, you can't answer that as to
 6   public appearances unrelated to this matter, but
 7   if there is something that happened behind the
 8   scenes -- I don't know if that's true or not --
 9   you can mention it.
10        A.    I have no idea, I just don't remember.
11   It's possible, it would be a matter of checking
12   it; I don't know.
13        Q.    There is nothing memorable about
14   Mr. Joe Lockhart that would make you remember him
15   if he had appeared on your program during the
16   month of January 2020 before the 29th?
17             MS. BOLGER:  Objection to the form.
18   Definitely not what the witness said.
19             MR. SCHWEIKERT:  It is --
20        A.    Joe is a contributor so he could have
21   been on, very possibly.  I just don't remember.
22             MR. SCHWEIKERT:  If I put a PDF into
23   the chat, Ms. Burnett, do you have the ability to
24   open it up?
25        A.    I should.
```

```
 1                      ERIN BURNETT
 2              MS. BOLGER:  Mark, I am not sure she
 3     will be able to do a PDF as she's on an iPad, you
 4     may need to do shared screen.  Happy to try, I am
 5     just warning you in advance.
 6              THE WITNESS:  Right, let's try it.
 7              (Discussion regarding iPad and PDF.)
 8              MR. SCHWEIKERT:  Can we take a brief
 9     break off the record?
10              THE VIDEOGRAPHER:  We are off the
11     record, the time is 11:10 a.m. Eastern time.
12              (Recess.)
13              THE VIDEOGRAPHER:  We are back on the
14     record, the time is 11:27 a.m. Eastern time.
15         Q.   Ms. Burnett, I understand that you're
16     having difficulty receiving PDF documents that I
17     am dropping in the chat of this Zoom deposition.
18              Is that right?
19         A.   Yes, I am checking again, and I do not
20     see it.
21              MS. BOLGER:  Just for the record, I
22     have offered to either do the share screen so the
23     witness can see them, and I've said we can e-mail
24     them to Ms. Burnett, but her devices are out of
25     the room; so we're doing our best to try to help
```

```
1                        ERIN BURNETT
2    Mr. Schweikert get this information to Erin
3    Burnett.  She's here to testify, she's here to
4    look at whatever she needs to look at, and we are
5    prepared to help, so I want the record to reflect
6    that less it appear otherwise.
7                 MR. SCHWEIKERT:  I will show you by
8    sharing my screen a document Bates labeled CNN 65
9    through 66, which was previously marked
10   Plaintiff's Exhibit 37, but to avoid any potential
11   confusion I am going to mark the document I am
12   about to show you as Plaintiff's Exhibit 47.
13                 (Plaintiff's Exhibit No. 47 was
14                 marked for identification.)
15        Q.   Can you see a document on your screen,
16   Ms. Burnett?
17        A.   Yes.
18        Q.   I will show you quickly it's two-pages
19   long, do you see that?
20        A.   Yes.
21        Q.   I'd like to give you a chance to review
22   the document before I ask you questions about it.
23                 (Witness directs scrolling and reads.)
24        A.   I see.
25        Q.   Do you recognize that document,
```

```
 1                    ERIN BURNETT

 2   Ms. Burnett?

 3        A.    I will answer it in the current time.

 4   I believe I was aware this would come up, but in

 5   the time that you're talking about, I have

 6   absolutely no recollection of it.

 7        Q.    Is Plaintiff's Exhibit 47 an e-mail

 8   from Katie Carver sent January 29, 2020 at

 9   approximately 3:15 p.m. to Susie Xu, yourself and

10   Rebecca Samuels?

11        A.    Yes.

12        Q.    Do you see the subject of the e-mail is

13   "Wednesday panel point of view"?

14        A.    Yes.

15        Q.    Is this an e-mail in preparation for

16   your broadcast that included the segment with Joe

17   Lockhart that's at issue in this case?

18        A.    Yes, it certainly appears to be.

19        Q.    Who is Katie Carver?

20        A.    Katie Carver is a segment producer.

21        Q.    Do you recall if more than one segment

22   producer worked on the segment in which

23   Mr. Lockhart appeared on your broadcast on

24   January 29th?

25        A.    I don't recall.
```

1          ERIN BURNETT

2     Q.     Does this document we're looking at

3   refresh your recollection in any way?

4          MS. BOLGER:  Objection to the form.

5     A.     So, it would appear from this document

6   that Katie Carver would be the segment producer

7   because she sent it -- the e-mail -- and the

8   recipients would be myself, the executive

9   producer, and Rebecca Samuels -- I mentioned her

10  name earlier -- her role is the anchor producer,

11  so in that capacity she would be copied on

12  anything -- not on anything -- on many things that

13  a segment producer would send me; not all, but it

14  would be common for it to be this way.

15    Q.     Would it be common for the entirety of

16  an e-mail such as this to contain information

17  related to the segment that the segment producer

18  is e-mailing you and others about?

19         MS. BOLGER:  Objection to the form.

20    A.     I'm sorry.  Are you asking, Mark, is it

21  common to get e-mail that would include the

22  panel's point of view?

23    Q.     Correct, yes.

24    A.     It would be common.  It would not be

25  guaranteed, like I said when we were talking about

Confidential

1              ERIN BURNETT

2    how contributors work, but it would be common and

3    this would be standard; yes.

4         Q.    You see how Ms. Carver writes in the

5    bottom of her e-mail "Thought I'd send over some

6    POV early, since Lockhart is Tweeting up a storm,"

7    right?

8         A.    Yes, I see that.

9         Q.    Then there is a big box that says

10   "non-responsive," right?

11        A.    Yes.

12        Q.    Below that we see Joe Lockhart's name,

13   right?

14        A.    Yes.

15        Q.    Immediately below his name is another

16   big redaction with the phrase "non-responsive,"

17   right?

18        A.    Yes.

19        Q.    Do you recall Mr. Lockhart providing

20   any commentary on anything other than the segment

21   in which Mr. Dershowitz's statements on the floor

22   of the Congress were discussed?

23        A.    No.

24             MS. BOLGER:  Objection to the form.  I

25   don't understand the question, you can answer if

ERIN BURNETT                    Confidential                    JOB NO. 306736
JULY 21, 2022

```
1                      ERIN BURNETT

2    you do.

3          A.    I don't recall any other topic.

4          Q.    Do you believe that Mr. Lockhart was

5    brought on as a guest for your broadcast on

6    January 29th solely for the segment regarding

7    Mr. Dershowitz's statements to Congress earlier

8    that day?

9               MS. BOLGER:  Objection to the form.

10         A.    So, Mark, all I can say is I don't know

11   what these other topics were, obviously that was

12   -- I had been watching hearings all day, and he

13   had been Tweeting about it, so I would presume

14   that we booked him with the intent of being on a

15   panel about the main story of the day which would

16   be the impeachment proceedings.

17              MS. BOLGER:  Don't assume, testify to

18   what you know.

19         A.    I don't know.  All I can tell you that

20   is the segment in which he appeared, so that's

21   what he talked about I guess is the best I can

22   answer.

23         Q.    You don't recall seeing in the video or

24   reading in the transcript of the broadcast

25   Mr. Lockhart commenting on anything other than the
```

1                    ERIN BURNETT

2    legal argument presented by Mr. Dershowitz to

3    Congress, is that fair?

4              MS. BOLGER:  Objection to the form.  Do

5    you mean the segment at issue?

6         A.    The segment at issue?  He talked

7    about --

8              MR. SCHWEIKERT:  Do you see what

9    happens?

10             MS. BOLGER:  I really didn't understand

11   the question.

12             MR. SCHWEIKERT:  Ma'am, you're not

13   testifying under oath, the witness is, I know you

14   would like to coach her like you have done so many

15   times; it is really, really dumbfounding for me to

16   experience.  Could you please refrain?  If you

17   think my question is confusing you could state a

18   form objection which would cover confusing; you

19   don't need to express any statements that the

20   witness then piggybacks and parrots in response to

21   my questions, like just occurred.

22             MS. BOLGER:  For the record, the reason

23   for my request for clarification is if the request

24   was more broad I would give the standard privilege

25   objection as I was confused, and that's why I

```
 1                    ERIN BURNETT

 2   asked the question.

 3              MR. SCHWEIKERT:  Form please, ma'am.

 4        Q.   Do you recall seeing in the video or

 5   reading in the transcript of the segment at issue

 6   Mr. Lockhart make any comments about anything

 7   other than Mr. Dershowitz's legal argument to

 8   Congress earlier that day?

 9        A.   To be honest, I'm not totally sure.  Do

10   you want to play the segment again?  Joe was on to

11   talk as a former campaign operative about the

12   segment, about Alan Dershowitz's comment, as well

13   as the impeachment proceedings of the day; how the

14   impeachment hearings had gone.  So in that

15   capacity he could have talked about anything in

16   the hearing.  He was not there as -- you had Laura

17   Coates and Ryan Goodman there also doing legal;

18   Joe and Scott Jennings were there as political

19   commentators and experts.

20        Q.   What do you mean by Mr. Lockhart being

21   at that time, among other things, a "political

22   operative"?

23              MS. BOLGER:  Objection to the form.

24        A.   He was a political expert, right, he

25   had run campaigns and been very active in advising
```

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

```
1                      ERIN BURNETT
2     political campaigns.
3          Q.   Do you know if at the time he appeared
4     on your broadcast on January 29th whether he was
5     advising any candidates running for public office
6     at that time?
7               MS. BOLGER:  Objection to the form.
8          A.   I do not know, I would be the wrong
9     person to ask that question to.
10         Q.   Do you recall Mr. Lockhart using the
11    word "Hitler" during your broadcast which is at
12    issue?
13         A.   So, again, I will answer that in two
14    ways:  I had no recollection of that until I
15    reviewed the tape, and then, of course, yes, I
16    heard it.
17         Q.   When you reviewed the tape, in your
18    opinion did you appear surprised to hear that
19    word?
20              MS. BOLGER:  Objection to the form.
21         A.   I'm not sure surprised, I don't think
22    so; certainly, I wouldn't have known he was going
23    to say it until he said it.  Again, I am happy to
24    re-watch it with you at any point if that's
25    helpful.
```

ERIN BURNETT                    Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1                      ERIN BURNETT

 2       Q.    How are you certain that you know he

 3    wasn't going to say that word if you can't recall

 4    any prior discussions with Mr. Lockhart before

 5    your broadcast aired that evening?

 6              MS. BOLGER:  Objection to the form.

 7       A.    Mr. Lockhart and I would not have had

 8    -- like I said I could have passed Joe in the

 9    hallway before he came on and possibly said "hi,"

10    I can't tell you that didn't happen.  So that

11    would have been the context in which I would have

12    seen him before.

13       Q.    But you're --

14       A.    We would not have talked about a

15    substance of what he was going to say is what I'm

16    saying, that wouldn't have happened.

17       Q.    But that is an assumption you're

18    making, you don't have a specific recollection of

19    whether you did or did not talk to him before the

20    broadcast aired, is that right?

21              MS. BOLGER:  Objection to the form.

22       A.    Right, right.  We were all sitting on

23    set, I don't know where before the commercial;

24    yeah.

25       Q.    When you just reviewed Plaintiff's
```

Confidential                          JOB NO. 306736

```
 1              ERIN BURNETT
 2   Exhibit 37 (sic), which was one your segment
 3   producer's e-mails to you about Joe Lockhart's
 4   point of view before the broadcast, did you see
 5   any reference in there to Hitler?
 6          MS. BOLGER:  If you are going to ask
 7   the witness about the document you should give her
 8   the chance to see it.
 9      A.   Could you put it back up, Mark?
10      Q.   What do you remember?  Do you not
11   remember what you just read?
12      A.   I did just read it.  If you want me to
13   be 1,000 percent sure it's not in there I can read
14   it again just to double check.
15      Q.   Do you recall seeing that word when you
16   just read it moments ago?
17      A.   No, I don't.
18      Q.   So you can double check, I will share
19   my screen with you momentarily.
20          (Screen shared.)
21      Q.   Do you see a portion of the exhibit you
22   just read on the screen?
23      A.   I do.  I see the exhibit, I am just
24   skimming through it just to make sure; I just
25   don't want to say anything definitively and be
```

Confidential

1            ERIN BURNETT

2    wrong.  No, it is not in there.

3        Q.    Do you see the word "Mussolini" in this

4    e-mail sent to you with Mr. Lockhart's point of

5    view prior to the broadcast at issue?

6        A.    No.

7        Q.    Do you see the word "Stalin"?

8        A.    No.

9        Q.    Do you see the word "genocide"?

10       A.    No.

11       Q.    Do you agree that as of January 29,

12   2020 the word "Hitler" may lead some of your

13   viewers to think of the Holocaust?

14            MS. BOLGER:  Objection to the form of

15   the question.

16       A.    I don't know what it would have made

17   people think, I know from my review of the tape

18   which again, I am happy to watch again, that Joe

19   mentioned that the concept and policy of the

20   argument being put forth by Professor Dershowitz

21   was akin to authoritarian regimes and dictators

22   like Stalin, Mussolini and Hitler.

23       Q.    Do you recall Mr. Lockhart making a

24   comment to the effect that he believed

25   Mr. Dershowitz's argument was similar to those

ERIN BURNETT                      Confidential                    JOB NO. 306736
JULY 21, 2022

1              ERIN BURNETT

2  arguments dictators such as Hitler used to justify

3  the mass extermination of a particular segment of

4  the global population?

5          MS. BOLGER:  Objection to the form of

6  the question.

7      A.    We can watch the tape again, but I

8  don't believe Joe mentioned the Holocaust.

9      Q.    You don't recall hearing or reading the

10  word "genocide" when you prepared for this

11  deposition?

12          MS. BOLGER:  Objection to the --

13      A.    Can we watch it again?  Is it helpful

14  for me to watch it again?

15      Q.    I understand why memory may be fuzzy

16  about things two years ago, but I am just asking

17  if you recall, based upon having reviewed the

18  video and the transcript of the broadcast in

19  connection with preparing for this deposition?

20          MS. BOLGER:  Mark, the witness has now

21  asked twice to see the video; if you're going to

22  ask her about the video and she's asked to see the

23  video, show her the video.

24          MR. SCHWEIKERT:  As you know, I

25  respectfully get to ask the questions here.  When

1        ERIN BURNETT

2   I am done with my examination you have every right

3   to ask your own questions, play videos, anything

4   else you think is appropriate.  I am entitled to

5   know what the witness recalls.

6        Q.    So my question stands, but I will

7   restate it.  Do you recall hearing or reading the

8   word "genocide" when you watched the video and

9   read the transcript of the segment at issue in

10  preparing for this deposition?

11            MS. BOLGER:  Objection to the form.

12        A.    I don't.  I obviously did read it, I

13  did review it, but what I recall from that, that I

14  can tell you for sure was the mention of Stalin,

15  Mussolini and Hitler.  But again, I am happy to

16  watch the tape if you want me to watch it and

17  answer your questions in the context of hearing

18  how it was used; I am happy to do that.

19        Q.    Do you recall if at any time during the

20  broadcast of the segment at issue you considered

21  how the comments being made by Mr. Lockhart may

22  impact Professor Dershowitz?

23            MS. BOLGER:  Objection to the form.

24        A.    I'm trying to think how to answer your

25  question.  What I recall or what I understand what

```
 1                      ERIN BURNETT

 2   we're talking about here was the question that Ted

 3   Cruz asked which Professor Dershowitz answered,

 4   and his answer to that question is what prompted

 5   Joe Lockhart to say that that justification, that

 6   if you believe your re-election is in the public

 7   interest, that what you did to advance your

 8   re-election would be acceptable.  Joe felt that

 9   that argument had been used to justify

10   authoritarian regimes like Hitler, Mussolini and

11   Stalin.

12        Q.    Did you watch Mr. Dershowitz's answer

13   to Senator Ted Cruz's question contemporaneously

14   as it occurred on the floor of Congress?

15        A.    Yes, I did, I watched it again that

16   day.

17        Q.    Do you recall Mr. Dershowitz make any

18   comments about genocide?

19              MS. BOLGER:  Objection to the form,

20   asked and answered.

21        A.    No, I don't recall that.

22        Q.    Do you recall Mr. Dershowitz using the

23   word "Hitler" during his presentation on that day?

24        A.     No, I don't, but obviously Hitler was

25   used on the program along with Stalin and
```

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

1                    ERIN BURNETT

2    Mussolini as describing the argument and

3    justification that Professor Dershowitz was

4    putting forth in his answer to Ted Cruz.  That was

5    the argument being put forth by Joe.

6        Q.    Are you aware that Professor Alan

7    Dershowitz is Jewish?

8        A.    Yes, I am.

9        Q.    At any time during the broadcast of the

10   segment at issue or thereafter, did you ever

11   consider how the comments made by Mr. Lockhart

12   might impact Professor Dershowitz?

13           MS. BOLGER:  Objection to the form.

14       A.    I am trying to think how to answer your

15   question.  Truthfully, I don't believe someone's

16   religion would be relevant if they are putting

17   forth an argument that someone felt was an

18   argument used by authoritarian regimes, including

19   like that of Hitler, Mussolini and Stalin, then

20   they are putting forth that argument.  The

21   religion of the person putting forth that argument

22   would not be relevant.

23       Q.    So "no," you did not consider during

24   any time during the broadcast of the segment at

25   issue or thereafter how Mr. Joe Lockhart's

```
 1                   ERIN BURNETT

 2   comments might affect Professor Dershowitz, is

 3   that right?

 4             MS. BOLGER:  Objection to the form,

 5   asked and answered.

 6        A.   No, because I wouldn't think that

 7   religion would be the driver -- it wasn't the

 8   driver of the comment being made.

 9        Q.   I was not asking about religion, ma'am.

10   I was asking whether in your role as an anchor who

11   strives to speak truth to power, did you ever

12   consider at any time during the broadcast of this

13   segment at issue or thereafter about how the

14   comments made by Joe Lockhart might impact

15   Professor Dershowitz?

16             MS. BOLGER:  Objection, asked and

17   answered.

18        A.   You asked me if I knew his religion and

19   in that context if I thought that this would

20   impact him, so I am simply putting it in that

21   context.  No, I wouldn't think that his

22   religion -- if someone says something and puts

23   forth an argument, I put forth an argument, it

24   turns out that because I was raised Catholic that

25   that caused some kind of an issue, that would not
```

```
 1                        ERIN BURNETT
 2   be relevant if I put forth the argument.
 3              So Joe was commenting on the substance
 4   of the comments that Professor Dershowitz made in
 5   their totality, separate from the religion of the
 6   person making the comments, and any implied
 7   offense that a person of that religion could take.
 8        Q.    Setting aside the context of religion,
 9   did you ever consider at any time during the
10   broadcast of the segment at issue or thereafter
11   how the comments made by Joe Lockhart might affect
12   Professor Dershowitz?
13              MS. BOLGER:  Objection, asked and
14   answered.
15        A.    I'm sorry, I'm not answering this in
16   the way that you seem to be looking for, but the
17   reality of it is that would not be a consideration
18   because the comments were made about the substance
19   of what Professor Dershowitz said.  So --
20        Q.    So the answer is "no" --
21        A.    -- I would not consider it to be within
22   my purview to consider how they might make
23   somebody feel, if the person said what they said.
24        Q.    And you didn't consider it to be within
25   your purview to think about how those comments
```

1              ERIN BURNETT

2    made on your broadcast might affect the reputation

3    of Professor Dershowitz, is that right?

4          MS. BOLGER:  Objection to the form.

5       A.    Professor Dershowitz said what he said

6    on the floor of Congress.  So anything he says on

7    the floor of Congress is a matter of public record

8    and public discussion and would be important to

9    discuss, which is what we did on that panel; and

10   Joe's comment would fall exactly within that

11   realm.

12       Q.    But Mr. Dershowitz never used the words

13   "Hitler, Stalin, Mussolini" or "genocide" during

14   his statements on January 29th to Congress, did

15   he?

16          MS. BOLGER:  Objection to the form.

17       A.    No, he did not, and Joe's argument, as

18   I understand it from my review of the tape, was to

19   say what the substance of what Professor

20   Dershowitz was saying, the argument that he was

21   making about the re-election of a president being

22   within the public interest justifying anything to

23   reach that means was something used by

24   authoritarian regimes such as Hitler, Stalin or

25   Mussolini.

```
 1                    ERIN BURNETT

 2       Q.    Did you agree with those statements by

 3   Mr. Lockhart?

 4       A.    Well, my job isn't to agree or

 5   disagree, I was there moderating the panel and Joe

 6   provided that argument, and as far as my

 7   understanding from reviewing it, Scott Jennings

 8   pushed back, Joe responded, there was immediate

 9   discussion in the actual moment about the use of

10   the words Hitler, Mussolini and Stalin.  So that

11   very conversation happened in the panel itself.

12       Q.    Would you agree that part of your role

13   as an anchor on a broadcast is to ensure that

14   anything said is premised upon a fair and accurate

15   characterization of the facts that are newsworthy?

16            MS. BOLGER:  Objection to the form.

17       A.    I would say that, that's, you know,

18   fair; we put on a panel and the context of the

19   segment we're discussing where various people

20   brought various points of view.  So you had -- I

21   know I keep repeating myself -- so you had Scott

22   Jennings and Joe Lockhart sort of coming from two

23   different perspectives, obviously Joe had been a

24   long-time Democratic campaign operative and Scott

25   Republican, and we also had two lawyers with their
```

1                      ERIN BURNETT

2    extensive expertise as well, so they would bring

3    their points of view to the table to add to the

4    conversation.

5         Q.    Around that time as a matter of custom,

6    if one of your panelists crossed the line in your

7    mind of what was a fair and accurate

8    characterization of the facts you would rein them

9    in, right?

10             MS. BOLGER:  Objection to the form.

11        A.    It would very much depend on the

12   conversation and the context.

13        Q.    Have you ever in your career as an

14   anchor told a commentator on air that their

15   characterization was not consistent with what you

16   believed at that time to be a fair and accurate

17   characterization of the facts?

18             MS. BOLGER:  Objection to the form.

19   You can talk about something that's been published

20   but not any news gathering that is not public,

21   that is not related to this lawsuit.

22        A.    Right.  I'd have to say, Mark, I don't

23   recall.  Obviously, there is some fact checking

24   that goes on realtime when someone says something

25   that is counterfactual.  This specific issue would

1              ERIN BURNETT

2    have been a matter of somebody's opinion and

3    interpretation that they were there as

4    contributors to provide.

