# **<u>EXHIBIT 112</u>**



# Congressional Record

United States
of America

PROCEEDINGS AND DEBATES OF THE *116th* CONGRESS, SECOND SESSION

*Vol. 166*     WASHINGTON, MONDAY, JANUARY 27, 2020     *No. 17*

# *Senate*

The Senate met at 1:05 p.m. and was called to order by the Chief Justice of the United States.

## TRIAL OF DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES

The CHIEF JUSTICE. The Senate will convene as a Court of Impeachment.

The Chaplain will lead us in prayer.

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Lord, through all the generations, You have been our mighty God. As millions mourn the deaths of Kobe and Gianna Bryant and those who died with them, we think about life's brevity, uncertainty, and legacy. Remind us that we all have a limited time on Earth to leave the world better than we found it.

As this impeachment process unfolds, give our Senators the desire to make the most of their time on Earth. Teach them how to live, O God, and lead them along the path of honesty. May they hear the words of Jesus of Nazareth reverberating down the corridors of the centuries: "And you shall know the truth, and the truth shall make you free."

And Lord, thank You for giving our Chief Justice another birthday. Amen.

### PLEDGE OF ALLEGIANCE

The Chief Justice led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

### THE JOURNAL

The CHIEF JUSTICE. Please be seated. If there is no objection, the Journal of proceedings of the trial is approved to date.

Without objection, it is so ordered.

The Sergeant at Arms will make the proclamation.

The Sergeant at Arms, Michael C. Stenger, made the proclamation as follows:

Hear ye! Hear ye! Hear ye! All persons are commanded to keep silence, on pain of imprisonment, while the Senate of the United States is sitting for the trial of the articles of impeachment exhibited by the House of Representatives against Donald John Trump, President of the United States.

The CHIEF JUSTICE. The majority leader is recognized.

Mr. McCONNELL. Mr. Chief Justice, as the Chaplain has indicated, on behalf of all of us, happy birthday. I am sure this is exactly how you had planned to celebrate the day.

The CHIEF JUSTICE. Thank you very much for those kind wishes, and thank you to all the Senators for not asking for the yeas and nays.

(Laughter.)

### ORDER OF PROCEDURE

Mr. McCONNELL. For the information of all Senators, we should expect to break every 2 or 3 hours and then at 6 o'clock a break for dinner.

And with that, Mr. Chief Justice, I yield the floor.

The CHIEF JUSTICE. Pursuant to the provisions of S. Res. 483, the counsel for the President have 22 hours and 5 minutes remaining to make the presentation of their case. The Senate will now hear you.

The Senate will now hear you, Mr. Sekulow.

### OPENING STATEMENT—CONTINUED

Mr. Counsel SEKULOW. Mr. Chief Justice, Members of the Senate, managers, what we have done on Saturday is the pattern that we are going to continue today, as far as how we are going to deal with the case. We deal with transcript evidence. We deal with publicly available information. We do not deal with speculation, allegations that are not based on evidentiary standards at all.

We are going to highlight some of those very facts we talked about very quickly on Saturday. You are going to

hear more about that. I want to give you a little bit of an overview of what we plan to do today in our presentation.

You will hear from a number of lawyers. Each one of these lawyers will be addressing a particular aspect of the President's case. I will introduce the issues that they are going to discuss, and, then, that individual will come up and make their presentation. We want to do this on an expeditious but yet thorough basis.

Let me start with, just for a very brief few moments, taking a look at where we were. One of the things that became very clear to us as we looked at the presentation from the House managers was the lack of focus on that July 25 transcript. That is because the transcript actually doesn't say what they would like it to say. We have heard—and you will hear more—about that in the days ahead. We know about Mr. SCHIFF's version of the transcript. You heard it. You saw it.

I want to keep coming back to facts—facts that are undisputed. The President, in his conversation, was clear on a number of points, but so was President Zelensky. I mentioned that at the close of my arguments earlier, that it was President Zelensky who said: No pressure, I didn't feel any pressure.

And, again, as this kind of reading of minds of what people were saying, I think we need to look at what they actually said and how it is backed up.

It is our position as the President's counsel that the President was at all time acting under his constitutional authority, under his legal authority, in our national interest, and pursuant to his oath of office. Asking a foreign leader to get to the bottom of issues of corruption is not a violation of an oath.

It was interesting because there was a lot of discussion the other day about Lieutenant Colonel Vindman, and one of the things that we reiterate is that

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

he himself said that he did not know if there was anything of crime or anything of that nature. He had deep policy concerns. I think that is what this is really about—deep policy concerns, deep policy differences.

We live in a constitutional Republic where you have deep policy concerns and deep differences. That should not be the basis of an impeachment. If the bar of impeachment has now reached that level, then, for the sake of the Republic, the danger that puts not just this body but our entire constitutional framework in is unimaginable. Every time there is a policy difference of significance or an approach difference of significance about a policy, are we going to start an impeachment proceeding?

As I said earlier, I don't think this was about just a phone call. There was a pattern in practice of attempts over a 3-year period to not only interfere with the President's capability to govern—which, by the way, they were completely unsuccessful at; just look at the state of where we are as a country—but also interfere with the constitutional framework.

I am going to say this because I want to be brief. We are going to have a series of lawyers address you. So it will not be one lawyer for hours and hours. We are going to have a series of lawyers address you on a variety of issues. This is how we envision the President's defense going. We thought it would be appropriate to start with an overview, if you will, of some of the significant historical issues, constitutional issues, involving impeachment proceedings, since we don't have a long history of that. I think that is a good thing for the country that we don't, and I think that we would all agree. But if this becomes the new standard, the future is going to look a lot different.

We are going to hear next from my cocounsel Judge Kenneth Starr. Judge Starr is a former judge for the U.S. Court of Appeals for the District of Columbia. He served as the 39th Solicitor General of the United States, arguing cases before the Supreme Court of the United States on behalf of the United States.

I had the privilege of arguing a case alongside Judge Starr—we were talking about this earlier—many years ago. He also served as the independent counsel during the Clinton Presidency and author of the Starr report. He testified for almost 12 hours before the Judiciary Committee with regard to that report. Judge Starr is very familiar with this process. He is going to address a series of deficiencies, which are legal issues with regard to articles I and II—constitutional implications, historical implications, and legal implications of where this case now stands.

I would like to yield my time right now to, for if it please the Chief Justice, Ken Starr.

The CHIEF JUSTICE. Mr. Starr.

Mr. Counsel STARR. Thank you.

Mr. Chief Justice, House Managers, and staff, Members of the Senate, the majority leader, and the minority leader, at the beginning of these proceedings on January 16, the Chief Justice administered the oath of office to the Members of this body and then again on Tuesday. In doing so, the Chief Justice was honoring the words of our Constitution, article I, section 3. We all know the first sentence of that article by heart: ''The Senate shall have the sole Power to try all Impeachments.'' But then the constitutional text goes on to say this: ''When sitting for that Purpose, they shall be on Oath Or Affirmation.'' That oath or affirmation, in turn, requires each Member of the Senate to do impartial justice.

This constitutionally administered oath or affirmation has been given in every proceeding in this body since 1798. Indeed, to signify the importance of the occasion, the Senate's more recent traditions call for you, as you did, to sign the book. And that book is not simply part of the record; it is entrusted to the National Archives. In contrast, Members of the House of Representatives do not take an oath in connection with impeachment. The Framers of our Constitution well knew when an oath or affirmation should be required—the Senate, yes; the House, no. Thus, each Member of the world's greatest deliberative body now has special—indeed unique—duties and obligations imposed under our founding document.

During the Clinton impeachment trial 21 years ago in this Chamber, the Chief Justice of the United States ruled in response to an objection that was interposed by Senator Tom Harkin of Iowa. The Senators are not sitting as jurors, Senator Harkin noted, and the Chief Justice agreed with that proposition. Rather, the Senate is a court. In fact, history teaches us that for literally decades, this body was referred to in this context as the High Court of Impeachment. So we are not a legislative Chamber during these proceedings. We are in a tribunal. We are in court.

Alexander Hamilton has been quoted frequently in these proceedings, but in Federalist 78, he was describing the role of courts—your role—and in doing so, he distinguished between what he called the exercise of judgment on the one hand, which is what courts do, and the exercise of will or policy preferences, if you will, on the other hand. That is what legislative bodies do.

According to Hamilton, courts were to be, in his word, ''impartial.'' There is that word again. You know, that is a daunting task for judges struggling to do the right thing, to be impartial—equal justice under law. It is certainly hard in life to be impartial. In politics, it is not even asked of one to be impartial. But that is the task that the Constitution chose to impose upon each of you.

Significantly, in this particular juncture in America's history, the Senate

is being called to sit as the High Court of Impeachment all too frequently. Indeed, we are living in what I think can aptly be described as the ''age of impeachment.'' In the House, resolution after resolution, month after month, has called for the President's impeachment.

How did we get here, with Presidential impeachment invoked frequently in its inherently destabilizing, as well as acrimonious way? Briefly told, the story begins 42 years ago.

In the wake of the long national nightmare of Watergate, Congress and President Jimmy Carter collaboratively ushered in a new chapter in America's constitutional history. Together, in full agreement, they enacted the independent counsel provisions of the Ethics in Government Act of 1978. But the new chapter was not simply the age of independent counsels; it became, unbeknownst to the American people, the age of impeachment.

During my service in the Reagan administration as Counsel and Chief of Staff to Attorney General William French Smith, the Justice Department took the position that, however well-intentioned, the independent counsel provisions were unconstitutional. Why? In the view of the Department, those provisions intruded into the rightful domain and prerogative of the executive branch of the Presidency.

The Justice Department's position was eventually rejected by the Supreme Court, but most importantly, in helping us understand this new era in our country's history, Justice Antonin Scalia was in deep dissent. Among his stinging criticisms of that law, Justice Scalia wrote this: ''The context of this statute is acrid with the smell of threatened impeachment.'' Impeachment.

Justice Scalia echoed the criticism of the court in which I was serving at the time, the District of Columbia Circuit, which had actually struck down the law as unconstitutional in a very impressive opinion by renowned Judge Laurence Silberman.

Why would Justice Scalia refer to impeachment? This was a reform measure. There would be no more Saturday Night Massacres—the firing of Special Prosecutor, as he was called, Archibald Cox by President Nixon. Government would now be better, more honest, greater accountability, and the independent counsel would be protected. But the word ''impeachment'' haunts that dissenting opinion, and it is not hard to discover why—because the statute, by its terms, expressly directed the independent counsel to become, in effect, an agent of the House of Representatives. And to what end? To report to the House of Representatives when a very low threshold of information was received that an impeachable offense, left undefined, may have been committed.

To paraphrase President Clinton's very able counsel at the time, Bernie Nussbaum, this statute is a dagger

aimed at the heart of the Presidency. President Clinton, nonetheless, signed the reauthorized measure into law, and the Nation then went through the long process known as Whitewater, resulting in the findings by the office which I led, the Office of Independent Counsel, and a written report to the House of Representatives. That referral to Congress was stipulated in the Ethics in Government Act of 1978.

To put it mildly, Democrats were very upset about what had happened. They then joined Republicans across the aisle who, for their part, had been outraged by an earlier independent counsel investigation, that of a very distinguished former judge, Lawrence Walsh.

During the Reagan administration, Judge Walsh's investigation into what became known to the country as Iran-Contra spawned enormous criticism on the Republican side of the aisle, both as to the investigation itself but also as to statute.

The acrimony surrounding Iran-Contra and then the impeachment and the trial and President Clinton's acquittal by this body led inexorably to the end of the independent counsel era. Enough was enough. Living through that wildly controversial, 21-year, bold experiment with the independent counsel statute, Congress, in a bipartisan way, had a change of heart. It allowed the law to expire in accordance with its terms in 1999.

That would-be and well-intentioned reform measure died a quiet and uneventful death, and it was promptly replaced by Justice Department internal regulations promulgated by Attorney General Janet Reno during the waning months of the President Clinton administration. One can review those regulations and see no reference to impeachment—none. No longer were the poison pill provisions of Presidential impeachment part of America's legal landscape. They were gone. The Reno regulation seemed to signal a return to traditional norms. Impeachment would no longer be embedded in the actual laws of the land but returned to the language of the Constitution.

In the meantime, America's constitutional DNA and its political culture had changed. Even with the dawn of the new century, the 21st century, "impeachment" remained on the lips of countless Americans and echoed frequently in the people's House. The impeachment habit proved to be hard to kick.

Ironically, while this was happening here at home, across the Atlantic, the use of impeachment as a weapon disappeared. In the United Kingdom, from which, of course, we inherited the process, impeachment was first used more than two centuries before those first settlers crossed the Atlantic. But upon thoughtful examination, a number of modern-day parliamentary committees looked and found impeachment to be obsolete.

Among other criticisms, Members of Parliament came to the view that the practice which had last been attempted in Britain in 1868 failed to meet modern procedural standards of fairness—fairness.

As Sir William McKay recently remarked: "Impeachment in Britain is dead."

Yet, here at home, in the world's longest standing constitutional Republic, instead of a once-in-a-century phenomenon, which it had been, Presidential impeachment has become a weapon to be wielded against one's political opponent.

In her thoughtful Wall Street Journal op-ed a week ago, Saturday, Peggy Noonan wrote this:

Impeachment has now been normalized. It will not be a once-in-a-generation act but an every-administration act. The Democrats will regret it when the Republicans are handing out the pens [for the signing ceremony].

When we look back down the corridors of time, we see that for almost our first century as a constitutional republic the sword of Presidential impeachment remained sheathed. Had there been controversial Presidents? Oh, yes, indeed. Think of John Adams and the Alien and Sedition Acts. Think of Andrew Jackson and Henry Clay. Were partisan passions occasionally inflamed during that first century? Of course.

And lest there be any doubt, the early Congresses full well knew how to summon impeachment to the floor, including against a Member of this body—Senator William Blount, of Tennessee. During the Jefferson administration, the unsuccessful impeachment of Justice Samuel Chase—a surly and partial jurist, who was, nonetheless, acquitted by this Chamber—became an early landmark in maintaining the treasured independence of our Federal judiciary.

It took the national convulsion of the Civil War, the assassination of Mr. Lincoln, and the counter-reconstruction measures aggressively pursued by Mr. Lincoln's successor, Andrew Johnson, to bring about the Nation's very first Presidential impeachment. Famously, of course, your predecessors in this High Court of Impeachment acquitted the unpopular and controversial Johnson but only by virtue of Senators from the party of Lincoln breaking ranks.

It was over a century later that the Nation returned to the tumultuous world of Presidential impeachment, necessitated by the rank criminality of the Nixon administration. In light of the rapidly unfolding facts, including uncovered by the Senate select committee, in an overwhelmingly bipartisan vote of 410 to 4, the House of Representatives authorized an impeachment inquiry; and, in 1974, the House Judiciary Committee, after lengthy hearings, voted again in a bipartisan manner to impeach the President of the United States. Importantly, President Nixon's own party was slowly but inexorably moving toward favoring the removal of their chosen leader from the Nation's highest office, who had just won reelection by a landslide.

It bears emphasis before this high court that this was the first Presidential impeachment in over 100 years. It also bears emphasis that it was powerfully bipartisan. And it was not just the vote to authorize the impeachment inquiry. Indeed, the House Judiciary chair, Peter Rodino, of New Jersey, was insistent that, to be accepted by the American people, the process had to be bipartisan.

Like war, impeachment is hell or, at least, Presidential impeachment is hell. Those of us who lived through the Clinton impeachment, including Members of this body, full well understand that a Presidential impeachment is tantamount to domestic war. Albeit thankfully protected by our beloved First Amendment, it is a war of words and a war of ideas, but it is filled with acrimony, and it divides the country like nothing else. Those of us who lived through the Clinton impeachment understand that in a deep and personal way.

Now, in contrast, wisely and judicially conducted, unlike in the United Kingdom, impeachment remains a vital and appropriate tool in our country to serve as a check with respect to the Federal judiciary. After all, in the Constitution's brilliant structural design, Federal judges know, as this body full well knows from its daily work, of a pivotally important feature—independence from politics—exactly what Alexander Hamilton was talking about in Federalist 78: during the Constitution's term, good behavior; in practical effect, life tenure. Impeachment is, thus, a very important protection for we the people against what could be serious article III wrongdoing within that branch.

And so it is that, when you count, of the 63 impeachment inquiries authorized by the House of Representatives over our history, only 8 have actually been convicted in this high court and removed from office, and each and every one has been a Federal judge.

This history leads me to reflect on the nature of your weighty responsibilities here in this high court as judges in the context of Presidential impeachment—the fourth Presidential impeachment. I am counting the Nixon proceedings in our Nation's history, but the third over the past half century.

And I respectfully submit that the Senate, in its wisdom, would do well in its deliberations to guide the Nation in this world's greatest deliberative body to return to our country's traditions when Presidential impeachment was truly a measure of last resort. Members of this body can help and in this very proceeding restore our constitutional and historical traditions, above all, by returning to the text of the Constitution itself. It can do so by its example here in these proceedings in weaving the tapestry of what can rightly be called the common law of

Presidential impeachment. That is what courts do. They weave the common law. There are indications within the constitutional text—I will come to our history—so that this fundamental question is appropriate to be asked—you are familiar with the arguments: Was there a crime or other violation of established law alleged?

So let's turn to the text.

Throughout the Constitution's description of impeachment, the text speaks always—always—without exception, in terms of crimes. It begins, of course, with treason—the greatest of crimes against the state and against we the people, but so misused as a bludgeon and parliamentary experience, to lead the Founders to actually define the term in the Constitution itself. Bribery—an iniquitous form of moral and legal corruption and the basis of so many of the 63 impeachment proceedings over the course of our history—again, almost all of them against judges. And then the mysterious terms—other high crimes and misdemeanors. Once again, the language is employing the language of crimes. The Constitution is speaking to us in terms of crimes.

Each of those references, when you count them—count seven, count eight—supports the conclusion that impeachments should be evaluated in terms of offenses against established law but especially with respect to the Presidency, where the Constitution requires the Chief Justice of the United States and not a political officer—no matter how honest, no matter how impartial—to preside at trial. Guided by history, the Framers made a deliberate and wise choice to cabin, to constrain, to limit the power of impeachment.

And so it was, on the very eve of the impeachment of President Andrew Johnson, that the eminent scholar and dean of Columbia Law School, Theodore Dwight, wrote this: "The weight of authority is that no impeachment will lie except for a true crime—a breach of the law—which would be the subject of indictment." I am not making that argument. I am noting what he is saying. He didn't over-argue the case. He said "the weight of authority," "the weight of authority."

And so this issue is a weighty one. Has the House of Representatives, with all due respect, in these two Articles of Impeachment charged a crime or a violation of established law or not? This is—I don't want to over-argue—an appropriate and weighty consideration for the Senate but especially as I am trying to emphasize in the case not of a Federal judge but of the President. Courts consider prudential factors, and there is a huge prudential factor that this trial is occurring in an election year, when we the people, in a matter of months, will go to the polls.

In developing the common law of Presidential impeachment, this threshold factor, consistent with the constitutional text, consistent with the Nation's history and Presidential impeachments, as I will seek to demonstrate, serves as a clarifying and stabilizing element. It increases predictability—to do what?—to reduce the profound danger that a Presidential impeachment will be dominated by partisan considerations—precisely the evil that the Framers warned about.

And so to history.

History bears out the point. The Nation's most recent experience—the Clinton impeachment—even though severely and roundly criticized, charged crimes. These were crimes proven in the crucible of the House of Representatives' debate beyond any reasonable observer's doubt.

So too the Nixon impeachment. The articles charged crimes. What about article II in Nixon, which is sometimes referred to as abuse of power? Was that the abuse of power article—the precursor to article I that is before this court? Not at all. When one returns to article II in Nixon—approved by a bipartisan House Judiciary Committee—article II of Nixon sets forth a deeply troubling story of numerous crimes—not one, not two, numerous crimes—carried out at the direction of the President himself.

And so the appropriate question: Were crimes alleged in the articles of the common law of Presidential impeachment? In Nixon, yes. In Clinton, yes. Here, no—a factor to be considered as the judges of the high court.

Come, as you will, individually to your judgment.

Even in the political cauldron of the Andrew Johnson impeachment, article XI charged a violation of the controversial Tenure of Office Act. You are familiar with it. And that act warned expressly the Oval Office; that its violation would institute a high misdemeanor, employing the very language of constitutionally cognizable crimes.

This history represents, and I believe, may it please the court, it embodies the common law of Presidential impeachment. These are facts gleaned from the constitutional text and from the gloss of the Nation's history.

And under this view, the commission of an alleged crime, the violation of established law, can appropriately be considered, again, a weighty and an important consideration and element of a historically supportable Presidential impeachment.

Will law professors agree with this? No, but with all due respect to the academy, this is not an academic gathering. We are in court. We are not just in court. With all due respect to the Chief Justice and the Supreme Court of the United States, we are in democracy's ultimate court.

And the better constitutional answer to the question is provided by a rigorous and faithful examination of the constitutional text and then looking faithfully and respectfully to our history.

The very divisive Clinton impeachment demonstrates that, while highly relevant, the commission of a crime is by no means sufficient to warrant the removal of our duly elected President. Why?

This body knows. We appoint judges and you confirm them and they are there for life. Not Presidents. And the Presidency is unique. The Presidency stands alone in our constitutional framework.

Before he became the Chief Justice of the United States, John Marshall, then sitting as a Member of the people's House, made a speech on the floor of the House, and there he said this:

The President is the sole organ of the Nation in its external relations, and its sole representative with foreign nations.

If that sounds like hyperbole, it has been embraced over decades by the Supreme Court of the United States, by Justices appointed by many different Presidents. The Presidency is unique. There is no other system quite like ours, and it has served us well.

And so as to the Presidency, impeachment and removal not only overturns a national election and perhaps profoundly affects an upcoming election, in the words of Yale's Akhil Amar, it entails a risk, and these are Akhil's words, Professor Amar's, "a grave disruption of the government." Professor Amar penned those words in connection with the Clinton impeachment. "Grave disruption of the government." Regardless of what the President has done, "grave disruption."

We will all agree that the Presidents, under the text of the Constitution and its amendments, are to serve out their term absent a genuine national consensus, reflected by the two-thirds majority requirement of this court, that the President must go away. Two-thirds. In politics and in impeachment, that is called a landslide.

Here, I respectfully submit to the court, that all fairminded persons will surely agree there is no national consensus. We might wish for one, but there isn't. To the contrary, for the first time in America's modern history, not a single House Member of the President's party supported either of the two Articles of Impeachment—not one, not in committee, not on the House floor.

And that pivotal fact puts in bold relief the Peter Rodino principle—call it the Rodino rule—impeachment must be bipartisan in nature.

Again, sitting as a court, this body should signal to the Nation the return to our traditions—bipartisan impeachments.

What is the alternative? Will the President be King? Do oversight. The tradition of oversight—an enormous check on Presidential power throughout our history, and it continues available today.

In Iran-Contra, no impeachment was undertaken. The Speaker of the House, a Democrat, Jim Wright from Texas, from Fort Worth, where the West begins, knew better. He said no. But as befits the age of impeachment, a House

resolution to impeach President Ronald Reagan was introduced. It was filed, and the effort to impeach President Reagan was supported by a leading law professor whose name you would well recognize, and you will hear it again this evening from Professor Dershowitz. I will leave to it him to identify the learned professor. But the Speaker of the people's House, emulating Peter Rodino, said no.

So I, respectfully, submit that the Senate should close this chapter, this idiosyncratic chapter, on this increasingly disruptive act, this era, this age of resorting to the Constitution's ultimate democratic weapon for the Presidency. Let the people decide.

There was a great Justice who sat for 30 years, Justice John Harlan, in the mid-century of the 20th century. And in a lawsuit involving a very basic question: Can citizens whose rights have clearly been violated by Federal law enforcement agencies and agents bring an action for damages when Congress has not so provided—no law that gave the wounded citizen a right to redress through damages?

And Justice Harlan, in a magnificent concurring opinion in Bivens v. Six Unnamed Federal Agents, suggested that courts—here you are—should take into consideration in reaching its judgment—their judgment—what he called factors counseling restraint.

He was somewhat reluctant to say that we, the Supreme Court, should grant this right, that we should create it when Congress hasn't acted and Congress could have acted, but it hadn't. But he reluctantly came to the conclusion that the Constitution itself empowered the Federal courts to create this right for our injured citizens, to give them redress, not just an injunctive relief but damages, money recovery, for violations of their constitutional rights. Factors counseling restraint. And he addressed them, and he came to the view—it was so honest—and said: I came to the case with a different view, but I changed my mind and voted in favor of the Bivens family having redress against the Federal agents who had violated their rights, judging in its most impartial, elegant sense.

I am going to draw from Justice Harlan's matrix of factors counseling restraint and simply identify these. I think there may be others.

The articles do not charge a crime for violations established. I am suggesting it is a relevant factor. I think it is a weighty factor, when we come to Presidential impeachment, not judicial impeachment.

Secondly, the articles come to you with no bipartisan support. They come to you as a violation of what I am dubbing the Rodino rule.

And third, as I will now discuss, the pivotally important issue of process, the second Article of Impeachment: Obstruction of Congress.

This court is very familiar with United States v. Nixon. Its unanimity in recognizing the President's profound interest in confidentiality, regardless of the world view or philosophy of the justice, the Justices were unanimous. This isn't just a contrivance; it is built into the very nature of our constitutional order. So let me comment, briefly.

This constitutionally based recognition of executive privilege and then companion privileges—the deliberative process privilege, the immunity of close Presidential advisers from being summoned to testify—these are all firmly established in our law.

If there is a dispute between the people's House and the President of the United States over the availability of documents or witnesses—and there is in each and every administration—then go to court. It really is as simple as that. I don't need to belabor the point.

But here is the point I would like to emphasize. Frequently, the Justice Department advises the President of the United States that the protection of the Presidency calls—whatever the President might want to do as a political matter, as an accommodation in the spirit of comity—to protect privileged conversations and communications.

I have heard it, in my two tours of duty at the Justice Department: Don't release the documents, Mr. President. If you do, you are injuring the Presidency. Go to court.

We have heard concerns about the length of time that the litigation might take. Those of us who have litigated know that sometimes litigation does take longer than we would like. Justice delayed is justice denied. We could all agree with that.

But our history—Churchill's maxim, study history—our history tells us that is not necessarily so. Take by way of example the Pentagon Papers case—orders issued preventing and sanctioning a gross violation of the First Amendment's guarantee of freedom of the press, an order issued out of the district court June 15, 1971. That order was reversed in an opinion by the Supreme Court of the United States 2 weeks later. June 15.

The House of Representatives could have followed that well-trodden path. It could have sought expedition. The E. Barrett Prettyman Courthouse is 6 blocks down. The judges are there. They are all very able. They are hard-working people of integrity. Follow the path. Follow the path of the law. Go to court.

There would have been at least one problem had the House seen fit to go to court and remain in court. The issue is before you.

But among other flaws, the Office of Legal Counsel determined—and I have read the opinion, and I believe it is correct—that with all respect, all House subpoenas issued prior to the adoption of H.R. 660, which for the first time authorized the impeachment inquiry as a House, all subpoenas were invalid. They were void. With all due respect to

the Speaker of the House of Representatives, with all her abilities and her vast experience, under our Constitution, she was powerless to do what she purported to do. As has been said now time and again, especially throughout the fall, the Constitution does entrust the sole power of impeachment to the House of Representatives, but that is the House, its 435 Members elected from across the constitutional Republic—not one, no matter how able she may be. In the people's House, every Congressperson gets a vote. We know the concept: one person, one vote.

More generally, the President, as I reviewed the record, has consistently and scrupulously followed the advice and counsel of the Justice Department and, in particular, the Office of Legal Counsel. He has been obedient. As you know, that important office—many of you have had your own experiences professionally with that office—is staffed with lawyers of great ability. It has a reputation for superb work. It has done such thoughtful work with both Democratic and Republican administrations. The office is now headed by a brilliant lawyer who served as a law clerk to Justice Anthony Kennedy.

The House may disagree with the guidance provided to the President by that office; the House frequently does disagree. But for the President to follow the guidance of the Department of Justice with respect to an interbranch legal and constitutional dispute cannot reasonably be viewed as an obstruction and, most emphatically, not as an impeachable offense.

History, once again, is a great teacher. In the Clinton impeachment, the House Judiciary Committee rejected a draft article asserting that President Clinton—and here are the words that were drafted: "fraudulently and corruptly asserted executive privilege." Strong words, "fraudulently and corruptly." That was the draft article.

In my view, having lived through the facts and with all due respect to the former President, he did. He did it time and again, month after month. We would go to court, and we would win. Many members—not everybody—on the House Judiciary Committee agreed that the President had, indeed, improperly claimed executive privilege, rebuffed time and again by the Judiciary. But at the end of the day, that Committee, the Judiciary Committee of the House, chaired by Henry Hyde, wisely concluded that President Clinton's doing so should not be considered an impeachable offense.

Here is the idea. It is not an impeachable offense for the President of the United States to defend the asserted legal and constitutional prerogatives of the Presidency.

This is, and I am quoting here from page 55 of the President's trial brief, "a function of his constitutional and policy judgments," not just a policy judgment, but a constitutional judgment.

I would guide this court, as it is coming through the deliberation process,

to read the President's trial brief with respect to process. It was Justice Felix Frankfurter, confidante of FDR, brilliant jurist, who reminded America that the history of liberty is in large measure the history of process, procedure.

In particular, I would guide the high court to the discussion of the long history of the House of Representatives— over two centuries—in providing due process protections in its impeachment investigations. It is a richly historical discussion.