5         Q.    But that opinion was being provided on

6    CNN's platform specifically via a broadcast of

7    your television program, right?

8              MS. BOLGER:  Objection to the form.

9         A.    That's correct.

10        Q.    In your role as an anchor, some of the

11   things that are important to you is to ensure that

12   the news being broadcast on CNN's platform is

13   based upon a fair and accurate characterization of

14   facts, right?

15             MS. BOLGER:  Objection to the form.

16        A.    That's correct -- and again, I know I

17   am repeating myself -- but the matter at hand was

18   the question and answer between Ted Cruz and

19   Professor Dershowitz.  So the argument put forth

20   by Professor Dershowitz in that answer was what

21   Joe said was an authoritarian justification in

22   Joe's opinion, and he obviously mentioned those

23   authoritarian dictators in that context.  That's

24   what happened.  And as I said, after that Scott

25   Jennings did bring up the specific names

```
 1                      ERIN BURNETT
 2   mentioned, and Joe made it very clear that he was
 3   talking about the ideas and justifications put
 4   forth by those regimes, not calling an individual
 5   equivalent to Hitler.  You can play that or watch
 6   that, but that's my understanding of what
 7   happened.
 8        Q.   So you do recall some of what you
 9   watched on the video or read --
10        A.   I do recall, yes, some of it, yes, of
11   course.  If you want to get into specific words
12   used in specific contexts I would prefer to watch
13   it, but overall that is my recollection.
14        Q.   Please tell me if you agree or disagree
15   with the following statement: "The abridgement is
16   not accurate to the extent that it omitted a
17   crucial qualification that an illegal motive for a
18   quid pro quo would be corrupt."
19             MS. BOLGER:  Objection to the form.
20   And I will make the same request I made yesterday
21   which is if you are going to read from a document,
22   show it to the witness.  Erin, you can certainly
23   answer.
24        A.   To be honest, I don't understand.  Can
25   you define the word "abridgement"?
```

1              ERIN BURNETT

2       Q.    Do you recall whether a portion of

3   Mr. Dershowitz's statements earlier in the day

4   were shown during your broadcast, before

5   Mr. Lockhart made the statements that are at

6   issue?

7              MS. BOLGER:  Objection to the form.

8       A.    So I will answer this as best I can if

9   we're going not going to re-watch it.  But Mark,

10  from what I have reviewed, our job at the end of

11  the day when I am watching hearings overall --

12  I'll answer this generally so you understand where

13  we come from -- would be to say "we have a limited

14  amount of air time, right, what stands out, what

15  should be analyzed?"  So that was done at various

16  points in the program, so in the program different

17  things would have been pulled out.  So, Senator

18  Tester was on prior I know from my review of the

19  video prior to this panel, and I talked to him

20  about different things that were said, right.  We

21  don't just come on and pound the table on one

22  thing, we'll talk about various things and that

23  appears to be what we did in this case.

24      Q.    Did your broadcast include a full

25  presentation of the statements Mr. Dershowitz had

```
1                      ERIN BURNETT

2    made in response to the questions posed by Senator

3    Ted Cruz earlier in the day?

4              MS. BOLGER:  Objection to the form.

5         A.   Well, you yourself sort of made me

6    smile internally when you referred to Professor

7    Dershowitz's comments that day as the length of

8    the Bible, so we would have picked out certain

9    parts that seemed very newsworthy and noteworthy.

10   We were not going to replay the whole thing, if

11   people wanted to watch the whole thing they could

12   have watched the whole thing in its totality on

13   CNN.

14        Q.   My reference to the length of the Bible

15   was to the entire Congressional Record, not

16   necessarily to what Mr. Dershowitz said, but I can

17   understand you may have interpreted it

18   differently.

19             So it is true that CNN did not present

20   Mr. Dershowitz's entire answer to Senator Ted

21   Cruz's questions on your broadcast before

22   Mr. Lockhart made the statements that are at

23   issue?

24             MS. BOLGER:  Objection to the form, you

25   can answer.
```

1        ERIN BURNETT

2    A.    So we played a sound bite which

3  included the main response of Professor

4  Dershowitz.  But without looking at exactly the

5  full, everything, I really can't get more specific

6  to you about we put in and what we did not put in;

7  we put in the core substance of the question and

8  answer with Ted Cruz.

9    Q.    Who made the determination about what

10  sound bite to use for your broadcast immediately

11  prior to Joe Lockhart's statements that are at

12  issue?

13    A.    Okay, so you're asking specifically

14  about that one sound bite, correct?

15    Q.    Yes.  We talked about how you and the

16  producers might collaborate on a script.  Do you

17  know who made the decision to use the sound bite

18  that was shown on your show before Mr. Lockhart

19  made the statements at issue?

20    A.    Again, I am trying to answer your

21  question here, I will answer specifically and

22  generally.  Specifically no, I don't know who

23  would have made the exact in and outs decision,

24  but generally why we would have chosen to pick

25  that moment, yes, that would have been something

```
 1                    ERIN BURNETT

 2   that we would have decided; I obviously watched

 3   the hearings in real time, watched the reaction to

 4   them.  We thought that moment stood out which was

 5   reflective of how I, when I re-watched the program

 6   my verbiage that I chose, sort of it -- that it

 7   made people's jaws drop, as I recall I said

 8   something like that, that would have been an

 9   accurate reflection of how I felt that moment was,

10   and so that moment itself being chosen would have

11   been one that Susie and I would have decided to

12   put in there.  That's why it would have been

13   there, as to how specifically word-by-word, ins

14   and outs, that I'm sorry, I can't answer; I don't

15   know.

16        Q.    Do you recall if the sound bite that

17   was prepared for the broadcast at issue was

18   presented to Mr. Lockhart before he went on air on

19   your show?

20        A.    I don't know the answer to that

21   question.

22        Q.    Would it have been customary around

23   that time for your team to provide a panelist with

24   a copy of the sound bite -- are you reading

25   something, ma'am?
```

```
 1                      ERIN BURNETT
 2       A.    No, I don't have anything, I'm sorry
 3   (holds up fingers).
 4              MS. BOLGER:  Objection to the form.
 5   And also, Mark she's not reading something, please
 6   stop asking --
 7              MR. SCHWEIKERT:  Ms. Bolger, I asked
 8   her a question, she said "no," that's it.
 9       Q.    You answered my question, ma'am, that's
10   all you're here to do.  I don't need a lawyer's
11   characterization of what you're supposedly doing
12   that she is not there to witness.
13              MS. BOLGER:  It's bordering on
14   harassing is all I am saying.
15              MR. SCHWEIKERT:  It's not, it's not; it
16   is just a question.
17              MS. BOLGER:  I think you are bordering
18   on accusing the witness of being dishonest, and
19   I'm going to make my record to say that.
20              MR. SCHWEIKERT:  I am not making an
21   accusation, I asked a question and she answered
22   it, and then you jumped in and started making
23   characterizations that I'm harassing or
24   insinuating things.  It was literally a factual
25   question, "are you reading," she said "no,"  and I
```

```
 1                        ERIN BURNETT
 2    was about --
 3                 MS. BOLGER:  You've asked that several
 4    times --
 5                 MR. SCHWEIKERT:  Now you have the
 6    opportunity to have another improper interruption
 7    in my deposition, which I am striving to complete
 8    as soon as possible because I know Ms. Burnett has
 9    other things to do today.  So again, please
10    refrain from making objections other than form and
11    privilege.
12                 MS. BOLGER:  I will say again I think
13    your conduct about what the witness is doing is
14    bordering on harassing, and I'm going to make my
15    record.  I'm not sure if there is a pending
16    question, but I'm sure the witness will be happy
17    to answer whatever your pending question is.
18                 MR. SCHWEIKERT:  You have the uncanny
19    ability, just like your client, to try to spin
20    everything, and the record and videotape will
21    reflect exactly whatever it reflects, whoever
22    watches it can form their own opinions.  I did not
23    intend to harass, I was just asking and she said
24    "no."
25                 Ellen, I'm so sorry, could you briefly
```

1                        ERIN BURNETT

2    remind me what I was talking about?

3      (The following was read from the record by the

4     stenographer:  "Q. Would it have been customary

5      around that time for your team to provide a

6    panelist with a copy of the sound bite -- are you

7             reading something, ma'am?")

8        A.    I can answer that question.

9        Q.    Let me restate it.  Would it have been

10   customary around the time of the broadcast at

11   issue for your team to have provided a panelist

12   with a copy of any sound bite that was going to be

13   presented in connection with their commentary on

14   your show?

15           MS. BOLGER:  Remember not to answer to

16   any specifics other than this, but you can answer

17   generally.

18        A.    Okay.  So no, that would not be

19   customary.  Do you recall, Mark, you showed me the

20   e-mail from Katie Carver?  If a panelist had said

21   in the context of a pre-interview "oh, this moment

22   really stands out to me" or "this is really

23   significant," and we think "oh, that's where that

24   person is particularly interesting or strong" we

25   may include that moment, right, for that person to

```
 1                      ERIN BURNETT

 2   respond to; that's a situation -- I am speaking

 3   generally, obviously that was not in that e-mail.

 4   If there is a moment in any given hearing or event

 5   that's going on that gets into the ether, right,

 6   that is the moment that people are talking about

 7   then that moment could be put into a panel --

 8   "hey, this is the moment that" -- again, I don't

 9   know exactly how that sound bite, why it was

10   specifically chosen to be there to Joe, I can't

11   answer that, but when I said "this was a moment

12   that sort of made people pause, I want to play it

13   for you" that would be indicative of something

14   that people were talking about that day, on that

15   particular day of hearings that we would want to

16   play to inform the public of the moment that had

17   sort of captured the ether.  Again, I can't answer

18   you specifically, but to give you the general way

19   of how things go; yeah.

20              MR. SCHWEIKERT:  I am going to show you

21   a document --

22              (Stenographer advises Mr. Schweikert to

23   put it in the chat box for the transcript.)

24        Q.   While we are waiting, I will ask you a

25   few more questions.  Ms. Burnett, when was the
```

```
 1                    ERIN BURNETT
 2   last time you had any communication with Joe
 3   Lockhart?
 4        A.    I truthfully do not recall.  It would
 5   have been a casual conversation in the hallway.
 6        Q.    Did you communicate with him in any way
 7   in preparing for this deposition?
 8        A.    No.
 9        Q.    Are you aware that his deposition is
10   scheduled to occur later today?
11        A.    Yes.
12        Q.    Did you make any effort to connect with
13   him in some fashion to refresh your recollection
14   about the event at issue which is the subject of
15   your deposition, and will be the subject of his
16   deposition later today?
17             MS. BOLGER:  Objection to the form,
18   asked and answered.
19        A.    No.
20        Q.    Do you know if Mr. Lockhart is
21   represented by an attorney in this lawsuit?
22        A.    I know nothing about Joe and this
23   lawsuit, other than that he's involved in his
24   capacity as contributor.
25        Q.    Ms. Burnett, I have provided you a link
```

```
 1                     ERIN BURNETT

 2  to a PDF document, Bates labeled CNN 1670 through

 3  1681.  Do you see that document on your device?

 4       A.    I do.

 5             MR. SCHWEIKERT:  I will mark that

 6  document as Plaintiff's Exhibit 49 --

 7             (Discussion regarding exhibit number.)

 8             MR. SCHWEIKERT:  I am going to show you

 9  a document Bates labeled CNN 1670 through 1681, I

10  will mark that document as Plaintiff's Exhibit 48,

11  and also note it had previously been marked in

12  another deposition as Plaintiff's Exhibit 39.

13             (Plaintiff's Exhibit No. 48 was

14             marked for identification.)

15       Q.    Ms. Burnett, do you recognize the

16  document?

17       A.    I do, it is a transcript of my show

18  from the date in question.

19       Q.    Is this the transcript that you

20  reviewed in preparing for this deposition?

21       A.    Yes, it is.

22       Q.    You have the right to review it in its

23  entirety before I ask you questions.  Would you

24  like to do that or do you feel comfortable based

25  upon your prior review?
```

1                    ERIN BURNETT

2       A.    I guess, to be honest with you, if you

3    ask me the question am I allowed to refer to it?

4            MS. BOLGER:  Yes, you can of course

5    refer to the document.

6       Q.    Yes, and as we have been discussing I

7    am sort of focused on Mr. Lockhart's statements

8    which are not throughout the entire broadcast.

9            MS. BOLGER:  It is not like a binding

10   contract which I'm sure Mr. Schweikert would

11   agree.  If you want to answer his questions and

12   then say "maybe I better read it," you can do

13   that.  You can make the decision about whether you

14   want to read the agreement (sic) but you don't

15   have to commit for all times.

16           THE WITNESS:  I understand.

17      A.    I am going into the Lockhart, section,

18   go ahead Michael.(sic)

19      Q.    It's Mark, but that's okay.

20      A.    I'm sorry.

21      Q.    It's all right.  I'd like to direct

22   your attention to the page Bates labeled CNN 1671,

23   in particular the portion of the transcript of

24   your broadcast that includes the sound bite of

25   Mr. Dershowitz's presentation to Congress earlier

Confidential                    JOB NO. 306736

```
 1                    ERIN BURNETT
 2   in the day.
 3             Do you see that?
 4        A.    Because my pages are labeled a little
 5   bit differently than yours -- let me just make
 6   sure.  So you're talking about after Laura Coates
 7   speaks, right Mark, then I say "so, Ryan, Alan
 8   Dershowitz I just played, forget what I said about
 9   a crime, abuse of power is too vague a term, blah,
10   blah, blah" and then it played Professor
11   Dershowitz.
12             That's what we're talking about now?
13        Q.    What do you mean your "pages are
14   labeled differently" than mine?
15        A.    I have the entire transcript in the --
16        Q.    It is the second page.
17        A.    It is a PDF, I have the entire
18   transcript.
19        Q.    Do you see the time stamp for 7:05:02?
20        A.    My time stamps are based on military
21   time, so 19:10.
22        Q.    Correct.  Go to 19:05:02 please.
23        A.    19:05:02, so we are back with Senator
24   Tester, correct?  My 19:05:02 is in the interview
25   with Senator Jon Tester.
```

```
 1                       ERIN BURNETT

 2        Q.    Do you see that time stamp, 19:05:02?

 3        A.    I do.

 4        Q.    Right above is a statement attributed

 5   to you, Erin Burnett.

 6              Do you see that?

 7        A.    That's correct.  I am just making clear

 8   I'm in a different segment, I'm in the segment

 9   with Senator Jon Tester, not the segment with Joe

10   Lockhart.

11        Q.    Could you please read your statement

12   shown in the transcript immediately before that

13   time stamp?

14        A.    Okay, and just to be clear I would

15   clarify that it was a setup for a question as

16   opposed to a statement.  So what I said was -- and

17   I am reading as you request -- "Yes.  Well, it

18   certainly has seemed that way.  I just wanted to -

19   as you know - Alan Dershowitz, one of the

20   President's lawyers has been making the case that

21   you need a crime, a statutory crime to impeach a

22   president, that that's required.  Now, just a few

23   moments ago, just before the dinner break that

24   you're in right now, Senator, he stood up and

25   seemed to acknowledge that many constitutional
```

Confidential                    JOB NO. 306736

1              ERIN BURNETT

2   scholars are finding that argument about a crime

3   hard to stomach" -- "And he said something I want

4   to play for you.  Here he is, Senator."

5        Q.    Thank you.  Is it fair to say that

6   prior to January 29, 2020 you understood that

7   Mr. Dershowitz had been making a legal argument

8   that a crime was required in order to impeach the

9   president of the United States?

10       A.    I mean, I would say, again in reference

11  to these obviously lengthy comments he was making

12  in his role in the impeachment as his manager

13  here, that was one of the arguments that he put

14  forth, which I obviously chose to mention here.

15       Q.    According to the transcript of your

16  broadcast you literally said, in part, quote,

17  "Alan Dershowitz, one of the President's lawyers

18  has been making the case that you need a crime, a

19  statutory crime to impeach a president, that

20  that's required," end quote.

21            Do you see that?

22       A.    I see that.

23       Q.    Were you referring to him having made

24  that case during his opening statements earlier in

25  the impeachment proceeding?

1            ERIN BURNETT

2        A.    I cannot tell you exactly what I was

3   referring to when I said that; I would have been

4   watching hearings in realtime over the multiple

5   days in which they occurred.  So in any given

6   broadcast on any night it would have been about a

7   combination of the key elements of the day that

8   were worth highlighting and discussing, and points

9   that had been made.  So I can't tell you exactly

10  from where I took that video clip.

11       Q.    But it is fair to say you were

12  informing your viewers at this moment in the

13  broadcast that Mr. Dershowitz had been making the

14  case that a crime, a statutory crime, was required

15  to impeach a president, right?

16       A.    I would say Mr. Dershowitz made

17  several, many arguments, some of which

18  contradicted each other during his presentation;

19  one of them was this point.

20       Q.    The point that you characterized as

21  Mr. Dershowitz making the case that a statutory

22  crime was required to impeach a president, right?

23            MS. BOLGER:  Objection to the form,

24  asked and answered.  You may answer it again.

25       A.    That is the point that I was making

```
 1                      ERIN BURNETT

 2    right here, yes, I was playing a sound bite where

 3    he says that; I was merely pointing out that in

 4    the course of his presentation as one of the

 5    president's lawyers he made many points, some of

 6    which were seemingly confusing and contradictory.

 7    One of the points he made was this one, and I

 8    wanted to have the Senator respond to

 9    Professor Dershowitz's argument.

10        Q.    Are you aware of whether the legal

11    debate which Mr. Dershowitz was addressing was

12    whether conduct less than a crime is sufficient as

13    a matter of Constitutional law to impeach a

14    president?

15             MS. BOLGER:  Objection to the form.

16        A.    I'm not sure I totally understand your

17    question, Mark, but looking at the transcript

18    here, the context was obviously whether abuse of

19    power in and of itself would constitute an

20    impeachable offense.

21        Q.    President Trump was not charged in any

22    of the articles of impeachment with a statutory

23    crime, was he?

24             MS. BOLGER:  Objection to the form,

25    calls for a legal conclusion.  You can answer.
```

```
 1                    ERIN BURNETT
 2        A.    Yeah, I mean, as a lawyer you
 3   understand obviously that impeachment is not a
 4   legal standard, right, it is a political process
 5   in Congress.
 6        Q.    As a journalist who is committed to
 7   speaking to truth to power and ensuring that her
 8   audience receives a fair and accurate report of
 9   the news, did you understand while you were
10   reporting on the impeachment trial that President
11   Trump had been charged with, among other things,
12   abuse of power which is not a statutory crime?
13              MS. BOLGER:  Objection to the form.
14        A.    Again, I'm not a lawyer so I don't want
15   to go out on territory that I am not on, but
16   impeachment is not a legal standard.
17        Q.    You literally told your audience,
18   according to the transcript we're reviewing, that
19   despite not being a lawyer that you believed
20   Professor Dershowitz's case he was making was that
21   a statutory crime was required to impeach the
22   president, right?
23              MS. BOLGER:  Objection to the form.
24        A.    Yes, that is one of the arguments that
25   Professor Dershowitz made, but again, I would be
```

```
 1                    ERIN BURNETT
 2   remiss if I didn't make it clear that he also at
 3   other times in the length of the many days that he
 4   was speaking, several days -- I don't know exactly
 5   how many it was -- say things which appeared to be
 6   confusing or contradictory to that point.
 7        Q.    So you found his presentation to
 8   Congress over the course of the impeachment
 9   proceeding to be confusing and contradictory, even
10   though you admit that he was making a legal
11   argument and you're not a lawyer, right?
12             MS. BOLGER:   Objection to the form,
13   misstates testimony.
14        A.    I'm not really sure what your question
15   is.  My job is to watch those hearings and be
16   informed and inform the public on what happened,
17   and to bring on subject matter experts to provide
18   substantial, substantive analysis for viewers.
19        Q.    Did you qualify your characterization
20   of Mr. Dershowitz's case that he had been making
21   during the impeachment trial as based upon your
22   lay opinion because you are not a lawyer; did you
23   do that?
24             MS. BOLGER:   Objection to the form.
25        A.    Could you ask that one more time, Mark,
```

```
 1              ERIN BURNETT
 2  so I could understand your phrasing?
 3      Q.   Sure.  I understand in response to my
 4  questions you're making it clear that you're not a
 5  lawyer and not qualified to provide a legal
 6  opinion, right?
 7      A.   I guess I would answer that question if
 8  I had lawyers on the program to provide their
 9  legal opinion.  Just looking at the transcript
10  that you provided, when I say "I am not a lawyer"
11  Ryan Goodman responds "I actually have taught at
12  Harvard with Alan and I am a lawyer and I've never
13  heard that argument in my life...It's the most
14  absurd theory I've ever heard of."  So Ryan
15  Goodman is the one providing that analysis, that
16  is, of course, referring to the comments which
17  Professor Dershowitz made in response to Ted
18  Cruz's question.
19      Q.   Right, but you --
20      A.   But the reason I bring that up is
21  because there are lawyers who are there to provide
22  their analysis.
23      Q.   But you don't recall being aware of
24  what your panelists might say during that
25  broadcast, and yet when you told your audience
```

```
 1                    ERIN BURNETT
 2   about your opinion of the case that Mr. Dershowitz
 3   had been making during the impeachment trial you
 4   didn't tell them "I'm not a lawyer, this is just
 5   my lay opinion," did you?
 6              MS. BOLGER:  Objection to the form.
 7        A.    I don't believe I put forth an opinion.
 8   Professor Dershowitz had made a case that you need
 9   a crime, a statutory crime, and I wanted to make
10   sure that people understood that at one point he
11   had made that case, and I wanted to put his point
12   out there so that Senator Tester could respond as
13   to whether he thought that was compelling.
14        Q.    He's consistently made that case that a
15   crime was required to impeach a president
16   throughout the entire duration of the impeachment
17   proceeding, right?
18              MS. BOLGER:  Objection to the form.
19        A.    I'd have to say at the time I would
20   have watched it live, and in my review
21   subsequently in preparation for speaking to you,
22   Mark, he was at times confusing and appeared to be
23   somewhat contradictory to that; so no, I wouldn't
24   say the way that you're characterizing it to me to
25   be fully accurate.
```

```
 1                        ERIN BURNETT
 2        Q.    Do you recall if you informed your
 3   audience that you found his argument to be
 4   confusing and contradictory?
 5        A.    Well, I guess in the context of this
 6   program as I review it, right, I gave Senator
 7   Tester the chance to respond to Professor
 8   Dershowitz's point about statutory crime, and then
 9   in the panel we talked about something that
10   Professor Dershowitz said which appeared to be
11   confusing or contradictory to that, right, so
12   various things he said were covered during the
13   program.
14        Q.    Following the portion of your words in
15   the transcript we have been discussing, a video
16   clip was played on your broadcast, right?
17        A.    Yes, I can see it here.  You're
18   referring to the panel with Joe Lockhart, Laura
19   Coates --
20        Q.    No, I am still referring to the 7:05
21   time stamp.
22        A.    I'm sorry, yes, I do see, yes; "Alan
23   Dershowitz member of Trump's defense team" sound
24   bite, correct.
25        Q.    And a sound bite of Mr. Dershowitz's
```

1        ERIN BURNETT

2   presentation was played which reads quote, "I read

3   you the list of 40 American presidents who have

4   been accused of abuse of power.  Should every one

5   of them be impeached?  Should every one of them

6   have been removed from office?  It's too vague a

7   term.  Reject my argument about crime.  Reject it

8   if you choose to.  Do not reject my argument that

9   abuse of power would destroy the impeachment

10  criteria of the Constitution and turn it in the

11  words of one of the senators of the Johnson trial

12  to make every president, every member of the

13  Senate, every member of Congress be able to define

14  itself from within their own bosom," end quote.