The good news is, you can read the core of it in four pages, pages 62 to 66, of the trial brief. It puts in bold relief, I believe, an irrefutable fact. This House of Representatives, with all respect, sought to turn its back on its own established procedures—procedures that have been followed faithfully decade after decade, regardless of who was in control, regardless of political party. All those procedures were torn asunder and all over the vigorous objections of the unanimous and vocal minority.

I need not remind this high court that in this country, minority rights are important. Minority rights should be protected. Equal justice.

But, then again, the House Members took no oath to be impartial. The Constitution didn't require them to say by oath or affirmation: We will do impartial judgment—justice. When they chose to tear asunder their procedures, they were oathless. They could toss out their own rule book through raw power.

Here we have—tragically for the country and, I believe, tragically for the House of Representatives—in article II of these impeachment articles a runaway House. It has run away not only from its longstanding procedures; it has run away from the Constitution's demand of fundamental fairness captured in those hallowed terms, "due process of law." We have cared about this as an English-speaking people since the Magna Carta.

By doing so, however, the House has inadvertently pointed this court to an exit ramp. It is an exit ramp provided by the Constitution itself. It is an exit ramp built by the most noble of builders, the founding generation. Despite the clearest precedent requiring due process for the accused in an impeachment inquiry but, surely, all the more so in a Presidential impeachment, House Democrats chose to conduct a wholly unprecedented process in this case, and they did so knowingly and deliberately because they were warned at every turn: Don't do it. Don't do it that way.

And process—the process of being denied the basic rights that have been afforded to every single accused President in the history of the Republic, even to the racist Andrew Johnson seeking to undo Mr. Lincoln's great legacy—he got those rights—but not here. Due process could have been honored; basic rights could have been hon-

ored. The House rules, the House's traditions could have been honored, but what is done is done. These two articles come before this court, this High Court of Impeachment, dripping with fundamental process violations.

The courts—and you are the court— are confronted with this kind of phenomenon, a train of fairness violations. Courts of this country do the right thing. They do impartial justice. They invoke, figuratively or literally, the words of the preamble to America's Constitution. The very first order of our government after "to form a more perfect Union" is to "establish Justice"—to "establish justice." Even before getting to the words to "provide for the common Defense, to promote the general Welfare, to insure domestic Tranquility," the Constitution speaks in terms of justice—establishing justice.

Courts would not allow this. They would not allow this because—why? They knew, and they know, that the purpose of our founding instrument is to protect our liberties, to safeguard us, but to safeguard us as individuals against the powers of government. Why? In the benedictory words of the preamble, to "secure the Blessings of Liberty to ourselves and our Posterity." Liberty under law.

I thank the court.

The CHIEF JUSTICE. Mr. Sekulow.

Mr. Counsel SEKULOW. Mr. Chief Justice, Members of the Senate, House managers: Judge Starr laid out before you the solemn nature of these proceedings. I want to contrast the solemn nature of these proceedings and what has been laid out before us from both a historical and constitutional perspective.

I want you to think about this, to history, the importance and solemnity of what we are engaged in in this body, with what took place in the House of Representatives upon the signing of Articles of Impeachment—pens distributed to the impeachment managers. A celebratory moment—think about that; think about this—a poignant moment.

We are next going to address a factual analysis. To briefly reflect, my colleague, the Deputy White House Counsel, Mike Purpura, will be joining us in a moment to discuss more of the facts, to continue the discussion that we had on Saturday. But let me just recap very quickly what was laid out on Saturday.

First, the transcript shows that the President did not condition either security assistance or a meeting on anything. The paused security assistance funds aren't even mentioned on the call.

Second, President Zelensky and other Ukrainian officials repeatedly said there was no quid pro quo and no pressure on them to review anything.

Third, President Zelensky and high-ranking Ukrainian officials did not even know the security assistance was paused until the end of August, over a month after the July 25 call.

Fourth, not a single witness testified that the President himself said that there was any connection between any investigation, security assistance, a Presidential meeting, or anything else.

Fifth, the security assistance flowed on September 11, and a Presidential meeting took place on September 25 without the Ukrainian Government— without the Ukrainian Government— announcing any investigations.

Finally, in the blind drive to impeach the President, President Trump, in reality, strategically, has been the best friend and supporter of Ukraine, certainly, in our recent history. These are the facts. That is what is before you.

Deputy White House Counsel Mike Purpura will now address additional facts related to these proceedings.

Mr. Counsel PURPURA. Mr. Chief Justice, Members of the Senate, good afternoon. I would inform the leader that I believe we will be ready to take a break at the conclusion of my remarks, if it meets with his approval.

On Saturday, we walked through some of the evidence that the House managers put forward during their 21-plus hours of presentation. The evidence that we recounted was drawn directly from the House managers' own record, the case they chose to submit to this Chamber.

To echo my colleague Mr. Sekulow briefly, the House managers' own evidence shows that President Trump did not condition anything on investigations during the July 25 call with President Zelensky and did not even mention the pause on the security assistance on the call. President Zelensky said that he felt no pressure on the call.

President Zelensky and the top Ukrainian officials did not learn of the pause on the security assistance until more than a month after the July 25 call, and the House managers' own record—their record that they developed and brought before this Chamber—reflects that anyone who spoke with the President said that the President made clear that there was no linkage between security assistance and investigations.

There is another category of evidence that demonstrated that the pause on security assistance was distinct and unrelated to investigations. The President released the aid without the Ukrainians ever announcing any investigations or undertaking any investigations.

Here is Ambassador Sondland.

(Text of Videotape presentation:)

Ms. STEFANIK. And the fact is the aid was given to Ukraine without any announcement of new investigations?

Ambassador SONDLAND. That's correct.

Ms. STEFANIK. And President Trump did in fact meet with President Zelensky in September at the United Nations, correct?

Ambassador SONDLAND. He did.

Ms. STEFANIK. And there was no announcement of investigations before this meeting?

Ambassador SONDLAND. Correct.

Ms. STEFANIK. And there was no announcement of investigations after this meeting?

Ambassador SONDLAND. That's right.

Mr. Counsel PURPURA. So while the security assistance was paused, the administration did precisely what you would expect. It addressed President Trump's concerns about the two issues that I mentioned on Saturday: burden-sharing and corruption.

A number of law- and policymakers also contacted the President and the White House to provide input on the security assistance issue during this period, including Senator LINDSEY GRAHAM. The process culminated on September 11, 2019. On that day, the President spoke with Vice President PENCE and Senator ROB PORTMAN. The Vice President, in NSC Senior Director Tim Morrison's words, was ''armed with his conversation with President Zelensky from their meeting just days earlier in Warsaw, Poland, and both the Vice President and Senator PORTMAN related their view of the importance of the assistance to Ukraine and convinced the President that the aid should be disbursed immediately. After the meeting, President Trump terminated the pause, and the support flowed to Ukraine.''

I want to take a step back now and talk for a moment about why the security assistance was briefly paused—again, in the words of the House managers' own witnesses. Witness after witness testified that confronting Ukrainian corruption should be at the forefront of U.S. foreign policy towards Ukraine. They also testified that the President had longstanding and sincere concerns about corruption in Ukraine. The House managers, however, told you that it was laughable to think that the President cared about corruption in Ukraine, but that is not what the witnesses said.

According to Ambassador Volker, President Trump demonstrated that he had a very deeply rooted negative view of Ukraine based on past corruption, and that is a reasonable position, according to Ambassador Volker. Most people who know anything about Ukraine would think that.

Dr. Hill testified:

I think the President has actually quite publicly said that he was very skeptical about corruption in Ukraine. And, in fact, he is not alone, because everyone has expressed great concerns about corruption in Ukraine.

The House managers have said the President's concern with corruption is disingenuous. They said that President Trump didn't care about corruption in 2017 or 2018 and he certainly didn't care about it in 2019. Those were their words. Not according to Ambassador Yovanovitch, however, who testified that President Trump shared his concern about corruption directly with President Poroshenko—President Zelensky's predecessor—in their first meeting in the Oval Office. When was that meeting? In June of 2017—2017.

The President also has well-known concerns about foreign aid generally. Scrutinizing and in some cases curtailing foreign aid was a central plank of his campaign platform. President Trump is especially wary of sending American taxpayer dollars abroad when other countries refuse to pitch in.

Mr. Morrison and Mr. Hale both testified at length about President Trump's longstanding concern with burden-sharing in foreign aid programs. Here is what they said.

(Text of Videotape presentation:)

Mr. RATCLIFFE. The President was concerned that the United States seemed to bear the exclusive brunt of security assistance to Ukraine. He wanted to see the Europeans step up and contribute more security assistance.

Mr. HALE. We've often heard at the State Department that the President of the United States wants to make sure that foreign assistance is reviewed scrupulously and make sure that it is truly in the U.S. national interests and that we evaluate it continuously and that it meets certain criteria the President has established.

Mr. RATCLIFFE. And has the President expressed that he expected our allies to give their fair share of foreign aid as evidenced by the point that he raised during the July 25th phone call to President Zelensky to that effect?

Mr. HALE. The principle of fair burden-sharing by allies and other like-minded states is an important element of the foreign assistance review.

Mr. Counsel PURPURA. The President expressed these precise concerns to Senator RON JOHNSON, who wrote:

He reminded me how thoroughly corrupt Ukraine was and again conveyed his frustration that Europe doesn't do its fair share of providing military aid.

The House managers didn't tell you about this. Why not? And President Trump was right to be concerned that other countries weren't paying their fair share. As Laura Cooper testified, U.S. contributions to Ukraine are far more significant than any individual country, and she also said EU funds tend to be on the economic side rather than for defense and security. Senator JOHNSON also confirmed that other countries refused to provide the lethal defensive weapons that Ukraine needs in its war with Russia.

Please keep in mind also that the pause of the Ukraine security assistance program was far from unusual or out of character for President Trump. The American people know that the President is skeptical of foreign aid and that one of his top campaign promises and priorities in office has been to avoid wasteful spending of American taxpayer dollars abroad.

Meanwhile, the same people who today claimed that President Trump was not genuinely concerned about burden-sharing are upset when, as a candidate, President Trump criticized free-riding by NATO members.

This past summer, the administration paused, reviewed, and in some cases canceled hundreds of millions of dollars in foreign aid to Afghanistan, El Salvador, Honduras, Guatemala, and Lebanon. These are just some of the reviews of foreign aid undertaken at the very same time that the Ukraine aid was paused.

So what happened during the brief period of time while the Ukraine security assistance was paused? People were gathering information and monitoring the facts on the ground in Ukraine as the new Parliament was sworn in and began introducing anti-corruption legislation.

Notwithstanding what the House managers would have you believe, the reason for the pause was no secret within the White House and the agencies. According to Mr. Morrison, in a July meeting attended by officials throughout the executive branch agencies, the reason provided for the pause by a representative of the Office of Management and Budget was that the President was concerned about corruption in Ukraine and he wanted to make sure Ukraine was doing enough to manage that corruption. In fact, as Mr. Morrison testified, by Labor Day, there had been definitive developments to demonstrate that President Zelensky was committed to the issues he campaigned on: anti-corruption reforms.

Mr. Morrison also testified that the administration was working on answering the President's concerns regarding burden-sharing. Here is Mr. Morrison.

(Text of Videotape presentation:)

Mr. CASTOR. Was there any interagency activity by either the State Department or the Defense Department coordinated by the National Security Council to look into that a little bit for the President?

Mr. MORRISON. We were surveying the data to understand who was contributing what and sort of in what categories.

Mr. CASTOR. And so the President evinced concerns. The interagency tried to address them?

Mr. MORRISON. Yes.

Mr. Counsel PURPURA. How else do we know that the President was awaiting information on burden-sharing and anti-corruption efforts in Ukraine before releasing the security assistance? Because that is what Vice President PENCE told President Zelensky.

On September 1, 2019, Vice President PENCE met with President Zelensky. President Trump was scheduled to attend the World War II commemoration in Poland but instead remained in the United States to manage the emergency response to Hurricane Dorian. Remember, this was 3 days—3 days—after President Zelensky learned through the POLITICO article about the review of the security assistance. Just as Vice President PENCE and his aides anticipated, Jennifer Williams testified that once the cameras left the room, the very first question that President Zelensky had was about the status of the security assistance. The Vice President responded by asking about two things: burden-sharing and corruption.

Here is how Jennifer Williams described it:

And the VP responded by really expressing our ongoing support for Ukraine, but wanting to hear from President Zelensky, you know, what the status of his reform efforts were that he could then convey back to the President, and also wanting to hear if there

was more that European countries could do to support Ukraine.

Vice President PENCE knows President Trump, and he knew what President Trump wanted to hear from President Zelensky. The Vice President was echoing the President's two recurring themes: corruption and burden-sharing. It is the same, consistent themes every time.

Ambassador Taylor received a similar readout of the meeting between the Vice President and President Zelensky, including the Vice President's focus on corruption and burden-sharing. Here is Ambassador Taylor.

(Text of Videotape presentation:)

Ambassador TAYLOR. On the evening of September 1st, I received a readout of the Pence-Zelensky meeting over the phone from Mr. Morrison during which he told me that President Zelensky had opened the meeting by immediately asking the Vice President about the security cooperation. The Vice President did not respond substantively but said that he would talk to President Trump that night. The Vice President did say that President Trump wanted the Europeans to do more to support Ukraine and that he wanted the Ukrainians to do more to fight corruption.

Mr. Counsel PURPURA. On September 11, based on the information collected and presented to President Trump, the President lifted the pause on the security assistance. As Mr. Morrison explained, "our process gave the President the confidence he needed to approve the release of the security-sector assistance."

The House managers say that the talk about corruption and burden-sharing is a ruse. No one knew why the security assistance was paused, and no one was addressing the President's concerns with Ukrainian corruption and burden-sharing. The House managers' own evidence—their own record—tells a different story, however. They didn't tell you about this, not in 21 hours. Why not?

The President's concerns were addressed in the ordinary course. The President wasn't caught, as the House managers allege. The managers are wrong. All of this, together with what we discussed on Saturday, demonstrates that there was no connection between security assistance and investigations.

When the House managers realized their "quid pro quo" theory on security assistance was falling apart, they created a second alternative theory. According to the House managers, President Zelensky desperately wanted a meeting at the White House with President Trump, and President Trump conditioned that meeting on investigations.

What about the managers' backup accusations? Do they fare any better than their quid pro quo for security assistance? No. No, they don't.

A Presidential-level meeting happened without any preconditions at the first available opportunity in a widely televised meeting at the United Nations General Assembly in New York on September 25, 2019. The White House was working to schedule the meeting earlier at the White House or in Warsaw, but those options fell through due to normal scheduling and a hurricane. The two Presidents met at the earliest convenience without President Zelensky ever announcing or beginning any investigations.

The first thing to know about the alleged quid pro quo for a meeting is that by the end of the July 25 call, the President had invited President Zelensky to the White House on three separate occasions, each time without any preconditions.

President Trump invited President Zelensky to an in-person meeting on their initial April 21 call. He said: "When you're settled in and ready, I'd like to invite you to the White House."

On May 29, the week after President Zelensky's inauguration, President Trump sent a congratulatory letter, again, inviting President Zelensky to the White House. He said:

As you prepare to address the many challenges facing Ukraine, please know that the American people are with you and are committed to helping Ukraine realize its vast potential. To help show that commitment, I would like to invite you to meet with me at the White House in Washington, D.C., as soon as we can find a mutually convenient time.

Then, on July 25, President Trump personally invited President Zelensky to participate in a meeting for a third time. He said: Whenever you would like to come to the White House, feel free to call. Give us a date, and we'll work that out. I look forward to seeing you.

Those are three separate invitations for a meeting, all made without any preconditions.

During this time, and behind the scenes, the White House was working diligently to schedule a meeting between the Presidents at the earliest possible date. Tim Morrison, whose responsibilities included helping to arrange head-of-state visits to the White House or other head-of-state meetings, testified that he understood that arranging the White House visit with President Zelensky was a do-out that came from the President.

The House managers didn't mention the work that the White House was doing to schedule the meeting between President Trump and President Zelensky; did they? Why not?

Scheduling a Presidential meeting takes time. Mr. Morrison testified that his directorate, which was just one of several, had a dozen schedule requests in with the President for meetings with foreign leaders that we were looking to land and Ukraine was but one of those requests.

According to Mr. Morrison, due to both Presidents' busy schedule, it became clear that the 'earliest opportunity for the two Presidents to meet would be in Warsaw' at the beginning of September."

The entire notion that a bilateral meeting between President Trump and President Zelensky was somehow conditioned on a statement about investigations is completely defeated by one straightforward fact: A bilateral meeting between President Trump and President Zelensky was planned for September 1 in Warsaw—the same Warsaw meeting we were just discussing—without the Ukrainians saying a word about investigations.

As it turned out, President Trump was not able to attend the meeting in Warsaw because of Hurricane Dorian. President Trump asked Vice President PENCE to attend in his place, but even that scheduling glitch did not put off their meeting for long. President Trump and President Zelensky met at the next available date, September 25, on the sidelines of the United Nations General Assembly.

As President Zelensky, himself, has said, there were "no preconditions" for his meeting with President Trump. Those are his words: "No conditions."

You are probably wondering how the House managers could claim there was a quid pro quo for a meeting with President Trump when the two Presidents actually did meet without President Zelensky announcing any investigations? Well, the House managers moved the goalpost again. They claim that the meeting couldn't be just an in-person meeting with President Trump. What it had to be was a meeting at the Oval Office and in the White House. That is nonsense.

Putting to one side the absurdity of the House managers trying to remove a duly-elected President of the United States from office because he met with a world leader in one location versus another, this theory has no basis in fact.

As Dr. Hill testified, what mattered was that there was a bilateral Presidential meeting, not the location of the meeting. She said:

[I]t wasn't always a White House meeting per se, but definitely a Presidential-level, you know, meeting with Zelensky and the President. I mean, it could've taken place in Poland, in Warsaw. It could've been, you know, a proper bilateral in some other context. But, in other words, a White House-level Presidential meeting.

The House managers didn't tell you about Dr. Hill's testimony. Why not? In fact, just last week they said that President Zelensky still hasn't gotten his White House meeting. Why didn't they tell you about Dr. Hill's testimony so you would have the full context and information? They spoke for over 21 hours. They couldn't take a couple of minutes to give you that context? How else do we know that Dr. Hill was right? Because President Zelensky said so on the July 25 call.

Remember, when President Trump invited President Zelensky to Washington on the July 25 call, President Zelensky said he would be "happy to meet with you personally" and offered to host President Trump in Ukraine or, on the other hand, meet with President Trump on September 1 in Poland. That is exactly what the administration planned to do.

If it weren't for Hurricane Dorian, President Trump would have met with President Zelensky in Poland on September 1, just as President Zelensky had requested and without any pre-conditions.

As it happened, President Zelensky met with the Vice President instead and just a few weeks later met with President Trump in New York—all without anyone making any statement about any investigations. And, once again, not a single witness in the House record that they compiled and developed under their procedures that we have discussed and will continue to discuss, provided any firsthand evidence that the President ever linked the Presidential meeting to any investigations.

The House managers have seized upon Ambassador Sondland's claim that Mr. Giuliani's requests were a quid pro quo for arranging a White House visit for President Zelensky. But, again, Ambassador Sondland was only guessing based on incomplete information. He testified that the President never told him there was any sort of a condition for a meeting with President Zelensky. Why, then, did he think there was one?

In his own words, Ambassador Sondland said that he could only repeat what he heard "through Ambassador Volker from Giuliani." So he didn't even hear from Mr. Giuliani himself. But Ambassador Volker, who is the supposed link between Mr. Giuliani and Ambassador Sondland, thought no such thing. Ambassador Volker testified unequivocally that there was no linkage between the meeting with President Zelensky and Ukrainian investigations.

I am going to read the full questions and answers because this passage is key. This is from Ambassador Volker's deposition testimony.

Question. Did President Trump ever withhold a meeting with President Zelensky or delay a meeting with President Zelensky until the Ukrainians committed to investigate the allegations that you just described concerning the 2016 Presidential election?

Answer. The answer to the question is no, if you want a yes-or-no answer. But the reason the answer is no is we did have difficulty scheduling a meeting, but there was no linkage like that.

Question. You said that you were not aware of any linkage between delaying the Oval Office meeting between President Trump and President Zelensky and the Ukrainian commitment to investigate the two allegations as you described them, correct?

Answer. Correct.

Over the past week, on no fewer than 15 separate occasions, the House managers played a video of Ambassador Sondland saying that the announcement of the investigations was a prerequisite for a meeting or call with the President—15 times. They never once read to you the testimony that I just did. They never once read to you the testimony in which Ambassador Volker refuted what Ambassador Sondland claimed he heard from Ambassador Volker.

Here is what we know. President Trump invited President Zelensky to meet three times without preconditions. The White House was working behind the scenes to schedule the meeting. The two Presidents planned to meet in Warsaw, just as President Zelensky had asked, and ultimately met 3 weeks later without Ukraine announcing any investigations.

No one testified in the House record that the President ever said there was a connection between a meeting and investigations. Those are the facts, plain and simple. So much for a quid pro quo for a meeting with the President.

Before I move on, let me take a brief moment to address a side allegation that was raised in the original whistleblower complaint and that the House managers are still trying to push.

The managers claim that President Trump ordered Vice President PENCE not to attend President Zelensky's inauguration in favor of a lower ranking delegation in order—according to them—to single a downgrading of the relationship between the United States and Ukraine.

That is not true. As I am sure everyone in this room can greatly appreciate, numerous factors had to align for the VP to attend.

First, dates of travel were limited. For national security reasons, the President and Vice President generally avoid being out of the country at the same time for more than a few hours.

The President had scheduled trips to Europe and Japan during the period when our Embassy in Ukraine anticipated the Ukrainian inauguration would occur, at the end of May or in early June. Jennifer Williams testified that the Office of the Vice President advised the Ukrainians that, if the Vice President were to participate in the inauguration, the ideal dates would be around May 29, May 30, May 31, or June 1, when the President would be in the United States. She said "if it wasn't one of those dates, it would be very difficult or impossible" for the Vice President to attend.

Second, the House managers act as if no other priorities in the world could compete for the administration's time. The Vice President's Office was simultaneously planning a competing trip for May 30 in Ottawa, Canada, to participate in an event supporting passage of the United States-Mexico-Canada Agreement. Ultimately, the Vice President traveled to Ottawa on May 30 to meet with Prime Minister Justin Trudeau and to promote the passage of the USMCA. This decision, as you know, advanced the top administration priority and an issue President Trump vigorously supported.

What you did not hear from the House managers was that the Ukrainian inauguration dates did not go as planned. On May 16—May 16—the Ukrainians surprised everyone and scheduled the inauguration for just 4 days later, on May 20—Monday, May 20. So think about that: May 16, May 20.

Get everybody—security, advance, everyone—to Ukraine. Jennifer Williams testified that it was very short notice, so it would have been difficult for the Vice President to attend, particularly since they hadn't sent out the advance team.

George Kent testified that the short notice left almost no time for either proper preparations or foreign delegations to visit and that the State Department scrambled on Friday the 17th to try and figure out who was available. Mr. Kent suggested that Secretary of Energy Perry be the anchor for the delegation, as "someone who was a person of stature and whose job had relevance to our agenda." Secretary Perry led the delegation, which also included Ambassador Sondland, Ambassador Volker, and Senator JOHNSON. Ambassador Volker testified that it was the largest delegation from any country there, and it was a high-level one. The House managers didn't tell you this. Why not?

The claim that the President instructed the Vice President not to attend President Zelensky's inauguration is based on House manager assumptions with no evidence that the President did something wrong.

Finally, as I am coming to the end, if the evidence doesn't show a quid pro quo, what does it show? Unfortunately for the House managers, one of the few things that all of the witnesses agreed on was that all of President Trump has strengthened the relationship between the United States and Ukraine and that he has been a more stalwart friend to Ukraine and a more fierce opponent of Russian aggression than President Obama. The House managers repeatedly claimed that President Trump doesn't care about Ukraine. They are attributing views to President Trump that are contrary to his actions. More importantly, they are contrary to the House managers' own evidence.

But don't take my word for it. Ambassadors Yovanovitch, Taylor, and Volker all testified to the Trump administration's positive new policy toward Ukraine based especially on President Trump's decision to provide lethal aid to Ukraine. Ambassador Taylor testified that President Trump's policy toward Ukraine was a substantial improvement over President Obama's policy. Ambassador Volker agreed that America's policy toward Ukraine has been strengthened under President Trump, whom he credited with approving each of the decisions made along the way.

Ambassador Yovanovitch testified that President Trump's decision to provide lethal weapons to Ukraine meant that our policy actually got stronger over the last 3 years. She called the policy shift that President Trump directed very significant. Let's hear from Ambassador Taylor, Ambassador Volker, and Ambassador Yovanovitch.

(Text of Videotape presentation:)

Ms. STEFANIK. The Trump administration has indeed provided substantial aid to

Ukraine in the form of defensive lethal aid, correct?

Ambassador TAYLOR. That is correct.

Ms. STEFANIK. And that is more so than the Obama administration, correct?

Ambassador TAYLOR. The Trump administration—

Ms. STEFANIK. Defensive lethal aid.

Ambassador TAYLOR. Yes.

Ambassador VOLKER. President Trump approved each of the decisions made along the way, providing lethal defensive equipment.

Ambassador YOVANOVITCH. And the Trump administration strengthened our policy by approving the provision to Ukraine of antitank missiles known as Javelins.

They are obviously tank busters. And so, if the war with Russia all—all of a sudden accelerated in some way and tanks come over the horizon, Javelins are a very serious weapon to deal with that.

Mr. Counsel PURPURA. Ukraine is better positioned to fight Russia today than it was before President Trump took office. As a result, the United States is safer too. The House managers did not tell you about this testimony from Ambassadors Taylor, Volker, and Yovanovitch. Why not?

These are the facts, as drawn from the House managers' own record on which they impeached the President. This is why the House managers' first Article of Impeachment must fail, for the six reasons I set forth when I began on Saturday:

There was no linkage between investigations and security assistance or a meeting on the July 25 call. The Ukrainians said there was no quid pro quo and they felt no pressure. The top Ukrainians did not even know that security assistance was paused until more than a month after the July 25 call. The House managers' record reflects that anyone who spoke with the President said that the President made clear that there was no linkage. The security assistance flowed, and the Presidential meeting took place, all without any announcement of investigations. And President Trump has enhanced America's support for Ukraine in his 3 years in office.

These facts all require that the first Article of Impeachment fail. You have already heard and will continue to hear from my colleagues on why the second article must fail. Once again, this is the case that the House managers chose to bring. This is the evidence they brought before the Senate.

The very heavy burden of proof rests with them. They say their case is overwhelming and uncontested. It is not. They say they have proven each of the articles against President Trump. They have not. The facts and evidence of the case the House managers have brought exonerate the President.

Thank you for your attention.

Mr. Chief Justice, I think we are ready for a break.

The CHIEF JUSTICE. The majority leader is recognized.

RECESS

Mr. McCONNELL. Mr. Chief Justice, colleagues, we will take a 15-minute break.

There being no objection, at 2:52 p.m., the Senate, sitting as a Court of Impeachment, recessed until 3:17 p.m.; whereupon the Senate reassembled when called to order by the CHIEF JUSTICE.

The CHIEF JUSTICE. The majority leader is recognized.

Mr. McCONNELL. It is my understanding that, having consulted with the President's lawyers, we are looking at around 6 p.m. for dinner, and we will plow right through until 6 p.m.

The CHIEF JUSTICE. Thank you.

President's counsel can continue with their case.

Mr. Counsel SEKULOW. Thank you, Mr. Chief Justice.

Mr. Chief Justice, Members of the Senate, House managers, there has been a lot of talk in both the briefs and in the discussions over the last week about one of our colleagues, former mayor of New York, Rudy Giuliani. Mayor Giuliani served as one of the leaders of the President's defense team during the Mueller investigation. He is mentioned 531 times—20 in the brief and about 511, give or take, in the arguments, including the motion day.

We had a robust team that worked on the President's defense during the Mueller probe, consisting of Mayor Giuliani, Andrew Ekonomou, Stuart Roth, Jordan Sekulow, Ben Sisney, Mark Goldfeder, Mayor Giuliani, of course, and Marty Raskin, as well as Jane Raskin. Jane Serene Raskin was one of the leading attorneys on the Mueller investigation for the defense of the President.

The issue of Mayor Giuliani has come up here in this Chamber a lot. We thought it would be appropriate now to turn to that issue, the role of the President's lawyer, his private counsel, in this proceeding. I would like to yield my time, Mr. Chief Justice, to Jane Serene Raskin.

Ms. Counsel RASKIN. Mr. Chief Justice, Majority Leader McCONNELL, Members of the Senate.

I expect you have heard American poet Carl Sandburg's summary of the trial lawyer's dilemma:

If the facts are against you, argue the law. If the law is against you, argue the facts. If the facts and the law are against you, pound the table and yell like hell.

Well, we have heard the House managers do some table-pounding and a little yelling, but, in the main, they have used a different tactic here, a tactic familiar to trial lawyers, though not mentioned by Mr. Sandburg. If both the law and the facts are against you, present a distraction, emphasize a sensational fact or perhaps a colorful or controversial public figure who appears on the scene, then distort certain facts, ignore others, even when they are the most probative, make conclusory statements, and insinuate the shiny object is far more important than the actual facts allow; in short, divert attention from the holes in your case.

Rudy Giuliani is the House managers' colorful distraction. He is a household name. He is a legendary Federal prosecutor who took down the Mafia, corrupt public officials, Wall Street racketeers. He is the crime-busting mayor who cleaned up New York and turned it around, a national hero, America's mayor after 9/11, and, after that, an internationally recognized expert on fighting corruption. To be sure, Mr. Giuliani has always been somewhat of a controversial figure for his hard-hitting, take-no-prisoners approach, but it is no stretch to say that he was respected by friend and foe alike for his intellect, his tenacity, his accomplishments, and his fierce loyalty to his causes and his country.