15        Do you see that?

16  A.    I see that.

17  Q.    What did you understand in your lay

18  opinion to be Mr. Dershowitz's point in making

19  those statements that I just read?

20        MS. BOLGER:  Objection to the form.

21  A.    So my lay opinion I don't see in here

22  at all, right, it was merely a matter of if I was

23  going to put on a democratic senator I wanted the

24  senator to respond to one of the key points that

25  Professor Dershowitz was put in for.

1                    ERIN BURNETT

2        Q.    Can you please read into the record for

3   me the things you said on your broadcast

4   immediately after that sound bite was played?

5        A.    That would be, yes, at the end of the

6   video clip, this is the question I asked Senator

7   Tester, "Senator, so that argument is he sort of

8   after making a passionate argument about crime

9   saying reject it, I don't care.  Throw it out if

10  you don't want it.  But if your standard is abuse

11  of power, every single president would be

12  impeached.  Do you find that argument compelling

13  at all?"

14       Q.    Thank you.  Do you recall if those

15  statements and questions by you were part of the

16  script for the program?

17            MS. BOLGER:  Objection to the form.

18       A.    I'm not sure exactly what you're asking

19  Mark, but if you are asking whether I would have

20  known I was going to ask that question before I

21  asked it the answer is yes, because there is a

22  sound bite in there.

23       Q.    In the prompt to Senator Tester you do

24  describe Mr. Dershowitz as making a passionate

25  argument about rejecting the requirement of a

ERIN BURNETT                    Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1                    ERIN BURNETT
 2   crime in order to impeach a president, right?
 3             MS. BOLGER:  Objection to the form,
 4   misquoted.
 5        A.    I am going back to it, sorry.
 6             MR. SCHWEIKERT:  For the record, I did
 7   not say I was quoting her.
 8        Q.    My question, ma'am, is in your
 9   statements following the sound bite you did
10   describe what you believed to be a passionate
11   argument by Mr. Dershowitz regarding; reject his
12   position that a statutory crime is required to
13   impeach a president, right?
14             MS. BOLGER:  Objection to the form.
15        A.    So all I can answer to you is this
16   question was about this moment.
17        Q.    My question was --
18        A.    Right, so at one point when Professor
19   Dershowitz said this, right, I would want to make
20   sure to represent what someone said at one point
21   in that day, right, so I would take this to force
22   Senator Tester to respond to that point.
23   Professor Dershowitz said other things at other
24   points, we would discuss that in other places
25   which, of course, we did during this program.
```

1                     ERIN BURNETT

2       Q.    In the portion of the transcript

3    immediately following the sound bite you, in part,

4    were telling your viewers that Mr. Dershowitz had

5    argued that if abuse of power is the standard for

6    impeachment then every single president could be

7    impeached, right?

8            MS. BOLGER:  Objection to the form.

9       A.    I played the sound bite of what he said

10   there.

11      Q.    I didn't ask you if you played the

12   sound bite, ma'am.

13      A.    I can only tell you I played what he

14   said.  Are you trying to get me to paraphrase what

15   he said?

16      Q.    All right --

17      A.    I am a little confused because we have

18   the exact words of what he said right here.

19      Q.    I am focused on your words, ma'am.

20      A.    And so, like I said, he made different

21   arguments over the period of his presentation that

22   were at times confusing.  One of the arguments

23   that he made was the argument I played here, and

24   asked Senator Tester to respond to.

25      Q.    My question, ma'am, did you, following

1              ERIN BURNETT

2   the sound bite we have been discussing say, in

3   part, quote, "so that argument is he sort of after

4   making a passionate argument about crime saying

5   reject it, I don't care.  Throw it out if you

6   don't want it.  But if your standards is abuse of

7   power, every single president would be impeached,"

8   end quote.

9          Right?

10      A.   Yes, I read that to you, yes, that is

11   what I said.

12      Q.   When you made those statements on air

13   to your audience, did you understand the point

14   that Mr. Dershowitz was making that if conduct

15   less than a crime is going be impeachable, such as

16   abuse of power, then that could lead to

17   circumstances where every single president would

18   be impeached, right?

19          MS. BOLGER:  Objection to the form,

20   asked and answered.  You can answer it again.

21      A.   That is one of the arguments that

22   Professor Dershowitz made during his presentation,

23   and that is the one I put here; yeah.

24      Q.   If we go to the next page there is a

25   time stamp 19:10.

```
 1                        ERIN BURNETT
 2       A.    I see it.
 3       Q.    Above that there is a quote attributed
 4  to you, right?
 5       A.    Mm-hmm.
 6       Q.    Is that a "yes"?
 7       A.    Yes.
 8       Q.    You said at that approximate time
 9  quote, "So Ryan, Alan Dershowitz, I just played
10  his whole, OK, forget what I said about a crime
11  but abuse of power is too vague of a term. He had,
12  arguably, even before that moment, the moment of
13  the day, that sort of had people going, wait, what
14  did he just say, what does this mean.  Let me play
15  it for you," end quote.
16            Did I read that correctly?
17       A.    You read exactly what I am seeing on
18  the transcript.
19       Q.    Okay.  And then another sound bite was
20  shown, right?
21       A.    Uh-huh.
22       Q.    Is that a "yes"?
23       A.    Yes.
24       Q.    In that sound bite Mr. Dershowitz said
25  quote, "Every public official whom I know believes
```

1                    ERIN BURNETT

2    that his election is in the public interest.  And

3    mostly you're right, your election is in the

4    public interest.  And if a president does

5    something, which he believes will help him get

6    elected in the public interest that cannot be the

7    kind of quid pro quo that results in impeachment,"

8    end quote.

9              Is that right?

10        A.    You read exactly what I'm seeing on the

11   transcript.

12        Q.    According to the transcript of your

13   broadcast what did you say to your audience

14   immediately following that sound bite?

15        A.    I said -- I am reading from the

16   transcript -- "I mean, I'm not a lawyer, I can't

17   believe Alan Dershowitz would take that seriously

18   if you heard that from someone else.  I mean, the

19   translation is do whatever you need to do to win

20   office.  If you think you're the best person for

21   that office, it's okay."

22        Q.    Do you recall Mr. Dershowitz making any

23   arguments throughout the impeachment trial to the

24   effect that a president can do whatever he needs

25   to do to win office and so long as he thinks -- he

```
 1                       ERIN BURNETT
 2   or she -- is the best person for that office, it's
 3   okay?
 4        A.    Well, that's what he said in the video
 5   clip prior to what I just read; yeah.
 6        Q.    It is not word-for-word what he said,
 7   is it?
 8            MS. BOLGER:  Objection to the form.
 9        A.    He said, "if a president does
10   something, which he believes will help him get
11   elected in the public interest that cannot be the
12   kind of quid pro quo that results in impeachment."
13            So I think my characterization is fair,
14   and, of course, we had lawyers on who you can --
15   obviously, I don't need to read it to you, Ryan
16   Goodman then proceeds to say "it is the most
17   absurd theory I've ever heard."
18        Q.    You believe your characterization is
19   fair and accurate, even though earlier in the
20   broadcast you had explained Mr. Dershowitz's point
21   that if abuse of power was the standard for
22   impeachment then every single president could be
23   impeached --
24            MR. SCHWEIKERT:  Objection to the form.
25        Q.    Is that right?
```

Confidential

```
 1              ERIN BURNETT
 2       A.    As I have said, Professor Dershowitz
 3   said things during his presentation which at times
 4   were confusing and contradictory, so he made
 5   different points, some of which could appear to be
 6   contradictory, but he made those points.  And our
 7   job is to air those points and inform the public
 8   with what he said, and give them an opportunity to
 9   hear people discuss them, which is what they're
10   doing here in this panel.
11       Q.    Do you agree that if portions of a
12   broader presentation are taken out of context it
13   is possible that an audience hearing those
14   portions might misinterpret the point of the
15   larger presentation?
16            MS. BOLGER:  Objection to the form.
17       A.    I guess the best way to answer your
18   question, Mark, so as far as I understand it, is
19   to say there were many hours and multiple days of
20   hearings in which Professor Dershowitz presented
21   himself.  So if viewers wanted to hear everything
22   that he had to say in its totality with all
23   context they could have watched them live on CNN
24   when they aired.  And when they watch programs
25   after the fact it is our job to go through and
```

Confidential

1        ERIN BURNETT

2    pick some of the key and most important points,

3    and in this program I picked multiple points which

4    could be seen as contradictory to each other by

5    the professor but -- that he made, that is up for

6    the viewers to decide and our job to provide the

7    context and panel to discuss the comments which is

8    what we did here.

9        Q.    Do you recall specifically picking

10   these sound bites for the program?

11            MS. BOLGER:  Objection to the form,

12   asked and answered.

13       A.    As I said, I don't recall exactly

14   picking them, but the best way to answer your

15   question, as I believe you intended, is that I had

16   watched the hearings live and would have had a

17   conversation with Susie Xu about what elements we

18   felt were important to include in the program.

19       Q.    In the sound bite that we just

20   discussed, do the words "unlawful, illegal or

21   purely corrupt" appear?

22            MS. BOLGER:  Objection to the form.

23       A.    They do not.

24       Q.    Do you think in your role as a

25   journalist speaking power to truth (sic) and

```
1              ERIN BURNETT
2   providing a fair and accurate report of the moment
3   of the day to your audience that it might be
4   important for them to understand that
5   Mr. Dershowitz had, in fact, also said in response
6   to Senator Ted Cruz's question that "the only
7   thing that would make a quid pro quo unlawful is
8   if the quo were illegal"?
9              MS. BOLGER:  Objection to the form.
10       A.    I believe the way we did this includes
11  the core of what Professor Dershowitz said -- and
12  I am reading through here the commentary where
13  Ryan Goodman goes into some more details -- so I
14  think it's, I feel very comfortable with how we
15  did this; and again, in the context of someone
16  watching this program they would have also seen
17  what Professor Dershowitz said which I played to
18  Senator Tester.
19       Q.    But the way you did this allowed
20  Mr. Joe Lockhart to subsequently say moments
21  later, in part, quote "And what I thought when I
22  was watching it was this is un-American.  This is
23  what you hear from Stalin.  This is what you hear
24  from Mussolini, what you hear from authority and
25  from Hitler, from all of the authoritarian people
```

1                    ERIN BURNETT

2    who rationalized and in some cases, genocide,

3    based on what was in the public interest.  It was

4    startling and I still can't believe he went on the

5    floor of the Senate and made that argument," end

6    quote.

7              Right?

8              MS. BOLGER:  What's the question?  Is

9    there a question?

10             MR. SCHWEIKERT:  Yes, there was; please

11   refrain from making unnecessary comments.

12             MS. BOLGER:  Objection to the form.

13        A.   Okay, I am a bit confused.  I'm

14   certainly not going to speak for Joe Lockhart, I

15   can only speak for what I know occurred here.  I

16   am watching the hearings, I am also watching

17   others watch the hearings via social media and

18   things like that, specifically Twitter, where, as

19   you obviously pointed out in Katie Carver's

20   original e-mail Joe Lockhart had been Tweeting up

21   a storm -- I don't know if those were her exact

22   words -- but certainly Joe Lockhart would have

23   been watching the hearings in their entirety and

24   Joe Lockhart's comments would be based upon his

25   interpretation of the hearings in the moment that

1          ERIN BURNETT

2    he thought mattered in however he perceived that

3    to be; again, I know you will speak about that

4    with him.

5          Q.    You said, did you not, that the way you

6    did this segment you believe was a fair and

7    accurate report of the moment of the day to your

8    audience, right?

9          A.    Yes.

10         Q.    The way in which you did this segment,

11   including the sound bites that you played, were

12   what Mr. Lockhart premised his comments upon which

13   I just read into the record, right?

14              MS. BOLGER:  Objection to the form.

15         A.    Well, I am confident with how we

16   presented it, I am confident with how we put it

17   forth.  I can't speak for Joe Lockhart in terms of

18   how he based his comments, but from what I read

19   here and from the e-mail and knowing Joe

20   Lockhart's job as a contributor, Joe Lockhart

21   would have watched the entire hearing.  Joe

22   Lockhart's first interaction with the hearings

23   would not have been a sound bite he heard on my

24   program.

25         Q.    But it is possible that some of the

Confidential                    JOB NO. 306736

1                    ERIN BURNETT

2     people who were watching your program while it

3     aired may have been hearing these portions of

4     Mr. Dershowitz's statements that you selected as

5     sound bites for the first time, right?

6             MS. BOLGER:  Objection to the --

7        A.    Absolutely it is, and if they had not

8     watched the hearings, and -- I think we did a good

9     job.

10       Q.    Wouldn't it have been fair and accurate

11    to ensure those viewers that had not watched the

12    entirety of Mr. Dershowitz's answer to Senator Ted

13    Cruz's question to understand from the anchor who

14    is speaking the truth to power that he had, in

15    fact, explained in his opinion that the only thing

16    that would make a quid pro quo unlawful is if the

17    quo were in some way illegal, right?

18            MS. BOLGER:  Objection to the form.

19       A.    Again, I am very confident with how we

20    cut and presented this.  I don't want to get into

21    a legalese discussion with you, but I would direct

22    you to what Ryan Goodman said in which he gets

23    into the interest of winning re-election and some

24    of the definition of what you're talking about,

25    and I do that to make a point that our job is to

1                          ERIN BURNETT

2    provide analysis, and people who can provide

3    substantive commentary, right, of which all of the

4    individuals on this panel did and are capable of

5    doing.  So out of that sound bite the person who

6    first responded was the lawyer, Ryan Goodman.

7         Q.    You're referring to Mr. Goodman's

8    comments and I am paraphrasing that he believed

9    Mr. Lockhart's commentary was extreme, right?

10             MS. BOLGER:  Objection to the form.  He

11   didn't say anything about Mr. Lockhart.

12        A.    I don't believe Ryan Goodman

13   responded -- Ryan Goodman came out of the sound

14   bite.  He commented on Mr. Dershowitz's theory as

15   "the most absurd theory I've ever heard."  And

16   then gets into the definition and Joe Lockhart

17   comes in after that.

18        Q.    I apologize.

19        A.    I believe it's Scott Jennings the one

20   you're referring to.

21        Q.    Yes.  Are you aware of a moment after

22   Mr. Lockhart had made his comments about Hitler

23   and others in which Mr. Jennings said, in part --

24   and I am reading from page CNN 1673 -- quote, "I

25   don't think it is appropriate frankly to compare

1                  ERIN BURNETT

2     the president of The United States to Stalin,

3     Mussolini, Hitler and people who commit genocide,

4     end quote.

5                  Right?

6          A.    I do see that, I do see that, mm-hmm.

7     I think, Mark, this is what I was referring to

8     earlier, this is the realtime discussion that

9     happened on the program about the use of the

10    dictators' names.  So Jennings took issue and then

11    Lockhart below that responds to say he did not

12    compare the president to those individuals, he was

13    talking about the argument and the

14    rationalization, "is exactly the rationalization

15    that these authoritarian dictators made," I am

16    quoting from him and his response.  So he and

17    Jennings did have the back and forth and the use

18    of those names, and why Lockhart felt it was

19    appropriate and important to make that point.

20         Q.    Why didn't you interject and say

21    anything similar to what Mr. Jennings said that

22    the rhetoric Joe Lockhart was using was not

23    appropriate for a fair and accurate presentation

24    of the moment of the day to your audience?

25                MS. BOLGER:  Objection to the form.

```
 1                    ERIN BURNETT

 2       A.    I can't put myself exactly back in that

 3   moment, Mark, but I would say that I understood

 4   Joe Lockhart's point to be that the argument and

 5   rationalization being put forth was an argument

 6   that he felt consistent with those authoritarian

 7   regimes.  So I understood Joe Lockhart's argument

 8   to be what it was; but Scott Jennings jumped in

 9   and made his point and they had their back and

10   forth about it, so certainly that was very loud

11   and clear to the audience.

12       Q.    And if we look at the fourth page of

13   the transcript around the time stamp 19:15:04.

14       A.    I see it.

15       Q.    That time stamp is printed after

16   Mr. Lockhart had clarified his earlier comment,

17   right?

18       A.    Yes.  Joe Lockhart expounded upon his

19   argument, and then 19:15:04; yes.

20       Q.    And then you said quote, "As long as

21   the end justify the means, then you're there," end

22   quote.

23             Right?

24       A.    Yes, I see it on the transcript.

25       Q.    What did you mean by that?
```

1          ERIN BURNETT

2       A.    I meant what I said.  This entire

3    conversation such that I see it here, this back

4    and forth with the panel specifically -- as

5    opposed to Jon Tester which was obviously about

6    different points -- is about the back and forth

7    with Ted Cruz.

8       Q.    Were you paraphrasing your

9    understanding of Mr. Lockhart's commentary for

10   your audience?

11            MS. BOLGER:  Objection to the form.

12      A.    I'm just looking here Mark.  It looks

13   like, yes, that's what I am doing.  If you are

14   looking at an interjection at that moment -- we

15   could certainly play the tape and I could watch

16   it -- but again, my apologies, I can't put myself

17   back in that exact moment reading this; it looks

18   like an interjection which would be sort of an

19   exclamation point on what the person was saying.

20      Q.    Do you believe that you were being

21   objective in making a statement in paraphrasing

22   Joe Lockhart to the effect that so long as the end

23   justify the means you can do whatever you want and

24   not be impeached?

25            MS. BOLGER:  Objection to the form.

ERIN BURNETT                    Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1                    ERIN BURNETT
 2       A.    Well, obviously what I exactly said "as
 3   long as the end justify the means, then you're
 4   there," just reading it.  Yeah, I would say that
 5   would be an objective, sort of a you're quick in
 6   the moment, right, that's what live television is,
 7   a summary of what Lockhart said.
 8       Q.    And you believe that to be true, even
 9   though moments earlier in the show you had
10   informed your audience that the case
11   Mr. Dershowitz had been making throughout the
12   impeachment proceeding was that a statutory crime
13   was required for impeachment, right?
14            MS. BOLGER:  Objection to the form.
15       A.    Again, I guess the way to answer your
16   question is that Professor Dershowitz had made
17   various arguments.  At the time, I'm watching them
18   in realtime, "okay, you said this and then you
19   said this, these two things are different."  Both
20   of the points of view are present in this program,
21   so you would have heard the statutory crime
22   argument, just as you would have heard the
23   response to Ted Cruz.
24            I will say, Mark, in retrospect now
25   looking back on that day I still think a lot of
```

1              ERIN BURNETT

2   what the Professor said that day was confusing and

3   made different points, probably perfectly natural

4   for someone to make different points during a

5   presentation which may seem contradictory or

6   confusing, but that is what -- even looking back

7   on it now I still have that same impression.

8       Q.    But in your role as an anchor you

9   didn't explain to your audience that you found the

10  argument to be confusing and subject to possibly

11  more than one interpretation.  You, in fact,

12  paraphrased Mr. Lockhart by saying quote, "as long

13  as the end justify the means, then you're there,"

14  end quote.

15          Right?

16          MS. BOLGER:  Objection to the form of

17  the question.

18      A.    No, I guess since we are talking about

19  the totality now of two segments I would say I

20  presented a sound bite of Professor Dershowitz

21  saying his point about a statutory crime, and I

22  presented a sound bite of Ted Cruz talking about

23  actions being justified in the interest of

24  re-election.  So the inconsistency such that it is

25  was in the sound bites of the professor himself.

1              ERIN BURNETT

2        Q.    Do you see in the transcript where

3    Mr. Lockhart said, in part, in his first comments

4    after the sound bite that quote, "that doesn't

5    give you a license to commit crimes or do things

6    that are unethical," end quote?

7              MS. BOLGER:  Objection to the form.

8        A.    I am looking for it here...I see that.

9        Q.    So you believe it was a fair and

10   accurate report of the moment of the day to inform

11   your audience that although Mr. Dershowitz had

12   been making the case previously that a statutory

13   crime was required for impeachment, you now

14   believed, based upon some of the statements you

15   aired on your program by Mr. Dershowitz, that a

16   president had a license to commit crimes and not

17   be impeached, right?

18       A.    Okay, let me answer that carefully.

19   Those were Joe's words, not mine, but in terms of

20   the program all I can say is that Professor

21   Dershowitz said things that appear confusing,

22   possibly contradictory at different points.  So in

23   the light of one given day, back to the earlier

24   conversation which you so carefully set up, right,

25   in the way we produce things you're watching what

1            ERIN BURNETT

2  happens on a given day, and your job is in the

3  moment to give people what are the key points,

4  what are the key things that were said.  My job is

5  not to make Professor Dershowitz's argument for

6  him or to in every instance say "oh, but he also

7  said this, and he said this, but he said this."

8  "He said this" -- "what do we think" -- "he also

9  said this" -- what do you think" -- and that's

10  what you're seeing reflected here in this show

11  transcript.

12      Q.    But you did say, did you not, quote "as

13  long as the end justify the means, then you're

14  there," end quote.

15          Right?

16          MS. BOLGER:  Objection to the form.

17      A.    So, I think we need to watch the video

18  for how that transcribed, but as I have said that

19  looks like an interjection which was made to sort

20  of say "okay, here's a summary of what Joe just

21  said."