And then, the unthinkable happened. He publicly supported the candidacy of President Trump—the one who was not supposed to win. And then, in the spring of 2018, he stood up to defend the President—successfully, it turns out—against what we all now know is the real debunked conspiracy theory; that the Trump campaign colluded with Russia during the 2016 campaign. The House managers would have you believe that Mr. Giuliani is at the center of this controversy. They have anointed him the proxy villain of the tale, the leader of a rogue operation. Their presentations were filled with ad hominem attacks and name-calling: cold-blooded political operative, political bagman.

But I suggest to you that he is front and center in their narrative for one reason and one reason alone: to distract from the fact that the evidence does not support their claims.

So what is the first tell that Mr. Giuliani's role in this may not be all that it is cracked up to be? They didn't subpoena him to testify. In fact, Mr. SCHIFF and his committee never even invited him to testify. They took a stab at subpoenaing his documents back in September, and when his lawyer responded with legal defenses to the production, the House walked away. But if Rudy Giuliani is everything they say he is, don't you think they would have subpoenaed and pursued his testimony? Ask yourselves, why didn't they?

In fact, it appears the House committee wasn't particularly interested in presenting you with any direct evidence of what Mayor Giuliani did or why he did it. Instead, they ask you to rely on hearsay, speculation, and assumption—evidence that would be inadmissible in any court.

For example, the House managers suggest that Mr. Giuliani, at the President's direction, demanded that Ukraine announce an investigation of the Bidens and Burisma before agreeing to a White House visit. They base that on a statement to that effect by Ambassador Sondland.

But what the House managers don't tell you is that Sondland admitted he was speculating about that. He presumed that Mr. Giuliani's requests were intended as a condition for a White House visit. Even worse, his assumption was on thirdhand information. As he put it, the most he could do

is repeat what he heard through Ambassador Volker from Giuliani, whom he presumed spoke to the President on the issue. And by the way, as Mr. Purpura has explained, the person who was actually speaking to Mr. Giuliani, Ambassador Volker, testified clearly that there was no linkage between the meeting with President Zelensky and Ukrainian investigations.

The House managers also make much of a May 23 White House meeting during which the President suggested to his Ukraine working group, including Ambassadors Volker and Sondland, that they should talk to Rudy. The managers told you that President Trump gave a directive and a demand that the group needed to work with Giuliani if they wanted him to agree with the Ukraine policy they were proposing, but those words, "directive" and "demand," are misleading. They misrepresent what the witnesses actually said.

Ambassador Volker testified that he understood, based on the meeting, that Giuliani was only one of several sources of information for the President, and the President simply wanted officials to speak to Mr. Giuliani because he knows all these things about Ukraine. As Volker put it, the President's comment was not an instruction but just a comment. Ambassador Sondland agreed. He testified that he didn't take it as an order, and he added that the President wasn't even specific about what he wanted us to talk to Giuliani about.

So it may come as no surprise to you that after the May 23 meeting, the one during which the House managers told you the President demanded that his Ukraine team talk to Giuliani, neither Volker nor Sondland even followed up with Mr. Giuliani until July, and the July followup by Mr. Volker happened only because the Ukrainian Government asked to be put in touch with him. Volker testified that President Zelensky's senior aide, Andriy Yermak, approached him to ask to be connected to Mr. Giuliani.

House Democrats also rely on testimony that Mayor Giuliani told Ambassadors Volker and Sondland that, in his view, to be credible, a Ukrainian statement on anti-corruption should specifically mention investigations into 2016 election interference and Burisma.

But when Ambassador Volker was asked whether he knew if Giuliani was "conveying messages that President Trump wanted conveyed to the Ukrainians," Volker said that he did not have that impression. He believed that Giuliani was doing his own communication about what he believed he was interested in.

But even more significant than the reliance on presumptions, assumptions, and unsupported conclusions is the managers' failure to place in any fair context Mr. Giuliani's actual role in exploring Ukrainian corruption. To hear their presentation, you might

think that Mayor Giuliani had parachuted into the President's orbit in the spring of 2019 for the express purpose of carrying out a political hit job. They would have you believe that Mayor Giuliani was only there to dig up dirt against former Vice President Biden because he might be President Trump's rival in the 2020 election.

Of course, Mr. Giuliani's intent is no small matter here. It is a central and essential premise of the House managers' case that Mr. Giuliani's motive in investigating Ukrainian corruption and interference in the 2016 election was an entirely political one, undertaken at the President's direction. But what evidence have the managers actually offered you to support that proposition? On close inspection, it turns out virtually none. They just say it over and over and over.

And they offer you another false dichotomy. Either Mr. Giuliani was acting in an official capacity to further the President's foreign policy objectives or he was acting as the President's personal attorney, in which case, they conclude, ipse dixit, his motive would only be to further the President's political objectives.

The House managers then point to various of Mr. Giuliani's public statements in which he is clear and completely transparent about the fact that he is, indeed, the President's personal attorney. There you have it. Giuliani admits he is acting as the President's personal attorney, and therefore he had to have been acting with a political motive to influence the 2020 election. No other option, right? Wrong. There is, of course, another obvious answer to the question, what motivated Mayor Giuliani to investigate the possible involvement of Ukrainians in the 2016 election? The House managers know what the answer is. It is in plain sight, and Mr. Giuliani has told any number of news outlets exactly when and why he became interested in the issue.

It had nothing to do with the 2020 election. Mayor Giuliani began investigating Ukraine corruption and interference in the 2020 election way back in November of 2018—a full 6 months before Vice President Biden announced his candidacy and 4 months before the release of the Mueller report, when the biggest false conspiracy theory in circulation that the Trump campaign had colluded with Russia during the 2016 campaign was still in wide circulation.

As The Hill reported: "As President Trump's highest profile defense attorney, the former New York City mayor, often known simply as 'Rudy,' believed the Ukrainians' evidence could assist in his defense against the Russia collusion investigation and former Special Counsel Robert Mueller's final report."

So Giuliani began to check things out in late 2018 and early 2019.

The genesis of Mayor Giuliani's investigation was also reported by numerous other media outlets, including CNN, which related that Giuliani's role in Ukraine could be traced back to No-

vember 2018, when he was contacted by someone he describes as a well-known investigator. The Washington Post and many other news outlets reported the same information.

So, yes, Mayor Giuliani was President Trump's personal attorney, but he was not on a political errand. As he has stated repeatedly and publicly, he was doing what good defense attorneys do. He was following a lead from a well-known private investigator. He was gathering evidence regarding Ukrainian election interference to defend his client against the false allegations being investigated by Special Counsel Mueller, but the House managers didn't even allude to that possibility. Instead, they just repeated their mantra that Giuliani's motive was purely political. That speaks volumes about the bias with which they have approached their mission.

The bottom line is, Mr. Giuliani defended President Trump vigorously, relentlessly, and publicly throughout the Mueller investigation and in the nonstop congressional investigations that followed, including the attempted Mueller redo by the House Judiciary Committee, which the managers would apparently like to sneak in the back door here.

The House managers may not like his style—you may not like his style—but one might argue that he is everything Clarence Darrow said a defense lawyer must be—outrageous, irreverent, blasphemous, a rogue, a renegade. The fact is, in the end, after a 2-year siege on the Presidency, two inspector general reports, and a $32 million special counsel investigation, it turns out Rudy was spot-on.

It seems to me we are keeping score on who got it right on allegations of FISA abuse, egregious misconduct at the highest level of the FBI, alleged collusion between the Trump campaign and Russia, and supposed obstruction of justice in connection with the special counsel's investigation. The score is Mayor Giuliani 4, Mr. SCHIFF 0. But in this trial, in this moment, Mr. Giuliani is just a minor player—that shiny object designed to distract you.

Senators, I urge you most respectfully: Do not be distracted.

Thank you, Mr. Chief Justice.

I yield back to Mr. Sekulow.

Mr. Counsel SEKULOW. Mr. Chief Justice, Members of the Senate, and House managers, we are going to now move to a section dealing with the law. There are two issues in particular that my colleague Pat Philbin, the Deputy White House Counsel, will be addressing, issues involving due process and legal issues specifically dealing with the second Article of Impeachment: Obstruction of Congress. So I yield my time now, Mr. Chief Justice, to Mr. Philbin.

Mr. Counsel PHILBIN. Mr. Chief Justice, Senators, Majority Leader McCONNELL, Minority Leader SCHUMER, the other day, as we opened our presentation, I touched on two areas: some of

the due process violations that characterized the proceedings in the House and some of the fundamental mischaracterizations and errors that underpinned the House Democrats' charge for obstruction. I will complete the presentation today on those points to round out some of the fundamentally unfair procedures that were used in the House and their implications in this proceeding before you now and also address in detail the purported charges of obstruction in the second Article of Impeachment.

On due process, there are three fundamental errors that affected the proceedings in the House. The first is, as I explained on Saturday, the impeachment inquiry was unauthorized and unconstitutional from the beginning.

No committee of the House has the power to launch an inquiry under the House's impeachment power unless the House itself has taken a vote to give that authority to a committee. I noted that, in cases such as Rumely v. United States and United States v. Watkins, the Supreme Court has set out these principles, general principles derived from the Constitution, which assign authority to each Chamber of the legislative branch—to the House and to the Senate—but not to individual members or to subcommittees. For an authority of the House to be transferred to a committee, the House has to vote on that.

The DC Circuit has distilled the principles from those cases this way: "To issue a valid subpoena, a committee or a subcommittee must conform strictly to the resolution establishing its investigatory powers." That was the problem here in that there was no such resolution. There was no vote from the House authorizing the issuance of subpoenas under the impeachment power. So this inquiry began with nearly two dozen invalid subpoenas. The Speaker had the House proceed on nothing more than a press conference in which she purported to authorize committees to begin an impeachment power. Under the Constitution, she lacked that authority.

As the chairman of the House Judiciary Committee, Peter Rodino, pointed out during the Nixon impeachment inquiry:

Such a resolution [from the House] has always been passed by the House. . . . It is a necessary step if we are to meet our obligation.

So we began this process with unauthorized subpoenas that imposed no compulsion on the executive branch to respond with documents or witnesses. I will be coming back to that point, that threshold foundational point, when we get to the obstruction charge.

The second fundamental due process error is that the House Democrats denied the President basic due process required by the Constitution and by the fundamental principles of fairness in the procedures that they used for the hearings. I am not going to go back in detail over those. As we heard from Judge Starr, the House Democrats essentially abandoned the principles that have governed impeachment inquiries in the House for over 150 years. I will touch on just a few points and respond to a couple of points that the House managers have made.

The first is that, in denying due process rights, the House proceedings were a huge reversal from the positions the House Democrats themselves had taken in the recent past, particularly in the Clinton impeachment proceeding.

I believe we have Manager NADLER's description of what was required. Perhaps not. Manager NADLER was explaining that due process requires at a minimum notice of the charges against you, the right to be represented by counsel, the right to cross-examine witnesses against you, and the right to present evidence. All of those rights were denied to the President.

Now, one of the responses that the managers have made to the defect that we pointed out in the secret proceedings, where Manager SCHIFF began these hearings in the basement bunker, is that, well, that was really just best investigative practice; they were operating like a grand jury. Don't be fooled by that. Those hearings operated nothing like a grand jury.

A grand jury has secrecy primarily for two reasons: to protect the direction of the investigation so others won't know what witnesses are being called in and what they are saying—to keep that secret for the prosecutor to be able to keep developing the evidence—and to protect the accused because the accused might not ever be indicted.

In this case, all of that information was made public every day. The House Democrats destroyed any legitimate analogy to a grand jury, because that was all public. They made no secret that the President was the target. They issued vile calumnies about him every day. They didn't keep the direction of their investigation secret. Their witness lists were published daily, and the direction of the investigation was open. The testimony that took place was selectively leaked to a compliant media to establish a false narrative about the President.

If that sort of conduct had occurred in a real grand jury, that would have been a criminal violation. Prosecutors can't do that. Under rule 6(e) of the Federal criminal rules, it is a criminal offense to be leaking what takes place in a grand jury.

Also, the grand jury explanation provides no rationale whatsoever for this second round of hearings. Remember, after the basement bunker—after the secret hearings where the testimony was prescreened—then the same witnesses who had already been deposed were put on in a public hearing where the President was still excluded.

Ask yourself, what was the reason for that? In every prior Presidential impeachment in the modern era where there have been public hearings, the President has been represented by counsel and could cross-examine witnesses. Why did there have to be public, televised hearings where the President was excluded? That was nothing more than a show trial.

I also addressed the other day the House managers' contention that they had offered the President due process; that when things reached the third round of hearings in front of the House Judiciary Committee, Manager NADLER offered the President due process. I explained why that was illusory. There was no genuine offer there because, before any hearings began, other than the law professor's seminar on December 4, the Speaker had already determined the outcome, had already said there were going to be Articles of Impeachment, and the Judiciary Committee had informed the counsel's office that they had no plans to call any fact witnesses or have any factual hearings whatsoever. It was all done. It was locked in. It was baked.

There was something else hanging over that when they had purportedly offered to allow the President some due process rights, and that was a special provision in the rules for the House Judiciary Committee proceedings—also unprecedented—that allowed the House Judiciary Committee to deny the President any due process rights at all if he continued to refuse to turn over documents or not allow witnesses to testify, so that if the President didn't give up his privileges and immunities that he had been asserting over executive branch confidentiality—if he didn't comply with what the House Democrats wanted—then it was up to Chairman NADLER, potentially, to say: No rights at all. There is a term for that in the law. It is called an unconstitutional condition. You can't condition someone's exercise of some rights on his surrendering other constitutional rights. You can't say: We will let you have due process in this way if you waive your constitutional privilege on another issue.

The last point I will make about due process is this: It is important to remember that due process is enshrined in the Bill of Rights for a reason. It is not that process is just an end in itself. Instead, it is a deep-seated belief in our legal tradition that fair process is essential for accurate decision making.

Cross-examination of witnesses, in particular, is one of the most important procedural protections for any American. The Supreme Court has explained that, for over 250 years, our legal tradition has recognized cross-examination as the greatest legal engine ever invented for the discovery of truth.

So why do House Democrats jettison every precedent and every principle of due process in the way they devise these hearing procedures? Why did they devise a process that kept the President blocked out of any hearings for 71 of the 78 days of the so-called investigation?

I would submit because their process was never about finding truth. Their process was about achieving a predetermined outcome on a timetable and having it done by Christmas, and that is what they achieved.

Now, the third fundamental due process error is that the whole foundation of these proceedings was also tainted beyond repair because an interested fact witness supervised and limited the course of the factual discovery, the course of the hearings. I explained the other day that Manager SCHIFF had a reason, potentially, because of his office's contact with the so-called whistleblower and what was discussed and how the complaint was framed, which all remained secret, to limit inquiry into that, which is relevant.

The whistleblower began this whole process. His bias, his motive, why he was doing it, what his sources were—that is relevant to understand what generated this whole process, but there was no inquiry into that.

So what conclusion does this all lead to—all of these due process errors that have infected the proceeding up to now?

I think it is important to recognize the right conclusion is not that this body, this Chamber, should try to redo everything—to start bringing in new evidence, bring in witnesses because the President wasn't allowed witnesses below and redo the whole process. And that is for a couple of reasons.

One is, first, as my colleagues have demonstrated, despite the one-sided, unfair process in the House, the record that the House Democrats collected through that process already shows that the President did nothing wrong. It already exonerates the President.

But the second and more important reason is because of the institutional implications it would have for this Chamber. Whatever precedent is set, whatever this body accepts now as a permissible way to bring an impeachment proceeding and to bring it to this Chamber becomes the new normal. And if the new normal is going to be that there can be an impeachment proceeding in the House that violates due process, that doesn't provide the President or another official being impeached due process rights, that fails to conduct a thorough investigation, that doesn't come here with facts established, that then this body should become the investigatory body and start redoing what the House didn't do and finding new witnesses and doing things over and getting new evidence, then, that is going to be the new normal, and that will be the way that this Chamber has to function, and there will be a lot more impeachments coming because it is a lot easier to do an impeachment if you don't have to follow due process and then come here and expect the Senate to do the work that the House didn't do.

I submit that is not the constitutional function of this Chamber sitting as a Court of Impeachment, and this Chamber should not put its imprimatur on a process in the House that would force this Chamber to take on that role.

Now, I will move on to the charge of obstruction in the second Article of Impeachment.

Accepting that Article of Impeachment would fundamentally damage separation of powers under the Constitution by permanently altering the relationship between the executive and the legislative branches. In the second article, House Democrats are trying to impeach the President for resisting legally defective demands for information by asserting established legal defenses and immunities based on legal advice from the Department of Justice's Office of Legal Counsel. In essence, the argument here is that House Democrats are saying: When we demand documents, the executive branch must comply immediately, and the assertions of privilege or defenses to our subpoenas are further evidence of obstruction. We don't have to go through the constitutionally mandated accommodations process to work out an acceptable solution with the executive branch. We don't have to go to the courts to establish the validity of our subpoenas.

At one point, Manager SCHIFF said that anything that makes the House even contemplate litigation is evidence of obstruction. Instead, the House claims it can jump straight to impeachment.

What this really means, in this case, is that they are saying for the President to defend the prerogatives of his office, to defend the constitutionally grounded principles of executive branch privileges of immunities is an impeachable offense.

If this Chamber accepts that premise, that what has been asserted here constitutes an impeachable offense, it will forever damage the separation of powers. It will undermine the independence of the executive and destroy the bounds between the legislative and executive branches that the Framers crafted in the Constitution.

As Professor Turley testified before the House Judiciary Committee, ''basing impeachment on this obstruction theory would itself be an abuse of power . . . by Congress.''

And I would like to go through that and unpack and explain something. I will start by outlining what the Trump administration actually did in response to subpoenas, because there are three different actions—three different legally based assertions for resisting different subpoenas that the Trump administration made.

I pointed out on Saturday that there has been this constant refrain from the House Democrats that there was just blanket defiance, blanket obstruction, as if it were unexplained obstruction—just, we won't cooperate with that warrant. And that is not true. There were very specific legal grounds provided, and each one was supported by an opinion from the Department of Justice's Office of Legal Counsel.

So the first is executive branch officials declined to comply with subpoenas that had not been authorized, and that is the point I made at the beginning. There was no vote from the House. Without a vote from the House, the subpoenas that were issued were not authorized. And I pointed out that in an October 18 letter from White House Counsel that specific ground was explained.

And it wasn't just from the White House counsel. There were other letters. On the screen now is an October 15 letter from OMB, which explains:

Absent a delegation by a House rule or a resolution of the House, none of your committees have been delegated jurisdiction to conduct an investigation pursuant to the impeachment power under article I, section 2 of the Constitution.

The letter went on to explain that legal rationale—not blanket defiance. There were specific exchanges of letters explaining these legal grounds for resisting.

The second ground, the second principle that the Trump administration asserted was that some of these subpoenas purported to require the President's senior advisers, his close advisers, to testify.

Following at least 50 years of precedent, the Department of Justice's Office of Legal Counsel advised that three senior advisers to the President—the Acting White House Chief of Staff, the Legal Advisor to the National Security Council, and the Deputy National Security Advisor—were absolutely immune from compelled congressional testimony. And based on that advice from the Office of Legal Counsel, the President directed those advisers not to testify.

Administrations of both political parties have asserted this immunity since the 1970s. President Obama asserted it as to the Director of the Office of Political Strategy and Outreach. President George W. Bush asserted it as to his former counsel and to his White House Chief of Staff. President Clinton asserted it as to two of his counsel. President Reagan asserted it as to his counsel, Fred Fielding, and President Nixon asserted it. This is not something that was just made up recently. There is a decades-long history of the Department of Justice providing the opinion that senior advisers to the President are immune from compelled congressional testimony, and it is the same principle that was asserted here.

There are important rationales behind this immunity. One is that the President's most senior advisers are essentially his alter egos, and allowing Congress to subpoena them and compel them to come testify would be tantamount to allowing Congress to subpoena the President and force him to come testify, but that in separation of powers would not be tolerated. Congress could no more do that with the

President than the President could force Members of Congress to come to the White House and answer to him.

There is also a second and important rationale behind this immunity, and that relates to executive privilege. The immunity protects the same interests that underlie executive privilege. The Supreme Court has recognized executive privilege that protects the confidentiality of the communications with the President and deliberations within his executive branch. As the Court put it in United States v. Nixon, "The privilege is fundamental to the operation of government and inextricably rooted in the separation of powers under the Constitution."

So the Supreme Court has recognized the executive needs this privilege to be able to function. It is rooted in the separation of powers.

As Attorney General Janet Reno advised President Clinton, "immunity such advisers enjoy from testimonial compulsion by a congressional committee is absolute and may not be overborne by competing congressional interests."

So that is Attorney General Janet Reno advising President Clinton. This is not a partisan issue. This is not a Republican or Democrat issue. Administrations of both parties have asserted this principle of immunity for senior advisers.

And why does it matter? It matters because the Supreme Court has explained that the fundamental principle behind executive privilege is that it is necessary to have confidentiality in communications and deliberations in order to have good and worthwhile deliberations, in order to have people provide their candid advice to the President. Because if they knew that what they were going to say was going to be on the front page of the Washington Post the next day or the next week, they wouldn't tell the President what they actually thought. If you want to have good decision making, there has to be that zone of confidentiality.

This is the way the Supreme Court put it: "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process."

That was also from United States v. Nixon.

So those are exactly the interests that are protected by having senior advisers to the President be immune from compelled congressional testimony. Because once someone is compelled to sit in the witness seat and start answering questions, it is very hard for them to protect that privilege, to make sure that they don't start revealing something that was discussed.

So for a small circle of those close to the President, for the past 40 to 50 years, administrations of both parties have insisted on this principle.

Now, the other night, House managers, when we were here very late last week, suggested that executive privilege was a distraction, and Manager NADLER called it "nonsense."

Not at all—it is a principle recognized by the Supreme Court—a constitutional principle grounded in separation of powers.

They also asserted that this immunity has been rejected by every court that has addressed it, as if to make it seem that lots of courts have addressed this. They have all said that this theory just doesn't fly. That is not accurate. That is not true.

In fact, in most instances, once the President asserts immunity for a senior adviser, the accommodations process between the executive branch and the legislature begins, and there is usually some compromise to allow, perhaps, some testimony, not in open hearing but in a closed hearing or a deposition, perhaps to provide some other information instead of live testimony. There is a compromise.

But in the only two times it has been litigated, district courts, it is true, rejected the immunity. One was in a case involving former counsel to George W. Bush, Harriet Miers. The district court rejected the immunity, but immediately on appeal, the Court of Appeals of the DC Circuit stayed that decision. And that decision means—to stay that district court decision—that the appellate court thought there was a likelihood of success on appeal, that the executive branch might succeed, or, at a minimum, that the issue of immunity presented "questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation." The first decision was stayed.

The second district court decision is still being litigated right now. It is the McGahn case that the House has brought, trying to get testimony from former counsel to President Trump, Donald McGahn. That case was just argued in the DC Circuit on January 3. So there is no established law suggesting that this immunity somehow has been rejected by the court. It is still being litigated right now. It is an immunity that is a standard principle asserted by every administration in both parties for the past 40 years. Asserting that principle cannot be treated as obstruction of Congress.

The third action that the President took—the administration took—related to the fact that House Democrats' subpoenas tried to shut out executive branch counsel, agency counsel from the depositions of executive branch employees. Now, the Office of Legal Counsel concluded that congressional committees may not bar agency counsel from assisting an executive branch witness without contravening the legitimate prerogatives of the executive branch and that attempting to enforce a subpoena while barring agency counsel would be "unconstitutional."

The President relied on that legal advice here. As Judge Starr pointed out,

the President was consulting with the Department of Justice, receiving advice from the very respected Office of Legal Counsel, and following that advice about the constitutional prerogatives of his office and the constitutional prerogatives of the executive branch. Again, administrations of both political parties have recognized the important role that agency counsel plays.

In the Obama administration, the Office of Legal Counsel stated that the exclusion of agency counsel "could potentially undermine . . . the President's constitutional authority to consider and assert executive privilege where appropriate."

So why is agency counsel important? As I tried to explain, the executive privilege of confidentiality for communications with the President for internal deliberative communications of the executive branch—those are important legal rights. They are necessary for the proper functioning of the executive branch, and the agency counsel is essential to protect those legal rights.

When an individual employee goes in to testify, he or she might not know—probably would not know—where is the line for what is covered by executive privilege or deliberative process privilege—not things the employees necessarily know, and their personal counsel, even if they are permitted to have their personal counsel with them—same thing. Most personal attorneys for employees don't know the finer points of executive branch confidentiality interests or deliberative process privilege. It is also not their job to protect those interests. They are the personal lawyer for the employee who is testifying, trying to protect that employee from potential legal consequences.

We usually have lawyers to protect legal rights, so it makes sense when there is an important legal and constitutionally based right at stake—the executive privilege—that there should be a lawyer there to protect that right for the executive branch, and that is the principle that the Office of Legal Counsel enjoys.

This also doesn't raise any insurmountable problems for congressional investigations for finding information. In fact, just as recently as April of 2019, the House Committee on Oversight and Government Reform reached an accommodation with the Trump administration after the administration had declined to make someone available for a deposition because of the lack of agency counsel. That issue was worked out and accommodation was made, and there was some testimony provided in other circumstances. So it doesn't always result in the kind of escalation that was seen here—straight to impeachment. The accommodation process can work things out.

House Democrats have pointed to a House rule that excludes agency counsel, but, of course, that House rule cannot override a constitutional privilege.

So those are the three principles that the Trump administration asserted. Now I would like to turn to the claim that somehow the assertion of these principles created an impeachable offense.

The idea that asserting defenses and immunity—legal defenses and immunity in response to subpoenas, acting on advice of the Department of Justice—is an impeachable offense is absurd and is dangerous for our government. Let me explain why.

House Democrats' obstruction theory is wrong first and foremost because, in a government of laws, asserting privileges and rights to resist compulsion is not obstruction; it is a fundamental right. In Bordenkircher v. Hayes, the Supreme Court explains that to ''punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional.''

This is a principle that in the past, in the Clinton impeachment, was recognized across the board, that it would be improper to suggest that asserting rights is an impeachable offense. Harvard law professor Laurence Tribe said: ''The allegation that invoking privileges and otherwise using the judicial system to shield information . . . is an abuse of power that should lead to impeachment and removal from office is not only frivolous, but also dangerous.''

Manager NADLER said that the use of a legal privilege is not illegal or impeachable itself—a legal privilege, executive privilege. Minority Leader SCHUMER, in the Clinton impeachment, expressed the same view:

(Text of Videotape presentation:)

Mr. SCHUMER. To suggest that any subject of an investigation, much less the President with obligations to the institution of the presidency, is abusing power and interfering with an investigation by making legitimate legal claims, using due process and asserting constitutional rights, is beyond serious consideration.

Mr. Counsel PHILBIN. That was exactly correct then and it is exactly correct now.

More important than simply the principle that asserting rights can't be considered obstruction, when the rights the President has asserted are based on executive privilege, when they are constitutionally grounded principles that are essential for the separation of powers and for protecting the institution of the Office of the Presidency, to call that obstruction is to turn the Constitution on its head. Defending the separation of powers cannot be deemed an impeachable offense without destroying the Constitution. Accepting that approach would do permanent damage to the separation of powers and would allow the House of Representatives to turn any disagreement with the Executive over informational demands into a supposed basis for removing the President from office. It would effectively create for us the very parliamentary system that the Framers sought to avoid because, by making any demand for information and goading the Executive to a refusal and treating that, then, as impeachable, the House would effectively be able to function with a no-confidence vote power. That is not the Framers' design. The legislative and executive branches frequently clash on questions of constitutional interpretation, including about congressional demands for information. These conflicts have happened since the founding.

In 1796, George Washington, our first President, resisted demands from Congress for information about the negotiation of the Jay Treaty, and there have been conflicts between the Executive and the Congress in virtually every administration since then about congressional demands for information.

The Founding Fathers expected the branches to have these conflicts. James Madison pointed out that ''the legislative, executive, and judicial departments . . . must, in the exercise of its functions, be guided by the text of the Constitution according to its own interpretation of it.'' It was recognized that there would be friction.

Similarly in Federalist 51, Madison pointed out that ''the great security against a gradual concentration of the several powers in the same department consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachment of the others.'' This is checks and balances, this friction, this clashing between the branches. It is not evidence of an impeachable offense. It is the separation of powers in its practical operation. It is part of the constitutional design.

Now, the proper and historically accepted way that these disagreements have been resolved is through the constitutionally mandated accommodations process. Courts have explained that the branches are required to engage in an accommodation process to resolve disagreements where there is a clash over a demand for information. As the DC Circuit has explained, when Congress asks for information from the executive branch that triggers ''an implicit constitutional mandate to seek optimal accommodation . . . of the needs of the conflicting branches,'' the goal is to accommodate the needs of both branches to reach a compromise.

If that accommodation process fails, Congress has other tools at its disposal to address the disagreement. The House traditionally has proceeded to contempt—to vote on a contempt resolution. In recent times, the House has taken the position that it may sue in the courts to determine the validity of its subpoenas and secure an injunction to enforce them.

The House managers have pointed out that the Trump administration, when sued in the McGahn case, has taken the view that those cases are not justiciable in article III courts. That is correct. That is the view of the Trump administration; that was the view of the Obama administration. So there is that resistance in the court cases to the jurisdiction of the courts to address those. But the House managers are missing the point when they identify that position that the administration has taken because the House cannot claim that they have a mechanism for going to court—they are in court right now asserting that mechanism in the McGahn case and simultaneously saying that, well, they don't have to bother with that mechanism; they can jump to impeachment.