22      Q.    I did not transcribe this, this was a

23  CNN document that was provided in this litigation,

24  but according to the transcript provided by CNN of

25  your broadcast you did say, did you not, quote,

1              ERIN BURNETT

2    "as long as the end justify the means, then you're

3    there," end quote.

4              Right?

5              MS. BOLGER:  Objection to --

6         A.   Yes, what I am trying to say to you --

7    sorry, maybe you're not understanding what I'm

8    trying to say -- when you watch something like

9    that on video in a conversational format sometimes

10   when you -- so if I say to you "hey Mark, I think

11   we should go downstairs" -- "yeah, go downstairs,

12   right."  Sometimes when you're having a

13   conversation with someone the way you see it play

14   is important in terms of how you read it.  So what

15   I am saying is the best I can see from the

16   transcript is that it looks like what I am doing

17   there is injecting with a summary of what Joe

18   said.

19        Q.   And it's possible that a reasonable

20   person watching your broadcast, who heard you make

21   that statement, could conclude that Erin Burnett

22   believed Mr. Dershowitz had the made the case that

23   a president could commit crimes and not be

24   impeached, right?

25              MS. BOLGER:  Objection to the form.

```
 1               ERIN BURNETT
 2       A.    I think people would watch the totality
 3   of the program.  Ultimately, Professor
 4   Dershowitz's words and what Professor Dershowitz
 5   said on the floor of the Senate is what we're
 6   talking about here, so these are things that he
 7   said that are being discussed.
 8               MS. BOLGER:  Mark, while there is no
 9   pending question I don't know what your plan is,
10   but I could use a five minute break whenever --
11       Q.    But you do agree --
12               MS. BOLGER:  Did you hear me?
13               MR. SCHWEIKERT:  Yes, I said in a
14   moment.
15               MS. BOLGER:  I didn't hear you.
16       Q.    But you do agree, Ms. Burnett, the
17   totality of Mr. Dershowitz's answer to the
18   questions posed by Senator Ted Cruz were not
19   presented in your broadcast at any time before
20   Mr. Lockhart provided his commentary in which he
21   referenced Hitler and other authoritarian
22   dictators, right?
23               MS. BOLGER:  Objection to the form.
24       A.    As I've answered your question I can't
25   speak exactly to where the ins and outs were for
```

1              ERIN BURNETT

2   any given sound bite.  But if anybody had wanted

3   to watch the totality of what Professor Dershowitz

4   said on multiple days, all of that aired live on

5   CNN in full.

6              MR. SCHWEIKERT:  Off the record.

7              THE VIDEOGRAPHER:  We are off the

8   record, the time is 1:13 p.m. Eastern time.

9              (Recess.)

10              THE VIDEOGRAPHER:  We are back on the

11   record, the time is 1:22 p.m. Eastern time.

12              MR. SCHWEIKERT:  Ms. Burnett, I am

13   going to put in the Dropbox a link to a document

14   in the chat.  I am showing you a document I will

15   remark as Plaintiff's Exhibit 49, which was

16   previously marked Plaintiff's Exhibit 38 in a

17   prior deposition, and is Bates labeled CNN 719

18   through 721.

19              (Plaintiff's Exhibit No. 49 was

20              marked for identification.)

21       Q.    Please take a moment, review the

22   document, and let me know if you have seen it

23   before.

24       A.    I was aware this would, as part of

25   the -- preparing to speak with you I was aware of

```
 1                    ERIN BURNETT
 2  this document.  I don't recall any awareness of it
 3  prior to this point.
 4       Q.    But you have seen this document before,
 5  right?
 6       A.    Yes, in the context of this case.
 7       Q.    Is Plaintiff's Exhibit 49 an e-mail
 8  chain in which Ms. Rebecca Samuels, one of the
 9  segment producers for your show, sent an e-mail to
10  you, Susie Xu and Andrew Haag on January 30th at
11  approximately 11:25 a.m.?
12       A.    Yes, I see it.
13       Q.    Do you see that in Ms. Rebecca Samuels'
14  e-mail to you, Susie Xu and Andrew Haag she writes
15  quote, "He's just nuts," end quote?
16       A.    I see that.
17       Q.    Is it your understanding that
18  Ms. Rebecca Samuels was referring to Professor
19  Dershowitz?
20       A.    Yes.  To Professor Dershowitz's Tweet
21  thread, to the trail; I am looking at it, yes.
22       Q.    His Tweet trail was "nuts" according to
23  Rebecca Samuels?
24       A.    That's what it appears she's referring
25  to, I'm not -- the thing below is Professor
```

1                    ERIN BURNETT

2    Dershowitz's defense of his comments.

3         Q.    Did you ever have any other

4    communications with anyone who received

5    Ms. Rebecca Samuels' e-mail about Mr. Dershowitz

6    being nuts?

7              MS. BOLGER:  Objection to the form.

8         A.    I don't have any recollection at all of

9    this e-mail or any conversations about it.

10        Q.    Would you be offended if someone was to

11   refer to you as nuts?

12        A.    It would depend; probably not.

13        Q.    That would be true if somebody believed

14   that your presentation of the news during a

15   particular broadcast was nuts, is that right?

16             MS. BOLGER:  Objection to the form.

17        A.    I suppose, yes, it could frustrate me

18   for sure; absolutely, it could frustrate me.

19        Q.    Do you know who Jeff Zucker is?

20        A.    Of course, yes.

21        Q.    He was the president of CNN at the time

22   of your broadcast we have been discussing?

23        A.    Yes.

24        Q.    Do you recall ever being aware that

25   Mr. Zucker was of the opinion around that time

1                      ERIN BURNETT

2    that Mr. Dershowitz's presentation to Congress was

3    un-American?

4             MS. BOLGER:  Objection to the form.

5        A.    I'm sorry, I just spaced out.  Could

6    you say that one more time, Mr. Zucker said

7    something about un-American?

8             MR. SCHWEIKERT:  Ellen, could you

9    please?

10     (The following was read from the record by the

11   stenographer:  "Q.  Do you recall ever being aware

12     that Mr. Zucker was of the opinion around that

13       time that Mr. Dershowitz's presentation to

14             Congress was un-American?")

15       A.    No.

16       Q.    Do you recall Mr. Lockhart using the

17   word "un-American" in his comments about Professor

18   Dershowitz during the broadcast of your program on

19   January 29th?

20       A.    One second, Mark, I am going back in

21   the transcript to read it, I want to be sure I see

22   it myself before I say it on the record (reading.)

23             Yes, I see it.

24       Q.    You see in the transcript from your

25   broadcast that is at issue Mr. Lockhart referring

1                       ERIN BURNETT

2    to Alan Dershowitz's presentation to Congress on

3    that day as "un-American," right?

4         A.    I see Joe Lockhart's sentence, "And

5    what I thought when I was watching it was this is

6    un-American," is the quote I see in the

7    transcript.

8         Q.    Do you recall having that thought occur

9    to you approximately two years ago during the live

10   broadcast?

11             MS. BOLGER:  Objection to the form.

12        A.    I'm sorry.  Are you saying do I

13   remember that he said that?  Do I remember him

14   having said that without having read this

15   transcript; is that what you're asking?

16        Q.    I understood your recollection of

17   events around this time was very little, and I

18   believe you just said you recall thinking that

19   Mr. Dershowitz's presentation that day was

20   un-American, is that right?

21             MS. BOLGER:  No, that's --

22        A.    No, no -- I just read a quote from Joe

23   Lockhart in the transcript.  You asked me "did he

24   say that" and I went to see it in the transcript.

25   I read to you what Joe Lockhart said; sorry if

```
 1                    ERIN BURNETT
 2  that wasn't clear.
 3       Q.    As far as you're aware, did anyone tell
 4  Joe Lockhart to use particular words in his
 5  commentary about Professor Dershowitz's statements
 6  to Congress earlier that day?
 7            MS. BOLGER:  Objection to the form.
 8       A.    No, no.
 9       Q.    You don't recall having any advanced
10  notice, aside from what you may have seen in the
11  Tweets that were forwarded to you in an e-mail of
12  what Joe Lockhart was going to say, when you asked
13  him to provide commentary on that day, is that
14  right?
15       A.    That's right.
16       Q.    Have you spoken to Mr. Zucker at any
17  time since he left his employment with CNN?
18       A.    I have, but not about this topic.
19       Q.    When was the last time you spoke with
20  him?
21       A.    I'd have to check, I speak with him
22  fairly regularly.
23       Q.    What is "fairly regularly" to you?
24       A.    Oh gosh, I don't know.  I would have to
25  look.  But, you know, check in with him
```

1                    ERIN BURNETT

2    periodically I guess I would say; it depends.  It

3    is all personal in nature.

4         Q.    During January of 2020 was it customary

5    for you to communicate with Mr. Zucker via text

6    message with respect to your job as an anchor for

7    CNN?

8         A.    No.  I mean Mr. Zucker did communicate

9    with people, right, he was a very, very present

10   person because he cared deeply about the content,

11   but no, talking about segments or content in the

12   show regularly; no.

13        Q.    Are you aware of whether Mr. Zucker had

14   regular morning conference calls around the time

15   of the broadcast at issue?

16        A.    So there is a daily conference call in

17   the morning, I am not on it, Mr. Zucker was --

18   again, you would have to ask others -- but he was

19   regularly on it; but if you want the right word to

20   describe the frequency with which he was on it and

21   how he was on it, I am the wrong person because I

22   am not on it.

23        Q.    Was there a meeting at approximately

24   4:30 p.m. with Jeffrey Zucker in connection with

25   your broadcast later in the evening of

```
 1                    ERIN BURNETT

 2    January 29th?

 3              MS. BOLGER:  Objection to the form.

 4         A.    Let me answer your question to give you

 5    a bit more color that may be helpful.  There was a

 6    daily call at 4:30, it was not for our show, it

 7    was for all the shows.  So all the shows were on

 8    the call, it was a regular editorial call where

 9    people would go through what was in their

10    programs.  So, I would not have been on that call,

11    I was never on that call, but the executive

12    producer or a number two on the shows would

13    usually be on the call, as well as bureau chiefs;

14    things like that.

15         Q.    As a matter of custom around that time,

16    did you have any regular interactions with Jeffrey

17    Zucker with respect to your role in reporting the

18    news on your show?

19              MS. BOLGER:  Objection to the form.

20         A.    You're talking about over that time

21    frame, on that day or both, Mark?

22         Q.    As a matter of custom around that

23    time -- I understand there were customary 9:30 and

24    4:30 calls -- did you have any customary

25    interaction with him in connection with preparing
```

1                    ERIN BURNETT

2    for your broadcast?

3         A.    No, no, certainly would have been

4    nothing customary.  If there was any interaction

5    it would have been impromptu, and I don't recall

6    it.

7              MR. SCHWEIKERT:  I am going to provide

8    you with a document, please take a moment to

9    review the document I've been provided which I

10   will mark as Plaintiff's Exhibit 50 to this

11   deposition.

12             (Plaintiff's Exhibit No. 50 was

13             marked for identification.)

14        A.    I am skimming over it, I understand the

15   general point.  Maybe if you ask the question, any

16   specific questions, then I can go into certain

17   parts to refer perhaps; thanks.

18        Q.    I will share my screen with you to make

19   this perhaps easier.

20        A.    Okay.

21        Q.    I am showing you an excerpt of the

22   document I marked Plaintiff's Exhibit 50, it is a

23   printout from the Wall Street Journal's website of

24   an article entitled "Wrapping Up Impeachment" by

25   the editorial board dated January 30, 2020.

Confidential

1              ERIN BURNETT

2          Do you see that?

3      A.    Yes, I do.

4          MS. BOLGER:  Objection to the form of

5  the question.

6          MR. SCHWEIKERT:  What's wrong with the

7  form of the question?

8          MS. BOLGER:  It is not an article.

9          MR. SCHWEIKERT:  What is it?

10          MS. BOLGER:  It is not an article, it

11  is an editorial.

12          MR. SCHWEIKERT:  I did say it was by

13  the editorial board.

14          MS. BOLGER:  It is not an article, it

15  is an editorial.  You can ask her the question.

16      Q.    I am going to read an excerpt from this

17  piece published on January 30, 2020 and ask you if

18  you agree with the excerpt, okay?

19      A.    Okay, go ahead.

20      Q.    Do you agree with the following

21  assertions:  Quote, "the media claim that defense

22  lawyer Alan Dershowitz said a President can do

23  anything to further his re-election as long he

24  thinks it is in the national interest.  This isn't

25  what he said.  The Harvard professor said

```
 1                    ERIN BURNETT
 2    explicitly that a President can be impeached for
 3    criminal acts.  He could be impeached for
 4    soliciting a financial bribe, for example, or
 5    seeking a campaign contribution from a foreign
 6    source.  He could also be impeached for exceeding
 7    his constitutional authority," end quote.
 8              Do you agree with those assertions?
 9         A.   I will answer the question I think as
10    Kate referred; this is an editorial, this is an
11    opinion.
12         Q.   So you disagree with those assertions?
13              MS. BOLGER:  Objection to the form.
14         A.   I am not agreeing or disagreeing, I'm
15    saying that what you're presenting me with is
16    something by an editorial board, it's an opinion,
17    so it is an opinion by the editorial board of what
18    they say the media claim, what they think he said
19    so --
20         Q.   And I am asking you --
21         A.   It would be inappropriate, it is just
22    not --  it's an editorial, it is a point of view.
23    It's as if in the context we were talking about
24    doing a panel, you put someone on with that point
25    of view and you put someone on with another point
```

1                     ERIN BURNETT

2     of view; right, point of view.

3          Q.    And I am asking, do you agree with the

4     point of view expressed in the excerpt that I just

5     read to you?

6          A.    I think the best way to answer your

7     question in terms of what you're asking is, I

8     think the way I presented it on my program is fair

9     and accurate.

10         Q.    So "no," you disagree with the

11    assertions that I just read to you, right?

12              MS. BOLGER:  Objection to the form.

13         A.    I'm not commenting on the editorial at

14    all, I'm saying I stand by what we did and there

15    were various points of view presented in the

16    program.  The program presented things Professor

17    Dershowitz said, various things that he said.  So

18    I am not going to agree or disagree with what

19    you're presenting, I merely am pointing out it is

20    a point of view of an editorial board of a

21    newspaper.

22         Q.    I am going to represent I am entitled

23    to your opinion as a lay witness, it is a simple

24    "yes" or "no."  I understand what you're telling

25    me to be you do not agree with what I am

ERIN BURNETT                    Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1                    ERIN BURNETT

 2   paraphrasing as the assertion that the media

 3   mischaracterized Mr. Dershowitz's answer to

 4   Senator Ted Cruz's questions, right?

 5            MS. BOLGER:  Objection to the form,

 6   that's actually not what she's telling you.

 7       A.    I am telling you I stand by how we

 8   presented the various things that Alan Dershowitz

 9   said.  I am comfortable with how we presented it,

10   that's what I am telling you.

11       Q.    I am going to --

12       A.    I think you are putting a lot of

13   emphasis on the word "claim" that I'm not

14   comfortable with.

15       Q.    You mean my vocal intonation?

16       A.    No, I mean you're trying to get me to

17   comment on something about the media claiming.

18   I'm telling you what we did was cite Professor

19   Dershowitz's words; not our claim, but his words.

20       Q.    But you did not play on your broadcast,

21   before Joe Lockhart started talking about Hitler

22   and Stalin and Mussolini, all of the words that

23   Mr. Dershowitz used in answering Senator Ted

24   Cruz's questions, right?

25            MS. BOLGER:  Objection to the form.
```

```
 1                    ERIN BURNETT

 2        A.    I know --

 3        Q.    It's a "yes" or "no" --

 4              MS. BOLGER:  Let the witness answer.

 5              MR. SCHWEIKERT:  Ms. Bolger, I don't

 6   want to bother Ms. Burnett with another

 7   deposition, you have already instructed her not to

 8   tell me her salary and I will get a court order to

 9   come back and answer questions to which I'm

10   entitled to an answer.  And I believe a question

11   calling for a "yes" or "no" should be answered

12   with a "yes" or "no."  If the witness feels the

13   need to explain she may do so, but you repeatedly

14   coaching, whether on the record or off the record,

15   your witnesses to evade direct questions is

16   improper, and you know it, and I will strongly

17   suggest you refrain from doing so because there

18   are ample transcriptions of formal court

19   proceedings in this case in which you continue to

20   interrupt my depositions with improper speaking

21   objections, argumentative objections and

22   suggestive statements, all of which you know are

23   improper because when you were taking the

24   deposition of Carolyn Cohen at which I was

25   defending you jumped on my case if I so much as
```

```
 1                      ERIN BURNETT

 2   said anything beyond "objection, form."

 3              So it is very hypocritical for you to

 4   now suddenly, when the shoe is on the other foot,

 5   behave as if the rules do not apply to you.  And

 6   again, I am going to raise all of this conduct

 7   with the court, and I don't want to bother

 8   Ms. Burnett with our disagreement as lawyers and I

 9   would ask that she answer the direct question

10   posed to her, if she needs to explain she can, but

11   I am trying to be respectful that she is a very

12   busy professional and has better things to do than

13   listen to you and I go on and on incessantly.

14              MS. BOLGER:  I will just repeat my

15   instruction which was "please let the witness

16   answer."

17       A.    So Mark, all I can say in our program

18   we played various things that Professor Dershowitz

19   said.  I think what you're asking me --

20       Q.    Let me put it this way -- I want to get

21   you out of here Ms. Burnett --

22              MS. BOLGER:  Don't interrupt the

23   witness --

24       A.    You're asking me to say "yes" or "no"

25   to the word "claim" and that is where in the
```

```
 1              ERIN BURNETT
 2   context of this opinion, the best I can do to give
 3   you an honest answer is I see what The Wall Street
 4   Journal is saying here as a valid opinion and
 5   their interpretation of things as the editorial
 6   board.  So if I was producing a show about this
 7   thing, I could put someone on from the editorial
 8   board and they can come on and make their point.
 9   That's what we do.
10       Q.    I think we are talking past each other,
11   ma'am.  I had moved onto another question.
12       A.    Okay, I'm sorry.  What is the other
13   question?  Perhaps I didn't hear it.
14       Q.    Your program did not air the entirety
15   of Mr. Dershowitz's answers to Senator Ted Cruz's
16   questions at any time before Mr. Lockhart provided
17   his commentary in which he referenced Hitler and
18   Stalin and Mussolini, correct?
19            MS. BOLGER:  Objection to the form.
20       A.    I guess, no, we played the sound bite
21   that we played, it's there on the transcript; the
22   portion that we played, yes.
23       Q.    A couple of more and then we can get
24   out of here, Ms. Burnett; I appreciate your time.
25   I would like you to let me know if you agree or
```

1                       ERIN BURNETT

2    disagree with the following assertion.

3         A.    Okay.

4         Q.    "Some Democratic senators and other

5    critics accused him of suggesting that even Nixon

6    was not impeachable, despite his clear crimes.

7    But that accusation is incompatible with Mr.

8    Dershowitz's main argument:  That an impeachable

9    'high crime and misdemeanor' requires an

10   indictable offense," end quote.

11             MS. BOLGER:  Again, I am going to again

12   ask as I did yesterday that you show what you're

13   reading to the witness.

14        A.    Who wrote it?  Where did it appear?

15        Q.    Do you agree or disagree with those

16   sentences?

17        A.    You would have to read that again;

18   first of all, it gets a little confusing just

19   hearing it.  I think the best way to answer what

20   you're getting at from where I sit as the anchor

21   of a program is to bring on people of various

22   opinions to discuss them.  I don't sit here with a

23   firm opinion of what is impeachable and what

24   isn't, that's not my job.

25        Q.    But you did paraphrase Joe Lockhart

```
 1                      ERIN BURNETT
 2   during the segment at issue by stating quote, "as
 3   long as the end justify the means, then you're
 4   there," end quote.
 5             Right?
 6             MS. BOLGER:  Objection to the form.
 7        A.    I paraphrased Joe Lockhart saying that.
 8        Q.    I am going to ask you if you disagree
 9   or agree with the following assertion:  "CNN" --
10   your employer -- "presented an abridgement of
11   Dershowitz's answer to Senator Cruz's question.
12   The abridgement is not accurate to the extent that
13   it omitted a crucial qualification that an illegal
14   motive for a quid pro quo would be corrupt.  As a
15   result, the commentator's statements that
16   Dershowitz believes a president can do anything,
17   even commit crimes that would help his
18   re-election, are not based upon a fair and
19   accurate summary of Dershowitz's statement to the
20   Senate."
21             Do you agree or disagree?
22             MS. BOLGER:  Objection to the form.  I
23   think you should show the witness what you're
24   looking at.
25        A.    Obviously, I hope I made it clear that
```

ERIN BURNETT                    Confidential                    JOB NO. 306736
JULY 21, 2022

1                        ERIN BURNETT

2    I think that we did a fair and accurate job of

3    what we did, and how it was presented, and who we

4    had on to discuss it.

5         Q.    So you disagree with that assertion

6    that included a clause that it was not a fair and

7    accurate --

8         A.    I disagree because I believe that we

9    did our jobs.

10        Q.    I will represent to you that the

11   statements I asked you whether you agree or

12   disagree were substantially identical to

13   statements made by The Wall Street Journal, The

14   New York Times and the District Judge presiding

15   over this case in an Order filed in the public

16   record.

17             MS. BOLGER:  I object to that

18   characterization.

19        Q.    Assume just for purposes of this

20   question that my representation that those

21   statements were made by those sources are

22   accurate, would that affect your opinion in any

23   way of whether your broadcast at issue did, in

24   fact, present a fair and accurate report of the

25   moment of the day?

1              ERIN BURNETT

2         MS. BOLGER:  Objection to the form.

3    A.    No, it wouldn't because we are -- CNN

4  is an independent news organization, we make our

5  own decisions, so no, a decision or different

6  point of view by the editorial board of The Wall

7  Street Journal or New York Times, any judge, would

8  not influence how we see things or how we cover

9  them.

10   Q.    Having reviewed transcripts and watched

11  videos in preparing for this deposition, and been

12  presented with various exhibits throughout this

13  deposition, if you had the chance to go back and

14  do it all over again would you have done anything

15  differently?

16   A.    No, I think we did a very good job, our

17  jobs -- I know I keep saying this but I think it

18  is important to emphasize -- our jobs are in the

19  moment, right, history is an unfolding document

20  and people write books about things that happen

21  over long periods of time. Our job is to chronicle

22  and cover what happens in the moment, and to

23  provide the context as best we can around that.

24  As part of that we add people to conversations to

25  provide and inform points of view.  So that's what

1                    ERIN BURNETT

2    we do and ultimately that's what we strive to do

3    as best we can, and I think we did that here.

4              MR. SCHWEIKERT:  I am going to adjourn

5    because I believe there were some improper

6    instructions not to answer relevant questions that

7    are seeking information which in my experience is

8    often presented to a jury during trials as

9    evidence of credibility, but your lawyer has

10   instructed you not to provide that information so

11   I will be seeking a ruling requiring you to answer

12   that question, and it's possible that I may have

13   some follow-ups to the extent that information

14   leads me to places.  And I also --

15             MS. BOLGER:  And the question?

16             MR. SCHWEIKERT:  Hold on.  And I also,

17   as I reminded Ms. Bolger for what must be the

18   fortieth time, that I have been very challenged by

19   the virtually endless speaking objections, which I

20   believe, could be construed as an attempt to

21   influence the testimony of a witness who has taken

22   an oath and sworn to tell the truth, and I

23   continue to believe that my client is entitled to

24   truthful answers without being influenced in any

25   way by statements made by her lawyer that should

1           ERIN BURNETT

2   not have been made, and therefore, to the extent I

3   obtain a ruling on any of these issues that

4   requires you to re-appear, I am reserving the

5   right to ask additional questions.

6           MS. BOLGER:  Mr. Schweikert, I think

7   that the only question I told the witness not to

8   answer was her salary.  I want the record to

9   reflect the only question I told her not to answer

10  was her salary.

11          MR. SCHWEIKERT:  The witness, who is

12  employed by the defendant and providing testimony

13  on behalf of the defendant, has been instructed

14  not to answer a simple question about the amount

15  of compensation she is paid for her work so that

16  the jury may consider that information in weighing

17  whether the answers to her questions should be

18  considered credible or not credible, and whether

19  she may be influenced by the fact that she is

20  compensated by the defendant for the work she

21  does.  So yes, that is the question that you

22  instructed the witness not to answer which I take

23  issue with; I will tender the witness.

24          MS. BOLGER:  First of all, I will

25  designate the transcript as confidential, the

```
 1                     ERIN BURNETT

 2   entire transcript is confidential pursuant to the

 3   protective order because CNN's confidential

 4   documents were discussed during this deposition.