Impeachment under the Constitution is the thermonuclear weapon of inter-branch friction, and where there is something like a rifle or a bazooka at the House's disposal to address some friction with the executive branch, that is the next step. It is incrementalism in the Constitution—not jumping straight to impeachment—that is the solution.

If the House could jump straight to impeachment, that would alter the relationship between the branches. It would suggest that the House could make itself superior over the Executive to dangle the threat of impeachment over any demand for information made to the Executive.

That is contrary to the Framers' plan. Madison explained that where the executive and legislative branches come into conflict, in Federalist No. 49, ''[neither] of them, it is evident, can pretend to exclusive or superior right of settling the batteries between their respective powers.'' But that is exactly what the House managers have asserted in this case. They have said that the House becomes supreme. There is no need for them to go to court. The Executive must be wrong. Any resistance to their subpoena is obstruction. If you claim that our subpoena is invalid, we don't have to do anything to address that concern; we will just impeach you because resistance is obstruction of Congress.

The House put it this way in their report to the Judiciary Committee. They effectively said that the House is the judge of its own powers, because what they said was ''the Constitution gives the House the final word.'' That is on page 154 of the House Judiciary Committee report.

What that is essentially saying—they point to the fact that article I, section 2, gives the House ''the sole Power of Impeachment,'' and they claim because it has the sole power of impeachment, the courts have no role; the House is the final word; it is the judge of its own powers. But that is contrary to constitutional design. There is no power that is unchecked in the Constitution. The sole power of impeachment given to the House simply means that power is given solely to the House, not anywhere else.

The Constitution does not say that the power of impeachment is the paramount power that makes all other constitutional rights and privileges and prerogatives of the other branches fall away.

The Framers recognized that there could be partisan impeachments and there could be impeachments for the wrong reasons, and they did not strip the executive branch of any of its needs for protecting its own sphere of authority and its own prerogatives under the Constitution. Those principles of executive privilege and those immunities still survive, even in the context of impeachment.

The power of impeachment is not like the House can simply flip a switch and say now we are in impeachment, and they have constitutional kryptonite that makes the powers of the executive eliminated. So when there are these conflicts, even in the context of impeachment inquiry, the executive can continue to assert its privileges and prerogatives under the Constitution, and, indeed, it must in order to protect the institutional interests of the Office of the Presidency and to preserve the proper balance between the branches under the Constitution.

Professor Turley, rightly, pointed out that by claiming Congress can demand any testimony or documents and impeach any President who dares to go to the courts, House Democrats were advancing a position that was ''entirely untenable and abusive of impeachment.'' Other scholars agree.

In the Clinton impeachment, Professor Susan Low Bloch testified that ''impeaching a President for invoking lawful privileges is a dangerous and ominous precedent.'' It would achieve exactly the result that Gouverneur Morris, one of the Framers, warned against at the Constitutional Convention. He explained that ''when we make him [referring to the President] amenable to Justice however we should take care to provide some mode that will not make him dependent on the Legislature.''

That is exactly what this Article of Impeachment would do. It would make the President dependent on the legislation because any demand for information, be it by Congress, could be used as a threat of impeachment to enforce compliance by the executive. The very theory that the House Democrats have asserted is that there can be no assertions of privileges and no constitutionally based prerogatives of the Executive to stand in the way.

If that theory were true, virtually every President could have been impeached. Virtually every President has asserted, at one time or another, these constitutional prerogatives. President Obama famously, in the Fast and Furious investigation, refused to turn over documents that led to his Attorney General being held in contempt, but that didn't lead to impeachment. It could be a long list. Professor Turley testified there could be a very long list

of Presidents who would have to be distinguished if the principles being asserted now in this case were applied to all past Presidents in history.

Now, House Democrats have given a few different justifications for this approach, but I submit none can be reconciled with the Constitution. They say that if we cannot impeach the President for this obstruction, then the President is above the law. Not so. I think I pointed out that the President is staying within the law, asserting the law, and relying on the legal advice from the Department of Justice to make his arguments based on long-recognized constitutional principles, and, indeed, is making the fundamental point, with respect to the subpoenas, that it is Congress that is not above the law. It is the House. The House has to follow the law as well. It has to issue valid subpoenas. And if the law isn't followed, those subpoenas are null and void, and the Executive doesn't have to comply with them.

The House Democrats say that they shouldn't go to the courts because the courts have no role in impeachment. I think I pointed out that the House Democrats can't say that they have the—just because of the provision of the sole power of impeachment, that it is a paramount power, and that no other branch plays any role in providing a check on how the power is exercised. And in addition, the House Democrats have gone to court.

In the McGahn case that they are litigating right now, they have asserted that is part of the impeachment inquiry. The Trump administration has explained that it was not validly part of the impeachment inquiry, but that is the ground on which they are litigating under.

They say that they have no time for the courts. I think what that really means is they have no time for the rule of law in the way that they are pursuing the inquiry. The other day, one of the House managers actually said on the floor of the Senate that they had to get it moving. They couldn't wait for litigation. They had to impeach the President before the election. That is not a valid reason to not pursue litigation in the courts.

I think it is relevant to bear in mind what sort of delay are we talking about? In the McGahn case that the House managers referred to a number of times—which they have pointed out, they presented as being very long and drawn out—they issued a subpoena in April, but they did not file a lawsuit until August. By November—November 25—they had a decision from the district court, and it was argued on appeal in the DC Circuit on January 3. For litigation, that is pretty fast, and it can go faster.

In the Nixon case, during Watergate, the special prosecutor issued a subpoena on April 18, 1974. On May 20—so in less than a month—the district court denied a motion to quash the subpoena. On May 31, the Supreme

Court agreed to hear the case, granting cert before judgment in the Court of Appeals, and on July 24, the Supreme Court issued the decision. That is lightning fast.

So when there is urgency to the case, when there is a reason for it, there can be expedition in the courts, and a decision can be had in a timely manner.

In the one case that actually arose from these impeachment proceedings, it was the House that derailed the case. This was the case involving Deputy National Security Advisor Charlie Kupperman, because when he received a subpoena, he went to court and asked the court for a declaratory judgment explaining what his obligations were: Should he take the directive from the President that he was immune and not go or should he obey the subpoena? Now, in that case, he filed suit on October 25. The court, within a few days, set an expedited briefing schedule, but the House withdrew the subpoena on November 5, just 11 days later, in order to moot the case.

So I think litigation is a viable avenue, along with the accommodation process, as a first step. Then, if the House believes it can go to court and wants to litigate the jurisdiction and litigate the validity of its subpoenas, that is also available to them, but impeachment as the first step doesn't make any sense.

I should point out, in part, when the House managers say they didn't have time to litigate, they didn't have time to go to the courts, but they now come to this Chamber and say this Chamber should issue some more subpoenas, this Chamber should get some witnesses that we didn't bother to fight about, what do you think will happen then? That there will not be similar assertions of privilege and immunity? That there wouldn't be litigation about that?

Again, this goes back to the point that I made. If you put your imprimatur on a process that was broken and say, yes, that was a great way to run things, this was a great package to bring here, and we will clean up the mess and issue subpoenas and try to do all the work that wasn't done, then that becomes the new normal, and that doesn't make sense for this body.

A proper way to have things handled is to have the House—if it wants to bring an impeachment here ready for trial—do the investigation. The information it wants to get, if there is going to be resistance, that has to be resolved, and it has to be ready to proceed, not transfer the responsibility to this Chamber to do the work that hasn't been done.

They also assert that President Trump's assertion of these privileges is somehow different because it is unprecedented, and it is categorical. Well, it is unprecedented, perhaps, in the sense that there was a broad statement that a lot of subpoenas wouldn't be complied with, but that is because it was unprecedented for the House to begin

these proceedings without voting to authorize the committee to issue the subpoenas. That was the first unprecedented step. That is what had never happened before in history. So, of course, the response to that would be, in some sense, unprecedented. The President simply pointed out that without that vote, there were no valid subpoenas.

There have also been categorical refusals in the past. President Truman, when the House Committee on Un-American Activities, in 1948, issued subpoenas to his administration, issued a directive to the entire executive branch that any subpoena or demand or request for information, reports, or files in the nature described in those subpoenas shall be respectfully declined on the basis of this directive, and he referred also to inquiries of the Office of the President for such response as the President may determine to be in the public interest. The Truman administration responded to none of them.

A last point on the House Democrats' claim that privileges simply disappear because this is impeachment power of the House. They have referred a number of times to United States v. Nixon, the Supreme Court decision, suggesting that that somehow determines that when you are in an impeachment inquiry, executive privilege falls away. That is not true. In fact, United States v. Nixon was not even actually addressing a congressional subpoena. It was a subpoena from the special prosecutor, and even in that context, the Court did not state that executive privilege simply disappears. Instead, the Court said: "It is necessary to resolve these competing interests"—they are the interests of the judicial branch in administering a criminal prosecution in a case where the evidence was needed—"these competing interests in a manner that preserves the essential functions of each branch."

And it even held out the possibility that in the field of foreign relations and national security, there might be something approaching an absolute executive privilege. That is exactly the field we are in, in this case—foreign relations and national security matters.

Another thing you have heard is that President Clinton voluntarily cooperated with the investigation that led to his impeachment—produced tens of thousands of documents. That is not really accurate. That was only after long litigation again and again about assertions of privilege. He asserted numerous privileges. The House Judiciary Committee then explained "during the Lewinsky investigation, President Clinton abused his power through repeated privilege assertions of executive privilege by at least five of his aides."

Unlike the House in this case, Independent Counsel Starr first negotiated with the White House and then litigated those claims and got them resolved. Ultimately, the House managers argued that all of the problems

with their obstruction theory should be brushed aside and the President's assertions of immunities and defenses have to be treated as something nefarious because, as Mr. NADLER said: Only guilty people try to hide the evidence. That is what he said from last Tuesday night. And Mr. SCHIFF, similarly, in discussing the assertion of the executive branch's constitutional rights, said: "The innocent do not act this way."

Really? Is that the principle in the United States of America that if you assert legal privileges or rights, that means you are guilty? If the innocent don't assert their rights, that the President can't defend the constitutional prerogatives of his office?

That doesn't make any sense. At bottom, the second Article of Impeachment comes down to a dispute over a legal issue relating to constitutional limits on the ability of the House to compel information from the Executive. No matter how House Democrats try to dress up their charges, a difference of legal opinion does not rise to the level of impeachment.

Until now, the House has repeatedly rejected attempts to impeach the President based on legal disputes over assertions of privilege. As Judge Starr pointed out, in the Clinton proceedings, the House Judiciary Committee concluded that the President had improperly exercised executive privilege, yet still concluded that it did not have the ability to second-guess the rationale behind the President or what was in his mind asserting executive privilege, and it could not treat that as an impeachable offense. It rejected an Article of Impeachment based on Clinton's assertions of privilege.

And as the House Democrat's own witness, Professor Gerhardt, has explained, in 1843, President Tyler similarly was investigated for potential impeachment—his attempts to protect and assert what he regarded as the prerogatives of his office as he resisted demands for information from Congress. Professor Gerhardt explained Tyler's attempt to protect and assert what he regarded as the prerogatives of his office were the function of his constitutional and policy judgments, and they could not be used by Congress to impeach him. President Trump's resistance to congressional subpoenas was no less a function of his constitutional and policy judgment, and it provides no basis to impeach him.

I would like to close with a final thought. One of the greatest issues—and perhaps the greatest issue—for your consideration in this case is how the precedent set in this case will affect the future.

The Framers recognized that there would be partisan and illegitimate impeachments. In Federalist No. 65, Hamilton expressly warned about impeachments that reflected what he called "the persecution of an intemperate or designing majority in the House of

Representatives." That is exactly what this case presents.

Justice Story recognized that the Senate provides the proper tribunal for trying impeachments because it was believed by the Framers to have a greater sense of obligation to the future, to future generations, not to be swayed by the passions of the moment.

One of the essential questions here is, Will the Chamber adopt a standard for impeachment—a diluted standard—that fundamentally disrupts, damages, and alters the separation of powers in our constitutional structure of government? Because that is what both the first article—for reasons that Judge Starr and Professor Dershowitz have covered—and the second article, the obstruction charge, would do.

I will close with a quotation from one of the Republican Senators who crossed the aisle and voted against convicting President Andrew Johnson during his impeachment trial. It was Lyman Trumbull who I think explained the great principle that applies here. He said:

"Once [we] set the example of impeaching a President for what, when the excitement of the hour shall have subsided will be regarded as insufficient causes, no future President will be safe . . . and what then becomes of the checks and balances of the constitution, so carefully devised and so vital to its perpetuity? They are all gone.

Thank you, Mr. Chief Justice.

I will yield to Mr. Sekulow.

Mr. Counsel SEKULOW. Mr. Chief Justice, Members of the Senate, House managers, Mr. Philbin just concluded on the importance of executive privilege.

Professor Turley, who testified before the House, said we have three branches of government, not two. If you impeach a President, if you make a high crime and misdemeanor out of going to court, it is an abuse of power. It is your abuse of power.

With regard to executive privilege, it was Mr. NADLER who called it "executive privilege and other nonsense."

When Attorney General Holder refused to comply with subpoenas, President Obama invoked executive privilege, arguing "compelled disclosure would be inconsistent with the separation of powers established in the Constitution"—"executive privilege and other nonsense."

Manager SCHIFF wrote that the White House assertion of executive privilege was backed by decades of precedent that has been recognized and has recognized the need for the President and his senior advisers to receive candid advice and information from their top aides—"executive privilege and other nonsense."

We talked about this the other night. The nonsense is to treat the separation of powers and constitutional privileges as if they are asbestos in the ceiling tiles. You can't touch them. That is not the way the Constitution is designed.

We are going to now turn our attention to a separate topic. It is one that

has been discussed a lot on the floor here and will be discussed now.

Presenting for the President is the former attorney general for the State of Florida, Pam Bondi. She is also a career prosecutor. She has handled countless cases. She is going to discuss an issue that the House managers have put pretty much at the center of their case, and that is the issue of corruption in Ukraine, particularly with regard to a company known as Burisma.

Mr. Chief Justice, I yield my time to former Attorney General Pam Bondi.

Ms. Counsel BONDI. Mr. Chief Justice, Senators, Members of the Senate, when the House managers gave you their presentation, when they submitted their brief, they repeatedly referenced Hunter Biden and Burisma.

They spoke to you for over 21 hours, and they referenced Biden or Burisma over 400 times. And when they gave these presentations, they said there was nothing—nothing—to see. It was a sham. This is fiction.

In their trial memorandum, the House managers described this as baseless. Why did they say that? Why did they invoke Biden or Burisma over 400 times? The reason they needed to do that is because they are here saying that the President must be impeached and removed from office for raising a concern, and that is why we have to talk about this today.

They say sham. They say baseless. They say this because if it is OK for someone to say, ''hey, you know what, maybe there is something here worth raising,'' then, their case crumbles. They have to prove beyond a reasonable doubt that there is no basis to raise this concern, but that is not what public records show.

Here are just a few of the public sources that flagged questions surrounding this very same issue. The United Kingdom's Serious Fraud Office, Deputy Assistant Secretary of State George Kent, Hunter Biden's former business associate, ABC White House reporter, ABC's Good Morning America, the Washington Post, the New York Times, Ukrainian law enforcement, and the Obama State Department itself—they all raised this issue.

We would prefer not to be talking about this. We would prefer not to be discussing this. But the House managers have placed this squarely at issue. So we must address it.

Let's look at the facts. In early 2014, Joe Biden, our Vice President of the United States, led the U.S. foreign policy in Ukraine with the goal of rooting out corruption. According to an annual study published by Transparency International, during this time, Ukraine was one of the most corrupt countries in the entire world.

There is a natural gas company in Ukraine called Burisma. Burisma has been owned by an oligarch named Mykola Zlochevsky. Here is what happened very shortly after Vice President Biden was made U.S. point man for

Ukraine. His son Hunter Biden ends up on the board of Burisma, working for and paid by the oligarch Zlochevsky.

In February 2014, in the wake of anticorruption uprising by the people of Ukraine, Zlochevsky flees the country, flees Ukraine. Zlochevsky, the oligarch, is well-known.

George Kent, the very first witness that the Democrats called during their public hearings, testified that Zlochevsky stood out for his self-dealings, even among other oligarchs. House managers didn't tell you that.

Ambassador Kurt Volker explained that Burisma had ''a very bad reputation as a company for corruption and money laundering.'' House managers didn't tell you that.

Burisma was so corrupt that George Kent said he intervened to prevent USAID from cosponsoring an event with Burisma. Do you know what this event was? It was a child's contest, and the prize was a camera. They were so bad—Burisma—that our country wouldn't even cosponsor a children's event with Burisma.

In March 2014, the United Kingdom's Serious Fraud Office opened a money laundering investigation into the oligarch, Zlochevsky, and the company Burisma. The very next month, April 2014, according to a public report, Hunter Biden quietly joins the board of Burisma.

Remember, early 2014 was when Vice President Biden began leading Ukraine policy.

Here is how Hunter Biden came to join Burisma's board in 2014. He was brought on the board by Devon Archer, his business partner. Devon Archer was college roommates with Chris Heinz, the stepson of Secretary of State John Kerry. All three men—Hunter Biden, Devon Archer, and Chris Heinz—had all started an investment firm together.

Public records show that on April 16, 2014, Devon Archer meets with Vice President Biden at the White House. Just 2 days later, on April 18, 2014, Hunter Biden quietly joins Burisma. That is according to public reporting.

Remember, this is just 1 month after the United Kingdom's Serious Fraud Office opened a money laundering case into Burisma, and Hunter Biden joins their board.

And not only 10 days after Hunter Biden joins the board, British authorities seized $23 million in British bank accounts connected to the oligarch Zlochevsky, the owner of Burisma. Did Hunter Biden leave the board then? No.

The British authorities also announced that they had started a criminal investigation into potential money laundering. Did Hunter Biden leave the board? No.

What happened was, then—and only then—did the company chose to announce that Hunter Biden had joined the board after the assets of Burisma and its oligarch owner, Zlochevsky, were frozen and a criminal investigation had begun. Hunter Biden's decision to join Burisma raised flags almost immediately.

One article from May 2014 stated that, ''the appointment of Joe Biden's son to the board of the Ukrainian gas firm Burisma has raised eyebrows the world over.''

Even an outlet with bias for Democrats pointed out Hunter Biden's activities created a conflict of interest for Joe Biden. The article stated: ''The move raises questions about a potential conflict of interest for Joe Biden.''

Even Chris Heinz, Hunter Biden's own business partner, had grave concerns. He thought that working with Burisma was unacceptable. This is Chris Heinz. He was worried about the corruption, the geopolitical risk, and how bad it would look. So he wisely distances himself from Hunter Biden and Devon Archer's appointments to Burisma.

He didn't simply call his stepfather, the Secretary of State, and say: I have a problem with this. He didn't tell his friends: Hey, guys, I am not getting on the board. I want nothing to do with this.

He went so far as to send an email to senior State Department officials about this issue. This is Chris Heinz. He wrote:

Apparently, Devon and Hunter have joined the board of Burisma, and a press release went out today. I can't speak [to] why they decided to, but there is no investment by our firm in their company.

What did Hunter Biden do? He stayed on the board. What did Chris Heinz do? He subsequently stopped doing business with his college roommate Devon Archer and his friend Hunter Biden. Chris Heinz' spokesperson said the lack of judgment in this matter was a major catalyst for Mr. Heinz ending his business relationship with Mr. Archer and Mr. Biden.

Now, the media also noticed. The same day, an ABC News reporter asked Obama White House Press Secretary Jay Carney about it. Here is what happened.

(Text of Videotape presentation:)

Jon KARL. Hunter Biden has now taken a position with the largest oil and gas company—holding company in Ukraine. Is there any concern about at least the appearance of a conflict there—the Vice President's son—

Jay CARNEY. I would refer you to the Vice President's Office. I saw those reports. You know, Hunter Biden and other members of the Biden family are obviously private citizens, and where they work does not reflect an endorsement by the administration or by the Vice President or President. But I would refer you to the Vice President's Office.

Ms. Counsel BONDI. The next day, the Washington Post ran a story about it. It said: ''The appointment of the Vice President's son to a Ukrainian oil board looks nepotistic at best, nefarious at worst.'' Again, ''The appointment of the Vice President's son to a Ukrainian oil board looks nepotistic at best, nefarious at worst.''

And the media didn't stop asking questions here. It kept going. Here is ABC.

(Text of Videotape presentation:)

Vice President BIDEN. You have to fight the cancer of corruption.

LLAMAS. But then something strange happened. Just three weeks later a Ukrainian natural gas company, Burisma, accused of corruption appoints Hunter Biden, seen here in their promotional videos, to their board of directors, paying his firm more than a million dollars a year.

Ms. Counsel BONDI. Here is more from ABC, continued on.

(Text of Videotape presentation:)

LLAMAS. And Ukraine wasn't the only country where Hunter Biden's business and his father's diplomacy as Vice President intersected. It also happened in China. This video shows Chinese diplomats greeting Vice President Biden as he arrived in Beijing in December of 2013. Right by his side, his son Hunter. Less than 2 weeks later, Hunter's firm had new business, creating an investment fund in China involving the government-controlled Bank of China, with reports they hoped to raise $1.5 billion.

Ms. Counsel BONDI. In fact, every witness who was asked about Hunter Biden's involvement with Burisma agreed there was a potential appearance of a conflict of interest. Multiple House Democratic witnesses, including those from the Department of State, the National Security Council, and others, unanimously testified there was a potential appearance of a conflict of interest. These were their witnesses.

How much money did Hunter Biden get for being on the board? Well, if we start looking at these bank records, according to reports, between April 2014 and October 2015, Burisma paid more than $3.1 million to Devon Archer and Hunter Biden. That is over the course of a year and a half. How do we know this? Some of Devon Archer's bank records were disclosed during an unrelated Federal criminal case having nothing to do with Hunter Biden. These bank records show 17 months that Burisma wired two payments of $83,333—not just for 1 month, for 2 months, for 3 months, but for 17 months. According to Reuters, sources report that of the two payments of $83,333 each, one was for Hunter Biden and one, Devon Archer.

Hunter Biden was paid significantly more than board members for major U.S. Fortune 100 companies such as Goldman Sachs, Comcast, and Citigroup. The typical board member of these Fortune 100 companies, we know, are the titans of their industry. They are highly qualified, and as such, they are well compensated. Even so, Hunter Biden was paid significantly more. This is how well he was compensated: Hunter Biden was paid over $83,000 a month, while the average American family of four, during that time, each year made less than $54,000. That is according to the U.S. Census Bureau during that time.

This is what has been reported about his work on the board. The Washington Post said: "What specific duties Hunter Biden carried out for Burisma are not fully known." The New Yorker reported: "Once or twice a year, he attended Burisma board meetings and energy forums that took place in Europe."

When speaking with ABC News about his qualifications to be on Burisma's board, Hunter Biden didn't point to any of the usual qualifications of a board member. Hunter Biden had no experience in natural gas, no experience in the energy sector, and no experience with Ukrainian regulatory affairs. As far as we know, he doesn't speak Ukrainian. So naturally the media has asked questions about his board membership. Why was Hunter Biden on this board?

(Text of Videotape presentation:)

Amy ROBACH. If your last name wasn't Biden, do you think you would've been asked to be on the board of Burisma?

Mr. Hunter BIDEN. I don't know. I don't know. Probably not.

Ms. Counsel BONDI. So let's go back and talk about his time on the board.

Remember, he joined Burisma's board in April 2014, while the United Kingdom had an open money laundering case against Burisma and its owner, the oligarch Zlochevsky. On August 20, 2014, 4 months later, the Ukrainian prosecutor general's office initiates a money laundering investigation into the same oligarch, Zlochevsky. This is one of 15 investigations into Burisma and Zlochevsky, according to a recent public statement made by the current prosecutor general.

On January 16, 2015, prosecutors put Zlochevsky, the owner of Burisma, on whose board Hunter Biden sat, on the country's wanted list for fraud—while Hunter Biden is on the board.

Then a British court orders that Zlochevsky's $23 million in assets be unfrozen. Why was the money unfrozen? Deputy Assistant Secretary Kent testified to it.

(Text of Videotape presentation:)

KENT. Somebody in the General Prosecutor's Office of Ukraine shut the case, issued a letter to his lawyer, and that money went poof.

CASTOR. So essentially paid a bribe to make the case go away.

KENT. That is our strong assumption, yes, sir.

Ms. Counsel BONDI. He also testified that the Ukrainian prosecutor general's office actions led to the unfreezing of the assets.

After George Kent's confirmation, that prosecutor was out. Viktor Shokin becomes prosecutor general. This is the prosecutor you will hear about later, the one Vice President Biden has publicly said he wanted out of office.

In addition to flagging questions about previous prosecutors' actions, George Kent also specifically voiced other concerns—this time to the Vice President's Office—about Hunter Biden. In February 2015, he raised concerns about Hunter Biden to Vice President Biden's Office.

(Text of Videotape presentation:)

KENT. In a briefing call with the National Security staff in the Office of the Vice President in February 2015, I raised my concern that Hunter Biden's status as a board member could create the perception of a conflict of interest.

Ms. Counsel BONDI. But House managers didn't tell you that.

This is all while Hunter Biden sat on Burisma's board. Did Hunter Biden stop working for Burisma? No. Did Vice President Biden stop leading the Obama administration's foreign policy efforts in Ukraine? No. In the meantime, Vice President Biden is still at the forefront of the U.S.-Ukraine policy. He pledges a billion-dollar loan guarantee to Ukraine contingent on its progress in rooting out corruption.

Around the same time as the $1 billion announcement, other people raised the issue of a conflict. As the Obama administration special envoy for energy policy told the New Yorker, he raised Hunter Biden's participation on the board of Burisma directly with the Vice President himself. This is a special envoy to President Obama.

The media had questions too. On December 8, 2015, the New York Times publishes an article that Prosecutor General Shokin was investigating Burisma and its owner, Zlochevsky. Here is their quote: "The credibility of the vice president's anticorruption message may have been undermined by the association of his son, Hunter Biden," with Burisma and its owner, Zlochevsky.

And it wasn't just one reporter who asked questions about the line between Burisma and the Obama administration. As we learned recently through reporting on FOX News, on January 19, 2016, there was a meeting between Obama administration officials and Ukrainian prosecutors.

Ken Vogel, journalist for the New York Times, asked the State Department about this meeting. He wanted more information about the meeting "where U.S. support for prosecutions of Burisma Holdings in the United Kingdom and Ukraine were discussed." But the story never ran.

Around the time of the reported story—January 2016—a meeting between the Obama administration and Ukrainian officials took place, and a Ukrainian press report, as translated, says: The U.S. Department of State made it clear to the Ukrainian authorities that it was linking the $1 billion in loan guarantees to the dismissal of Prosecutor General Viktor Shokin.

Now, we all know the Obama administration, from the words of Vice President Biden himself—he advocated for the prosecutor general's dismissal.

There was ongoing investigation into the oligarch Zlochevsky, the owner of Burisma, at the time. We know this because on February 2, 2016, the Ukrainian prosecutor general obtained a renewal of a court order to seize the Ukrainian oligarch's assets. A Kyiv Post article published on February 4, 2015, says the oligarch Zlochevsky is "suspected of committing a criminal offense of illicit enrichment."

Over the next few weeks, the Vice President had multiple calls with Ukraine's President Poroshenko.

Days after the last call, on February 24, 2016, a DC consultant reached out to

the State Department to request a meeting to discuss Burisma. We know what she said because the email was released under the Freedom of Information Act. The consultant explicitly invoked Hunter Biden's name as a board member.

In an email summarizing the call, the State Department official says that the consultant noted that two high-profile citizens are affiliated with the company, including Hunter Biden as a board member. She added that the consultant would like to talk with Under Secretary of State Novelli about getting a better understanding of how the United States came to the determination that the country is corrupt.

To be clear, this email documents that the U.S. Government had determined Burisma to be corrupt, and the consultant was seeking a meeting with an extremely senior State Department official to discuss the U.S. Government's position. Her pitch for the meeting specifically used Hunter Biden's name, and according to the email, the meeting was set for a few days later.

Later that month, on March 29, 2016, the Ukrainian Parliament finally votes to fire the prosecutor general. This is the prosecutor general investigating the oligarch, owner of Burisma, on whose board Hunter Biden sat.

Two days after the prosecutor general is voted out, Vice President Biden announces that the United States will provide $335 million in security assistance to Ukraine. He soon announces that the United States will provide $1 billion in loan guarantees to Ukraine.

Let's talk about one of the Democrats' central witnesses: Ambassador Yovanovich. In May 2016, Ambassador Yovanovitch was nominated to be Ambassador to Ukraine. Here is what happened when she was preparing for her Senate confirmation hearing.

(Text of Videotape presentation:)

Representative RATCLIFFE. Congresswoman Stefanik had asked you how the Obama-Biden State Department had prepared you to answer questions about Burisma and Hunter Biden specifically. Do you recall that?

Ambassador YOVANOVITCH. Yes.

Representative RATCLIFFE. Out of thousands of companies in the Ukraine, the only one that you recall the Obama-Biden State Department preparing you to answer questions about was the one where the Vice President's son was on the board, is that fair?

Ambassador YOVANOVITCH. Yes.

Ms. Counsel BONDI. So she is being prepared to come before all of you—all of you—and talk about world issues, going to be in charge of the Ukraine, and what did they feel the only company—the company—that it was important to brief her on in case she got a question? Burisma.

Ambassador Yovanovich was confirmed July 2016 as the Obama administration was coming to a close. In September 2016, a Ukrainian court cancels the oligarch Zlochevsky's arrest warrant for lack of progress in the case.

In mid-January 2017, Burisma announces that all legal proceedings against it and Zlochevsky have been closed. Both of these things happened while Hunter Biden sat on the board of Burisma. Around this time, Vice President Biden leaves office.