 5                     EXAMINATION BY

 6   MS. BOLGER:

 7        Q.    Ms. Burnett, does your salary in any

 8   way affect what you say or do on air at CNN?

 9        A.    No.

10        Q.    Ms. Burnett, have I told you at any

11   point throughout the course of this deposition --

12             MR. SCHWEIKERT:  I object to the form.

13        Q.    -- otherwise how to answer a single

14   question during this deposition?

15        A.    No.

16             MS. BOLGER:  I have no further

17   questions.

18                     EXAMINATION BY

19   MR. SCHWEIKERT:

20        Q.    So what is your salary ma'am?

21             MS. BOLGER:  She's not going to answer

22   the question; it's not relevant.

23             MR. SCHWEIKERT:  Hold on, you just

24   asked her a leading question to say under oath

25   that some unknown amount of compensation has no
```

```
 1                      ERIN BURNETT
 2   influence on the things she has said today, and I
 3   believe in the proper context, which we know is
 4   important, it would be reasonable to understand
 5   what is the amount of that compensation.  Whether
 6   it is a lot of money to her or not is besides the
 7   point; it is for the jury to weigh the evidence in
 8   making the findings on the claims that are at
 9   issue.  And --
10            MS. BOLGER:  Mr. Schweikert, you --
11            MR. SCHWEIKERT:  -- if you want to
12   continue to instruct the witness not to answer
13   what is basically one of the most basic questions
14   asked of virtually every witness that testifies on
15   behalf of their employer, that is your
16   prerogative, but I am reserving the right to
17   unfortunately ask Ms. Burnett to re-appear to
18   answer those questions, and any other questions I
19   am permitted once the court has given full
20   consideration to the record created by the
21   depositions in this case.
22            MS. BOLGER:  Erin, don't tell him your
23   salary.
24            MR. SCHWEIKERT:  Ms. Burnett, I thank
25   you for your patience, and it was a pleasure
```

ERIN BURNETT                      Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1                      ERIN BURNETT

 2   meeting you despite the uncomfortable nature of

 3   the circumstances.

 4            THE VIDEOGRAPHER:  Ms. Bolger, would

 5   you like a copy of the video?

 6            MS. BOLGER:  Yes, please.

 7            THE STENOGRAPHER:  Do you need a copy

 8   of the transcript, Ms. Bolger?

 9            MS. BOLGER:  Yes, I do.

10            THE VIDEOGRAPHER:  This concludes the

11   deposition of Erin Burnett in the matter of

12   Dershowitz vs. Cable News Network Inc. We are now

13   off the record, the time is 2:01 p.m. Eastern

14   time.

15            (Time Noted:  2:01 p.m.)

16

17

18

19

20

21

22

23

24

25
```

ERIN BURNETT                          Confidential                    JOB NO. 306736
JULY 21, 2022

```
 1

 2                    C E R T I F I C A T E

 3

 4   STATE OF NEW YORK     )

 5                             : ss.

 6   COUNTY OF NEW YORK    )

 7

 8          I, ELLEN SANDLES, a Notary Public and

 9   Stenographic Reporter within and for the State of

10   New York, do hereby certify:

11          That ERIN BURNETT, the witness whose

12   deposition is hereinbefore set forth, was duly

13   sworn by me and that such deposition is a true

14   record of the testimony given by the witness.

15          I further certify that I am not related

16   to any of the parties to this action by blood or

17   marriage, and that I am in no way interested in

18   the outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto set

20   my hand this 8th day of August, 2022.

21

22          _____

23                    ELLEN SANDLES

24

25
```