Years later now, former Vice President Biden publicly details what we know happened: his threat to withhold more than $1 billion in loan guarantees unless Shokin was fired.

Here is the Vice President.

(Text of Videotape presentation:)

Vice President BIDEN. I said I'm not—we are not going to give you the billion dollars. They said: You have no authority. You're not the President. The President said—I said: Call him. I said: I'm telling you, you are not getting the billion dollars. I said: You are not getting the billion. I'm going to be leaving here in, I think it was about 6 hours. I looked at them and said: I'm leaving in six hours. If the prosecutor is not fired, you're not getting the money. Well, son of a bitch. (Laughter.) He got fired. And they put in place someone who was solid at the time.

Ms. Counsel BONDI. What he didn't say on the video—according to the New York Times, this was the prosecutor investigating Burisma, Shokin.

What he also didn't say on the video was that his son was being paid significant amounts by the oligarch owner of Burisma to sit on that board.

Only then does Hunter Biden leave the board. He stays on the board until April 2019. In November 2019, Hunter Biden signs an affidavit saying he "has been unemployed" and has no other "monthly income since May 2019."

This was in November of 2019, so we know, from after April 2019 to May 2019 through November 2019, he was unemployed, by his own statement—April 2019 to November 2019.

Despite his resignation from the board, the media continued to raise the issue relating to a potential conflict of interest.

On July 22, 2019, the Washington Post wrote that fired Prosecutor General Shokin "believes his ouster was because of his interest in the company," referring to Burisma. The Post further wrote that "had he remained in his post, he would have questioned Hunter Biden.

On July 25, 2019, 3 days later, President Trump speaks with President Zelensky. He said:

The other thing. There's a lot of talk about Biden's son, that Biden stopped the prosecution and a lot of people want to find out about that so whatever you can do with the Attorney General would be great. Biden went around bragging that he stopped the prosecution so if you can look into it . . . It looks horrible to me.

The House managers talked about the Bidens and Burisma 400 times, but they never gave you the full picture. But here are those who did: The United Kingdom's Serious Fraud Unit; Deputy Assistant Secretary of State George Kent; Chris Heinz, the ABC White House reporter; ABC "Good Morning America''; the Washington Post; the New York Times; Ukrainian law en-

forcement; and the Obama State Department itself. They all thought there was cause to raise the issue about the Bidens and Burisma.

The House managers might say, without evidence, that everything we just have said has been debunked, that the evidence points entirely and unequivocally in the other direction. That is a distraction.

You have heard from the House managers. They do not believe that there was any concern to raise here, that all of this was baseless. And all we are saying is that there was a basis to talk about this, to raise this issue, and that is enough.

I yield my time.

The CHIEF JUSTICE. Mr. Sekulow.

Mr. Counsel SEKULOW. Mr. Chief Justice, Majority Leader McCONNELL, Democratic Leader SCHUMER, House managers, Members of the Senate, this will be our last presentation before dinner.

The next lawyer representing the President is Eric Herschmann. He is a partner in the Kasowitz firm, the law firm which has been representing the President for over two decades. He is a former prosecutor and trial lawyer, and he ran a natural gas company in the United States.

He is going to discuss additional evidence the House managers ignored or misstated and how other Presidents might have measured up under this new impeachment standard.

Mr. Counsel HERSCHMANN. Mr. Chief Justice, Members of the Senate, I am Eric Herschmann. I have the honor and privilege of representing the President of the United States in these proceedings. I have been carefully listening to and reviewing the House managers' case. That case pretty much boils down to one straightforward contention—that the President abused his power to promote his own personal interests and not our country's interests.

The House managers say that the President did not take the steps that they allege for the benefit of our country but only for his own personal benefit. If that is wrong, if what the President had wanted would have benefited our country, then the managers have not met their burden, and these Articles of Impeachment must be rejected. As we will see, the House managers do not come close to meeting the burden.

Last week, Manager SCHIFF said that the investigations President Trump supposedly asked President Zelensky about on the July 25 call could not have been in the country's interest because he said they were "discredited entirely." The House managers say that the investigations had been debunked; they were sham investigations. Now we have the question: Were they really?

The House managers in the over 21 hours of the repetitive presentation never found the time to support those conclusory statements. Was it, in fact, true that any investigation had been debunked? The House managers do not

identify for you who supposedly conducted any investigations, who supposedly did the debunking, who discredited it. Where and when were any such investigations conducted? When were the results published? And much more is left unanswered.

Attorney General Bondi went through for you some of what we know about Burisma in its millions of dollars in payments to Vice President Biden's son and his son's business partner.

There is no question that any rational person would like to understand what happened. I am going to go through some additional evidence, which was easily available to the House managers but which they never sought or considered.

Based on what Attorney General Bondi told you in this additional evidence, you can judge for yourself whether the conduct was suspect. As you know, one of the issues concerned Hunter Biden's involvement with the Ukrainian natural gas company, which paid him millions of dollars while his father was Vice President and was in charge of the Ukrainian portfolio during the prior administration. I will get to those supposedly discredited allegations identified by the House managers in a few minutes.

The other issue was what Manager SCHIFF called "the baseless conspiracy theory that Ukraine, not Russia, interfered in the 2016 election."

Manager SCHIFF said that President Trump wanted to "erase from history his previous political misconduct." But there was no previous political misconduct. If any theory has actually been discredited, it is the theory that President Trump colluded with Russia in 2016. It was that theory that was discredited, and discredited entirely, by Mr. Mueller's massive investigation— the same investigation the Democrats demanded since President Trump took office; the same investigation they knew, they were absolutely sure, would expose such collusion; the same investigation, which, after 22 months of exhaustive work at a cost to the taxpayers of $32 million, found no conspiracy and no evidence of Russian collusion with the Trump campaign.

As we will see, the Democrats are as wrong now about the Articles of Impeachment as they were in 2016 about the Russian collusion.

As to the other incident President Trump mentioned—the one concerning the Ukrainian gas company Burisma— I actually think this is something that is undisputed, that Ukraine had a particularly bad corruption problem. It was so corrupt that dealing with corruption and solving the corruption was a priority to our U.S. foreign policy. Here is how one knowledgeable observer of Ukraine put it in 2015:

It's not enough to set up a new anti-corruption bureau and establish a special prosecutor fighting corruption. The Office of the General Prosecutor desperately needs reform. The judiciary should be overhauled. The energy sector needs to be competitive,

ruled by market principles—not sweetheart deals. It's not enough to push through laws to increase transparency with regard to official sources of income. Senior elected officials have to remove all conflicts between their business interests and their government responsibilities.

As Attorney General Bondi said, here are the facts we do know about Hunter Biden's involvement with Ukraine. Burisma, a Ukrainian natural gas company, paid Hunter Biden millions of dollars to serve on its board of directors. He did not have any relevant experience or experience. He had no expertise or experience in the natural gas industry. He had no known expertise in corporate governance nor any expertise in Ukrainian law. He doesn't, so far as we know, speak Ukrainian. So why— why—did Burisma want Hunter Biden on its board? Why did they want to pay him millions of dollars? Well, he did have one qualification. He was the son of the Vice President of the United States. He was the son of the man in charge of the Ukrainian portfolio for the prior administration. And we are to believe there is nothing to see here, that for anyone to investigate or inquire about this would be a sham— nothing to see here.

But tellingly, Hunter Biden's attorney, on October 13, 2019, issued a statement on his behalf. He indicated that in April 2014, Hunter was asked to join the board of Burisma, then states Hunter stepped off Burisma's board in April 2019.

Now listen to the commitment that Hunter Biden is supposedly willing to make to all of us. Hunter makes the following commitment: Under a Biden administration, Hunter will readily comply with any and all guidelines or standards a President Biden may issue to address purported conflicts of interest or the appearance of such conflicts, including any restrictions related to overseas business interests.

That statement almost tells us all we need to know. That is the rule that should have been in place in 2014 because there already was an Obama-Biden administration. What changed? What changed?

Remember a couple of minutes ago when I quoted an expert on Ukraine, the one who said that Ukraine must clean up its energy sector, the one who said that Ukraine's senior elected officials have to remove all conflicts between their business interests and their government responsibilities? You know who said that about Ukraine? Vice President Joe Biden in December of 2015.

Vice President Biden went to Ukraine approximately 12 to 13 times. He spoke with legislators, business people, and officials. He was purportedly fighting corruption in Ukraine. He was urging Ukraine to investigate and uproot corruption.

One thing he apparently did not do, however, was to tell his son not to trade on his family connections. He did not tell his son to especially stay away from the energy sector in the very cor-

ruption-ridden country Vice President Biden was responsible for.

And Manager SCHIFF says: Move along; there is nothing to see here. What are the House managers afraid of finding out? In an interview with ABC in October of last year, Hunter Biden said he was on the board of Burisma to focus on principles of corporate governance and transparency.

(Text of Videotape presentation:)

Mr. HUNTER BIDEN. Bottom line is that I know I was completely qualified to be on the board, to head up the corporate governance and transparency committee on the board. And that's all that I focused on.

Mr. Counsel HERSCHMANN. But when asked how much money Burisma was paying him, he responded he doesn't want to "open his kimono" and disclose how much. He does refer to public reports about how much he was being paid, but as we now know, he was being paid far more than what was in the public record.

(Text of Videotape presentation:)

Ms. ROBACH. You were paid $50,000 a month for your position?

Mr. HUNTER BIDEN. Look, I'm a private citizen. One thing that I don't have to do is sit here and open my kimono as it relates to how much money I make or made or did or didn't. But it's all been reported.

Mr. Counsel HERSCHMANN. So what was the real reason that Hunter Biden, the Vice President's son, was being paid by Burisma? Was it based on his knowledge and understanding of the natural gas industry in Ukraine? Was he going to discuss how our government regulates the energy industry here? Was he going to discuss how we set gas rates? Was he going to discuss pipeline development construction or environmental impact statements? Did he know anything about the natural gas industry at all? Of course not.

So what was the reason? I think you do not need to look any further than the explanation that Hunter Biden gave during the ABC interview when he was asked why.

Here is what he had to say.

(Text of Videotape presentation:)

Ms. ROBACH. If your last name wasn't Biden, do you think you would have been asked to be on the board of Burisma?

Mr. HUNTER BIDEN. I don't know. Probably no. I don't think there are a lot of things that would have happened in my life if my last name wasn't Biden.

Mr. Counsel HERSCHMANN. And as if to confirm how suspect this conduct was that it should be a concern to our country, Hunter Biden and his lawyer could not even keep their story straight. Compare the press release that was issued by Burisma on May 12, 2014, with Hunter Biden's lawyer's statement on October 13 of 2019. The May 2014 press release begins: "R. [Robert] Hunter Biden will be in charge of holding's legal unit." He was going to be in charge of a Ukrainian gas company owned by an oligarch's legal unit. However, in his lawyer's statement in October of 2019, after his involvement with Burisma came under renewed public scrutiny, he now claims: "At no

time was Hunter in charge of the company's legal affairs.''

Which is it? What was Hunter Biden doing at Burisma in exchange for millions of dollars? Who knows? What were they looking to hide so much for his corporate governance and transparency?

But let's take a step back and realize what actually transpired, because the House managers would have us believe this had nothing at all to do with our government, nothing at all to do with our country's interests, nothing at all to do with our Vice President, nothing at all to do with the State Department. It was simply private citizen Hunter Biden doing his own private business. It was purely coincidental that it was in his father's portfolio in Ukraine, in the exact sector—the energy sector—that his father said was corrupt.

But we have a document here—again, something that House managers did not show you or even put before the House before voting on these baseless Articles of Impeachment. If you look at that email, it is an email from Chris Heinz. And as Attorney Bondi already told you, he is the stepson of the then-Secretary of State John Kerry, and he was the other business partner with Hunter Biden and Devon Archer. Our Secretary of State's stepson and our Vice President's son are in business together.

It was sent on May 13, 2014, to the official government email addresses of two senior people at the State Department. These two people are the Chief of Staff to the Secretary of State and the Special Adviser to the Secretary of State. The subject line in the email is not ''corporate transparency.'' It is not ''corporate governance.'' It is not ''here's a heads-up.'' The subject line is ''Ukraine.''

Chris Heinz certainly understood the sensitivity to our U.S. foreign policy. What does the Secretary of State's stepson say about Hunter Biden and Devon Archer? He says this:

Apparently Devon and Hunter both joined the board of Burisma and a press release went out today. I can't speak to why they decided to, but there was no investment by our firm in their company.

What is the most telling thing about this? It is clear that the Chief of Staff and the Special Assistant to the Secretary already knew who Devon was because Mr. Heinz did not include his last name. It is just ''Devon.'' They obviously knew who Hunter was because, again, it is Hunter Biden. This is Chris Heinz saying: ''I can't speak to why they decided to join the board of Burisma.'' He is their business partner—not that there were good corporate reasons that they are going there for corporate governance, not that they are there to enhance corporate transparency, not that they are there to further U.S. policy, not that they are there to help fight corruption in Ukraine, not that they are there to ensure boards of directors' compensation and benefits are publicly dis-

closed—nothing like that. He cannot say those things because he knows Devon and Hunter well and he knows they have no particular qualifications, whatsoever, to do those things, especially for a Ukrainian gas company.

Instead, Mr. Heinz is planning to go on the record to report what Hunter and Devon were doing through official channels to take pains to disassociate himself from what they were doing. And what did the State Department do with this information that the Secretary of State's stepson thought they needed to know? Apparently, nothing. They did not tell Mr. Heinz to stay away. They did not tell Mr. Heinz there is no problem—nothing. But all this, the House managers want us to believe, does not even merit any inquiry. Anyone asking for one, anyone discussing one is now corrupt.

Does it matter in an inquiry why a corrupt company in a corrupt country would be paying our Vice President son's a million dollars per year, plus, it appears, some additional expenses, and paying his business partner an additional million dollars per year? Secretary of State Kerry's stepson thought it was important enough to report. Why aren't the House managers concerned?

And I ask you, why would it not merit an investigation? You know something else about Vice President Biden? Well, back in January of 2018, as you heard, former Vice President Biden bragged that he had pressured the Ukrainians—threatened them, indeed, coerced them—into firing the state prosecutor who reportedly was investigating the very company that paid millions of dollars to his son. He bragged that he gave them 6 hours to fire the prosecutor or he would cut off $1 billion in U.S. loan guarantees.

(Text of Videotape presentation:)

Vice President BIDEN. I said: We're not going to give you the billion dollars.

They said: You have no authority. You're not the President. The President said—

I said: Call him. I said: I'm telling you, you're not getting the billion dollars. I said: You're not getting the billion. I'm going to be leaving here in—I think it was, what—6 hours. I looked at him and said: I'm leaving in 6 hours. If the prosecutor is not fired, you're not getting the money.

Well, son of a bitch, he got fired, and they put in place someone who was solid at the time.

Mr. Counsel HERSCHMANN. Are we really to believe it was the policy of our government to withhold $1 billion of guarantees to Ukraine unless they fired a prosecutor on the spot? Was that really our policy? We have all heard continuously from the managers and many agree about the risks to the Ukrainians posed by the Russians. We have heard the managers say that a slight delay in providing funding to Ukraine endangers our national security and jeopardizes our interests and, therefore, the President must immediately be removed from office. Yet, they also argue that it was the official policy of our country to withhold $1

billion unless one individual was fired within a certain matter of hours. Was that really or could it ever be our United States policy?

According to the House managers' theory, we were willing to jeopardize Ukrainians unless somebody who happened to be investigating Burisma was promptly fired. Are we going to jeopardize a Ukrainian economy because a prosecutor was not fired in the 6-hour time period Vice President Biden demanded? Does anyone really believe that was or ever could be our U.S. foreign policy? And, just in case, the managers or others tried to argue: No, no, no, he wasn't serious about that; he was just bluffing. What kind of message would that send to the Russians about our support for the Ukrainians that we would bluff and bluff with the Ukrainian economy?

From 2014 to 2017, Vice President Biden claimed to be on a crusade against corruption in Ukraine. He repeatedly spoke about how the cancer of corruption was endemic in Ukraine, hobbled Ukraine, how Ukraine faced no more consequential mission than confronting corruption, and he encouraged Ukraine to close the space for corrupt middlemen who rip off the Ukrainian people. The Vice President railed against monopolistic behavior where a select few profit from so many sweetheart deals that has characterized that country for so long.

On his last official visit to Ukraine, 4 days before he left office, he spoke out against corruption and oligarchy, that eats away like a cancer, and against corruption, which continues to eat away at Ukraine's democracy within. Why was Vice President doing this? Was he so concerned about corruption in Ukraine—even singling out that country's energy sector—because corruption in Ukraine is a critical policy concern for our country?

But during this whole time, what else was happening? His son and his son's business partner were raking in over $1 million a year from what was regarded as one of the most corrupt Ukrainian companies in the energy sector, owned and controlled by one of the most corrupt oligarchs. Were Vice President Biden's words and advice to Ukraine just hollow? According to the House managers, the answer apparently is yes, they were empty words, at least when it came to anyone questioning his son's own sweetheart deal, his own son's deal with Ukraine's corruption and oligarchy.

Again, to raise Manager SCHIFF's own question: What kind of message did this send to future U.S. Government officials? Your family can accept money from foreign corrupt companies? No problem. You can pay family members of our highest government officials, and no one is allowed to even ask questions.

What was going on? We have to just accept now the House managers' conclusory statements, like ''sham,'' ''discrediting,'' even though no one has

ever investigated why. And can you imagine what House Manager SCHIFF and his fellow Democratic Representatives would say if it were President Trump's children on an oligarch's payroll?

And when it finally appeared that a true Ukrainian corruption fighter had assumed the country's Presidency, President Trump was not supposed to—he was not permitted to—- follow up on Vice President Biden's own words about fighting corruption and try to make those words something other than empty?

According to the House managers, Ukrainian corruption is now only a private interest. It no longer is a serious important concern for our country.

Now I want to take a moment to cover a few additional points about the July 25 telephone call in which the House managers believe that the President of the United States, in their words, was shaking down and pressuring the President of Ukraine to do his personal bidding.

First of all, this was not the first telephone call that the President of the United States had with other foreign leaders. Think about this for a moment. The call was routed through the Situation Room. It was a scheduled call. There were other people on the call. There were other people taking notes. Obviously, the President was aware of that fact.

The House managers talked about the fact that the President did not follow the approved talking points as if the President—any President—is obligated to follow approved talking points. The last time I checked—and I think this is clear to the American people—President Trump knows how to speak his mind.

Do you remember the fake transcript that Manager SCHIFF read when he was before the Intelligence Committee—his mob, gangster-like, fake rendition of the call? Well, I prosecuted organized crime for years. The type of description of what goes on—what House Manager SCHIFF tried to create for the American people—is completely detached from reality. It is as if we were supposed to believe that mobsters would invite people they do not know into an organized crime meeting to sit around and take notes to establish their corrupt intent.

Manager SCHIFF, our jobs as prosecutors—and I know you were one—would have been a lot easier if that were how it worked.

Think about what he is saying. Think about the managers' position: that our President decided with corrupt intent to shake down, in their words, another foreign leader, and he decided to do it in front of everyone, in a documented conversation, in the presence of people he did not even know, just so he could get this personal benefit that was not in our country's interest. This logic is flawed—it is completely illogical—because that is not what happened, and that is why Manager SCHIFF ran away from the ac-

tual transcript. That is why he created his own, fake conversation.

I would like to just address another point, for the transcript, of the July 25 phone call.

The House managers alleged that an Oval Office meeting with the President was critical to the newly elected Ukrainian President because it would signal to Russia, which had invaded Ukraine in 2014 and still occupied Ukrainian territory, that Ukraine could count on American support. They actually argued that it was a quid pro quo, that the President withheld this critical Oval Office meeting that would deter the Russians and save the Ukrainians because he wanted something personal.

Now, if that were, in fact, critical to President Zelensky for the safety of his own citizens, he would have immediately jumped at the opportunity to come to the Oval Office, especially when President Trump offered him that invitation during the July 25 call. Let's see what President Zelensky actually said when he was invited to Washington on that call.

He does not say: Oh, this is what I would like to do. It is critical for my people. We will arrange it in a meeting.

His response is:

I would be very happy to come and would be happy to meet you personally and get to know you better . . . On the other hand, I believe that, on September 1, we will be in Poland, and we could meet in Poland, hopefully.

If an Oval Office meeting were critical to President Zelensky, that was the time to say so, not to suggest another venue.

When we look at the evidence that is before us, it is clear that the only people who talked about having an Oval Office meeting were lower level government employees who thought it was a good idea. But for the principals involved, those who actually make the decisions—President Zelensky, President Trump—to them, it was not critical, it was not material, and it was definitely never a quid pro quo. What was important to President Zelensky was not an Oval Office meeting but the lethal weapons that President Trump supplied to Ukraine and the sanctions that President Trump enforced against the Russians. That is what the transcript of the July 25 call demonstrates.

Let us now consider what President Zelensky knew about the support that President Trump had provided to Ukraine compared to the support—or more accurately, the lack thereof—that the prior administration had provided to Ukraine.

In February 2004, Russia began its military campaign against Ukraine. Against the advice and urgings of Congress and of many in his own administration, President Obama refused then and throughout the remainder of his Presidency to provide lethal assistance to Ukraine.

In the House, Manager SCHIFF joined many of his colleagues in a letter-writ-

ing campaign to President Obama, urging "the U.S. must supply Ukraine with the means to defend itself" against Russian aggression, urging President Obama to quickly approve additional efforts to support Ukraine's efforts to defend the sovereign territory, including the transfer of lethal defense weapons to the Ukraine military.

On March 23, the House of Representatives overwhelmingly passed a resolution urging President Obama to immediately exercise the authority by Congress to provide Ukraine with a lethal defensive weapons system.

The very next day, this Senate passed a unanimous resolution urging the President to prioritize and expedite the provision of defensive lethal and nonlethal military assistance to Ukraine, consistent with U.S. national interests and policies.

As one Senator here stated in March 2015, "Providing nonlethal equipment like night vision goggles is all well and good, but giving the Ukrainians the ability to see the Russians coming but not the ability to stop them is not the answer."

Yet President Obama refused. He refused even in the face of support by senior career professionals recommending he provide lethal weapons to the Ukrainians.

By contrast, what did President Zelensky and the Russians know? They knew that President Trump did—did—provide that support. That, clearly, was the most material thing to him, much more important than a meeting in the Oval Office.

The House managers also made much of the contention that President Trump supposedly wanted President Zelensky only to announce an investigation, not conduct it, but that contention makes no sense. President Trump's call with President Zelensky was in July of 2019—almost a year and a half before our next election. Would only a bare announcement so far in advance, with no followup, really have had any effect on the election, as the managers claim? Would anyone have remembered the announcement a year or more later?

Ironically, it is the House managers who have put Burisma and its connection to the Bidens front and center in this proceeding, and now the voters will know about it and probably will remember it. Be careful what you wish for.

Manager SCHIFF—well, there he goes again. He is putting words in the President's mouth that were never there. Again, look at the transcript of the July call. President Trump never asked about any announcement of any type of investigation, and President Zelensky told President Trump:

I guarantee, as the President of Ukraine, that all the investigations will be done openly and candidly. That I can assure you.

What happened next?
The House managers say President Zelensky did not want to get mixed up

in U.S. politics, but it is precisely the Democrats who politicized the issue.

Last August, they began circling the wagons in trying to protect Vice President Biden, and they are still doing it in these proceedings. They contend that any investigation into the millions of dollars of payments by a corrupt Ukraine company—owned by a corrupt Ukraine oligarch—to the son of the second highest officeholder in our land, who was supposed to be in charge of fighting corruption in Ukraine, to be a sham, debunked. But there has never been an investigation, so how could it be a sham—simply because the House managers say so?

Which brings me to yet another one of the House managers' baseless contentions—that President Trump raised the matter with President Zelensky because Vice President Biden had just announced his candidacy for President. But, of course, it was far from a secret that Vice President Biden was planning to run.

What had, in fact, changed?

First, President Zelensky had been elected in April on an anti-corruption platform. In July, running on the same platform, his party took control of the Ukrainian Parliament. That made it the opportune time to raise the issue because finally there was a receptive government in Ukraine that was committed to fighting precisely the kind of highly questionable conduct displayed by Burisma in its payments to Hunter Biden and his partner, just as Joe Biden had raised years before.

There are two other things.

In late June, ABC News ran a story entitled "Hunter Biden's foreign deals. Did Joe Biden's son profit off of his father's position as Vice President?"

Then, just a couple of weeks before President Trump's telephone call with President Zelensky, the New Yorker magazine—not exactly a supporter of President Trump's—ran an expose—"Will Hunter Biden Jeopardize His Father's Campaign?"—and went through some of the facts that we do know about Hunter Biden's involvement with Burisma and his involvement with the Chinese company.

The New Yorker reporter—again, this was in July, just a couple of weeks before the phone call—said that some of Vice President Biden's advisers were worried that Hunter would expose the Vice President to criticism.

A former senior White House aide told the New Yorker reporter that Hunter's behavior invited questions about whether he was "leveraging access for his benefit." The reporter wrote: "When I asked members of Biden's staff whether they did raise their concern with the Vice President, several of them said they had been too intimidated to do so."

"Everyone who works for him has been screamed at," a former adviser told the reporter. "I don't know whether anyone has been intimidated by Vice President Biden or has been screamed at by him about Burisma or his son's involvement."

Do we want the type of government where questions about facially suspect conduct are suppressed or dismissed as illegitimate because someone is intimidating or screams or is just too important? No. That is precisely when an investigation is most important.

Last Thursday night, Manager JEFFRIES provided us with the Democrats' standard for abuse of power.

He said: "Abuse of power occurs when the President exercises his official power to obtain a corrupt personal benefit while ignoring or injuring the national interest."

Mr. JEFFRIES and the House managers contend that, under this standard, President Trump has committed an impeachable offense and must be immediately removed from office. But if Manager JEFFRIES' standard applies, then where were these same Democrats' calls for impeachment when uncontroverted, smoking-gun evidence emerged that President Obama had violated their standard?

The American people understand this basic notion as equal justice under the law. It is as American as apple pie. Yet the House managers want to apply their own version of selective justice here, which applies only to their political opponents. They want one system of justice for Democrats and another system of justice for everyone else. You do not need to take my word for it; let's walk through the facts.

On March 26, 2012, on the eve of the 2012 Nuclear Security Summit in Seoul, South Korea, President Obama met with Russian President Dmitry Medvedev to discuss one of the pressing issues in the U.S. national security interests—missile defense.

How important was the issue of missile defense to the strategic relationship between the United States and Russia?

As President Obama's Defense Secretary Robert Gates said in June 2010, upgraded missile interceptors in development "would give us the ability to protect our troops, our bases, our facilities and our allies in Europe."

Gates continued:

There is no meeting of the minds on missile defense. The Russians hate it. They have hated it since the late 1960s. They will always hate it, mostly because we will build it, and they won't.

During the Nuclear Security Summit, President Obama had a private exchange with Russian President Medvedev that was picked up on a hot microphone.

(Text of Videotape presentation:)

President OBAMA. This is my last election. After my election, I have more flexibility.

President MEDVEDEV. I understand. I will transmit this information to Vladimir, and I stand with you.

President Obama said:

On all these issues, but particularly missile defense, this can be solved, but it's important for him to give me space.

President Medvedev responded:

Yeah, I understand. I understand your message about space. Space for you.

President Obama:

This is my last election. After my election, I will have more flexibility.

President Medvedev responds:

I understand. I will transmit this information to Vladimir.

As we all know, it is Vladimir Putin.

As you just saw in 2012, President Obama asked the Russians for space until after the upcoming 2012 election, after which he would have more flexibility.

Now, let me apply Mr. JEFFRIES' and the House managers' three-part test for abuse of power.

One, the President exercises his official power. President Obama's actions clearly meet the test for exercising official power because in his role as head of state during the nuclear security summit, after asking President Medvedev for space, he promised him that "missile defense can be solved." What else did that mean but solved in a way favorable to the Russians, who were dead set against the expansion of a U.S. missile defense system in Europe?

Two, to obtain a corrupt personal benefit. President Obama's actions were clearly for his own corrupt personal benefit because he was asking an adversary for space for the express purpose of furthering his own election chances.

Again, President Obama said:

This is my last election. After my election, I have more flexibility.

President Obama knew the importance of missile defense in Europe but decided to use that as a bargaining chip with the Russians to further his own election chances in 2012.

Three, while ignoring or injuring our national interest. As President Obama's Defense Secretary said, "Missiles would give us the ability to protect our troops, our bases, our facilities, and our allies in Europe."

Surely, sacrificing the ability to protect our troops and our allies would injure the national interest. Yet President Obama was willing to barter away the safety of our troops and the safety of our allies in exchange for space in the upcoming election.

In short, President Obama leveraged the power of his office to the detriment of U.S. policy on missile defense in order to influence the 2012 election solely to his advantage. And we never would have known had President Obama realized that the microphone was on; that there was a hot mic.

One could easily substitute President Obama's 2012 exchange with President Medvedev into article I of the House's Impeachment Articles against President Trump.

Using the powers of his high office, President Obama solicited interference of a foreign government, Russia, in the 2012 U.S. Presidential election. He did so through a scheme or course of conduct that included soliciting the Government of Russia to give him "space" on missile defense that would benefit

his reelection and influence the 2012 U.S. Presidential election to his advantage.

In doing so, President Obama used the powers of the Presidency in a manner that compromised the national security of the United States and undermined the integrity of the U.S. democratic process. He thus ignored and injured the interest of the Nation.

Does it sound familiar, House managers? It should, as the case against President Obama would have been far stronger than the allegations against President Trump.

President Obama's abuse of power to benefit his own political interests was there and is here now for everyone to hear. It was a direct, unquestionable quid pro quo. No mind reading was needed there. Where were the House managers then?