ERIN BURNETT                          Confidential                       JOB NO. 306736
JULY 21, 2022

```
  1                         I N D E X

  2

  3    TESTIMONY              EXAMINATION BY             PAGE
       PAGE
  4

  5     Ms. Burnett     Examination/Mr. Schweikert   6

  6                     Examination/Ms. Bolger       136

  7                     Examination/Mr. Schweikert   136

  8

  9    PLAINTIFF'S
       EXHIBITS            DESCRIPTION               PAGE
 10

 11    Exhibit 47  E-mail from Katie Carver re:      47
                   Wednesday Panel POV, January 29,
 12                2020 at approximately 3:15 p.m.
       Exhibit 48  Transcript of Out Front show on   78
 13                day in question
       Exhibit 49  E-mail from Rebecca Samuels to    114
 14                Susie Xu, copying Witness re:
                   Dershowitz saying he was
 15                mischaracterized
       Exhibit 50  WSJ Editorial, "Wrapping Up       122
 16                Impeachment"

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

**Exhibits**

**Exhibit 47** 47:12,13
48:7 140:11

**Exhibit 48** 78:10,13
140:12

**Exhibit 49** 78:6 114:15,
19 115:7 140:13

**Exhibit 50** 122:10,12,
22 140:15

**0**

**0-20-CV-61872-
SINGHAL/HUNT** 5:8

**1**

**1,000** 56:13

**10:11** 5:3

**11:10** 46:11

**11:25** 115:11

**11:27** 46:14

**1670** 78:2,9

**1671** 79:22

**1673** 104:24

**1681** 78:3,9

**19:05:02** 80:22,23,24
81:2

**19:10** 80:21 94:25

**19:15:04** 106:13,19

**1:13** 114:8

**1:22** 114:11

**2**

**2011** 44:22,23,24

**2020** 7:10,13,18 10:4,16
11:18 12:12,16,19
13:21 14:16,22 15:5,8,
13 16:11 17:2,19 18:4,8
23:12 24:21 33:5 38:20,
25 45:2,16 48:8 57:12
82:6 120:4 122:25

123:17

**2022** 5:4

**21** 5:4

**29** 10:16 12:19 13:21
14:16,22 15:5,7,13 17:2
23:12 24:21 38:20 48:8
57:11 82:6

**29th** 15:16 18:8 24:12
43:13 45:3,16 48:24
51:6 54:4 64:14 117:19
121:2

**2:01** 138:13,15

**3**

**30** 122:25 123:17

**30th** 115:10

**37** 47:10 56:2

**38** 114:16

**39** 78:12

**3:15** 48:9

**4**

**40** 90:3

**47** 47:12,13 48:7

**48** 78:10,13

**49** 78:6 114:15,19 115:7

**4:30** 120:24 121:6,24

**5**

**50** 122:10,12,22

**6**

**65** 47:8

**66** 47:9

**7**

**719** 114:17

**721** 114:18

**7:05** 89:20

**7:05:02** 80:19

**9**

**9:30** 121:23

**A**

**a.m.** 5:3 46:11,14
115:11

**abide** 10:3

**ability** 45:23 74:19

**abreast** 13:25

**abridgement** 68:15,25
131:10,12

**absolutely** 48:6 103:7
116:18

**absurd** 87:14 97:17
104:15

**abuse** 80:9 84:18 85:12
90:4,9 91:10 93:5 94:6,
16 95:11 97:21

**acceptable** 60:8

**access** 37:9,23

**accurate** 12:13,20,23
23:14 24:14,19 25:2,16
65:14 66:7,16 67:13
68:16 72:9 85:8 88:25
97:19 100:2 102:7
103:10 105:23 110:10
125:9 131:12,19 132:2,
7,22,24

**accusation** 73:21
130:7

**accused** 22:9 90:4
130:5

**accusing** 73:18

**acknowledge** 5:24 6:3
81:25

**acquired** 17:4

**actions** 109:23

**active** 53:25

**acts** 124:3

**actual** 65:9

**adamantly** 19:7

**add** 66:3 133:24

**additional** 135:5

**address** 19:22,24

**addressing** 84:11

**adhere** 10:7

**adhered** 26:25

**adjourn** 134:4

**administer** 6:5

**administered** 6:4

**admissible** 21:7

**admit** 86:10

**advance** 41:3 46:5
60:7

**advanced** 119:9

**advises** 76:22

**advising** 53:25 54:5

**affect** 62:2 63:11 64:2
132:22 136:8

**afraid** 11:3

**agree** 6:12,13 57:11
65:2,4,12 68:14 79:11
98:11 113:11,16
123:18,20 124:8 125:3,
18,25 129:25 130:15
131:9,21 132:11

**agreeing** 124:14

**agreement** 6:8,9 79:14

**ahead** 79:18 123:19

**air** 10:25 14:21 15:12
43:6 66:14 69:14 72:18
94:12 98:7 129:14
136:8

**aired** 55:5,20 98:24
103:3 110:15 114:4

**airplanes** 36:25

**akin** 57:21

**Alan** 5:17 53:12 61:6
80:7 81:19 82:17 87:12
89:22 95:9 96:17 118:2
123:22 126:8

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

**allegedly** 8:2 19:9

**allocated** 34:21

**allowed** 29:17 79:3 100:19

**America** 9:14

**American** 19:10 90:3

**amount** 69:14 135:14 136:25 137:5

**ample** 127:18

**analysis** 86:18 87:15, 22 104:2

**analyzed** 69:15

**anchor** 7:14,16,19 10:4 11:19 12:6 13:21 25:22 26:24 43:25 44:18,22 49:10 62:10 65:13 66:14 67:10 103:13 109:8 120:6 130:20

**Andrew** 115:10,14

**annoyance** 20:25

**answering** 28:20 63:15 126:23

**answers** 129:15 134:24 135:17

**apologies** 107:16

**apologize** 104:18

**appearance** 45:3

**appearances** 45:6

**appeared** 28:17 44:25 45:15 48:23 51:20 54:3 86:5 88:22 89:10

**appearing** 30:6

**appears** 48:18 69:23 115:24

**applicable** 10:12,15

**applied** 11:18 12:18

**applies** 8:10

**apply** 9:13 128:5

**approximate** 95:8

**approximately** 43:21 44:14 48:9 115:11 118:9 120:23

**area** 33:12

**areas** 33:10

**arguably** 95:12

**argued** 93:5

**argument** 52:2 53:7 57:20,25 60:9 61:2,5, 17,18,20,21 62:23 63:2 64:17,20 65:6 67:19 82:2,7 84:9 86:11 87:13 89:3 90:7,8 91:7,8,12, 25 92:11 93:23 94:3,4 101:5 105:13 106:4,5,7, 19 108:22 109:10 111:5 130:8

**argumentative** 127:21

**arguments** 58:2 82:13 83:17 85:24 93:21,22 94:21 96:23 108:17

**arrangement** 6:6

**article** 122:24 123:8,10, 14

**articles** 84:22

**articulated** 13:10

**assertion** 126:2 130:2 131:9 132:5

**assertions** 123:21 124:8,12 125:11

**assigned** 28:13,16

**assistant** 44:18

**assume** 51:17 132:19

**assumption** 55:17

**attack** 21:14

**attempt** 21:6 134:20

**attention** 79:22

**attorney** 6:12 21:15 27:13 77:21

**attorneys** 5:23 15:22 16:14 17:5,6 23:8

**attributed** 81:4 95:3

**audience** 23:13 85:8, 17 87:25 89:3 94:13 96:13 98:13 100:3 102:8 105:24 106:11 107:10 108:10 109:9

110:11

**authoritarian** 57:21 60:10 61:18 64:24 67:21,23 100:25 105:15 106:7 113:21

**authority** 100:24 124:7

**availability** 37:15

**avoid** 47:10

**aware** 8:10 9:12,16 15:19 16:8 33:9 41:21 48:4 61:6 77:9 84:10 87:23 104:21 114:24,25 116:24 117:11 119:3 120:13

**awareness** 115:2

**B**

**back** 44:20 46:13 56:9 65:8 80:23 92:5 105:17 106:2,9 107:3,6,17 108:25 109:6 110:23 114:10 117:20 127:9 133:13

**based** 21:12 29:4 58:17 67:13 78:24 80:20 86:21 101:3,24 102:18 110:14 131:18

**basic** 137:13

**basically** 7:16 137:13

**Bates** 47:8 78:2,9 79:22 114:17

**Bay** 44:18

**bears** 8:12

**begin** 5:4

**behalf** 5:10,12,18 8:7 33:16 135:13 137:15

**behave** 21:4 128:5

**behavior** 22:14

**believed** 57:24 66:16 85:19 92:10 104:8 110:14 112:22 116:13

**believes** 95:25 96:5 97:10 131:16

**Bible** 70:8,14

**big** 34:20 50:9,16

**binding** 79:9

**bit** 80:5 101:13 121:5

**bite** 71:2,10,14,17 72:16,24 75:6,12 76:9 79:24 84:2 89:24,25 91:4,22 92:9 93:3,9,12 94:2 95:19,24 96:14 99:19 102:23 104:5,14 109:20,22 110:4 114:2 129:20

**bites** 99:10 102:11 103:5 109:25

**Black-holmes** 5:20

**blah** 80:9,10

**blank** 40:12,16,17

**Bloomberg** 44:11

**board** 122:25 123:13 124:16,17 125:20 129:6,8 133:6

**Bob** 39:6

**Bolger** 5:18 6:13 7:23 8:14,15,19,25 9:5,6,15, 20,23 10:5,10,17 11:8, 20 12:8,15,21 13:3 14:23 15:25 16:12 17:25 19:4,6,16,20 20:5,6,8,20 21:21 22:4, 8,22 23:15 24:15 25:3, 17 26:7,20 27:21 28:4, 11,19 29:7,12 30:8,15, 20 31:8,20 32:3,15,21 33:7,17 34:17 35:6,19, 24 36:17 37:17 38:9 39:23 40:9 41:16,25 42:11 43:7,18 45:4,17 46:2,21 49:4,19 50:24 51:9,17 52:4,10,22 53:23 54:7,20 55:6,21 56:6 57:14 58:5,12,20 59:11,23 60:19 61:13 62:4,16 63:13 64:4,16 65:16 66:10,18 67:8,15 68:19 69:7 70:4,24 73:4,7,13,17 74:3,12 75:15 77:17 79:4,9 83:23 84:15,24 85:13, 23 86:12,24 88:6,18 90:20 91:17 92:3,14 93:8 94:19 97:8 98:16

STENO.COM
(310) 573-8380

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

99:11,22 100:9 101:8,
12 102:14 103:6,18
104:10 105:25 107:11,
25 108:14 109:16 110:7
111:16 112:5,25 113:8,
12,15,23 116:7,16
117:4 118:11,21 119:7
121:3,19 123:4,8,10,14
124:13 125:12 126:5,25
127:4,5 128:14,22
129:19 130:11 131:6,22
132:17 133:2 134:15,17
135:6,24 136:6,16,21
137:10,22 138:4,6,8,9

**booked** 51:14

**booker** 41:4

**bookers** 40:13,15

**booking** 37:22 38:17,
19,25 39:3,4,8,21 40:6

**booklet** 10:7,8 11:11,
15,18

**books** 133:20

**bordering** 73:13,17
74:14

**bosom** 90:14

**bother** 127:6 128:7

**bottom** 50:5

**bounds** 21:17

**box** 50:9 76:23

**brain** 23:5

**break** 46:9 81:23
113:10

**bribe** 124:4

**briefly** 44:9 74:25

**bring** 9:10 29:17 35:17
66:2 67:25 86:17 87:20
130:21

**broad** 52:24

**broadcast** 14:16
18:10,11 22:25 24:2,3,
7,8 25:2 26:19 27:5
28:3,10 30:14 31:19
43:4,13 48:16,23 51:5,
24 54:4,11 55:5,20 56:4
57:5 58:18 59:20 61:9,
24 62:12 63:10 64:2

65:13 67:6,12 69:4,24
70:21 71:10 72:17
75:10 79:8,24 82:16
83:6,13 87:25 89:16
91:3 96:13 97:20
111:25 112:20 113:19
116:15,22 117:18,25
118:10 120:15,25 122:2
126:20 132:23

**broader** 98:12

**brought** 51:5 65:20

**bureau** 121:13

**Burnett** 5:1,5 6:1,15,25
7:1,17 8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1,23 46:1,15,24
47:1,3,16 48:1,2 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1,8 75:1 76:1,25
77:1,25 78:1,15 79:1
80:1 81:1,5 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1,21 113:1,16
114:1,12 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1,6 128:1,8,
21 129:1,24 130:1
131:1 132:1 133:1
134:1 135:1 136:1,7,10
137:1,17,24 138:1,11

**Burnett's** 7:24

**business** 7:15

**busy** 128:12

---

**C**

**Cable** 5:5 138:12

**calendar** 7:10

**call** 16:16 37:3 120:16
121:6,8,10,11,13

**called** 7:17 27:13

**calling** 68:4 127:11

**calls** 84:25 120:14
121:24

**campaign** 53:11 65:24
124:5

**campaigns** 32:24
53:25 54:2

**candidates** 54:5

**capable** 104:4

**capacity** 44:15 49:11
53:15 77:24

**captured** 76:17

**care** 91:9 94:5

**cared** 120:10

**career** 66:13

**carefully** 110:18,24

**Carolyn** 127:24

**Carry** 21:23

**Carver** 48:8,19,20 49:6
50:4 75:20

**Carver's** 101:19

**case** 5:6,7 8:6 15:14,24
16:20,22 24:24 32:6,10
36:2 40:2 42:21 48:17
69:23 81:20 82:18,24
83:14,21 85:20 86:20
88:2,8,11,14 108:10
110:12 112:22 115:6
127:19,25 132:15
137:21

**cases** 27:23 101:2

**casual** 77:5

**Catholic** 62:24

**caused** 62:25

**cell** 18:22 30:3

**chain** 115:8

**challenged** 134:18

**chance** 47:21 56:8 89:7
133:13

**change** 14:10

**changed** 39:5

**characterization**
65:15 66:8,15,17 67:13
73:11 86:19 97:13,18
132:18

**characterizations**
21:14 73:23

**characterized** 83:20

**characterizing** 88:24

**charged** 84:21 85:11

**chat** 45:23 46:17 76:23
114:14

**check** 56:14,18 119:21,
25

**checking** 45:11 46:19
66:23

**chief** 7:14

**chiefs** 121:13

**choose** 90:8

**choreography** 43:5

**chose** 34:8 72:6 82:14

**chosen** 32:8,12 71:24
72:10 76:10

**chronicle** 133:21

**circumstances** 94:17
138:3

**cite** 126:18

**claim** 123:21 124:18
126:13,19 128:25

**claiming** 126:17

**claims** 137:8

**clarification** 52:23

ERIN BURNETT
JULY 21, 2022
Confidential
JOB NO. 306736

**clarified** 106:16

**clarify** 12:17 81:15

**clause** 132:6

**clear** 23:24 68:2 81:7, 14 86:2 87:4 106:11 119:2 130:6 131:25

**client** 19:7 74:19 134:23

**clip** 83:10 89:16 91:6 97:5

**close** 22:14

**CNBC** 44:12

**CNN** 5:19,20 7:8,9 10:2, 6,14 11:11,19 13:21 15:24 16:9 19:9 33:6,16 43:20 44:5,15,17,19,22 47:8 70:13,19 78:2,9 79:22 98:23 104:24 111:23,24 114:5,17 116:21 119:17 120:7 131:9 133:3 136:8

**CNN's** 11:25 16:14 67:6,12 136:3

**coach** 20:15 52:14

**coaching** 127:14

**Coates** 34:4,5 53:17 80:6 89:19

**coffee** 29:8 30:6

**Cohen** 127:24

**collaborate** 28:9 71:16

**color** 121:5

**combination** 34:18 35:8,12 37:24 40:19 83:7

**comfortable** 78:24 100:14 126:9,14

**comment** 36:8 53:12 57:24 62:8 64:10 106:16 126:17

**commentary** 50:20 75:13 100:12 104:3,9 107:9 113:20 119:5,13 129:17

**commentator** 66:14

**commentator's** 131:15

**commentators** 53:19

**commented** 104:14

**commenting** 51:25 63:3 125:13

**comments** 28:17 42:25 53:6 59:21 60:18 61:11 62:2,14 63:4,6, 11,18,25 70:7 82:11 87:16 99:7 101:11,24 102:12,18 104:8,22 110:3 116:2 117:17

**commercial** 31:4 55:23

**commit** 79:15 105:3 110:5,16 112:23 131:17

**committed** 85:6

**common** 49:14,15,21, 24 50:2

**communicate** 77:6 120:5,8

**communication** 77:2

**communications** 15:11 116:4

**companies** 44:10,21

**company** 39:6 44:5

**compare** 104:25 105:12

**compelling** 88:13 91:12

**compensated** 135:20

**compensation** 8:6 135:15 136:25 137:5

**Complaint** 16:19

**complete** 21:19 74:7

**completely** 21:17

**comport** 26:5

**computer** 36:11

**concept** 57:19

**conclude** 112:21

**concludes** 138:10

**conclusion** 84:25

**conditions** 29:22

**conduct** 21:2 22:12 74:13 84:12 94:14 128:6

**conduit** 25:13

**conference** 120:14,16

**confident** 102:15,16 103:19

**confidential** 19:10 135:25 136:2,3

**confirm** 28:25

**confused** 52:25 93:17 101:13

**confusing** 52:17,18 84:6 86:6,9 88:22 89:4, 11 93:22 98:4 109:2,6, 10 110:21 130:18

**confusion** 47:11

**Congress** 17:18 24:4, 13 50:22 51:7 52:3 53:8 60:14 64:6,7,14 79:25 85:5 86:8 90:13 117:2, 14 118:2 119:6

**Congressional** 18:12 22:25 70:15

**conjunction** 28:12

**connect** 77:12

**connection** 30:18 58:19 75:13 120:24 121:25

**consent** 6:6

**consideration** 63:17 137:20

**considered** 30:18 59:20 135:18

**consistent** 11:25 66:15 106:6

**consistently** 88:14

**constitute** 84:19

**Constitution** 13:12,13 90:10

**constitutional** 81:25 84:13 124:7

**construct** 41:7 42:18

**construed** 134:20

**contact** 39:21 40:5

**contacted** 40:7

**contacting** 38:14

**contemporaneously** 60:13

**content** 120:10,11

**context** 13:18 40:7 43:24 55:11 59:17 62:19,21 63:8 65:18 66:12 67:23 75:21 84:18 89:5 98:12,23 99:7 100:15 115:6 124:23 129:2 133:23 137:3

**contexts** 68:12

**continue** 20:14 21:18 127:19 134:23 137:12

**continued** 22:3

**contract** 79:10

**contradicted** 83:18

**contradictory** 84:6 86:6,9 88:23 89:4,11 98:4,6 99:4 109:5 110:22

**contributed** 27:25

**contribution** 124:5

**contributor** 32:22 33:5 34:4 40:3 43:19 45:20 77:24 102:20

**contributors** 33:8,15, 18,20,21,22 34:21 36:3, 5,6,25 37:3,20 40:13 50:2 67:4

**control** 37:13

**conversation** 14:11 26:2 32:7 36:18 40:21 41:5 65:11 66:4,12 77:5 99:17 107:3 110:24 112:13

**conversational** 112:9

**conversations** 14:13, 15,17,18,20 15:2,4,7 24:20 25:10 26:12,15

41:9 43:12 116:9
133:24

**copied** 49:11

**copy** 27:23 41:22 72:24
75:6,12 138:5,7

**core** 34:20 71:7 100:11

**correct** 15:8,9 29:20
49:23 67:9,16 71:14
80:22,24 81:7 89:24
129:18

**correctly** 95:16

**correspondent** 7:15

**corrupt** 68:18 99:21
131:14

**counsel** 5:13,20 6:6

**counterfactual** 66:25

**couple** 129:23

**court** 5:7,11 21:2
29:17,19 127:8,18
128:7 137:19

**courtesy** 20:24 22:16

**courtroom** 22:15

**cover** 26:12 52:18
133:8,22

**coverage** 16:24

**covered** 89:12

**covering** 16:10

**COVID** 39:2

**cowed** 11:2

**create** 32:7

**created** 137:20

**credibility** 8:5,9,13,24
134:9

**credible** 135:18

**crime** 80:9 81:21 82:2,
8,18,19 83:14,22 84:12,
23 85:12,21 88:9,15
89:8 90:7 91:8 92:2,12
94:4,15 95:10 108:12,
21 109:21 110:13 130:9

**crimes** 110:5,16 112:23
130:6 131:17

**criminal** 124:3

**criteria** 90:10

**critics** 130:5

**crossed** 66:6

**crucial** 68:17 131:13

**Cruz** 60:3 61:4 67:18
70:3 71:8 107:7 108:23
109:22 113:18

**Cruz's** 60:13 70:21
87:18 100:6 103:13
126:4,24 129:15 131:11

**cup** 29:8

**current** 7:22 38:24 39:7
48:3

**custom** 28:8 34:14
35:3,16 38:13 39:20
42:6,22 43:3 66:5
121:15,22

**customarily** 24:24
26:3 31:18 34:18 36:15

**customary** 30:12,16
31:11 72:22 75:4,10,19
120:4 121:23,24 122:4

**cut** 103:20

---

**D**

**daily** 120:16 121:6

**date** 78:18

**dated** 122:25

**day** 10:19,20,21 11:24
12:11,23 13:24 14:9
15:2,17 17:10 23:20
24:14 25:10 26:12,13,
15 27:5,9,20 31:10,13
32:16 33:23 34:12 35:2,
10 37:15 40:20 41:11
42:5 51:8,12,15 53:8,13
60:16,23 69:3,11 70:3,7
76:14,15 80:2 83:7
92:21 95:13 100:3
102:7 105:24 108:25
109:2 110:10,23 111:2
118:3,19 119:6,13
121:21 132:25

**days** 18:6 83:5 86:3,4
98:19 114:4

**debate** 84:11

**decide** 99:6

**decided** 26:16 72:2,11

**decision** 34:12,15
35:17 71:17,23 79:13
133:5

**decisions** 14:3 133:5

**deeply** 120:10

**defamatory** 8:2

**defendant** 135:12,13,
20

**defending** 127:25

**defense** 89:23 116:2
123:21

**define** 68:25 90:13

**definition** 103:24
104:16

**definitively** 56:25

**demand** 37:10

**democratic** 65:24
90:23 130:4

**depend** 34:24 35:7
43:11 66:11 116:12

**depends** 120:2

**deposition** 5:4,8,24,25
6:2 17:8 18:9 21:19,20,
24 27:11 46:17 58:11,
19 59:10 74:7 77:7,9,
15,16 78:12,20 114:17
122:11 127:7,24
133:11,13 136:4,11,14
138:11

**depositions** 19:9
21:16 22:18 127:20
137:21

**Dershowitz** 5:5,17
16:9,20,25 24:13 28:18
52:2 57:20 59:22 60:3,
17,22 61:3,7,12 62:2,15
63:4,12,19 64:3,5,12,20
67:19,20 69:25 70:16
71:4 80:8,11 81:19
82:7,17 83:13,16,21
84:11 85:25 87:17 88:2,
8 89:10,23 90:25 91:24
92:11,19,23 93:4 94:14,

22 95:9,24 96:17,22
98:2,20 100:5,11,17
108:11,16 109:20
110:11,15,21 112:22
113:4 114:3 115:19
116:5 117:18 123:22
125:17 126:8,23 128:18
131:16 138:12

**Dershowitz's** 15:24
17:17 24:3 50:21 51:7
53:7,12 57:25 60:12
69:3 70:7,20 79:25 84:9
85:20 86:20 89:8,25
90:18 97:20 103:4,12
104:14 111:5 113:4,17
115:20 116:2 117:2,13
118:2,19 119:5 126:3,
19 129:15 130:8
131:11,19

**describe** 9:3 91:24
92:10 120:20

**describing** 37:16 61:2

**description** 33:2

**designate** 135:25

**desk** 29:11

**destroy** 90:9

**details** 12:2 42:20
100:13

**determination** 8:9
71:9

**device** 30:5 78:3

**devices** 46:24

**dictators** 57:21 58:2
67:23 105:15 113:22

**dictators'** 105:10

**differently** 70:18 80:5,
14 133:15

**difficult** 22:20 25:4

**difficulty** 46:16

**digital** 41:22

**dinner** 81:23

**direct** 14:11,13,14
79:21 103:21 127:15
128:9

**directs** 47:23

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

**disagree** 65:5 68:14
124:12 125:10,18
130:2,15 131:8,21
132:5,8,12

**disagreeing** 124:14

**disagreement** 128:8

**discuss** 14:2 32:5 64:9
92:24 98:9 99:7 130:22
132:4

**discussed** 50:22 99:20
113:7 136:4

**discussing** 65:19 79:6
83:8 89:15 94:2 116:22

**discussion** 35:11 36:7,
15 46:7 64:8 65:9 78:7
103:21 105:8

**discussions** 28:22
29:2 31:12 55:4

**dishonest** 73:18

**displaying** 22:12

**disrupt** 21:5

**District** 5:7 132:14

**divulging** 24:23

**document** 47:8,11,15,
22,25 49:2,5 56:7 68:21
76:21 78:2,3,6,9,10,16
79:5 111:23 114:13,14,
22 115:2,4 122:8,9,22
133:19

**documents** 18:18,21
46:16 136:4

**double** 56:14,18

**doubt** 33:9

**downstairs** 112:11

**draft** 42:23

**drafts** 31:17,22

**driver** 62:7,8

**drop** 72:7

**Dropbox** 114:13

**dropping** 46:17

**duly** 6:16

**dumbfounding** 52:15

**duration** 88:16

---

**E**

---

**e-mail** 40:3 46:23 48:7,
12,15 49:7,16,21 50:5
57:4 75:20 76:3 101:20
102:19 115:7,9,14
116:5,9 119:11

**e-mailing** 49:18

**e-mails** 56:3

**earlier** 24:14 49:10
51:7 53:8 69:3 70:3
79:25 82:24 97:19
105:8 106:16 108:9
110:23 119:6

**early** 50:6

**easier** 122:19

**Eastern** 5:3 46:11,14
114:8,11 138:13

**economics** 7:15

**editorial** 121:8 122:25
123:11,13,15 124:10,
16,17,22 125:13,20
129:5,7 133:6

**effect** 57:24 96:24
107:22

**effort** 77:12

**efforts** 19:19

**egregious** 22:11

**elected** 96:6 97:11

**election** 96:2,3

**elementary** 27:18

**elements** 83:7 99:17

**Ellen** 5:11 6:16 74:25
117:8

**emphasis** 126:13

**emphasize** 133:18

**employed** 7:5,7,8,9
135:12

**employer** 8:8 131:10
137:15

**employment** 7:12
119:17

**end** 11:13 69:10 82:20
90:14 91:5 94:8 95:15
96:8 101:5 105:4
106:21 107:22 108:3
109:13,14 110:6
111:13,14 112:2,3
115:15 124:7 130:10
131:3,4

**endless** 134:19

**engaging** 22:14

**ensure** 12:24 13:22
23:12 24:10,25 25:15
65:13 67:11 103:11