And that points out the absurdity of the House managers' case against President Trump. It was President Obama, not President Trump, who was weak on Russia and weak on support to Ukraine.

President Obama caved to Russia and Putin on missile defense when he decided to scrap the U.S. plans to install missile bases in Poland. Yet he criticized Senator ROMNEY during the 2012 Presidential campaign when Senator ROMNEY said Russia was the greatest geopolitical threat to the U.S.

(Text of Videotape presentation:)

President OBAMA. I'm glad that you recognize that al-Qaida's a threat because a few months ago when you were asked what's the biggest geopolitical threat facing America, you said Russia. Not al-Qaida, you said Russia, and the 1980s are now calling to ask for their foreign policy back because, you know, the Cold War's been over for 20 years.

Mr. Counsel HERSCHMANN. Now, when it is politically convenient, the Democrats are saying the same thing that President Obama criticized Senator ROMNEY for saying. In fact, they are basing their entire politicized impeachment on this inversion of reality, this claim that President Trump is not supporting Ukraine far more than the prior administration.

President Obama caved on missile defense in late 2009. His hot mic moment occurred in March 2012. His reelection was 8 months later. Two years later, in March 2014, Russia invaded Ukraine and annexed Crimea. President Obama refused to provide lethal aid to Ukraine to enable it to defend itself. Where were the House managers then?

The House managers would have the American people believe that there is a threat—an imminent threat—to the national security of our country for which the President must be removed immediately from the highest office in the land because of what? Because he had a phone call with a foreign leader and discussed corruption? Because he paused for a short period of time giving away our tax dollars to a foreign country? That is their threat.

It is absurd on its face. Not one American life was in jeopardy or lost by this short delay, and they know it.

And how do we know that they know it? Because they went on vacation after they adopted the Articles of Impeachment. They did not cancel their recess. They did not rush back to deliver the Articles of Impeachment to the Senate because of this supposed terrible imminent threat to our national security. What did they do?

(Text of Videotape presentation:)

Speaker PELOSI. Urgency.

Mr. SCHIFF. Timing is really driven by the urgency.

Mr. SWALWELL. The urgency.

Mr. NADLER. Nothing could be more urgent.

Mr. RICHMOND. The urgency.

Speaker PELOSI. And urgent. And urgent.

Mr. SWALWELL. There is an urgency, you know, to this.

Mr. NADLER. Then we must move swiftly.

Mr. SWALWELL. We don't have time to screw around.

Speaker PELOSI. It's about urgency.

Mr. TAPPER. House Speaker NANCY PELOSI is still holding on to the Articles of Impeachment.

Mr. Counsel HERSCHMANN. Urgency? Urgency, for which you want to immediately remove the President of the United States? You sat on the articles for a month—the longest delay in the history of our country.

They adopted them on Friday, December 13, 2019—Friday the 13th—went on vacation, and finally decided after one of their Democratic Presidential debates had finished and after the BCS football championship game, that it was time to deliver them.

What happened to their national security interest argument? Wasn't it the reason that they said they had to rush to vote? It is urgent, they told us. No due process for this President. It is a crisis of monumental proportion. Our national security is at risk every additional day that he is in office, they tell us.

The House managers also used the same excuse for not issuing subpoenas for testimony. They had no time for the normal judicial review. They even complained about the judicial review process sitting in this Chamber before the Chief Justice of the U.S. Supreme Court—a judicial review in which the judge agreed to an expedited schedule. Even that was not good enough for them when they issued the subpoenas.

One of the lawyers for the subpoenaed witnesses wrote to the House general counsel: "We are dismayed that the House committees have chosen not to join us in seeking resolution from the judicial branch of this momentous constitutional question as expeditiously as possible."

He continued: "It is important to get a definitive judgment from the judicial branch determining their constitutional duty in the place of conflicting demands of the legislative and executive branches."

Isn't that the point? Isn't that how our system of government works? Isn't that how it has always worked? Isn't that how it is supposed to work?

These same Democrats defended other administrations who fought judicial review of congressional subpoenas, and I think we all remember Fast and Furious.

The same attorney, when he wrote to the House chair, said:

The House chairman, Mr. SCHIFF and Mr. NADLER, are mistaken to say the lawsuit is intended to delay or otherwise obstruct the committees' vital investigatory work.

He continued:

Nor has this lawsuit been coordinated in any way with the White House any more than it has been coordinated with the House of Representatives. If the House chooses not to pursue through subpoenaed testimony, let the record be clear that is the House's decision, if they come before you and they blame the administration and they blame you if you don't subpoena witnesses and have them before you.

Yet even in the face of this overwhelming evidence, they claim that the President is to blame for their decision to withdraw their own subpoenas or not issue others. Their choice, but the President is responsible. That is one of their claims. It is ludicrous.

They are blaming the President because they decided on their own not to seek judicial review and enforcement of their own subpoenas and for some witnesses never even issued subpoenas. In their minds, that is impeachable.

Manager NADLER spoke eloquently back before the House Judiciary Committee hearing in December of 1998. He said:

There must never be a narrowly voted impeachment or an impeachment substantially supported by one of our major political parties and largely opposed by the other. Such an impeachment would lack legitimacy, would produce divisiveness and bitterness in our politics for years to come, and will call into question the very legitimacy of our political institutions.

Manager NADLER was right then, and it is equally true today. Divisiveness and bitterness. Divisiveness and bitterness. Listen to his words.

Impeachments by one party cause divisiveness and bitterness in our country. That is what a partisan impeachment leads to.

Sadly, when Manager NADLER eloquently warned against divisiveness and bitterness, the House did not follow his admonition. They did not heed his advice, and that is one of the reasons we are sitting here today with Articles of Impeachment that are not found in our Constitution or the evidence and are brought simply for partisan politics.

This is a sad time for all of us. This is not a time to give out souvenirs, the pens used to sign two Articles of Impeachment, trying to improperly impeach our country's representative to the world.

This is not the time to try to get digs in that the President will always be impeached because we had the majority and we could do it to you and we did it to you. It is wrong. It is not what the American people deserve or want.

Sadly, the House managers do not trust their fellow Americans to choose their own President. They do not think

that they can legitimately win an election against President Trump, so they need to rush to impeach him immediately. That is what they have continually told the American people, and that—that is a shame.

We, on the other hand, trust our fellow Americans to choose their President. Choose your candidate. Let the Senators who are here who are trying to become the Democratic nominee try to win that election, and let the American people choose.

Maybe—maybe they are concerned that the American people like historically low unemployment. Maybe the American people like that their 401(k) accounts have done extremely well. Maybe the American people like prison reform and giving people a second chance.

Tellingly, some of these House managers worked constructively with this administration to give Americans a second chance. That was the public interest. That is what the country demands. That is what society deserves.

Maybe the American people like an administration that is fighting the opioid epidemic. Maybe the American people like secure borders. Maybe the American people like better trade agreements with our biggest trading partners. Maybe the American people like other countries sharing in the burden when it comes to foreign aid. Maybe the American people actually like low taxes. In other words, maybe the American people like their current President—a President who has kept his promises and delivered on them.

If you think Americans want to abandon our prosperity and our unprecedented successes under this President, then convince the electorate in November at the ballot box. Do not try to improperly interfere with an election that is only months away, based on these Articles of Impeachment.

In your trial memorandum that you submitted here before the Senate, you speak about the Framers of the Constitution believing that President Trump's alleged conduct is their "worst nightmare" and that they would be horrified.

In fact, sadly, sadly, it is the House managers' conduct in bringing these baseless Articles of Impeachment that would clearly be their and our worst nightmare.

Thank you.

The CHIEF JUSTICE. The majority leader is recognized.

RECESS

Mr. McCONNELL. Mr. Chief Justice, I think we are looking at a 45-minute break for dinner.

I ask unanimous consent that the Senate stand in recess.

There being no objection, at 6:01 p.m., the Senate, sitting as a Court of Impeachment, recessed until 6:48 p.m., and thereupon reassembled when called to order by the CHIEF JUSTICE.

The CHIEF JUSTICE. The Senate will come to order. Ready to proceed?

Mr. Counsel SEKULOW. Yes, sir.

Mr. Chief Justice, Members of the Senate, House managers, we are going to do two things this evening. We are going to first hear from former independent counsel Robert Ray. He is going to discuss issues of how he was involved in the investigation, the legal issues, some of the history of how that works, and then we will conclude this evening with a presentation from Professor Dershowitz.

With that, I yield my time, Mr. Chief Justice, to Robert Ray.

Mr. Counsel RAY. Mr. Chief Justice, Members of the Senate, distinguished House managers, and may it please this Court of Impeachment, I stand before you today in defense of my fellow Americans, who in November 2016 elected Donald Trump to serve the people as their President. Their reasons for that vote were as varied as any important decisions are, but their collective judgment, accepted as legitimate under our Constitution, is deserving of my respect and yours.

For only the third time in our Nation's history, the Senate is convened to try the President of the United States on Articles of Impeachment. Those articles do not allege crimes. The Constitution, the Framers' intent, and historical practice all dictate that well-founded Articles of Impeachment allege both that a high crime has been committed, and that, as such, removal from office is warranted only when such an offense also constitutes an abuse of the public trust; that is, in the case of the President, a violation of his oath of office. Both are required and neither one, by clear and unmistakable evidence, is shown here by these Articles of Impeachment.

I am here this evening in this Chamber distinctly privileged to represent and defend the President of the United States on the facts, on the law, and on the constitutional principles that must be paramount to you, Members of the Senate, in deciding the great question of whether these articles warrant, with or without witnesses, the removal of the President from office.

Because there is and can be no basis in these articles on which the Senate can or should convict a President on what is alleged, the President must not be removed from office. That judgment is reserved to the people in the ordinary course of elections, the next of which is just over 9 months away.

Now, 40 years ago, in 1980, I first came to Capitol Hill as a legislative intern for a Congressman who only 6 years earlier had played an important and critical role in the impeachment proceedings against President Richard Nixon. The Congressman of whom I speak, whom I came to respect immensely, served then, in 1974, in the House Judiciary Committee. He was tasked in the summer of 1974, together with his colleagues, in evaluating and voting on, as most of the House managers here have, Articles of Impeachment. Those articles included the crime of obstruction of justice, abuse

of power, and obstruction of Congress. But unlike how House managers—and, indeed, the entire House—45 years later in December 2019 proceeded here, bipartisan consensus in 1974, among both House Democrats and House Republicans, was the order of the day. Indeed, it became apparent then, that narrow partisan views aside, the House Judiciary Committee would step into the breach only insofar as evidence of criminal Presidential conduct warranted.

The tapes of Oval Office conversations involving the President provided that evidence. The Supreme Court, in effect, overruled the claim of executive privilege and ordered the release of the tapes to the House Judiciary Committee.

As a result, 3 days later, the high crime of obstruction of justice, including suborning perjury tethered to a second Article of Impeachment 2 days after that, alleging abuse of power, was approved by the House Judiciary Committee by a vote of 27 to 11 and 28 to 10, respectively.

The second Article of Impeachment alleged, among other things, unlawful use of the CIA and its resources, including covert activity in the United States and interference with the law enforcement actions of the FBI to advance the coverup; that is, the criminal conspiracy to obstruct justice charge in the first Article of Impeachment.

The crimes alleged were serious, involving unlawful electronic surveillance of an opposing political party, paying hush money out of a White House safe to burglars and other co-conspirators to silence cooperation with law enforcement, and attempts to alter testimony under oath.

Six Republican House committee members joined all 21 Democrats in supporting those two articles. My Congressman was among those six Republican House Members. Another one of the six was then a young Congressman from Maine, who later became a Member of this body, serving with distinction as a Senator and later as President Bill Clinton's Secretary of Defense. That young Congressman was Bill Cohen. A third of the six was Representative Caldwell Butler, a Republican from Virginia, whose papers are housed at Washington and Lee University in Lexington, VA, in the State where I grew up and where I later went to law school.

Together, these six Republicans made history. They did so with no sense of triumph—in today's parlance, no fist bumps—but in the words of my Congressman, only "with deep reluctance" and only because the evidence was clear and unmistakable of unlawful activities by the President in a criminal coverup that was—in the concluding language of the first Article of Impeachment—"contrary to his trust as President."

As to the third article in the Nixon impeachment, that article charging obstruction of Congress did not enjoy bipartisan support but instead was voted

*January 27, 2020* **CONGRESSIONAL RECORD — SENATE** **S605**

on by the House Judiciary Committee along party lines by a vote of 21 to 17. Republicans objected then to the third article in the face of the President's good-faith prior claim to executive privilege by withholding certain evidence until such time as the matter was definitively resolved by the Supreme Court.

My point in mentioning these three votes by the House Judiciary Committee is simply this: Count votes, and do the math. I understand that you all have been deprived of your phones and, thus, a calculator app, so I will do it for you.

A 27-to-11 vote was not only bipartisan, as I have indicated, but overwhelmingly so—indeed, over 70 percent; that is to say, greater than a two-thirds supermajority.

That vote sent a powerful signal to the full House and indeed the Senate that impeachment was overwhelmingly bipartisan and, therefore, politically and legally legitimate.

President Nixon's fate was sealed, and the result was inevitable. Thus, less than 2 weeks after that initial committee vote on impeachment, the President resigned.

During the course of those proceedings, my Congressman commented simply and plainly that it was, in his words, "a great American tragedy." But the greater point was—and is—that impeachment was never designed or intended to be a partisan tool and was to be undertaken only as a last resort.

This then brings me to what was intended by the Framers of the Constitution relative to impeachment. That subject will be addressed at some length by my colleague Professor Dershowitz, but, for now, let me just say that much has been said by House managers in reliance on Alexander Hamilton's oft-quoted statement in Federalist No. 65. That is the one repeatedly taken out of context and cited in favor of an expansive scope of jurisdiction by Congress over alleged offenses.

In Hamilton's words, "which proceed from misconduct of [a] public [official constituting] the abuse of or violation of some public trust." The irony that Hamilton—the greatest proponent in this country of executive and Presidential authority that perhaps ever lived—should be front and center in this partisan impeachment effort to remove a duly elected President from office is apparently lost on House impeachment managers. I dare say that Hamilton would roll over in his grave at the end of Wall Street in New York City to know that, contrary to what he explicitly acknowledged in Federalist No. 69, a President can only be removed from office "upon conviction of treason, bribery, or other high crimes or misdemeanors." We should just read the word "crime" right out of the impeachment clause of the Constitution and proceed merrily along the way toward an impeachment trial, with witnesses, no less, of a President duly elected by the people. And for what? Articles of Impeachment that do not even allege crimes.

President Trump is right. That course, if sustained, cheapens the impeachment process and, thus, is an American tragedy all its own.

Indeed, during the impeachment trial 21 years ago in January 1999, none other than President Clinton's highly respected White House Counsel Charles Ruff stated it best: "To argue then, as the managers do, that the phrase 'other high crimes and misdemeanors' was really meant to encompass a wide range of offenses . . . simply flies in the face of the clear intent of the framers, who carefully chose their language, knew exactly what those words meant and knew exactly what risk they intended to promote against."

Counsel Ruff went on to explain: One of those concerns and risks was that "impeachment be limited and well defined."

For our purposes here, what is required is both that crimes be alleged and that those crimes be of the type that, in particular, are so serious that they—again, in Mr. Ruff's words—"subvert our system of government and would justify overturning a popular election." Otherwise, what you have—in Tocqueville's words—is legislative tyranny.

I respectfully submit, Members of the Senate, taken in its proper context, that is what Alexander Hamilton well understood and meant, and so did my Congressman. That Congressman was, of course, Hamilton Fish, Jr. Actually, he was not really a junior but Hamilton Fish IV. His great-grandfather was also Hamilton Fish, who was born in 1808, later served as Governor of New York, a U.S. Senator immediately before the Civil War, and, notably, as President Ulysses Grant's Secretary of State. But at the time back in 1980, what I didn't realize—even though now, perhaps, it is so obvious—the original Hamilton Fish was named after his parents' best friend, none other than Alexander Hamilton himself.

What Congressman Hamilton Fish, from the Watergate era, courageously understood is the same historical lesson that Jeffrey A. Engel, founding director of the Center for Presidential History at Southern Methodist University, has written about in a coauthored 2018 book on impeachment:

The charge must be treason, bribery or other high crimes and misdemeanors. It must be one for which clear and unmistakable proof can be produced. Only if the evidence actually produced against the President is indeed irrefutable such that his own constituents—in this case, the 63 million people, like me, who voted for President Trump—accept his guilt of the offense charged in order to overwhelmingly persuade a supermajority of Americans and, thus, their Senators, of malfeasance, warranting his removal from office.

And, finally, because it is the President of the United States, after all, that we are talking about here, the repository of and entrusted under the Constitution with all of the executive power of the United States—in other words, an entire branch of government—removal from office cannot be based upon an impeachable offense or offenses which are, in essence, nothing more than—paraphrasing President Gerald Ford now—whatever a partisan majority of the House of Representatives considers them to be.

To supplement that cited statement 50 years ago, in 1970, from then-Congressman Jerry Ford in connection with the prospect of potentially impeaching a Supreme Court Justice, Ford pointedly clarified that executive branch impeachments are different because voters can remove the President, the Vice President, and all persons holding office at their pleasure at least every 4 years. To remove a President in midterm—it has been tried before and never done—would indeed, he said, require crimes of the magnitude of treason and bribery.

Professor Akhil Amar of Yale Law School made largely the same point during the Clinton impeachment about the danger presented through Presidential impeachment of transforming an entire branch of government:

When they remove a duly elected President, they undo the votes of millions of ordinary Americans on Election Day. This is not something that Senators should do lightly, lest we slide toward a kind of parliamentary government that our entire structure of government was designed to repudiate.

In hammering home the constitutional uniqueness of Presidential impeachments, he emphasized the case of Richard Nixon and distinguished it from Andrew Johnson; that is to say, only when extremely high crimes and gross abuses of official power indeed pose a threat to our basic constitutional system, a threat as high and truly as malignant to democratic government as treason and bribery, he reasoned, would the Senate ever be justified in nullifying the votes of millions of Americans and removing a President from office.

My point is this: History—our American history—matters. To listen to how the House managers would have it, Articles of Impeachment are merely—as Chuck Ruff warned a generation ago—empty vessels into which can be poured any number of charges, even those considered and abandoned.

At least in the case of President Clinton's impeachment, the articles actually charged crimes. The Senate thereafter determined, by its vote in that case, in effect, that while those crimes—perjury and obstruction of justice—may have been committed, those crimes were not high enough crimes damaging to the body politic to warrant the President's removal from office.

That judgment was, of course, within this body's discretion to render, and it has been accepted as such by the country—whether you agreed with it or

not—as legitimate. It is also one that is historically consistent with Hamilton's views and Madison's, too, concerning the proper scope of impeachment as applied to a President.

When I entered the scene and succeeded my colleague and cocounsel here, Judge Kenneth Starr, as independent counsel in October of 1999, it was left for me to decide whether prosecution of President Clinton following impeachment, nonetheless, was warranted, consistent with the Department of Justice's Principles of Federal Prosecution. That matter was exhaustively considered in the midst of a Federal grand jury investigation that I commissioned in order to decide, first, whether crimes, in fact, had been committed. I found that they had, and I later said so publicly in the final report expressly authorized and mandated by Congress concluding the Lewinsky investigation.

Significantly, though, I also determined that the prosecution of the President, while in, or once he left office, would not be in the national interest, given alternative available means, short of prosecution, in order to hold the President accountable for his conduct. Those means included a written acknowledgement by the President 2 years after his Senate trial that his testimony under oath before the grand jury had, in fact, been false and a related agreement to suspend his law license.

The price paid by President Clinton was indeed high, and it stemmed, in the end, from the need to vindicate the principle, first raised most prominently during Watergate, that no person, including the President, is above the law.

Despite President Clinton's subsequent protestation in his memoirs that I was just another Federal prosecutor out to extract, in his words, a pound of flesh, I credit the President to this day with agreeing to do what was necessary in order to exercise my discretion not to prosecute; namely, that for the good of the country and recognizing the unique place that the President—indeed, any President—occupies in our constitutional government, accountability and discretion go hand in hand and permitted—indeed, demanded—such an appropriate resolution. It enabled the country to move on, and it was as much, if not more, a credit to Bill Clinton than to any credit I received or deserved that we were able to reach agreement and avoid any further partisan recriminations or interference with the will of the American people in electing and reelecting President Clinton in the first place—and his successor, President George W. Bush.

In short, I was absolutely mindful and exceedingly concerned throughout my tenure as independent counsel that, although crimes had been committed, Bill Clinton was the elected official placed in office by voters throughout the Nation and head of the executive branch, and I was not.

The lesson for me was a simple one that I am sure every American citizen, whatever their own experience or political perspective, can understand: Be humble and act with humility. Never be too sure that you are right.

Today, 20 years later, what have we learned from that experience? I fear that the answer to that question is nothing at all. If these Impeachment Articles now are sustained beyond summary resolution in favor of acquittal, impeachment in the future literally will mean not only that proof of high crimes is no longer necessary to sustain the effort but that no crime at all is sufficient so long as a partisan majority in the House says so.

Thus, during the past 4 months alone, we have witnessed the endless procession of legal theories used to sustain this partisan impeachment—from treason to quid pro quo, to bribery, to extortion, to obstruction of justice, to soliciting an illegal foreign campaign contribution, to a violation of the Impoundment Control Act—to who knows what all is next.

What you are left with, then, are constitutionally deficient articles abandoning any pretense of the need to allege crimes that are another vehicle or weapon, if you will, in order to damage the President politically in an election year.

It is, I submit, decidedly not in the country's best interest to have the prosecution of the grave issue of impeachment and the drastic prospect of removal from office become just politics by other means, any more than it would be appropriate for the huge power of prosecution of offenses under the Federal Criminal Code to be exercised not on the merits, without fear or favor, but instead as a raw, naked, and pernicious exercise of partisan power and advantage.

I have spent the better part of my professional life, for over 30 years—as a Federal prosecutor for 13 years through two independent counsel investigations and now as a defense lawyer for over 17 years—trying my level best always to ensure that politics and prosecution do not mix. It must not happen here. A standardless and partisan impeachment is illegitimate and should be rejected as such overwhelmingly by this body, I hope and submit, or alternatively and, if need be, by only a partisan Republican majority—for the good of the country.

Turning now to what the House managers have alleged, regarding the first article, the House Judiciary Committee report on impeachment contains a rather extraordinary statement. It says as follows: "Although President Trump's actions need not rise to the level of a criminal violation to justify impeachment, his conduct here was criminal." So, in short, we needn't bother in an Impeachment Article charging the President with a crime, implicitly recognizing that there is insufficient evidence to prove that such a crime was committed, but

we are going to say that the President's conduct was criminal nonetheless. Aside from being exceedingly unfair to call something criminal and not stand behind the allegation and actually charge it, it just ain't so.

I have heard House Manager HAKEEM JEFFRIES argue before this body that he and his team have overwhelming evidence of an explicit—his word, not mine—quid pro quo by the President; that is, an explicit, purported, and proposed exchange by President Trump of something of personal benefit to himself in return for an official act by the U.S. Government.

As I have explained as far back as November of last year in a TIME magazine cover story, the problem with this legal theory is that an unlawful quid pro quo is limited to those arrangements that are corrupt; that is to say, only those that are clearly and unmistakably improper are therefore illegal. And, in the eyes of the law, the specific, measurable benefit that an investigation—or even the announcement of an investigation—against the Bidens might bring President Trump is, at best, nebulous.

I should add here also that any effort to contend that this purported thing of value also constitutes an illegal foreign campaign contribution to the President of the United States is fraught with doubt as a matter of law. Indeed, the Justice Department has said as much. So, too, have courts which have struggled since at least the early 1990s with application of the Federal anticorruption laws to situations like this when an in-kind benefit in the form of campaign interference or assistance is alleged to be illegal. None of this would permit the requisite finding supported by clear and unmistakable evidence of a violation of law necessary to sustain impeachment as an abuse of power.

But back to Manager JEFFRIES' contention, proof of an explicit quid pro quo by the President—which, parenthetically, as previously noted by Mr. Cipollone, is nowhere to be found in the Articles of Impeachment—would have required a very different telephone call than the one President Trump actually had with Ukraine President Zelensky. As I tried to explain in the TIME magazine piece, an explicit quid pro quo for alleged improper campaign interference would have had President Trump saying to his counterpart in Ukraine, in words or substance, "Here is the deal," and followed up by explicitly linking a demand for an investigation of the Bidens to the provision or release of foreign aid. None of that was said or ever happened. The call transcript itself demonstrates that beyond any doubt. In the President's words, read the transcript.

By the way, the demand characterization apparently creeps into this phone call largely as the result of Army LTC Alexander Vindman's testimony where he equates a request based

upon his military experience, and having listened in on the call, by a superior officer—in this case, the Commander in Chief—as the same thing as an order in the chain of command. While all of this may be true in the military, it goes without saying that President Zelensky, as the leader and head of a sovereign nation, was not and is not in our military chain of command.

I say that to you, Members of the Senate, as the son of a U.S. Army colonel and Vietnam war veteran buried in Arlington National Cemetery and as the father of a U.S. Army major currently serving with President Trump's Space Force Command in Aurora, CO, near Denver.

With all due respect, Lieutenant Colonel Vindman's testimony in this regard is at best, I submit to you, distorted and unpersuasive.

Next, the purported implicit link between foreign aid and the investigations, or the announcement of them, is weak. The most that Ambassador Gordon Sondland was able to give was his presumption that such a link likely existed, and that presumption was flatly contradicted by the President's express denial of the existence of a quid pro quo to Ambassador Sondland as well as to Senator RON JOHNSON.

The President was emphatic to Ambassador Sondland. The President said:

I want nothing. I want no quid pro quo. I just want Zelensky to do the right thing, to do what he ran on.

And to Senator JOHNSON, the same thing, just two words: "No way."

Recognizing this flaw in the testimony, House managers have focused instead on an alternate quid pro quo rationale, that the exchange was conditioned on a foreign head-of-state meeting at the White House in return for Ukraine publicly announcing an investigation of the Bidens.

In the House Judiciary report, it states as follows: "It is beyond question that official White House visits constitute a 'formal exercise of governmental power' within the meaning of McDonnell."

Not so fast. Actually, the Supreme Court in McDonnell helpfully boiled it down to only those acts that constitute the formal exercise of government power and that are more specific and focused than a broad policy objective. An exchange resulting in meetings, events, phone calls, as those terms are typically understood as being routine, according to the Supreme Court's definition of an official act, do not count.

The fact that the meeting involved was a formal one, with all of the trappings of a state visit by the President of Ukraine and hosted by the President of the United States, makes no difference. The Supreme Court is talking about an official act as a formal exercise of decision-making power, not the formality of the visit. Even if the allegation were true, this could not constitute a quid pro quo.

I should know. I argued, in effect, the contrary proposition in United States v. Sun-Diamond before the Supreme Court over 20 years ago in 1999. That proposition lost—unanimously. The vote was 9 to 0.

In any event, the coveted meeting—and it was, after all, just a meeting, whether at the White House or not—was not permanently withheld. It later happened between the two Presidents at the United Nations in New York City at the first available opportunity in September 2019.

Finally, the argument by Chairman JERRY NADLER that this call by President Trump with President Zelensky represented an "extortionate demand" is patently ridiculous. The essential element of the crime of extortion is pressure. No pressure was exercised or exerted during the call. Ukrainian officials, including President Zelensky himself, have since repeatedly denied that any such pressure existed. Indeed, to the contrary, the evidence strongly suggests Ukraine was perfectly capable of resisting any efforts to entangle itself in United States domestic party politics and partisanship.

What, then, remains of the first Article of Impeachment? No crimes were committed. Indeed, no crimes were even formally alleged. In that regard, what exactly is left? It is not treason. Ukraine is our ally, not our enemy or our adversary. And Russia is not our enemy, only our adversary. It is not bribery. There is no quid pro quo. It is not extortion—no pressure.

It is not an illegal foreign campaign contribution. The benefit of the announcement of an investigation is not tangible enough to constitute an in-kind campaign contribution warranting prosecution under Federal law.

It is also not a violation of the Impoundment Control Act. Let's take a look at that last one for a moment, shall we. The U.S. Government Accountability Office, an arm of the U.S. Congress, in its infinite wisdom, has decided, contrary to the position of the executive branch Office of Management and Budget, OMB, that while the President may temporarily withhold funds from obligation—but not beyond the end of the fiscal year—he may not do so with vague or general assertions of policy priorities contrary to the will of Congress.

The President's response to this interbranch dispute between Congress and the executive branch was to assert his authority over foreign policy to determine the timing of the best use of funds. Ultimately, this is a dispute that has constitutional implications under separation of powers principles, about which this body is well familiar. It pits the President's constitutional prerogatives to control foreign policy against Congress's reasonable expectation that the President will comply with the Constitution's faithful execution of the law requirement of his oath of office.

This issue has come up before with other Presidents. There is a huge constitutional debate among legal scholars about who is right. Law review articles have been written about it, one as recently as last June in the Harvard Law Review.

Congress, through its arm, the GAO, had an opposing view from that of the administration and OMB—big surprise.

I am reminded of one of President Kennedy's famous press conferences, where he was asked to comment about a report that the Republican National Committee had voted a resolution that concluded he was a total failure as President. He famously quipped: "I am sure that it was passed unanimously."

That is all that this is here: politics. No more, no less. And in the end, what are we talking about? The temporary hold was lifted and the funds were released, as they had to be under the law and as acknowledged was required by none other than Acting Chief of Staff Mick Mulvaney, 19 days before the end of the fiscal year on September 11, 2019.

In any event, an alleged violation of the Impoundment Act can no more sustain an Impeachment Article than can an assertion of executive privilege in opposition to a congressional subpoena, absent a final decision of a court ordering compliance with that subpoena.