**ensuring** 85:7

**entire** 70:15,20 79:8
80:15,17 88:16 102:21
107:2 136:2

**entirety** 49:15 78:23
101:23 103:12 129:14

**entitled** 19:11 59:4
122:24 125:22 127:10
134:23

**environment** 37:6

**episode** 26:9

**equivalent** 7:20 68:5

**Erin** 5:1,4 6:1,15,24 7:1,
17 8:1 9:1 10:1 11:1
12:1 13:1,3 14:1 15:1,
25 16:1 17:1 18:1 19:1,
20 20:1 21:1 22:1 23:1,
16 24:1 25:1 26:1,8
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1,5 46:1
47:1,2 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1,22 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1,5 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1

103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1,21 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1,22 138:1,
11

**ether** 76:5,17

**evade** 127:15

**evening** 55:5 120:25

**event** 76:4 77:14

**events** 12:10,13 118:17

**evidence** 8:8 134:9
137:7

**exact** 7:15 14:17 23:22
71:23 93:18 101:21
107:17

**examination** 6:20 59:2
136:5,18

**examined** 6:18

**exceeding** 124:6

**excerpt** 122:21 123:16,
18 125:4

**exchange** 43:9

**exclamation** 107:19

**excuse** 19:6 27:17

**executive** 14:2,7,20
15:12 25:20,21,24
30:10 37:22 49:8
121:11

**exhibit** 47:10,12,13
48:7 56:2,21,23 78:6,7,
10,12,13 114:15,16,19
115:7 122:10,12,22

**exhibits** 133:12

**expect** 36:12

**experience** 34:7 44:8
52:16 134:7

**expert** 53:24

Confidential

expertise 32:9,19
33:10,12 37:4,7 42:15,
17,18 66:2

experts 53:19 86:17

explain 22:10 109:9
127:13 128:10

explained 97:20
103:15

explicitly 124:2

expounded 106:18

express 52:19

expressed 125:4

expression 40:22

extend 22:16,17,18

extensive 33:21 34:6
66:2

extent 24:7 68:16
131:12 134:13 135:2

extermination 58:3

extreme 104:9

---

**F**

fact 22:19 66:23 98:25
100:5 103:15 109:11
132:24 135:19

facts 65:15 66:8,17
67:14

factual 73:24

fair 12:13,19,23,25
13:23 25:16 52:3 65:14,
18 66:7,16 67:13 82:5
83:11 85:8 97:13,19
100:2 102:6 103:10
105:23 110:9 125:8
131:18 132:2,6,24

fairly 119:22,23

fall 64:10

falls 20:14

familiar 33:19

fashion 77:13

feel 25:23 63:23 78:24
100:14

feels 127:12

feigned 20:24

felt 60:8 61:17 72:9
99:18 105:18 106:6

filed 16:9,20 132:15

fill 40:11

financial 124:4

find 41:5 91:12

finding 82:2

findings 137:8

fine 19:21 20:21

fingers 73:3

firm 22:2 130:23

fit 21:5 35:12

floor 17:17 24:4 50:21
60:14 64:6,7 101:5
113:5

Florida 5:6 13:11,12

focused 79:7 93:19

follow 40:14

follow-ups 134:13

foot 128:4

force 92:21

foreign 124:5

forget 80:8 95:10

form 7:23 9:5,7,15,20,
23 10:5,10,17 11:8,20
12:8,15,21 14:23 16:12
17:25 20:7,9,12,13
21:11 23:15 24:15 26:7,
20 27:21 28:4,11,19,22
30:15,20 31:8,20 32:3,
15,21 33:7,17 34:17
35:19 36:17 37:17,21
38:9 39:23 40:9 41:16,
25 42:11 43:7,18 45:4,
17 49:4,19 50:24 51:9
52:4,18 53:3,23 54:7,20
55:6,21 57:14 58:5
59:11,23 60:19 61:13
62:4 64:4,16 65:16
66:10,18 67:8,15 68:19
69:7 70:4,24 73:4
74:10,22 77:17 83:23

84:15,24 85:13,23
86:12,24 88:6,18 90:20
91:17 92:3,14 93:8
94:19 97:8,24 98:16
99:11,22 100:9 101:12
102:14 103:18 104:10
105:25 107:11,25
108:14 109:16 110:7
111:16 112:25 113:23
116:7,16 117:4 118:11
119:7 121:3,19 123:4,7
124:13 125:12 126:5,25
128:2 129:19 131:6,22
133:2 136:12

formal 127:18

format 112:9

fortieth 134:18

forward 23:25

forwarded 119:11

found 16:14 86:7 89:3
109:9

foundation 27:14

fourth 106:12

frame 30:19 121:21

frank 16:16

frankly 104:25

Frazier 39:11

frequency 120:20

front 7:17 11:14,16
14:9 18:19 30:5 44:2

frustrate 116:17,18

frustrated 22:2,11

fulfill 33:9

fulfilled 33:2

fulfilling 33:23 34:11

full 33:19 69:24 71:5
114:5 137:19

fully 88:25

fun 19:17,18

fundamental 8:12

fuzzy 58:15

---

**G**

Gary 5:10

gathering 13:5,10
24:23 25:7 66:20

gave 33:3 89:6

general 9:13 13:7
15:10,23 24:5,6 36:8
76:18 122:15

generalities 13:14
25:8 26:9

generally 11:22 24:22
26:3 28:9 35:16 36:13
37:19 44:8 69:12 71:22,
24 75:17 76:3

genocide 57:9 58:10
59:8 60:18 64:13 101:2
105:3

gentleman 32:13

gist 15:23

give 13:3 20:24 21:4
25:4,6 47:21 52:24 56:7
76:18 98:8 110:5 111:3
121:4 129:2

glasses 30:9

global 58:4

good 5:2,15 6:22 103:8
133:16

Goodman 34:3,4 53:17
87:11,15 97:16 100:13
103:22 104:6,12,13

Goodman's 104:7

gosh 119:24

group 35:15 39:15

guaranteed 49:25

guess 10:18 51:21 79:2
87:7 89:5 98:17 108:15
109:18 120:2 129:20

guest 32:2 41:5,9 51:5

guest's 41:24

guys 32:4

## H

**Haag** 115:10,14

**hallway** 55:9 77:5

**hand** 26:24 27:23 32:9 39:7 67:17

**hands** 29:6

**happen** 41:10 55:10 133:20

**happened** 12:11 41:10 45:7 55:16 65:11 67:24 68:7 86:16 105:9

**happening** 13:25

**happy** 46:4 54:23 57:18 59:15,18 74:16

**harass** 74:23

**harassing** 73:14,23 74:14

**hard** 41:22 82:3

**Harvard** 87:12 123:25

**head** 38:24 39:3,7

**hear** 54:18 98:9,21 100:23,24 113:12,15 129:13

**heard** 40:22 54:16 87:13,14 96:18 97:17 102:23 104:15 108:21, 22 112:20

**hearing** 16:24 53:16 58:9 59:7,17 76:4 98:13 102:21 103:3 130:19

**hearings** 26:14 51:12 53:14 69:11 72:3 76:15 83:4 86:15 98:20 99:16 101:16,17,23,25 102:22 103:8

**helpful** 54:25 58:13 121:5

**helps** 41:7

**here...i** 110:8

**hey** 40:11,16 76:8 112:10

**high** 37:4,5,10 38:2 130:9

**highlighting** 83:8

**hired** 39:8 44:14,21

**history** 133:19

**Hitler** 54:11 56:5 57:12, 22 58:2 59:15 60:10,23, 24 61:19 64:13,24 65:10 68:5 100:25 104:22 105:3 113:21 126:21 129:17

**hold** 32:18 134:16 136:23

**holds** 73:3

**Holocaust** 57:13 58:8

**home** 19:3

**honest** 53:9 68:24 79:2 129:3

**honestly** 39:9 40:10

**hope** 22:15 131:25

**hour** 34:22 36:7

**hours** 37:11,12,13 98:19

**house** 19:25 20:3

**hypocritical** 128:3

## I

**idea** 38:21 41:10 45:10

**ideas** 38:4 68:3

**identical** 132:12

**identification** 47:14 78:14 114:20 122:13

**identify** 5:13

**illegal** 68:17 99:20 100:8 103:17 131:13

**immediately** 50:15 71:10 81:12 91:4 93:3 96:14

**impact** 59:22 61:12 62:14,20

**impeach** 81:21 82:8,19 83:15,22 84:13 85:21 88:15 92:2,13

**impeachable** 84:20

**impeached** 90:5 91:12 93:7 94:7,18 97:23 107:24 110:17 112:24 124:2,3,6

**impeachment** 15:18 16:11,24 17:18,23 18:3 37:6 51:16 53:13,14 82:12,25 84:22 85:3,10, 16 86:8,21 88:3,16 90:9 93:6 96:7,23 97:12,22 108:12,13 110:13 122:24

**implied** 63:6

**important** 11:3,6 64:8 67:11 99:2,18 100:4 105:19 112:14 133:18 137:4

**impression** 109:7

**impromptu** 122:5

**improper** 74:6 127:16, 20,23 134:5

**improperly** 20:15

**in-house** 5:20

**inappropriate** 19:12 124:21

**incessantly** 128:13

**include** 25:12 31:13,14 49:21 69:24 75:25 99:18

**included** 31:18 48:16 71:3 132:6

**includes** 79:24 100:10

**including** 31:25 61:18 102:11

**incompatible** 130:7

**inconsistency** 109:24

**independent** 133:4

**independently** 17:4

**indicative** 76:13

**indictable** 130:10

**individual** 28:14 68:4

**individuals** 30:17 104:4 105:12

**industry** 27:2

**influence** 133:8 134:21 137:2

**influenced** 134:24 135:19

**inform** 9:11,17 10:18 11:10,23 12:6,10 16:17 41:8 76:16 86:16 98:7 110:10 133:25

**information** 9:10 47:2 49:16 134:7,10,13 135:16

**informed** 86:16 89:2 108:10

**informing** 26:10 83:12

**initial** 40:5

**injecting** 112:17

**input** 30:13

**ins** 72:13 113:25

**insinuating** 73:24

**insisted** 19:7

**instance** 36:10 111:6

**instruct** 8:3 21:11 137:12

**instructed** 127:7 134:10 135:13,22

**instructing** 8:11,22

**instruction** 13:4 128:15

**instructions** 134:6

**instructs** 9:7

**integrity** 21:15

**intend** 74:23

**intended** 31:6 99:15

**intent** 51:14

**interaction** 102:22 121:25 122:4

**interactions** 121:16

**interest** 37:4 38:2,3 60:7 64:22 96:2,4,6 97:11 101:3 103:23 109:23 123:24

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

**interested** 23:25 123:17

**interesting** 44:16 75:24

**interject** 105:20

**interjection** 107:14,18 111:19

**internally** 70:6

**interpret** 11:15

**interpretation** 67:3 101:25 109:11 129:5

**interpreted** 70:17

**interrupt** 127:20 128:22

**interruption** 74:6

**interview** 80:24

**intonation** 126:15

**invading** 25:4

**involved** 16:25 30:22, 24 31:12,15,16 35:4 36:4 77:23

**ipad** 46:3,7

**Isabelle** 6:24

**issue** 7:25 8:5 13:6 28:5,7 31:7 32:9,13 34:9 37:8 48:17 52:5,6 53:5 54:12 57:5 59:9,20 61:10,25 62:13,25 63:10 66:25 69:6 70:23 71:12,19 72:17 75:11 77:14 105:10 117:25 120:15 131:2 132:23 135:23 137:9

**issues** 135:3

**items** 18:17,18 23:6

**J**

**January** 10:4,16 11:18 12:19 13:21 14:16,22 15:5,7,13,16 16:11 17:2,19 18:4,8 23:12 24:12,21 33:5 38:20,25 43:13 45:2,16 48:8,24 51:6 54:4 57:11 64:14 82:6 115:10 117:19 120:4 121:2 122:25

123:17

**jaws** 72:7

**Jeff** 116:19

**Jeffrey** 120:24 121:16

**Jennings** 32:25 34:2 42:16 53:18 65:7,22 67:25 104:19,23 105:10,17,21 106:8

**Jewish** 61:7

**job** 9:3,9,17,22 10:4,18, 20,24 11:10,15,19,23 12:22 15:3 33:11 65:4 69:10 86:15 98:7,25 99:6 102:20 103:9,25 111:2,4 120:6 130:24 132:2 133:16,21

**jobs** 132:9 133:17,18

**Joe** 32:13,22 34:2 38:22 40:21 42:16 43:14,15, 17 44:25 45:14,20 48:16 50:12 53:10,18 55:8 56:3 57:18 58:8 60:5,8 61:5,25 62:14 63:3,11 65:5,8,22,23 67:21 68:2 71:11 76:10 77:2,22 81:9 89:18 100:20 101:14,20,22,24 102:17,19,20,21 104:16 105:22 106:4,7,18 107:22 111:20 112:17 118:4,22,25 119:4,12 126:21 130:25 131:7

**Joe's** 64:10,17 67:22 110:19

**Johnson** 90:11

**Jon** 80:25 81:9 107:5

**Journal** 129:4 132:13 133:7

**Journal's** 122:23

**journalist** 7:20 9:4,9 11:4,5 12:24 85:6 99:25

**journalists** 9:14 24:19 26:11 33:15

**judge** 21:3 22:12 132:14 133:7

**July** 5:4

**jumped** 73:22 106:8 127:25

**jury** 134:8 135:16 137:7

**justification** 60:5 61:3 67:21

**justifications** 68:3

**justified** 109:23

**justify** 58:2 60:9 106:21 107:23 108:3 109:13 111:13 112:2 131:3

**justifying** 64:22

**K**

**Kate** 5:18 6:13 124:10

**Katie** 39:5 48:8,19,20 49:6 75:20 101:19

**Kelly** 5:19 16:3

**key** 18:16 23:6 83:7 90:24 99:2 111:3,4

**kind** 62:25 96:7 97:12

**kitchen** 29:14

**knew** 18:6 62:18

**knowing** 102:19

**L**

**labeled** 47:8 78:2,9 79:22 80:4,14 114:17

**larger** 98:15

**launched** 44:23

**Laura** 34:3,4 53:16 80:6 89:18

**law** 84:13

**lawsuit** 13:6 16:9 66:21 77:21,23

**lawyer** 29:16 34:6 85:2, 14,19 86:11,22 87:5,10, 12 88:4 96:16 104:6 123:22 134:9,25

**lawyer's** 73:10

**lawyers** 65:25 81:20 82:17 84:5 87:8,21

97:14 128:8

**lay** 86:22 88:5 90:17,21 125:23

**laying** 27:13

**lead** 57:12 94:16

**leading** 136:24

**leads** 134:14

**learned** 15:22 16:3

**left** 44:18 119:17

**legal** 5:9 6:23,24 34:6 42:17,18 52:2 53:7,17 82:7 84:10,25 85:4,16 86:10 87:5,9

**legalese** 103:21

**length** 70:7,14 86:3

**lengthy** 82:11

**license** 21:4 110:5,16

**lies** 9:22

**lieu** 6:3

**life...it's** 87:13

**light** 110:23

**limited** 69:13

**link** 77:25 114:13

**list** 39:13 90:3

**listen** 128:13

**listening** 19:8

**literally** 8:22 19:15 21:7 30:8 73:24 82:16 85:17

**litigation** 111:23

**live** 43:4,13 88:20 98:23 99:16 108:6 114:4 118:9

**located** 19:13

**location** 18:25

**Lockhart** 28:17 32:14, 18 34:2 38:7,22 42:16 43:14,16,17 44:25 45:14 48:17,23 50:6,19 51:4,25 53:6,20 54:10 55:4,7 57:23 59:21 60:5 61:11 62:14 63:11 65:3,

22 69:5 70:22 71:18
72:18 77:3,20 79:17
81:10 89:18 100:20
101:14,20,22 102:12,
17,20 104:11,16,22
105:11,18,22 106:16,18
107:22 108:7 109:12
110:3 113:20 117:16,25
118:23,25 119:4,12
126:21 129:16 130:25
131:7

**Lockhart's** 50:12 56:3
57:4 61:25 71:11 79:7
101:24 102:20,22 104:9
106:4,7 107:9 118:4

**long** 43:25 47:19 96:25
106:20 107:22 108:3
109:12 111:13 112:2
123:23 131:3 133:21

**long-time** 65:24

**longer** 39:6,12

**lot** 37:7 39:4 40:17
44:20 108:25 126:12
137:6

**loud** 106:10

_____

**M**

_____

**made** 24:13 28:17
34:12,15 36:6 57:16
59:21 61:11 62:8,14
63:4,11,18 64:2 68:2,20
69:5 70:2,5,22 71:9,17,
19,23 72:7 76:12 82:23
83:9,16 84:5,7 85:25
87:17 88:8,11,14 93:20,
23 94:12,22 98:4,6 99:5
101:5 104:22 105:15
106:9 108:16 109:3
111:19 112:22 131:25
132:13,21 134:25 135:2

**main** 25:12 51:15 71:3
130:8

**make** 8:9 14:3 20:23
21:14,17 22:6,20 23:5
24:18 35:17 45:14 53:6
56:24 60:17 63:22
68:20 73:19 74:14
77:12 79:13 80:5 86:2
88:9 90:12 92:19 100:7
103:16,25 105:19 109:4

111:5 112:20 122:18
129:8 133:4

**making** 31:14 55:18
57:23 63:6 64:21 73:20,
22 74:10 81:7,20 82:7,
11,18 83:13,21,25
85:20 86:10,20 87:4
88:3 90:18 91:8,24
94:4,14 96:22 101:11
107:21 108:11 110:12
137:8

**manager** 82:12

**manner** 6:7 12:14,20,
23 13:2,23 21:5

**mark** 5:16 6:11 13:18
16:5,14 19:5,16,21,25
20:20 21:23 22:4 23:21
25:9 28:20 29:2,14 30:9
32:5 33:20 35:8 36:2
39:10 40:10 46:2 47:11
49:20 51:10 56:9 58:20
66:22 69:9 73:5 75:19
78:5,10 79:19 80:7
84:17 86:25 88:22
91:19 98:18 105:7
106:3 107:12 108:24
112:10 113:8 117:20
121:21 122:10 128:17

**Mark's** 16:2

**marked** 47:9,14 78:11,
14 114:16,20 122:13,22

**mass** 58:3

**materials** 26:18 29:18

**Matt** 39:11

**matter** 5:5 15:11 25:24
28:8 32:19 34:14 35:3,
16 37:5 38:13 39:20
42:6,22 43:3 45:6,11
64:7 66:5 67:2,17 84:13
86:17 90:22 121:15,22
138:11

**mattered** 102:2

**means** 64:23 106:21
107:23 108:3 109:13
111:13 112:2 131:3

**meant** 107:2

**media** 40:18 44:4,9
101:17 123:21 124:18
126:2,17

**meeting** 120:23 138:2

**member** 89:23 90:12,
13

**memorable** 45:13

**memorialize** 41:23

**memories** 36:12

**memory** 58:15

**mention** 45:9 59:14
82:14

**mentioned** 30:25 49:9
57:19 58:8 67:22 68:2

**message** 120:6

**met** 43:22

**methods** 40:4

**Michael.(sic)** 79:18

**middle** 34:19

**military** 80:20

**mind** 13:18 29:10 66:7

**mine** 80:14 110:19

**minute** 113:10

**mischaracterized**
126:3

**misdemeanor** 130:9

**misinterpret** 98:14

**misquoted** 92:4

**misstates** 11:21 38:10
42:12 86:13

**mm-hmm** 95:5 105:6

**Mm-mmm...it** 35:7

**moderating** 65:5

**moment** 65:9 71:25
72:4,9,10 75:21,25
76:4,6,7,8,11,16 83:12
92:16 95:12 100:2
101:25 102:7 104:21
105:24 106:3 107:14,17
108:6 110:10 111:3
113:14 114:21 122:8
132:25 133:19,22

**momentarily** 56:19

**moments** 56:16 81:23
100:20 108:9

**money** 137:6

**month** 12:12,16 45:16

**morning** 5:2,15 6:22
120:14,17

**motive** 68:17 131:14

**moved** 129:11

**MSNBC** 44:13

**mug** 30:6

**multiple** 83:4 98:19
99:3 114:4

**Mussolini** 57:3,22
59:15 60:10 61:2,19
64:13,25 65:10 100:24
105:3 126:22 129:18

_____

**N**

_____

**named** 44:18

**names** 7:3 67:25
105:10,18

**national** 123:24

**natural** 109:3

**nature** 120:3 138:2

**NBC** 44:13

**necessarily** 26:25
70:16

**network** 5:6 32:23
33:11 36:6,24 37:3,19
138:12

**news** 5:5 9:10,13,17
10:9,11,13,15,19 11:7,
10 12:19,23,25 13:5,10,
22,25 16:10 23:12
24:11,23,25 25:6,15
26:22 33:15 37:2,5
44:11,13,21 66:20
67:12 85:9 116:14
121:18 133:4 138:12

**newspaper** 125:21

**newsworthy** 65:15
70:9

**night** 26:22 83:6

**Nixon** 130:5

**non-responsive**

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

50:10,16

**Notary** 6:17

**note** 8:4 78:11

**Noted** 138:15

**notes** 41:22 42:3

**noteworthy** 70:9

**notice** 119:10

**number** 5:7 20:19 78:7 121:12

**nuts** 115:15,22 116:6, 11,15

---

**O**

**oath** 6:4,5 19:14 52:13 134:22 136:24

**object** 21:10 132:17 136:12

**objection** 7:23 9:5,7, 15,20,23 10:5,10,17 11:8,20 12:8,15,21 14:23 16:12 17:25 20:9, 10,12 23:15 24:15 25:17 26:7,20 27:21 28:4,11,19 30:15,20 31:8,20 32:3,15,21 33:7,17 34:17 35:6,19 36:17 37:17 38:9 39:23 40:9 41:16,25 42:11 43:7,18 45:4,17 49:4,19 50:24 51:9 52:4,18,25 53:23 54:7,20 55:6,21 57:14 58:5,12 59:11,23 60:19 61:13 62:4,16 63:13 64:4,16 65:16 66:10,18 67:8,15 68:19 69:7 70:4,24 73:4 77:17 83:23 84:15,24 85:13, 23 86:12,24 88:6,18 90:20 91:17 92:3,14 93:8 94:19 97:8,24 98:16 99:11,22 100:9 101:12 102:14 103:6,18 104:10 105:25 107:11, 25 108:14 109:16 110:7 111:16 112:5,25 113:23 116:7,16 117:4 118:11 119:7 121:3,19 123:4 124:13 125:12 126:5,25 128:2 129:19 131:6,22

133:2

**objections** 6:7 74:10 127:21 134:19

**objective** 107:21 108:5

**observe** 29:23

**obstruction** 19:19

**obtain** 21:6 41:13 135:3

**occasions** 42:7

**occur** 77:10 118:8

**occurred** 14:18,20 15:4 20:18 52:21 60:14 83:5 101:15

**October** 44:24

**offended** 116:10

**offense** 63:7 84:20 130:10

**offered** 20:12 46:22

**office** 19:3 54:5 90:6 96:20,21,25 97:2

**officers** 20:25

**official** 95:25

**omitted** 68:16 131:13

**open** 45:24

**opening** 82:24

**operative** 32:23 53:11, 22 65:24

**operatives** 34:3

**opinion** 54:18 67:2,5, 22 86:22 87:6,9 88:2,5, 7 90:18,21 103:15 116:25 117:12 124:11, 16,17 125:23 129:2,4 130:23 132:22

**opinions** 74:22 130:22

**opportunity** 74:6 98:8

**opposed** 81:16 107:5

**order** 82:8 92:2 127:8 132:15 136:3

**ordinarily** 34:25

**organization** 133:4

**original** 101:20

**originally** 44:17

**outs** 71:23 72:14 113:25

---

**P**

**p.m.** 48:9 114:8,11 120:24 138:13,15

**pages** 80:4,13

**paid** 87 135:15

**pair** 30:9

**panel** 36:2 41:7 42:15, 19 48:13 51:15 64:9 65:5,11,18 69:19 76:7 89:9,18 98:10 99:7 104:4 107:4 124:24

**panel's** 49:22

**panelist** 35:5,18 38:7, 15 39:22 40:6,8 42:7 45:2 72:23 75:6,11,20

**panelist's** 41:13

**panelists** 32:7,8,12 34:8 36:21 42:23 43:5 66:6 87:24

**paper** 30:2

**paraphrase** 93:14 130:25

**paraphrased** 109:12 131:7

**paraphrasing** 104:8 107:8,21 126:2

**parrots** 52:20

**part** 24:8 28:7 31:25 38:11,14 40:5 44:12 65:12 82:16 91:15 93:3 94:3 100:21 104:23 110:3 114:24 133:24

**participating** 5:24

**parties** 6:5

**parts** 70:9 122:17

**passed** 55:8

**passionate** 91:8,24 92:10 94:4

**past** 32:4 129:10

**patience** 137:25

**pause** 76:12

**PDF** 45:22 46:3,7,16 78:2 80:17

**pencil** 29:9 30:9

**pending** 22:22 74:15, 17 113:9

**people** 9:10 35:10,16 36:12 37:7,12,19,24,25 38:23 39:15 41:19 57:17 65:19 70:11 76:6, 12,14 88:10 95:13 98:9 100:25 103:2 104:2 105:3 111:3 113:2 120:9 121:9 130:21 133:20,24

**people's** 72:7

**perceived** 102:2

**percent** 56:13

**perfect** 36:12

**perfectly** 109:3

**performance** 10:3

**performing** 13:20

**period** 93:21

**periodically** 120:2

**periods** 133:21

**permitted** 137:19

**person** 6:4 8:9 14:11 28:25 35:15 39:14,21 40:6 42:20 54:9 61:21 63:6,7,23 75:24,25 96:20 97:2 104:5 107:19 112:20 120:10, 21

**personal** 120:3

**personnel** 39:13

**perspectives** 65:23

**ph** 39:6,11

**phone** 18:22 30:3 40:4

**phrase** 11:12 50:16

**phrasing** 87:2

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

physically 5:25

pick 71:24 99:2

picked 70:8 99:3

picking 99:9,14

piece 123:17

piggybacks 52:20

place 5:9

places 92:24 134:14

plaintiff 5:16 21:22

plaintiff's 6:11 47:10,
12,13 48:7 55:25 78:6,
10,12,13 114:15,16,19
115:7 122:10,12,22

plan 113:9

planning 23:13

platform 67:6,12

play 53:10 59:3 68:5
76:12,16 82:4 95:14
107:15 112:13 126:20

played 71:2 80:8,10
89:16 90:2 91:4 93:9,
11,13,23 95:9 100:17
102:11 128:18 129:20,
21,22

playing 42:14 84:2

pleasantries 43:9

pleasure 137:25

point 16:15 41:8,14,18,
24 48:13 49:22 54:24
56:4 57:4 83:19,20,25
86:6 88:10,11 89:8
90:18 92:18,20,22
94:13 97:20 98:14
103:25 105:19 106:4,9
107:19 109:21 115:3
122:15 124:22,24,25
125:2,4,20 129:8 133:6
136:11 137:7

pointed 101:19

pointing 84:3 125:19

points 65:20 66:3
69:16 83:8 84:5,7 90:24
92:24 98:5,6,7 99:2,3
107:6 108:20 109:3,4
110:22 111:3 125:15

133:25

policy 57:19

political 32:23 34:3
42:17 53:18,21,24 54:2
85:4

politics 37:2

population 58:4

portion 17:16 24:2
56:21 69:2 79:23 89:14
93:2 129:22

portions 18:2,5,11
22:25 98:11,14 103:3

posed 70:2 113:18
128:10

position 7:12 19:15
21:20 92:12

possibly 45:21 55:9
109:10 110:22

pot 29:14

potential 32:2 36:21
38:7 39:21 40:8 41:5,
13,23 47:10

pound 69:21

POV 50:6

power 9:18 10:20,23
11:13 26:6 62:11 80:9
84:19 85:7,12 90:4,9
91:11 93:5 94:7,16
95:11 97:21 99:25