Mere assertion of a privilege or objection in a legitimate interbranch dispute is a constitutional prerogative. It should never result in an impeachable offense for abuse of power or obstruction of Congress. And, yet, in a last-ditch effort to reframe its first Article of Impeachment on abuse of power, House managers, as part of the House Judiciary Committee report, have gone back into history—always a treacherous endeavor for lawyers. They now argue that President Andrew Johnson's impeachment, from over 150 years ago following the end of the Civil War and during reconstruction, was not about a violation of the Tenure of Office Act, which, after all, was the violation of law charged as the principle Article of Impeachment but, instead, rested on his use of power with illegitimate motives.

In an ahistorical sleight of hand worthy only of the New York Times recent "1619" series—a series, by the way, roundly criticized by two of my Princeton Civil War and reconstruction history professors as inaccurate—House managers now claim that President Johnson's removal of Lincoln's Secretary of War Edwin Stanton without Congress's permission in violation of a congressional statute, later found to be unconstitutional, is best understood with the benefit of revisionist hindsight to be motivated not by his desire to violate the statute but on his illegitimate use of power to undermine reconstruction and subordinate African Americans following the Civil War.

That all may be true, but it is another thing altogether to claim that that motive actually was the basis of Johnson's impeachment. Professor Laurence Tribe, who was the source for this misguided reinterpretation of the Johnson impeachment, simply substitutes his own self-described, far

more compelling basis for Johnson's removal from office from the one that the House of Representatives actually voted on and the Senate considered at his impeachment trial.

There has been an awful lot of that going on in this impeachment—people substituting their own interpretations for the ones that the principles actually and explicitly insist on.

At any rate, a President's so-called illegitimate motives in wielding power can no more frame and legitimize the Johnson impeachment than recasting the Nixon impeachment as really about his motives in defying Congress over the country's foreign policy in Vietnam. Again, all of that may be true, but it has nothing to do with impeachment. Not only that, it is also bad history.

As recognized 65 years ago by then-Senator John F. Kennedy in his book "Profiles in Courage," President Johnson was saved from removal from office by one vote and thus by one courageous Senator who recognized the legislative overreach that the Tenure of Office Act represented.

Quoting now from Senator Edmund G. Ross in "Profiles in Courage," who explained his vote as follows:

The independence of the executive office as a coordinate branch of the government was on trial. . . . If . . . the President must step down . . . upon insufficient proofs and from partisan considerations, the office of President would be degraded.

So, too, here. Contrary, apparently to the fashion now, Senator Ross's action eventually was praised and accepted several decades after his service and again many years later by President Kennedy as a courageous stand against legislative mob rule. Professor Dershowitz will have more to say about one other courageous Senator from that impeachment. More on that later.

For now, the point is that our history demonstrates that Presidents should not be subject to impeachment based upon bad or ill motives, and any thought to the contrary should strike you, I submit, as exceedingly dangerous to our constitutional structure of government.

If that were the standard, what President would ever be safe by way of impeachment from what Hamilton decried as the "persecution of an intemperate or designing majority in the House of Representatives"?

The central import of the abuse of power Article of Impeachment—indeed, when added together with the obstruction of justice article—is a result not far off from what one citizen tweet I saw back in December described as article I, Democrats don't like President Trump; article II, Democrats can't beat President Trump.

President Trump is not removable from office just because a designing majority in the House, as represented by their managers, believes that the President abused the power of his office during the July 25 call with President Zelensky. The Constitution requires

more. To ignore the requirement of proving that a crime was committed is to sidestep the constitutional design as well as the lessons of history.

I know that many of you may come to conclude, or may have already concluded, that the call was less than perfect. I have said on any number of occasions previously—and publicly—that it would have been better, in attempting to spur action by a foreign government in coordinating law enforcement efforts with our government, to have done so through proper channels. While the President certainly enjoys the power to do otherwise, there is consequence to that action, as we have now witnessed. After all, that is why we are all here.

But it is another thing altogether to claim that such conduct is clearly and unmistakably impeachable as an abuse of power. There can be no serious question that this President, or any President, acts lawfully in requesting foreign assistance with investigations into possible corruption, even when it might potentially involve another politician.

To argue otherwise would be to engage in the specious contention that a Presidential candidate or, for that matter, any candidate enjoys absolute immunity from investigations during the course of a campaign.

I can tell you that is not the case from my own experience. I did so during 2000 in investigating Hillary Clinton while she was running for office to become a U.S. Senator from New York, to which she was elected.

My point simply is this: This President has been impeached and stands on trial here in the Senate for allegedly doing something indirectly about which he was entirely permitted to do directly. That cannot form a basis as an abuse of power article sufficient to warrant his removal from office.

Turning now to the second Article of Impeachment, as we argued in our written trial brief, at the outset, it must be noted that it is at least a little odd for House managers to be arguing that President Trump somehow obstructed Congress when he declassified and released what is the central piece of evidence in this case. And that is, of course, the transcript of the July 25 call, as well as the call with President Zelensky that preceded it on April 21, 2019.

Release of that full call record should have been the end of this claim of obstruction, but apparently not. Instead, again, relying on the United States v. Nixon, House managers have proffered a broad claim to documents and witnesses in an impeachment inquiry, notwithstanding the Nixon court's limited holding that an objection by the President based on executive privilege could only be overcome in the limited circumstances presented there where the information sought was also material to the preparation of the defense by his coconspirators in pending cases awaiting trial following indictments. In

other words, a defendant's Sixth Amendment right to a fair trial in collateral proceedings was what the court actually found dispositive in rejecting the President's claim of privilege to prevent Congress from gaining access to the Watergate tapes.

All subsequent administrations have defended that narrow exception against any general claim of access to executive branch confidential communications, documents, and witnesses who are the President's closest advisers.

Thus, it should be a matter of accepted wisdom and historical premise that a President cannot be removed from office for invoking established legal rights, defenses, privileges, and immunities, even in the face of subpoenas from House committees. Back in 1998, Professor Tribe called out any argument to the contrary as frivolous and dangerous.

House managers respond now by arguing, nonetheless, that the President has no right to defy a legitimate subpoena, particularly, I suppose, when their impeachment efforts are at stake. And thus, it is an issue rising to the level of an interbranch conflict that in our system of government only accommodation between the branches and, ultimately, courts can finally resolve.

The House chose to forgo that course and to plow forward with impeachment. House managers cannot be heard to complain now that their own strategic choice can form any basis to place blame on the President for it and, worse yet, to then impeach him on that basis and seek his removal from office. That is no basis at all, as Professor Jonathan Turley persuasively has explained.

Compliance with a legitimate subpoena is enforced over a claim of executive privilege or Presidential immunity only when a court with jurisdiction says so in a final decision.

In sum, calling a subpoena legitimate, as House managers have done here, does not make it so. An analogy taken from baseball, which I believe the Chief Justice might appreciate, makes the point: A longtime major league umpire named Bill Klem, who worked until 1941 after 37 years in the big leagues, was once asked during a game by a player whether a ball was fair or foul. The umpire replied: It ain't nothing until I call it.

I say the same thing to Chairman SCHIFF now. It's not a legitimate and, therefore, enforceable subpoena until a court says that it is.

Preceding the Clinton impeachment and, indeed, in response to demands not just from the Whitewater independent counsel but also from several other of the independent counsel investigations that were ongoing at that time—and, again, I know, I was in one of them—the White House repeatedly asserted claims of executive privilege. Many of those claims were litigated for months, not weeks, and in some cases for years.

When I hear Mr. SCHIFF's complaint that the House's request for former

White House Counsel Don McGahn's testimony, grand jury material, and other documents has been drawn out since April of last year, I can only say in response: Boohoo.

Did I think at the time that many of those claims of privilege were frivolous and an abuse of the judicial process? Of course. And, indeed, that was the determination of the House Judiciary Committee during the Clinton impeachment. What did they do about it? Nothing. The committee properly concluded then that those assertions of privilege, even if ill-founded, did not constitute an impeachable offense. Did I believe that the Clinton administration's actions in this regard have adversely impacted our investigation? You bet I did. And I said so in the final report. But never did I seriously consider that those efforts by the White House, although endlessly frustrating and damaging to the independent counsel's investigation, would constitute the crime of obstruction of justice or any related impeachable offense for obstruction of Congress. Instead, I and my colleagues did the best that we could in reaching an accommodation with the White House where possible or through litigation, when necessary, in order to complete the task at hand, to the best of our ability to do so.

Any contention that what has transpired here involving this administration's assertion of valid and well-recognized claims of privileges and immunities is somehow contrary to law and impeachable is ludicrous. In short, to add to the parade of criminal offenses not sustained on this impeachment, there was no obstruction of justice or of Congress, period.

The President cannot be impeached and removed from office for asserting, subject to judicial review, what he has every right to assert. That is true now, as it has been true of every President all the way back to President George Washington.

In short, as to both Articles of Impeachment, all the President is asking for here is basic fairness and to be held to the very same standard that both House Speaker NANCY PELOSI proffered in March 2019 and which previously was endorsed during the Clinton impeachment in strikingly similar language by House manager JERRY NADLER 20-odd years ago in 1998. The evidence must be nothing less than "compelling, overwhelming, and bipartisan." We agree. No amount of witness testimony, documents, high-fives, fist-bumps, signing pens, or otherwise are ever going to be sufficient to sustain this impeachment under the Democrats' own standard.

With that, I am ready to conclude. The President's only instruction to me for this trial was a simple one: Do what you think is right.

As a country, we need to put a stop to doing anything and everything that we can do and start doing what is right and what needs to be done in the Nation's best interests. A brazenly partisan, political impeachment by House Democrats is not, I submit, in the best interest of this country because in the final analysis, we will all be judged in the eyes of history on whether, in this moment, we act with the country's overriding welfare firmly in mind rather than in advancing the cause of partisan political advantage.

I have always believed as an article of faith that in good times and in hard times and even in bad times, with matters of importance at stake, that this country gets the big things right. I have seen that in my own life and for my own experience, even in Washington, DC.

Well, Members of the Senate, this, what lies before you now, is just such a big thing. The next election awaits. Election day is only 9 months away.

As Senator Dale Bumpers eloquently concluded in arguing against President Clinton's removal from office:

That is the day when we reach across this aisle and hold hands, Democrats and Republicans, and we say, win or lose, we will abide by the decision. It is a solemn event, a Presidential election, and it should not be undone lightly or just because one side has political clout and the other one doesn't.

Otherwise, as Abraham Lincoln warned us during his first inaugural address:

If the minority will not acquiesce . . . the government must cease.

So that rejecting the majority principle, anarchy . . . in some form, is all that is left.

This impeachment and the refusal to accept the results of the last election in 2016 cannot be left to stand. For the reasons stated, the Articles of Impeachment, therefore, should be rejected, and the President must be acquitted.

Members of the Senate, thank you very much.

With that, Mr. Chief Justice, I yield back to Mr. Sekulow.

Thank you.

Mr. Counsel SEKULOW. Mr. Chief Justice, we are going to now delve into the constitutional issues for a bit and our presenter is Professor Alan Dershowitz. He is the Felix Frankfurter Professor Emeritus of Harvard Law School. After serving as a law clerk for Judge David Bazelon of the U.S. Court of Appeals for the District of Columbia, he served as a law clerk for Justice Arthur Goldberg at the U.S. Supreme Court. At the age of 28, Professor Dershowitz became the youngest tenured professor at Harvard Law School. Mr. Dershowitz spent 50 years as an active faculty member at Harvard, teaching generations of law students, including several Members of this Chamber, in classes ranging from criminal law to constitutional litigation, legal ethics, and even courses on impeachment. He will address the constitutional issues raised by these articles.

Mr. Counsel DERSHOWITZ. Mr. Chief Justice, distinguished Members of the Senate, our friends, lawyers, fellow lawyers, it is a great honor for me to stand before you today to present a constitutional argument against the impeachment and removal not only of this President but of all and any future Presidents who may be charged with the unconstitutional grounds of abuse of power and obstruction of Congress.

I stand before you today as I stood in 1973 and 1974 for the protection of the constitutional and procedural rights of Richard Nixon, whom I personally abhorred, and whose impeachment I personally favored; and as I stood for the rights of President Clinton, whom I admired and whose impeachment I strongly opposed. I stand against the application and misapplication of the constitutional criteria in every case and against any President without regard to whether I support his or her parties or policies. I would be making the very same constitutional argument had Hillary Clinton, for whom I voted, been elected and had a Republican House voted to impeach her on these unconstitutional grounds.

I am here today because I love my country and our Constitution. Everyone in this room shares that love. I will argue that our Constitution and its terms, high crimes and misdemeanors, do not encompass the two articles charging abuse of power and obstruction of Congress. In offering these arguments, I stand in the footsteps and in the spirit of Justice Benjamin Curtis, who was of counsel to impeached President Andrew Johnson and who explained to the Senate that "a greater principle was at stake than the fate of any particular president" and of William Evarts, a former Secretary of State, another one of Andrew Johnson's lawyers, who reportedly said that he had come to the defense table not as a "partisan," not as a "sympathizer," but to "defend the Constitution."

The Constitution, of course, provides that the Senate has the sole role and power to try all impeachments. In exercising that power, the Senate must consider three issues in this case.

The first is whether the evidence presented by the House managers establishes, by the appropriate standard of proof—proof beyond a reasonable doubt—that the factual allegations occurred.

The second is whether, if these factual allegations occurred, did they rise to the level of abuse of power and/or obstruction of Congress?

Finally, the Senate must determine whether abuse of power and obstruction of Congress are constitutionally authorized criteria for impeachment.

The first issue is largely factual and I leave that to others. The second is a combination of traditional and constitutional law, and I will touch on those. The third is a matter of pure constitutional law. Do charges of abuse and obstruction rise to the level of impeachable offenses under the Constitution?

I will begin, as all constitutional analysis begins, with the text of the Constitution governing impeachment. I

Case 0:20-cv-61872-AHS Document 271-112 Entered on FLSD Docket 12/12/2022 Page 33 of 40

will then examine why the Framers selected the words they did as the sole criteria authorizing impeachment. In making my presentation, I will transport you back to a hot summer in Philadelphia and a cold winter in Washington. I will introduce you to patriots and ideas that helped shape our great Nation.

To prepare for this journey, I have immersed myself in a lot of dusty old volumes from the 18th and 19th century. I ask your indulgence as I quote from the wisdom of our Founders. This return to the days of yesteryear is necessary because the issue today is not what the criteria of impeachment should be, not what a legislative body or a constitutional body might today decide are the proper criteria for impeachment of a President but what the Framers of our Constitution actually chose and what they expressly and implicitly rejected.

I will ask whether the Framers would have accepted such vague and open-ended terms as "abuse of power" and "obstruction of Congress" as governing criteria. I will show by close review of the history that they did not and would not accept such criteria for fear that these criteria would turn our new Republic into a British-style parliamentary democracy in which the Chief Executive's tenure would be, in the words of James Madison, father of our Constitution, "at the pleasure" of the legislature.

The conclusion I will offer for your consideration is similar, though not identical, to that advocated by highly respected Justice Benjamin Curtis, who, as you know, dissented from the Supreme Court's notorious decision in Dred Scott, and who, after resigning in protest from the High Court, served as counsel to President Andrew Johnson in the Senate impeachment trial. He argued that "there can be no crime, there can be no misdemeanor without a law, written or unwritten, express or implied."

In so arguing, he was echoing the conclusion reached by Dean Theodore Dwight of the Columbia Law School, who wrote in 1867, just before the impeachment, that "unless the crime is specifically named in the Constitution"—treason and bribery—"impeachments, like indictments, can only be instituted for crimes committed against the statutory law of the United States." As Judge Starr said earlier today, he described that as the weight of authority being on the side of that proposition at a time much closer to the framing than we are today.

The main thrust of my argument, however, and the one most relevant to these proceedings is that even if that position is not accepted, even if criminal conduct were not required, the Framers of our Constitution implicitly rejected—and, if it had been presented to them, would have explicitly rejected—such vague terms as "abuse of power" and "obstruction of Congress" as among the enumerated and defined criteria for impeaching a President.

You will recall in the many Articles of Impeachment against President Johnson were accusations of noncriminal but outrageous misbehavior, including ones akin to abuse of power and obstruction of Congress. For example, article X charged Johnson "did attempt to bring into disgrace, ridicule, hatred, contempt and reproach, the Congress of the United States."

Article XI charged Johnson with denying that Congress was [a]uthorized by the Constitution to exercise the legislative power" and denying that "[t]he legislation of said Congress was obligatory upon him." Those are pretty serious charges.

Here is how Justice Curtis responded to these noncriminal charges:

My first position is, that when the Constitution speaks of treason, bribery, and other crimes and misdemeanors, it refers to, and includes only, high criminal offenses against the United States, made so by some law of the United States existing when the acts complained of were done, and I say that this is plainly to be inferred from each and every provision of the Constitution on the subject of impeachment.

I will briefly review those other provisions of the Constitution with you. Judge Curtis's interpretation is supported—indeed, in his view it was compelled—by the constitutional text. Treason, bribery, and other high crimes and misdemeanors are high crimes. Other high crimes and misdemeanors must be akin to treason and bribery. Curtis cited the Latin phrase "Noscitur a sociis,"—I am sorry for my pronunciation—referring to a classic rule of interpretation that when the meaning of a word that is part of a group of words is uncertain, you should look to the other words in that group that provide interpretive context.

The late Justice Antonin Scalia gave the following current example. If one speaks of Mickey Mantle, Rocky Marciano, Michael Jordan, and other great competitors, the last noun does not reasonably refer to Sam Walton, who is a great competitor, but in business, or Napoleon, a great competitor on the battlefield. Applying that rule to the groups of words "treason, bribery, or other high crimes and misdemeanors," the last five words should be interpreted to include only serious criminal behavior akin to treason and bribery.

Justice Curtis then reviewed the other provisions of the Constitution that relate to impeachment. First, he started with the provision that says "the President of the United States shall have Power to grant Reprieves and Pardons"—listen now—"for Offenses against the United States, except in Cases of Impeachment."

He cogently argued that if impeachment were not for "offenses against the United States"—was not based on an offense against the United States— there would have been no need for any constitutional exception.

He then went on to a second provision: "The trial of all crimes, except in cases of impeachment, shall be by

jury." This demonstrated, according to Curtis, that impeachment requires a crime, but unlike other crimes, it does not require a jury trial. You are the judge and the jury. He also pointed out that an impeachment trial, by the "express words" of the Constitution, requires an "acquittal" or a "conviction," judgments generally rendered only in the trials of crimes.

Now, President Johnson's lawyers, of course, argued in the alternative, as all lawyers do when there are questions of fact and law. He argued that Johnson did not violate the Articles of Impeachment, as you heard from other lawyers today but, even if he did, that the articles do not charge impeachable offenses, which is the argument that I am making before you this evening.

Justice Curtis's first position, however, was that the articles did not charge an impeachable offense because they did not allege "high criminal offenses against the United States."

According to Harvard historian and law professor Nikolas Bowie, Curtis's constitutional arguments were persuasive to at least some Senators who were no friends of President Johnson's, including the coauthors of the 13th and the 14th Amendments. As Senator William Pitt Fessenden later put it, "Judge Curtis gave us the law, and we followed it."

Senator James W. Grimes echoed Curtis's argument by refusing to "accept an interpretation" of high crimes and misdemeanors that changes "according to the law of each Senator's judgment, enacted in his own bosom after the alleged commission of the offense." Though he desperately wanted to see President Johnson, whom he despised, out of office, he believed that an impeachment removal without the violation of law would be "construed into approval of impeachments as part of future political machinery."

According to Professor Bowie, Justice Curtis's constitutional arguments may well have contributed to the decision by at least some of the seven Republican dissidents to defy their party and vote for acquittal, which was secured by a single vote.

Today, Professor Bowie has an article in the New York Times in which he repeats his view of "impeachment requires a crime," but he now argues that the Articles of Impeachment do charge crimes. He is simply wrong. He is wrong because, in the United States v. Hudson—a case decided almost more than 200 years ago now—the U.S. Supreme Court ruled that Federal courts have no jurisdiction to create common law crimes. Crimes are only what are in the statute book.

So Professor Bowie is right that the Constitution requires a crime for impeachment but wrong when he says that common law crimes can be used as a basis for impeaching even though they don't appear in the statute book.

Now, I am not here arguing that the current distinguished Members of the Senate are in any way bound—legally

bound—by Justice Curtis's arguments or those of Dean Dwight, but I am arguing that you should give them serious consideration—the consideration to which they are entitled by the eminence of their author and the role they may have played in the outcome of the closest precedent to the current case.

I want to be clear. There is a nuanced difference between the arguments made by Curtis and Dwight and the argument that I am presenting here today based on my reading of history.

Curtis argued that there must be a specific violation of preexisting law. He recognized that, at the time of the Constitution, there were no Federal criminal statutes. Of course not. The Constitution established a national government, so we couldn't have statutes prior to the establishment of our Constitution and our Nation.

This argument is offered today by proponents of this impeachment on the claim that the Framers could not have intended to limit the criteria for impeachment to criminal-like behavior. Justice Curtis addressed that issue and that argument head-on.

He pointed out that crimes such as bribery would be made criminal "by the laws of the United States, which the Framers of the Constitution knew would be passed." In other words, he anticipated that Congress would soon enact statutes punishing and defining crimes such as burglary, extortion, perjury, et cetera. He anticipated that, and he based his argument, in part, on that.

The Constitution already included treason as a crime, and that was defined in the Constitution itself, and then it included other crimes; but what Justice Curtis said is that you could include laws, "written or unwritten, express or implied"—by which he meant common law, which, at the time of the Constitution, there were many common law crimes—and they were enforceable, even federally, until the Supreme Court, many years later, decided that common law crimes were no longer part of Federal jurisdiction.

So the position that I have derived from history would include—and this is a word that will upset some people—criminal-like conduct akin to treason and bribery. There need not be, in my view, conclusive evidence of a technical crime that would necessarily result in a criminal conviction. Let me explain.

For example, if a President were to receive or give a bribe outside of the United States and outside of the statute of limitations, he could not technically be prosecuted in the United States for such a crime, but I believe he could be impeached for such a crime because he committed the crime of bribery even though he couldn't technically be accused of it in the United States. That is the distinction that I think we draw. Or if a President committed extortion, perjury, or obstruction of justice, he could be charged with these crimes as impeachable of-

fenses because these crimes, though not specified in the Constitution, are akin to treason and bribery. This would be true even if some of the technical elements—time and place—were absent.

What Curtis and Dwight and I agree upon—and this is the key point in this impeachment case; please understand what I am arguing—is that purely noncriminal conduct, including abuse of power and obstruction of Congress, are outside the range of impeachable offenses. That is the key argument I am presenting today.

This view was supported by text writers and judges close in time to the founding. William Oldhall Russell, whose 1819 treatise on criminal law was a Bible among criminal law scholars and others, defined "high crimes and misdemeanors" as "such immoral and unlawful acts as are nearly allied, and equal in guilt, to a felony; and yet, owing to the absence of some technical circumstances"—technical circumstances—"do not fall within the definition of a felony." Similar views were expressed by some State courts. Others disagreed.

Curtis's considered views and those of Dwight, Russell, and others, based on careful study of the text and history, are not "bonkers," "absurdist," "legal claptrap," or other demeaning epithets thrown around by partisan supporters of this impeachment. As Judge Starr pointed out, they have the weight of authority. They were accepted by the generation of the Founders and the generations that followed. If they are not accepted by academics today, that shows a weakness among the academics, not among the Founders. Those who disagree with Curtis's textual analysis are obliged, I believe, to respond with reason, counter interpretations, not name-calling.

If Justice Curtis's arguments and those of Dean Dwight are rejected, I think then proponents of impeachment must offer alternative principles and alternative standards for impeachment and removal.

We just heard that, in 1970, Congressman Gerald Ford, whom I greatly admired, said the following in the context of an impeachment of justice: "[A]n impeachable offense is whatever a majority of the House of Representatives considers it to be at a given moment in history," et cetera. You all know the quote.

Congresswoman MAXINE WATERS recently put it more succinctly in the context of a Presidential impeachment. Here is what she said:

Impeachment is whatever Congress says it is. There is no law.

But this lawless view would place Congress above the law. It would place Congress above the Constitution. For Congress to ignore the specific words of the Constitution itself and substitute its own judgments would be for Congress to do what it is accusing the President of doing—and no one is above the law, not the President and not Congress.

This is precisely the kind of view expressly rejected by the Framers, who feared having a President serve at the "pleasure" of the legislature, and it is precisely the view rejected by Senator James Grimes when he refused to accept an interpretation of high crimes and misdemeanors that would change "according to the law of each Senator's judgment, enacted in his own bosom."

The Constitution requires, in the words of Gouverneur Morris, that the criteria for impeachment must be "enumerated and defined." Those who advocate impeachment today are obliged to demonstrate how the criteria accepted by the House in this case are enumerated and defined in the Constitution.

The compelling textual analysis provided by Justice Curtis is confirmed by the debate in the Constitutional Convention, by the Federalist Papers, by the writings of William Blackstone, and, I believe, by the writings of Alexander Hamilton, which were heavily relied on by lawyers at the time of the Constitution's adoption.

There were at the time of the Constitution's adoption two great debates that went on, and it is very important to understand the distinction between these two great debates. It is hard to imagine today, but the first was, Should there be any power to impeach a President at all? There were several members of the founding generation and of the Framers of the Constitution who said no—who said, no, a President shouldn't be allowed to be impeached.

The second—and the second is very, very important in our consideration today—is, If a President is to be subject to impeachment, what should the criteria be? These are very different issues, and they are often erroneously conflated.

Let's begin with the first debate.

During the broad debate about whether a President should be subject to impeachment, proponents of impeachment used vague and open-ended terms, such as "unfit," "obnoxious," "corrupt," "misconduct," "misbehavior," "negligence," "malpractice," "perfidy," "treachery," "incapacity," "peculation," and "maladministration." They worried that a President might "pervert his administration into a scheme of speculation and oppression"; that he might be "corrupted by foreign influence"; and—yes, this is important—that he might have "great opportunities of abusing his power."

Those were the concerns that led the Framers to decide that a President must be subject to impeachment, but not a single one of the Framers suggested that these general fears justifying the need for an impeachment and removal mechanism should automatically be accepted as a specific criterion for impeachment. Far from it.

As Gouverneur Morris aptly put it: "[C]orruption and some other offenses . . . ought to be impeachable, but . . . the cases ought to be enumerated and defined."

Case 0:20-cv-61872-AHS   Document 271-112   Entered on FLSD Docket 12/12/2022   Page 35 of 40

The great fallacy of many contemporary scholars and pundits and, with due respect, Members of the House of Representatives is that they fail to understand the critical distinction between the broad reasons for needing an impeachment mechanism and the carefully enumerated and defined criteria that should authorize the deployment of this powerful weapon.

Let me give you a hypothetical example that might have faced Congress or, certainly, will face Congress.

Let's assume that there is a debate over regulating the content of social media—whether we should have regulations or criminal, civil regulations over Twitter or Facebook, et cetera. In the debate over regulating the social media, proponents of regulation might well cite broad dangers, such as false information, inappropriate content, hate speech. Those are good reasons for having regulation; but when it came to enumerating and defining what should be prohibited, such broad dangers would have to be balanced against other important policies, and the resulting legislation would be much narrower and more carefully defined than the broad dangers that necessitated some regulation.

The Framers understood and acted on this difference, but I am afraid that many scholars and others and Members of Congress fail to see this distinction, and they cite some of the fears that led to the need for an impeachment mechanism. They cite them as the criteria themselves. That is a deep fallacy, and it is crucially important that the distinction be sharply drawn between arguments made in favor of impeaching and the criteria then decided upon to justify the impeachment specifically of the President.

The Framers understood this, and so they got down to the difficult business of enumerating and defining precisely which offenses, among the many that they feared a President might commit, should be impeachable as distinguished by those left to the voters to evaluate.

Some Framers, such as Roger Sherman, wanted the President to be removable by "the National legislature" at its "pleasure," much like the Prime Minister can be removed by a simple vote of no confidence by Parliament. That view was rejected.

Benjamin Franklin opposed decidedly the making of the Executive "the mere creature of the legislature."

Gouverneur Morris was against "a dependence of the Executive on the Legislature, considering the Legislature"—you will pardon me for quoting this—"a great danger to be apprehended . . . ."

I don't agree with that.

James Madison expressed concern about the President being improperly dependent on the legislature. Others worried about a feeble executive.

Hearing these and other arguments against turning the new Republic into a parliamentary democracy, in which the legislature had the power to remove the President, the Framers set out to strike the appropriate balance between the broad concerns that led them to vote for a provision authorizing the impeachment of the President and the need for specific criteria not subject to legislative abuse or overuse.

Among the criteria proposed were: malpractice, neglect of duty, malconduct, neglect in the execution of office, and—and this word we will come back to talk about—maladministration.

It was in response to that last term, a term used in Britain, as a criteria for impeachment that Madison responded: "So vague a term will be equivalent to a tenure during the pleasure of the Senate."

Upon hearing Madison's objections Colonel Mason withdrew "maladministration" and substituted "other high crimes and misdemeanors."

Had a delegate proposed inclusion of "abuse of power" or "obstruction of Congress" as enumerated and defined criteria for impeachment, history strongly suggests that Madison would have similarly opposed it, and it would have been rejected.

I will come back to that argument a little later on when I talk specifically about abuse of power.

Indeed, Madison worried that a partisan legislature could even misuse the word "misdemeanor" to include a broad array of noncrimes, so he proposed moving the trial to the nonpartisan Supreme Court. The proposal was rejected.