103:14

powerful 11:2

practice 27:2,8

practices 10:6,12 12:2
13:7

pre-interview 40:23,25
41:2,13 42:2 75:21

predominantly 39:15

prefer 68:12

premised 65:14 102:12

preparation 48:15
88:21

prepare 17:7 26:4

prepared 26:18 27:19

31:19 47:5 58:10 72:17

preparing 18:9 23:3
28:23 29:2 30:13 58:19
59:10 77:7 78:20
114:25 121:25 133:11

preplanned 31:5

prerogative 137:16

present 5:25 18:24
19:8 21:4 22:13 32:25
70:19 108:20 120:9
132:24

presentation 60:23
69:25 79:25 83:18 84:4
86:7 90:2 93:21 94:22
98:3,12,15 105:23
109:5 116:14 117:2,13
118:2,19

presented 52:2 72:18
75:13 98:20 102:16
103:20 109:20,22
113:19 125:8,15,16
126:8,9 131:10 132:3
133:12 134:8

presenting 124:15
125:19

preserved 20:11

president 64:21 81:22
82:9,19 83:15,22 84:14,
21 85:10,22 88:15
90:12 91:11 92:2,13
93:6 94:7,17 96:4,24
97:9,22 105:2,12
110:16 112:23 116:21
123:22 124:2 131:16

president's 84:5

presidents 90:3

President's 81:20
82:17

presiding 132:14

presume 27:14 51:13

pretend 33:20

previously 44:10,25
47:9 78:11 110:12
114:16

print 26:22,23

printed 106:15

printout 122:23

prior 14:15 15:14 21:16
42:9 44:8 55:4 57:5
69:18,19 71:11 78:25
82:6 97:5 114:17 115:3

privilege 8:10,17,22
13:10 21:12 25:5 52:24
74:11

pro 68:18 96:7 97:12
100:7 103:16 131:14

proceed 42:24

proceeding 17:23 18:3
82:25 86:9 88:17
108:12

proceedings 15:18
51:16 53:13 127:19

proceeds 97:16

process 38:12,14 85:4

produce 110:25

producer 14:2,7,21
15:12 25:21,25 28:16
30:10,11,25 40:14 41:4,
23 48:20,22 49:6,9,10,
13,17 121:12

producer's 56:3

producers 25:20 28:13
36:16 37:22 71:16
115:9

producing 129:6

productive 20:25

professional 22:16
128:12

professor 28:18 57:20
59:22 60:3 61:3,6,12
62:2,15 63:4,12,19
64:3,5,19 67:19,20 70:6
71:3 80:10 84:9 85:20,
25 87:17 88:8 89:7,10
90:25 92:18,23 94:22
98:2,20 99:5 100:11,17
108:16 109:2,20,25
110:20 111:5 113:3,4
114:3 115:18,20,25
117:17 119:5 123:25
125:16 126:18 128:18

program 7:16 14:4,21
15:3 17:10 23:14 24:12

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

25:11,12,20 26:16,22
42:8 43:6 44:23 45:2,15
60:25 67:7 69:16 72:5
87:8 89:6,13 91:16
92:25 99:3,10,18
100:16 102:24 103:2
105:9 108:20 110:15,20
113:3 117:18 125:8,16
128:17 129:14 130:21

**programs** 98:24
121:10

**prompt** 42:24 91:23

**prompted** 60:4

**prompts** 31:6

**proper** 137:3

**protected** 13:9

**protective** 136:3

**provide** 40:6 67:4
72:23 75:5 86:17 87:5,
8,21 99:6 104:2 119:13
122:7 133:23,25 134:10

**provided** 29:18 30:13
42:23 65:6 67:5 75:11
77:25 87:10 111:23,24
113:20 122:9 129:16

**providing** 50:19 87:15
100:2 135:12

**public** 6:17 9:18 10:19
11:10,23 12:6,10 19:10
26:11 41:8 45:6 54:5
60:6 64:7,8,22 66:20
76:16 86:16 95:25 96:2,
4,6 97:11 98:7 101:3
132:15

**published** 66:19
123:17

**pulled** 69:17

**purely** 99:21

**purposes** 132:19

**pursuant** 136:2

**purview** 63:22,25

**pushed** 65:8

**put** 14:4 26:16 32:6
45:22 56:9 57:20 61:5
62:23 63:2 65:18 67:19
68:3 71:6,7 72:12 76:7,

23 82:13 88:7,11 90:23,
25 94:23 102:16 106:2,
5 107:16 114:13
124:24,25 128:20 129:7

**puts** 26:23 62:22

**putting** 61:4,16,20,21
62:20 126:12

---

## Q

**qualification** 68:17
131:13

**qualified** 87:5

**qualify** 86:19

**question** 7:24 8:3,12,
16,20,23 9:2,8 12:10
13:19 15:20 16:2,4,6
22:23 23:22 26:8 27:5,6
31:23,25 35:20,21,24
42:10,24 44:17 45:5
50:25 52:11,17 53:2
54:9 57:15 58:6 59:6,25
60:2,4,13 61:15 67:18
71:7,21 72:21 73:8,9,
16,21,25 74:16,17 75:8
78:18 79:3 81:15 84:17
86:14 87:7,18 91:6,20
92:8,16,17 93:25 98:18
99:15 100:6 101:8,9
103:13 108:16 109:17
113:9,24 121:4 122:15
123:5,7,15 124:9 125:7
127:10 128:9 129:11,13
131:11 132:20 134:12,
15 135:7,9,14,21
136:14,22,24

**questions** 20:16 21:8
22:5,20 23:16 24:5
27:11,12,18 31:6,17
32:4 47:22 52:21 58:25
59:3,17 70:2,21 76:25
78:23 79:11 87:4 91:15
113:18 122:16 126:4,24
127:9,15 129:16 134:6
135:5,17 136:17
137:13,18

**quick** 108:5

**quickly** 47:18

**quid** 68:18 96:7 97:12
100:7 103:16 131:14

**quo** 68:18 96:7 97:12
100:7,8 103:16,17
131:14

**quote** 11:12,13 82:16,
20 90:2,14 94:3,8 95:3,
9,15,25 96:8 100:21
101:6 104:24 105:4
106:20,22 109:12,14
110:4,6 111:12,14,25
112:3 115:15 118:6,22
123:21 124:7 130:10
131:2,4

**quoting** 92:7 105:16

---

## R

**rack** 23:5

**raise** 128:6

**raised** 62:24

**rationalization** 105:14
106:5

**rationalized** 101:2

**re-appear** 135:4
137:17

**re-election** 60:6,8
64:21 103:23 109:24
123:23 131:18

**re-watch** 54:24 69:9

**re-watched** 72:5

**reach** 38:5 40:13 64:23

**reached** 38:22

**reaction** 72:3

**read** 17:20 31:3 42:5
56:11,12,13,16,22 59:9,
12 68:9,21 75:3 79:12,
14 81:11 90:2,19 91:2
94:10 95:16,17 96:10
97:5,15 102:13,18
112:14 117:10,21
118:14,22,25 123:16
125:5,11 130:17

**reader** 29:9

**reading** 30:9 51:24
53:5 58:9 59:7 72:24
73:5,25 75:7 81:17
96:15 100:12 104:24
107:17 108:4 117:22

130:13

**reads** 47:23 90:2

**real** 72:3

**reality** 63:17

**realm** 64:11

**realtime** 66:24 83:4
105:8 108:18

**reason** 29:12 52:22
87:20

**reasonable** 8:8 112:19
137:4

**reasons** 41:12

**Rebecca** 28:24 48:10
49:9 115:8,13,18,23
116:5

**recall** 11:17 12:3 14:14,
17 15:4,6,10 18:2,16
23:4,11 24:10,19 26:17
27:7,25 28:6 31:5,9
34:10,12 36:9 38:19,23
39:17 43:12,15,21
48:21,25 50:19 51:3,23
53:4 54:10 55:3 56:15
57:23 58:9,17 59:7,13,
19,25 60:17,21,22
66:23 68:8,10 69:2
72:7,16 75:19 77:4
87:23 89:2 91:14 96:22
99:9,13 115:2 116:24
117:11,16 118:8,18
119:9 122:5

**recalls** 59:5

**received** 116:4

**receives** 85:8

**receiving** 46:16

**recent** 18:6

**Recess** 46:12 114:9

**recipients** 49:8

**recognize** 47:25 78:15

**recollection** 15:16
28:21 39:18 42:4 48:6
49:3 54:14 55:18 68:13
77:13 116:8 118:16

**record** 5:3 6:9,23 18:12
20:23 21:21 22:6,21
23:2 46:9,11,14,21 47:5

52:22 64:7 70:15 73:19 74:15,20 75:3 91:2 92:6 102:13 114:6,8,11 117:10,22 127:14 132:16 135:8 137:20 138:13

**redaction** 50:16

**refer** 79:3,5 116:11 122:17

**reference** 36:14 56:5 70:14 82:10

**referenced** 11:12 36:20 113:21 129:17

**referred** 70:6 124:10

**referring** 17:22 24:7 36:16 82:23 83:3 87:16 89:18,20 104:7,20 105:7 115:18,24 117:25

**refers** 26:8

**reflect** 21:21 47:5 74:21 135:9

**reflected** 111:10

**reflection** 72:9

**reflective** 72:5

**reflects** 74:21

**refrain** 52:16 74:10 101:11 127:17

**refresh** 49:3 77:13

**regimes** 57:21 60:10 61:18 64:24 68:4 106:7

**regular** 120:14 121:8, 16

**regularly** 119:22,23 120:12,19

**rein** 66:8

**reject** 90:7,8 91:9 92:11 94:5

**rejecting** 91:25

**relate** 10:9

**related** 25:6 49:17 66:21

**relentlessly** 21:16

**relevant** 8:23 32:9 37:8

61:16,22 63:2 134:6 136:22

**religion** 61:16,21 62:7, 9,18,22 63:5,7,8

**rely** 25:14

**remark** 114:15

**remember** 14:19 16:15,16,17 45:10,14, 21 56:10,11 75:15 118:13

**remind** 75:2

**reminded** 134:17

**remiss** 86:2

**remotely** 6:3,5

**removed** 90:6

**repeat** 23:21 128:14

**repeatedly** 127:13

**repeating** 13:19 65:21 67:17

**replay** 70:10

**report** 9:10,17 11:10 12:13,19 23:13 24:11 25:15 85:8 100:2 102:7 110:10 132:24

**reported** 24:25

**reporter** 5:11,21 6:17

**reporting** 6:2,7 9:13 10:9,11,13,15 11:6 12:22,25 13:14,15,22 16:10 33:15 85:10 121:17

**represent** 5:14,16 19:7 92:20 125:22 132:10

**representation** 132:20

**represented** 77:21

**Republican** 65:25

**reputation** 64:2

**request** 52:23 68:20 81:17

**requested** 33:12

**required** 81:22 82:8,20 83:14,22 85:21 88:15 92:12 108:13 110:13

**requirement** 91:25

**requires** 130:9 135:4

**requiring** 134:11

**reserving** 135:4 137:16

**respect** 10:3 11:6 16:10 24:3,12 120:6 121:17

**respectful** 128:11

**respectfully** 58:25

**respond** 9:6 20:16,23 76:2 84:8 88:12 89:7 90:24 92:22 93:24

**responded** 65:8 104:6, 13

**responds** 87:11 105:11

**response** 52:20 70:2 71:3 87:3,17 100:5 105:16 108:23

**restate** 59:7 75:9

**resting** 29:15

**result** 131:15

**results** 96:7 97:12

**resume** 44:7

**retrospect** 108:24

**review** 17:11,16 31:22 47:21 57:17 59:13 64:18 69:18 78:22,25 88:20 89:6 114:21 122:9

**reviewed** 16:19 17:9 18:10 23:2 54:15,17 55:25 58:17 69:10 78:20 133:10

**reviewing** 18:2 65:7 85:18

**rhetoric** 105:22

**rights** 21:13

**role** 7:19 11:3 12:6 13:20 25:21,22 26:10 33:5 42:14,15 43:19 49:10 62:10 65:12 67:10 82:12 99:24

109:8 121:17

**roles** 11:5 33:24,25 34:11 39:5

**room** 5:19,25 18:23 19:2,5 20:2 29:22 30:3 46:25

**roster** 33:19 34:20 36:20,24 37:16,19

**rules** 21:13 128:5

**ruling** 134:11 135:3

**run** 53:25

**running** 54:5

**Ryan** 34:3,4 53:17 80:7 87:11,14 95:9 97:15 100:13 103:22 104:6, 12,13

## S

**salary** 7:22,24 127:8 135:8,10 136:7,20 137:23

**Samuels** 28:24 48:10 49:9 115:8,18,23

**Samuels'** 115:13 116:5

**Sandles** 5:11 6:11,17

**scenes** 45:8

**scheduled** 77:10

**scholars** 82:2

**Schweikert** 5:15,16 6:10,11,21 8:4,17,21 19:6,18,23 20:6,10,22 21:24 22:6,9 35:22 45:19,22 46:8 47:2,7 52:8,12 53:3 58:24 73:7,15,20 74:5,18 76:20,22 78:5,8 79:10 92:6 97:24 101:10 113:13 114:6,12 117:8 122:7 123:6,9,12 127:5 134:4,16 135:6,11 136:12,19,23 137:10, 11,24

**Scott** 32:25 34:2 42:16 53:18 65:7,21,24 67:24 104:19 106:8

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

**screen** 46:4,22 47:8,15 56:19,20,22 122:18

**script** 27:19 28:2 30:13 31:18,24,25 71:16 91:16

**scripts** 26:21,23 28:10

**scrolling** 47:23

**section** 79:17

**see...our** 38:24

**seek** 34:23

**seeking** 124:5 134:7,11

**seemingly** 84:6

**segment** 23:17,18,23 28:5,7,13,15,16 30:11, 14,23,24,25 31:7,15 32:13 34:9 38:16 39:22 40:14,15 41:3,4,15,23 48:16,20,21,22 49:6,13, 17 50:20 51:6,20 52:5,6 53:5,10,12 56:2 58:3 59:9,20 61:10,24 62:13 63:10 65:19 81:8,9 102:6,10 115:9 131:2

**segments** 23:20 28:13, 14 109:19 120:11

**selected** 38:7 103:4

**selecting** 35:4

**selection** 36:4

**Senate** 90:13 101:5 113:5 131:20

**senator** 60:13 69:17 70:2,20 80:23,25 81:9, 24 82:4 84:8 88:12 89:6 90:23,24 91:6,7,23 92:22 93:24 100:6,18 103:12 113:18 126:4,23 129:15 131:11

**senators** 90:11 130:4

**send** 49:13 50:5

**senior** 14:3,5

**sentence** 118:4

**sentences** 130:16

**separate** 63:5

**set** 43:8 55:23 110:24

**Setting** 63:8

**setup** 81:15

**shape** 28:22

**share** 46:22 56:18 122:18

**shared** 46:4 56:20

**sharing** 47:8

**shoe** 128:4

**show** 14:8 23:17,19 24:21 26:5 29:10 30:19, 21 38:2,8 39:4,12 47:7, 12,18 58:23 68:22 71:18 72:19 75:14 76:20 78:8,17 108:9 111:10 115:9 120:12 121:6,18 129:6 130:12 131:23

**showed** 30:8 75:19

**showing** 114:14 122:21

**shown** 37:16 69:4 71:18 81:12 95:20

**shows** 34:22 121:7,12

**sic** 56:2 79:14 99:25

**significant** 75:23

**silly** 27:12

**similar** 57:25 105:21

**simple** 40:11 125:23 135:14

**simply** 35:10 62:20

**single** 15:2 91:11 93:6 94:7,17 97:22 136:13

**sit** 130:20,22

**sitting** 43:8 55:22

**situation** 76:2

**skimming** 56:24 122:14

**smile** 70:6

**social** 40:18 101:17

**solely** 51:6

**soliciting** 124:4

**somebody's** 67:2

**someone's** 41:18 42:14 61:15

**sort** 20:24 26:17 28:22 33:2 39:9 40:19 41:22 43:5 65:22 70:5 72:6 76:12,17 79:7 91:7 94:3 95:13 107:18 108:5 111:19

**sound** 71:2,10,14,17 72:16,24 75:6,12 76:9 79:24 84:2 89:23,25 91:4,22 92:9 93:3,9,12 94:2 95:19,24 96:14 99:10,19 102:11,23 103:5 104:5,13 109:20, 22,25 110:4 114:2 129:20

**source** 17:5 124:6

**sources** 132:21

**Southern** 5:7

**spaced** 117:5

**speak** 9:18,22 10:19, 22,24 11:12 20:20 23:9 25:7 29:2 62:11 101:14, 15 102:3,17 113:25 114:25 119:21

**speakers** 7:25

**speaking** 18:6 26:6,13 76:2 85:7 86:4 88:21 99:25 103:14 127:20 134:19

**speaks** 80:7

**specific** 12:2,3 15:4,6 17:3 23:23 24:20 36:10 38:3 55:18 66:25 67:25 68:11,12 71:5 122:16

**specifically** 26:13 31:10 42:20 67:6 71:13, 21,22 72:13 76:10,18 99:9 101:18 107:4

**specifics** 13:8,9 25:6 26:9 75:16

**speech** 13:5 21:23

**spin** 74:19

**spoke** 119:19

**spoken** 119:16

**spring** 44:22,23

**staff** 38:18,20 39:4

**Stalin** 57:7,22 59:14 60:11,25 61:19 64:13, 24 65:10 100:23 105:2 126:22 129:18

**stamp** 80:19 81:2,13 89:21 94:25 106:13,15

**stamps** 80:20

**stand** 29:18 125:14 126:7

**standard** 9:19 26:5 27:2,3,8 50:3 52:24 85:4,16 91:10 93:5 97:21

**standards** 9:12,16 10:2,6,8,12,15 11:11,25 12:5,13,18 94:6

**stands** 59:6 69:14 75:22

**start** 43:10

**started** 73:22 126:21

**startling** 101:4

**state** 5:14 6:18,22 13:11,12 52:17

**statement** 68:15 81:4, 11,16 107:21 112:21 131:19

**statements** 8:2 17:17 24:4,13 50:21 51:7 52:19 64:14 65:2 69:3, 5,25 70:22 71:11,19 79:7 82:24 90:19 91:15 92:9 94:12 103:4 110:14 119:5 127:22 131:15 132:11,13,21 134:25

**States** 9:14 13:13 82:9 105:2

**stating** 6:8 131:2

**statutes** 13:11

**statutory** 81:21 82:19 83:14,21 84:22 85:12, 21 88:9 89:8 92:12 108:12,21 109:21

110:12

**Steinmatz** 39:5

**STENO** 5:11,12

**stenographer** 5:23
75:4 76:22 117:11
138:7

**Stenographic** 6:17

**stick** 13:14

**stipulate** 20:12

**stomach** 82:3

**stood** 72:4 81:24

**stop** 73:6

**stored** 37:21

**storm** 50:6 101:21

**story** 13:8 33:10 34:20
51:15

**Street** 122:23 129:3
132:13 133:7

**strive** 24:18 134:2

**strives** 62:11

**striving** 74:7

**strong** 75:24

**strongest** 41:7

**strongly** 127:16

**structure** 25:11

**structured** 30:21

**studio** 27:4

**subject** 15:10 32:19
37:5 41:14 48:12 77:14,
15 86:17 109:10

**subsequently** 26:18
88:21 100:20

**substance** 55:15 63:3,
18 64:19 71:7

**substantial** 86:18

**substantially** 132:12

**substantive** 40:21
86:18 104:3

**suddenly** 128:4

**sufficient** 84:12

**suggest** 127:17

**suggesting** 130:5

**suggestive** 127:22

**suggests** 9:8

**summary** 108:7 111:20
112:17 131:19

**suppose** 116:17

**supposedly** 73:11

**surprised** 54:18,21

**Susie** 14:7,12,15 15:7
25:9,14,19 36:19 39:10
48:9 72:11 99:17
115:10,14

**suspicious** 29:13

**swear** 5:22

**sworn** 6:16 134:22

---

**T**

**table** 29:24 30:4 66:3
69:21

**taking** 5:9 127:23

**talk** 33:12 40:15,16
53:11 55:19 66:19
69:22

**talked** 15:15 51:21 52:6
53:15 55:14 69:19
71:15 89:9

**talking** 15:19 32:4 48:5
49:25 60:2 68:3 75:2
76:6,14 80:6,12 103:24
105:13 109:18,22 113:6
120:11 121:20 124:23
126:21 129:10

**tape** 17:9,12,13 18:10
54:15,17 57:17 58:7
59:16 64:18 107:15

**taught** 87:11

**team** 14:3,6,8,10 25:19,
25 34:16 37:22 72:23
75:5,11 89:23

**teases** 30:23 31:2

**Ted** 60:2,13 61:4 67:18
70:3,20 71:8 87:17
100:6 103:12 107:7

108:23 109:22 113:18
126:4,23 129:15

**teleprompter** 27:4,8,
15,20,22

**television** 67:7 108:6

**telling** 15:21 19:12 93:4
125:24 126:6,7,10,18

**ten** 44:3

**tender** 135:23

**term** 80:9 90:7 95:11

**terms** 102:17 110:19
112:14 125:7

**territory** 85:15

**Tester** 69:18 80:24,25
81:9 88:12 89:7 91:7,23
92:22 93:24 100:18
107:5

**testified** 6:19

**testifies** 137:14

**testify** 23:3 29:17 47:3
51:17

**testifying** 8:7 18:25
19:14 52:13

**testimony** 11:21 21:6
23:7 38:10 42:12 86:13
134:21 135:12

**text** 40:3 120:5

**theory** 87:14 97:17
104:14,15

**thing** 17:21 19:17 29:15
31:11 39:10 41:20
69:22 70:10,11,12
100:7 103:15 115:25
129:7

**things** 20:17 24:5
30:23 31:3 34:19 35:9,
13 36:13 44:20 49:12
53:21 58:16 67:11
69:17,20,22 73:24 74:9
76:19 85:11 86:5 89:12
91:3 92:23 98:3 101:18
108:19 110:5,21,25
111:4 113:6 121:14
125:16,17 126:8
128:12,18 129:5 133:8,
20 137:2

**thinking** 44:19 118:18

**thinks** 96:25 123:24

**thought** 50:5 62:19
72:4 88:13 100:21
102:2 118:5,8

**thoughtful** 25:5

**thoughts** 41:6

**thread** 115:21

**Throw** 91:9 94:5

**time** 5:3 14:10 18:7
28:8 30:12,19 32:20
33:14 36:14 39:5,9,12,
20 42:8,22 46:11,14
48:3,5 53:21 54:3,6
59:19 61:9,24 62:12
63:9 66:5,16 69:14
72:3,23 75:5,10 77:2
80:19,20,21 81:2,13
86:25 88:19 89:21
94:25 95:8 103:5
106:13,15 108:17
113:19 114:8,11
116:21,25 117:6,13
118:17 119:17,19
120:14 121:15,20,23
129:16,24 133:21
134:18 138:13,14,15

**times** 35:11 37:4 52:15
74:4 79:15 86:3 88:22
93:22 98:3 132:14
133:7

**title** 7:16

**titles** 25:24

**today** 7:22 21:20 23:3
37:10,23 74:9 77:10,16
137:2

**told** 11:22 66:14 85:17
87:25 135:7,9 136:10

**tomorrow** 37:11

**topic** 41:6 51:3 119:18

**topics** 36:25 38:4 51:11

**totality** 63:5 70:12
98:22 109:19 113:2,17
114:3

**totally** 12:9 53:9 84:16

**trail** 115:21,22

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

transcribe 111:22

transcribed 111:18

transcript 17:12,23
18:3,5,11,12 22:24
51:24 53:5 58:18 59:9
76:23 78:17,19 79:23
80:15,18 81:12 82:15
84:17 85:18 87:9 89:15
93:2 95:18 96:11,12,16
106:13,24 110:2
111:11,24 112:16
117:21,24 118:7,15,23,
24 129:21 135:25 136:2
138:8

transcriptions 127:18

transcripts 133:10

translation 96:19

transparency 19:11

trial 16:11 17:18 20:11
85:10 86:21 88:3 90:11
96:23

trials 134:8

true 32:10 45:8 70:19
108:8 116:13

Trump 84:21 85:11

Trump's 17:18 89:23

truth 9:18,19 10:19,22,
25 11:12 26:6 62:11
85:7 99:25 103:14
134:22

truthful 21:6 134:24

truthfully 35:2 61:15
77:4

turn 90:10

turns 62:24

Tweet 115:20,22

Tweeting 50:6 51:13
101:20

Tweets 119:11

Twitter 101:18

two-pages 47:18

typically 31:19 35:4

**U**

Uh-huh 95:21

ultimately 21:7 113:3
134:2

umbrella 20:13

un-american 100:22
117:3,7,14,17 118:3,6,
20

unafraid 10:24

uncanny 74:18

uncomfortable 22:21
138:2

understand 8:11 10:14
12:9 13:17 16:5 23:6
27:16 31:24 35:15,23
36:11,13 41:18 44:8
46:15 50:25 52:10
58:15 59:25 64:18
68:24 69:12 70:17
79:16 84:16 85:3,9
87:2,3 90:17 94:13
98:18 100:4 103:13
121:23 122:14 125:24
137:4

understanding 15:23
16:23 17:4 33:4 42:9
65:7 68:6 107:9 112:7
115:17

understood 82:6
88:10 106:3,7 118:16

unethical 22:11 110:6

unfolding 133:19

United 9:14 13:13 82:9
105:2

unknown 136:25

unlawful 22:11 99:20
100:7 103:16

unnecessary 101:11

unrelated 24:23 45:6

usual 29:22

**V**

vague 80:9 90:6 95:11

valid 129:4

variety 36:25

venued 5:6

verbiage 72:6

video 22:24 51:23 53:4
58:18,21,22,23 59:8
68:9 69:19 83:10 89:15
91:6 97:4 111:17 112:9
138:5

videoconference 5:9

videos 59:3 133:11

videotape 74:20

view 41:8,14,18,24
48:13 49:22 56:4 57:5
65:20 66:3 108:20
124:22,25 125:2,4,15,
20 133:6,25

viewers 57:13 83:12
86:18 93:4 98:21 99:6
103:11

virtually 134:19 137:14

visually 29:23

vocal 126:15

**W**

wait 95:13

waiting 76:24

waive 6:7

Wall 122:23 129:3
132:13 133:6

wanted 12:7 32:5 70:11
81:18 84:8 88:9,11
90:23 98:21 114:2

warning 46:5

watch 57:18 58:7,13,14
59:16 60:12 68:5,12
70:11 86:15 98:24
101:17 107:15 111:17
112:8 113:2 114:3

watched 59:8 60:15
68:9 70:12 72:2,3 88:20
98:23 99:16 102:21
103:8,11 133:10

watches 74:22

watching 26:14 51:12
69:11 83:4 100:16,22
101:16,23 103:2 108:17
110:25 112:20 118:5

ways 54:14

website 122:23

Wednesday 48:13

weigh 137:7

weighing 135:16

wife 19:8

Williamson 5:10

Willow 44:18

win 96:19,25

winning 103:23

witnesses 22:19
127:15

word 30:2 37:18 54:11,
19 55:3 56:15 57:3,7,9,
12 58:10 59:8 60:23
68:25 117:17 120:19
126:13 128:25

word-by-word 72:13

word-for-word 97:6

words 64:12 65:10
68:11 89:14 90:11
93:18,19 99:20 101:22
110:19 113:4 119:4
126:19,22

work 25:25 34:25 36:9
44:12 50:2 135:15,20

worked 30:18 32:24
35:2 36:9 44:4,10,11,12
48:22

working 26:4

worth 83:8

Wrapping 122:24

write 31:24 133:20

writer 30:22

writers 30:18

writes 30:23 50:4
115:14

ERIN BURNETT
JULY 21, 2022

Confidential

JOB NO. 306736

**writing** 28:2

**written** 17:22 26:17

**wrong** 54:8 57:2
120:21 123:6

**wrote** 130:14

---

### X

**Xu** 14:7,12,15 15:7
25:9,14,19 28:9 36:19
39:10 48:9 99:17
115:10,14

---

### Y

**year** 7:10 12:16

**years** 44:3 58:16 118:9

**yell** 19:17,18

**yelled** 21:22

**yelling** 21:25 22:10

**yesterday** 68:20
130:12

**York** 6:18 13:11,12
132:14 133:7

---

### Z

**Zoom** 5:9 46:17

**Zucker** 116:19,25
117:6,12 119:16 120:5,
8,13,17,24 121:17