Now, this does not mean, as some have suggested, that Madison suddenly changed his mind and favored such misuse to expand the meaning of "misdemeanor" to include broad terms like "misbehavior." No, it only meant that he feared—he feared that the word "misdemeanor" could be abused. His fear has been proved prescient by the misuse of that term, "high crimes and misdemeanors," by the House, in this case.

Now, the best evidence that the broad concerns cited by the Framers to justify impeachment were not automatically accepted as criteria justifying impeachment is the manner by which the word "incapacity"—focus on that word, please—incapacity was treated.

Madison and others focused heavily on the problem of what happens if a President becomes incapacitated. Certainly, a President who is incapacitated should not be allowed to continue to preside over this great country. And everyone seemed to agree that the possibility of Presidential incapacity is a good and powerful reason for having impeachment provisions.

But when it came time to establishing criteria for actually removing a President, "incapacity" was not included. Why not? Presumably because it was too vague and subjective a term.

And when we had the incapacitated President in the end of the Woodrow Wilson second term, he was not impeached and removed.

A constitutional amendment with carefully drawn procedural safeguards against abuse was required to remedy the daunting problem of a President who was deemed incapacitated.

Now, another reason why incapacitation was not included among impeachable offenses is because it is not criminal. It is not a crime to be incapacitated. It is not akin to treason. It is not akin to bribery, and it is not a high crime and misdemeanor.

The Framers believed that impeachable offenses must be criminal in nature and akin to the most serious crimes. Incapacity simply did not fit into this category. Nothing criminal about it.

So the Constitution had to be amended to include a different category of noncriminal behavior that warranted removal.

I urge you to consider seriously that important part of the history of the adoption of our Constitution.

I think that Blackstone and Hamilton also support this view.

There is no disagreement over the conclusion that the words "treason, bribery, or other high crimes"—those words require criminal behavior. The debate is only over the words "and misdemeanors." The Framers of the Constitution were fully cognizant of the fact that the word "misdemeanor" was a species of crime.

The book that was most often deemed authoritative was written by William Blackstone of Great Britain, and here is what he says about this in the version that was available to the Framers:

A crime, or misdemeanor, is an act committed or omitted, in violation of the [public] law, either forbidding or commanding it. The general definition comprehends both crimes and misdemeanors; which, properly speaking, are mere synonymous terms.

Mere synonymous terms. He went then on:

[T]hough, in common usage, the word "crimes" is made to denote such offenses are of a deeper and more atrocious dye; while smaller faults, and omissions of less consequence, are comprised under the gentler name of "misdemeanors" only.

Interestingly, though, he pointed out that misdemeanors were not always so gentle.

There was a category called "capital misdemeanors," where if you stole somebody's pig or other fowl, you could be sentenced to death, but it was only for a misdemeanor. Don't worry. It is not for a felony. But there were misdemeanors that were capital in nature.

Moreover, Blackstone wrote that parliamentary impeachment "is a prosecution"—a prosecution—"of already known and established law [presented] to the most high and Supreme Court of criminal jurisdiction"—analogous to this great court.

He observed that "[a] commoner [can be impeached] but only for high misdemeanors: a peer may be impeached for any crime"—any crime.

This certainly suggests that Blackstone deemed high misdemeanors to be a species of crime.

Hamilton is a little less clear on this issue, and not surprisingly because he was writing—in Federalist No. 65, he was writing not to define what the criteria for impeachment were, he was writing primarily in defense of the Constitution as written and less to define its provisions, but he certainly cannot be cited as in favor of criteria such as abuse of power or obstruction of Congress, nor of impeachment voted along party lines.

He warned that the ''greatest danger''—these were his words—''the greatest danger [is] that the decision will be regulated more by the comparative strength of parties, than by the real demonstrations of innocence or guilt.''

In addition to using the criminal terms ''innocence'' or ''guilt,'' Hamilton also referred to ''prosecution'' and ''sentence.'' He cited the constitutional provisions that states that ''the party convicted shall nevertheless be libel and subject'' to a criminal trial, as a reason for not having the President tried before the Supreme Court.

He feared a double prosecution, a variation of double jeopardy, before the same judiciary. These points all sound in criminal terms.

But advocates of a broad, open-ended, noncriminal interpretation of ''high crimes and misdemeanors'' insist that Hamilton is on their side, and they cite the following words regarding the court of impeachment. And I think I heard these words quoted more than any other words in support of a broad view of impeachment, and they are misunderstood. Here is what he said when describing the court of impeachment. He said:

The subjects of its jurisdiction—

Those are important words, the subjects of its jurisdiction, by which he meant treason, bribery, and other high crimes and misdemeanors.

The subjects of its jurisdiction are those offenses which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to society itself.''

Those are Hamilton's words. They are often misunderstood as suggesting that the criteria authorizing impeachment include ''the misconduct of public men'' or ''the abuse or violation of some public trust.''

That is a misreading. These words were used to characterize the constitutional criteria that are ''the subject of'' the jurisdiction of the court of impeachment: namely, ''treason, bribery, or other high crimes and misdemeanors.''

Those specified crimes are political in nature. They are the crimes that involve ''misconduct of public men'' and ''the abuse or violation of some public trust.''

Hamilton was not expanding the specified criteria to include—as independent grounds for impeachment—misconduct, abuse, or violation. If anything, he was contracting them to require, in addition to proof of the specified crimes, also proof that the crime must be of a political nature.

This would exclude President Clinton's private, nonpolitical crimes. In fact, and this is interesting, Hamilton's view was cited by Clinton's advocates as contracting, not expanding, the meaning of ''high crimes.''

Today, some of these same advocates, you look at the same words and cite them as expanding its meaning.

Clinton was accused of a crime—perjury—and so the issue in his case was not whether the Constitution required a crime for impeachment. Instead, the issue was whether Clinton's alleged crime could be classified as a ''high crime'' in light of the personal nature.

During the Clinton impeachment, I stated in an interview that I did not think that a technical crime was required but that I did think that abusing trust could be considered. I said that.

At that time, I had not done the extensive research on that issue because it was irrelevant to the Clinton case, and I was not fully aware of the compelling counterarguments. So I simply accepted the academic consensus on an issue that was not on the front burner at the time.

But because this impeachment directly raises the issue of whether criminal behavior is required, I have gone back and read all the relevant historical material, as nonpartisan academics should always do, and have now concluded that the Framers did intend to limit the criteria for impeachment to criminal-type acts akin to treason, bribery, and they certainly did not intend to extend it to vague and open-ended and noncriminal accusations such as abuse of power and obstruction of Congress.

I published this academic conclusion well before I was asked to present the argument to the Senate in this case. My switch in attitude, purely academic, purely nonpartisan.

Nor am I the only participant in this proceeding who has changed his mind. Several Members of Congress, several Senators expressed different views regarding the criteria for impeachment when the subject was President Clinton than they do now.

When the President was Clinton, my colleague and friend Professor Laurence Tribe, who is advising Speaker PELOSI now, wrote that a sitting President could not be charged with a crime. Now he has changed his mind. That is what academics do and should do, based on new information.

If there are reasonable doubts about the intended meaning of ''high crimes and misdemeanors,'' Senators might consider resolving these doubts by reference to the legal concept known as lenity.

Lenity goes back to hundreds of years before the founding of our country and was a concept in Great Britain, relied upon by many of our own Justices and judges over the years. It was well known to the legal members of the founding generations.

It required that in construing a criminal statute that is capable of more than one reasonable interpretation, the interpretation that favors the defendant should be selected unless it conflicts with the intent of the statute.

It has been applied by Chief Justice Marshall, Justice Oliver Wendell Holmes, Felix Frankfurter, Justice Antonin Scalia and others.

Now, applying that rule to the interpretation of ''high crimes and misdemeanors'' would require that these words be construed narrowly to require criminal-like conduct akin to treason and bribery rather than broadly to encompass abuse of power and obstruction of Congress.

In other words, if Senators are in doubt about the meaning of ''high crimes and misdemeanors,'' the rule of lenity should incline them toward accepting a narrower rather than a broad interpretation, a view that rejects abuse of power and obstruction of Congress as within the constitutional criteria.

Now, even if the rule of lenity is not technically applicable to impeachment—that is a question—certainly, the policies underlying that rule are worthy and deserving of consideration as guides to constitutional interpretation.

Now, here I am making, I think, a very important point. Even if the Senate were to conclude that a technical crime is not required for impeachment, the critical question remains—and it is the question I now want to address myself to—do abuse of power and objection of Congress constitute impeachable offenses?

The relevant history answers that question clearly in the negative. Each of these charges suffers from the vice of being ''so vague a term that they will be equivalent of tenure at the pleasure of the Senate,'' to quote again the Father our Constitution.

Abuse of power is an accusation easily leveled by political opponents against controversial presidents. In our long history, many Presidents have been accused of abusing their power. I will now give you a list of Presidents who in our history have been accused of abusing their power and who would be subject to impeachment under the House managers' view of abuse: George Washington, for refusal to turn over documents relating to the Jay Treaty; John Adams for signing and enforcing the Alien and Sedition laws; and Thomas Jefferson, for purchasing Louisiana without congressional authorization.

I will go on—John Quincy Adams; Martin Van Buren; John Tyler, ''arbitrary, despotic and corrupt use of the veto power''; James Polk—and here I quote Abraham Lincoln. Abraham Lincoln accused Polk of abusing the power of his office, ''contemptuously disregarding the Constitution, usurping

the role of Congress, and assuming the role of dictator.'' He didn't seek to impeach him, just sought to defeat him.

Abraham Lincoln was accused of abusing his power for suspending the writ of habeas corpus during the Civil War; President Grant, Grover Cleveland, William McKinley, Theodore Roosevelt, William Taft, Woodrow Wilson, Franklin Roosevelt, Harry Truman, Jimmy Carter, Ronald Reagan—concerning Iran-Contra, and now I say, Professor Laurence Tribe said the following: ''Therein lies what appears to be the most serious breach of duty by the President, a breach that may well entail an impeachable abuse of power''—George H.W. Bush, ''The following was released today by the Clinton-Gore campaign: In the past weeks, Americans have begun to learn the extent to which George Bush and his administration have abused their governmental power for political purposes.''

That is how abuse of power should be used, as campaign rhetoric. It should be issued as statements of one political party against the other. That is the nature of the term. Abuse of power is a political weapon, and it should be leveled against political opponents. Let the public decide if that is true.

Barack Obama, the House Committee on the Judiciary held an entire hearing entitled ''Obama Administration's Abuse of Power.''

By the standards applied to earlier Presidents, nearly any controversial act by a Chief Executive could be denominated as abuse of power. For example, past Presidents have been accused of using their foreign policy, even their war powers, to enhance their electoral prospects. Presidents often have mixed motives that include partisan personal benefits, along with the national interest.

Professor Josh Blackman, constitutional law professor, provided the following interesting example:

In 1864, during the height of the Civil War, President Lincoln encouraged General William Sherman to allow soldiers in the field to return to Indiana to vote.

What was Lincoln's primary motivation, the professor asks.

He wanted to make sure that the government of Indiana remained in the hands of Republican loyalists who would continue the war until victory. Lincoln's request risked undercutting the military effort by depleting the ranks. Moreover, during this time, soldiers in the remaining States faced greater risks than did the returning Hoosiers.

The professor continues:

Lincoln had personal motives. Privately, he sought to secure victory for his party; but the President, as a President and as a party leader and Commander in Chief made a decision with life-or-death consequences.

Professor Blackman used the following relevant conclusion from this and other historical events. He said:

Politicians routinely promote the understanding of the general welfare while at the back of their minds considering how these actions will affect their popularity. Often the two concepts overlap. What is good for the country is good for the official's reelection. All politicians understand that dynamic.

Like all human beings, Presidents and other politicians, persuade themselves that their actions seen by their opponents as self-serving are primarily in the national interest. In order to conclude that such mixed-motive actions constitute an abuse of power, opponents must psychoanalyze the President and attribute to him a singular, self-serving motive. Such a subjective probing of motives cannot be the legal basis for a serious accusation of abuse of power that could result in the removal of an elected President.

Yet this is precisely what the managers are claiming. Here is what they said: ''Whether the President's real reason, the one actually in his mind, are at the time legitimate.''

What a standard, what was in the President's mind—actually in his mind? What was the real reason? Would you want your actions to be probed for what was ''the real reason'' why you acted? Even if a President were—and it clearly shows in my mind that the Framers could not have intended this psychoanalytical approach to Presidential motives to determine the distinction between what is impeachable and what is not.

Here, I come to a relevant and contemporaneous issue: Even if a President—any President—were to demand a quid pro quo as a condition to sending aid to a foreign country—obviously a highly disputed matter in this case—that would not, by itself, constitute an abuse of power.

Consider the following hypothetical case that is in the news today as the Israeli Prime Minister comes to the United States for meetings. Let's assume a Democratic President tells Israel that foreign aid authorized by Congress will not be sent or an Oval Office meeting will not be scheduled unless the Israelis stop building settlements—quid pro quo. I might disapprove of such a quid pro quo demand on policy grounds, but it would not constitute an abuse of power.

Quid pro quo alone is not a basis for abuse of power. It is part of the way foreign policy has been operated by Presidents since the beginning of time. The claim that foreign policy decisions can be deemed abuses of power based on subjective opinions about mixed or sole motives that the President was interested only in helping himself demonstrate the dangers of employing the vague, subjective, and politically malleable phrase ''abuse of power'' as a constitutionally permissible criteria for the removal of a President.

Now, it follows from this that, if a President—any President—were to have done what ''The Times'' reported about the content of the Bolton manuscript, that would not constitute an impeachable offense. Let me repeat it. Nothing in the Bolton revelations, even if true, would rise to the level of an abuse of power or an impeachable offense. That is clear from the history.

That is clear from the language of the Constitution. You cannot turn conduct that is not impeachable into impeachable conduct simply by using words like ''quid pro quo'' and ''personal benefit.''

It is inconceivable that the Framers would have intended so politically loaded and promiscuously deployed a term as ''abuse of power'' to be weaponized as a tool of impeachment. It is precisely the kind of vague, openended, and subjective term that the Framers feared and rejected.

Consider the term ''maladministration.'' I want to get back to that term because it was a term explicitly rejected by the Framers. Recall that it was raised, Madison objected to it, and it was then withdrawn, and it was not a part of the criteria. We all agree that maladministration is not a ground for impeachment. If the House were to impeach on maladministration, it would be placing itself above the law. There is no doubt about that because the Framers explicitly rejected maladministration.

Now what is maladministration? It is comparable in many ways to abuse of power. Maladministration has been defined as ''abuse, corruption, misrule, dishonesty, misuse of office, and misbehavior.'' Professor Bowie in his article in today's ''New York Times'' equates abuse of power with ''misconduct in office''—misconduct in office—thus supporting the view that, when the Framers rejected maladministration, they also rejected abuse of power as a criteria for impeachment.

Blackstone denominated maladministration as a ''high misdemeanor'' that is punishable ''by the method of parliamentary impeachment, wherein such penalties, short of death, are inflicted.'' He included among those imprisonment. In other words, you can go to prison for maladministration. Despite this British history, Madison insisted it be rejected as a constitutional criteria for impeachment because ''so vague a term will be equivalent to a tenure during pleasure of the Senate,'' and it was subsequently rejected and withdrawn by its sponsor.

This important episode in our constitutional history supports the conclusion that the Framers did not accept, whole hog, the British approach to impeachment as some have mistakenly argued. Specifically, they rejected vague and open-ended criteria, even those that carried the punishment of imprisonment in Britain because they did not want to turn our new Republic into a parliamentary-style democracy in which the Chief Executive could be removed from office simply by a vote of nonconfidence. That is what they didn't want.

Sure, nobody was above the law, but they created a law. They created a law by which Congress could impeach, and they did not want to expand that law to include all the criteria that permitted impeachment in Great Britain. The Framers would never have included and did not include abuse of

power as an enumerated and defined criteria for impeachment. By expressly rejecting maladministration, they implicitly rejected abuse.

Nor would the Framers have included obstruction of Congress as among the enumerated defined criteria—it, too, is vague and indefinable, especially in a constitutional system in which, according to Hamilton in Federalist No. 78, "the legislative body" is not themselves "the constitutional judge of their own powers" and the "construction they put on them" is not "conclusive upon other departments." Instead, he said, "the courts were designed as an intermediate body between the people [as declared in the Constitution] and the legislature" in order "to keep the latter within the limits assigned to their authority."

Under our system of separation of powers and checks and balances, it cannot be an "obstruction of Congress" for a President to demand judicial review of legislative subpoenas before they are complied with. The legislature is not the "Constitutional judge of their own powers," including the power to issue subpoenas. The courts were designated to resolve disputes between the executive and legislative branches, and it cannot be obstruction of Congress to invoke the constitutional power of the courts to do so.

By their very nature, words like "abuse of power" and "obstruction of Congress" are standardless. It is impossible to put standards into words like that. Both are subjective matters of degree and amenable to varying powers of interpretations. It is impossible to know in advance whether a given action will subsequently be deemed to be on one side or the other of the line. Indeed, the same action with the same state of mind can be deemed abusive or obstructive when done by one person but not when done by another. That is the essence of what the rule of law is not, when you have a criteria that can be applied to one person in one way and another person in another way and they both fit within the terms "abuse of power."

A few examples will illustrate the dangers of standardless impeachment criteria. My friend and colleague Professor Noah Feldman argued that a tweet containing what he believed false information could "get the current President impeached if it is part of a broader course of conduct"—a tweet.

Professor Allan Lichtman has argued that the President could be impeached based on his climate change policy, which he regards as "a crime against humanity." I have to tell you, I disagree with our President's climate change policy, as I do many of his other policies, but that is not a criteria for impeachment. That is a criteria for deciding who you are going to vote for.

If you don't like the President's policies on climate change, vote for the other candidate. Find a candidate who has better policies on climate change. If you don't like the President's

tweets, find somebody who doesn't tweet. That will be easy. But don't allow your subjective judgments to determine what is and is not an impeachable offense. Professor Tribe, as I mentioned, argued that under the criteria of abuse of power, President Ronald Reagan should have been impeached.

Would any American today accept a legal system in which prosecutors could charge a citizen with abuse of conduct? Can you imagine, abuse of conduct? Fortunately, we have constitutional protections against a statute that "either forbids or requires the doing of an act in terms so vague that men and women of common intelligence must necessarily guess at its meaning and differ as to its application." It is very difficult to imagine criteria that fits this description of what the Supreme Court has said violates the first essential rule of due process more closely than abuse of power and obstruction of Congress.

Another constitutional rule of construction is that, when words can be interpreted in an unconstitutionally vague manner or a constitutional precise manner, the latter must be chosen. You are entitled to use that rule of interpretation as well in deciding whether or not obstruction of Congress or abuse of power can be defined as fitting within the criteria of high crimes and misdemeanors.

For the Senate to remove a duly-elected President on vague, nonconstitutional grounds, such as abuse of power or obstruction of Congress, would create a dangerous precedent and "be construed," in the words of Senator James N. Grimes, "into approval of impeachment as part of future political machinery."

This is a realistic threat to all future Presidents who serve with opposing legislative majorities that could easily concoct vague charges of abuse or obstruction. The fact that a long list of Presidents who were accused of abuse of power were not impeached demonstrates how selectively this term has and can be used in the context of impeachment.

I am sorry, House managers, you just picked the wrong criteria. You picked the most dangerous possible criteria to serve as a precedent for how we supervise and oversee future Presidents. The idea of abuse of power and obstruction of Congress are so far from what the Framers had in mind that they so clearly violate the Constitution and would place Congress above the law.

Nor are these vague, open-ended, and unconstitutional Articles of Impeachment that were charged here—they are not saved by the inclusion in these articles of somewhat more specific but still not criminal-type conduct. The specifications are themselves vague, open-ended, and do not charge impeachable offenses. They include such accusations as compromising national security, abusing the power of the Presidency, and violating his oath of office.

In any event, it is the actual articles that charge abuse of power and obstruction of justice—neither of which are in the Constitution. It is the actual articles on which you must all vote, not on the more specific list of means included in the text of the articles.

An analogy to a criminal indictment might be helpful. If a defendant were accused of dishonesty, committing the crime of dishonesty, it wouldn't matter that the indictment listed as well the means toward dishonesty, a variety of far more specific potential offenses. Dishonesty is simply not a crime. It is too broad a concept. It is not in the statute. It is not a crime. The indictment would be dismissed because dishonesty is a sin and not a crime, even if the indictment included a long list of more specific acts of dishonesty.

Nor can impeachment be based on a bunching together of nonimpeachable sins, none of which, standing alone, meet the constitutional criteria. Only if at least one constitutionally authorized offense is proved can the Senate then consider other conduct in deciding the discretionary issue of whether removal is warranted.

In other words, your jurisdiction is based on commission of an impeachable offense. Once that jurisdictional element is satisfied, you have broad discretion to determine whether removal is warranted, and you can consider a wide array—a wide array—of conduct, criminal and noncriminal. But you have no jurisdiction to remove unless there is at least one impeachable offense within the meaning of high crimes and misdemeanors.

In the 3 days of argument, the House managers tossed around words even vaguer and more open-ended than "abuse" and "obstruction" to justify their case for removal. These words include "trust," "truth," "honesty," and finally "right." These aspirational words of virtue are really important, but they demonstrate the failure of the managers to distinguish alleged political sins from constitutionally impeachable offenses.

We all want our Presidents and other public officials to live up to the highest standards set by Washington and Lincoln, although both of them were accused of abuse of power by their political opponents.

The Framers could have demanded that all Presidents must meet Congressman SCHIFF's standards of being honest, trustworthy, virtuous, and right in order to complete their terms, but they didn't because they understand human fallibility. As Madison put it, "If men were angels, no government would be necessary," and then, speaking of Presidents and other public officials, "If angels were to govern men, neither internal nor external controls on government would be necessary."

The Framers understood that if they set the criteria for impeachment too low, few Presidents would serve their terms. Instead, their tenure would be

at the pleasure of the legislature, as it was and still is in Britain. So they set the standards and the criteria high, requiring not sinful behavior—not dishonesty, distrust, or dishonor—but treason, bribery, or other high crimes and misdemeanors.

I end this presentation today with a nonpartisan plea for fair consideration of my arguments and those made by counsel and managers on both sides. I willingly acknowledge that the academic consensus is that criminal conduct is not required for impeachment and that abuse of power and obstruction of Congress are sufficient. I have read and respectfully considered the academic work of my many colleagues who disagree with my view and the few who accept it. I do my own research, and I do my own thinking, and I have never bowed to the majority on intellectual or scholarly matters.

What concerns me is that during this impeachment proceeding, there have been few attempts to respond to my arguments and other people's arguments opposed to the impeachment of this President. Instead of answering my arguments and those of Justice Curtis and Professor Bowie and others on their merits and possible demerits, they have simply been rejected with negative epithets.

I urge the Senators to ignore these epithets and to consider the arguments and counterarguments on their merits, especially those directed against the unconstitutional vagueness of abuse of power and obstruction of Congress.

I now offer a criteria for evaluating conflicting arguments. The criteria that I offer I have long called the "shoe on the other foot" test. It is a colloquial variation of the test proposed by the great legal and political thinker, my former colleague, John Rawls. It is simple in its statement but difficult in its application.

As a thought experiment, I respectfully urge each of you to imagine that the person being impeached were of the opposite party of the current President but that in every other respect, the facts were the same.

I have applied this test to the constitutional arguments I am offering today. I would be making the same constitutional arguments in opposition to the impeachment on these two grounds regardless of whether I voted for or against the President and regardless of whether I agreed or disagreed with his or her policies. Those of you who know me know that is the absolute truth. I am nonpartisan in my application of the Constitution. Can the same be said for all of my colleagues who support this impeachment, especially those who opposed the impeachment of President Bill Clinton?

I first proposed the shoe test 20 years ago in evaluating the Supreme Court's decision in Bush v. Gore, asking the Justices to consider how they would have voted had it been Candidate Bush, rather than Gore, who was several hundred votes behind and seeking a re-count. In other words, I was on the other side of that issue. I thought the Supreme Court in that case favored the Republicans over the Democrats, and I asked them to apply the "shoe on the other foot" test.

I now respectfully ask this distinguished Chamber to consider that heuristic test in evaluating the arguments you have heard in this historic Chamber. It is an important test because how you vote on this case will serve as a precedent for how other Senators of different parties, different backgrounds, and different perspectives vote in future cases.

Allowing a duly-elected President to be removed on the basis of standardless, subjective, ever-changing criteria—abuse of power and obstruction of Congress—risks being "construed," in the words of Senator Grimes, a Republican Senator from Iowa, who voted against impeaching President Andrew Johnson, "into approval of impeachments as part of future political machinery."

As I began, I will close. I am here today because I love my country. I love the country that welcomed my grandparents and made them into great patriots and supporters of the freest and most wonderful country in the history of the world. I love our Constitution—the greatest and most enduring document in the history of human kind.

I respectfully urge you not to let your feelings about one man—strong as they may be—establish a precedent that would undo the work of our Founders, injure the constitutional future of our children, and cause irreparable damage to the delicate balance of our system of separation of powers and checks and balances.

As Justice Curtis said during the trial of Andrew Johnson, a greater principle is at stake than the fate of any particular President. The fate of future Presidents of different parties and policies is also at stake, as is the fate of our constitutional system. The passions and fears of the moment must not blind us to our past and to our future.

Hamilton predicted that impeachment would agitate the passions of the whole community and enlist all their animosities, partialities, influence, and interest on one or the other. The Senate—the Senate—was established as a wise and mature check on the passions of the moment with "a deep responsibility to future times."

I respectfully urge the distinguished Members of this great body to think beyond the emotions of the day and to vote against impeaching on the unconstitutional articles now before you. To remove a duly-elected President and to prevent the voters from deciding his fate on the basis of these articles would neither do justice to this President nor to our enduring Constitution. There is no conflict here. Impeaching would deny both justice to an individual and justice to our Constitution.

I thank you for your close attention. It has been a great honor for me to address this distinguished body on this important matter. Thank you so much for your attention.

The CHIEF JUSTICE. The majority leader is recognized.

I am sorry. Are you complete?

Mr. Cipollone.

Mr. Counsel CIPOLLONE. Mr. Chief Justice, Majority Leader McCONNELL, Democratic Leader SCHUMER, Senators, don't worry, this won't take very long. We are going to stop for the day, and we will continue with our presentations tomorrow. I just had three observations that I wanted to briefly make for you.

First of all, thank you very much, Professor Dershowitz and all the presenters from our side today.

I was sitting here listening to Professor Dershowitz, and believe it or not, my mind went back to law school, and I began thinking, how would this impeachment look as a law school hypothetical question on an exam? How would we answer that question? And I found myself thinking maybe that is a good way to think about it.

The question would go something like this: Imagine you are a U.S. Senator and you are sitting in an impeachment trial. The Articles of Impeachment before you had been passed on a purely partisan basis for the first time in history. In fact, there was bipartisan opposition to the Articles of Impeachment. They have been trying to impeach the President from the moment of his inauguration for no reason—just because he won.

The articles before you do not allege a crime or even any violation of the civil law. One article alleges obstruction of Congress simply for exercising longstanding constitutional rights that every President has exercised. The President was given no rights in the House of Representatives. The Judiciary Committee conducted only 2 days of hearings.

You are sitting through your sixth day of trial. The House is demanding witnesses from you that they refused to seek themselves. When confronted with expedited court proceedings regarding subpoenas they had issued, they actually withdrew those subpoenas.

They are now criticizing you in strong, accusatory language if you don't capitulate to their unreasonable demands and sit in your seats for months. An election is only months away, and for the first time in history, they are asking you to remove a President from the ballot. They are asking you to do something that violates all past historical precedents that you have studied in class and principles of democracy and take the choice away from the American people. It would tear apart the country for generations and change our constitutional system forever.

Question: What should you do?

Your first thought might be, that is not a realistic hypothetical. That could never happen in America.

But then you would be happy because you would have an easy answer and you can be done with your law school exam, and it would be—you immediately reject the Articles of Impeachment.

Bonus question: Should your answer depend on your political party?

Answer: No.

My second observation is, I actually think it is very instructive to watch the old videos from the last time this happened, when many of you were making so eloquently—more eloquently than we are—the points that we are making about the law and precedent. But that is not playing a game of ''gotcha''; that is paying you a compliment.

You were right about those principles. You were right about those principles. And if you will not listen to me, I urge you to listen to yourselves. You were right.

The third observation I had sitting here today is, Judge Starr talked about that we are in the age of impeachment, in the age of constant investigations.

Imagine—imagine—if all of that energy were being used to solve the problems of the American people. Imagine if the age of impeachment were over in the United States. Imagine that.

I was listening to Professor Dershowitz talking about the shoe-on-the-other-foot rule, and it makes a lot of sense. I would maybe put it differently. I would maybe call it the golden rule of impeachment. For the Democrats, the golden rule could be, do unto Republicans as you would have them do unto Democrats. And hopefully we will never be in another position in this country where we have another impeachment but vice versa for that rule.

Those are my three observations. I hope that is helpful. Those were the thoughts I had listening to the presentations.

At the end of the day, the most important thought is this: This choice belongs to the American people. They will get to make it months from now.

The Constitution and common sense and all of our history prevent you from removing the President from the ballot. There is no basis for it in the facts. There is simply no basis for it in the law. I urge you to quickly come to that conclusion so we can go have an election.

Thank you very much for your attention.

Thank you, Mr. Chief Justice.

The CHIEF JUSTICE. The majority leader is recognized.

―――――――◆―――――――

ADJOURNMENT UNTIL 1 P.M. TOMORROW

Mr. McCONNELL. Mr. Chief Justice, I ask unanimous consent that the trial adjourn until 1 p.m., Tuesday, January 28, and that this order also constitute the adjournment of the Senate.

There being no objection, at 9:02 p.m. the Senate, sitting as a Court of Impeachment, adjourned until Tuesday, January 28, 2020, at 1 p.m.